Case No. 22-13626 DD

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

## HOUSTON COUNTY, GEORGIA, AND HOUSTON COUNTY SHERIFF CULLEN TALTON, IN HIS OFFICIAL CAPACITY
### Defendants-Appellants,

**v.**

## ANNA LANGE
### Plaintiff-Appellee.

---

## ON APPEAL FROM
## THE UNITED STATES DISTRICT COURT FOR THE MIDDLE
## DISTRICT OF GEORGIA, MACON DIVISION
## CASE NO.:  5:19-CV-00392-MTT

---

## BRIEF OF DEFENDANTS-APPELLANTS

---

**Sharon P. Morgan, Georgia Bar No. 522955**
**R. Read Gignilliat, Georgia Bar No. 293390**
**William D. Deveney, Georgia Bar No. 219744**
**Patrick L. Lail, Georgia Bar No. 431101**
**ELARBEE, THOMPSON, SAPP & WILSON LLP**
**800 International Tower**
**229 Peachtree Street, NE**
**Atlanta, Georgia 30303**
**(404) 659-6700**

**Attorneys for Defendants-Appellants**

Case No. 22-13626 DD

# APPELLANTS' CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, Appellants hereby certify that the following is a full and complete list of all interested persons as defined under the above-referenced rules that may have an interest in the outcome of this case:

a)   Arkles, Z. Gabriel (Counsel for Appellee)

b)   Barry, Kevin M. (Counsel for Appellee)

c)   Barton, III, Kenneth E. (Counsel for Appellee)

d)   Brown, David (Counsel for Appellee)

e)   Cooper, Barton & Cooper (Counsel for Appellee)

f)   Cooper, M. Devlin (Counsel for Appellee)

g)   Deveney, William D.  (Counsel for Appellants)

h)   Elarbee, Thompson, Sapp & Wilson, LLP (Counsel for Appellants)

i)   Fata, Catherine Elizabeth (Counsel for Appellee)

j)   Gignilliat, R. Read (Counsel for Appellants)

k)   Grant, Jill K. (Counsel for Appellee)

l)   Houston County, Georgia (Defendant-Appellant)

Case No. 22-13626 DD

m)  Lail, Patrick L. (Counsel for Appellants)

n)  Lange, Anna (Plaintiff-Appellee)

o)  Morgan, Sharon P.  (Counsel for Appellants)

p)  Payne, Amanda M. (Counsel for Appellee)

q)  Powell, Wesley (Counsel for Appellee)

r)  Quinnipiac University School of Law Legal Clinic
    (Counsel for Appellee)

s)  Talton, Cullen (in his official capacity as Sheriff)
    (Defendant-Appellant)

t)  Transgender Legal Defense Education Fund, Inc. (Counsel
    for Appellee)

u)  Treadwell, Marc T. Hon. (District Court Judge)

v)  Wilkie Farr & Gallagher LLP (Counsel for Appellee)

## <u>STATEMENT REGARDNG ORAL ARGUMENT</u>

Defendants-Appellants Houston County, Georgia and Houston County Sheriff Cullen Talton, in his official capacity, believe that oral argument would benefit the Court, both because of the complicated procedural history of this case and because this appeal presents the first-time application in this Circuit of the Supreme Court's opinion in *Bostock v. Clayton County, Georgia* to a claim of discrimination in insurance benefits.

# <u>TABLE OF CONTENTS</u>

APPELLANTS' CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ...................................... C-1

STATEMENT REGARDING ORAL ARGUMENT ................................... i

TABLE OF CONTENTS .............................................................. ii

TABLE OF CITATIONS .......................................................... vi

STATEMENT OF JURISDICTION ........................................... ix

STATEMENT OF THE ISSUES ................................................ 1

I.  STATEMENT OF THE CASE .......................................... 2

   A.  Nature of the Case .................................................... 2

   B.  Course of Proceedings and Disposition in the
      Court Below ................................................................ 4

     1.  The Parties and Lange's Amended Complaint ................. 4

     2.  Lange's Motion for Preliminary Injunction,
        Defendants' Motions to Dismiss, and the U.S. Supreme
        Court's *Bostock* opinion ...................................... 6

     3.  The district court's hearing and Order on
        Defendants' Motions to Dismiss ....................... 8

4.  Lange's renewal of her Motion for Preliminary
    Injunction.............................................................12

5.  The Parties' Motions for Summary Judgment.................12

6.  The district court's summary judgment Order ...............14

7.  Trial on Damages on Lange's Title VII Claim ................22

8.  Permanent Injunction and Appeal...................................23

C. Statement of Facts....................................................................25

1.  Introduction ......................................................................25

2.  Lange's Hire.....................................................................25

3.  Lange's Gender Transition...............................................26

4.  Lange's Request for Insurance Coverage for
    Bottom Surgery.................................................................26

5.  Denial of Coverage for Bottom Surgery ..........................27

D. Standard of Review.................................................................29

II.    SUMMARY OF THE ARGUMENT...........................................30

III.   ARGUMENT AND CITATION OF AUTHORITY....................31

A. A genuine issue of material fact exists

   as to whether the Exclusion prohibited Lange

from accessing at least some medically necessary
care for her gender dysphoria....................................................32

B. The district court erred as a matter of law in
holding that the Exclusion was facially
discriminatory under Title VII. ...................................................40

    1. *Bostock* simply addressed the threshold question
      of whether discrimination against an employee
      who is homosexual or transgender is sex
      discrimination under Title VII, but it did not
      otherwise address the standard of causation
      or healthcare benefits. ...................................................42

    2. The Supreme Court's opinion in *Johnson Controls* does
      not mandate summary judgment for Lange. ...................48

    3. The Supreme Court's opinion in *Manhart* and *Newport*
      *News* do not mandate – or  authorize – summary
      judgment for Lange. .......................................................51

    4. The Injunction should be vacated ...................................61

C. The district court erred as a matter of law in holding
that the County is the Sheriff's "agent" within the meaning of
Title VII. ........................................................................... 62

    1. The County is not the Sheriff's "agent" for purposes of
providing health insurance benefits for his employees
or otherwise ................................................................ 62

    2. Defendants-Appellants have consistently maintained
their position throughout this action that the
County is not Lange's "employer" within the
meaning of Title VII. .................................................. 69

IV.   CONCLUSION ........................................................................ 74

## <u>TABLE OF CITATIONS</u>

### <u>Cases</u>

*Adams v. Sch. Bd. of St. Johns Cty., Fla.*,2022 WL 18003879 (11th Cir. Dec. 30, 2022) (en banc) ........................................................................ 44

*Alabama v. Ctrs. for Medicare & Medicaid Servs.*,
674 F.3d 1241 (11th Cir. 2012) (per curiam) .......................................... 29

*Barnes v. CoxCom, LLC*, Case No. 16-CV-764-TCK-FHM,
2018 WL 773990 (N.D. Okla. Feb. 7, 2018) ............................................ 37

*Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020) .......... *passim*

*Brown v. Dorsey*, 276 Ga. App. 851 ........................................................ 64

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................ 33

*City of Los Angeles v. Manhart*,
435 U.S. 702, 710 (1978) ........................................................................ *40*

*Clark v. St. Joseph's / Candler Health Sys., Inc.*, No. 4:05-CV-119,
2006 WL 2228929 (S.D. Ga. Aug. 3, 2006) .............................................. 72

*Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009 (2020)  .................................................................. 40, 47, 55, 56

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*,
884 F.3d 560 (6th Cir. 2018) .................................................................. 43

*EEOC v. Wooster Brush Co. Employees Relief Assn.*, 727 F.2d 566, 571-73 (6th Cir. 1984)................................................................................... 68

* *Geduldig v. Aiello*, 417 U.S. 484 (1974) ........................ 9, 10, 11, 15, 16

*General Elec. Co. v. Gilbert, 429 U.S. 125 (1976)*.................................... 9

*Glenn v. Brumby, 663 F.3d 1312 (11th Cir. 2011)*.................................. 11

*Grech v. Clayton County, 335 F.3d 1326 (11th Cir. 2005)
(en banc)*................................................................................ 64, 65, 67

*Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993)*.................................. 41

*Int'l Union, United Auto, Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.,* 499 U.S. 187 (1991) .................................................................. 19

*Jones v. Dillard's Inc.,* 331 F.3d 1259 (11th Cir. 2003) .......................... 32

*Lyes v. City of Riviera Beach, Fla.,* 166 F.3d 1332 (11th Cir. 1999) (en banc) ................................................. 66, 74

*Macuba v. Deboer,* 193 F.3d 1316 (11th Cir. 1999) ................................ 37

*Matewski v. Orkin Exterminating Co.,* No. Civ. 02-233-P-C, 2003 WL 21516577 (D. Me. July 1, 2003) ................................................. 37

*Manders v. Lee,* 338 F.3d 1304 (11th Cir. 2003) (en banc) .................... 65

*McDonnell Douglas v. Green,* 411 U.S. 792 (1973) .................... 12, 59, 62

*McKenzie v. Davenport-Harris Funeral Home,* 834 F.2d 930 (11th Cir.1987) ...................................................... 69, 71

*Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.,* 462 U.S. 669 (1983) ........................................................ passim

*Peters v. Wayne State University,* 691 F.2d 235 (6th Cir. 1982) ...... 67, 69

*Ricci v. DeStefano,* 557 U.S. 557 (2009) .................................................. 41

*Smith v. Lockheed-Martin Corp.,* 644 F.3d 1321 (11th Cir. 2011) ....................................................... 13

*Spirt v. Teachers Insurance and Annuity Assn.,* 691 F.2d 1054 (2d Cir. 1982) .......................................... 66, 67, 68

*United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in Ala.,* 941 F.2d 1428 (11th Cir. 1991) (en banc) ......................... 33

*United States v. Tinoco,* 304 F.3d 1088 (11th Cir.2002) ........................ 69

*Watson v. Fort Worth Bank & Trust,* 487 U.S. 977 (1988) .................... 41

* *Williams v. City of Montgomery,* 742 F.2d 586 (11th Cir. 1984) (per curiam) ............................. 21, 22, 23, 60, 62, 63, 64, 65, 66, 67, 68, 71, 72

* *Young v. United Parcel Service,* 575 U.S. 206 (2015) .............. 57, 58, 59

*Zarda v. Altitude Express, Inc.*, 883 F.3d 100
(2d Cir. 2018) ................................................................ 43, 44, 48

## Statutes, Rules, and Regulations

28 U.S.C. § 1292(a)(1) .................................................... ix, 32

42 U.S.C. § 2000e *et seq.* ("Title VII"). ........................... p*assim*

42 U.S.C. §§ 12101-12117 ("ADA") ............................................ 5

42 U.S.C. § 1981 ........................................................................ 55

42 U.S.C. § 1983 .......................................................................... 5

29 U.S.C. § 794(A) ....................................................................... 6

92 Stat. 2076 ("PDA") .............................................................. 52

Equal Protection Clause of the Fourteenth Amendment to the U.S.
Constitution ("Equal Protection Clause") ..................................... *passim*

Ga. Const. art. I, § 1 ................................................................... 5

Ga. Const. art. IX, §2, ¶1(c)(1) ............................................... 64

Rule 12(b)(1) of the Federal Rules of Civil Procedure ................. 6, 7, 43

Rule 56 of the Federal Rules of Civil Procedure ................. 20, 21, 43, 70

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) because this is an appeal of an injunction entered against Defendants-Appellants by the United States District Court for the Middle District of Georgia on October 3, 2022.  [Doc. 258.]

This Court also has jurisdiction to review the district court's June 2, 2022 Order insofar as it granted summary judgment to Plaintiff on her Title VII claim against Defendants [Doc. 205], as this aspect of the June 2, 2022 Order merged into the October 3, 2022 Injunction. *See* Fed. R. App. P. 3(c)(4) ("The notice of appeal encompasses all orders that, for purposes of appeal, merge into the designated judgment or appealable order. It is not necessary to designate those orders in the notice of appeal.").

Additionally, this Court has pendent jurisdiction over the June 2, 2022 Order insofar as it granted summary judgment to Plaintiff on her Title VII claim, because the October 3, 2022 Injunction was predicated on the earlier ruling. As such, the rulings are "inextricably intertwined" and review of the former "is necessary to ensure meaningful review" of the latter. *Tillis on behalf of Weschler v. Brown*, 12 F. 4th 1291, 1297

(11th Cir. 2021) ("[U]nder the doctrine of pendent appellate jurisdiction, we "may address non-appealable orders if they are inextricably intertwined with an appealable decision or if review of the former decision is necessary to ensure meaningful review of the latter."); *see also Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1365 (11th Cir.1997) (exercising pendent appellate jurisdiction to review otherwise non-appealable order granting motion to compel where appealed sanctions order was based in part on defendant's alleged violation of sanctions order).

Defendants-Appellants filed their notice of appeal on October 21, 2022. [Doc. 262.]

## STATEMENT OF THE ISSUES

1.     Whether the district court erred in permanently enjoining enforcement of medical and pharmacy exclusions for sex reassignment surgery (collectively, the "Exclusion") contained in Defendant-Appellant Houston County's health insurance plan on the grounds that the Exclusion is facially discriminatory under, or otherwise violative of, Title VII, when the plan covered Plaintiff-Appellee Anna Lange's non-surgical treatments associated with her gender transition?

2.     Whether the district court erred in including Defendant-Appellant Houston County in its permanent injunction, despite the lack of an employment relationship between Plaintiff-Appellee Anna Lange and Houston County, on the grounds that Houston County served as an "agent" for Defendant-Appellant Sheriff Talton—Lange's actual employer—within the meaning of Title VII?

# I.    STATEMENT OF THE CASE

## A.    Nature of the Case

Defendants-Appellants Houston County, Georgia ("Houston County" or the "County") and Houston County Sheriff Cullen Talton, in his official capacity ("Sheriff Talton" or "the Sheriff"), appeal from the district court's "Order for Permanent Injunctive and Declaratory Relief" (the "Injunction") entered on October 3, 2022. [Doc. 258.]

As discussed further below, Plaintiff-Appellee Anna Lange ("Lange"), a transgender female, brought this action claiming that coverage exclusions for sex reassignment surgery contained in the County's self-funded health insurance plan (the "Health Plan"), in which she and the other employees of the Sheriff's Office (including the Sheriff himself) participate, constituted intentional discrimination because of sex under, *inter alia*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"). [Doc. 1.] After discovery, the district court denied Lange's motion for summary judgment on her all-but identical claim under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution ("Equal Protection Clause"), finding that there existed genuine issues of material fact as to whether the County's

adoption and maintenance of those exclusions were done with discriminatory intent. [Doc. 205, pp. 16-21.] However, the district court *granted* summary judgment to Lange on her disparate treatment claim *under Title VII*, finding that the United States Supreme Court's opinion in *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020), compelled the conclusion that the exclusions were "facially discriminatory" as a matter of law and that the question of Defendants' alleged discriminatory intent was therefore "immaterial." [*Id.* at pp. 21-28.]

Following a jury trial on September 26 and 27, 2022 on Lange's claim for damages under Title VII only, the district court entered the Injunction—permanently enjoining Defendants from further enforcement or application of the exclusions and directing Defendants, through the Health Plan's third-party administrator ("TPA"), to process Lange's claim for "bottom surgery" (*i.e.*, surgery to change the sex of a person's genitalia). [Doc. 258.] The trial, if any, of Lange's Equal Protection claim has been continued pending this appeal.

**B.    Course of Proceedings and Disposition in the Court Below**

**1.    The Parties and Lange's Amended Complaint**

Lange brought this action on October 2, 2019, against Houston County, the Houston County Board of Commissioners ("the Board"), its then-current County Commissioners in their official and individual capacities, two County Administrators in their official and individual capacities, and the County's Director of Personnel Kenneth Carter in his official and individual capacities.  [Doc. 1.]  Sheriff Talton was added as a Defendant pursuant to an Amended Complaint filed by Lange on April 10, 2020.  [Doc. 56.]

Lange, a transgender female employed as a Deputy Sheriff by the Houston County Sheriff's Office (the "Sheriff's Office"), challenged as discriminatory based on her sex and transgender status two coverage exclusions in the County's Health Plan related to "Sex Change Services and supplies for a sex change and/or the reversal of a sex change" and "Sex Change Drugs [] for sex change surgery."[1]  [Doc. 1; Doc. 56.]  More

---

[1]  In the proceedings below, the district court referred to those two exclusions—medical exclusion number 54 and pharmacy exclusion number 25, respectively—collectively as the "Exclusion," and for ease of reference, and except where otherwise necessary, Defendants do the same here.

specifically, Lange's Amended Complaint asserted claims of (i) intentional discrimination based on her sex and transgender status under the Equal Protection Clause against the County, the Board, and each of the individual Defendants in both their individual and official capacities pursuant to 42 U.S.C. § 1983; (ii) intentional discrimination based on her sex and transgender status under the Equal Protection guarantee of the Georgia Constitution, Ga. Const. art. I, § 1, para. 2, against each of the individual Defendants in both their individual and official capacities; (iii) intentional sex discrimination under Title VII against the County, the Board, and each of the individual Defendants in their official capacities only; (iv) intentional discrimination—including an alleged failure to reasonably accommodate—based on gender dysphoria under Title I of the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12117 ("ADA"), against the County, the Board, and each of the individual Defendants in their official capacities only; (v) intentional discrimination under Title II of the ADA, 42 U.S.C. §§ 12131-12134, against the County, the Board, and each of the individual Defendants in their official capacities only; and (vi) intentional discrimination under

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(A), against

Sheriff Talton in his individual capacity only.  [Doc. 56.]

### 2. Lange's Motion for Preliminary Injunction, Defendants' Motions to Dismiss, and the U.S. Supreme Court's *Bostock* opinion

Lange filed a Motion for a Preliminary Injunction on November 22,

2019, and a Superseding Motion for a Preliminary Injunction on April 10,

2020—each requesting an order enjoining the enforcement of the

Exclusion as to Lange and directing the Health Plan's TPA to provide

coverage for "bottom surgery" (*i.e.*, surgery "to change the sex of a

person's genitalia") for which Lange had previously been denied coverage

under the Health Plan pursuant to the Exclusion.  [Doc. 28, p. 1; Doc. 28-

1, p. 11; Doc. 57, p. 1; Doc. 57-1, p. 8.[2]]   In both her original and

superseding motions, Lange stated that "[d]ue to the Exclusion, [she]

pays out of pocket for *most of* her transition-related medical care."  [Doc.

28-1, p. 13, and Doc. 57-1, p. 5 (emphasis added).]

On May 11, 2020, Sheriff Talton filed a Motion to Dismiss for Lack

of Jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil

---

[2] At all times relevant hereto, TPA services were provided by Anthem Blue Cross/Blue Shield ("Anthem"). [*See* Doc. 137-4 at 2-3.]

Procedure, and the remaining Defendants filed a Motion to Dismiss pursuant to Rule 12(b)(6). [Doc. 61; Doc. 62.] On May 15, 2020, all Defendants filed their Response Brief in opposition to Lange's Superseding Motion for a Preliminary Injunction. [Doc. 63.[3/]]

On June 15, 2020, the United States Supreme Court issued its decision in *Bostock*, in which the Court held that "[a]n employer who fires an individual merely for being gay or transgender defies" Title VII's prohibition on discrimination because of sex. 140 S. Ct. at 1754.

On June 18, 2020, Lange filed a brief in reply to Defendants' Response Brief in opposition to her Superseding Motion for Preliminary Injunction [Doc. 73], as well as a Response Brief in opposition to Sheriff Talton's and the remaining Defendants' Motions to Dismiss [Doc. 74]. Lange's Response Brief relied heavily on the opinion in *Bostock*. [*Id.*]

---

[3/] On April 10, 2020, the Parties had filed a Stipulation that Lange would file an Amended Complaint adding Sheriff Talton and that all then-pending motions—including Plaintiff's original Motion for a Preliminary Injunction and the then-pending Defendants' Motions to Dismiss or for Judgment on the Pleadings—were withdrawn as procedurally moot. [Doc. 55.]

On May 22, 2020, Lange filed a Motion to Correct her Declaration offered in support of her Superseding Motion for Preliminary Injunction [Docs. 64, 66], and Defendants filed their Amended Response in Opposition to Lange's Superseding Motion on June 2, 2020 [Doc. 68].

On July 16, 2020, Defendants filed their briefs in reply to Lange's Response Brief in opposition to their Motions to Dismiss.  [Doc. 79, 80.] On August 14, 2020, Lange filed a Surreply to Sheriff Talton and the remaining Defendants' reply briefs in support of their Motions to Dismiss.  [Doc. 83, 84.]

### 3.    The district court's hearing and Order on Defendants' Motions to Dismiss

On August 19, 2020, the district court conducted a hearing on Sheriff Talton's and Defendants' Motions to Dismiss.  [*See* Doc. 87.]  In response to the district court's request at the hearing, Defendants filed a Statement of Additional Authorities "in support of their argument that the County is not an agent of the Sheriff's Office under Title VII [] or the [ADA]."  [Doc. 86.]

On October 30, 2020, the district court entered an Order dismissing each of Lange's claims and each of the Defendants except as follows: (i) her federal constitutional Equal Protection claim against Houston County and Sheriff Talton in his official capacity; (ii) her Title VII claim against the County and the Sheriff in his official capacity; and (iii) her ADA Title I claim against the County and the Sheriff in his official capacity.  [Doc. 89, p. 36; *see also* Doc. 205, p. 8.]

As to her Title VII sex discrimination claim, the district court held that "Lange ha[d] alleged sufficient facts to support a plausible inference of individual discrimination." [Doc. 89, p. 21; *see also id.* at p. 22 ("From those allegations, 'the court [can] draw the reasonable inference that the defendant is liable' for sex discrimination under Title VII ….")[4]]

As to Lange's Equal Protection claim, the district court held that her "argument that the Exclusion is facially discriminatory [was] suspect" based on the Supreme Court's opinion in *Geduldig v. Aiello*, 417 U.S. 484 (1974). [Doc. 89, pp. 23-25.] In *Geduldig*, the Supreme Court heard a federal Equal Protection challenge to a California "disability insurance system that pa[id] benefits to persons in private employment who [were] temporarily unable to work because of disability not covered by workmen's compensation" but "exclude[d] from coverage certain

---

[4] The district court noted that the Parties had not "address[ed] whether the adoption or renewal of the Exclusion is an adverse employment action within the meaning of Title VII," and, "[a]s a result, the [District] Court [did] not address that issue" in its Order. [*See* Doc. 89, p. 22 n.13.] On that question, the district court referred the Parties to "a discussion of the analogous issue of whether exclusions of disability coverage for pregnancy violate Title VII." [*See id.* (citing *Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 676 (1983) ("*Newport News*"), & *General Elec. Co. v. Gilbert*, 429 U.S. 125 (1976), "*overruled by Newport News*" (emphasis in district court's Order).]

-9-

disabilities resulting from pregnancy." *See* 417 U.S. at 486. The issue before the Court was whether that program "invidiously discriminate[d] against [the one remaining plaintiff] and others similarly situated by not paying insurance benefits for disability that accompanie[d] normal pregnancy and childbirth." *Id.* at 492. Resolving that issue against the plaintiff, the Court found it "[could not] agree that the exclusion of [that] disability from coverage amount[ed] to invidious discrimination under the Equal Protection Clause." *Id.* at 494.

More specifically, the Supreme Court found that

> [t]he lack of identity between [pregnancy] and gender as such under th[e] insurance program [at issue there] [became] clear upon the most cursory analysis. The program divide[d] potential recipients into *two groups—pregnant women and nonpregnant persons. While the first group is exclusively female, the second includes members of both sexes.* The fiscal and actuarial benefits of the program thus accrue[d] to members of both sexes.

417 U.S. at 496 n.20. Accordingly, the Court held that the plaintiff's contention there that "she ha[d] suffered discrimination because she encountered a risk that was outside the program's protection" "[was] not a valid one under the Equal Protection Clause." *Id.* at 497.

Applying *Geduldig* to Lange's case, the district court here held that the Exclusion was *not* facially discriminatory under the Equal Protection

Clause because, "[s]imilarly, Lange has the same health coverage as other employees."  [Doc. 89, p. 21.]  In so holding, the district court expressly rejected Lange's contentions that *Geduldig* "ha[d] been undermined by intervening precedent"—including *Bostock* and this Circuit's opinion in *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011)— finding that "*those cases have no bearing on whether a health exclusion is facially discriminatory.*"  [*See* Doc. 89, p. 24 (emphasis added); *see also id.* ("the issue addressed by *Geduldig* is different: whether an insurance exclusion based on a health condition is facially discriminatory.  *Neither Bostock nor Glenn had any bearing on that issue*" (emphasis added).]

Nevertheless, similar to its disposition of her Title VII claim, the district court held that although the Parties' briefing "[did] not reach the question of whether Lange ha[d] alleged sufficient facts to create a plausible claim for intentional discrimination" under the Equal Protection Clause, even "if the Defendants had made that argument, the Court would find that Lange has plausibly alleged that the adoption of the Exclusion was motivated by discriminatory purpose."  [*Id.* at pp. 25-26.]

### 4.    Lange's renewal of her Motion for Preliminary Injunction

On October 30, 2020, Lange renewed her request that the district court schedule oral argument on her pending Superseding Motion for Preliminary Injunction as to her Title VII and Equal Protection claims "against the remaining Defendants as expeditiously as possible to prevent further [alleged] irreparable harm."  [Doc. 91, pp. 1-2.]  Lange subsequently withdrew that motion on May 19, 2021.  [Doc. 111, p. 1.]

### 5.    The Parties' Motions for Summary Judgment

Following an extended discovery period, Lange and Defendants each moved for summary judgment on all remaining claims on November 3, 2021.  [Docs. 136, 137, 140.]  The Parties filed their respective responses in opposition on December 22, 2021, [Docs. 177, 178, 179], and their respective briefs in reply on January 26, 2022, [Docs. 186, 187, 188].

In moving for summary judgment on her Title VII claim, Lange contended that she had presented direct evidence of sex discrimination. [Doc. 140-1, pp. 21-30.]  Accordingly, Lange deemed it "unnecessary" to proceed under either the burden-shifting circumstantial-evidence framework adopted by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 802-804 (1973), or the "convincing mosaic" standard

recognized by this Circuit in *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). [*Id.* at p. 15 n.7.] In their response in opposition, Defendants expressly contested, *inter alia*, Lange's arguments that she had presented direct evidence of sex discrimination under Circuit precedent. [Doc. 179, pp. 10-11.]

The district court conducted a hearing on the Parties' motions on February 24, 2022. [Docs. 196; 197.] On March 18, 2022, Lange submitted a supplemental brief purporting to address the Court's inquiry during oral argument about whether her claims for damages against the County, which she contended was acting as an agent for Sheriff Talton in providing healthcare for Sheriff's Office employees, could survive even if the Sheriff was immune from suit pursuant to the Eleventh Amendment to the U.S. Constitution. [Doc. 198.] Lange argued that a finding of sovereign immunity for Sheriff Talton would not affect any of her claims against the County. [*Id.*, pp. 2-4.]

On March 29, 2022, the district court requested additional briefing from the Parties on the following issue: "[w]hether an exclusion in the employee health care benefit plan that excludes medically necessary coverage because of transgender status necessarily is a violation of Title

-13-

VII." [Doc. 200.]  On April 8, 2022, the Parties submitted their additional

briefing: Lange arguing that the Exclusion violated Title VII, Defendants

arguing that it did not.[5/]  [Docs. 201, 202.]

### 6.    The district court's summary judgment Order

On June 2, 2022, the district court entered an Order on the Parties'

summary judgment motions.  [Doc. 205.]  The district court denied both

Lange and Defendants' summary judgment motions on her Equal

Protection claim—holding that the Exclusion was not "facially

discriminatory" under the Equal Protection Clause, and, moreover, that

"there is a genuine dispute of material fact as to whether the adoption

and maintenance of the Exclusion was done with discriminatory intent."

[*Id.* at 21, n. 11; *see also id.* at 16-21.[6/]] But the district court reached a

---

[5/]  The term "medically necessary" as used in this case is contained
in Anthem's guidelines.  [*See* Doc. 205, p. 4.]  Under those guidelines,
surgery is considered medically necessary if there is a "significant
functional impairment AND the procedure can be reasonably expected to
improve the functional impairment."  [*See* Doc. 150-25, p. 2.]

[6/]  *See also id.* ("the facts [regarding Defendants' alleged
discriminatory intent are hotly disputed"); *id.* at 33 ("Lange's equal
protection claim will proceed to trial because there are numerous
disputes of fact as to whether the Exclusion was adopted and maintained
with a discriminatory intent."); *accord id.* at 19 & n.10 ("There was no
direct evidence shedding light on why the Exclusion was adopted in
1998.").

different result on her Title VII claim—denying summary judgment to Defendants but *granting* summary judgment to Lange.  [Doc. 205, pp. 21-28.]

Regarding the Equal Protection claim, the district court found that *Geduldig* "foreclosed" any argument that the Exclusion facially discriminates based on sex.  [*Id*. at p. 17.]  Following "the logic of *Geduldig*," the district court held that "Lange has the same coverage as other employees because *the Exclusion applies equally to a male seeking to become a woman or a woman seeking to become a man*."  [*Id.* (emphasis added).]  The district court, again citing *Geduldig*, held that the Exclusion therefore "creates two groups—those that want a 'sex change' and those that do not"—but "*[b]oth groups contain* transgender members and *non-transgender members*, so a 'lack of identity' exists between the policy and transgender status."  [*Id*. at p. 18 (emphasis added).[1]]  Accordingly, the district court held that "in the context of the Equal

---

[1] It is undisputed that transgender members may be either biologically male or biologically female, and that some transgender members do *not* want a "sex change" [Doc. 140-1, p. 10], but it is unclear (at least to Defendants) what "*non*-transgender members" might want a "sex change," if that is what the district court concluded.  [Doc. 205, p. 17.]

Protection Clause, the Exclusion does not facially discriminate on the basis of sex." [*Id.*[8]]

Nevertheless, the district court came to the opposite legal conclusion in *granting Lange's motion* (and denying Defendants' motion) for summary judgment on her Title VII sex discrimination claim. [Doc. 205, pp. 21-28.] The district court observed that "[a]t first look, it may seem odd that the question of whether the Exclusion violates the Equal Protection Clause is one of fact while the question of whether the Exclusion violates Title VII can be decided as a matter of law." [*Id.* at p. 21.] But the district court held that "[w]hether odd or not, the reason is clear— *Bostock* …." [*Id.*]

The district court correctly held that "healthcare coverage" falls within the statutorily-protected "'compensation, terms, conditions, or privileges of employment'" regarding which an employer may not

---

[8] As in its Order on Defendants' Motions to Dismiss, the district court found that this Circuit's opinion in *Glenn*, *supra*, "ha[d] no bearing on the issue of whether an insurance exclusion based on a medical procedure that only one sex can undergo is facially discriminatory under the Equal Protection Clause because *Geduldig* already provides the answer." [Doc. 205, p. 18 n.9, *citing* 417 U.S. at 496 n.20; *see also* Doc. 89, p. 24.] Again, to the extent the district court was referring to the insurance exclusion in this case, it is unclear to which "one sex" the district court was referring to here.

discriminate.  [*Id.*, citing *Newport News*, 462 U.S. at 682 (quoting 42 U.S.C. § 2000e-2(a)(1)).]  Furthermore, the district court also correctly held that, under *Bostock*, when an employer discriminates against an individual for being transgender, the employer discriminates against that individual because of his or her sex in violation of Title VII.  [*See* Doc. 205, p. 21, *citing Bostock*, 140 S. Ct. at 1741.]

But the district court then held that, based on *Bostock*, "it is undisputed that the Exclusion is facially discriminatory" under Title VII and, as such, Defendants' "intent [was] immaterial."  [*Id.*, p. 22, citing *Int'l Union, United Auto, Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991) ("*Johnson Controls*").]

The district court appears to have based that conclusion on two *purportedly* undisputed facts contained in Paragraph 77 and 78 of Lange's statement of material facts in support of her summary judgment motion: (i) that "[t]he Exclusion denies coverage for procedures and treatments that would otherwise be covered if provided in connection with a different diagnosis" [*id.*, pp. 22-23, quoting Doc. 179-3, ¶ 77; *see also* Doc. 195, ¶ 77]; and (ii) that "Defendants admit 'that the only Health

Plan participants impacted by the Exclusion are transgender people seeking a 'sex change'" [Doc. 205, pp. 22-23, quoting Doc. 179-3, ¶ 78; *see also* Doc. 195, ¶ 78].

> More specifically, as to paragraph 77, the district court found
>
> that the [Health Plan] pays for mastectomies when medically necessary for cancer treatment but not when mastectomies are medically necessary for sex change surgery. And the [Health Plan] pays for hormone replacement therapy medically necessary for the treatment of menopause, but not hormone replacement therapy medically necessary for "sex change."

[Doc. 205, p. 23.] This finding directly contradicts Lange's own deposition testimony that her hormones and hormone therapy *were* covered by insurance. [Doc. 137-3, pp. 49-50.] The notion that *all* medically necessary care for her transition was excluded is also belied by Lange's other deposition testimony and exhibits, and her psychologist's testimony that insurance covered the bulk of her charges. [Doc. 150-18, pp. 11-12 (Pl. Dep., Ex. 36, pp. 120:14-124:17; Doc. 141 (Soety Dep., Ex. 3, pp. 38:23-41:12 – filed under seal).] In fact, Lange claimed at the summary judgment hearing that some of her healthcare was covered only because her providers used special coding to hide that the care was for a gender transition. [Doc. 197, pp. 56-57.] Defendants, however, had shown that

was not the case, by pointing to the coding used by her psychologist and endocrinologist in their own records. [Doc. 201, p. 3.]

Moreover, because *Lange* bore the burden of proof on causation under Title VII, all material facts and reasonable inferences therefrom were to be drawn in favor of Defendants on *her* motion for summary judgment. So, as discussed in further detail below, the district court erred in crediting Lange's assertion that the Exclusion encompasses non-surgical treatment for participants diagnosed with gender dysphoria as either undisputed or otherwise supporting summary judgment in her favor.[9]

As to Paragraph 78 of Lange's statement of material facts, Defendants did admit that the Exclusion—one medical exclusion and one pharmacy exclusion among a total of 68 medical exclusions and 29

---

[9] Indeed, as also discussed further below, the district court expressly stated in its Order that Defendants' "qualification of their [purported] admission to Plaintiff's Statement of Fact 77"—principally, that although the Exclusion "excludes coverage for sex change surgery and drugs related to sex change surgery," it does not exclude non-surgical treatment for gender dysphoria—"[was] well taken." [Doc. 205, p. 23; *see also id.* at p. 26 (appearing to acknowledge that the Health Plan "covers some treatment relating to Lange's transgender status").] Ultimately, however, the district court held Defendants' qualification was "immaterial to the question of whether the Exclusion is facially discriminatory" under Title VII. [*Id.* at p. 23.]

pharmacy exclusions—impacted only transgender participants who might seek a sex change. But the district court appeared to treat that admission as not just one of undeniable fact but one of but-for causation and, ultimately, liability under Title VII, concluding that under the Exclusion, "[t]ransgender employees cannot get medically necessary *treatment* for 'sex change' medical care because they are transgender." [Doc. 205, p. 24 (emphasis added).] And the district court held that, "[o]n these [purportedly] undisputed facts, the implication of *Bostock* is clear." [*Id.*] Accordingly, the district court entered summary judgment for Lange on her Title VII claim. [*Id.* at p. 28.]

As part of her Motion for Summary Judgment, Lange also contended that "[t]he County could not escape liability under Title VII or under the ADA because [she] works for the Sheriff's Office." [Doc. 140-1, p. 32.] The County argued that Lange, as the movant, was required under Rule 56 to show the absence of any "genuine issue of material fact as to whether the County [was] her employer" under each statute. [Doc. 137-2, p. 11; Doc. 179, p. 28.] The district court, however, held that "it [was] undisputed that the County acted as the Sheriff's agent" for purposes of both statutes. [Doc. 205, pp. 10-12.]

"In short," the district court held, "the County acted as an agent of the Sheriff because the County provided a health insurance plan to the Sheriff's deputies—*a function traditionally exercised by an employer*." [*Id.* at p. 12 (emphasis added) (citing *Williams v. City of Montgomery*, 742 F.2d 586, 588 (11th Cir. 1984) (per curiam)).]  The district court based its holding on admissions purportedly made by the County that "Sheriff Talton delegated the authority to the County to provide and administer healthcare benefits to his employees," [Doc. 205, citing Doc. 179-3, ¶ 60; Doc. 195, ¶ 60], and that "[t]he County—on behalf of the Sheriff— provided the Sheriff's employees a health insurance plan containing the Exclusion and, in the administration of that plan, it denied Lange's claim for medically necessary treatment," [*id.*, citing Doc. 179-3, ¶¶ 60, 75; Doc. 195, ¶¶ 60, 75].  [*See also id.*, Doc. 137-2, pp. 8-11; Doc. 179, p. 30).[10]/]

----

[10]/ Respectfully, and as discussed at Section IV.C, *infra*, as to the precise issue of delegation, these were not admissions under Rule 56. Instead, these were legal conclusions drawn by the district court from Defendants' responses to Lange's statements of material fact and their argument in response to her brief.  Indeed, both at page 10 of ECF docket entry 137-2 and page 30 of ECF docket entry 180, Defendants expressly stated that "[t]he Sheriff's power and authority in this regard were *not* delegated to the County."

-21-

The district court acknowledged "[t]he well-established law that a sheriff's employees are not county employees" and the County's argument that "Georgia law provides that sheriffs alone have the authority to decide whether and how to provide healthcare benefits to their employees." [*See* Doc. 205, p. 12.] Nevertheless, the district court held that

> the County cite[d] no law prohibiting what happened here— the Sheriff's delegation to the County the authority to provide and administer, on behalf of the Sheriff, healthcare benefits for his employees. … In other words just because Sheriff Talton alone chooses how a health insurance plan is provided to his employees does not mean the County does not act as an agent when it provides health coverage at the express delegation of the Sheriff.

[*See id.* (citing *Williams*, 742 F.2d at 589).[11/]]

## 7.    Trial on Damages on Lange's Title VII Claim

In its Order granting Lange summary judgment on her Title VII claim, the district court observed that she had not addressed appropriate relief.  [*Id.* at p. 28.]  The district court set the action for a jury trial on

---

[11/] The district court entered summary judgment for Defendants on Plaintiff's ADA claim nonetheless because Lange "submitted no evidence that her gender dysphoria results from a physical impairment."  [Doc. 205, p. 33; *see also id.* at pp. 28-33.]

compensatory damages on Lange's Title VII claim only beginning on September 26, 2022, and on September 26 and 27, trial proceeded on her damages claim.  [*See* Doc. 251.]  On September 27, the jury returned a damages verdict in the amount of $60,000.  [Doc. 256.[12]/]

## 8.    Permanent Injunction and Appeal

On September 27, 2022, Lange submitted to the district court an "Order for Permanent Injunctive and Declaratory Relief" pursuant to 42 U.S.C. § 2000e-5(g).[13]/  The relief sought pursuant to the Injunction was similar to that sought in Lange's motions for preliminary injunctive relief but was now based on the Order granting summary judgment to Lange

---

[12]/ At trial, Lange did not put forth any evidence in support of her claim for damages based on the lack of any coverage for her "top surgery" or other out-of-pocket expenses and, ultimately, withdrew any claim to recover pecuniary damages based on the same. [Doc. 259 (Trial Transcript), p. 226.]

[13]/ The first line of the Injunction entered on October 3, 2022, states: "The parties jointly prepared, and the Court now approves, the following order." [Doc. 258, p. 1.]  That line, added by the district court after the submission of a proposed order by the Parties on September 27, 2022, does not make the Injunction a consent order.  The district court asked, "what is the defendants' position on the *scope* of injunctive relief?" [Doc. 259 (Trial Tr.), p. 227 (emphasis added).]  As requested, Defendants merely took the opportunity to negotiate its scope, focusing on the time for compliance and scope of relief provisions in Paragraph 3. [Doc. 258.]

on her Title VII claim and, purportedly, "the findings of undisputed fact and conclusions of law in the Court's [summary judgment] opinion." [Doc. 258.]   In the Injunction, the district court declared that the Exclusion "violate[d] Title VII"; "permanently enjoin[ed] Defendants from any further enforcement or application of the Exclusion"; and ordered Defendants (i) to notify Anthem of the Order and "to take all necessary steps to ensure Anthem cease[d] to enforce or apply the Exclusion or to maintain it in the Health Plan," and (ii) to

> direct Anthem to process any claim for Sgt. Lange's vaginoplasty, including all "Medically Necessary pre-operative and post-operative care" (as that term is used in the Health Plan) as indicated by her treating providers, in accordance with the terms, conditions, and limitations of the Health Plan as they stood in 2019 (except as modified herein).

[*Id.* at 1-2.]   It is this October 3, 2022 Injunction from which Defendants appeal.

On October 21, 2022, Defendants filed their notice of appeal.   [Doc. 262.]   The trial of Lange's Equal Protection claim, if any, has been continued pending this appeal.   [Doc. 285.]

**C.** **Statement of Facts.**

### 1. Introduction

Since at least 1973, Houston County has made its Health Plan available to employees of the Sheriff's Office through an inter-governmental arrangement between the two entities. [Doc. 137-5, ¶ 6.] The Health Plan is a self-funded plan, under which a TPA administers claims using funds provided by the County and employee contributions. [Docs. 137-4, ¶ 3, 137-5, ¶ 11.]   Anthem provided the TPA services at all times relevant hereto. [*See* Doc. 137-4, ¶¶ 2-3.]

The benefit terms of the Health Plan are set by the County, which also determines members' deductibles and premiums. [*See* Doc. 150-19, pp. 28-29.]   Including dependents, the Health Plan has about 1,500 members in total, about 320 of whom are employees of the County and about 350 of whom are employees of the Sheriff's Office. [Docs. 137-5, ¶ 9, 154-14, p. 16.]

### 2. Lange's Hire

In September 2006, Sheriff Talton. who has been Sheriff since 1973, hired Lange, who then presented as male, as a Deputy Sheriff. [Doc. 150-

8, p. 6.] At all times since, Lange has participated in and contributed monthly premiums to the Health Plan. [Doc. 150-8, p. 13.]

### 3.   Lange's Gender Transition

After being diagnosed with gender dysphoria, Lange began her gender transition in 2017, including a regimen of hormone replacement therapy overseen by an endocrinologist and sessions with a psychotherapist. [Doc. 150-8, p. 16.] All those treatments were covered under the Health Plan.  [Doc. 150-18, pp. 11-12 (Pl. Dep., Ex. 36, pp. 120:14-124:17; Doc. 141 (Soety Dep., Ex. 3, pp. 38:23-41:12 – filed under seal).]  In April 2017, Lange informed the Sheriff's Office that she wished to present as a female going forward and requested permission to follow its female dress policy. [Doc. 150-8, p. 18.]  The Sheriff agreed to her request. [Doc. 150-8, p. 18.]

### 4.   Lange's Request for Insurance Coverage for Bottom Surgery

In April 2018, Lange underwent "top surgery" to feminize her chest but did not seek reimbursement for that procedure under the Health Plan. [Docs. 147, ¶ 14; 150-18, pp. 20-21.] Lange determined that "bottom surgery" was the next step in her treatment. [Doc. 147, ¶¶ 21, 26.] On November 13, 2018, Lange met with a surgeon in New York, whose office

visit was covered by the Health Plan.  [Doc. 144-1, p. 8, ¶ 23; Doc. 253-2, p. 1; Doc. 259 (Trial Tr.), pp. 172-73.]

### 5.    Denial of Coverage for Bottom Surgery

The Health Plan, however, contains a number of exclusions.  [Doc. 137-5, ¶ 13.]    In particular, the Health Plan contains 68 medical exclusions, including the following:

> ....

> 36.    **Hearing Aids** Hearing aids or exams to prescribe or fit hearing aids for Members over 18 years of age, unless listed as covered in this Benefit Booklet. This Exclusion does not apply to cochlear implants. This Exclusion does not apply to hearing aids to correct degenerative hearing loss.

> ....

> 39.    **Infertility Treatment** Testing or treatment related to infertility treatment except for diagnostic services and procedures to correct an underlying medical condition. Infertility procedures not specified in this Benefit Booklet.

> ....

> 57.    **Sex Change** *Services and supplies for a sex change and/or the reversal of a sex change.*

> 58.    **Sexual Dysfunction** Services or supplies for male or female sexual problems.

> ....

68.    **Weight Loss Surgery** Bariatric surgery. This includes but is not limited to Roux-en-Y (RNY), laparoscopic gastric bypass surgery or other gastric bypass surgery (surgeries to lower stomach capacity and divert partially digested food from the duodenum to the jejunum, the section of the small intestine extending from the duodenum, or gastroplasty, (surgeries that reduce stomach size), or gastric banding procedures.

[Doc. 155-1, pp. 70, 72 (boldface in original; italics added).]

The Health Plan also contains 29 pharmacy exclusions, including the following:

....

15.    **Infertility Drugs** Drugs used in assisted reproductive technology procedures to achieve conception (e.g., IVF, ZIFT, GIFT).

....

26.    **Sex Change Drugs** *Drugs for sex change surgery.*

27.    **Sexual Dysfunction Drugs** Drugs to treat sexual or erectile problems.

....

29.    **Weight Loss Drugs** Any drug mainly used for weight loss.

[Doc. 155-1, pp. 74 (boldface in original; italics added).]

Pursuant to the Exclusion (*i.e.*, medical exclusion number 54 and pharmacy exclusion number 25), Anthem informed Lange that coverage

-28-

for bottom surgery under the Health Plan would be denied. [Doc. 147, ¶ 27.] Lange subsequently requested that the County remove the Exclusion or, in the alternative, grant her an exemption that would allow her to access coverage for bottom surgery, but the County denied her request. [Doc. 147, ¶¶ 29-30.]

The Health Plan has contained the Exclusion (using the same or similar language) since at least 1998—approximately eight years before Lange was hired as a Sheriff's Deputy and approximately 19 years before she began her transition. [Doc. 150-13, p. 12; Doc. 159, p. 45.] Lange is the only openly transgender person employed by the Sheriff's Office or the County government, and, thus, the only known transgender member of the Health Plan. [Doc. 150-19, p. 19.] The Parties do not dispute that the only Health Plan participants impacted by the Exclusion are those transgender persons who seek to undergo a "sex change."[Doc. 151, ¶15; Doc.115-20, p. 3.]

## D.    Standard of Review

This Court reviews a district court's entry of a permanent injunction for an abuse of discretion, but it reviews the district court's underlying conclusions of law de novo. *Alabama v. Ctrs. for Medicare &*

*Medicaid Servs.*, 674 F.3d 1241, 1244 n.2 (11th Cir. 2012) (per curiam).

Additionally, this Court reviews the grant of summary judgment de novo.

*Jones v. Dillard's Inc.*, 331 F.3d 1259, 1262 (11th Cir. 2003).

## II.    SUMMARY OF THE ARGUMENT

The district court erred in issuing the Injunction because the Injunction was based on the erroneous grant of summary judgment to Lange on her Title VII claim.    The underlying grant of summary judgment was erroneous for several reasons.

First, there exists a genuine issue of material fact—based on both Lange's deposition testimony and her providers' similar deposition testimony—as to whether the Exclusion prohibited her from accessing coverage for some medically necessary care for her gender dysphoria, even if the Health Plan indisputably does not provide coverage for sex change *surgery*.    Since the record shows most non-surgical transition-related care was covered by the Health Plan, this was not a categorical (or "blanket") exclusion and therefore was not facially discriminatory. Second, regardless of the extent of coverage under the Health Plan for gender dysphoria, neither *Bostock* nor the other Supreme Court cases relied upon by the district court compel a finding that the Exclusion is

-30-

facially discriminatory as a matter of law, as the district court held. Third, the record presents at least a genuine issue of material fact whether the Sheriff's decision to place his employees in the County's Health Plan and the County's administration of the Health Plan amounted to a legal "delegation" of employer rights and made the County his agent. Because the district court erred in granting summary judgment to Lange on her Title VII claim and that ruling was the foundation for the Injunction, this Court should reverse.

## III.  <u>ARGUMENT AND CITATION OF AUTHORITY</u>

The Injunction issued by the district court—permanently enjoining Defendants from further enforcement or application of the Exclusion and directing Defendants and the TPA of the self-funded Health Plan to process Lange's claims for "bottom surgery" (*i.e.*, surgery to change the sex of a person's genitalia)—was based on the district court's grant of summary judgment to Lange on her Title VII claim.  [Doc. 258.][14]  But

---

[14] The district court's summary judgment order is not independently appealable; however, it is nevertheless properly before the Court in accordance with Fed. R. App. P. 3(c)(4) insofar as it granted summary judgment to Plaintiff on her Title VII claim, because this ruling is the primary basis for the district court's subsequent Injunction. This Court also has pendent jurisdiction over the summary judgment Order. *See* Statement of Jurisdiction, pp. 1-2, *supra*.

the district court's grant of summary judgment to Lange on her Title VII

claim was erroneous because there are genuine issues of material fact as

to whether (i) the Exclusion applies to non-surgical treatment and

procedures; (ii) the Exclusion is not facially discriminatory under Title

VII; and (iii) the County was not acting as an agent of the Sheriff's Office

under Title VII.[15/]

## A.    <u>A genuine issue of material fact exists as to whether the Exclusion prohibited Lange from accessing at least some medically necessary care for her gender dysphoria</u>.

Addressing the Title VII claim in its summary judgment Order, the

district court held that "it is undisputed that the Exclusion is facially

discriminatory." [Doc. 205, p. 22.] But that finding, whether factual or

legal, is incorrect and was not based on any express admission by

Defendants.

---

[15/] Given the unusual procedural posture of the case, Defendants clarify that they are only addressing in this appeal, filed under 28 U.S.C. § 1292(a)(1), the legal issues implicated by the Injunction. For example, although they use the district court's ruling on Lange's Equal Protection claim for comparison purposes, they are not appealing the denial of summary judgment to Defendants as to that claim in this appeal. Defendants understand they cannot appeal that determination, and certain others, until judgment on that claim is entered. 28 U.S.C. § 1291.

On summary judgment, "[t]he moving party bears 'the initial responsibility of informing the … court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in Ala.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*) ("*Four Parcels*") (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Where, *as here*, "the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence … that would entitle it to a directed verdict if not controverted at trial." *Four Parcels*, 941 F.2d at 1438 (internal quotation marks and citation omitted) (emphasis in original). Therefore, Lange, as the movant, "must show that, on all the essential elements of [her] case on which [she] bears the burden of proof at trial, no reasonable jury could find for the nonmoving party." *Id.*

In addition, "all reasonable doubts about the facts" and "all justifiable inferences" therefrom are to be drawn in favor of the County

and Sheriff Talton as the non-moving Parties. *Id.* at 1437 (internal quotation marks and citation omitted). "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, summary judgment is not justified." *Id.* (internal quotation marks and citation omitted). Applying the correct standard to her disparate treatment claim under Title VII here, Lange did not affirmatively demonstrate her entitlement to judgment as a matter of law in her favor on her Title VII sex discrimination claim. Therefore, the district court erred in granting summary judgment to Lange on that claim.

Specifically, the district court's finding here that "it is undisputed that the Exclusion is facially discriminatory" [Doc. 205, p. 22], is not supported by the record and was not based on any express admission by Defendants. Rather, the district court's finding was premised on two facts proffered by Lange as undisputed: (i) "The Exclusion denies coverage for procedures and treatments that would otherwise be covered if provided in connection with a different diagnosis"; and (ii) "the only Health Plan participants impacted by the Exclusion are transgender

people seeking a 'sex change.'" [Doc. 205, pp. 22-23 *citing* Doc. 179-3, ¶¶ 77, 78.]

Defendants did admit without qualification that the Exclusion "impact[s]" only those "transgender people seeking a 'sex change,'" but Defendants expressly contested Lange's Statement of Fact 77 "to the extent [Lange] suggest[ed] that all treatment for gender dysphoria is excluded" based on her own deposition testimony that "her endocrinologist visits, psychological visits, and hormones and other medications have been covered by the Health Plan." [Doc. 205, p. 23 *citing* ¶¶ 77, 78 Responses; *see also* Doc. 137-3, pp. 49-50.] Lange testified at her April 2021 deposition as follows:

> Q    For your -- your transition, some of the medical treatments you obtained have been covered by the current plan -- or the plans in the past few years; is that correct?
>
> A    That's correct.
>
> MR. BROWN:  Objection.  Vague.
>
> A    Yeah, some of them have.
>
> Q    What has been covered the plan?
>
> A    The medication that I'm taking.
>
> Q    And without getting into detail, what is that medication for in general?

A    It's for gender transition.

Q    So are those hormones?

A    Yes.

Q    What else it [*sic*] covered?

A    My mental health coverage has been covered, but I don't know – you know, there's coding. You know how doctors will code a diagnosis? I don't know what she coded or what she does.

Q    Is your endocrinologist also covered?

A    I don't know about the doctor's visits, if they are covered. But I know my blood work is not. I have to pay – I get a bill for $400 for that every time I go get blood done.

[Doc. 137-3, pp. 49-50.[16]] In her second deposition (in a later phase of discovery), Lange acknowledged that she only paid a consistent copay of

---

[16] In her response to Defendants' Statement of Undisputed Material Facts, Lange sought to create a question of fact (or otherwise evade her deposition testimony) by claiming to have been denied coverage for "a routine blood test for [her] hormone and medication levels" in June 2019, as well as for her annual visit to her endocrinologist in October 2021 (*after* the close of discovery). [*See* Doc. 178-1, ¶ 20; *see also* Doc. 147, ¶ 36.] However, further questioning revealed that Lange had only been *billed* $400 on one occasion (which she had negotiated down to $200) and then she obtained blood tests through her primary care physician. [Doc. 150-18, p. 21.] Lange did not contend that her annual visits had been denied in either 2019 or 2020—both of which would have occurred after she was informed that her surgery would not be covered—and her testimony that her endocrinologist attributed any denial of her October

$15 for her endocrinology office visits and insurance paid "the bulk of the charge." [Doc. 150-18, Ex. 36, pp. 11-12.]

Lange's deposition testimony provided additional context to the prior representations made by her counsel in both Lange's Motion for a Preliminary Injunction filed in November 2019 as well as in her Superseding Motion for a Preliminary Injunction filed in April 2020, that "[d]ue to the Exclusion, [she] pays out of pocket for *most of* her transition-related medical care." [Doc. 28-1, p. 13 (emphasis added); Doc. 57-1, p. 5 (emphasis added).] And, indeed, the district court described as "well

---

2021 annual visit to the lack of coverage under the Health Plan would be inadmissible hearsay in Lange's opposition to Defendants' summary judgment motion—and would certainly be inadmissible hearsay in support of her own motion. *Macuba v. Deboer*, 193 F.3d 1316, 1322-25 (11th Cir. 1999); *Barnes v. CoxCom, LLC*, Case No. 16-CV-764-TCK-FHM, 2018 WL 773990, at *6 (N.D. Okla. Feb. 7, 2018) (holding that the plaintiff's testimony regarding the contents of his call with his doctor's office was inadmissible hearsay where offered to prove the truth of the matter asserted); *Matewski v. Orkin Exterminating Co.*, No. Civ. 02-233-P-C, 2003 WL 21516577, at *7 n.26 (D. Me. July 1, 2003) (holding that doctor's letter presented by the plaintiff to his employer was inadmissible hearsay for proving the truth of the matter asserted), *adopted*, 2003 WL 22056378 (D. Me. Sept. 3, 2003). Defendants likewise cited Lange's deposition testimony in their Statement of Material Facts to be Tried: "Plaintiff's non-surgical treatment for her gender transition, including her endocrinologist visits, psychologist visits, and hormones and medications have been covered." [*See* Doc. 179-2, ¶ 6, citing Doc. 137-3, pp. 49-50.]

taken" Defendants' "qualification of their [purported] admission to Plaintiff's Statement of Fact 77"—principally, that although the Exclusion "excludes coverage for sex change surgery and drugs related to sex change surgery," it does not exclude other, non-surgical treatment for gender dysphoria. [*Id.* at 23.] Still later in the Order, the district court again appeared to acknowledge that the Health Plan "covers some treatment relating to Lange's transgender status." [*Id.* at 26.]

As noted above, "all reasonable doubts about the facts" and "all justifiable inferences" therefrom are to be drawn in favor of the County and the Sheriff as the non-moving Parties. *Four Parcels*, 941 F.2d at 1437 (internal quotation marks and citation omitted). "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, summary judgment is not justified." *Id.* (internal quotation marks and citation omitted).

The district court held that the Exclusion violated Title VII because "[t]ransgender employees cannot get medically necessary treatment for 'sex change' *medical care* because they are transgender." [Doc. 205, p. 24 (emphasis added).] But as shown above, at the very least there exists a

genuine issue of material fact as to whether all such "medical care" for gender dysphoria is excluded under the Health Plan. This is important for two reasons. First, it shows the Exclusion is not a categorical exclusion of *all* medically necessary care for a gender transition; indeed, since much of Lange's transition-related care was covered, this fact is inconsistent with a finding that the Exclusion is *facially* discriminatory. Second, the fact that some care is covered is consistent with the Health Plan's treatment of other healthcare. As just one example, the Health Plan covers various medically necessary treatments for participants suffering from obesity but excludes lap-band surgery. [Doc. 150-4, pp. 51, 60; Doc. 150-5, p. 6, ¶ 67.]

Accordingly, applying the correct legal standard to disparate treatment claims under Title VII here, Lange did not affirmatively demonstrate her entitlement to judgment as a matter of law in her favor on her Title VII claim. To the extent the district court granted summary judgment in favor of Lange on her Title VII claim based on either a purported admission or asserted fact that the Exclusion prohibits *all* medical care for gender dysphoria, it erred in doing so because Lange

herself testified that at least some of her non-surgical treatment for that condition was covered under the Health Plan.

## B. The district court erred as a matter of law in holding that the Exclusion was facially discriminatory under Title VII.

The district court also erred as a matter of law in granting summary judgment to Lange on her Title VII claim. "An understanding of the burdens of proof … is essential to the proper application of the summary judgment standard." *Four Parcels*, 941 F.2d at 1438. In a disparate treatment case such as the one brought by Lange here, the "plaintiff first must show that [she] was deprived of the protected right." *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1018 (2020) ("*Comcast Corp.*"). It is undisputed that Title VII prohibits a covered employer from discriminating against any individual with respect to health insurance because of his or her sex: "there is no reason to believe that Congress intended a special definition of discrimination in the context of employee group insurance coverage." *City of Los Angeles v. Manhart*, 435 U.S. 702, 710 (1978).

But the plaintiff must still "establish causation," which is "analytically distinct" from the first showing. *Comcast Corp.*, 140 S. Ct. at 1018. Moreover, to prevail on a disparate treatment claim under Title

-40-

VII based on his or her sex, "the difference in treatment based on sex must be intentional." *Bostock*, 140 S. Ct. at 1740 (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986 (1988)); *see also Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) ("A disparate-treatment plaintiff [claiming race discrimination under Title VII] must establish 'that the defendant had a discriminatory intent or motive' for taking a job-related action." (quoting *Watson*, 487 U.S. at 986)); *cf. Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993) ("In a disparate treatment case, liability depends on whether the protected trait (under the [Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA)], age) actually motivated the employer's decision.").

In *Hazen Paper*, the Supreme Court observed that one way of proving the requisite discriminatory intent is to show "[t]he employer … relied upon a formal facially discriminatory policy requiring adverse treatment of employees with that trait." *Id.* (citing *Manhart*, 435 U.S. at 704-18.) Another way, the Court observed, is to prove "the employer [was] motivated by the protected trait on an ad hoc, informal basis." *Hazen Paper*, 507 U.S. at 610. Nevertheless, "[w]hatever the employer's decisionmaking process, a disparate treatment claim cannot succeed

unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome." *Id.*; *Bostock*, 140 S. Ct. at 1739 ("because of sex" means that "a particular outcome would not have happened 'but for' the purported cause").

The district court here held (if not expressly, then effectively) that, under *Bostock*, excluding—or even *limiting*—health insurance benefits for medically necessary treatment for a health condition that only a transgender participant might undergo is facially discriminatory under Title VII, (although not under the Equal Protection Clause).[17]/ [*Id.* at 21.] But *Bostock* does not speak to whether an insurance exclusion for health care is facially discriminatory under Title VII, and the other Supreme Court cases upon which the district court relied do not mandate any such finding here. The district court therefore erred as a matter of law in granting summary judgment to Lange.

**1.    *Bostock* simply addressed the threshold question of whether discrimination against an employee who is homosexual or transgender is sex discrimination under Title VII, but it did not otherwise address the standard of causation or healthcare benefits.**

_____

[17]/ Far from being limited to life-saving procedures, "medically necessary" care under the Health Plan here encompasses care that is expected to effectively address a functional impairment. [*See* Doc. 179-3, ¶ 38.]

The district court correctly held in ruling on Defendants' Motion to *Dismiss* that "*Bostock* recognized that discrimination against transgender persons … is a form of discrimination on the basis of sex for purposes of Title VII." [Doc. 89, p. 24.]  But as the district court also appeared to recognize then, *Bostock* did not address an allegedly discriminatory health exclusion.  [*See id.* (*Bostock* and *Glenn* "have no bearing on whether a health exclusion is facially discriminatory").  Rather, the plaintiff Bostock's case came before the Supreme Court on an Eleventh Circuit panel opinion holding that Title VII "[did] not prohibit employers from firing employees for being gay and so [his] suit could be dismissed as a matter of law" pursuant to Rule 12(b)(6).  *See Bostock*, 140 S. Ct. at 1738 (citing *Bostock v. Clayton Cty., Ga.*, 723 F. App'x 964 (11th Cir. May 10, 2018) (per curiam)).[18]

---

[18] The two companion cases in *Bostock* likewise came before the Supreme Court on Title VII claims of discriminatory discharge, albeit under Rule 56.  *See Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 108-108, 119, 132 (2d Cir. 2018) (en banc) (overruling binding Second Circuit law, holding that the plaintiff, who claimed to have been discharged because he was gay, could assert a claim under Title VII for discrimination based on his sexual orientation, and vacating the grant of summary judgment for the employer under Title VII); *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 566-67, 571, 581 (6th Cir. 2018) (holding that the plaintiff, a transgender woman who was

Of course, the Supreme Court ultimately held that, "under the 'plain terms' of Title VII [], an employer intentionally, necessarily, and illegally discriminates against an individual because of such individual's sex when the employer discriminates against an employee for being homosexual or transgender." *See Bostock v. Clayton Cty. Bd. of Comm'rs*, 819 F. App'x 891, 892 (11th Cir. Aug. 27, 2020) (quoting *Bostock*, 140 S. Ct. at 1741, 1743). Accordingly, the Supreme Court held that because "employers are prohibited from firing employees on the basis of homosexuality or transgender status" under Title VII, "[a]n employer

---

discharged after informing her employer of her intention to dress as a woman, could "pursue a claim that she was discriminated against on the basis of her transgender and transitioning status" and affirming the district court's determination on summary judgment that the plaintiff had been "fired because of her failure to conform to sex stereotypes, in violation of Title VII"). Therefore, whether based on their procedural posture (*Zarda* and *Bostock*) or factual record (*G.R. Harris*), the Supreme Court considered it undisputed that the employer in each case had "fired the plaintiffs for being homosexual or transgender." *See Bostock*, 140 S. Ct. at 1753; *see also Adams v. Sch. Bd. of St. Johns Cty., Fla.*, 2022 WL 18003879, 2022 WL 18003879, at *11 (11th Cir. Dec. 30, 2022) (en banc) ("*Bostock* involved … various employers' decisions to fire employees based *solely* on their sexual orientations or gender identities." (emphasis added)).

-44-

who fires an individual merely for being gay or transgender defies [Title VII]." *Bostock*, 140 S. Ct. at 1753, 1754.[19]

Contrary to Lange's repeated contentions in this action, Defendants do *not* contend that the Supreme Court's holding in *Bostock* is limited solely to claims of discriminatory *discharge*. The Supreme Court's holding in that case undoubtedly applies to, for example, a demotion or failure to promote, provided such personnel action was taken with the proscribed discriminatory intent.

But the specific legal issue presented here—where there exists, at the very least, a genuine issue of material fact as to whether non-surgical treatments for gender dysphoria are covered—is whether the exclusion of sex change *surgery* from the Health Plan's coverage is "facially discriminatory" under Title VII such that "the employer's intent is

---

[19] In its summary judgment order, the district court mused over the emphasis added to Defendants' quotation of *Bostock*'s language "*merely for being*" transgender. [*See* Doc. 205, p. 26, quoting Doc. 201, p. 1.] But Defendants assume the Supreme Court used that language in its everyday way; *i.e.*, "nothing less than" or "nothing more than." *See* Merriam-Webster's Collegiate Dictionary, p. 777 (defining "mere"). *See also Bostock*, 140 S. Ct. at 1753 ("The only question before us is whether an employer who fires someone *simply for being* homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'") (emphasis added).

-45-

USCA11 Case: 22-13626    Document: 28    Date Filed: 01/13/2023    Page: 59 of 89

immaterial." [*See* Doc. 205, p. 22.]   It cannot be argued, as Lange nonetheless does, that *Bostock* held that discriminatory intent was immaterial in a disparate treatment claim brought by a transgender employee, much less one for transgender-related medical care or healthcare benefits generally.  *See* 140 S. Ct. at 1740.

Indeed, in dissenting from the majority opinion in *Bostock*, Justice Alito, joined by Justice Thomas, "briefly note[d] some of the potential consequences of the Court's decision," among them:

> *Healthcare.*   Healthcare benefits may emerge as an intense battleground under the Court's holding.  *Transgender employees have brought suit under Title VII to challenge employer-provided health insurance plans that do not cover costly sex reassignment surgery*.  Similar claims have been brought under the Affordable Care Act (ACA), which broadly prohibits sex discrimination in the provision of healthcare.

*Bostock*, 140 S. Ct. at 1781 (Alito, J., dissenting) (footnotes omitted; emphasis added); *see also id*. at 1778-83 (Alito, J., dissenting) (discussing other "potential consequences" of the majority's decision).[20]

---

[20] Justice Alito's dissent "[did] not claim to provide a comprehensive survey or to suggest how any of th[o]se issues should necessarily play out under the Court's reasoning." *Bostock*, 140 S. Ct. at 1778.

Justice Gorsuch's majority opinion made no mention whatsoever of health benefits or insurance, but did address that part of Justice Alito's dissent generally as follows:

> What are these consequences anyway? …. *The only question before us is whether an employer who fires someone simply for being homosexual or transgender* has discharged or otherwise discriminated against that individual "because of such individual's sex." …. *Whether other policies and practices might or might not qualify as unlawful discrimination* or find justifications under other provisions of Title VII *are questions for future cases*, not these.

*Id.* at 1753 (emphasis added).[21]  Indeed, contrary to Lange's argument, and to the extent the district court held otherwise, the Supreme Court's decision in *Bostock* is no more dispositive of the *healthcare benefits* issue presented in this case than it was to the discriminatory discharge issue presented by the plaintiff Bostock in his own case.[22]

---

[21] *See also Comcast Corp.* 140 S. Ct. at 1018 n.* ("[W]e are a court of review, not of first view, and do not normally strain to address issues that are less than fully briefed and the district and appellate courts have had no opportunity to consider." (internal quotation marks and citations omitted)); *cf. Adams*, 2022 WL 18003879, at *11 (observing that the Supreme Court in *Bostock* "expressly declined to address the issue of sex-separated bathrooms and locker rooms").

[22] Following remand to the district court, and the parties' conduct of discovery, the magistrate judge issued a final report and recommendation in the plaintiff Bostock's case recommending the denial of both the plaintiff's and the defendant's motions for summary judgment, concluding that "[a] jury should resolve the disputed issues of

-47-

Instead, *Bostock* addressed only the threshold question of whether discrimination against an employee who is homosexual or transgender is sex discrimination under Title VII.  Therefore, the district court erred as a matter of law in finding intent to be immaterial to its Title VII analysis, and because, as with Lange's all-but identical sex discrimination claim under the Equal Protection Clause, "there is a genuine dispute of material fact as to whether the adoption and maintenance of the Exclusion was done with discriminatory intent."  [*Id.* at 21 n.11.]

### 2. The Supreme Court's opinion in *Johnson Controls* does not mandate summary judgment for Lange.

The district court also held that "if an adverse action is facially discriminatory, the employer's intent is immaterial—'the absence of a

_____

material fact presented," including those pursuant to the plaintiff's mixed-motive theory of liability.  *See Bostock v. Clayton Cty., Ga.*, 1:16-CV-01460, ECF No. 166, p. 63 (N.D. Ga. June 2, 2002); *id.* at pp. 62-63 (same).  The case was administratively closed pursuant to a settlement before the district court acted on the report and recommendation.  *See id.*, ECF No. 177 (Aug. 8, 2022), ECF No. 179 (Oct. 14, 2022).

Nor did the Supreme Court's opinion in *Bostock* result in judgment being entered for the plaintiff on remand in the companion case of *Altitude Express*.  That case, too, ultimately settled, after significant further proceedings following the Supreme Court's opinion.  *See Zarda v. Altitude Express, Inc. et al.*, Case # 2:10-cv-04334-EK-AYS, ECF Nos. 270-309.

-48-

malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect,'" quoting from the Supreme Court's opinion in *Johnson Controls*. [*Id.* at 22 (quoting *Johnson Controls*, 499 U.S. at 199).] But *Johnson Controls* is not factually analogous here and neither mandates nor supports the district court's legal conclusion that the Exclusion is facially discriminatory.

As an initial matter, although *Johnson Controls* did address a policy, that policy did not address fringe benefits in any sense. Instead, the policy at issue there limited the ability of female employees to obtain or hold certain positions of employment with the defendant employer. Johnson Controls' "fetal-protection policy" gave "[f]ertile men, but not fertile women, [] a choice as to whether they wish[ed] to risk their reproductive health for a particular job." *Id.* at 197. The Supreme Court found the bias to be "obvious," as that policy "classifie[d] on the basis of gender and childbearing capacity, rather than fertility alone," "[d]espite evidence in the record about the debilitating effect of lead exposure on the male reproductive system." *Id.* at 198. As such, the Court held, the policy "[did] not pass the simple test of whether the evidence show[ed]

'treatment of a person in a manner which but for that person's sex would be different." *Id.* at 200 (quoting *Manhart*, 435 U.S. at 711).

But Lange is not limited in her ability to pursue any positions of employment; rather, she is challenging two of dozens of Health Plan medical and pharmacy exclusions that happen to limit *her* treatment for gender dysphoria—just as the exclusion for hearing aids limits the Sheriff's own ability to address his hearing loss and other exclusions limit other plan participants' ability to treat various conditions. Lange's testimony that the Health Plan covered her hormones, endocrinologist visits, and psychological care dispels any notion that the Exclusion is facially discriminatory on the basis of transgender status. *See* pp. 19-21, *supra.*

Moreover, the principal legal question presented in *Johnson Controls* was whether "an employer [could] exclude a fertile female employee from certain jobs *because of its concern for the health of the fetus the woman might conceive*?" 499 U.S. at 187 (emphasis added). No such issue is present in Lange's case. Accordingly, *Johnson Controls* does not significantly inform the Court's analysis here.

3.  **The Supreme Court's opinions in *Manhart* and *Newport News* do not mandate—or authorize— summary judgment for Lange.**

In contrast to *Johnson Controls*, the Supreme Court's *Manhart* and *Newport News* opinions did indeed address questions related to employment fringe benefits.  But contrary to the district court's conclusion, neither case mandated summary judgment in Lange's favor under Title VII because both cases are factually distinct.

*Manhart*, for example, presented a disparate treatment claim based on a direct comparison of a fringe benefit offered to male and female employees that was *identical* in kind but not in cost.  In that case, the employer "required its [2,000] female employees to make larger contributions to its pension fund than its [10,000] male employees" based on the employer's belief that, "[a]s a class, women live longer than men." *Manhart*, 435 U.S. at 704; *id.* (noting that employer "required female employees to make monthly contributions to the [pension] fund which were 14.84% higher than the contributions required of comparable male employees.").  And, indeed, the Supreme Court recognized that the "two classes [were] *in fact* different" in that sense: "[w]omen, *as a class*, do live longer than men."  *Id.* at 707 & 708 (emphasis added).

The Supreme Court in *Manhart*, however, observed that not all women live longer than men (and vice versa), thus prompting the question of "whether the existence or nonexistence of 'discrimination' [under Title VII] [was] to be determined by comparison of *class* characteristics or *individual* characteristics." *Id*. at 708 (emphasis added). The Court first held that "[t]he statute's focus on the individual is unambiguous." *Id*. The Court then observed that there was "no assurance that any individual woman working for the [employer] [would] actually fit the generalization on which the [employer's] policy [was] based" and that "[m]any of those [female] individuals [would] not live as long as the average man." *Id*. Accordingly, because the Court found "[i]ndividual risks, like individual performance, [could] not be predicted by resort to classifications proscribed by Title VII," the employer's policy was held to violate Title VII's prohibition on sex discrimination. *Id*. at 710.

The Supreme Court followed *Manhart* in *Newport News*, which was decided in the wake of the enactment of the Pregnancy Discrimination Act, Publ. L. 95-555, 92 Stat. 2076 ("PDA"). Prior to that amendment to Title VII, the employer's health plan had provided identical

hospitalization and medical-surgical coverage for its employees and their eligible spouses—male and female—except for "a limitation on hospital coverage for pregnancy that did not apply to any other hospital confinement." *Newport News*, 462 U.S. at 671-72. Following the enactment of the PDA, that plan was amended to "provide[] the same hospitalization coverage for male and female *employees* themselves for all medical conditions, but it differentiated between female employees [who had pregnancy coverage] and spouses of male employees [who did not have pregnancy coverage]." *Id.* at 672. But applying *Manhart*, the Court held that the pregnancy limitation on the wives of male employees violated Title VII's "original prohibition against discrimination based on an employee's sex"; "the husbands of female employees receive a specified level of hospitalization coverage for *all* conditions; the wives of male employees receive such coverage *except for* pregnancy-related conditions." *Id.* at 682-85 (emphasis added).[23/]

---

[23/] The Court in *Newport News* assumed all dependent spouses of male employees were female. *Id.* at 684 ("And since the sex of the spouse is always the opposite of the sex of employee, it follows inexorably that discrimination against female spouses in the provision of fringe benefits is also discrimination against male employees.").

Contrary to the district court's findings here, however, neither *Manhart* nor *Newport News* mandates summary judgment in Lange's favor under Title VII. In each of those cases, an *identical* employment benefit was provided to male and female employees in a discriminatory manner based on their sex: pension benefits at a higher cost to female employees than male employees in *Manhart*; pregnancy coverage for female employees but not for the wives of male employees in *Newport News*. In contrast, under the Health Plan here, it is undisputed that "Lange has the same health coverage as other employees"—and at the same cost. [*See* Doc. 89, p. 24; *see also* Doc. 205, p. 17.[24]]

On summary judgment, however, Lange argued, by reference to the Exclusion, that "[a] policy [that] cannot be stated without referencing sex is inherently based upon a sex-classification" [*see* Doc. 140-1, p. 22 (internal quotation marks and citation omitted).] But the district court neither accepted nor (expressly) rejected her argument, perhaps recognizing that other exclusions in the Health Plan also clearly

---

[24] The Exclusion itself also "applies equally to a male seeking to become a woman or a woman seeking to become a man." [Doc. 205 at p. 17.]

reference "sex" in similarly limiting coverage for *cisgender* persons. [Doc. 155-1, pp. 72, 74.] Instead, the district court's Order on Lange's Title VII claim focused on the use of certain medical procedures to treat conditions *different from* gender dysphoria. This, too, was error.

In *Comcast Corp.*, the plaintiff brought a claim under 42 U.S.C. § 1981 alleging that "Comcast systematically disfavored 100% African American-owned media companies." 140 S. Ct. at 1014. In holding that the plaintiff was required to show that race was the but-for cause of its injury, the Supreme Court found that although the statute's prohibition on race discrimination "[did] not expressly discuss causation," it did "direct[] [the Court's] attention to the counterfactual—*what would have happened if the plaintiff had been white*." *Id.* at 1015 (emphasis added). The Court held that "[t]his focus fits naturally with the ordinary rule that a plaintiff must prove but-for causation." *Id.*

The district court's analysis fails here because there is no counterfactual demonstrating sex discrimination. To use the district court's primary example, if a cisgender participant is covered for a mastectomy when medically necessary to treat cancer—"*what would have happened if [that plan participant] had been [Lange]*"? *Id.*

(emphasis added).  The record here suggests no answer other than that Lange, too, would have been covered.  And as to surgery when medically necessary to treat gender dysphoria, "*what would have happened if the [plan participant] had been [cisgender]*"?  *Comcast Corp.*, 140 S. Ct. at 1015 (emphasis added).  Again, the record here suggests no answer other than that a cisgender participant would also have been denied such coverage.

Furthermore, Lange did not challenge the Exclusion as applied to her "top surgery"; instead, Lange brought this action—and was awarded injunctive relief—to require the Health Plan to cover her *bottom surgery*, arguing on summary judgment that that procedure was *factually* akin to a vaginoplasty that a cisgender woman might undergo.  [*See* Doc. 140-1, pp. 4, 24-25 & n.9; Doc. 187, pp. 14, 17, 23.]  But Defendants specifically contested that argument on summary judgment [*see* Doc. 179, pp. 18-19 nn.14-15], and the district court did not grant summary judgment to Lange based on her argument..[25]/  [*See* Doc. 140-1, pp. 4, 24-25 & n.9; Doc. 179, pp. 18-19 nn.14-15; Doc. 187, pp. 14, 17, 23.]

---

[25]/ Furthermore, the injunction also permanently enjoins the future application of the Exclusion generally, which presumably would require Defendants to process a claim for sex change surgery made by a

-56-

Furthermore, to the extent the PDA is instructive, as the district court appeared to find by its reference to *Newport News*, the district court also should have considered subsequent decisions interpreting that act. In *Young v. United Parcel Service*, the Supreme Court addressed a pregnant plaintiff's challenge to her employer's policy of providing light duty or other accommodations to certain categories of employees with on-the-job injuries (or who suffered from disabilities or other restrictions on their ability to perform their regular duties)—but not to pregnant employees—under the second clause of the PDA. 575 U.S. 206, 211-12 (2015).[26/] The plaintiff, who had a history of miscarriages and had been advised by her doctor to limit her lifting, was told by her employer that she could not continue performing *any* of her job duties even though, she

---

transgender male (*i.e.*, a person who identifies as male but was assigned a female sex at birth). [Doc. 260-2.] Neither Lange nor the district court identified a surgery that a cisgender male might undergo that would be comparable to such surgery as a matter of either fact or law.

[26/] *See* 42 U.S.C. § 2000e(k) ("The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth or related medical conditions; *and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work.*") (emphasis added).

contended, the employer had accommodated several persons with disabilities that had created work restrictions like hers. *Id.*; *see also id.* at 214-17. Similar to Lange's argument and the district court's holding here, the plaintiff in *Young* argued that "*because the record [] contains 'evidence that pregnant and nonpregnant workers were not treated the same,' that is the end of the matter, she must win.*" *Id.* at 221 (emphasis added).

But "[t]he problem with [the plaintiff's] approach" in *Young*, the Supreme Court found, was that "[i]t seem[ed] to say that the [PDA] grant pregnant workers a 'most-favored nation' status." *Id.* Putting it another way, the Court found that the plaintiff's argument was that "[a]s long as an employer provides one or two workers with an accommodation … then it must provide similar accommodations to *all* pregnant workers (with comparable physical limitations), irrespective of the nature of their jobs, the employer's need to keep them working[,] their ages, or any other criteria." *Id.*

The Supreme Court observed that "disparate-treatment law normally permits an employer to implement policies that are not intended to harm members of a protected class, even though their

implementation sometimes harms those members, as long as the employer has [] legitimate, nondiscriminatory, nonpretextual reasons for doing so." *Id.* at 222. Therefore, even though Young was the only pregnant employee impacted by the employer's policy, she was still required to prove discriminatory intent under a variant of the *McDonnell Douglas* circumstantial evidence test. *Id.* at 228-32.

The reasoning of *Young*, for example, would preclude a male participant in the Health Plan here seeking to challenge the exclusion for erectile problems by pointing to a female as a comparator, and should apply to Lange's but-for argument here, as well. The district court placed particular importance on Defendants' admission "'that the only Health Plan participants impacted by the Exclusion are transgender people seeking a 'sex change.'" [Doc. 205, p. 23, citing Doc. 179-3, ¶ 78; Doc. 195, ¶ 78.] But this is a misinterpretation of the County's argument in its Reply in Support of its Motion for Summary Judgment, which noted only that *transgender* individuals fall on both sides of the line.[27] And the fact

---

[27] The statement in context was: "This is an insurance case. It is alleged in the form of constitutional and statutory claims, but it boils down to whether a relatively small self-funded health insurance plan can cover less expensive treatments for certain conditions while excluding coverage of more expensive treatments for those same conditions.

that transgender individuals fall on both sides further indicates the Exclusion is not *facially* discriminatory.

Moreover, under the terms of Injunction, Lange would be treated more favorably than the approximately 1,499 cisgender participants whose treatment—including medically necessary treatment—are subject to Health Plan exclusions for "[s]ervices or supplies for male or female sexual problems" generally and "[d]rugs to treat sexual or erectile problems," as well as for infertility treatment and drugs. [Doc. 155-1, pp. 72, 74.] Pretermitting whether the condition of gender dysphoria is considered sexual dysfunction, performing bottom surgery would be more comparable to procedures to treat a sexual dysfunction than it would be the performance of a mastectomy in the course of treating breast cancer.

---

Conditions administered in this way include hearing, obesity, and transgender care. In distinguishing between different levels of treatment for these conditions, the Health Plan engages in the necessary insurance evil of line-drawing. However, this line-drawing is not discriminatory to Plaintiff. The Plan does not draw a line between transgender and non-transgender participants; it draws a line between transgender participants who want surgery and those who do not. Since there are transgender individuals on both sides of the line, the exclusion is not based on transgender or gender dysphoria status and does not violate the law." [Doc. 189, p. 1.]

**4.      The Injunction should be vacated.**

In summary, to the extent the district court relied on medical procedures or forms of treatment unrelated to gender dysphoria, those other forms of treatment constitute, at most, circumstantial evidence of discrimination regarding which there exist, at the very least, genuine issues of material fact that a reasonable jury could have resolved in favor of Defendants.   As such, and as with Lange's all-but identical sex discrimination claim pursuant to the Equal Protection Clause, there exists "a genuine dispute of material fact as to whether the adoption and maintenance of the Exclusion was done with discriminatory intent" and, so, the district court erred in granting summary judgment in Lange's favor under Title VII.  [Doc. 205, p. 21; *see also id.*, p. 33 ("Lange's equal protection claim will proceed to trial because there are numerous disputes of fact as to whether the Exclusion was adopted and maintained with a discriminatory intent.")]    The Supreme Court's opinions in *Manhart*, *Newport News*, *Johnson Controls*, and *Bostock* do not render that question "immaterial" as to her disparate treatment claim under Title VII.  [*Id.*, p. 22.]  Accordingly, the district court erred in granting

summary judgment to Lange on that claim and issuing the Injunction as to the Exclusion.[28/]

## C. **The district court erred as a matter of law in holding that the County is the Sheriff's "agent" within the meaning of Title VII.**

Even if the Injunction were not otherwise subject to vacatur as to both Defendants-Appellants for the reasons addressed above, the County would nevertheless be entitled to such relief for the additional reason that the district court erred in holding that it is the Sheriff's "agent" for purposes of the health insurance benefits he makes available to his employees (including Lange). *See* 42 U.S.C. § 2000e(b) ("The term 'employer' means a person … who has fifteen or more employees …, and any agent of such a person, ….").

### 1. **The County is not the Sheriff's "agent" for purposes of providing health insurance benefits for his employees or otherwise.**

In holding that the County is the Sheriff's "agent" for Title VII purposes, the district court relied primarily on this Court's per curium

---

[28/] Because the district court based its grant of summary judgment to Lange solely on a but-for theory of causation—and not the *McDonnell Douglas* or convincing mosaic test, both which Lange expressly chose *not* to move under [*see* Doc. 140-1, p. 15]—the Order did not address Defendants' legitimate, nondiscriminatory reasons.

opinion in *Williams v. City of Montgomery*, 742 F.2d 586, 588 (11th Cir. 1984). In *Williams*, an employee of the City of Montgomery asserted discrimination claims under Title VII against the city and the Montgomery City-County Personnel Board, among others. *See* 742 F.2d at 587. On appeal, this Court affirmed the district court's conclusion that the personnel board was the agent of the city for Title VII purposes. *See id.* at 588-89. In so doing, the Court observed that, while the city was the plaintiff's employer, *Alabama* law "grants the [personnel] board rights traditionally reserved to the employer." *Id.* at 589. The rights granted to the personnel board—and stripped away from the city—were significant and wide ranging, and included the right to establish a pay plan, a position classification plan, and minimum standards and qualifications, to evaluate the performance of employees during their probationary periods, to transfer, promote, demote, and reinstate employees. *Id.* Not surprisingly, therefore, this Court held that such a wide-ranging delegation of traditional employment authority to the personnel board made the board an agent of the city for purposes of Title VII. *Id.*[29]

---

[29] Notably, a true delegation of employment authority between independent governmental agencies such as seen in the *Williams* case is unusual—indeed, Defendants-Appellants are unaware of any analogous

-63-

In the present case, however, while it is true that the County controls the terms and conditions of the Plan, including the Exclusion, and is responsible for administering the Plan (albeit through a third-party administrator), it is the Sheriff who controls both *whether* to provide health insurance benefits to his employees in the first instance and *how* such benefits will be provided. Indeed, under *Georgia* law, a county *cannot* exercise the sort of control over a sheriff's employees that this Court in its *Williams* decision found supported the existence of a principal-agent relationship. *See Brown v. Dorsey*, 276 Ga. App. 851, 856, 625 S.E.2d 16, 21 (Ga. Ct. App. 2006) ("[T]he [c]ounty has no control over the sheriff's department personnel, including its deputies and jailors."); *see also* Ga. Const. art. IX, §2, ¶1(c)(1) (counties' home rule authority does not include any "[a]ction affecting any elective county office … or the personnel thereof …").[30/] *Compare Williams*, 742 F.2d at 589.

_____

delegation of such employment authority between independent governmental agencies in Georgia. This fact underscores the en banc Eleventh Circuit's acknowledgment that the agency theory may be "a poor fit where public entities are concerned." *Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1341 n.4 (11th Cir. 1999) (en banc).

[30/] In the context of immunity, the en banc Eleventh Circuit has rejected the notion that an agency-principal relationship exists between a Georgia sheriff and the county in which he or she operates. *See Grech*

Rather than having "delegated" it to the County or anyone else, the Sheriff alone exercised his power and authority with regard to his employment relationship with his employees (including Lange) by choosing to provide them health insurance benefits in the first instance, and then by choosing to do so by taking advantage of the opportunity to join the County's Plan.[31/] Indeed, the County adds newly hired Sheriff's Office employees into applicable benefit plans *only when directed to do so by a letter from the Sheriff's Office.* [Doc. 150-11, pp. 13-14; Doc. 150-14, p. 7 .] Moreover, unlike the city in *Williams*, this power and authority was *not* stripped from the Sheriff, as he is not, and never has been, bound

---

*v. Clayton County*, 335 F.3d 1326 (11th Cir. 2005) (en banc); *Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003) (en banc).

[31/] Defendants-Appellants are unaware of a single sheriff's office in Georgia that self-funds, maintains, and administers its own health insurance plan. Under the rationale employed by the district court, every county that makes its plan available to a sheriff's employees and, presumably, any other entity which maintains one or more such plans— whether public or private—through whom a sheriff arranges to provide health insurance coverage for his or her employees, is performing "a function traditionally exercised by an employer" and, as such, is the sheriff's "agent" for purposes of Title VII. [Doc. 205, p. 12.] Neither the statutory language of Title VII, its legislative history, nor any Supreme Court or Eleventh Circuit decision supports such an expansive application.

to use the County's Plan as the means to provide health insurance benefits for his employees.

*Spirt v. Teachers Insurance and Annuity Assn.*, 691 F.2d 1054 (2d Cir. 1982), *vacated on other grounds*, 463 U.S. 1223 (1983), bears noting. In that case, the Second Circuit concluded that the Teacher Insurance and Annuity Association (TIAA) and the College Retirement Equities Fund (CREF) were "agents" of a university employer for Title VII purposes, on the grounds that they "exist solely for the purpose of enabling universities to delegate their responsibility to provide retirement benefits for their employees [and] are so closely intertwined with those universities, … that they must be deemed an 'employer' for purposes of Title VII." *Spirt*, 691 F.2d at 1063. The court also found it "relevant that participation in TIAA-CREF is mandatory for [the university employer's employees] and that [the university employer] shares in the administrative responsibilities that result from its [employees'] participation in TIAA-CREF." *Id.*

Pretermitting whether the *Sprit* court's holding is consistent with the seemingly higher standard recognized by this Court in its *Williams*

decision, *Sprit* is nevertheless inapposite.[32]  In contrast to the facts of that case, the County, as an independent local governmental entity under Georgia law—unlike the personnel board in *Williams*—is neither "intertwined with" the Sheriff's Office[33] nor exists "for the purpose of

---

[32] Notably, the Sixth Circuit, in *Peters v. Wayne State University*, 691 F.2d 235, 238 (6th Cir. 1982), *vacated on other grounds*, 463 U.S. 1223 (1983), flatly rejected these very arguments that the *Sprit* court embraced: "The district court's characterization of [TIAA] as an 'employer' is clearly erroneous. … Obviously [TIAA] does not 'employ' the plaintiffs in the conventional sense of the word. Neither does [the university employer] retain [TIAA] as an agent or delegate to it any aspect of employee compensation. … On the contrary, [the university employer] determines the eligibility requirements for participation in the [TIAA] plans and sets the contribution levels for itself and its employees. [TIAA]'s responsibility is limited to management of the retirement fund and disbursement of individual annuities. Furthermore, [the university employer] exercises no control over [TIAA], otherwise essential to a principal agent relationship. … [The university employer] cannot control [TIAA's] administrative policies once its employees decide to join the [TIAA] plan. Indeed, the decision to use sex-segregated mortality tables to compute annuity payments was [TIAA]'s alone." *Peters*, 691 F.2d at 238. These points of distinction are equally applicable in the present case. In this regard, the County "does not 'employ' Lange in the conventional sense of the word, given that the County adds the Sheriff's employees to the plan *only* when directed to do so in writing by the Sheriff's Office, that the County's responsibility is limited to management of the plan, that the Sheriff cannot control the County's plan once his employees become participants, and that the Sheriff played no role whatsoever in the plan's Exclusion. [Doc. 150-11 at 45:20-46:3; Doc. 150-14 at 18:4-19:2.]

[33] *See Grech*, 335 F.3d at 1332 ("[T]he sheriff occupies a separate constitutional office independent from the defendant Clayton County.").

-67-

enabling [the Sheriff] to delegate [his] responsibility to provide [health insurance] benefits for [his] employees." *Id.* Furthermore, "the administrative responsibilities that result from [the Sheriff's employees'] participation in [the County's plan]" are handled by a third-party administrator, while "participation in [the County's plan] is [*not*] mandatory for [the Sheriff's employees, including Lange]." *Id.*[34] Moreover, as previously observed, unlike the city in *Williams*, no traditional employment authority has been surrendered or otherwise stripped from the Sheriff.

In view of the foregoing, the manner in which the Sheriff, as the employer of Lange and her fellow deputies, chose to exercise his exclusive control over this aspect of their employment simply cannot be likened to the compulsory delegation of broad control that was held to support a finding of agency in this Court's *Williams* decision.[35] *See EEOC v.*

---

[34] Nor can the County be viewed as the equivalent of a "corporate shell" set up by the Sheriff "to avoid his responsibilities" to his employees. *Id.* (quoting *Manhart*, 435 U.S. at 718 n.33).

[35] The district court acknowledged the County's argument "that Georgia law provides that sheriffs alone have the authority to decide whether and how to provide healthcare benefits to their employees" [Doc. 205, p. 12], but rejected the argument on the grounds that "the County cite[d] no law prohibiting what happened here—the Sheriff's delegation

*Wooster Brush Co. Employees Relief Assn.*, 727 F.2d 566, 571-73 (6th Cir. 1984) (holding that an independent employee association, which maintained an allegedly discriminatory disability insurance plan, was not the employer's "agent" for Title VII purposes). *See also Peters*, 691 F.2d at 238 (holding that the TIAA, which maintained an allegedly discriminatory retirement plan, was not the university's "agent" for Title VII purposes).

> **2. Defendants-Appellants have consistently maintained their position throughout this action that the County is not Lange's "employer" within the meaning of Title VII.**

In holding that the County meets Title VII's definition of an "employer" for purposes of Lange's Title VII claim, the district court

---

to the County the authority to provide and administer, on behalf of the Sheriff, healthcare benefits for his employees." [*Id.*] By this rationale, every time a Georgia sheriff works through an outside vendor to provide uniforms, coffee and snacks, counseling, or training for his or her employees, a "delegation of authority" occurs, which is clearly not the case. Moreover, by faulting the County for failing to cite a law prohibiting a sheriff from delegating authority to provide healthcare benefits for his or her employees [*id.*], the district court wrongly placed the burden on the County to prove that it is not Lange's "employer" under Title VII—a burden that was always Lange's to bear. *See McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 932 (11th Cir.1987) (plaintiff bears burden of proving that defendants are an "employer" within the meaning of Title VII); *United States v. Tinoco*, 304 F.3d 1088, n. 18 (11th Cir.2002) (same).

found that "it is undisputed that the County acted as the Sheriff's agent" for purposes of Title VII. [Doc. 205, p. 12.] Similarly, the district court appears to state that Defendants-Appellants admitted that "Sheriff Talton *delegated* the authority to the County to provide and administer healthcare benefits to his employees" and further admitted that it acted "*on behalf of the Sheriff* [in providing his] employees a health insurance plan containing the [alleged discriminatory] Exclusion." [*Id.* (emphasis added).] Defendants-Appellants made no such admissions.

As discussed above, Defendants-Appellants in their summary judgment papers expressly stated that "[t]he Sheriff's power and authority [with regard to the decisions whether and how to provide health insurance benefits to his employees] were *not* delegated to the County." [Doc. 137-2, p. 10 (emphasis added); *see also* Doc. 180, p. 30 ("The Sheriff's power and authority in th[at] regard were *not* delegated to the County.") (emphasis added).] Moreover, in direct response to Lange's assertion, in her Motion for Summary Judgment, that "[t]he County could not escape liability under Title VII … because [she] works for the Sheriff's Office" [Doc. 140-1, p. 32], Defendants-Appellants argued that Lange, as the movant under Rule 56, was required to affirmatively

-70-

show the absence of any genuine issue of material fact as to "whether the County is her employer" within the meaning of Title VII. [Doc. 179 at 28.][36]

In connection with finding the aforementioned "admissions," the district court faulted the County for "cit[ing] no law prohibiting what happened here—the Sheriff's [purported] delegation to the County the authority to provide and administer, on behalf of the Sheriff, healthcare benefits for his employees." [Doc. 205, p. 12.] Not only does this observation reflect a misallocation of the burden of proof by requiring the County to disprove its employer status under Title VII, *see McKenzie*, 834 F.2d at 932 (plaintiff bears burden of proving that defendants are an

_____

[36]/ In fact, from its earliest appearance in this action—its Answers and Motions for Judgment on the Pleadings—the County has denied these points which the district judge deemed "undisputed." [*See* Doc. 30, p. 2, n.1 ("The County asserts that it is not, and has never been, Plaintiff's employer as defined by Title VII …."); pp. 11 & 51 (Sheriff's Office is Plaintiff's employer); p. 11 ("[T]he County … denies that the Sheriff's Office delegated—or is legally authorized to delegate—any such obligations or 'essential employer' functions to the County."); Doc. 31-1, p. 6 ("The County is not—and never has been—Plaintiff's employer. Plaintiff is—and at all times relevant to this action has been—an employee of the Houston County Sheriff's Office, a separate and independent governmental entity."), p. 6 n.8 ("The Sheriff's Office has not delegated fundamental aspects of the employment relationship … to the County as was done in *Williams v. Montgomery*, 742 F.2d 586, 589 (11th Cir. 1984)); *see also* Doc. 50, p. 10; Doc. 92, pp. 22-24; Doc. 62-1, p. 7, n.7.]

"employer" within the meaning of Title VII), it does not fairly describe the record.

In responding to Lange's Motion for Summary Judgment, as well as in various other filings addressing the County's purported "employer" status under Title VII, Defendants-Appellants cited numerous legal authorities addressing the requisite level of control over traditional employer functions necessary to support a finding of "agent" status under Title VII and demonstrated the absence of such control as between the County and the Sheriff. [*See* Doc. 179, pp. 28-31.] In particular, Defendants-Appellants established that the manner in which the Sheriff—as the employer of Lange and her fellow deputies—chose to exercise his exclusive control over the relevant aspect of their employment simply cannot be viewed as the legal equivalent of the compulsory delegation held to support agent status in other cases, including this Court's *Williams* opinion.[37] [*See id.*]

------

[37] Defendants-Appellants also cited and addressed *Lyes*, 166 F.3d at 1341 & n.4 (acknowledging that agency theory is poor fit where public agencies are concerned) and *Clark v. St. Joseph's/Candler Health Sys., Inc.*, No. 4:05-CV-119, 2006 WL 2228929, at *7 (S.D. Ga. Aug. 3, 2006) (holding that the plaintiff "failed to offer evidence that [the alleged interrelated entity] retained any control over employment decisions involving [his employer's] employees" so as to establish joint employment

Accordingly, there is no basis for the district court's finding that Defendants admitted—either literally, implicitly, or by operation of law—or that it is otherwise undisputed that the County is the Sheriff's "agent" within the meaning of Title VII. Moreover, for the reasons set forth above, the Court erred in making this finding based on the record and applicable legal authorities. As such, because this erroneous finding is the sole basis for the district court's inclusion of the County in its Injunction, even if the Injunction were not subject to vacatur for the reasons previously addressed, this affords an additional basis for granting the County the relief sought through this appeal.

Therefore, at least with regard to Lange's Motion for Summary Judgment, there exist genuine issues of material fact regarding the Sheriff's delegation of control to the County over whether and how to provide health insurance benefits to his employees. Accordingly, Lange was not entitled to summary judgment on her Title VII claim on the issue

---

and, thus, "failed to prove an essential element of his cause of action under Title VII, i.e., that [his employer] [was] a covered employer for Title VII purposes."), aff'd, 225 F. App'x 799 (11th Cir. 2007) (*per curiam*) and distinguished the Second Circuit's *Sprit* decision.

of whether the County was an agent of the Sheriff and, thus, an employer within the meaning of Title VII.

## IV.   CONCLUSION

For each of the reasons set forth above, Defendants respectfully request that this Court dissolve the Injunction and reverse the district court's Order granting summary judgment to Lange on her Title VII claim.

Respectfully submitted this 13th day of January 2023.

*s/ Sharon P. Morgan*
Sharon P. Morgan
Georgia Bar No. 522955
R. Read Gignilliat
Georgia Bar No. 293390
William D. Deveney
Georgia Bar No. 219744
Patrick L. Lail
Georgia Bar No. 431101

ELARBEE, THOMPSON, SAPP & WILSON, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia  30303
(404) 659-6700 (telephone)
(404) 222-9718 (facsimile)
morgan@elarbeethompson.com
gignilliat@elarbeethompson.com
deveney@elarbeethompson.com
lail@elarbeethompson.com

*Attorneys for Defendants-Appellants*

# CERTIFICATE OF COMPLIANCE

Counsel for the Appellants hereby certifies that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B). This brief contains 12,211  words.

_s/ Sharon P. Morgan_
Georgia Bar No. 522955

ELARBEE, THOMPSON, SAPP & WILSON, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia  30303
(404) 659-6700 (telephone)
(404) 222-9718 (facsimile)
morgan@elarbeethompson.com
gignilliat@elarbeethompson.com
deveney@elarbeethompson.com
lail@elarbeethompson.com

_Attorneys for Defendants-Appellants_

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify pursuant to Rule 25(d)(2) of the Federal Rules of Appellate Procedure that a true and correct copy of this **BRIEF OF DEFENDANTS-APPELLANTS** has been filed via the Court's ECF filing system, which will automatically serve Plaintiff-Appellee's attorneys as follows:

Kenneth E. Barton, III
M. Devlin Cooper
Wesley R. Powell
Jill K. Grant
Catherine E. Fata
Amanda M. Payne
David Brown
Gabriel Arkles
Kevin M. Barry

This the 13th day of January 2023.

*s/Sharon P. Morgan*
Sharon P. Morgan
Georgia Bar No. 522955

ELARBEE, THOMPSON, SAPP & WILSON, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia  30303
(404) 659-6700 (telephone)
(404) 222-9718 (facsimile)
morgan@elarbeethompson.com

*Attorneys for Defendants-Appellants*