

<span style="color:red">STAYED,</span><span style="color:blue">APPEAL,</span><span style="color:green">NO EXTENSION - MOTION</span>

### U.S. District Court <span style="color:red">[LIVE AREA]</span>
### Middle District of Georgia (Macon)
### CIVIL DOCKET FOR CASE #: 5:19-cv-00392-MTT

LANGE v. HOUSTON COUNTY, GEORGIA et al
Assigned to: CHIEF DISTRICT JUDGE MARC T TREADWELL
Case in other court:  US Court of Appeals, 22-13626-DD
Cause: 42:1983 Civil Rights (Employment Discrimination)

Date Filed: 10/02/2019
Jury Demand: Plaintiff
Nature of Suit: 442 Civil Rights: Jobs
Jurisdiction: Federal Question

**Plaintiff**

**ANNA LANGE**                                    represented by   **KENNETH E BARTON , III**
170 COLLEGE ST
MACON, GA 31201
478-841-9007
Fax: 4788419002
Email: keb@cooperbarton.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ALEJANDRA CARABALLO**
520 8TH AVE
STE 2204
NEW YORK, NY 10018
646-993-1676
Fax: 646-993-1686
Email: acaraballo@transgenderlegal.org
*TERMINATED: 08/16/2021*

**AMANDA MARIE PAYNE**
787 7TH AVE
NEW YORK, NY 10019
212-728-3781
Email: apayne@willkie.com
*ATTORNEY TO BE NOTICED*

**CATHERINE FATA**
787 SEVENTH AVE
NEW YORK, NY 10019-6099
212-728-8563
Email: cfata@willkie.com
*ATTORNEY TO BE NOTICED*

**DAVID BROWN**
520 8TH AVE
STE 2204
NEW YORK, NY 10018
646-862-9396
Email: dbrown@transgenderlegal.org
*ATTORNEY TO BE NOTICED*

**JILL K GRANT**
787 SEVENTH AVENUE
NEW YORK, NY 10019-6099
212-728-8774
Email: jgrant@willkie.com
*ATTORNEY TO BE NOTICED*

**KEVIN BARRY**
275 MT CARMEL AVE
HAMDEN, CT 06518
203-582-3238
Email: legalclinic@quinnipiac.edu
*ATTORNEY TO BE NOTICED*

**MARY EATON**
601 LEXINGTON AVE
STE 31ST FL
NEW YORK, NY 10022
212-277-4000
Email: mary.eaton@freshfields.com
*TERMINATED: 08/15/2022*
*ATTORNEY TO BE NOTICED*

**MICHAEL DEVLIN COOPER**
170 COLLEGE ST
MACON, GA 31201
478-841-9007
Fax: 478-841-9002
Email: mdc@cooperbarton.com
*ATTORNEY TO BE NOTICED*

**NOAH E LEWIS**
223-241 WEST 38TH STREET
PO BOX 1094
NEW YORK, NY 10018
(646) 862-9396
Fax: (646) 930-5654
Email: nlewis@transgenderlegal.org
*TERMINATED: 08/31/2021*
*ATTORNEY TO BE NOTICED*

**NOAH ETHAN LEWIS**
520 8TH AVE
STE 2204
NEW YORK, NY 10018
646-862-9396
Fax: 646-993-1686
Email: nlewis@transgenderlegal.org
*TERMINATED: 08/31/2021*
*ATTORNEY TO BE NOTICED*

**SARAH MATLACK WASTLER**
1875 K ST NW
WASHINGTON, DC 20006-1238
202-303-1257

Fax: 202-303-2257
Email: swastler@willkie.com
*TERMINATED: 10/19/2021*
*ATTORNEY TO BE NOTICED*

**WESLEY POWELL**
787 SEVENTH AVE
NEW YORK, NY 10019
212-728-8264
Email: wpowell@willkie.com
*ATTORNEY TO BE NOTICED*

**Z GABRIEL ARKLES**
520 8TH AVE
STE 2204
NEW YORK, NY 10004
646-993-1688
Email: garkles@transgenderlegal.org
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**HOUSTON COUNTY GEORGIA**                    represented by

**SHARON P MORGAN**
229 PEACHTREE ST NE STE 800
ATLANTA, GA 30303
404-659-6700
Email: morgan@elarbeethompson.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**PATRICK L LAIL**
229 PEACHTREE ST NE
800 INTERNATIONAL TOWER
ATLANTA, GA 30303
404-582-8428
Fax: 404-222-9718
Email: lail@elarbeethompson.com
*ATTORNEY TO BE NOTICED*

**RICHARD READ GIGNILLIAT**
Elarbee, Thompson LLP
229 Peachtree Street, N.E.
800 International Tower
Atlanta, GA 30303
404-659-6700
Fax: (404) 222-9718
Email: gignilli@elarbeethompson.com
*ATTORNEY TO BE NOTICED*

**WILLIAM DRUMMOND DEVENEY**
229 Peachtree Street, N.E.
800 International Tower
Atlanta, GA 30303
404-659-6700

Email: deveney@elarbeethompson.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**HOUSTON COUNTY BOARD OF COMMISSIONERS**
*TERMINATED: 08/20/2020*

represented by **SHARON P MORGAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**PATRICK L LAIL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**RICHARD READ GIGNILLIAT**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Commissioner TOMMY STALNAKER**
*Houston County, In his individual capacity*
*TERMINATED: 10/30/2020*

represented by **SHARON P MORGAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**PATRICK L LAIL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**RICHARD READ GIGNILLIAT**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**H. JAY WALKER, III**
*In his individual capacity*
*TERMINATED: 10/30/2020*

represented by **SHARON P MORGAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**PATRICK L LAIL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**RICHARD READ GIGNILLIAT**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**GAIL ROBINSON**
*In her individual capacity*
*TERMINATED: 10/30/2020*

represented by **SHARON P MORGAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**PATRICK L LAIL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**RICHARD READ GIGNILLIAT**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**LARRY THOMSON**
*In his individual capacity*
*TERMINATED: 10/30/2020*

represented by **SHARON P MORGAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**PATRICK L LAIL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**RICHARD READ GIGNILLIAT**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**TOM MCMICHAEL**
*In his individual capacity*
*TERMINATED: 10/30/2020*

represented by **SHARON P MORGAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**PATRICK L LAIL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**RICHARD READ GIGNILLIAT**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**BARRY HOLLAND**
*In his individual capacity*
*TERMINATED: 10/30/2020*

represented by **SHARON P MORGAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**PATRICK L LAIL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**RICHARD READ GIGNILLIAT**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**ROBBIE DUNBAR**
*In his official and individual capacity*
*TERMINATED: 04/13/2020*

represented by **SHARON P MORGAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**PATRICK L LAIL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**RICHARD READ GIGNILLIAT**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**KENNETH CARTER**
*Director of Personnel at Houston County, In his individual capacity*
*TERMINATED: 10/30/2020*

represented by **SHARON P MORGAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**PATRICK L LAIL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**RICHARD READ GIGNILLIAT**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Sheriff CULLEN TALTON**
*in his Official Capacity*

represented by **PATRICK L LAIL**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**RICHARD READ GIGNILLIAT**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**SHARON P MORGAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**WILLIAM DRUMMOND DEVENEY**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**BLUE CROSS BLUE SHIELD HEALTHCARE PLAN OF GEORGIA INC**

represented by **JAMES MITCHELL FUCETOLA , IV**
30 IVAN ALLEN JR BLVD NW
STE 700
ATLANTA, GA 30308
404-962-3511
Fax: 404-261-3556
Email: mfucetola@balch.com
*ATTORNEY TO BE NOTICED*

**T JOSHUA ARCHER**
30 IVAN ALLEN JR BLVD NW STE 700
ATLANTA, GA 30308-3036
404-261-6020
Email: jarcher@balch.com
*ATTORNEY TO BE NOTICED*

**TYLER P BISHOP**
3414 PEACHTREE RD NE
STE 1500
ATLANTA, GA 30326
404-589-3410
Email: tbishop@bakerdonelson.com
*TERMINATED: 09/12/2022*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/02/2019 | 1 | **COMPLAINT** against All Defendants Fee paid: Receipt # AGAMDC-3277783, $400 filed by All Plaintiffs (Attachments: # 1 Exhibit Ex. A EEOC Right to Sue, # 2 Civil Cover Sheet Civil Cover Sheet, # 3 Summons Houston County Summons, # 4 Summons Board of Commissioners Summons, # 5 Summons Stalnaker Summons, # 6 Summons Walker Summons, # 7 Summons Robinson Summons, # 8 Summons Thomson Summons, # 9 Summons McMichael Summons, # 10 Summons Holland Summons, # 11 Summons Dunbar Summons, # 12 Summons Carter Summons)(BARTON, KENNETH) (Entered: 10/02/2019) |
| 10/02/2019 | | NOTICE TO COUNSEL WESLEY POWELL, MARY EATON, JILL K GRANT, DAVID BROWN, NOAH E LEWIS, KEVIN M BARRY - Counsel is notified that they do not show in the court records that they meet the required attorney admissions policies of this court. If within 14 days of this notice all requirements, including the payment of Pro Hac Vice or admissions fees, have not been met, a show cause hearing will be scheduled. (vs) (Entered: 10/02/2019) |
| 10/02/2019 | 2 | Summons Issued as to KENNETH CARTER, ROBBIE DUNBAR, BARRY HOLLAND, HOUSTON COUNTY BOARD OF COMMISSIONERS, HOUSTON COUNTY, GEORGIA, TOM MCMICHAEL, GAIL ROBINSON, TOMMY STALNAKER, LARRY THOMPSON, H. JAY WALKER, III. (Attachments: # 1 Summons Robbie Dunbar, # 2 Summons Barry Holland, # 3 Summons Tom McMichael, # 4 Summons Larry Thomson, # 5 Summons Gail Robinson, # 6 Summons H. Jay Walker, # 7 Summons Tommy Stalnaker, # 8 Summons Houston County, Georgia, # 9 Summons Houston County Board of Commissioners)(vs) (Entered: 10/02/2019) |
| 10/02/2019 | 3 | Consent Form (28 USC 636(c)(1)) sent to ANNA LANGE (vs) (Entered: 10/02/2019) |
| 10/09/2019 | 4 | PETITION TO THE CLERK FOR ADMISSION TO PLEAD AND PRACTICE PRO HAC VICE by ANNA LANGE Attorney Admission Fee (Pro Hac Vice) paid by Receipt # AGAMDC-3283244, $100. LOCAL COUNSEL Name and Georgia Bar #: Kenneth E. Barton III Ga. State Bar No. 301171. (Attachments: # 1 Certificate of Good Standing SDNY Cert. Good Standing) (LEWIS, NOAH) (Entered: 10/09/2019) |
| 10/09/2019 | 5 | Order granting Petition for Admission Pro Hac Vice (Petition Attached); Attorney Admission Fee Met by NOAH E LEWIS (nop) (Entered: 10/09/2019) |
| 10/14/2019 | 6 | PETITION TO THE CLERK FOR ADMISSION TO PLEAD AND PRACTICE PRO HAC VICE by ANNA LANGE Attorney Admission Fee (Pro Hac Vice) paid by Receipt # AGAMDC-3286675, $100. LOCAL COUNSEL Name and Georgia Bar #: Kenneth E. Barton III; State Bar No. 301171. (Attachments: # 1 Certificate of Good Standing)(EATON, MARY) (Entered: 10/14/2019) |
| 10/14/2019 | 7 | PETITION TO THE CLERK FOR ADMISSION TO PLEAD AND PRACTICE PRO HAC VICE by ANNA LANGE Attorney Admission Fee (Pro Hac Vice) paid by Receipt # AGAMDC-3286679, $100. LOCAL COUNSEL Name and Georgia Bar #: Kenneth E. Barton III; State Bar No. 301171. (Attachments: # 1 Certificate of Good Standing)(GRANT, JILL) (Entered: 10/14/2019) |
| 10/15/2019 | 8 | PETITION TO THE CLERK FOR ADMISSION TO PLEAD AND PRACTICE PRO HAC VICE by ANNA LANGE Attorney Admission Fee (Pro Hac Vice) paid by Receipt # AGAMDC-3287156, $100. LOCAL COUNSEL Name and Georgia Bar #: Kenneth E. Barton III Ga. State |

| | | |
|---|---|---|
| | | Bar No. 301171. (Attachments: # 1 Certificate of Good Standing D.Conn. Cert. Good Standing) (BARRY, KEVIN) (Entered: 10/15/2019) |
| 10/15/2019 | 9 | PETITION TO THE CLERK FOR ADMISSION TO PLEAD AND PRACTICE PRO HAC VICE by ANNA LANGE Attorney Admission Fee (Pro Hac Vice) paid by Receipt # AGAMDC-3287634, $100. LOCAL COUNSEL Name and Georgia Bar #: Kenneth E. Barton III; State Bar No. 301171. (Attachments: # 1 Certificate of Good Standing)(POWELL, WESLEY) (Entered: 10/15/2019) |
| 10/16/2019 | 10 | Order granting Petition for Admission Pro Hac Vice (Petition Attached); Attorney Admission Fee Met by MARY EATON (ans) (Entered: 10/16/2019) |
| 10/16/2019 | 11 | Order granting Petition for Admission Pro Hac Vice (Petition Attached); Attorney Admission Fee Met by JILL K GRANT (ans) (Entered: 10/16/2019) |
| 10/16/2019 | 12 | Order granting Petition for Admission Pro Hac Vice (Petition Attached); Attorney Admission Fee Met by KEVIN BARRY (ans) (Entered: 10/16/2019) |
| 10/16/2019 | 13 | Order granting Petition for Admission Pro Hac Vice (Petition Attached); Attorney Admission Fee Met by WESLEY POWELL (ans) (Entered: 10/16/2019) |
| 10/28/2019 | 14 | PETITION TO THE CLERK FOR ADMISSION TO PLEAD AND PRACTICE PRO HAC VICE by ANNA LANGE Attorney Admission Fee (Pro Hac Vice) paid by Receipt # AGAMDC-3299956, $100. LOCAL COUNSEL Name and Georgia Bar #: Kenneth E. Barton III, Ga. State Bar No. 301171. (Attachments: # 1 Certificate of Good Standing District of North Dakota) (BROWN, DAVID) (Entered: 10/28/2019) |
| 10/30/2019 | 15 | Order granting Petition for Admission Pro Hac Vice (Petition Attached); Attorney Admission Fee Met by DAVID BROWN (nop) (Entered: 10/30/2019) |
| 11/01/2019 | 16 | WAIVER OF SERVICE Returned Executed by ANNA LANGE. as to TOM MCMICHAEL (BARTON, KENNETH) (Entered: 11/01/2019) |
| 11/01/2019 | 17 | WAIVER OF SERVICE Returned Executed by ANNA LANGE. as to KENNETH CARTER (BARTON, KENNETH) (Entered: 11/01/2019) |
| 11/01/2019 | 18 | WAIVER OF SERVICE Returned Executed by ANNA LANGE. as to TOMMY STALNAKER (BARTON, KENNETH) (Entered: 11/01/2019) |
| 11/01/2019 | 19 | WAIVER OF SERVICE Returned Executed by ANNA LANGE. as to GAIL ROBINSON (BARTON, KENNETH) (Entered: 11/01/2019) |
| 11/01/2019 | 20 | WAIVER OF SERVICE Returned Executed by ANNA LANGE. as to H. JAY WALKER, III (BARTON, KENNETH) (Entered: 11/01/2019) |
| 11/01/2019 | 21 | WAIVER OF SERVICE Returned Executed by ANNA LANGE. as to ROBBIE DUNBAR (BARTON, KENNETH) (Entered: 11/01/2019) |
| 11/01/2019 | 22 | WAIVER OF SERVICE Returned Executed by ANNA LANGE. as to LARRY THOMPSON (BARTON, KENNETH) (Entered: 11/01/2019) |
| 11/01/2019 | 23 | WAIVER OF SERVICE Returned Executed by ANNA LANGE. as to BARRY HOLLAND (BARTON, KENNETH) (Entered: 11/01/2019) |
| 11/01/2019 | 24 | STIPULATION *AND ACKNOWLEDGMENT OF SERVICE OF PROCESS* by KENNETH CARTER, ROBBIE DUNBAR, BARRY HOLLAND, HOUSTON COUNTY BOARD OF COMMISSIONERS, HOUSTON COUNTY, GEORGIA, TOM MCMICHAEL, GAIL ROBINSON, TOMMY STALNAKER, LARRY THOMPSON, H. JAY WALKER, III (MORGAN, SHARON) (Entered: 11/01/2019) |
| 11/01/2019 | 25 | NOTICE of Attorney Appearance by Patrick L. Lail on behalf of All Defendants Attorney Patrick L. Lail added to party KENNETH CARTER(pty:dft), Attorney Patrick L. Lail added to party ROBBIE DUNBAR(pty:dft), Attorney Patrick L. Lail added to party BARRY |

| | | |
|---|---|---|
| | | HOLLAND(pty:dft), Attorney Patrick L. Lail added to party HOUSTON COUNTY BOARD OF COMMISSIONERS(pty:dft), Attorney Patrick L. Lail added to party HOUSTON COUNTY, GEORGIA(pty:dft), Attorney Patrick L. Lail added to party TOM MCMICHAEL(pty:dft), Attorney Patrick L. Lail added to party GAIL ROBINSON(pty:dft), Attorney Patrick L. Lail added to party TOMMY STALNAKER(pty:dft), Attorney Patrick L. Lail added to party LARRY THOMPSON(pty:dft), Attorney Patrick L. Lail added to party H. JAY WALKER, III(pty:dft) (Lail, Patrick) (Entered: 11/01/2019) |
| 11/01/2019 | 26 | NOTICE of Attorney Appearance by RICHARD READ GIGNILLIAT on behalf of All Defendants Attorney RICHARD READ GIGNILLIAT added to party KENNETH CARTER(pty:dft), Attorney RICHARD READ GIGNILLIAT added to party ROBBIE DUNBAR(pty:dft), Attorney RICHARD READ GIGNILLIAT added to party BARRY HOLLAND(pty:dft), Attorney RICHARD READ GIGNILLIAT added to party HOUSTON COUNTY BOARD OF COMMISSIONERS(pty:dft), Attorney RICHARD READ GIGNILLIAT added to party HOUSTON COUNTY, GEORGIA(pty:dft), Attorney RICHARD READ GIGNILLIAT added to party TOM MCMICHAEL(pty:dft), Attorney RICHARD READ GIGNILLIAT added to party GAIL ROBINSON(pty:dft), Attorney RICHARD READ GIGNILLIAT added to party TOMMY STALNAKER(pty:dft), Attorney RICHARD READ GIGNILLIAT added to party LARRY THOMPSON(pty:dft), Attorney RICHARD READ GIGNILLIAT added to party H. JAY WALKER, III(pty:dft) (GIGNILLIAT, RICHARD) (Entered: 11/01/2019) |
| 11/01/2019 | 27 | NOTICE of Attorney Appearance by SHARON P MORGAN on behalf of All Defendants Attorney SHARON P MORGAN added to party KENNETH CARTER(pty:dft), Attorney SHARON P MORGAN added to party ROBBIE DUNBAR(pty:dft), Attorney SHARON P MORGAN added to party BARRY HOLLAND(pty:dft), Attorney SHARON P MORGAN added to party HOUSTON COUNTY BOARD OF COMMISSIONERS(pty:dft), Attorney SHARON P MORGAN added to party HOUSTON COUNTY, GEORGIA(pty:dft), Attorney SHARON P MORGAN added to party TOM MCMICHAEL(pty:dft), Attorney SHARON P MORGAN added to party GAIL ROBINSON(pty:dft), Attorney SHARON P MORGAN added to party TOMMY STALNAKER(pty:dft), Attorney SHARON P MORGAN added to party LARRY THOMPSON(pty:dft), Attorney SHARON P MORGAN added to party H. JAY WALKER, III(pty:dft) (MORGAN, SHARON) (Entered: 11/01/2019) |
| 11/22/2019 | 28 | MOTION for Preliminary Injunction by ANNA LANGE filed by KENNETH E BARTON, III. (Attachments: # 1 Memorandum in Support Brief in Supp. of Motion for Injunction, # 2 Exhibit Lange Declaration, # 3 Exhibit Bluebond-Langner Declaration, # 4 Exhibit Lewis Declaration, # 5 Exhibit Schechter Declaration)(BARTON, KENNETH) (Entered: 11/22/2019) |
| 11/26/2019 | | NOTICE OF **SETTING** TELEPHONE CONFERENCE: Telephone Conference set for 12/5/2019 at 10:00 AM in Macon before US DISTRICT JUDGE MARC THOMAS TREADWELL. Call-in instructions emailed to the parties. (kat) (Entered: 11/26/2019) |
| 12/03/2019 | 29 | MOTION to Dismiss Complaint re 1 Complaint by KENNETH CARTER, ROBBIE DUNBAR, BARRY HOLLAND, HOUSTON COUNTY BOARD OF COMMISSIONERS, TOM MCMICHAEL, GAIL ROBINSON, TOMMY STALNAKER, LARRY THOMPSON, H. JAY WALKER, III filed by SHARON P MORGAN. (Attachments: # 1 Memorandum in Support) (MORGAN, SHARON) Modified on 12/4/2019 to edit docket text (vs). (Entered: 12/03/2019) |
| 12/03/2019 | 30 | ANSWER to Complaint by HOUSTON COUNTY, GEORGIA. (Attachments: # 1 Exhibit A - 2019 POS Plan, # 2 Exhibit B - EEOC FOIA File)(MORGAN, SHARON) Modified on 12/4/2019 to edit docket text (vs). (Entered: 12/03/2019) |
| 12/03/2019 | 31 | MOTION for Judgment on the Pleadings by HOUSTON COUNTY, GEORGIA filed by SHARON P MORGAN. (Attachments: # 1 Memorandum in Support)(MORGAN, SHARON) (Entered: 12/03/2019) |
| 12/05/2019 | 32 | Minute Entry for proceedings held before US DISTRICT JUDGE MARC THOMAS TREADWELL: Telephone Conference held on 12/5/2019. Court Reporter: Darlene Fuller. (kat) |

| | | (Entered: 12/05/2019) |
|---|---|---|
| 12/11/2019 | 33 | Letter regarding Request of 7-day extension to file Defendants' Response to Plaintiff's Motion for Preliminary Injunction re 28 MOTION for Preliminary Injunction (MORGAN, SHARON) (Entered: 12/11/2019) |
| 12/12/2019 | | Notice of Clerk's Granting of Extension Pursuant to Local Rule 6.2 re: 28 MOTION for Preliminary Injunction filed by ANNA LANGE (vs) (Entered: 12/12/2019) |
| 12/14/2019 | 34 | UNOPPOSED MOTION for Extension of Time to File RESPONSE as to 31 MOTION for Judgment on the Pleadings, 29 MOTION to Dismiss Complaint re 1 Complaint,, :MOTION to Dismiss Complaint, 28 MOTION for Preliminary Injunction by ANNA LANGE filed by KENNETH E BARTON, III.(BARTON, KENNETH) (Entered: 12/14/2019) |
| 12/17/2019 | 35 | **ORDER** GRANTING 34 Motion for Extension of Time to File Reply for 34 Plaintiff's motion for preliminary injunction, Response for 29 Defendants' motion to dismiss complaint, and Response for 31 Defendant's motion for judgment on the pleadings. Plaintiff shall have until January 14, 2020 to file the briefs. Ordered by US DISTRICT JUDGE MARC THOMAS TREADWELL on 12/17/2019. (kat) (Entered: 12/17/2019) |
| 12/20/2019 | 36 | RESPONSE filed by KENNETH CARTER, ROBBIE DUNBAR, BARRY HOLLAND, HOUSTON COUNTY BOARD OF COMMISSIONERS, HOUSTON COUNTY, GEORGIA, TOM MCMICHAEL, GAIL ROBINSON, TOMMY STALNAKER, LARRY THOMPSON, H. JAY WALKER, III re 28 MOTION for Preliminary Injunction (Attachments: # 1 Exhibit 1 - Declaration of Kenneth Carter)(GIGNILLIAT, RICHARD) (Entered: 12/20/2019) |
| 01/06/2020 | 37 | PETITION TO THE CLERK FOR ADMISSION TO PLEAD AND PRACTICE PRO HAC VICE by ANNA LANGE Attorney Admission Fee (Pro Hac Vice) paid by Receipt # AGAMDC-3354423, $100. LOCAL COUNSEL Name and Georgia Bar #: Kenneth E. Barton III Ga. State Bar No. 301171. (Attachments: # 1 Certificate of Good Standing)(WASTLER, SARAH) (Entered: 01/06/2020) |
| 01/06/2020 | 38 | Order granting Petition for Admission Pro Hac Vice (Petition Attached); Attorney Admission Fee Met by SARAH MATLACK WASTLER (nop) (Entered: 01/06/2020) |
| 01/09/2020 | 39 | UNOPPOSED MOTION for Leave to File Excess Pages for Motions to Dismiss and for Judgment on the Pleadings by ANNA LANGE filed by KENNETH E BARTON, III.(BARTON, KENNETH) (Entered: 01/09/2020) |
| 01/10/2020 | 40 | This is a text only entry; no document issued. **ORDER** GRANTING 39 Motion for Leave to File Omnibus Response and to Extend Page Limits. Ordered by US DISTRICT JUDGE MARC THOMAS TREADWELL on 1/10/2020. (wbm) (Entered: 01/10/2020) |
| 01/14/2020 | 41 | RESPONSE filed by ANNA LANGE re 31 MOTION for Judgment on the Pleadings, 29 MOTION to Dismiss Complaint re 1 Complaint,, :MOTION to Dismiss Complaint (BARTON, KENNETH) (Entered: 01/14/2020) |
| 01/14/2020 | 42 | REPLY to Response filed by ANNA LANGE re 28 MOTION for Preliminary Injunction (BARTON, KENNETH) (Entered: 01/14/2020) |
| 01/21/2020 | 43 | TRANSCRIPT of Telephone Conference held on 12/05/2019, before Judge Marc T. Treadwell. Court Reporter Darlene D. Fuller. The transcript may be inspected at the court or purchased through the court reporter for a period of 90 days. After 90 days, the transcript may be obtained via PACER. REDACTION OF TRANSCRIPTS: Complete redaction policy available on the courts website. (ddf) (Entered: 01/21/2020) |
| 01/23/2020 | 44 | Letter regarding Request of 14-day extension to file Defendants' Reply in Support of their Motion to Dismiss and Defendant Houston County's Reply in Support of its Motion for Judgment on the Pleadings re 31 MOTION for Judgment on the Pleadings, 29 MOTION to |

| | | |
|---|---|---|
| | | Dismiss Complaint re 1 Complaint,, :MOTION to Dismiss Complaint (MORGAN, SHARON) (Entered: 01/23/2020) |
| 01/23/2020 | 45 | MOTION for Hearing re Motion for Preliminary Injunction re 36 Response to Motion, 43 Transcript of Proceedings, 28 MOTION for Preliminary Injunction (COOPER, MICHAEL) Modified on 1/24/2020 to change event type (vs). (Entered: 01/23/2020) |
| 01/24/2020 | | Notice of Clerk's Granting of Extension Pursuant to Local Rule 6.2 re: 31 MOTION for Judgment on the Pleadings filed by HOUSTON COUNTY, GEORGIA (vs) (Entered: 01/24/2020) |
| 01/30/2020 | 46 | Letter from Judge Treadwell regarding pending motions. (kat) (Entered: 01/30/2020) |
| 02/06/2020 | 47 | UNOPPOSED MOTION for Leave to File Excess Pages for Defendants' Reply in Support of their Motion to Dismiss and Defendants' Reply in Support of their Motion for Judgment on the Pleadings by KENNETH CARTER, ROBBIE DUNBAR, BARRY HOLLAND, HOUSTON COUNTY BOARD OF COMMISSIONERS, HOUSTON COUNTY, GEORGIA, TOM MCMICHAEL, GAIL ROBINSON, TOMMY STALNAKER, LARRY THOMPSON, H. JAY WALKER, III filed by SHARON P MORGAN.(MORGAN, SHARON) (Entered: 02/06/2020) |
| 02/07/2020 | 48 | This is a text only entry; no document issued. **ORDER** GRANTING 47 Motion for Leave to File Excess Pages. Ordered by US DISTRICT JUDGE MARC THOMAS TREADWELL on 2/7/2020. (wbm) (Entered: 02/07/2020) |
| 02/11/2020 | 49 | REPLY to Response filed by KENNETH CARTER, ROBBIE DUNBAR, BARRY HOLLAND, HOUSTON COUNTY BOARD OF COMMISSIONERS, TOM MCMICHAEL, GAIL ROBINSON re 29 MOTION to Dismiss Complaint re 1 Complaint,, :MOTION to Dismiss Complaint (MORGAN, SHARON) (Entered: 02/11/2020) |
| 02/11/2020 | 50 | REPLY to Response filed by HOUSTON COUNTY, GEORGIA re 31 MOTION for Judgment on the Pleadings (MORGAN, SHARON) (Entered: 02/11/2020) |
| 02/12/2020 | 51 | Letter regarding Intention to File Motion for Leave to Amend Complaint (POWELL, WESLEY) (Entered: 02/12/2020) |
| 02/26/2020 | 52 | PETITION TO THE CLERK FOR ADMISSION TO PLEAD AND PRACTICE PRO HAC VICE by All Plaintiffs Attorney Admission Fee (Pro Hac Vice) paid by Receipt # AGAMDC-3401421, $100. LOCAL COUNSEL Name and Georgia Bar #: Kenneth E. Barton III 301171. (Attachments: # 1 Certificate of Good Standing)(CARABALLO, ALEJANDRA) (Entered: 02/26/2020) |
| 02/27/2020 | 53 | Order granting Petition for Admission Pro Hac Vice (Petition Attached); Attorney Admission Fee Met by ALEJANDRA CARABALLO (nop) (Entered: 02/27/2020) |
| 03/23/2020 | 54 | **ORDER** STAYING pending motions 28 MOTION for Preliminary Injunction; 29 MOTION to Dismiss Complaint; 31 MOTION for Judgment on the Pleadings, and 45 MOTION for Hearing until the Plaintiff's motion to amend is resolved. Ordered by US DISTRICT JUDGE MARC THOMAS TREADWELL on 3/23/2020. (kat) (Entered: 03/23/2020) |
| 04/10/2020 | 55 | STIPULATION *Regarding Amended Complaint, Motion for Preliminary Injunction and Dispositive Motions* re 29 MOTION to Dismiss Complaint re 1 Complaint,, :MOTION to Dismiss Complaint, 28 MOTION for Preliminary Injunction by ANNA LANGE (BARTON, KENNETH) (Entered: 04/10/2020) |
| 04/10/2020 | 56 | AMENDED 1 Complaint,, against All Defendants by ANNA LANGE (BARTON, KENNETH) (Entered: 04/10/2020) |
| 04/10/2020 | 57 | MOTION for Preliminary Injunction by ANNA LANGE filed by KENNETH E BARTON, III. (Attachments: # 1 Memorandum in Support Brief in Support of Motion, # 2 Exhibit Lange Declaration, # 3 Exhibit Lewis Declaration, # 4 Exhibit Schechter Declaration, # 5 Exhibit Bluebond-Langer Declaration)(BARTON, KENNETH) (Entered: 04/10/2020) |

| | | |
|---|---|---|
| 04/28/2020 | 58 | Letter regarding extension of time to file Defendants' Response to Plaintiff's Superseding Motion for Preliminary Injunction re 57 MOTION for Preliminary Injunction (MORGAN, SHARON) (Entered: 04/28/2020) |
| 04/28/2020 | | Notice of Clerk's Granting of Extension Pursuant to Local Rule 6.2 re: 57 MOTION for Preliminary Injunction filed by ANNA LANGE (vs) (Entered: 04/28/2020) |
| 05/06/2020 | 59 | UNOPPOSED MOTION for Leave to File Excess Pages for Defendants' Brief in Support of their Motion to Dismiss by KENNETH CARTER, BARRY HOLLAND, HOUSTON COUNTY BOARD OF COMMISSIONERS, HOUSTON COUNTY, GEORGIA, TOM MCMICHAEL, GAIL ROBINSON, TOMMY STALNAKER, CULLEN TALTON, LARRY THOMSON, H. JAY WALKER, III filed by SHARON P MORGAN.(MORGAN, SHARON) (Entered: 05/06/2020) |
| 05/08/2020 | 60 | This is a text only entry; no document issued. **ORDER** GRANTING 59 Motion for Leave to File Excess Pages. Ordered by US DISTRICT JUDGE MARC THOMAS TREADWELL on 5/8/2020. (wbm) (Entered: 05/08/2020) |
| 05/11/2020 | 61 | MOTION to Dismiss for Lack of Jurisdiction by CULLEN TALTON filed by SHARON P MORGAN. (Attachments: # 1 Memorandum in Support)(MORGAN, SHARON) (Entered: 05/11/2020) |
| 05/11/2020 | 62 | MOTION to Dismiss Complaint re 56 Amended Complaint/Petition : by KENNETH CARTER, ROBBIE DUNBAR, BARRY HOLLAND, HOUSTON COUNTY BOARD OF COMMISSIONERS, HOUSTON COUNTY, GEORGIA, TOM MCMICHAEL, GAIL ROBINSON, TOMMY STALNAKER, CULLEN TALTON, LARRY THOMSON, H. JAY WALKER, III filed by SHARON P MORGAN. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A - 2019 POS Plan)(MORGAN, SHARON) (Entered: 05/11/2020) |
| 05/15/2020 | 63 | RESPONSE filed by KENNETH CARTER, BARRY HOLLAND, HOUSTON COUNTY BOARD OF COMMISSIONERS, HOUSTON COUNTY, GEORGIA, TOM MCMICHAEL, GAIL ROBINSON, TOMMY STALNAKER, CULLEN TALTON, LARRY THOMSON, H. JAY WALKER, III re 57 MOTION for Preliminary Injunction (Attachments: # 1 Exhibit 1 - Declaration of Kenneth Carter)(MORGAN, SHARON) (Entered: 05/15/2020) |
| 05/22/2020 | 64 | UNOPPOSED MOTION to Amend/Correct 57 MOTION for Preliminary Injunction by ANNA LANGE filed by DAVID BROWN. (Attachments: # 1 Affidavit Corrected Declaration of Sgt. Lange)(BROWN, DAVID) (Entered: 05/22/2020) |
| 05/26/2020 | 65 | This is a text only entry; no document issued. **ORDER** GRANTING 64 Motion to Amend/Correct. The Defendants shall have 7 days to file an amended response brief. Ordered by US DISTRICT JUDGE MARC THOMAS TREADWELL on 5/26/2020. (wbm) (Entered: 05/26/2020) |
| 05/26/2020 | 66 | EXHIBIT(S) *Corrected Declaration with Exhibits* by ANNA LANGE re 65 Order on Motion to Amend/Correct, (BARTON, KENNETH) (Entered: 05/26/2020) |
| 05/26/2020 | 67 | Letter regarding Request of 14-day extension to file Plaintiffs Responses re 62 MOTION to Dismiss Complaint re 56 Amended Complaint/Petition :, 61 MOTION to Dismiss for Lack of Jurisdiction (WASTLER, SARAH) (Entered: 05/26/2020) |
| 05/27/2020 | | Notice of Clerk's Granting of Extension Pursuant to Local Rule 6.2 re: 62 MOTION to Dismiss Complaint re 56 Amended Complaint/Petition : filed by HOUSTON COUNTY BOARD OF COMMISSIONERS, BARRY HOLLAND, TOM MCMICHAEL, KENNETH CARTER, LARRY THOMSON, H. JAY WALKER, III, GAIL ROBINSON, ROBBIE DUNBAR, HOUSTON COUNTY, GEORGIA, TOMMY STALNAKER, CULLEN TALTON, 61 MOTION to Dismiss for Lack of Jurisdiction filed by CULLEN TALTON (vs) (Entered: 05/27/2020) |
| 06/02/2020 | 68 | DEFENDANTS' AMENDED RESPONSE in Opposition to Plaintiff's Superseding Motion for a Preliminary Injunction filed by KENNETH CARTER, BARRY HOLLAND, HOUSTON |

| | | |
|---|---|---|
| | | COUNTY BOARD OF COMMISSIONERS, HOUSTON COUNTY, GEORGIA, TOM MCMICHAEL, GAIL ROBINSON, TOMMY STALNAKER, CULLEN TALTON, LARRY THOMSON, H. JAY WALKER, III re 57 MOTION for Preliminary Injunction (Attachments: # 1 Exhibit 1 - Declaration of Kenneth Carter)(MORGAN, SHARON) Modified on 6/3/2020 to add docket text(vs). (Entered: 06/02/2020) |
| 06/10/2020 | 69 | UNOPPOSED MOTION for Leave to File Excess Pages for Response to Defendants' Motions to Dismiss by ANNA LANGE filed by KENNETH E BARTON, III.(BARTON, KENNETH) (Entered: 06/10/2020) |
| 06/10/2020 | | NOTICE OF SETTING HEARING ON MOTION re 62 MOTION to Dismiss Complaint re 56 Amended Complaint/Petition, and 61 MOTION to Dismiss for Lack of Jurisdiction: Motion Hearing set for 8/10/2020 at 2:00 PM in Macon before CHIEF US DISTRICT JUDGE MARC THOMAS TREADWELL. Hearing will occur via **VIDEOCONFERENCE** . Counsel will receive connection information by separate email. Interested parties may obtain dial information by emailing macon.ecf@gamd.uscourts.gov. (kat) Text modified on 7/28/2020 to include videoconference language(kat). (Entered: 06/10/2020) |
| 06/11/2020 | 70 | This is a text only entry; no document issued. **ORDER** GRANTING 69 Motion for Leave to File Excess Pages. Ordered by US DISTRICT JUDGE MARC THOMAS TREADWELL on 6/11/2020. (wbm) (Entered: 06/11/2020) |
| 06/15/2020 | 71 | EMERGENCY MOTION for Extension of Time to File RESPONSE as to 57 MOTION for Preliminary Injunction, 62 MOTION to Dismiss Complaint re 56 Amended Complaint/Petition :, 61 MOTION to Dismiss for Lack of Jurisdiction by ANNA LANGE filed by KENNETH E BARTON, III.(BARTON, KENNETH) (Entered: 06/15/2020) |
| 06/15/2020 | 72 | This is a text only entry; no document issued. **ORDER** GRANTING 71 Emergency Unopposed Motion for Extension of Time to File RESPONSE re 62 MOTION to Dismiss Complaint re 56 Amended Complaint/Petition, 57 MOTION for Preliminary Injunction, and 61 MOTION to Dismiss for Lack of Jurisdiction. Plaintiff shall have through and including 6/18/2020 to respond. Ordered by US DISTRICT JUDGE MARC THOMAS TREADWELL on 6/15/2020. (kat) (Entered: 06/15/2020) |
| 06/18/2020 | 73 | REPLY to Response filed by ANNA LANGE re 57 MOTION for Preliminary Injunction (Attachments: # 1 Exhibit Ex 1 EEOC Interim Enforcement Guidance on application of ADA, # 2 Exhibit Ex 2 Notice of Claim Sheriff Talton)(BARTON, KENNETH) (Entered: 06/18/2020) |
| 06/18/2020 | 74 | RESPONSE filed by ANNA LANGE re 62 MOTION to Dismiss Complaint re 56 Amended Complaint/Petition :, 61 MOTION to Dismiss for Lack of Jurisdiction (Attachments: # 1 Exhibit Ex. A Demonstrative Chart)(BARTON, KENNETH) (Entered: 06/18/2020) |
| 06/25/2020 | 75 | Letter regarding Request of 14-day extension to file Defendant Talton's' Reply in Support of his Motion to Dismiss for Lack of Subject-Matter Jurisdiction and Defendants' Reply in Support of their Motion to Dismiss Amended Complaint re 62 MOTION to Dismiss Complaint re 56 Amended Complaint/Petition :, 61 MOTION to Dismiss for Lack of Jurisdiction (MORGAN, SHARON) (Entered: 06/25/2020) |
| 06/25/2020 | | Notice of Clerk's Granting of Extension Pursuant to Local Rule 6.2 re: 75 Letter, 62 MOTION to Dismiss Complaint re 56 Amended Complaint/Petition : filed by HOUSTON COUNTY BOARD OF COMMISSIONERS, BARRY HOLLAND, TOM MCMICHAEL, KENNETH CARTER, LARRY THOMSON, H. JAY WALKER, III, GAIL ROBINSON, ROBBIE DUNBAR, HOUSTON COUNTY, GEORGIA, TOMMY STALNAKER, CULLEN TALTON, 61 MOTION to Dismiss for Lack of Jurisdiction filed by CULLEN TALTON () (tam) (Entered: 06/25/2020) |
| 07/10/2020 | 76 | UNOPPOSED MOTION for Leave to File Excess Pages for Defendants' Reply Brief of their Rule 12(b)(6) Motion to Dismiss and Defendant Talton's Reply Brief in Support of his Rule 12(b)(1) Motion to Dismiss by KENNETH CARTER, BARRY HOLLAND, HOUSTON COUNTY BOARD OF COMMISSIONERS, HOUSTON COUNTY, GEORGIA, TOM |

| | | |
|---|---|---|
| | | MCMICHAEL, GAIL ROBINSON, TOMMY STALNAKER, CULLEN TALTON, LARRY THOMSON, H. JAY WALKER, III filed by SHARON P MORGAN.(MORGAN, SHARON) (Entered: 07/10/2020) |
| 07/13/2020 | 77 | This is a text only entry; no document issued. **ORDER** GRANTING [76](#) Motion for Leave to File Excess Pages. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 7/13/2020. (wbm) (Entered: 07/13/2020) |
| 07/16/2020 | 78 | Motion for hearing/Letter regarding oral argument for PI motion (WASTLER, SARAH) Modified on 7/17/2020 to edit docket text(vs). (Entered: 07/16/2020) |
| 07/16/2020 | 79 | REPLY to Response filed by KENNETH CARTER, BARRY HOLLAND, HOUSTON COUNTY BOARD OF COMMISSIONERS, HOUSTON COUNTY, GEORGIA, TOM MCMICHAEL, GAIL ROBINSON, TOMMY STALNAKER, CULLEN TALTON, LARRY THOMSON, H. JAY WALKER, III re [62](#) MOTION to Dismiss Complaint re [56](#) Amended Complaint/Petition : (MORGAN, SHARON) (Entered: 07/16/2020) |
| 07/16/2020 | 80 | REPLY to Response filed by CULLEN TALTON re [61](#) MOTION to Dismiss for Lack of Jurisdiction (MORGAN, SHARON) (Entered: 07/16/2020) |
| 08/05/2020 | | AMENDED NOTICE OF **RESETTING** HEARING ON MOTION re [62](#) MOTION to Dismiss Complaint re [56](#) Amended Complaint/Petition, [61](#) MOTION to Dismiss for Lack of Jurisdiction. Motion Hearing PREVIOUSLY set for 8/10/2020 is RESET for 8/19/2020 at 2:00 PM in Macon before CHIEF DISTRICT JUDGE MARC T TREADWELL. Hearing will be convened in court. Counsel shall appear via **VIDEOCONFERENCE**. Counsel will receive connection information by separate email. For telephonic access, contact macon.ecf@gamd.uscourts.gov.(kat) Text modified on 8/10/2020 (kat). (Entered: 08/05/2020) |
| 08/11/2020 | 81 | UNOPPOSED MOTION for Leave to File Surreply by ANNA LANGE filed by DAVID BROWN.(BROWN, DAVID) (Entered: 08/11/2020) |
| 08/11/2020 | 82 | This is a text only entry; no document issued. **ORDER** GRANTING [81](#) Motion for Leave to File Surreply. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 8/11/2020. (wbm) (Entered: 08/11/2020) |
| 08/14/2020 | 83 | SURREPLY filed by ANNA LANGE re [62](#) MOTION to Dismiss Complaint re [56](#) Amended Complaint/Petition :, [61](#) MOTION to Dismiss for Lack of Jurisdiction (BROWN, DAVID) (Entered: 08/14/2020) |
| 08/20/2020 | 84 | **ORDER**. The official-capacity claims against Defendants Stalnaker, Walker, Robinson, Thomson, McMichael, Holland, Carter, and the Houston County Board of Commissioners, are DISMISSED without prejudice as redundant of the claims against the County. If discovery reveals that any of those claims are not redundant, Plaintiff may amend her complaint to add the claims back in. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 8/20/2020. (kat) (Entered: 08/20/2020) |
| 08/21/2020 | 85 | NOTICE of Statement of Authorities by ANNA LANGE re [74](#) Response to Motion (WASTLER, SARAH) (Entered: 08/21/2020) |
| 08/26/2020 | 86 | NOTICE Defendants' Statement of Additional Authorities by KENNETH CARTER, BARRY HOLLAND, TOM MCMICHAEL, GAIL ROBINSON, TOMMY STALNAKER, CULLEN TALTON, LARRY THOMSON, H. JAY WALKER, III re [62](#) MOTION to Dismiss Complaint re [56](#) Amended Complaint/Petition : (Attachments: # [1](#) Exhibit 1 Childs v Macon-Bibb County Ind'l Auth., # [2](#) Exhibit 2 Zimmerman v. Cherokee County)(MORGAN, SHARON) (Entered: 08/26/2020) |
| 08/28/2020 | 87 | Minute Entry **(content for administrative purposes only)** for proceedings held before CHIEF DISTRICT JUDGE MARC T TREADWELL: Motion Hearing held on 8/19/2020 re [61](#) MOTION to Dismiss for Lack of Jurisdiction filed by CULLEN TALTON; and [62](#) MOTION to Dismiss Complaint re [56](#) Amended Complaint/Petition filed by HOUSTON COUNTY BOARD |

| | | |
|---|---|---|
| | | OF COMMISSIONERS, BARRY HOLLAND, TOM MCMICHAEL, KENNETH CARTER, LARRY THOMSON, H. JAY WALKER, III, GAIL ROBINSON, ROBBIE DUNBAR, HOUSTON COUNTY, GEORGIA, TOMMY STALNAKER, CULLEN TALTON. Court Reporter: Darlene Fuller. (kat) (Entered: 08/28/2020) |
| 09/02/2020 | 88 | TRANSCRIPT of Motion to Dismiss held on 08/19/2020, before Judge Marc T. Treadwell. Court Reporter Darlene D. Fuller. The transcript may be inspected at the court or purchased through the court reporter for a period of 90 days. After 90 days, the transcript may be obtained via PACER. REDACTION OF TRANSCRIPTS: Complete redaction policy available on the courts website. (ddf) (Entered: 09/02/2020) |
| 10/30/2020 | 89 | **ORDER** DENYING 61 Motion to Dismiss for Lack of Jurisdiction; and GRANTING in part and DENYING in part 62 Motion to Dismiss Complaint. The remaining claims are (1) ADA Title I claims against the County and the Sheriff in his official capacity, (2) Title VII claims against the County and the Sheriff in his official capacity, and (3) federal equal protection claims against the County and the Sheriff in his official capacity. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 10/30/2020. (kat) (Entered: 10/30/2020) |
| 10/30/2020 | 90 | ***RE-FILED AT 91 ***Letter regarding Request for Oral Argument re 57 MOTION for Preliminary Injunction (BARTON, KENNETH) Modified on 11/2/2020 to add docket text (vs). (Entered: 10/30/2020) |
| 11/02/2020 | | Notice of Deficiency (related document(s): 90 Letter ); Document must be re-filed using correct event - MOTION FOR HEARING(vs) (Entered: 11/02/2020) |
| 11/02/2020 | 91 | MOTION for Hearing re 57 MOTION for Preliminary Injunction by ANNA LANGE filed by KENNETH E BARTON, III.(BARTON, KENNETH) (Entered: 11/02/2020) |
| 11/13/2020 | 92 | ANSWER to 56 Amended Complaint/Petition by HOUSTON COUNTY, GEORGIA. Related document: 56 Amended Complaint/Petition filed by ANNA LANGE.(MORGAN, SHARON) (Entered: 11/13/2020) |
| 11/13/2020 | 93 | DISREGARD - WRONG DOCUMENT ATTACHED - REFILED AT TAB 96. ANSWER to 56 Amended Complaint/Petition by CULLEN TALTON. Related document: 56 Amended Complaint/Petition filed by ANNA LANGE.(MORGAN, SHARON) Modified on 11/16/2020 (ggs). (Entered: 11/13/2020) |
| 11/13/2020 | 94 | MOTION for Reconsideration re 89 Order on Motion to Dismiss/Lack of Jurisdiction,,, Order on Motion to Dismiss Complaint,, by HOUSTON COUNTY, GEORGIA filed by SHARON P MORGAN.(MORGAN, SHARON) (Entered: 11/13/2020) |
| 11/13/2020 | 95 | DISREGARD - WRONG DOCUMENT ATTACHED - REFILED AT TAB 96. ANSWER to 56 Amended Complaint/Petition by CULLEN TALTON. Related document: 56 Amended Complaint/Petition filed by ANNA LANGE.(MORGAN, SHARON) Modified on 11/16/2020 (ggs). (Entered: 11/13/2020) |
| 11/13/2020 | 96 | ANSWER to 56 Amended Complaint/Petition by CULLEN TALTON. Related document: 56 Amended Complaint/Petition filed by ANNA LANGE.(MORGAN, SHARON) (Entered: 11/13/2020) |
| 11/16/2020 | | Notice of Deficiency (related document(s): 95 Answer to Amended Complaint filed by CULLEN TALTON, 93 Answer to Amended Complaint filed by CULLEN TALTON: Wrong document attached. No action necessary, correctly filed at Tab 96. (ggs) (Entered: 11/16/2020) |
| 11/19/2020 | 97 | UNOPPOSED MOTION for Extension of Time to File RESPONSE as to 94 MOTION for Reconsideration re 89 Order on Motion to Dismiss/Lack of Jurisdiction,,, Order on Motion to Dismiss Complaint,, by ANNA LANGE filed by KENNETH E BARTON, III.(BARTON, KENNETH) (Entered: 11/19/2020) |
| 11/19/2020 | 98 | UNOPPOSED MOTION for Discovery by ANNA LANGE filed by KENNETH E BARTON, III. (Attachments: # 1 Memorandum in Support Memorandum in Support of Unopposed Motion |

| | | |
|---|---|---|
| | | for Expedited Discovery, # 2 Proposed Order Proposed Consent Order for Expedited Discovery) (BARTON, KENNETH) (Entered: 11/19/2020) |
| 11/20/2020 | 99 | This is a text only entry; no document issued. **ORDER** GRANTING 97 Motion for Extension of Time to File RESPONSE re 94 MOTION for Reconsideration. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 11/20/2020. (wbm) (Entered: 11/20/2020) |
| 11/20/2020 | 100 | **CONSENT ORDER FOR EXPEDITED DISCOVERY**. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 11/20/2020. (kat) (Entered: 11/20/2020) |
| 11/30/2020 | 101 | RESPONSE filed by ANNA LANGE re 94 MOTION for Reconsideration re 89 Order on Motion to Dismiss/Lack of Jurisdiction,,, Order on Motion to Dismiss Complaint,, (Attachments: # 1 Exhibit Declaration of David Brown)(BARTON, KENNETH) (Entered: 11/30/2020) |
| 12/22/2020 | 102 | **ORDER** DENYING 94 Motion for Reconsideration. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 12/22/2020. (kat) (Entered: 12/22/2020) |
| 01/07/2021 | 103 | JOINT MOTION for Protective Order by ANNA LANGE filed by KENNETH E BARTON, III. (Attachments: # 1 Proposed Order Prosposed Consent Protective and Confidentiality Order) (BARTON, KENNETH) (Entered: 01/07/2021) |
| 01/08/2021 | 104 | **CONSENT PROTECTIVE AND CONFIDENTIALITY ORDER**. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 1/8/2021. (kat) (Entered: 01/08/2021) |
| 02/10/2021 | 105 | JOINT MOTION for Consent Order Extending Expedited Discovery Period re 100 Order on Motion for Discovery by HOUSTON COUNTY, GEORGIA, CULLEN TALTON filed by PATRICK L LAIL. (Attachments: # 1 Proposed Order)(LAIL, PATRICK) (Entered: 02/10/2021) |
| 02/10/2021 | 106 | **ORDER** GRANTING 105 JOINT MOTION for Consent Order Extending Expedited Discovery Period re 100 Consent Order for Expedited Discovery. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 2/10/2021. (kat) (Entered: 02/10/2021) |
| 03/10/2021 | 107 | UNOPPOSED MOTION for Second Consent Order Extending Expedited Discovery Period re 98 MOTION for Discovery by HOUSTON COUNTY, GEORGIA, CULLEN TALTON filed by PATRICK L LAIL. (Attachments: # 1 Proposed Order Text of Order)(LAIL, PATRICK) (Entered: 03/10/2021) |
| 03/11/2021 | 108 | This is a text only entry; no document issued. **ORDER** GRANTING 107 Unopposed Motion for Second Consent Order Extending Expedited Discovery Period. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 3/11/2021. (wbm) (Entered: 03/11/2021) |
| 03/15/2021 | 109 | PETITION TO THE CLERK FOR ADMISSION TO PLEAD AND PRACTICE PRO HAC VICE by ANNA LANGE Attorney Admission Fee (Pro Hac Vice) paid by Receipt # AGAMDC-3741013, $100. LOCAL COUNSEL Name and Georgia Bar #: Kenneth E. Barton III, 301171. (Attachments: # 1 Certificate of Good Standing SDNY COGS)(ARKLES, Z) (Entered: 03/15/2021) |
| 03/16/2021 | 110 | Order granting Petition for Admission Pro Hac Vice (Petition Attached); Attorney Admission Fee Met by Z GABRIEL ARKLES (nop) (Entered: 03/16/2021) |
| 05/19/2021 | 111 | MOTION to Withdraw Document 57 Motion for Preliminary Injunction, by ANNA LANGE filed by SARAH MATLACK WASTLER.(WASTLER, SARAH) Modified on 5/26/2021 to edit text(vs). (Entered: 05/19/2021) |
| 05/26/2021 | 112 | **ORDER**. Discovery SHALL be completed by August 19, 2021, and dispositive and Daubert motions are due by September 2, 2021. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 5/26/2021. (kat) (Entered: 05/26/2021) |
| 08/06/2021 | 113 | UNOPPOSED MOTION for Extension of Time to File. by HOUSTON COUNTY, GEORGIA filed by PATRICK L LAIL. (Attachments: # 1 Proposed Order)(LAIL, PATRICK) (Entered: |

| | | 08/06/2021) |
|---|---|---|
| 08/09/2021 | 114 | This is a text only entry; no document issued. **ORDER** GRANTING [113](#) Motion for Extension of Time. Discovery to be complete by 9/20/2021. Dispositive and *Daubert* motions due by 10/20/2021. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 8/9/2021. (wbm) (Entered: 08/09/2021) |
| 08/16/2021 | [115](#) | MOTION to Withdraw as Attorney by ANNA LANGE filed by KENNETH E BARTON, III. (Attachments: # [1](#) Proposed Order Proposed Order on Motion to Withdraw)(BARTON, KENNETH) (Entered: 08/16/2021) |
| 08/30/2021 | [116](#) | MOTION to Withdraw as Attorney by ANNA LANGE filed by NOAH ETHAN LEWIS. (Attachments: # [1](#) Proposed Order Proposed Order Proposed Order on Motion to Withdraw) (LEWIS, NOAH) (Entered: 08/30/2021) |
| 10/04/2021 | [117](#) | UNOPPOSED MOTION re 114 Order on Motion for Extension of Time (Misc), by HOUSTON COUNTY BOARD OF COMMISSIONERS, CULLEN TALTON filed by PATRICK L LAIL. (Attachments: # [1](#) Proposed Order)(LAIL, PATRICK) (Entered: 10/04/2021) |
| 10/04/2021 | 118 | This is a text only entry; no document issued. **ORDER** GRANTING [117](#) Motion for Extension of Time. Dispositive and *Daubert* motions due by 11/3/2021. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 10/4/21 (bwr) (Entered: 10/04/2021) |
| 10/18/2021 | [119](#) | MOTION to Withdraw as Attorney by ANNA LANGE filed by SARAH MATLACK WASTLER. (Attachments: # [1](#) Exhibit A: Notice of Withdrawal of Counsel, # [2](#) Proposed Order)(WASTLER, SARAH) (Entered: 10/18/2021) |
| 10/27/2021 | [120](#) | CONSENT MOTION to Seal Document(s) by BLUE CROSS BLUE SHIELD HEALTHCARE PLAN OF GEORGIA INC filed by TYLER P BISHOP. (Attachments: # [1](#) Exhibit A - Subpoena, # [2](#) Exhibit B - Declaration of D. Smead, # [3](#) Exhibit C - Proposed Order)(BISHOP, TYLER) (Entered: 10/27/2021) |
| 10/27/2021 | [121](#) | UNOPPOSED MOTION to Seal Document(s) [104](#) Order on Motion for Protective Order by ANNA LANGE filed by KENNETH E BARTON, III. (Attachments: # [1](#) Proposed Order Proposed Order)(BARTON, KENNETH) (Entered: 10/27/2021) |
| 10/28/2021 | [122](#) | **ORDER** GRANTING [120](#) CONSENT MOTION to Seal Document(s) by BLUE CROSS BLUE SHIELD HEALTHCARE PLAN OF GEORGIA INC. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 10/28/2021. (kat) (Entered: 10/28/2021) |
| 10/28/2021 | [123](#) | **ORDER** GRANTING [121](#) UNOPPOSED MOTION to Seal Document(s). Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 10/28/2021. (kat) (Entered: 10/28/2021) |
| 10/28/2021 | [124](#) | PETITION TO THE CLERK FOR ADMISSION TO PLEAD AND PRACTICE PRO HAC VICE by ANNA LANGE Attorney Admission Fee (Pro Hac Vice) paid by Receipt # CGAMDC-3935413, $100. LOCAL COUNSEL Name and Georgia Bar #: Kenneth E. Barton III Ga. State Bar No. 301171. (Attachments: # [1](#) Certificate of Good Standing)(FATA, CATHERINE) (Entered: 10/28/2021) |
| 10/28/2021 | [125](#) | UNOPPOSED MOTION for Leave to File Excess Pages for Motions for Summary Judgment by HOUSTON COUNTY GEORGIA, CULLEN TALTON filed by SHARON P MORGAN. (MORGAN, SHARON) (Entered: 10/28/2021) |
| 10/28/2021 | [126](#) | UNOPPOSED MOTION for Leave to File Excess Pages for Motion for Summary Judgment by ANNA LANGE filed by KENNETH E BARTON, III.(BARTON, KENNETH) (Entered: 10/28/2021) |
| 10/29/2021 | | Notice of Deficiency (related document(s): [124](#) Petition to the Clerk for Admission to Plead and Practice Pro Hac Vice, filed by ANNA LANGE ); Other - If you are not a member of the State Bar of Georgia and do not maintain an office in Georgia, you must obtain a Certificate of Good Standing from a US District Court where you are admitted to practice. (The Certificate must be |

| | | |
|---|---|---|
| | | issued within 30 days of petition for admission.) State court certificates are NOT accepted. (mdm) (Entered: 10/29/2021) |
| 11/01/2021 | 127 | This is a text only entry; no document issued. **ORDER** GRANTING <u>125</u> Motion for Leave to File Excess Pages. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 11/1/2021. (bwr) (Entered: 11/01/2021) |
| 11/01/2021 | 128 | This is a text only entry; no document issued. **ORDER** GRANTING <u>126</u> Motion for Leave to File Excess Pages. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 11/1/2021. (bwr) (Entered: 11/01/2021) |
| 11/03/2021 | <u>129</u> | MOTION To Exclude Plaintiff's Expert Testimony: Paisley Currah by HOUSTON COUNTY GEORGIA, CULLEN TALTON filed by PATRICK L LAIL. (Attachments: # <u>1</u> Memorandum in Support, # <u>2</u> Exhibit 1 Plaintiff's Expert Witness Identifications, # <u>3</u> Exhibit 2 Expert Report of Paisley Currah, # <u>4</u> Exhibit 3 2015 U.S. Transgender Survey GA State Report)(LAIL, PATRICK) (Entered: 11/03/2021) |
| 11/03/2021 | <u>130</u> | MOTION To Exclude Plaintiff's Expert Testimony: Chanel Haley by HOUSTON COUNTY GEORGIA, CULLEN TALTON filed by PATRICK L LAIL. (Attachments: # <u>1</u> Memorandum in Support, # <u>2</u> Exhibit 1 Plaintiff's Expert Witness Identifications, # <u>3</u> Exhibit 2 Expert Report for Chanel Haley, # <u>4</u> Exhibit 3 2015 U.S. Transgender Survey GA State Report)(LAIL, PATRICK) (Entered: 11/03/2021) |
| 11/03/2021 | <u>131</u> | Request to ANNA LANGE to file original discovery document(s) by CULLEN TALTON, HOUSTON COUNTY GEORGIA.(MORGAN, SHARON) (Entered: 11/03/2021) |
| 11/03/2021 | <u>132</u> | MOTION To Exclude Plaintiff's Expert Testimony - Loren S. Schechter, M.D. by HOUSTON COUNTY GEORGIA, CULLEN TALTON filed by PATRICK L LAIL. (Attachments: # <u>1</u> Memorandum in Support, # <u>2</u> Exhibit 1 Plaintiff's Expert Witness Identification, # <u>3</u> Exhibit 2 Expert Report of Loren S. Schechter, M.D., # <u>4</u> Exhibit 3 Societal Implications of Health Coverage for Medically Necessary Services in the U.S. Transgender Population, # <u>5</u> Exhibit 4 The implications of Allowing Transgender Personnel to Serve Openly in the U.S. Military, # <u>6</u> Exhibit 5 Declaration of Kenneth Carter)(LAIL, PATRICK) (Entered: 11/03/2021) |
| 11/03/2021 | <u>133</u> | MOTION To Exclude Plaintiff's Expert Testimony- Joan Barrett by HOUSTON COUNTY GEORGIA, CULLEN TALTON filed by PATRICK L LAIL. (Attachments: # <u>1</u> Memorandum in Support, # <u>2</u> Exhibit 1 Plaintiff's Expert Witness Identifications, # <u>3</u> Exhibit 2 Expert Report of Joan Barrett, FSA, MAAA, # <u>4</u> Exhibit 3 Joan Barret Deposition Excerpt Pages, # <u>5</u> Exhibit 4 Actuarial Standard of Practice No. 1, # <u>6</u> Exhibit 5 Actuarial Standard of Practice No. 41, # <u>7</u> Exhibit 6 Expert Report of James P. Galasso (8-12-21), # <u>8</u> Exhibit 7 Declaration of Kenneth Carter, # <u>9</u> Exhibit 8 Expert Report of Joan C Barrett and Elaine T. Corrough Submitted On Behalf of the Plaintiffs (3/22/19))(LAIL, PATRICK) (Entered: 11/03/2021) |
| 11/03/2021 | <u>134</u> | ***Refiled at <u>142</u> *** MOTION To Exclude Plaintiff's Expert Testimony - Rachel Bluebond-Langner, M.D. by HOUSTON COUNTY GEORGIA, CULLEN TALTON filed by PATRICK L LAIL. (Attachments: # <u>1</u> Memorandum in Support, # <u>2</u> Exhibit 1 Plaintiff's Expert Witness Identifications, # <u>3</u> Exhibit 2 Plaintiff's Disclosure of Expert Witness Pursuant to Fed.R.Civ.P26(A)(2)(C), # <u>4</u> Exhibit 3 Health Insurance Coverage of Gender-Affirming Top Surgery in the United States, # <u>5</u> Exhibit 4 Anna Lange 4/2/21 Deposition Excerpt Pages, # <u>6</u> Exhibit 5 Declaration of Kenneth Carter, # <u>7</u> Exhibit 6 Declaration of Joan C Barrett, # <u>8</u> Exhibit 7 Expert Report of Joan C. Barrett and Elaine T. Corrough Submitted On Behalf of the Plaintiffs)(LAIL, PATRICK) Modified on 11/4/2021 to add docket text(vs). (Entered: 11/03/2021) |
| 11/03/2021 | <u>135</u> | ***Refiled at <u>140</u> *** MOTION for Summary Judgment by ANNA LANGE filed by WESLEY POWELL.(POWELL, WESLEY) Modified on 11/4/2021 to add docket text(vs). (Entered: 11/03/2021) |
| 11/03/2021 | <u>136</u> | MOTION for Summary Judgment by CULLEN TALTON filed by SHARON P MORGAN. (Attachments: # <u>1</u> Statement of Material Facts, # <u>2</u> Declaration of Donna Clark, # <u>3</u> Declaration of Tommy Stalnaker, # <u>4</u> Declaration of Barry Holland, # <u>5</u> Declaration of Ken Carter, # <u>6</u> |

| | | |
|---|---|---|
| | | Declaration of William Rape, # 7 Declaration of Gail Robinson, # 8 Declaration of Jay Walker, # 9 Memorandum in Support)(MORGAN, SHARON) (Entered: 11/03/2021) |
| 11/03/2021 | 137 | MOTION for Summary Judgment by HOUSTON COUNTY GEORGIA filed by PATRICK L LAIL. (Attachments: # 1 Stmt of Material Facts Resp, # 2 Memorandum in Support, # 3 Plaintiff Anna Lange 4/2/21 Deposition and Exhibits, # 4 Declaration of Donna Clark, # 5 Declaration of Kenneth Carter, # 6 Declaration of Barry Holland, # 7 Declaration of Tommy Stalnaker, # 8 Declaration of Gail Robinson, # 9 Declaration of H. Jay Walker, # 10 Declaration of William H. Rape, # 11 August 24, 2021 Deposition of Joan Barrett, # 12 September 9, 2021 Deposition of Tom Galasso)(LAIL, PATRICK) (Entered: 11/03/2021) |
| 11/03/2021 | 138 | Certificate of Need to File Discovery by HOUSTON COUNTY GEORGIA, CULLEN TALTON. Related document: 137 MOTION for Summary Judgment filed by HOUSTON COUNTY GEORGIA, 136 MOTION for Summary Judgment filed by CULLEN TALTON. (MORGAN, SHARON) (Entered: 11/03/2021) |
| 11/03/2021 | 139 | ***Disregard refiled at 140 *** MEMORANDUM in Support filed by ANNA LANGE re: 135 MOTION for Summary Judgment (POWELL, WESLEY) Modified on 11/4/2021 to add docket text(vs). (Entered: 11/03/2021) |
| 11/04/2021 | 140 | MOTION for Summary Judgment by ANNA LANGE filed by WESLEY POWELL. (Attachments: # 1 Memorandum in Support, # 2 Statement of Material Facts, # 3 Declaration of Jill K. Grant, # 4 Declaration of Sgt. Anna Lange, # 5 Declaration of Loren S. Schechter, # 6 Declaration of Joan Barrett, # 7 Declaration of Rachel Bluebond-Langner, # 8 Declaration of Chanel Haley, # 9 Declaration of Paisley Currah)(POWELL, WESLEY) (Entered: 11/04/2021) |
| 11/04/2021 | | Notice of Deficiency (related document(s): 139 Memorandum in Support filed by ANNA LANGE ); Other - Wrong document attached. (vs) (Entered: 11/04/2021) |
| 11/04/2021 | 141 | **SEALED DOCUMENT** (Attachments: # 1 Exhibit, # 2 Exhibit)(vs) (Entered: 11/04/2021) |
| 11/04/2021 | 142 | MOTION To Exclude Plaintiff's Expert Testimony - Rachel Bluebond-Langner M.D. by HOUSTON COUNTY GEORGIA, CULLEN TALTON filed by PATRICK L LAIL. (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1 Plaintiff's Expert Witness Identifications, # 3 Exhibit 2 Plaintiff's Disclosure of Expert Witness Pursuant to Fed.R.Civ.P26(A)(2)(C), # 4 Exhibit 3 Health Insurance Coverage of Gender-Affirming Top Surgery in the United States, # 5 Exhibit 4 Anna Lange 4-2-21 Deposition Excerpt Pages, # 6 Exhibit 5 Declaration of Kenneth Carter, # 7 Exhibit 6 Declaration of Joan C Barret (Boyden v State of Wisconsin Dept of Employee Trust Funds), # 8 Exhibit Expert Report of Joan C. Barrett and Elaine T. Corrough Submitted on Behalf of the Plaintiffs)(LAIL, PATRICK) (Entered: 11/04/2021) |
| 11/04/2021 | 143 | EXHIBIT(S) *Declaration of Joan Barrett* by ANNA LANGE re 140 MOTION for Summary Judgment, 135 MOTION for Summary Judgment (Attachments: # 1 Exhibit Expert Report of Barrett)(BARTON, KENNETH) (Entered: 11/04/2021) |
| 11/04/2021 | 144 | EXHIBIT(S) *Declaration of Bluebond-Langner* by ANNA LANGE re 139 Memorandum in Support, 140 MOTION for Summary Judgment, 135 MOTION for Summary Judgment (Attachments: # 1 Exhibit Expert Declaration, # 2 Exhibit Expert Disclosure)(BARTON, KENNETH) (Entered: 11/04/2021) |
| 11/04/2021 | 145 | EXHIBIT(S) *Declaration of Currah* by ANNA LANGE re 139 Memorandum in Support, 140 MOTION for Summary Judgment, 135 MOTION for Summary Judgment (Attachments: # 1 Exhibit Expert Report)(BARTON, KENNETH) (Entered: 11/04/2021) |
| 11/04/2021 | 146 | EXHIBIT(S) *Declaration of Haley* by ANNA LANGE re 139 Memorandum in Support, 140 MOTION for Summary Judgment, 135 MOTION for Summary Judgment (Attachments: # 1 Exhibit Expert Witness Report)(BARTON, KENNETH) (Entered: 11/04/2021) |
| 11/04/2021 | 147 | EXHIBIT(S) *Declaration of Sgt. Lange* by ANNA LANGE re 139 Memorandum in Support, 140 MOTION for Summary Judgment, 135 MOTION for Summary Judgment (BARTON, |

| | | |
|---|---|---|
| | | KENNETH) (Entered: 11/04/2021) |
| 11/04/2021 | [148](#) | EXHIBIT(S) *Declaration of Schecter* by ANNA LANGE re [139](#) Memorandum in Support, [140](#) MOTION for Summary Judgment, [135](#) MOTION for Summary Judgment (Attachments: # [1](#) Exhibit Expert Report, # [2](#) Exhibit Declaration)(BARTON, KENNETH) (Entered: 11/04/2021) |
| 11/04/2021 | [149](#) | EXHIBIT(S) *Declaration of Jill Grant (without exhibits, errors preventing filing)* by ANNA LANGE re [139](#) Memorandum in Support, [140](#) MOTION for Summary Judgment, [135](#) MOTION for Summary Judgment (BARTON, KENNETH) (Entered: 11/04/2021) |
| 11/05/2021 | [150](#) | EXHIBIT(S) *Declaration of Grant (Exhibits Part 1 of 2)* by ANNA LANGE re [140](#) MOTION for Summary Judgment, [135](#) MOTION for Summary Judgment, [139](#) Memorandum in Support, [149](#) Exhibit(s) (Attachments: # [1](#) Exhibit Deposition of Carter Part 1 of 5, # [2](#) Exhibit Deposition of Carter Part 2 of 5, # [3](#) Exhibit Deposition of Carter Part 3 of 5, # [4](#) Exhibit Deposition of Carter Part 4 of 5, # [5](#) Exhibit Deposition of Carter Part 5 of 5, # [6](#) Exhibit Deposition of Sheriff Part 1 of 2, # [7](#) Exhibit Deposition of Sheriff Part 2 of 2, # [8](#) Exhibit Deposition of Lange Part 1 of 2, # [9](#) Exhibit Deposition of Lange Part 2 of 2, # [10](#) Exhibit Deposition of Holland, # [11](#) Exhibit Deposition of Rape Part 1 of 2, # [12](#) Exhibit Deposition of Rape Part 2 of 2, # [13](#) Exhibit Deposition of Clark, # [14](#) Exhibit Deposition of Carter, # [15](#) Exhibit Deposition of Holland, # [16](#) Exhibit Deposition of Barrett, # [17](#) Exhibit Deposition of Galasso, # [18](#) Exhibit Deposition of Lange, # [19](#) Exhibit Deposition of Carter, # [20](#) Exhibit Defendants Responses to First RFAs, # [21](#) Exhibit Houston County Responses to Third Rogs, # [22](#) Exhibit Sheriff Responses to Second RFAs, # [23](#) Exhibit Sheriff Responses to First Rogs, # [24](#) Exhibit Zhao Report, # [25](#) Exhibit Anthems Clinical Guideline for Gender Affirming Surgery, # [26](#) Exhibit Carters November 4, 2019 Memo, # [27](#) Exhibit Anthems January 29, 2019 Denial, # [28](#) Exhibit Langes Fiscal Year 2020 Total Compensation Statement, # [29](#) Exhibit Houston County Responses to First Rogs, # [30](#) Exhibit Pope and Clark Email, # [31](#) Exhibit Hall and Lewis Email, # [32](#) Exhibit Lewis and Hall Email)(BARTON, KENNETH) (Entered: 11/05/2021) |
| 11/05/2021 | [151](#) | EXHIBIT(S) *Declaration of Grant (Exhibits Part 2 of 2)* by ANNA LANGE re [139](#) Memorandum in Support, [140](#) MOTION for Summary Judgment, [149](#) Exhibit(s), [135](#) MOTION for Summary Judgment (Attachments: # [1](#) Exhibit Clark and Clark Email, # [2](#) Exhibit Clark and Pope Email, # [3](#) Exhibit Clark and Carter Email, # [4](#) Exhibit November 19, 2019 Houston County Board of Commissioners Meet Minutes, # [5](#) Exhibit January 16, 2019 letter from Lewis to County Attorney, # [6](#) Exhibit Clark and Carter Email, # [7](#) Exhibit BCBS000351, # [8](#) Exhibit Open Records Request, # [9](#) Exhibit Lange and Holland Email, # [10](#) Exhibit Anthem data re: 2018 Total Health Conditions by Paid Amount, # [11](#) Exhibit Anthem data re: 2019 Total Medical Conditions by Paid Amount, # [12](#) Exhibit Langes Petition to Change Name)(BARTON, KENNETH) (Entered: 11/05/2021) |
| 11/05/2021 | [152](#) | **SEALED DOCUMENT** (Attachments: # [1](#) Exhibit, # [2](#) Exhibit, # [3](#) Exhibit, # [4](#) Exhibit)(vs) (Entered: 11/05/2021) |
| 11/10/2021 | [153](#) | Request for Rule Local 6.2 Clerk's Extension re [137](#) MOTION for Summary Judgment, [142](#) MOTION To Exclude Plaintiff's Expert Testimony - Rachel Bluebond-Langner M.D., [133](#) MOTION To Exclude Plaintiff's Expert Testimony- Joan Barrett, [134](#) MOTION To Exclude Plaintiff's Expert Testimony - Rachel Bluebond-Langner, M.D., [136](#) MOTION for Summary Judgment, [130](#) MOTION To Exclude Plaintiff's Expert Testimony: Chanel Haley, [129](#) MOTION To Exclude Plaintiff's Expert Testimony: Paisley Currah, [132](#) MOTION To Exclude Plaintiff's Expert Testimony - Loren S. Schechter, M.D. by ANNA LANGE (BARTON, KENNETH) (Entered: 11/10/2021) |
| 11/10/2021 | | Notice of Clerk's Granting of Extension Pursuant to Local Rule 6.2 re: [130](#) MOTION To Exclude Plaintiff's Expert Testimony: Chanel Haley filed by CULLEN TALTON, HOUSTON COUNTY GEORGIA, [137](#) MOTION for Summary Judgment filed by HOUSTON COUNTY GEORGIA, [142](#) MOTION To Exclude Plaintiff's Expert Testimony - Rachel Bluebond-Langner M.D. filed by CULLEN TALTON, HOUSTON COUNTY GEORGIA, [133](#) MOTION To Exclude Plaintiff's Expert Testimony- Joan Barrett filed by CULLEN TALTON, HOUSTON |

| | | |
|---|---|---|
| | | COUNTY GEORGIA, [129] MOTION To Exclude Plaintiff's Expert Testimony: Paisley Currah filed by CULLEN TALTON, HOUSTON COUNTY GEORGIA, [136] MOTION for Summary Judgment filed by CULLEN TALTON, [132] MOTION To Exclude Plaintiff's Expert Testimony - Loren S. Schechter, M.D. filed by CULLEN TALTON, HOUSTON COUNTY GEORGIA (vs) (Entered: 11/10/2021) |
| 11/12/2021 | [154] | Certificate of Need to File Discovery *Deposition of Ken Carter 02/23/2021* by ANNA LANGE. Related document: [137] MOTION for Summary Judgment filed by HOUSTON COUNTY GEORGIA, [136] MOTION for Summary Judgment filed by CULLEN TALTON, [140] MOTION for Summary Judgment filed by ANNA LANGE.(BARTON, KENNETH) (Entered: 11/12/2021) |
| 11/12/2021 | [155] | DEPOSITION of Kenneth Carter taken on 02/23/2021 filed by ANNA LANGE. Related document: [154] Certificate of Need to File Discovery, filed by ANNA LANGE, [137] MOTION for Summary Judgment filed by HOUSTON COUNTY GEORGIA, [136] MOTION for Summary Judgment filed by CULLEN TALTON, [140] MOTION for Summary Judgment filed by ANNA LANGE. (Attachments: # [1] Exhibit Ex. 1 Medical Benefit Booklet, # [2] Exhibit Ex. 2 Clinical UM Guideline, # [3] Exhibit Ex. 3 HBCS Approval of Changes, # [4] Exhibit Ex. 4 2017 Medical Plan Changes, # [5] Exhibit Ex. 5 Carter Email to Clark, # [6] Exhibit Ex. 6 Clark Email to Carter, # [7] Exhibit Ex. 7 Carter Email to Clark, # [8] Exhibit Ex. 8 Hall Email to Carter, # [9] Exhibit Ex. 9 Lewis Letter to HCBC, # [10] Exhibit Ex. 10 Transcend Legal Memo, # [11] Exhibit Ex. 11 Carter Email to Kissell, # [12] Exhibit Ex. 12 Carter Email to Clark, # [13] Exhibit Ex. 13 HCBC Meeting 02192019, # [14] Exhibit Ex. 14 Powell Letter to HCBC, # [15] Exhibit Ex. 15 Hall Letter to Powell, # [16] Exhibit Ex. 16 Clark Email to Carter, # [17] Exhibit Ex. 17 Memo to HCBC Health Plan Changes, # [18] Exhibit Ex. 18 Memo to HCBC Health Insurance Considerations, # [19] Exhibit Ex. 21 Carter Text 08122018, # [20] Exhibit Ex. 22 Carter Text 11042018, # [21] Exhibit Ex. 23 Carter Text 03302019, # [22] Exhibit Ex. 24 Carter Text 07042020)(BARTON, KENNETH) (Entered: 11/12/2021) |
| 11/12/2021 | [156] | Certificate of Need to File Discovery *Sheriff Cullen Talton 03/25/2021* by ANNA LANGE. Related document: [137] MOTION for Summary Judgment filed by HOUSTON COUNTY GEORGIA, [136] MOTION for Summary Judgment filed by CULLEN TALTON, [140] MOTION for Summary Judgment filed by ANNA LANGE.(BARTON, KENNETH) (Entered: 11/12/2021) |
| 11/12/2021 | [157] | DEPOSITION of Sheriff Cullen Talton taken on 03/25/2021 filed by ANNA LANGE. Related document: [156] Certificate of Need to File Discovery, filed by ANNA LANGE, [137] MOTION for Summary Judgment filed by HOUSTON COUNTY GEORGIA, [136] MOTION for Summary Judgment filed by CULLEN TALTON, [140] MOTION for Summary Judgment filed by ANNA LANGE.(BARTON, KENNETH) (Entered: 11/12/2021) |
| 11/12/2021 | [158] | Certificate of Need to File Discovery *Houston County 30(b)(6)* by ANNA LANGE. Related document: [137] MOTION for Summary Judgment filed by HOUSTON COUNTY GEORGIA, [136] MOTION for Summary Judgment filed by CULLEN TALTON, [140] MOTION for Summary Judgment filed by ANNA LANGE.(BARTON, KENNETH) (Entered: 11/12/2021) |
| 11/12/2021 | [159] | DEPOSITION of Houston County 30(b)(6) (Holland and Carter) taken on 04/15/2021 filed by ANNA LANGE. Related document: [158] Certificate of Need to File Discovery, filed by ANNA LANGE, [137] MOTION for Summary Judgment filed by HOUSTON COUNTY GEORGIA, [136] MOTION for Summary Judgment filed by CULLEN TALTON, [140] MOTION for Summary Judgment filed by ANNA LANGE. (Attachments: # [1] Exhibit Deposition of Ken Carter 04/15/2021)(BARTON, KENNETH) (Entered: 11/12/2021) |
| 11/12/2021 | [160] | Certificate of Need to File Discovery *Houston County 30(b)(6) Ken Carter 09/16/2021* by ANNA LANGE. Related document: [137] MOTION for Summary Judgment filed by HOUSTON COUNTY GEORGIA, [136] MOTION for Summary Judgment filed by CULLEN TALTON, [140] MOTION for Summary Judgment filed by ANNA LANGE.(BARTON, KENNETH) (Entered: 11/12/2021) |
| 11/12/2021 | [161] | DEPOSITION of Houston County 30(b)(6) (Carter) taken on 09/16/2021 filed by ANNA LANGE. Related document: [160] Certificate of Need to File Discovery, filed by ANNA LANGE, |

| | | |
|---|---|---|
| | | [137](#) MOTION for Summary Judgment filed by HOUSTON COUNTY GEORGIA, [136](#) MOTION for Summary Judgment filed by CULLEN TALTON, [140](#) MOTION for Summary Judgment filed by ANNA LANGE.(BARTON, KENNETH) (Entered: 11/12/2021) |
| 11/12/2021 | [162](#) | Certificate of Need to File Discovery *Deposition of Donna Clark 04/13/2021* by ANNA LANGE. Related document: [137](#) MOTION for Summary Judgment filed by HOUSTON COUNTY GEORGIA, [136](#) MOTION for Summary Judgment filed by CULLEN TALTON, [140](#) MOTION for Summary Judgment filed by ANNA LANGE.(BARTON, KENNETH) (Entered: 11/12/2021) |
| 11/12/2021 | [163](#) | DEPOSITION of Donna Clark taken on 04/13/2021 filed by ANNA LANGE. Related document: [162](#) Certificate of Need to File Discovery, filed by ANNA LANGE, [137](#) MOTION for Summary Judgment filed by HOUSTON COUNTY GEORGIA, [136](#) MOTION for Summary Judgment filed by CULLEN TALTON, [140](#) MOTION for Summary Judgment filed by ANNA LANGE.(BARTON, KENNETH) (Entered: 11/12/2021) |
| 11/15/2021 | [164](#) | Certificate of Need to File Discovery *Sheriff's Office 30(b)(6)* by ANNA LANGE. Related document: [137](#) MOTION for Summary Judgment filed by HOUSTON COUNTY GEORGIA, [136](#) MOTION for Summary Judgment filed by CULLEN TALTON, [140](#) MOTION for Summary Judgment filed by ANNA LANGE.(BARTON, KENNETH) (Entered: 11/15/2021) |
| 11/15/2021 | [165](#) | DEPOSITION of Houston County Sheriff's Office 30(b)(6) (Rape and Holland) taken on 04/13/2021 filed by ANNA LANGE. Related document: [164](#) Certificate of Need to File Discovery, filed by ANNA LANGE, [137](#) MOTION for Summary Judgment filed by HOUSTON COUNTY GEORGIA, [140](#) MOTION for Summary Judgment filed by ANNA LANGE. (Attachments: # [1](#) Exhibit Deposition of HCSO 30(b)(6) J. Holland)(BARTON, KENNETH) (Entered: 11/15/2021) |
| 11/15/2021 | [166](#) | Certificate of Need to File Discovery *Deposition of Tom Galasso* by ANNA LANGE. Related document: [137](#) MOTION for Summary Judgment filed by HOUSTON COUNTY GEORGIA, [136](#) MOTION for Summary Judgment filed by CULLEN TALTON, [140](#) MOTION for Summary Judgment filed by ANNA LANGE.(BARTON, KENNETH) (Entered: 11/15/2021) |
| 11/15/2021 | [167](#) | DEPOSITION of Tom Galasso taken on 09/09/2021 filed by ANNA LANGE. Related document: [166](#) Certificate of Need to File Discovery, filed by ANNA LANGE, [137](#) MOTION for Summary Judgment filed by HOUSTON COUNTY GEORGIA, [136](#) MOTION for Summary Judgment filed by CULLEN TALTON, [140](#) MOTION for Summary Judgment filed by ANNA LANGE.(BARTON, KENNETH) (Entered: 11/15/2021) |
| 11/17/2021 | [168](#) | Request for Rule Local 6.2 Clerk's Extension re [140](#) MOTION for Summary Judgment by HOUSTON COUNTY GEORGIA, CULLEN TALTON (MORGAN, SHARON) (Entered: 11/17/2021) |
| 11/17/2021 | | Notice of Clerk's Granting of Extension Pursuant to Local Rule 6.2 re: [140](#) MOTION for Summary Judgment filed by ANNA LANGE (vs) (Entered: 11/17/2021) |
| 11/18/2021 | [169](#) | PETITION TO THE CLERK FOR ADMISSION TO PLEAD AND PRACTICE PRO HAC VICE by ANNA LANGE Attorney Admission Fee (Pro Hac Vice) paid by Receipt # AGAMDC-3952412, $100. LOCAL COUNSEL Name and Georgia Bar #: Kenneth E. Barton III Ga. State Bar No. 301171. (Attachments: # [1](#) Certificate of Good Standing)(FATA, CATHERINE) (Entered: 11/18/2021) |
| 11/19/2021 | [170](#) | Order granting Petition for Admission Pro Hac Vice (Petition Attached); Attorney Admission Fee Met by CATHERINE FATA. (mdm) (Entered: 11/19/2021) |
| 12/02/2021 | [172](#) | JOINT MOTION for Extension of Time to File RESPONSE as to [137](#) MOTION for Summary Judgment, [133](#) MOTION To Exclude Plaintiff's Expert Testimony- Joan Barrett, [136](#) MOTION for Summary Judgment, [130](#) MOTION To Exclude Plaintiff's Expert Testimony: Chanel Haley, [142](#) MOTION To Exclude Plaintiff's Expert Testimony - Rachel Bluebond-Langner M.D., [129](#) MOTION for Summary Judgment, [129](#) MOTION To Exclude Plaintiff's Expert Testimony: |

| | | |
|---|---|---|
| | | Paisley Currah, [132](#) MOTION To Exclude Plaintiff's Expert Testimony - Loren S. Schechter, M.D. by ANNA LANGE filed by KENNETH E BARTON, III.(BARTON, KENNETH) (Entered: 12/02/2021) |
| 12/03/2021 | 173 | This is a text only entry; no document issued. **ORDER** GRANTING [172](#) Motion for Extension of Time to File RESPONSE and REPLY briefs. The parties shall file responses to all Motions for Summary Judgment and *Daubert* motions by December 22, 2021 and file reply briefs by January 26, 2022. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 12/3/21. (bwr) (Entered: 12/03/2021) |
| 12/03/2021 | | Notice of Deficiency (related document(s): 171 Notice (Other) filed by ANNA LANGE ); The PACER login ID and password used to electronically file a document constitutes the Participants electronic signature for all purposes under the Federal Rules. Document must be re-filed using the user credentials of the name of the attorney in the signature block. See CM/ECF Administrative Procedures, page 7.(vs) (Entered: 12/03/2021) |
| 12/15/2021 | [175](#) | JOINT MOTION for Leave to File Excess Pages for Motions for Summary Judgment by HOUSTON COUNTY GEORGIA, CULLEN TALTON filed by SHARON P MORGAN. (MORGAN, SHARON) (Entered: 12/15/2021) |
| 12/15/2021 | 176 | This is a text only entry; no document issued. **ORDER** GRANTING [175](#) Motion for Leave to File Excess Pages. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 12/15/21. (bwr) (Entered: 12/15/2021) |
| 12/22/2021 | [177](#) | RESPONSE filed by ANNA LANGE re [142](#) MOTION To Exclude Plaintiff's Expert Testimony - Rachel Bluebond-Langner M.D., [133](#) MOTION To Exclude Plaintiff's Expert Testimony- Joan Barrett, [134](#) MOTION To Exclude Plaintiff's Expert Testimony - Rachel Bluebond-Langner, M.D., [130](#) MOTION To Exclude Plaintiff's Expert Testimony: Chanel Haley, [129](#) MOTION To Exclude Plaintiff's Expert Testimony: Paisley Currah, [132](#) MOTION To Exclude Plaintiff's Expert Testimony - Loren S. Schechter, M.D. (BARTON, KENNETH) (Entered: 12/22/2021) |
| 12/22/2021 | [178](#) | RESPONSE filed by ANNA LANGE re [137](#) MOTION for Summary Judgment, [136](#) MOTION for Summary Judgment (Attachments: # [1](#) Stmt of Material Facts Resp Ex A Plaintiff's Response to Defendant Houston County's Statement of Undisputed Facts, # [2](#) Stmt of Material Facts Resp Ex B Plaintiff's Response to Defendant Sheriff Talton's Statement of Undisputed Facts) (BARTON, KENNETH) (Entered: 12/22/2021) |
| 12/22/2021 | [179](#) | RESPONSE filed by HOUSTON COUNTY GEORGIA, CULLEN TALTON re [140](#) MOTION for Summary Judgment (Attachments: # [1](#) Exhibit A - Declaration of Kenneth Carter, # [2](#) Statement of Material Facts, # [3](#) Stmt of Material Facts Resp)(LAIL, PATRICK) (Entered: 12/22/2021) |
| 12/23/2021 | [180](#) | **SEALED DOCUMENT** re [179](#) (vs) (Entered: 12/23/2021) |
| 12/23/2021 | [181](#) | **SEALED DOCUMENT** re [177](#) (vs) Modified on 12/27/2021 to link to motion. (ggs). (Entered: 12/23/2021) |
| 01/20/2022 | [182](#) | JOINT MOTION for Leave to File Excess Pages for Reply Briefs in Support of Motions for Summary Judgment by ANNA LANGE filed by KENNETH E BARTON, III.(BARTON, KENNETH) (Entered: 01/20/2022) |
| 01/20/2022 | 183 | This is a text only entry; no document issued. **ORDER** GRANTING [182](#) Motion for Leave to File Excess Pages. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 1/20/22. (bwr) (Entered: 01/20/2022) |
| 01/21/2022 | | NOTICE OF SETTING HEARING ON MOTION re [142](#) MOTION To Exclude Plaintiff's Expert Testimony - Rachel Bluebond-Langner M.D., [133](#) MOTION To Exclude Plaintiff's Expert Testimony- Joan Barrett, [132](#) MOTION To Exclude Plaintiff's Expert Testimony - Loren S. Schechter, M.D., [140](#) MOTION for Summary Judgment, [130](#) MOTION To Exclude Plaintiff's Expert Testimony - Chanel Haley, [129](#) MOTION To Exclude Plaintiff's Expert Testimony - |

| | | |
|---|---|---|
| | | Paisley Currah, [137] MOTION for Summary Judgment, [136] MOTION for Summary Judgment. Motion Hearing set for 2/24/2022 at 2:00 PM in Macon before CHIEF DISTRICT JUDGE MARC T TREADWELL. Hearing will occur **IN-PERSON**. Counsel, parties, and members of the public and press should review Standing Order 2021-08, available on the court's website, regarding courthouse entrance procedures due to COVID-19. Interested parties may obtain dial information by emailing macon.ecf@gamd.uscourts.gov. (kat) (Entered: 01/21/2022) |
| 01/26/2022 | [184] | REPLY to Response filed by HOUSTON COUNTY GEORGIA, CULLEN TALTON re [142] MOTION To Exclude Plaintiff's Expert Testimony - Rachel Bluebond-Langner M.D., [132] MOTION To Exclude Plaintiff's Expert Testimony - Loren S. Schechter, M.D. (Attachments: # [1] Exhibit A - Commentary on Gender Surgery Beyond Chest & Genitals - Current Insurance Landscape)(LAIL, PATRICK) (Entered: 01/26/2022) |
| 01/26/2022 | [185] | REPLY to Response filed by HOUSTON COUNTY GEORGIA, CULLEN TALTON re [130] MOTION To Exclude Plaintiff's Expert Testimony: Chanel Haley, [129] MOTION To Exclude Plaintiff's Expert Testimony: Paisley Currah (LAIL, PATRICK) (Entered: 01/26/2022) |
| 01/26/2022 | [186] | REPLY to Response filed by HOUSTON COUNTY GEORGIA, CULLEN TALTON re [133] MOTION To Exclude Plaintiff's Expert Testimony- Joan Barrett (LAIL, PATRICK) (Entered: 01/26/2022) |
| 01/26/2022 | [187] | REPLY to Response filed by ANNA LANGE re [140] MOTION for Summary Judgment (Attachments: # [1] Exhibit Order in Vasquez v. Iowa Dep't of Human Servs.)(BARTON, KENNETH) (Entered: 01/26/2022) |
| 01/26/2022 | [188] | REPLY to Response filed by ANNA LANGE re [140] MOTION for Summary Judgment (Attachments: # [1] Exhibit Exhibit 1 Anthem BCBS Claims Summary)(BARTON, KENNETH) (Entered: 01/26/2022) |
| 01/26/2022 | [189] | REPLY to Response filed by HOUSTON COUNTY GEORGIA, CULLEN TALTON re [137] MOTION for Summary Judgment (Attachments: # [1] Exhibit 1 - Civil Docket for Henderson et al v Bodine Aluminum et al 4 95-cv-01051-CAS)(LAIL, PATRICK) (Entered: 01/26/2022) |
| 01/26/2022 | [190] | REPLY to Response filed by CULLEN TALTON re [136] MOTION for Summary Judgment (Attachments: # [1] Exhibit 1 - Civil Docket for Henderson et al v Bodine Aluminum et al 4 95-cv-01051-CAS)(LAIL, PATRICK) (Entered: 01/26/2022) |
| 02/01/2022 | [191] | NOTICE of Attorney Appearance by WILLIAM DRUMMOND DEVENEY on behalf of HOUSTON COUNTY GEORGIA, CULLEN TALTON Attorney WILLIAM DRUMMOND DEVENEY added to party HOUSTON COUNTY GEORGIA(pty:dft), Attorney WILLIAM DRUMMOND DEVENEY added to party CULLEN TALTON(pty:dft)(DEVENEY, WILLIAM) (Entered: 02/01/2022) |
| 02/17/2022 | [192] | UNOPPOSED MOTION to Seal Document(s) 174 Notice (Other), 171 Notice (Other),, MOTION for Leave to File Redacted Statement of Facts by ANNA LANGE filed by KENNETH E BARTON, III.(BARTON, KENNETH) (Entered: 02/17/2022) |
| 02/18/2022 | 193 | This is a text only entry; no document issued. **ORDER** GRANTING [192] Motion to Seal Document(s) 171 and 174 NOTICE Amended Local Rule 56 Statement of Undisputed Facts in Support of Plaintiff's Motion for Summary Judgment with access restricted to court users and case parties. **ORDER** GRANTING [192] Motion for Leave to File Redacted Version of 174 NOTICE Amended Local Rule 56 Statement of Undisputed Facts in Support of Plaintiff's Motion for Summary Judgment. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 2/18/2022. (kat) (Entered: 02/18/2022) |
| 02/18/2022 | [194] | ***REFILED AT [195] *** NOTICE Amended Local Rule 56 Statement of Undisputed Facts in Support of Plaintiff's Motion for Summary Judgment by ANNA LANGE re 171 Notice (Other), (BARTON, KENNETH) Text modified on 2/22/2022 (kat). (Entered: 02/18/2022) |

| | | |
|---|---|---|
| 02/18/2022 | 195 | NOTICE Amended Local Rule 56 Statement of Undisputed Facts in Support of Plaintiff's Motion for Summary Judgment by ANNA LANGE re 174 Notice (Other) - *REDACTED* (BARTON, KENNETH) Text modified on 2/22/2022 (kat). (Entered: 02/18/2022) |
| 02/22/2022 | | *** TIME CHANGE ONLY*** NOTICE OF RESETTING HEARING ON MOTION re 142 MOTION To Exclude Plaintiff's Expert Testimony - Rachel Bluebond-Langner M.D., 133 MOTION To Exclude Plaintiff's Expert Testimony- Joan Barrett, 132 MOTION To Exclude Plaintiff's Expert Testimony - Loren S. Schechter, M.D., 140 MOTION for Summary Judgment, 130 MOTION To Exclude Plaintiff's Expert Testimony - Chanel Haley, 129 MOTION To Exclude Plaintiff's Expert Testimony - Paisley Currah, 137 MOTION for Summary Judgment, 136 MOTION for Summary Judgment. Motion Hearing RESET for 2/24/2022 at 1:30 PM in Macon before CHIEF DISTRICT JUDGE MARC T TREADWELL. Hearing will occur IN-PERSON. Counsel, parties, and members of the public and press should review Standing Order 2022-02, available on the court's website, regarding courthouse entrance procedures due to COVID-19. Interested parties may obtain dial information by emailing macon.ecf@gamd.uscourts.gov. (kat) (Entered: 02/22/2022) |
| 02/24/2022 | 196 | Minute Entry **(content for administrative purposes only)** for proceedings held before CHIEF DISTRICT JUDGE MARC T TREADWELL: Motion Hearing held on 2/24/2022 re 137 MOTION for Summary Judgment filed by HOUSTON COUNTY GEORGIA, 142 MOTION To Exclude Plaintiff's Expert Testimony - Rachel Bluebond-Langner M.D. filed by CULLEN TALTON, HOUSTON COUNTY GEORGIA, 133 MOTION To Exclude Plaintiff's Expert Testimony- Joan Barrett filed by CULLEN TALTON, HOUSTON COUNTY GEORGIA, 136 MOTION for Summary Judgment filed by CULLEN TALTON, 140 MOTION for Summary Judgment filed by ANNA LANGE, 130 MOTION To Exclude Plaintiff's Expert Testimony: Chanel Haley filed by CULLEN TALTON, HOUSTON COUNTY GEORGIA, 129 MOTION To Exclude Plaintiff's Expert Testimony: Paisley Currah filed by CULLEN TALTON, HOUSTON COUNTY GEORGIA, 132 MOTION To Exclude Plaintiff's Expert Testimony - Loren S. Schechter, M.D. filed by CULLEN TALTON, HOUSTON COUNTY GEORGIA. Court Reporter: Darlene Fuller. Time in Court: 1 hour / 44 minutes. (kat) (Entered: 02/24/2022) |
| 03/03/2022 | 197 | TRANSCRIPT of hearing on Motions for Summary Judgment held on 02/24/2022, before Judge Marc T. Treadwell. Court Reporter Darlene D. Fuller. The transcript may be inspected at the court or purchased through the court reporter for a period of 90 days. After 90 days, the transcript may be obtained via PACER. REDACTION OF TRANSCRIPTS: Complete redaction policy available on the courts website. (ddf) (Entered: 03/03/2022) |
| 03/18/2022 | 198 | RESPONSE to Court Order filed by ANNA LANGE re 197 Transcript of Proceedings, (BARTON, KENNETH) (Entered: 03/18/2022) |
| 03/18/2022 | 199 | RESPONSE to Court Order filed by HOUSTON COUNTY GEORGIA, CULLEN TALTON re 197 Transcript of Proceedings, (LAIL, PATRICK) (Entered: 03/18/2022) |
| 03/29/2022 | 200 | Letter from Judge Treadwell. (kat) (Entered: 03/29/2022) |
| 04/08/2022 | 201 | RESPONSE to Court Order filed by HOUSTON COUNTY GEORGIA, CULLEN TALTON re 200 Letter (LAIL, PATRICK) (Entered: 04/08/2022) |
| 04/08/2022 | 202 | RESPONSE to Court Order filed by ANNA LANGE re 200 Letter (BARTON, KENNETH) (Entered: 04/08/2022) |
| 04/28/2022 | 203 | NOTICE of New Authority by HOUSTON COUNTY GEORGIA, CULLEN TALTON (LAIL, PATRICK) (Entered: 04/28/2022) |
| 05/17/2022 | 204 | NOTICE Supplemental Authority by ANNA LANGE re 140 MOTION for Summary Judgment (Attachments: # 1 Exhibit Eknes-Tucker v. Marshall Order)(BARTON, KENNETH) (Entered: 05/17/2022) |
| 06/02/2022 | 205 | **ORDER** DENYING without prejudice 129 MOTION To Exclude Plaintiff's Expert Testimony: Paisley Currah; DENYING without prejudice 130 MOTION To Exclude Plaintiff's Expert |

| | | |
|---|---|---|
| | | Testimony: Chanel Haley; DENYING without prejudice [132](#) MOTION To Exclude Plaintiff's Expert Testimony - Loren S. Schechter, M.D. ; DENYING without prejudice [133](#) MOTION To Exclude Plaintiff's Expert Testimony- Joan Barrett; GRANTING in part and DENYING in part [136](#) Motion for Summary Judgment; GRANTING in part and DENYING in part [137](#) Motion for Summary Judgment; GRANTING in part and DENYING in part [140](#) Motion for Summary Judgment; DENYING without prejudice [142](#) MOTION To Exclude Plaintiff's Expert Testimony - Rachel Bluebond-Langner M.D. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 6/2/2022. (kat) (Entered: 06/02/2022) |
| 06/16/2022 | [206](#) | MOTION for Leave to File Defendants' Motion to Certify the Court's June 2, 2022 Order for Interlocutory Review by HOUSTON COUNTY GEORGIA, CULLEN TALTON filed by PATRICK L LAIL. (Attachments: # [1](#) Memorandum in Support, # [2](#) Proposed Order)(LAIL, PATRICK) (Entered: 06/16/2022) |
| 07/01/2022 | [207](#) | Letter regarding Request for Status Conference to Set Trial Date re [206](#) MOTION for Leave to File Defendants' Motion to Certify the Court's June 2, 2022 Order for Interlocutory Review (BARTON, KENNETH) (Entered: 07/01/2022) |
| 07/07/2022 | [208](#) | RESPONSE filed by ANNA LANGE re [206](#) MOTION for Leave to File Defendants' Motion to Certify the Court's June 2, 2022 Order for Interlocutory Review (BARTON, KENNETH) (Entered: 07/07/2022) |
| 07/13/2022 | | NOTICE of **SETTING** STATUS CONFERENCE. Status Conference re [207](#) Letter set for 7/28/2022 at 10:00 AM in Macon before CHIEF DISTRICT JUDGE MARC T TREADWELL. The parties shall also be prepared to discuss [206](#) MOTION for Leave to File Defendants' Motion to Certify the Court's June 2, 2022 Order for Interlocutory Review. Hearing will occur **IN-PERSON**. Counsel, parties, and members of the public and press should review Standing Order 2022-03, available on the court's website, regarding courthouse entrance procedures due to COVID-19. (kat) (Entered: 07/13/2022) |
| 07/19/2022 | [209](#) | Letter regarding rescheduling status conference (POWELL, WESLEY) (Entered: 07/19/2022) |
| 07/20/2022 | | Notice of Deficiency (related document(s): [209](#) Letter filed by ANNA LANGE ); Document must be re-filed using correct event which is - Motion to Continue. (vs) (Entered: 07/20/2022) |
| 07/20/2022 | [210](#) | MOTION to Continue *Status Conference* by ANNA LANGE filed by WESLEY POWELL. (POWELL, WESLEY) (Entered: 07/20/2022) |
| 07/20/2022 | 211 | This is a text only entry; no document issued. **ORDER** GRANTING [210](#) Motion to Continue Status Conference. Status Conference PREVIOUSLY set for 7/28/2022 is RESET for 8/11/2022 at 10:00 AM in Macon before CHIEF DISTRICT JUDGE MARC T TREADWELL. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 7/20/2022. (kat) (Entered: 07/20/2022) |
| 07/21/2022 | | Notice of Deficiency (related document(s): [210](#) Motion to Continue filed by ANNA LANGE ); The signature block does not include the e mail address of the filer. Please do not re-file, for future reference only. See Fed.R.Civ.P 11.(rlw) (Entered: 07/21/2022) |
| 07/21/2022 | [212](#) | REPLY to Response filed by HOUSTON COUNTY GEORGIA, CULLEN TALTON re [206](#) MOTION for Leave to File Defendants' Motion to Certify the Court's June 2, 2022 Order for Interlocutory Review (LAIL, PATRICK) (Entered: 07/21/2022) |
| 08/08/2022 | [213](#) | PETITION TO THE CLERK FOR ADMISSION TO PLEAD AND PRACTICE PRO HAC VICE by ANNA LANGE Attorney Admission Fee (Pro Hac Vice) paid by Receipt # CGAMDC-4153272, $100. LOCAL COUNSEL Name and Georgia Bar #: Kenneth E. Barton III 301171. (Attachments: # [1](#) Certificate of Good Standing)(PAYNE, AMANDA) (Entered: 08/08/2022) |
| 08/10/2022 | [214](#) | NOTICE Supplemental Authority by ANNA LANGE re [208](#) Response to Motion (Attachments: # [1](#) Exhibit Supplemental Authority)(BROWN, DAVID) (Entered: 08/10/2022) |
| 08/11/2022 | [215](#) | NOTICE of Attorney Withdrawal by MARY EATON on behalf of ANNA LANGE(EATON, MARY) (Entered: 08/11/2022) |

| 08/11/2022 | 216 | Order granting Petition for Admission Pro Hac Vice (Petition Attached); Attorney Admission Fee Met by AMANDA MARIE PAYNE. (mdm) (Entered: 08/11/2022) |
|---|---|---|
| 08/11/2022 | 217 | **ORDER** SETTING PRETRIAL CONFERENCE AND TRIAL (*re Title VII damages*): Pretrial Conference set for 9/8/2022 at 9:30 AM in Macon before CHIEF DISTRICT JUDGE MARC T TREADWELL. Proposed Pretrial Order due by 9/1/2022. This case is set for jury trial during the trial term scheduled to begin on 9/19/2022 at 9:00 a.m. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 8/11/2022. (Attachments: # 1 Required Form) (kat) Modified on 9/1/2022 (kat). (Entered: 08/11/2022) |
| 08/11/2022 | 218 | NOTICE Clarification of Answer to Court's Question by HOUSTON COUNTY GEORGIA, CULLEN TALTON (DEVENEY, WILLIAM) (Entered: 08/11/2022) |
| 08/11/2022 | 219 | Minute Entry **(content for administrative purposes only)** for proceedings held before CHIEF DISTRICT JUDGE MARC T TREADWELL: Status Conference / Motion Hearing held on 8/11/2022. Court Reporter: Tammy DiRocco. Time in Court: 1 hour / 26 minutes. (kat) Modified on 8/15/2022 to change filing date (vs). (Entered: 08/12/2022) |
| 08/18/2022 | 220 | **ORDER** DENYING 206 Motion to Certify Court's Order for Interlocutory Review. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 8/18/2022. (kat) (Entered: 08/18/2022) |
| 08/31/2022 | 221 | TRANSCRIPT of Proceedings held on 8-11-22, before Judge Treadwell. Court Reporter Tammy W. DiRocco. Volume Number: 1 of 1. The transcript may be inspected at the court or purchased through the court reporter for a period of 90 days. After 90 days, the transcript may be obtained via PACER. REDACTION OF TRANSCRIPTS: Complete redaction policy available on the courts website. (Tammy W. DiRocco) (Entered: 08/31/2022) |
| 09/01/2022 | 222 | FIRST MOTION in Limine regarding Plaintiff's claims for future emotional distress damages by HOUSTON COUNTY GEORGIA, CULLEN TALTON filed by PATRICK L LAIL. (Attachments: # 1 Memorandum in Support)(LAIL, PATRICK) (Entered: 09/01/2022) |
| 09/01/2022 | 223 | SECOND MOTION in Limine regarding Plaintiff's failure to make Rule 26 Disclosures by HOUSTON COUNTY GEORGIA, CULLEN TALTON filed by PATRICK L LAIL. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A - Plaintiff's Initial Disclosures, # 3 Exhibit B - Defendant Houston County's Second Interrogatories to Plaintiff, # 4 Exhibit C - Plaintiff's Responses and Objections to Defendant Houston County's Second Set of Interrogatories)(LAIL, PATRICK) (Entered: 09/01/2022) |
| 09/01/2022 | 224 | THIRD MOTION in Limine regarding Rachel Bluebond-Langner, M.D. by HOUSTON COUNTY GEORGIA, CULLEN TALTON filed by PATRICK L LAIL. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A - Plaintiff's Initial Disclosures, # 3 Exhibit B - Expert Declaration of Rachel Bluebond-Langner, M.D. in Support of Plaintiff's Motion for Preliminary Injunction)(LAIL, PATRICK) (Entered: 09/01/2022) |
| 09/01/2022 | 225 | TRIAL BRIEF by HOUSTON COUNTY GEORGIA, CULLEN TALTON (Attachments: # 1 Exhibit A - Plaintiff's Response and Objections to Defendant Houston County's Second Set of Interrogatories)(LAIL, PATRICK) (Entered: 09/01/2022) |
| 09/01/2022 | 226 | TRIAL BRIEF by ANNA LANGE(BARTON, KENNETH) (Entered: 09/01/2022) |
| 09/01/2022 | 227 | ***DISREGARD REFILED AT 231 *** MOTION in Limine regarding Expert Testimony of Dr. Soety by ANNA LANGE filed by KENNETH E BARTON, III.(BARTON, KENNETH) Modified on 9/6/2022 to add docket text(vs). (Entered: 09/01/2022) |
| 09/01/2022 | 228 | ***DISREGARD, REFILED AT 230 *** MOTION in Limine regarding Arguments and Evidence Concerning Defendants' Liability by ANNA LANGE filed by KENNETH E BARTON, III.(BARTON, KENNETH) Modified on 9/6/2022 to add docket text(vs). (Entered: 09/01/2022) |

| 09/01/2022 | 229 | ***DISREGARD REFILED AT 232 *** MOTION in Limine regarding Evidence of Plaintiff's Disciplinary Record by ANNA LANGE filed by KENNETH E BARTON, III.(BARTON, KENNETH) Modified on 9/6/2022 to add docket text(vs). (Entered: 09/01/2022) |
|---|---|---|
| 09/02/2022 | | ***TIME CHANGE ONLY*** NOTICE OF **RESETTING** PRETRIAL CONFERENCE. Pretrial Conference RESET for 9/8/2022 at 1:00 PM in Macon before CHIEF DISTRICT JUDGE MARC T TREADWELL. Hearing will occur **IN-PERSON**. Counsel, parties, and members of the public and press should review Standing Order 2022-03, available on the courts website, regarding courthouse entrance procedures due to COVID-19. (kat) (Entered: 09/02/2022) |
| 09/02/2022 | | Notice of Deficiency (related document(s): 227 Motion in Limine filed by ANNA LANGE, 229 Motion in Limine filed by ANNA LANGE, 228 Motion in Limine filed by ANNA LANGE ); Document must refiled. The Motion has not been filed. The Memorandum must be filed as an exhibit to the Motion. (vs) (Entered: 09/02/2022) |
| 09/02/2022 | 230 | MOTION in Limine regarding Arguments and Evidence Concerning Defendants' Liability by ANNA LANGE filed by KENNETH E BARTON, III. (Attachments: # 1 Memorandum in Support Memorandum in Support of First Motion in Limine)(BARTON, KENNETH) (Entered: 09/02/2022) |
| 09/02/2022 | 231 | MOTION in Limine regarding Expert Testimony of Dr. Soety by ANNA LANGE filed by KENNETH E BARTON, III. (Attachments: # 1 Memorandum in Support Memorandum in Support of Second Motion in Limine)(BARTON, KENNETH) (Entered: 09/02/2022) |
| 09/02/2022 | 232 | MOTION in Limine regarding Evidence of Plaintiff's Disciplinary Record by ANNA LANGE filed by KENNETH E BARTON, III. (Attachments: # 1 Memorandum in Support Memorandum in Support of Third Motion in Limine)(BARTON, KENNETH) (Entered: 09/02/2022) |
| 09/06/2022 | 233 | **ORDER** SETTING PRETRIAL CONFERENCE AND TRIAL (*re equal protection clause claim*): Pretrial Conference set for 2/2/2023 at 9:30 AM in Macon before CHIEF DISTRICT JUDGE MARC T TREADWELL. Proposed Pretrial Order due by 1/12/2023. This case is specially set for jury trial to begin on February 27, 2023 at 9:00 a.m. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 9/6/2022. (Attachments: # 1 Required Form) (kat) (Entered: 09/06/2022) |
| 09/08/2022 | 234 | NOTICE of Filing Corrected Exhibit B in Support of Defendants' Third Motion in Limine by HOUSTON COUNTY GEORGIA, CULLEN TALTON re 224 MOTION in Limine regarding Rachel Bluebond-Langner, M.D. (Attachments: # 1 Exhibit B - Plaintiff's Disclosure of Expert Witness Pursuant to Fed.R.Civ.P.26(A)(2)(C))(LAIL, PATRICK) (Entered: 09/08/2022) |
| 09/08/2022 | 237 | MINUTE ORDER FOR FINAL PRETRIAL CONFERENCE held 9/8/2022 before CHIEF DISTRICT JUDGE MARC T TREADWELL. The Court ruled as follows: 222 Defendants' First Motion in Limine re: Plaintiff's Claims for Future Emotional Distress Damages is WITHDRAWN; 223 Defendants' Second Motion in Limine re: limitations on economic loss evidence - no ruling is required; 224 Defendants' Third Motion in Limine re: Dr. Bluebond-Langner is GRANTED in part and DENIED in part; 230 Plaintiff's First Motion in Limine re: Argument and Evidence Concerning Defendants' Liability is GRANTED subject to Plaintiff opening the door; 231 Plaintiff's Second Motion in Limine to Exclude Expert Testimony of Dr. Soety is WITHDRAWN; 232 Plaintiff's Third Motion in Limine re: Evidence of Plaintiff's Disciplinary Record is WITHDRAWN. FTR Gold START and STOP Times 1:00 - 2:48 pm. (Court Reporter Tammy DiRocco). (kat) (Entered: 09/15/2022) |
| 09/12/2022 | 235 | NOTICE of Attorney Appearance by JAMES MITCHELL FUCETOLA, IV on behalf of BLUE CROSS BLUE SHIELD HEALTHCARE PLAN OF GEORGIA INC Attorney JAMES MITCHELL FUCETOLA, IV added to party BLUE CROSS BLUE SHIELD HEALTHCARE PLAN OF GEORGIA INC(pty:dft)(FUCETOLA, JAMES) (Entered: 09/12/2022) |

| | | |
|---|---|---|
| 09/12/2022 | [236](#) | NOTICE of Attorney Withdrawal by T JOSHUA ARCHER on behalf of BLUE CROSS BLUE SHIELD HEALTHCARE PLAN OF GEORGIA INC(ARCHER, T) (Entered: 09/12/2022) |
| 09/15/2022 | | NOTICE OF **SETTING** ATTORNEY COURTROOM TECHNOLOGY TESTING. ATTORNEY COURTROOM TECHNOLOGY TESTING (defendants' counsel) set for 9/16/2022 at 11:00 AM in Macon with Courtroom Deputy. ***Please have Court Security notify Chambers upon arrival.*** (kat) (Entered: 09/15/2022) |
| 09/16/2022 | [238](#) | TRANSCRIPT of Proceedings held on 9-8-22, before Judge Treadwell. Court Reporter Tammy W. DiRocco. Volume Number: 1 of 1. The transcript may be inspected at the court or purchased through the court reporter for a period of 90 days. After 90 days, the transcript may be obtained via PACER. REDACTION OF TRANSCRIPTS: Complete redaction policy available on the courts website. (Tammy W. DiRocco) (Entered: 09/16/2022) |
| 09/16/2022 | [239](#) | NOTICE of Attorney Appearance by T JOSHUA ARCHER on behalf of BLUE CROSS BLUE SHIELD HEALTHCARE PLAN OF GEORGIA INC Attorney T JOSHUA ARCHER added to party BLUE CROSS BLUE SHIELD HEALTHCARE PLAN OF GEORGIA INC(pty:dft) (ARCHER, T) (Entered: 09/16/2022) |
| 09/19/2022 | 240 | INITIAL NOTIFICATION OF ELECTRONIC AVAILABILITY OF JUROR QUESTIONNAIRES. In order to obtain access to the attached juror questionnaires, you must docket CERTIFICATION RE: JUROR QUESTIONNAIRES. (hdw) (Entered: 09/19/2022) |
| 09/19/2022 | | Counsel for HOUSTON COUNTY GEORGIA, CULLEN TALTON hereby certifies that the juror information forms and the information obtained therefrom are privileged and shall be kept confidential and not shared with anyone other than his or her client or other members of his or her law firm or Federal Defender organization without written consent of the United States District Court. This information shall be used only for selecting the jury. Further, counsel certifies in accordance with U.S. District Court, Middle District of Georgia, Local Rule 48, that, immediately after trial, he or she will destroy all copies of completed juror information forms and any other documents containing information obtained from the completed form and shall not use juror information for any purpose(MORGAN, SHARON) (Entered: 09/19/2022) |
| 09/19/2022 | | Counsel for HOUSTON COUNTY GEORGIA, CULLEN TALTON hereby certifies that the juror information forms and the information obtained therefrom are privileged and shall be kept confidential and not shared with anyone other than his or her client or other members of his or her law firm or Federal Defender organization without written consent of the United States District Court. This information shall be used only for selecting the jury. Further, counsel certifies in accordance with U.S. District Court, Middle District of Georgia, Local Rule 48, that, immediately after trial, he or she will destroy all copies of completed juror information forms and any other documents containing information obtained from the completed form and shall not use juror information for any purpose(DEVENEY, WILLIAM) (Entered: 09/19/2022) |
| 09/19/2022 | | Counsel for ANNA LANGE hereby certifies that the juror information forms and the information obtained therefrom are privileged and shall be kept confidential and not shared with anyone other than his or her client or other members of his or her law firm or Federal Defender organization without written consent of the United States District Court. This information shall be used only for selecting the jury. Further, counsel certifies in accordance with U.S. District Court, Middle District of Georgia, Local Rule 48, that, immediately after trial, he or she will destroy all copies of completed juror information forms and any other documents containing information obtained from the completed form and shall not use juror information for any purpose(BARTON, KENNETH) (Entered: 09/19/2022) |
| 09/20/2022 | | Counsel for ANNA LANGE hereby certifies that the juror information forms and the information obtained therefrom are privileged and shall be kept confidential and not shared with anyone other than his or her client or other members of his or her law firm or Federal Defender organization without written consent of the United States District Court. This information shall be used only for selecting the jury. Further, counsel certifies in accordance with U.S. District Court, Middle District of Georgia, Local Rule 48, that, immediately after trial, he or she will |

| | | |
|---|---|---|
| | | destroy all copies of completed juror information forms and any other documents containing information obtained from the completed form and shall not use juror information for any purpose(POWELL, WESLEY) (Entered: 09/20/2022) |
| 09/20/2022 | | Counsel for ANNA LANGE hereby certifies that the juror information forms and the information obtained therefrom are privileged and shall be kept confidential and not shared with anyone other than his or her client or other members of his or her law firm or Federal Defender organization without written consent of the United States District Court. This information shall be used only for selecting the jury. Further, counsel certifies in accordance with U.S. District Court, Middle District of Georgia, Local Rule 48, that, immediately after trial, he or she will destroy all copies of completed juror information forms and any other documents containing information obtained from the completed form and shall not use juror information for any purpose(BROWN, DAVID) (Entered: 09/20/2022) |
| 09/20/2022 | | NOTICE OF **SETTING** ATTORNEY COURTROOM TECHNOLOGY TESTING. Attorney Courtroom Technology Testing (plaintiff's counsel) set for 9/23/2022 at 10:00 AM in Macon with Courtroom Deputy. ***Please have Court Security notify Chambers upon arrival.*** (kat) (Entered: 09/20/2022) |
| 09/20/2022 | 241 | Letter from Judge Treadwell to all counsel of record. (kat) (Entered: 09/20/2022) |
| 09/22/2022 | | NOTICE OF **RESETTING** JURY TRIAL. Jury Trial PREVIOUSLY set for 9/19/2022 has been **RESET for 9/26/2022 at 9:00 AM in Macon** before CHIEF DISTRICT JUDGE MARC T TREADWELL. Hearing will occur **IN-PERSON**. Counsel, parties, and members of the public and press should review Standing Order 2022-03, available on the court's website, regarding courthouse entrance procedures due to COVID-19. (kat) (Entered: 09/22/2022) |
| 09/22/2022 | 242 | Letter regarding Judge Treadwell's Letter to All Counsel of Record dated 9/20/22 re 241 Letter (POWELL, WESLEY) (Entered: 09/22/2022) |
| 09/23/2022 | 243 | SUPPLEMENTAL NOTIFICATION OF AVAILABILITY OF JUROR QUESTIONNAIRES. If you have already entered a CERTIFICATION RE: JUROR QUESTIONNAIRES, it is not necessary to enter another Certification. If you have not entered a CERTIFICATION RE: JUROR QUESTIONNAIRES, you must do so in order to obtain access. (hdw) (Entered: 09/23/2022) |
| 09/23/2022 | 244 | Letter regarding the Court's trial documents (POWELL, WESLEY) (Entered: 09/23/2022) |
| 09/23/2022 | 245 | TRIAL BRIEF by ANNA LANGE (Attachments: # 1 Proposed Order Proposed Order) (BARTON, KENNETH) (Entered: 09/23/2022) |
| 09/24/2022 | 246 | Letter regarding Judge Treadwell's Letter re 241 Letter (DEVENEY, WILLIAM) (Entered: 09/24/2022) |
| 09/25/2022 | 247 | Letter regarding Plaintiff's Second Letter and Proposed Revision to Trial Documents re 244 Letter (LAIL, PATRICK) (Entered: 09/25/2022) |
| 09/25/2022 | 248 | TRIAL BRIEF by HOUSTON COUNTY GEORGIA, CULLEN TALTON(LAIL, PATRICK) (Entered: 09/25/2022) |
| 09/26/2022 | 249 | **COURT'S RULINGS** on Deposition Objections as to Dr. Rachel Bluebond-Langner. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 9/26/2022. (kat) (Entered: 09/28/2022) |
| 09/26/2022 | 250 | TEXT ONLY Minute Entry **(content for administrative purposes only)** for proceedings held before CHIEF DISTRICT JUDGE MARC T TREADWELL: Pretrial Conference held on 9/26/2022. FTR Gold START and STOP Times 8:59AM - 9:14AM. Court Reporter: Darlene Fuller.Time in Court: 15 minutes. (ans) Modified to change hearing date to 09/26/2022 on 9/28/2022 (ans). (Entered: 09/28/2022) |

| | | |
|---|---|---|
| 09/26/2022 | 251 | Minute Entry **(content for administrative purposes only)** for proceedings held before CHIEF DISTRICT JUDGE MARC T TREADWELL: Jury Trial Day 1 and Day 2 held on 9/26/2022 - 9/27/2022 Court Reporter: Darlene Fuller. (vs) (Entered: 09/28/2022) |
| 09/27/2022 | 252 | PLAINTIFF'S TRIAL EXHIBIT by ANNA LANGE (Attachments: # 1 Exhibit P3 - Surgery Denial Letter, dated 11/26/2018 (Lange - HC001951-54))(vs) (Entered: 09/28/2022) |
| 09/27/2022 | 253 | DEFENDANTS' TRIAL EXHIBITS by HOUSTON COUNTY, GA and CULLEN TALTON (Attachments: # 1 Exhibit D5 - Letter dated 10/11 /18 from Dr. Soety to Dr. Bluebond-Langner [Lange 2443-24441], # 2 Exhibit D8 - 11/13/18 Consult notes of Dr. Bluebond-Langner [Lange 2417-2421], # 3 Exhibit D9 - 11/13/18 Consult notes of Dr. Lee Zhao [Lange 2422-2427])(vs) Text modified on 9/29/2022 (kat). (Entered: 09/28/2022) |
| 09/27/2022 | 254 | Jury Instructions (Attachments: # 1 Burden of Proof)(vs) (Entered: 09/28/2022) |
| 09/27/2022 | 255 | Jury Notes/Questions(vs) (Entered: 09/28/2022) |
| 09/27/2022 | 256 | JURY VERDICT for ANNA LANGE(vs) (Entered: 09/28/2022) |
| 09/27/2022 | 257 | Jury Verdict signature page (Un-redacted) Related document: 256 JURY VERDICT.(vs) (Entered: 09/28/2022) |
| 10/03/2022 | 258 | **ORDER** FOR PERMANENT INJUNCTIVE AND DECLARATORY RELIEF. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 10/3/2022. (kat) (Entered: 10/03/2022) |
| 10/17/2022 | 259 | TRANSCRIPT of Jury Trial held on 09/26/2022 and 09/27/2022, before Chief Judge Marc T. Treadwell. Court Reporter Darlene D. Fuller. The transcript may be inspected at the court or purchased through the court reporter for a period of 90 days. After 90 days, the transcript may be obtained via PACER. REDACTION OF TRANSCRIPTS: Complete redaction policy available on the courts website. (ddf) Text modified on 10/17/2022 (kat). (Entered: 10/17/2022) |
| 10/17/2022 | 260 | MOTION to Stay re 258 Order by HOUSTON COUNTY GEORGIA, CULLEN TALTON filed by RICHARD READ GIGNILLIAT. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A - The New York Times Article 05/10/2022)(GIGNILLIAT, RICHARD) Modified on 10/18/2022 to edit docket text(vs). (Entered: 10/17/2022) |
| 10/19/2022 | 261 | **PRETRIAL ORDER** (*as to Title VII Damages*). Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 10/19/2022. (Attachments: # 1 Exhibit - PTO Attachment A, # 2 Exhibit - PTO Attachment B, # 3 Exhibit - PTO Attachment C, # 4 Exhibit - PTO Attachment D, # 5 Exhibit - PTO Attachment E, # 6 Exhibit - PTO Attachment F, # 7 Exhibit - PTO Attachment G). (kat) (Entered: 10/19/2022) |
| 10/21/2022 | 262 | NOTICE OF APPEAL as to 258 Order by HOUSTON COUNTY GEORGIA, CULLEN TALTON. Filing fee $ 505, Receipt No.: AGAMDC-4212594. (Attachments: # 1 Exhibit A - Docket 258 ORDER for Permanent Injunctive and Declaratory Relief)(MORGAN, SHARON) (Entered: 10/21/2022) |
| 10/21/2022 | | Appeal Instructions re 262 Notice of Appeal,. The Transcript Information Form and instructions are available on the District Court website under Forms & Guides. **PLEASE NOTE** Separate forms must be filed for each court reporter. Transcript Order Form due by 11/7/2022 (vs) (Entered: 10/21/2022) |
| 10/21/2022 | 263 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re: 262 Notice of Appeal, 258 Order Judge Appealed: Marc T. Treadwell. Court Reporter: Darlene Fuller. Fee: Paid. (vs) (Entered: 10/21/2022) |
| 10/27/2022 | 264 | Request for Local Rule 6.2 Clerks Extension re 260 MOTION to Stay Pending Appeal re 258 Order by ANNA LANGE (POWELL, WESLEY) (Entered: 10/27/2022) |
| 10/28/2022 | | Notice of Clerk's Granting of Extension Pursuant to re: 260 MOTION to Stay Pending Appeal re 258 Order filed by CULLEN TALTON, HOUSTON COUNTY GEORGIA (vs) (Entered: |

| | | |
|---|---|---|
| | | 10/28/2022) |
| 10/31/2022 | 265 | This is a text only entry; no document issued. **ORDER**. The Court's October 3, 2022, order 258 is **STAYED** pending resolution of the defendants' motion for stay pending appeal 260 . Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 10/31/2022. (bwr) (Entered: 10/31/2022) |
| 10/31/2022 | 266 | USCA Case Number 22-13626-DD re 262 Notice of Appeal, filed by CULLEN TALTON, HOUSTON COUNTY GEORGIA. (vs) (Entered: 10/31/2022) |
| 10/31/2022 | 267 | MOTION To Exclude Plaintiff's Expert Testimony- Joan Barrett by HOUSTON COUNTY GEORGIA, CULLEN TALTON filed by PATRICK L LAIL. (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1 - Plaintiff's Expert Witness Identifications, # 3 Exhibit 2 - Expert Report of Joan Barrett, FSA, MAAA, # 4 Exhibit 3 - Deposition of Joan Barrett 8-24-21, # 5 Exhibit 4 - Actuarial Standard of Practice No. 1, # 6 Exhibit 5 - Actuarial Standard of Practice No. 41, # 7 Exhibit 6 - Expert Report of James P. Galasso, # 8 Exhibit 7 - Declaration of Kenneth Carter, # 9 Exhibit 8 - Expert Report of Joan C Barrett and Elaine T Corrough Submitted on Behalf of the Plaintiffs)(LAIL, PATRICK) (Entered: 10/31/2022) |
| 10/31/2022 | 268 | MOTION To Exclude Plaintiff's Expert Testimony - Rachel Bluebond-Langner, M.D. by HOUSTON COUNTY GEORGIA, CULLEN TALTON filed by PATRICK L LAIL. (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1 - Plaintiff's Expert Witness Identifications, # 3 Exhibit 2 - Plaintiff's Disclosure of Expert Witness Pursuant to Fed.R.Civ.P26(A)(2)(C), # 4 Exhibit 3 - Health Insurance Coverage of Gender-Affirming Top Surgery in the United States, # 5 Exhibit 4 - Anna Lange 4-2-21 Deposition Excerpt Pages, # 6 Exhibit 5 - Declaration of Kenneth Carter, # 7 Exhibit 6 - Declaration of Joan C. Barrett, # 8 Exhibit 7 - Expert Report of Joan C. Barrett and Elaine T. Corrough Submitted on Behalf of the Plaintiffs)(LAIL, PATRICK) (Entered: 10/31/2022) |
| 10/31/2022 | 269 | MOTION To Exclude Plaintiff's Expert Testimony: Paisley Currah by HOUSTON COUNTY GEORGIA, CULLEN TALTON filed by PATRICK L LAIL. (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1 - Plaintiff's Expert Witness Identifications, # 3 Exhibit 2 - Expert Report of Paisley Currah, # 4 Exhibit 3 - 2015 - U.S. Transgender Survey - GA State Report)(LAIL, PATRICK) (Entered: 10/31/2022) |
| 10/31/2022 | 270 | MOTION To Exclude Plaintiff's Expert Testimony - Loren S. Schechter, M.D. by HOUSTON COUNTY GEORGIA, CULLEN TALTON filed by PATRICK L LAIL. (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1 - Plaintiff's Expert Witness Identifications, # 3 Exhibit 2 - Expert Report of Loren S. Schechter, M.D., # 4 Exhibit 3 - Societal Implications of Health Coverage for Medically Necessary Services in the U.S. Transgender Population, # 5 Exhibit 4 - The implications of Allowing Transgender Personnel to Serve Openly in the U.S. Military, # 6 Exhibit 5 - Declaration of Kenneth Carter)(LAIL, PATRICK) (Entered: 10/31/2022) |
| 10/31/2022 | 271 | MOTION To Exclude Plaintiff's Expert Testimony: Chanel Haley by HOUSTON COUNTY GEORGIA, CULLEN TALTON filed by PATRICK L LAIL. (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1 - Plaintiff's Expert Witness Identifications, # 3 Exhibit 2 - Plaintiff's Expert Witness Report for Chanel Haley, # 4 Exhibit 3 - 2015 U.S. Transgender Survey GA State Report)(LAIL, PATRICK) (Entered: 10/31/2022) |
| 10/31/2022 | 272 | MOTION to Continue *of Jury Trial Set for February 27, 2023* by HOUSTON COUNTY GEORGIA, CULLEN TALTON filed by WILLIAM DRUMMOND DEVENEY. (Attachments: # 1 Memorandum in Support)(DEVENEY, WILLIAM) (Entered: 10/31/2022) |
| 11/01/2022 | 273 | This is a text only entry; no document issued. **ORDER** FOR RESPONSE TO MOTION re: 272 MOTION to Continue *Jury Trial Set for February 27, 2023* filed by CULLEN TALTON, HOUSTON COUNTY GEORGIA. Lange shall respond to 272 defendants' motion for continuance by November 11, 2022. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 11/1/2022. (kat) (Entered: 11/01/2022) |

| | | |
|---|---|---|
| 11/04/2022 | 274 | USCA Case Number 22-13626-DD re 262 Notice of Appeal, filed by CULLEN TALTON, HOUSTON COUNTY GEORGIA. (vs) (Entered: 11/04/2022) |
| 11/04/2022 | 275 | TRANSCRIPT INFORMATION FORM by HOUSTON COUNTY GEORGIA, CULLEN TALTON. re 262 Notice of Appeal, *Tammy DiRocco* (GIGNILLIAT, RICHARD) (Entered: 11/04/2022) |
| 11/04/2022 | 276 | TRANSCRIPT INFORMATION FORM by HOUSTON COUNTY GEORGIA, CULLEN TALTON. re 262 Notice of Appeal, *Darlene D. Fuller* (GIGNILLIAT, RICHARD) (Entered: 11/04/2022) |
| 11/07/2022 | 277 | Notice of Filing Official Transcript to all parties re 221 Transcript of Proceedings, 238 Transcript of Proceedings,.(Tammy W. DiRocco) (Entered: 11/07/2022) |
| 11/08/2022 | 278 | ***Refiled at 279 *** Letter regarding Proposed Consent Order for Continuance of Jury Trial Set for February 27, 2023 re 272 MOTION to Continue *of Jury Trial Set for February 27, 2023*, 273 Order for Response to Motion, (Attachments: # 1 Proposed Order)(POWELL, WESLEY) Modified on 11/10/2022 to add docket text(vs). (Entered: 11/08/2022) |
| 11/09/2022 | | Notice of Deficiency (related document(s): 278 Letter, filed by ANNA LANGE); Document is a response to a motion, which is not in the proper format, and does not contain the filer's e-mail address in the signature block. The response must be re-filed using correct event which is "Response to Motion."(ggs) (Entered: 11/09/2022) |
| 11/09/2022 | 279 | RESPONSE filed by ANNA LANGE re 272 MOTION to Continue *of Jury Trial Set for February 27, 2023* (Attachments: # 1 Proposed Order)(POWELL, WESLEY) (Entered: 11/09/2022) |
| 11/11/2022 | 280 | RESPONSE filed by ANNA LANGE re 260 MOTION to Stay Pending Appeal re 258 Order (Attachments: # 1 Exhibit A - Defendants' Attorneys' Fees)(POWELL, WESLEY) (Entered: 11/11/2022) |
| 11/17/2022 | 281 | **ORDER** TERMINATING 267 MOTION To Exclude Plaintiff's Expert Testimony- Joan Barrett ; TERMINATING 268 MOTION To Exclude Plaintiff's Expert Testimony - Rachel Bluebond-Langner, M.D. ; TERMINATING 269 MOTION To Exclude Plaintiff's Expert Testimony: Paisley Currah ; TERMINATING 270 MOTION To Exclude Plaintiff's Expert Testimony - Loren S. Schechter, M.D.; TERMINATING 271 MOTION To Exclude Plaintiff's Expert Testimony: Chanel Haley ; and GRANTING 272 MOTION to Continue of Jury Trial Set for February 27, 2023. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 11/17/2022. (kat) (Entered: 11/17/2022) |
| 11/18/2022 | | NOTICE OF <span style="color:red">**CANCELLATION**</span> OF PRETRIAL CONFERENCE. Pretrial Conference previously scheduled for 2/2/2023 is CANCELLED. (kat) (Entered: 11/18/2022) |
| 11/21/2022 | 282 | Request for Local Rule 6.2 Clerks Extension re 260 MOTION to Stay Pending Appeal re 258 Order by HOUSTON COUNTY GEORGIA, CULLEN TALTON (DEVENEY, WILLIAM) (Entered: 11/21/2022) |
| 11/21/2022 | | Notice of Clerk's Granting of Extension Pursuant to re: Defendants Reply Brief to Plaintiffs Response to Defendants Motion to Stay Pending Appeal 280 and 260 Motion.(ksl) Modified on 11/22/2022 to add link (ggs). (Entered: 11/21/2022) |
| 12/09/2022 | 283 | REPLY to Response filed by HOUSTON COUNTY GEORGIA, CULLEN TALTON re 260 MOTION to Stay Pending Appeal re 258 Order (LAIL, PATRICK) (Entered: 12/09/2022) |
| 12/12/2022 | 284 | MOTION for Extension of Time to File her Motions for Attorneys' Fees and Costs. by ANNA LANGE filed by WESLEY POWELL.(POWELL, WESLEY) (Entered: 12/12/2022) |
| 12/14/2022 | 285 | This is a text only entry; no document issued. **ORDER** GRANTING 284 Motion for Extension of Time. The Plaintiff shall file her Motions for Attorneys' Fees and Costs within thirty (30) days of the expiration of the time for any party to seek reconsideration or to obtain a grant of |

| | | |
|---|---|---|
| | | certiorari from the United States Supreme Court of the Court of Appeals' opinion on Defendants' pending appeal. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 12/14/2022. (bwr) (Entered: 12/14/2022) |
| 12/20/2022 | | Pursuant to F.R.A.P 11(c) the Clerk of the District Court for the Middle District of Georgia certifies that the record is complete for purposes of this appeal re: 262 Notice of Appeal,. The entire record on appeal is available electronically (vs) (Entered: 12/20/2022) |
| 01/09/2023 | 286 | **ORDER** FOR RESPONSE. The parties shall supplement their briefs to address what effect, if any, Adams has on the defendants' 260 motion to stay injunctive relief pending appeal by January 23, 2023. Ordered by CHIEF DISTRICT JUDGE MARC T TREADWELL on 1/9/2023. (kat) (Entered: 01/09/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 01/20/2023 09:56:57 | | |
| **PACER Login:** et0016 | **Client Code:** | |
| **Description:** Docket Report | **Search Criteria:** 5:19-cv-00392-MTT | |
| **Billable Pages:** 30 | **Cost:** 3.00 | |

259

```
 1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE MIDDLE DISTRICT OF GEORGIA
 2                           MACON DIVISION

 3                        _____

 4   ANNA LANGE, Plaintiff,              )
                                         ) Case No. 5:19-CV-392
 5        vs.                            )
                                         ) Macon, Georgia
 6   HOUSTON COUNTY, GEORGIA; HOUSTON    )
     COUNTY BOARD OF COMMISSIONERS;      )
 7   Houston County Commissioners TOMMY  )
     STALNAKER, H. JAY WALKER III, GAIL  )
 8   ROBINSON, LARRY THOMSON, TOM        )
     McMICHAEL, BARRY HOLLAND, and ROBBIE)
 9   DUNBAR, in their official and       )
     individual capacities; Houston      )
10   County Director of Personnel KENNETH)
     CARTER, in his official and         )
11   individual capacity; and SHERIFF    )
     CULLEN TALTON, in his official and  )
12   individual capacity, Defendants.    )
     _____)
13

14                            JURY TRIAL

15                    September 26 and 27, 2022

16

17           BEFORE THE HONORABLE MARC T. TREADWELL
                   UNITED STATES DISTRICT JUDGE
18

19

20

21
     Proceedings reported stenographically
22   _____

23                     DARLENE D. FULLER, USCR
                      Registered Professional Reporter
24                        Registered Merit Reporter
                         Certified Realtime Reporter
25             Georgia Certified Reporter No. 5641-3440-5157-6832
```

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFF:        M. Devlin Cooper
                                COOPER BARTON & COOPER
 3                              170 College Street
                                Macon, Georgia 31201
 4                              (478) 841-9007
                                mdc@cooperbarton.com
 5
                                David Brown
 6                              TRANSGENDER LEGAL DEFENSE EDUCATION
                                   FUND, INC.
 7                              520 8th Avenue, Suite 2204
                                New York, New York 10018
 8                              (646) 862-9396
                                dbrown@transgenderlegal.org
 9
                                Wesley Powell
10                              Jill K. Grant
                                Catherine Fata
11                              WILLKIE FARR & GALLAGHER LLP
                                878 Seventh Avenue
12                              New York, New York 10019-6099
                                (212) 728-8000
13                              wpowell@willkie.com
                                jgrant@willkie.com
14                              cfata@willkie.com

15    FOR THE DEFENDANTS:       Patrick L. Lail
                                William D. Deveney
16                              Sharon P. Morgan
                                R. Read Gignilliat
17                              ELARBEE, THOMPSON, SAPP & WILSON, LLP
                                800 International Tower
18                              229 Peachtree Street NE
                                Atlanta, Georgia 30303
19                              (404) 659-6700
                                lail@elarbeethompson.com
20                              deveney@elarbeethompson.com
                                morgan@elarbeethompson.com
21                              gignilli@elarbeethompson.com

22    ALSO PRESENT:             Anna Lange, Plaintiff
                                Ken Carter, Houston County
23                              Tom Hall, Houston County
                                Captain Ron Brainard, HCSD

24

25
```

1                          <u>WITNESS INDEX</u>

2                                                          <u>PAGE</u>

3     **SERGEANT ANNA LANGE**

4     Direct Examination By Mr. Brown: ........................48

5     Cross Examination By Mr. Lail: .........................86

6     Redirect Examination By Mr. Brown: .....................98

7     Recross Examination By Mr. Lail: ......................102

8

9     **ELIZABETH M. SOETY, PH.D.**

10    Direct Examination By Ms. Grant: ......................104

11    Cross Examination By Mr. Lail: ........................118

12    Redirect Examination By Ms. Grant: ....................126

13

14    **RACHEL BLUEBOND-LANGNER, M.D. (Video Deposition)**

15    Examination by Mr. Powell. ............................132

16    Examination by Mr. Lail. ..............................152

17    Re-Examination by Mr. Powell. .........................176

18

19

20

21

22

23

24

25

1              PLAINTIFF EXHIBITS ADMITTED DURING TESTIMONY

2

3       NUMBER            DESCRIPTION                              PAGE

4       PX 3              11-26-18 Insurance Denial Letter .........73

5

6

7              DEFENSE EXHIBITS ADMITTED DURING TESTIMONY

8       NUMBER            DESCRIPTION                              PAGE

9       DX 5              10-11-18 Soety letter ...................122

10      DX 8              11-13-18 Dr. Bluebond-Langner consult ...192
                          notes
11
        DX 9              11-13-18 Dr. Lee Zhao consult notes .....192
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   Macon, Georgia
 2   Monday, September 26, 2022
 3   Pretrial Conference proceedings in Courtroom B
 4   8:58 a.m.
 5                    P R O C E E D I N G S
 6          COURTROOM DEPUTY:  Let me get your appearances.  Yes,
 7   who is here for the plaintiff?
 8          MS. MORGAN:  Wes Powell from Willkie Farr.
 9          MS. GRANT:  Jill Grant from Willkie Farr & Gallagher.
10          MR. BROWN:  David Brown from the Transgender Legal
11   Defense and Education Fund.
12          MR. COOPER:  Devlin Cooper from Cooper Barton Cooper.
13          COURTROOM DEPUTY:  And for the defendant?
14          MR. GIGNILLIAT:  Read Gignilliat, Elarbee Thompson.
15          MS. MORGAN:  Sharon Morgan, Elarbee Thompson.
16          MR. LAIL:  Patrick Lail, Elarbee Thompson.
17          MR. DEVENEY:  And William Deveney, Elarbee Thompson.
18          THE COURT:  Thank you, all.  As I was saying, Kim is
19   moving things along quickly.  The jury will be finishing their
20   orientation video in a few minutes.  They will take about a
21   15-minute break, so we'll -- so we will probably start around
22   9:45.  We'll start a little earlier than that, 9:25, 9:30.
23          Let me walk through some things, and then I will tell
24   you what I've done based upon the briefing and correspondence
25   over the weekend.  I will, of course, welcome the jurors.  Kim
```

1    will call the roll, administer the oath, I will call the case

2    for the record.  You just need to announce ready.

3           And then I will move into my voir dire, and let's go

4    ahead and turn to that, and I will tell you what I have done in

5    response to your briefs and correspondence.

6           Yes, I think it's appropriate to say, "...the Supreme

7    Court in another case..."  And I am looking at Page 3, which is

8    the first time that that appears.  Page 3 of my voir dire.  And

9    I am going to add this sentence right after the sentence with

10   the Supreme Court based on what you, again, have sent me over

11   the weekend.

12           "It has also been established that both

13           defendants are responsible for any damages

14           Sergeant Lange may have suffered."

15           You know, this -- there's no need to get into a

16   discussion and potentially confuse the jury about who's

17   responsible for putting the exclusions in the plan.  All the

18   jury needs to know is that if Sergeant Lange suffered any

19   damages, these defendants are responsible for it.  If she

20   hasn't, then there's no damages to recover.

21           And that's throughout the voir dire and the jury

22   instructions anyway, but we'll make it clear by doing that.

23           MR. LAIL:  Your Honor, if I can interject.  The only

24   exception to that, I guess, would be the misinformation from

25   Anthem about the initial read of the policy that then led her

```
 1    to go up to New York.  I think that's -- that's on them as
 2    opposed to on us.
 3              THE COURT:  Yeah, that's nothing the jury is going to
 4    be dealing with.  No, that's not --
 5              MR. LAIL:  I think it depends on what is covered in
 6    direct that we may need to clarify.  Again, I don't know
 7    exactly what she may testify to, but if she testifies to the
 8    frustration or upset or whatever about having traveled up to
 9    New York for nothing, I think that's attributable to Anthem's
10    misinformation in the first instance.
11              THE COURT:  Well, the scope of damages is limited to
12    what was a consequence of the denial of coverage.
13              MR. LAIL:  Exactly.
14              THE COURT:  And that was before the denial of
15    coverage.
16              MR. LAIL:  Exactly.
17              THE COURT:  I know there is an issue about that
18    expense, and you have briefed that, but that is nothing that we
19    need to resolve right now.
20              Who is going to be Houston County's representative?
21              MR. LAIL:  It is Captain Ron Brainard.  He is the
22    head of the Criminal Investigation Division where Sergeant
23    Lange works.
24              THE COURT:  That would be for the Sheriff's
25    Department in Houston County.  Will there be anybody --
```

1          MR. LAIL:  Oh, for Houston County?  Yes, Ken Carter,

2     who is the Director of Personnel; and also the County Attorney,

3     Tom Hall is here as well.

4          THE COURT:  And then for the Sheriff's Office, the

5     representative will be...

6          MR. LAIL:  Captain Ron Brainard.

7          THE COURT:  How is that last name spelled?

8          MR. LAIL:  It's B-r-a-i-n-a-r-d.

9          THE COURT:  Now turn to the preliminary instructions

10    to see what I've done there.  At Paragraph 7, of course, we're

11    changing "December" to "November."

12          And at the end of that Paragraph 7, I think we

13    addressed the issues about just making it clear that the

14    defendants are the defendants to answer for any damages to say

15    this:

16               "These exclusions were the only reason the

17               surgery was denied; otherwise, the surgery

18               was covered by the plan."

19          And that also addresses the "medically necessary."  I

20    think the defendants --

21          Ben, would you close that door, please.

22          Mr. Barton, would you close that door, please.  I am

23    not sure if the jurors are -- yeah, they are.

24          Defendants made a good point about "medically

25    necessary."  It is not defined, and, believe me, I know how

1    jurors can latch onto things and draw conclusions that we never

2    would think they would draw.  The effect and point is covered,

3    I think, by what I just read.  And I will read it again:

4              "These exclusions were the only reason the

5              surgery was denied; otherwise, the surgery

6              was covered by the plan."

7              And then in Paragraph 8, of course, we add the

8    language, "at the Supreme Court."  And then again I have to

9    make it clear that these are the defendants to answer for the

10    damages at issue here.  I am adding this:

11              "Because of the Court's ruling, the

12              defendants are responsible for Sergeant

13              Lange's damages, if any."

14              By the way, I saw your -- the case you've cited on

15    nominal damages.  The defendants have cited.  It is

16    interesting.  I haven't had a chance to study it.  But that's

17    not an issue we have to resolve until after the verdict.  That

18    is nothing the jury would be involved in anyway.

19              All right.  Any questions about that?

20              MS. GRANT:  No, Your Honor.

21              THE COURT:  Nothing remarkable yet about the jury.

22    We have 31 present.  Kim has an extra questionnaire, I don't

23    know if y'all -- that has come to y'all yet.

24              MS. TAVALARO:  I have another one here.

25              THE COURT:  And another one.

```
 1              (Ms. Tavalaro entered at 9:06 a.m.)

 2              MS. TAVALARO:  I had a couple more show up.

 3              THE COURT:  All right.  Juror 3 -- pardon me, Juror

 4    13, Harriet Steele, has requested to be excused, primarily

 5    because of hearing issues.  Is that right?

 6              MS. TAVALARO:  Yes.

 7              THE COURT:  And 43 has requested to be excused for

 8    the same reason.  And did 15 request that?

 9              MS. TAVALARO:  Just after -- yeah, he actually has a

10    hearing aid.  Number 15.

11              THE COURT:  Juror 15, Joey Kornegay, has requested to

12    be excused because of hearing issues as well.

13              I am going to defer those.  I will watch them.  I

14    also want to see, you know -- I want to be sure we don't need

15    the bodies.

16              MS. GRANT:  Sorry, Your Honor.  You said 13, 43, and

17    who was the third?

18              THE COURT:  15.

19              MS. GRANT:  "15," thank you.

20              THE COURT:  In that regard -- and I don't anticipate

21    this happening, but, again, the issues are a bit unusual --

22    while we will seat a jury of 12, if we start losing people for

23    cause, we don't have to sit a jury for 12.  We'll seat the most

24    we can as long as we have 6 in the box.  Again, I don't see

25    that happening.  And then we'll regroup if we get to that
```

1    point.  After -- how we're going to handle jury selection.

2            But as things stand, remember that when we do come to

3    selecting, we will be passing the strike sheet.  Each of you

4    will have three strikes.  You will strike from the top 18, and

5    the 12 remaining will be put in the jury box.

6            Are they on break right now?

7            MS. TAVALARO:  Yes, sir.

8            THE COURT:  What time did you tell them to come back?

9            MS. TAVALARO:  Ten minutes.  Probably about five more

10   minutes.

11           THE COURT:  It seems to me that we're going to finish

12   this case today unless something unusual happens.  Three

13   witnesses?  Is that correct?  How long is the video now that

14   it's been edited?

15           MS. GRANT:  I think it's around 35 minutes.

16           MR. POWELL:  Yeah.

17           THE COURT:  So, clearly, we're going to get to the

18   evidence before lunch.  We will see how things go, but it sure

19   looks to me like the case will go to the jury this afternoon.

20   So you need to be prepared to open, put your witnesses up,

21   cross-examine, close, and charge.

22           And the charge turned out to be very streamlined and

23   to the point.  I will -- I gather there's no exceptions to the

24   charge.  None have been raised.  But if there are, I'll give

25   you an opportunity to -- well, no, I'm assuming there's no

1    exceptions to the charge.  I have taken what you've given me.

2    We'll do that on the record during the trial, to make sure

3    there's no exceptions.  But if there's any problems, let me

4    know now and I'll see if I can fix them.

5              Hearing none, it looks like we're good to go.  All

6    right.  Any questions from the plaintiffs?

7              MS. GRANT:  No, Your Honor.

8              MR. POWELL:  No, Your Honor.

9              THE COURT:  From the defendants?

10             MR. LAIL:  Your Honor, in one of the letters from the

11   plaintiffs there was a proposal to add to your statements that

12   there -- that the defendants put the exclusions in the plan.  I

13   assume you are not going to do that?

14             THE COURT:  No.

15             MR. LAIL:  Okay.

16             THE COURT:  No, that is addressed, I think, along

17   with the "medical necessity" or "medically necessary" language

18   by the changes I went through.

19             All right.  We'll -- why don't we reconvene at 9:30.

20   In the courtroom.

21        (Pretrial Conference concluded in Courtroom B at

22        9:11 a.m.; proceedings resumed in Courtroom A at 9:36 a.m.

23        with Jury Voir Dire.)

24        (Jury Voir Dire conducted from 9:36 to 10:53 a.m.)

25        (Proceedings resumed at 11:07 a.m.)

```
1                COURT OFFICER:  All rise.  This Honorable Court is

2      back in session.  Be seated.  Come to order.

3                THE COURT:  I understand you have one exhibit you

4      want to use in opening, and there's no objection to that; is

5      that correct?

6                MR. POWELL:  Your Honor, we are not using an exhibit

7      in opening, but we will be in the examination of Sergeant

8      Lange.

9                COURTROOM DEPUTY:  She clarified for me, it is not

10     opening.

11               THE COURT:  Okay.  No issue there.

12               Anything else to discuss before the jury comes in

13     from the plaintiffs?

14               MR. BROWN:  Not for us, Your Honor.

15               THE COURT:  From the defendants?

16               MR. LAIL:  No, Your Honor.

17               THE COURT:  All right.  Let's bring the jury in.

18          (Jury returned to courtroom at 11:08 a.m.)

19               THE COURT:  Welcome back, ladies and gentlemen.  The

20     first thing we need to do is to administer another oath.

21               Ms. Tavalero?

22               COURTROOM DEPUTY:  Okay.  If you can please stand

23     again.  Raise your right hand and repeat after me.  I do

24     solemnly swear...

25               JURY COLLECTIVELY:  I do solemnly swear...
```

```
 1              COURTROOM DEPUTY:  ...that I shall well and truly...

 2              JURY COLLECTIVELY:  ...that I shall well and truly...

 3              COURTROOM DEPUTY:  ...try the matters at issue now on

 4    trial...

 5              JURY COLLECTIVELY:  ...try the matters at issue now

 6    on trial...

 7              COURTROOM DEPUTY:  ...and render a true verdict...

 8              JURY COLLECTIVELY:  ...and render a true verdict...

 9              COURTROOM DEPUTY:  ...according to the law and the

10    evidence...

11              JURY COLLECTIVELY:  ...according to the law and the

12    evidence...

13              COURTROOM DEPUTY:  ...so help me, God.

14              JURY COLLECTIVELY:  ...so help me, God.

15              COURTROOM DEPUTY:  Thank you.  You may be seated.

16              THE COURT:  Thank you, Ms. Tavalero.

17              I invoke the Rule of Sequestration.  What that means,

18    ladies and gentlemen, is that other than the parties

19    themselves, witnesses -- and we only have three, and one of

20    those will be appearing by way of a videotaped deposition.  But

21    what the Rule of Sequestration means is that witnesses have to

22    remain outside while other witnesses are testifying.  And by

23    invoking that rule, that means that -- well, I guess we don't

24    have any non-party -- well, we do have one non-party witness.

25    That means that non-party witnesses will remain outside, except
```

1    when testifying.

2              Now that you have been sworn, I need to explain some

3    basic principles about a civil trial.  And bear in mind that

4    this is a civil trial as opposed to a criminal trial.

5              You have been sworn, and it will be your duty, as

6    jurors, to try the issues in this case.  I am going to give you

7    some preliminary instructions, but at the conclusion of the

8    evidence, I will give you more detailed instructions about the

9    law that applies to the case.

10             It is your duty to listen to the evidence, decide

11   what happened, and apply that law to the facts.  It's my job to

12   give you that law, and which, as we discussed at some length

13   during jury selection, it will be your duty to apply that law,

14   even if you were to disagree with it.

15             You must decide the case only on the evidence

16   presented here in this courtroom.  And evidence comes in many

17   forms.  It can be testimony from witnesses who take the stand

18   and are sworn about what they saw, heard, smelled, whatever.

19   It can be an exhibit, it can be a photograph, or something like

20   that.  And if I admit that exhibit into evidence, it becomes

21   evidence just like the testimony of the witnesses is evidence.

22             Now, some evidence can prove a fact indirectly.  You

23   might have heard some talk of "direct" and "circumstantial

24   evidence."  There's some legal significance to those terms.  If

25   a witness were to say, "Well, I looked outside the window, and

1    it was raining."  That's direct evidence.  That witness saw

2    that it was raining.

3            But if the witness were to look outside and she sees

4    people -- and the ground is wet, and she sees people walking

5    around with umbrellas, but they are not open, she can say,

6    "Well, I'm satisfied, I'm pretty sure it was raining that day."

7    That's indirect or circumstantial evidence.  It's based upon

8    facts that tend to prove the fact that it was at some point

9    raining, even though it wasn't raining at the precise time the

10   witness looked out the window.  Again, that's circumstantial

11   evidence.

12           And your verdict can be based on either one -- direct

13   or circumstantial evidence.  It doesn't make any difference.

14   It is up to you to put whatever weight you want on the

15   evidence, whether it be direct or circumstantial.

16           Now, during the trial, you will hear things that are

17   not evidence.  For example, the lawyers will give you their

18   opening statements and they will give you their closing

19   arguments.  Those are important, and you should listen

20   carefully.  But what the lawyers say is not evidence.  It will

21   help you, we hope, in deciding what the evidence shows, but the

22   lawyers' statements themselves are not evidence.

23           Similarly, any objections they may make to the

24   evidence are not evidence.  It is the answers of the

25   question -- pardon me, the answers to the question, not the

1    question itself or not any objection to the question, that is

2    evidence.  In other words, it's what the witness says, not what

3    the lawyer says.

4            Sometimes lawyers will phrase their questions -- and

5    this is permissible under some circumstances -- as leading

6    questions.  Such as, "You saw Mr. Jones hit his sister; didn't

7    you?"  There won't be a question like that in this case, but

8    that's an example of a leading question, and it suggests that

9    Mr. Jones did hit his sister.  But that is not evidence.

10           The witness may say, "No," and that means, well,

11   there is no evidence, at least based upon that question and

12   answer, that Mr. Jones hit his sister.  So pay attention to

13   what the lawyers say, but it's what the witnesses say that

14   count.

15           Now, I am governed, as the lawyers are, by the Rules

16   of Evidence.  Some things are admissible in evidence, some

17   things aren't.  And if an objection is made to a question or to

18   an exhibit, I might sustain or agree with that objection.  And

19   if that's the case, then that item of evidence, whatever it may

20   be, would not be admissible, and you could not consider it.  It

21   would not be back in the jury room with you if it were an

22   exhibit.  If it were a question, and I sustained or agreed with

23   the objection to the question, then even if the witness were to

24   give an answer before I ruled on the objection, it would not be

25   evidence that you can consider.

1              I could sometimes strike evidence as a part of that

2     process.  And if I strike evidence, even though you heard it or

3     saw it, that would mean that it's no longer in evidence and you

4     cannot consider that.

5              It may be that I will allow evidence for a limited

6     purpose, so you can consider it for one reason or -- one

7     reason, two reasons, whatever the case may be, but not for any

8     other reason.  And if that were to happen, I will instruct you

9     about that.

10             Now, to reach a verdict, you may have to decide what

11    testimony you believe and what you do not believe.  You may

12    believe everything a witness says, part of it, or none of it.

13    When considering the believability or the credibility of a

14    witness, here are some things that you can take into account:

15             The witness' opportunity and ability to see and hear

16    or know about the things he or she testified.

17             You can judge just how well they knew about whatever

18    it was they were testifying and make a decision as to whether

19    you find that testimony credible or how much weight you want to

20    give that expert.

21             You may ask yourself, did the witness seem to have a

22    good memory?  Even the witness' manner of testifying is

23    something that you can take into account.  You can consider any

24    interest the witness may have in the outcome of the case.  You

25    may consider any bias or prejudice the witness may have or may

1    appear to have.

2              You can consider other evidence that contradicts what

3    the witness said on the stand.  And you can consider the

4    reasonableness of the witness' testimony in light of all the

5    other evidence in trial.

6              In short, you are the judges of the evidence in the

7    case.  It's up to you to decide what evidence you believe and

8    what evidence you may not believe.

9              Now, this is, as I've said, a civil case, and many of

10   the facts in the case are now undisputed.  In a minute, I will

11   tell you precisely what those undisputed facts are.

12             First, let me again introduce the parties to you.  As

13   I said, Sergeant Anna Lange is the plaintiff, the party

14   bringing this case; and the defendants are Houston County,

15   Georgia, and Houston County Sheriff Cullen Talton -- again,

16   legal term here -- "in his official capacity."  In effect, that

17   means the case is against the Office of Sheriff, and that's the

18   reason we may refer to that defendant as the "Houston County

19   Sheriff's Office" or something to that effect.

20             Now, as the plaintiff, Sergeant Lange has the burden

21   of proof.  Here that means she has to prove her damages by what

22   the law calls a "preponderance of the evidence."  That means

23   that Sergeant Lange must prove that in light of all of the

24   evidence in the case, what she claims is more likely true than

25   not.

1          You can think of that burden of proof as scales, old

2     fashioned scales.  And if the scales tilt in favor of the

3     plaintiff -- Sergeant Lange in this case -- that means that she

4     has carried her burden of proof.  If they tilt the other way,

5     or even if they are evenly balanced, then that would mean that

6     Sergeant Lange has not carried her burden of proof.

7          Now, you probably have all heard of the term "beyond

8     a reasonable doubt."  That is the burden of proof in a criminal

9     case.  It's got nothing to do with a civil case.  Again, here

10    the burden is whether the plaintiff has proved her case by a

11    preponderance of the evidence.  More likely than not.

12         As I mentioned, the case will be a fairly short

13    trial.  We may finish today.  While you are jurors, you cannot

14    talk about anything related to the case with anybody else,

15    including yourselves, at least -- you can talk about the case

16    during the course of the trial, but you can't talk about what

17    you think the result of the trial may be.

18         You need to hear all the evidence before you can

19    start talking about that, which means you should keep an open

20    mind until the end of the trial.  Again, until you have heard

21    all the evidence, the closing arguments of the lawyers, and my

22    instructions on the law that you have to apply, you will not

23    have the information that you need to decide the case.  So it's

24    important to keep an open mind.

25         Now, let me talk about one thing that I've learned --

1    or that we know that we have to talk about and stress in

2    particular.  Some of you have -- probably, like me, you can

3    remember a time when, if you wanted to look something up, you

4    had to go to the library or if you had an encyclopedia at home,

5    which we did, you can look it up in the encyclopedia.  But

6    that's what we had to do to get information.

7              It is not like that anymore.  We have information

8    literally at the tip of our fingers.  And that's generally a

9    good thing.  Not always a good thing, but generally it's a good

10   thing that we have those resources available to us.

11             But those resources are not available to you as

12   jurors as they concern anything to do with this case.  That

13   means you cannot get on the internet to start searching about

14   this case, about the lawyers, about the parties, about the

15   issues -- anything like that.  You can't talk to others outside

16   of the jury about this case.  You cannot allow yourselves to be

17   exposed to any information about the case.

18             The lawyers and the parties have invested a lot of

19   time and effort in getting this case to where it is today so

20   that you can decide the remaining issues.  And when a juror

21   allows himself or herself to be exposed to information about

22   the case, all that can go for naught.

23             Let me tell you what I mean.  I keep a collection of

24   these here on the bench.  I will read just a couple of

25   headlines to make the point.  These are not local cases.  I

1    have never had to do anything like that, and I don't anticipate

2    that I will.  But here's the headline for one article:  "Juror

3    fined $11,000 conducting outside research during criminal trial

4    and causing mistrial."  That's what happened.  A juror in a

5    case thought that she would go out and do some research, and

6    when that happens, it usually comes out.  The case had to be

7    mistried, we call it, and she got an $11,000 fine for that

8    research she did.

9           Another headline:  "Doc convicted of murder gets new

10   trial because of juror's texts and an attempt to hide them."  A

11   case that went all the way through a conviction and it came out

12   later some jurors -- two, I think, maybe just one -- had been

13   texting and getting information.  They had to start all over

14   again.  The conviction got tossed out of court.

15          Again, I've never had anything that serious happen,

16   to my knowledge -- and I would know about it.  It has not

17   happened to any other judge in this Court.  But I stress this

18   point because it's important, and I think you can understand

19   how important it is.  Every time you come back from lunch or if

20   we come back in the morning, I will ask you:  Did any of you

21   have any difficulty following my instructions and in particular

22   my instruction about not being exposed to any information in

23   the case?  And I'm confident that all of you will say:  No, we

24   did not have any problem in that regard.

25          So, bear that in mind, please.

```
 1              You have notepads available to you.  You are free to
 2     take notes.  You don't have to.  If you do take notes, please
 3     don't share them with anyone until you go to the jury room to
 4     decide the case.  Do not let note-taking distract you from
 5     carefully listening to the evidence and observing the
 6     witnesses.  And when you leave the courtroom, you should leave
 7     your notes hidden from view in the jury room.
 8              Now, whether or not you take notes, you should rely
 9     on your own memory of the testimony.  Your notes are only there
10     to help or aid you in your recollection, and they are not
11     entitled to any greater weight than your memory or impression
12     about the testimony you have heard.
13              Let me walk through the trial.  In just a moment, the
14     lawyers will give their opening statements.  The plaintiff,
15     Sergeant Lange's lawyer, will go first, and then a lawyer for
16     the defendants will argue.  And opening statements, as I told
17     you, they are not evidence, but they're still important.  The
18     lawyers will give you an outline of what they expect the
19     evidence to show.
20              After opening statements, the plaintiff will call her
21     witnesses.  The defendant can cross-examine those witnesses.
22     And after the plaintiff rests her case, the defendants will put
23     up any witnesses they have and ask questions, and, again,
24     Sergeant Lange's lawyers can cross-examine that witness.
25              After the evidence has been concluded, you will hear
```

1    the closing arguments of the lawyers.  Here, they have more

2    leeway.  They can argue to you what they believe the evidence

3    has shown, what you should do by way of a verdict.  After

4    you've heard the closing arguments, I will instruct you on the

5    law, and you will go back to the jury room to begin your

6    deposition (sic).

7         One of the witnesses who will be testifying will be

8    testifying by deposition.  That is a procedure that the law

9    allows.  This is a doctor, and it is sometimes difficult for

10   doctors to be able to come to court, particularly in this case

11   where the doctor is out of state, so the lawyers have taken a

12   deposition to present her testimony to you.

13        In this case, a deposition is just exactly like

14   testifying in court.  The witness is under oath, there's a

15   court reporter present taking down, transcribing, recording

16   everything that is said.  There will be, again, a videotape of

17   the deposition as well.  And you should treat that testimony

18   just as if the witness were sitting on the stand.

19        Finally, before I give you the undisputed facts of

20   the case, let me introduce people who you -- you've already met

21   Ms. Tavalero, who works harder than anybody else in the

22   courtroom.

23        Next is Darlene Fuller, who is our court reporter

24   here, whose job it is to "take down," as we call it, everything

25   here.  The fact that she's taking this down to prepare a record

1    does not mean you'll have a transcript of the testimony

2    available to you.  You have to rely on your recollection to

3    remember what the evidence was.

4          To Kim's left is Ben Roth, one of my law clerks.  And

5    Steven Greenway is sitting in with us.  He is an intern in our

6    office.  He is a student at the law school here in town.

7          Now, this is important, because I am going to give

8    you a statement -- a stipulation of facts.  These are facts

9    that are undisputed.  And I will remind you of these facts

10   again at the conclusion of the trial.  But you must treat these

11   facts as proved in the case.

12         First, Sergeant Lange is a transgender woman;

13   meaning, that although she was assigned a male sex at birth,

14   her internal knowledge of herself is that she is female.

15         Two, in September, 2006, the Houston County Sheriff's

16   Office hired Sergeant Lange as a deputy sheriff.  She has since

17   been promoted twice, and she is now a sergeant.

18         Three, in 2017, Sergeant Lange was diagnosed with

19   gender dysphoria.  Since then, Sergeant Lange has fully -- has

20   lived fully and consistently with her female identity.

21         Four, for the last five years, Sergeant Lange has

22   been receiving hormone replacement therapy.  And in August,

23   2018, she had surgery to feminize her chest.  That's also known

24   as "top surgery."

25         Five, following the recommendations of various health

1  care providers, Sergeant Lange determined that vaginoplasty, or

2  the surgical creation of a vagina from existing tissue, also

3  known as "bottom surgery," was the next step in her treatment.

4        Six, as a sheriff's deputy, Sergeant Lange

5  participates in Houston County's health insurance plan.  We'll

6  be calling that likely "the health plan."  Sergeant Lange

7  contributes a monthly fee towards the cost of coverage under

8  the health plan, and the County has hired a third-party

9  administrator, Anthem/Blue Cross/Blue Shield, to administer the

10  plan.

11        Seven, Sergeant Lange sought coverage under the

12  health plan for her vaginoplasty in November, 2018, and she was

13  denied coverage of that surgery based on exclusions for, quote,

14  drugs for sex change surgery, close quote, and, quote, services

15  and supplies for a sex change and/or the reversal of a sex

16  change, close quote.  These exclusions were the only reason the

17  surgery was denied; otherwise, the surgery was covered by the

18  plan.

19        Eight, in a prior stage of this litigation, the Court

20  determined that the exclusions violate Title VII of the Civil

21  Rights Act of 1964, as interpreted by the United States Supreme

22  Court in another case in 2020.  Title VII is a federal law that

23  prohibits employers from discriminating in the terms and

24  conditions of employment because of sex.  And because of the

25  Court's ruling, the defendants are responsible for Lange's --

1    Sergeant Lange's damages, if any.

2              What that means, in a nutshell, is that the health

3    plan denied coverage for Sergeant Lange's surgery because of

4    those sex change exclusions.  The exclusions violate the law.

5    And now you must decide whether Sergeant Lange should recover

6    damages from the defendants for any emotional pain and mental

7    anguish resulting from the denial.

8              Again, those facts are stipulated and undisputed, and

9    you will take them as having been decided and use them as you

10   think appropriate in reaching a verdict in the case.

11             With that, we will turn to opening statements.

12   Again, the plaintiff will go first.

13             MR. POWELL:  Thank you, Your Honor.

14             Good morning again, ladies and gentlemen.  It is nice

15   to be before you today.  This is a case about being treated

16   fairly at work, no matter who you are.  And it's about the

17   right to do your job and do your job well, but be free of

18   discrimination while you're doing it.

19             And it's about the severe and concrete harm that

20   happens to someone who works hard, who does just what she's

21   asked to do, day in and day out, for years, and then is treated

22   unfairly.  She's discriminated against just because she's

23   different.

24             Now, this is not, perhaps, the typical job

25   discrimination case you might have heard about.  It is not

1    about getting fired on the job.  It is not about getting

2    demoted.  The case is about health care.  And it is about

3    discrimination in who gets coverage for certain things and who

4    doesn't get coverage for it, and that -- under a health plan --

5    under the defendants' health plan that you heard

6    Judge Treadwell describe earlier.

7         Now, let me just pause and explain something.

8    Judge Treadwell touched on this.  But there are two defendants

9    in this case:  Sergeant Lange's employer, the Houston County

10   Sheriff's Office, and Houston County Government, which controls

11   the health plan at issue here, and it covers Sergeant Lange and

12   other Sheriff's Office employees.

13        As Judge Treadwell told you, Sergeant Lange is a

14   transgender woman.  And you may already know a bit about what

15   that means from your own experience, and Judge Treadwell gave

16   you a definition of it.  But Sergeant Lange is here, and she's

17   going to testify.  And she's going to walk you through what

18   being transgender means for her, what her life has been like.

19        Now, Sergeant Lange, as you heard, is also a deputy

20   sheriff in Houston County.  And since 2006, Sergeant Lange has

21   gone to work every day to protect the people of Houston County.

22        And she does that by investigating crimes --

23   everything from theft to elder abuse to murder.  And even

24   though Sergeant Lange works hard in her job, as hard as any of

25   her co-workers, the health insurance she has through work does

1    not cover the health care that she needs.

2         And that's not an accident.  The defendants, as you

3    heard, made a deliberate decision to exclude that care for

4    transgender people.  And that is unfair and that is illegal.

5    And you don't have to take my word for it, that it's illegal.

6    As you heard Judge Treadwell say, he already ruled earlier in

7    the case that the defendants had violated the law by

8    maintaining the exclusion that you heard about and I'll tell

9    you a bit more about.  They did that by discriminating against

10   Sergeant Lange by denying her health care and by treating her

11   different -- differently just because of who she is.

12        And so you might be wondering why, if she already

13   won, are we in court today.  But you've heard Judge Treadwell

14   tell you that under the law that Sergeant Lange is entitled to

15   be compensated for any harm that she suffered as a result of

16   the defendant's actions that I will be describing to you and

17   that you will be hearing about in testimony.

18        And that's what we are asking all of you, the jury,

19   to do -- to listen to Sergeant Lange when she testifies.

20   Listen to her story.  Listen to what she experienced.  And

21   decide how to fairly compensate her for how her employer

22   mistreated her.  For the suffering, the sadness, the

23   hopelessness, and the sleepless nights, and the humiliation

24   that she has experienced for almost the past four years because

25   she cannot get the only treatment that will help her --

1    surgery.

2          Ladies and gentlemen, I introduced myself to you

3    earlier.  I'm Wes Powell.  It is my honor to be representing

4    Sergeant Lange in this case.  You already met Sergeant Lange,

5    but she will be with us throughout the trial here at the

6    counsel table.  And I also introduced my co-counsel before, but

7    they deserve to be introduced again.  I have here my colleague,

8    Jill Grant, Catherine Fata, David Brown, and Devlin Cooper.

9          And on behalf of all of us and on behalf of Sergeant

10   Lange, we thank you.  We thank you for serving as jurors in

11   this case.  And we thank you for keeping an open mind and for

12   listening to the evidence and deciding what's a fair and just

13   recovery for Sergeant Lange.

14         Now, let me just tell you a bit more about our

15   client, Sergeant Lange.  And you'll hear this from her

16   testimony.  That she's a 25-year law enforcement veteran.

17   She's worked in the Houston County Sheriff's Office since 2006,

18   so right about 16 years now.

19         And from a very early age, Sergeant Lange was

20   struggling with an inner conflict every day of her life.  She

21   knew that she was a boy on the outside, but everything inside

22   her told her that she was, in fact, a girl.

23         And she didn't really understand what she was

24   feeling.  She didn't understand it then and she didn't

25   understand it for many, many years to come.  She knew, however,

1  that something was off -- that she felt in every way like a

2  girl, that she had been born in the wrong body.

3          And she kept it all a secret.  She grew up, she lived

4  as a man, she got married, she had a son, and she became a law

5  enforcement officer.  And she did everything she could do to

6  keep all of that struggle inside.

7          But there was a big event in her life about a decade

8  ago.  She nearly lost her life in a bicycle accident.  And it

9  was a huge wake-up call for her.  She just knew that she

10  couldn't continue living every day as she was living, and so

11  she had to come to terms with who she is.

12          So, Sergeant Lange sought professional help.  She

13  decided to seek the care of doctors and psychologists to help

14  her figure this out.  And they diagnosed her with a condition

15  called "gender dysphoria."  And you heard Judge Treadwell

16  describe that.  And you will hear Sergeant Lange talk about it,

17  what it means to her, what the symptoms are.

18          But it basically means the distress, the really

19  significant distress that someone experiences when the gender

20  that they know, that they feel they are inside, is different

21  from how they are on the outside.  And you will hear about the

22  treatments -- the medical treatments that are available for

23  this particular medical condition.

24          Suffice it to say, Sergeant Lange tried all of them.

25  And they helped a bit.  But her body still didn't match who she

1    really is.  And so in 2018, her doctors determined that she

2    needed surgery.  And as Judge Treadwell said, that surgery is

3    called vaginoplasty.  And that's what she needed to treat her

4    condition.

5            But she ran into a brick wall when she went to set up

6    this surgery.  It turns out that her health plan, the

7    defendants' health plan, won't cover the surgery for someone in

8    her particular situation.

9            And that's because, as you heard Judge Treadwell say,

10   the defendants' health plan contains what's called an

11   exclusion.  And here's how this exclusion works.  Say, you need

12   a surgery, a vaginoplasty, and your doctor determines that it's

13   medically necessary for you.  Under the health plan rules --

14   under the rules of this health plan, that care is covered.

15           Unless...you are transgender.  And then it is not

16   covered.  Even if it's the only treatment that you need for

17   your medical condition.  Now, because the defendants adopted

18   and maintained this exclusion, Sergeant Lange was denied

19   insurance coverage for her surgery when she submitted for it in

20   November of 2018.  And she can't afford it on her sheriff's

21   salary.  It's surgery and it's expensive.  And that means that

22   for almost the last four years, Sergeant Lange has had to

23   continue suffering from her gender dysphoria, even though --

24   even though, the surgery is the only care she needs.  It is THE

25   care she needs.  And even though, without that surgery she will

1    not get better.

2              Now, we think it's important that you hear that

3    background and you hear that -- you heard it from me, but the

4    evidence will be hearing it from Sergeant Lange about how the

5    exclusion works and how it's impacted her as you consider

6    the -- coming up with the damages number.

7              But as Judge Treadwell said, you're not here to

8    decide whether this exclusion violates the law.  And because of

9    that decision, we expect that the exclusion will be eliminated

10   and that Sergeant Lange will eventually be able to get her

11   surgery, so we are not asking you to do anything about that.

12             But what she's not been able to get is compensation

13   for her pain and her suffering that she endured for the roughly

14   four years between when her care was denied and as we stand

15   here today.  And that, of course, is why you all are here

16   today.  You have the important responsibility of deciding how

17   much the defendants should pay for any harm that they've caused

18   Sergeant Lange.  And only you, the jury, can make that

19   decision.

20             And now, as Judge Treadwell said, the -- we'll be

21   giving you a little bit of a road map of what you're going to

22   hear and see in the trial today.  And potentially tomorrow.

23   And as you heard Judge Treadwell say, some facts have been

24   resolved here.  They are not disputed in the case.  And he ran

25   through those, and I am not going to repeat all of them, but I

1     do want to emphasize three of them and ask as you hear the

2     evidence that you just keep these in mind and as you deliberate

3     you keep these things in mind.

4              First, there's no dispute that when Sergeant Lange

5     sought insurance coverage for the care--the vaginoplasty--that

6     she needed, that she was denied that care.  And, secondly, that

7     the exclusion, the exclusion from care -- or from coverage that

8     the defendants have maintained, was the sole reason for that

9     denial.  But for the exclusion, the health plan would have

10    covered the care.  That's all been established.

11             And -- and then, finally, these defendants, each of

12    them, is responsible.  They are the responsible party for any

13    harm that Sergeant Lange experienced.

14             So, first, again, you're going to hear from Sergeant

15    Lange herself very shortly.  And I will say that I've gotten to

16    know Sergeant Lange very well through the process of being her

17    lawyer.  And one thing I can tell you about her is that she is

18    not someone who enjoys sharing the intimate details of her

19    private life to the world, but she's going to do her best.  She

20    is going to do her best to, um, tell you about herself, about

21    her experience of being transgender, and the toll that gender

22    dysphoria has taken on her.

23             And you're going to hear about how hopeful she was,

24    how hopeful she felt when she was recommended surgery as the

25    care that she needed, and when she was able to schedule that

1   surgery, knowing that it would finally give her relief from the

2   distress, the anxiety, and the depression that she experienced

3   from her gender dysphoria that comes with her medical

4   condition.

5          And then she will tell you how devastated she was

6   when the rug was just pulled out from under her, when her

7   surgery was denied.  And Sergeant Lange will tell you how hard

8   it was to be told that only because of who you are the surgery

9   you need will not be covered.  And because of the exclusion,

10  and without the ability to pay for the surgery herself, she was

11  forced to cancel it and to continue for nearly four more years

12  to suffer the symptoms of gender dysphoria.  Every day.  For

13  almost four years.

14         And she will tell you about how life has been for her

15  since then, knowing that the surgery is what -- the only thing

16  that can help her, but she can't get it under the defendants'

17  health plan.

18         And she'll explain what it feels like to live every

19  day, to work in a dangerous job, and to be treated like you

20  don't matter, as though your health and your wellbeing just

21  doesn't matter.  Even as you serve the people of Houston County

22  day in and day out, like you're really worth nothing.

23         And not only has she been forced to continue

24  suffering from her gender dysphoria, but she will testify that

25  she's had to spend much of the last four years fighting to get

1    rid of this exclusion.  And she did what I think many people

2    would do -- she tried everything that she could do to get

3    Houston County just to agree to get rid of the exclusion.

4           She appealed the denial.  They said no.  She tried to

5    talk to County officials who are responsible for the plan, and

6    they did nothing.  She went to a public meeting of the Houston

7    County Commissioners and asked them to get rid of the

8    exclusion, and they said no.  She tried everything she had,

9    short of bringing this lawsuit, but she was shot down every

10   single time.

11          And so she had little choice but to file this

12   lawsuit, to fight for her rights, and to get the medical care

13   she needs.  And she won.

14          Now, briefly, you will also hear, as Judge Treadwell

15   said, from a woman named Dr. Elizabeth Soety.  She is a

16   clinical psychologist, who practices in the Macon area.  And

17   Sergeant Lange went to Dr. Soety for support during her -- the

18   process by which she was going through, what's called a gender

19   transition.  And I am not going to define that for you now.  I

20   am going to get Sergeant Lange explain it to you.

21          And Dr. Soety is going to tell you that she evaluated

22   Sergeant Lange, and she formally diagnosed her with gender

23   dysphoria.  And that she tried to help Sergeant Lange

24   understand her gender dysphoria, but ultimately she determined

25   that she, herself -- Dr. Soety -- the therapy that she provides

1    is not the care that she needed.  Because what she needed was

2    surgery.  That's what Dr. Soety recommended to her.

3              And then last you'll hear, again, by video, as

4    Judge Treadwell said, from a doctor, a surgeon in New York,

5    named Dr. Rachel Bluebond-Langner.  It's a mouthful.  She's

6    going to -- as I said, she is going to appear by video.  She is

7    a prominent surgeon that specializes in, among other things,

8    surgical care for transgender folks.

9              And she's going to tell you a bit more about gender

10   dysphoria and what she saw in Sergeant Lange.  You'll hear that

11   it's a serious medical condition that can cause some

12   transgender folks, like Sergeant Lange, severe distress,

13   anxiety, and depression.  And she will testify that

14   vaginoplasty is the one thing that Sergeant Lange needs to

15   eliminate her gender dysphoria.

16             And she will also tell you, in her opinion, as

17   Sergeant Lange's physician, that Sergeant Lange's gender

18   dysphoria, her suffering from that, will not go away without

19   surgery.

20             I will finish by saying this, ladies and gentlemen.

21   There is a real, everyday, human cost to what the defendants

22   have done to Sergeant Lange over the last four years by

23   discriminating against her.  And it is only fair that they

24   should compensate her for it.

25             But please understand this.  Sergeant Lange is not

```
 1   trying to become a millionaire by filing a lawsuit.  That's not
 2   what she's after.  She just wants fair and just compensation.
 3   And that's what we ask you, the jury, to do.  You have the
 4   important job of deciding what is fair and reasonable
 5   compensation for her.  Only you.  It is not up to me.  It is
 6   not up to anyone else in the courtroom.  It is up to you.
 7            So, we thank you.  Again, we thank you for your time
 8   and your attention to the witnesses.  We thank you for
 9   listening to Sergeant Lange and for doing what is fair and just
10   for her.  Thank you all.
11            THE COURT:  Thank you, Mr. Powell.
12            Ms. Grant, you may proceed.
13            MS. MORGAN:  Good morning, I want to say my name is
14   Sharon Morgan.  I was introduced to you earlier.  And I would
15   just like to reiterate the counsel with me today is Patrick
16   Lail, Read Gignilliat, and Will Deveney, who have had the
17   pleasure to represent the defendants in this case who, you have
18   heard, is Houston County and the Houston County Sheriff's
19   Office.
20            As the judge has described to you, this cases deals
21   with really a very single issue here.  It is Sergeant Lange's
22   alleged emotional distress for not receiving or having sex
23   reassignment or sex change surgery.
24            Now, as you have heard, there are really going to be
25   three witnesses.  As part of this opening, my job is to try to
```

1    share a little bit about what I think you're going to hear from

2    those witnesses to help you, so as you listen, you can

3    understand the evidence hopefully a little better and to point

4    out some things for you.

5              Obviously, Sergeant Lange is the plaintiff in this

6    case.  You have met her as she sits here at the table.  It is

7    her emotional distress, right, that you're going to be

8    deciding.  So, you're going to try to determine what emotional

9    distress damages, if any, she will be awarded from the denial

10   of the sex change surgery.

11             By way of a little bit of background, you have heard

12   some of this, she does work for the Houston County Sheriff's

13   Office.  She's been there a number of years.  Through an

14   agreement between that office and the County, Sergeant Lange

15   participates in the Houston County Health Plan.  And you heard

16   that the health plan has an exclusion for sex change surgery

17   and drugs for sex change surgery.

18             When she sought coverage under the plan, as you've

19   heard, she was denied coverage based on the exclusion.  And

20   then, as you've heard the judge say earlier in directing you,

21   one of the things is that more recently in a separate case in

22   2020, based on the Supreme Court's decision, this Court

23   determined that that exclusion violates federal law within that

24   particular plan.

25             With respect to the emotional distress for the denial

1    of sex change, you're going to hear really a couple of

2    categories of evidence.  And Mr. Powell described Sergeant

3    Lange, her background, all the information about her situation.

4    You will certainly hear, as he indicated, her experience with

5    being transgender, of course, and her desire to have surgery to

6    physically align her body to how she views herself currently.

7    And so that's part of what you're going to hear from her.  And

8    you will hear, as he said, her describe her emotional distress

9    from being denied the surgery, from the coverage not being

10   provided to her.

11          But I want you to also listen carefully to other

12   things that you're going to hear because you have to determine

13   what is the level, if any, of additional emotional distress

14   that comes from being denied the surgery.  As you've heard,

15   Sergeant Lange is an investigator with the Houston County

16   Sheriff's Office.  She holds an important role.  She is a sworn

17   law enforcement officer.  She is a lead investigator, a

18   principal player in a lot of investigations, very significant

19   investigations.  She is a valued member of the department.  She

20   has resolved matters including homicides, elder abuse cases,

21   theft, sexual assaults.  You're going to hear that she does a

22   good job.  She goes to work every day, she handles these types

23   of investigations for the Sheriff's Office.

24          You're going to also hear that she engages in a lot

25   of her non-work related activities, as you might imagine.  She

```
1    has refereed kids' soccer games.  She enjoys fishing, golf.
2    She is a beekeeper.  She has shared honey with friends.  She
3    has engaged in tennis.  She plays tennis on three teams.  They
4    have gone to championships.  She enjoys good relationships,
5    work relationships, and she enjoys good relationships with
6    friends and with family.  You will weigh all of that evidence
7    that you hear in this particular trial to determine the level
8    of emotional distress damages and whether there are any
9    emotional distress damages to be awarded.
10           You're also going to hear from Dr. Rachel
11   Bluebond-Langner.  Her name was mentioned earlier.  She is a
12   surgeon at New York University.  You will hear her testimony by
13   video.  There are a few things significant about
14   Dr. Bluebond-Langner's testimony that I think you're going to
15   hear.  She saw Sergeant Lange on one occasion only for a
16   pre-surgery consult.  Now, this was at a time before the
17   surgery had been denied due to the exclusion.  She did not see
18   Sergeant Lange again after the surgery was denied.
19           I want you to really listen carefully.  This may
20   sound a little strange, but I want you to listen carefully for
21   what you're not going to hear from Dr. Bluebond-Langner.  You
22   are not going to hear that she assessed Sergeant Lange's
23   emotional status during her pre-surgery consult.  You will hear
24   her talk about gender dysphoria and, generally speaking, sort
25   of what individuals with gender dysphoria suffer from.  But you
```

1    will not hear specific information about an emotional distress

2    or a consult regarding that as it relates to Sergeant Lange.

3              I think the important thing for Dr. Bluebond-Langner,

4    she is a surgeon.  She saw Sergeant Lange as a surgeon.  She

5    spent her time talking about, as you might imagine, the

6    surgical procedure itself, the risks and the benefits of the

7    actual surgery.  She will tell you herself on the video she is

8    not a psychiatrist and she is not a psychologist.  That was her

9    role in that particular matter.

10             And then last, but certainly not least, you are going

11   to hear from Dr. Elizabeth Soety, who is Sergeant Lange's

12   treating psychologist.  You are going to hear that Dr. Soety

13   saw Sergeant Lange on approximately eight occasions, and that

14   is going to span both before and after she was denied the

15   surgery.

16             You are going to hear that Sergeant Lange reported to

17   Dr. Soety that her surgery had been denied, and you will hear

18   information -- testimony from Dr. Soety about that and about

19   that discussion.  You are going to hear that Sergeant Lange

20   later reported to Dr. Soety about this particular lawsuit.

21   And -- but since December, 2019, Sergeant Lange has not seen

22   Dr. Soety or asked to see Dr. Soety for a consult.

23             On behalf of Houston County and the Sheriff's Office,

24   I am going to ask you to do something that I know you already

25   will.  I'm just going to ask you to please keep an open mind

1    until you have heard all the evidence that comes in in this

2    particular case before you determine what level of emotional

3    distress damages, if any, should be awarded to Sergeant Lange

4    following the denial of the surgery for her.

5             Thank you so much for your attention.

6             THE COURT:  Thank you, Ms. Morgan.

7             Ladies and gentlemen, it is noon, so it is time for

8    our lunch break.  I am going to let you go back to the jury

9    room in just a moment.  Ms. Tavalero will check with you, and

10   then you will be free to go to lunch on your own.

11            I ask that you be back in the jury room by 1:15.  I

12   would like to get started just as soon thereafter as we can.

13   We will be ready to go with the first witness, so if you can be

14   back by 1:15 or even a few minutes before, we will get started

15   promptly at that time.

16            Now, as I told you I would, I am going to remind you

17   of my instructions, all of my instructions, but particularly my

18   instruction that during your lunch hour that you not allow

19   yourselves to be exposed to any information about the case, and

20   just to be sure, I will check on you about that when you get

21   back after lunch.  With that, we will remain seated while you

22   go to the jury room.

23        (Jury excused for lunch break at 12:01 p.m.)

24            THE COURT:  Ms. Morgan, I apologize.  I was actually

25   looking to see if Mr. Gignilliat was going to stand up because

1    I have worked on the pronunciation of his name and I sought my

2    pad and I thought, well, maybe I can get it right this time.

3              MR. GIGNILLIAT:  I appreciate it, Your Honor.

4              THE COURT:  All right.  Anything we need to discuss

5    from the plaintiff's standpoint before we break for lunch?

6              MR. POWELL:  No, Your Honor.

7              THE COURT:  And from the defendants'?

8              MR. LAIL:  No, not at this time, thank you.

9              THE COURT:  Who will your first witness be?

10             MR. POWELL:  It will be Sergeant Lange.

11             THE COURT:  Okay.  And you've got your deposition

12    ready to go whenever that comes?

13             MR. POWELL:  I believe we do.

14             THE COURT:  Okay.

15             MR. POWELL:  I think our plan, Your Honor, is to have

16    Dr. Soety be our next witness.  I believe she's somewhere in

17    the building now.  So, we'll confirm that.  So, our plan was to

18    move to her, and then have Dr. Bluebond-Langner by video after

19    that.

20             THE COURT:  Very good.  All right.  Try and be back a

21    few minutes before 1:15 so that we can get started as soon as

22    we assemble our jurors.  Thank you, all.

23             COURT OFFICER:  All rise.  Court is in recess.

24        (Court in recess for lunch from 12:03 to 1:14 p.m.)

25             COURT OFFICER:  All rise.  This Honorable Court is

```
 1    back in session.  Be seated.  Come to order.
 2              THE COURT:  Good afternoon.  Something we need to
 3    discuss?
 4              MR. LAIL:  Yes, Your Honor.  With respect to the
 5    opening, it seems to me that the scope of the plaintiff's
 6    opening went a little beyond what the Court had discussed with
 7    the parties this morning.  The summary judgment brief says the
 8    employer's intent is immaterial.  This morning the Court said,
 9    no, I'm not going to allow an instruction to the jury that
10    Defendants put these exclusions into the health plan.
11              And yet in the plaintiff's opening statement -- and I
12    am not a transcriptionist, but what I got down is that there
13    was a deliberate decision to exclude and that the rug was
14    pulled out from Lange with respect to this exclusion.  And that
15    seems to stray into the intent territory that the Court had
16    described should not be delved into.
17              THE COURT:  Well, I thought there were a couple times
18    when objections could have been raised.  I know it's rare to
19    object in openings, but sometimes you have to.  And I didn't
20    hear any objections.
21              MR. LAIL:  Well, we consider that door to have been
22    opened so that we can address some of those things in the cross
23    examination of Sergeant Lange --
24              THE COURT:  No.
25              MR. LAIL:  -- assuming that the evidence --
```

1           THE COURT:  No.

2           MR. LAIL:  -- matches what the --

3           THE COURT:  The remedy for that was to object.  I

4    mean, if you can point to something that needs a curative

5    instruction, I might consider that.  But, again, the remedy is

6    to object.  It does not expand the scope of the evidence.  And

7    I will -- if it's in testimony -- well, you still need to

8    object.

9           MR. LAIL:  All right.  Thank you, Your Honor.

10          MR. BROWN:  Your Honor, two matters from the

11   plaintiff.  One -- I'm sorry, can you hear me okay?  One is

12   we -- we are seeking a curative instruction regarding the date

13   of the Supreme Court's decision in *Bostock*.  During their

14   opening, defendants' counsel emphasized that the case was

15   decided after the denial, and we request a clarifying

16   instruction that that's not relevant.

17          THE COURT:  Yeah.  I -- I -- I caught that.  And

18   let's leave it at this.  Nothing more said on that, period.

19   And I'll decide later if anything needs to be addressed.  I

20   don't think so.  But certainly I will be alert to anything

21   along those lines as well.

22          MR. BROWN:  Thank you, Your Honor.  And then the

23   second point is just in light of the Court's comment this

24   morning about -- before voir dire about events occurring before

25   the denial, and I just wanted to clarify since I am about to

1   examine Sergeant Lange that I do intend to elicit that she did
2   go to New York and why.
3          And I -- we are certainly not seeking any -- to
4   elicit any evidence of emotional distress in connection with
5   that visit.  We just need it as necessary background for the
6   jury to understand why they are hearing from -- from people who
7   are in New York.  And also not to -- not to perhaps
8   inadvertently create a misimpression as to her credibility that
9   she went to New York for no reason at all or -- or sort of in
10  the teeth of an exclusion in the plan.
11         THE COURT:  Well, I don't have any issue with that.
12  I mean, it is part of the background that gets us to where we
13  are.  But we are on the same page that the scope of damages is
14  limited to consequences and events occurring after the denial.
15         MR. BROWN:  Thank you, Your Honor.
16         THE COURT:  All right.  You may bring the jury in.
17      (Jury returned to courtroom at 1:18 p.m.)
18         THE COURT:  Welcome back, ladies and gentlemen.  You
19  know my question now:  During lunch, did anybody have any
20  difficulties with regard to my instructions, particularly the
21  instruction that you not be exposed to any information about
22  the case?
23      (No response.)
24         THE COURT:  Very good.  Plaintiff may call her first
25  witness.

```
 1                    MR. BROWN:  Your Honor, Plaintiff calls Sergeant
 2    Lange.
 3                    THE COURT:  Sergeant Lange, come forward please.
 4                    COURTROOM DEPUTY:  Sergeant Lange, please raise your
 5    right hand.  Do you solemnly swear that your testimony in this
 6    case shall be the truth, the whole truth, and nothing but the
 7    truth, so help you, God?
 8                    THE WITNESS:  I do.
 9                    COURTROOM DEPUTY:  Thank you, you can be seated.
10                    Can you please state your name for the record.
11                    THE WITNESS:  It's Anna Lange.
12                    COURTROOM DEPUTY:  Thank you.
13                             SERGEANT ANNA LANGE
14    called by Plaintiff at 1:20 p.m., having first been duly sworn,
15    testified as follows:
16                             DIRECT EXAMINATION
17    BY MR. BROWN:
18    Q.   Good afternoon, Sergeant Lange.
19    A.   Hey, how are you?
20    Q.   I'm well.  How are you doing?
21    A.   I'm doing well.
22    Q.   I apologize, I can barely hear you.  Can you speak up just
23    a little bit?
24    A.   Yeah, all right.
25    Q.   That's better, thank you.  I'm sorry, how are you doing?
```

1    A.    I'm all right.  A little nervous.

2    Q.    Okay.  Take a deep breath.

3    A.    Yeah.

4    Q.    Where do you live, Sergeant Lange?

5    A.    Perry, Georgia.

6    Q.    Is that in Houston County?

7    A.    It is.

8    Q.    How long have you lived in Houston County?

9    A.    Since 2006.

10   Q.    And what is your job?

11   A.    I am -- right now I am an investigator with the Houston

12   County Sheriff's Office in the Criminal Investigation Division.

13   Q.    And are you the plaintiff in this lawsuit?

14   A.    I am.

15   Q.    And very briefly, why did you bring this lawsuit?

16   A.    Because the County and the Sheriff's Office discriminated

17   against me by withholding health insurance; specifically, trans

18   healthcare, transgender health care.

19   Q.    Thank you, Sergeant Lange.  So let me take a step back and

20   begin at the beginning and ask you a few questions about your

21   personal history.  Where were you born?

22   A.    I was born in Atlanta, Georgia.

23   Q.    And tell us a little bit about your family.

24   A.    I have my mom and dad.  And an older brother.  And my

25   parents are still married.  It is just a normal family.

1    Q.    Are any of them here today?

2    A.    They are, actually.  My parents are here and my son is

3    here.

4    Q.    You said a "normal family."  What was your childhood like?

5    A.    Just every day, you know, playing.  You know, back then I

6    guess we all played outside, so playing outside, riding bikes,

7    hide and seek, you know, that kind of stuff.  With neighborhood

8    kids.  Just every day.

9    Q.    After your childhood, did you go to college?

10   A.    I did.

11   Q.    Where did you go?

12   A.    Auburn University.

13   Q.    And what did you major in there?

14   A.    Criminal justice.

15   Q.    How did you end up working in law enforcement?

16   A.    I knew I wanted an outside job.  And I've always been fond

17   of, you know, the outdoors, like nature, that kind of stuff.

18   Not necessarily hunting but, you know, just hiking and that

19   kind of stuff.  So, I thought being a game warden would be

20   neat.

21        That kind of got me into criminal justice.  And then they

22   weren't hiring right when I graduated, so I got on with the

23   local agency where I lived.  And been -- been kind of in the

24   local level ever since.

25   Q.    And when did you graduate from college?

1    A.    1997.

2    Q.    So, can you just walk us through -- you said you started

3    working in law enforcement right after graduating.

4    A.    Yes.

5    Q.    So, can you just walk us through your work history in law

6    enforcement.

7    A.    Sure.  So, for a year I worked in the jail in Harris

8    County, which is just above Columbus -- Callaway Gardens, y'all

9    may know that area.  So, I was there for a year, and then I got

10   hired with the Columbus, Georgia, Police Department.  And so I

11   worked there for eight.  And then I was married at the time.

12   My wife was from Perry, so we moved here in 2006, and I have

13   been here ever since.

14   Q.    And you have been with the Houston County Sheriff's

15   Office?

16   A.    Yeah, I've been with the Houston County Sheriff's Office

17   since 2006.

18   Q.    And you said you were married at the time.  Are you still

19   married?

20   A.    No.

21   Q.    Are you divorced?

22   A.    I am.

23   Q.    And you said you have a child?

24   A.    I do.

25   Q.    A son?

```
 1    A.    I do.

 2    Q.    And how old is he?

 3    A.    He just turned eighteen.

 4    Q.    Congratulations.

 5    A.    Yeah, thanks.  Still a long way to go.

 6    Q.    Yeah.  Did you raise him right there in Perry?

 7    A.    We did.

 8    Q.    And tell me about your job at the Houston County Sheriff's

 9    Office.  What rank did you start out at?

10    A.    I started out as deputy.  I was in the Patrol Division,

11    answered 911 phone calls, you know, just patrol officer.

12    Q.    Okay.  The judge said this morning that you were promoted

13    twice; is that right?

14    A.    Um-hum.

15    Q.    So, can you tell us what those promotions were and when.

16    A.    Sure.  So in 2012, I was promoted from Patrol into the

17    Criminal Investigations Division, and I made the rank of

18    corporal then.  And then two years later, I made sergeant.

19    Q.    And as a sergeant in the Criminal Investigations Division,

20    what are your duties?

21    A.    We work general crimes, so that's anywhere from theft to

22    homicide, but I specialize in elder abuse; you know, whether

23    that be physical abuse, but a lot of times it's a lot of

24    financial stuff, financial kind of -- you know, exploitation,

25    that kind of thing.
```

1    Q.   And your job is to solve these crimes?  Figure out who the

2    perpetrator is?

3    A.   It is.

4    Q.   And you said you've solved murders before?

5    A.   Yes.

6    Q.   Homicides?  And you make arrests?

7    A.   I do.

8    Q.   And you carry a gun?

9    A.   I do.

10   Q.   Are these duties the same kinds of duties your colleagues

11   in the Criminal Investigation Division have?

12   A.   They are.

13   Q.   Do you like your job?

14   A.   Most days.

15   Q.   Okay.  "Most days."  On the days when you like it, what do

16   you like about it?

17   A.   You know, I -- it's kind of cliche, but I do like helping

18   people.  Especially with the elder cases.  You know, they don't

19   have anybody that is going to be a voice for them.  And so once

20   a case gets on my desk, and I'm able to, you know, kind of

21   protect that individual, it's -- it's my way of righting a

22   wrong and looking out for somebody that, you know, otherwise

23   would be lost.

24   Q.   Outside of your position at the Sheriff's Office, do you

25   do any other work?

```
1    A.    I work side jobs periodically, just security-type side

2    jobs, extra-duty stuff.

3    Q.    And that's just from time to time?

4    A.    Yeah, it's nothing on a regular basis.

5    Q.    And why do you work those side jobs?

6    A.    Extra money.

7    Q.    Do you have any hobbies?

8    A.    I do.  I play a lot of tennis -- a lot of tennis,

9    actually.  So.

10   Q.    What do you like about tennis?

11   A.    I like competing.  You know, I like to play singles, so I

12   know that it's -- the challenge is mine alone, and that it's,

13   you know, my skill and mental toughness versus my opponent's.

14   Sometimes I win, sometimes I lose, but -- yeah, I just -- I

15   love the game.  And then, of course, with that comes tennis

16   teams that I'm on, and I enjoy the friendships that I have made

17   along the way.

18   Q.    Sergeant Lange, the Court this morning told us that you're

19   a transgender woman.

20   A.    That's correct.

21   Q.    What does that mean to you?

22   A.    Well, for me it means, um, you know, I was born male, but

23   since a young age I have always known that I should have been

24   born female.

25   Q.    And you said "a young age."  How young were you when you
```

1   first felt different?

2   A.   You know, it's hard to kind of understand, I guess, those

3   feelings when you're younger.  But I would say maybe around

4   fifth grade is when it started to be a little clearer.  Still

5   not quite, but -- it's confusing.  Very confusing time.  So.

6   Q.   What was that like for you as a kid to have these

7   feelings?

8   A.   You know, as I said, it was confusing.  I mean, it's --

9   you know, I would like to go out, you know, and play sports,

10  but then at the same time I'd have stuffed animals and we would

11  play family.  You know, most of my guy friends back in fifth

12  grade weren't doing that.  And so it was -- it was really

13  conflicting for me.

14          I didn't know why I felt this way, you know.

15  Certainly, Judge, as you had mentioned with the encyclopedia

16  Britannica, that's all I had, too.  So there wasn't, like, a

17  lot of research that we could do back then.  I didn't know.

18  Q.   Did you tell anyone as a child about these feelings?

19  A.   No.  No.  I didn't want to get picked on.

20  Q.   As an adult, did these feelings continue?

21  A.   They did.

22  Q.   And then what was it like for you to have these feelings

23  as an adult?

24  A.   You know, it's -- it's still not easy.  And, you know, as

25  you get older, it's very difficult to accept the fact of

1    really -- of these feelings or -- in my circle, I was never

2    really around a lot of LGBTQ people, so I didn't really have

3    any friends or anything to base my experience off of.  And so I

4    felt isolated.

5         My value and my self-esteem.  You know, if I was to walk

6    by and, you know, look in the mirror, I would just view

7    somebody -- I would just -- the self-loathing in the mirror.  I

8    hated myself.  There was nothing that I could do that was good

9    enough.  I mean, I could solve a big case, you know, I could

10   win a tennis match, it was -- it wasn't good enough.  At the

11   end of the day, I still hated myself.  Or, you know, pretty

12   strong, no self-confidence whatsoever.

13   Q.   Did having these feelings affect you mentally?

14   A.   They did.  You're scared.  You are so guarded about

15   somebody finding out, you know, your feelings and your true

16   identity that you learn ways to protect yourself.  You learn

17   mannerisms, a way to guard yourself from anybody finding out.

18   And what you'll find, at least for me, is that you never had

19   any long-sustained, close relationships because -- you know,

20   it's natural if you -- you know, meet somebody, you -- they --

21   you know, you obviously develop a bond, get closer.  And I just

22   would never allow that.

23   Q.   And did having these feelings affect you physically?

24   A.   Having these feelings -- yeah.  I mean, it was -- it was

25   stressful.  You know, we all suffer stress, you know, in our

```
1    everyday lives, and, you know, we -- I had some anxiety, but I
2    dealt with it on my own.  I wasn't going to let it cripple me.
3        I don't have the kind of job where if I was to just
4    crumble and not be able to function or live.  Or certainly when
5    I had a child, I had to provide for that child, I couldn't just
6    lay down and say, "woe is me."  You still have to take care of
7    your stuff.  I still had a child to raise, you know, a roof to
8    put over his head.  So that doesn't mean that I didn't have
9    any, you know, anxiety or depression or, you know, a lot of
10   sleepless nights.  You know, there were some nights that I
11   cried to sleep, you know, and that kind of stuff.
12   Q.   Did these feelings ever go away?
13   A.   No.
14   Q.   The Court this morning also said that you were diagnosed
15   with gender dysphoria; that's correct?
16   A.   That's correct.
17   Q.   What is your understanding of what that term means?  What
18   does it mean to you?
19   A.   What I really described earlier is that for me it's -- you
20   know, I was born male, but I believe I should have been born a
21   female.  I feel like I'm in the wrong body.
22   Q.   And all of the bad feelings that you just described, are
23   they a part of your gender dysphoria?
24   A.   They are.
25   Q.   You eventually did come out as a woman.
```

1    A.    I did.

2    Q.    When was that?

3    A.    2017.

4    Q.    So, your entire adult life until 2017, did you keep this

5    to yourself?

6    A.    Well, I did.  Except for my wife maybe in 2004, I think.

7    Q.    And that marriage didn't last, you say?

8    A.    Yeah, it was --

9    Q.    So, after all of those years, why in 2017 did things

10   change?

11   A.    I always promised myself that, um, in life -- you know, I

12   certainly didn't want to come out.  You know, there's -- like,

13   oh, my gosh, I could never do that.  There's, like, an

14   embarrassment to it when you haven't gone through it.  You

15   know, what are my friends, what are my family going to say?  Am

16   I going to get fired?  You know, there were no protections back

17   then when I came out.  So it's scary.  You know.

18        This is all I'd ever done for 20-something long years, law

19   enforcement.  Am I going to get suddenly fired just for being

20   transgender?  It was -- I didn't know.  But it could happen.

21        And so it was terrifying.

22   Q.    And what made you change your mind that you actually had

23   to come out despite all of that?

24   A.    So, in 2012, I was riding a bicycle, a road bike, and I

25   got hit from behind by a car.  I think she was texting and

1    driving.  And it cracked my neck and, you know, it -- I had

2    some serious injuries.

3        And I remember being in the hospital, my parents came, and

4    waking up, and I was angry that it hadn't killed me.  Because

5    you know, if I had died I could have gone out of -- well, you

6    know, I was doing what I liked to do and I would never have to

7    explain to anybody how I felt.

8        But, as I healed, I -- you know, physically, I knew

9    mentally I had a long way to go.  Because that wasn't like my

10   normal, rational thinking.  Like, who wishes they were dead.

11       And, so, you know, I still fought it for, like, another

12   two years.  And just -- one night I just -- I couldn't fight it

13   anymore.  And I just crumpled to the floor, I was bawling, and

14   decided this is, you know, what I'm going to have to do.  And I

15   knew the consequences.  As I said earlier, it's scary.  You

16   know, people lose family, you know, they lose friends,

17   employment.  It's just -- it's -- everything you know about

18   life is suddenly about to change, and that's terrifying for me.

19   Q.   Thank you.  And there was a word used this morning,

20   "transitioning."  What does that word mean?

21   A.   For me, it's basically medically transitioning from one

22   gender to the other.

23   Q.   And so when you said you felt like you knew what you had

24   to do, is that what you were referring to?

25   A.   Yeah.  At least, you know, start that process.  It doesn't

1   mean that I had planned to kind of go all the way with

2   surgeries and whatnot.  I was just going to take it one step at

3   a time to see if that helped.

4   Q.   Okay.  And so in 2017, you decided you were going to start

5   the process of transitioning?

6   A.   Yes.

7   Q.   Okay.  And you said that was a -- at least in part a

8   medical process; is that right?

9   A.   It is.

10   Q.   All right.  Well, let's focus on the health care.

11   A.   Okay.

12   Q.   And you said that you had wanted to take it one step at a

13   time; is that what you said?

14   A.   Yes.

15   Q.   And we'll try to do that as well and walk through those

16   steps.

17   A.   Okay.

18   Q.   So, what was the first step?  How did you begin seeking

19   health care?

20   A.   It was another day, I just had gone into my primary care

21   physician and was -- just broke down in her office and just

22   told her basically the issues that I had been dealing with.

23   And so they referred me to an endocrinologist in Macon to begin

24   hormone therapy.

25   Q.   And what is your understanding of why you needed to begin

1  hormone therapy?

2  A.   Well, it's -- it's really one of the first, initial stages

3  of, you know, medically transitioning.  And so I take two

4  medications; one is a medication that completely blocks my

5  testosterone, and then the other one is estrogen that starts to

6  feminize me, you know, as my -- the gender that I'm

7  transitioning to.

8  Q.   And why are you taking those medications?

9  A.   Just taking steps to become, you know, the female I always

10  knew I should be.

11  Q.   And you said you took them under the supervision of an

12  endocrinologist?

13  A.   That's correct.  Dr. Barry Johns.

14  Q.   Does the endocrinologist prescribe them to you?

15  A.   Yes.

16  Q.   Did taking hormone medications help your gender dysphoria?

17  A.   They did.

18  Q.   How so?

19  A.   I was at -- you know, with -- I guess with testosterone

20  and just the feelings of agitation that I had constantly.  On a

21  daily basis, I was angry.  Just, you know, again, I was unhappy

22  with myself.

23       And then I felt like once the testosterone was removed and

24  replaced with the estrogen, it seemed like my mind started

25  working the way I had always kind of thought, but there was no

```
 1   con- -- you know, kind of a -- like, a -- I guess, a mess-up in
 2   my head some kind of way.  It just seemed everything to start
 3   clicking.  And I thought I felt good.  I was at peace, kind of.
 4   To a point.
 5   Q.   You said, "to a point."  What does that mean?
 6   A.   It still didn't alleviate, you know, my gender dysphoria.
 7   It wasn't like I took a pill and I was, like, well, that didn't
 8   work.  I mean, it's just over time.  But it didn't help.
 9   Q.   And how much time are we talking?
10   A.   Oh, probably eight -- six to eight months, I think.
11   Q.   What were the things you were still feeling?
12   A.   Um, you know, I still felt -- you know, I was anxious
13   still, and just -- just wasn't content.  Wasn't happy.  Didn't
14   feel like I was the person I was supposed to be.
15        You know, I still had, you know, some kind of issues with,
16   you know, sleeping and, you know, that kind of stuff.  But
17   we -- um, you know, by then I had started seeing a therapist.
18   Q.   Okay.  Let's talk about that, then.
19   A.   Okay.
20   Q.   You started seeing a therapist after you were on hormone
21   therapy?
22   A.   I was.  I did.
23   Q.   And what was that person's name?
24   A.   That was Lynn Ervin.
25   Q.   And what were your goals in talking to a therapist?
```

```
 1    A.   You know, there were a lot of things.  You know, for me,
 2    obviously, the transition portion of it was -- was one of them.
 3    And the feelings, but -- as far as how I was feeling.  But, you
 4    know, there's no road map to transitioning.  Certainly not a
 5    road map to being a law enforcement officer and transitioning
 6    in that kind of environment.  There's -- I mean, I don't know
 7    anybody, like, here locally that, you know, has done that.
 8         And then, so there's -- there's no policies or whatnot put
 9    in place, you know, to assist you.  So, there's no --
10    obviously, I had never done that, so I was seeking the advice
11    for maybe what was best for my son and what should I say to him
12    in kind of a kid-appropriate manner to help him understand.
13    Just all those kind of dynamics.  And so that's, you know, what
14    we discussed.
15    Q.   Were you trying to get a therapist to end your gender
16    dysphoria?
17    A.   No.
18    Q.   Why not?
19    A.   Because they can't.  I mean, there's -- there's problems
20    that come along with gender dysphoria such as, you know, as the
21    depression, anxiety, sleeplessness, you know, low self-esteem.
22    But those are just the side effects of gender dysphoria.  Some
23    people handle those different.  Some people handle those better
24    than others.  You know, some people can't function.  Some
25    people can.  It doesn't mean that you still don't have those
```

1    issues, but they are there.

2    Q.   How often did you see your therapist?

3    A.   It wasn't, you know, a whole lot.  Maybe once a month.

4    Part of it, too, is -- you know, I was raised to be fairly

5    self-sufficient, so usually if I had issues or problems, I was

6    able to work them out on my own.

7         Of course, you know, in -- when you go to a doctor, those

8    $30 co-pays, they add up pretty dang quick or whatever, so --

9    if you go frequently.  So, you know, I had to kind of watch

10   that, too.

11   Q.   And how long did you see Ms. Ervin?

12   A.   It was probably about a year, I think.  I am not really

13   sure, but roughly.

14   Q.   So you might have seen her roughly a dozen times in total?

15   A.   Yeah, maybe.  Some more, some less, I am not sure.

16   Q.   Why not more?

17   A.   She had a massive stroke.  Basically, life-altering

18   stroke.  So, I went in one day for therapy, and the door was

19   locked, and no clue what happened to her.  And then -- so -- I

20   found out later she had had a massive stroke.

21   Q.   And then -- we might come back to therapy a bit, but for

22   now, let's move on.  So, we said we were going to do this

23   step-wise.  So, we talked about hormones.  We talked about

24   Ms. Ervin.  Did you seek any other forms of health care?

25   A.   I did.  I had breast augmentation in 2018.

1    Q.    Okay.   This morning the Court used the word, "top

2    surgery."   Is that the same thing?

3    A.    It is.

4    Q.    Okay.   And do you know why some people call it "top

5    surgery"?

6    A.    Just top half -- top half of your body.

7    Q.    Okay.   And then "bottom surgery," which we'll talk about

8    in a minute, would be the bottom half?

9    A.    That's correct.

10   Q.    All right.   So, you had breast augmentation.   And that was

11   a surgical procedure?

12   A.    It was.

13   Q.    And why did you decide to go and take that step?

14   A.    You know, a lot of it -- there's numerous reasons.   You

15   know, some of it was just in my mind, I didn't feel like I was

16   complete -- a complete female yet.   You know, with hormones,

17   the older you start, I guess, the less -- I mean, I'm -- it's

18   kind of personal, but you don't develop very well.

19        And then -- and so it really -- I guess I felt it was

20   needed just to help me achieve, you know, that -- I guess

21   appearance.   And then alleviate some of the distress that I had

22   with how I thought about myself.   And then, you know,

23   obviously, for the physical portion of it, just because it -- I

24   didn't look as -- so male.

25   Q.    And did the top surgery, the breast augmentation,

1    alleviate your distress?

2    A.    No.

3    Q.    So, did you try -- well, let me ask you.  About how long

4    had you been on hormones at that point?

5    A.    Probably about -- I don't know, almost two years, maybe.

6    Q.    Okay.  So, moving on, then.  Since it didn't alleviate

7    your distress, did you seek -- take any more steps?

8    A.    I did.  I changed my name legally in 2018 and had that --

9    you know, took care of that.  And then I started living

10   full-time as a female.  That was probably -- probably around

11   '18, as well.

12         And it still -- I still had gender dysphoria.  It hadn't

13   gone away.  So, you know -- I am not naïve, so I kind of knew

14   what the next step was.  Or could possibly be.  And so I had to

15   find another therapist.  And somebody recommended Dr. Soety.

16   Q.    Let me pause you there.

17   A.    Sure.

18   Q.    When you say that you knew what the next step kind of

19   needed to be, just to make it clear, what was that step?

20   A.    Well, I had pretty much done everything except for bottom

21   surgery.  Now I -- I wasn't 100-percent sure that that's what I

22   wanted, but that's why I kind of wanted -- I mean, I had an

23   idea, I think, that's the route I needed to head.  Just because

24   I was still pretty, you know, unhappy.  But I knew I needed a

25   therapist.  You have to have, you know -- well, we can talk

1   about that.

2   Q.   Well, sure.  That's a good question.  Why did you need a

3   therapist if you were thinking about surgery?

4   A.   So, according to the standards that, you know, all

5   transgender people go through, there are certain requirements

6   that you have to go through in order just to be eligible for

7   surgery.

8        And one of those is, you know, continuous hormone use for

9   a year, living full-time in that -- in your gender for a year,

10  and that includes being out at work, at home, in all aspects of

11  your life.  So, it's not like you can say, "Oh, I'm living as a

12  male at home, but I'm female."  Or for me it would be, you

13  know, I'm living as a female at home, but then when I go to

14  work, I'm a male.  It doesn't work like that.

15       And so then once you've completed all that, then you go to

16  a psychologist, and they have to recommend that you're a good

17  candidate for gender confirmation surgery, as I call it, or

18  bottom surgery, and that you've met all the criteria.

19       And then there's also, you have to go to a counselor who

20  gives a second -- secondary recommendation for this procedure.

21  And then once you've got those two letters, then you can get

22  referred to -- or, you know, go seek a surgeon.

23  Q.   Okay.  And so you found yourself a therapist for that

24  purpose?

25  A.   Yes.

1   Q.   And, I'm sorry if you already said this, but what was that

2   person's name?

3   A.   That was Dr. Soety.  Dr. Elizabeth Soety.

4   Q.   Okay.  Were you seeing her to treat the gender dysphoria?

5   A.   No.

6   Q.   Were you seeing her to -- I will withdraw that.

7        Did she eventually provide the recommendation?

8   A.   She did.

9   Q.   And about how many times had you seen her by that point?

10  A.   It wasn't, you know, a whole lot.  I can't say how many

11  times I saw her.  I mean, I went a few times, maybe.  I am not

12  sure.  *You know, I am not a -- I am not a therapist.  I just

13  don't go often.

14  Q.   Fair enough.  And you said a little -- a moment ago that

15  you -- you weren't 100-percent certain, but -- but what made

16  you feel like this was likely necessary for you at that point?

17  A.   Just because I knew that I was still pretty unhappy inside

18  with how I felt I was.  I didn't -- I didn't feel like I could

19  have relationships with people, you know, the way that would be

20  normal or consistent.  And it's not necessarily just about

21  physical characteristics, but also, you know, emotional,

22  internal.

23       But, you know, one thing that a lot of people don't

24  realize is, you know, physical characteristics also hurt the

25  mental.  You know, my tennis team would have a pool party, but

1    I can't really go because, you know, I can't really wear a

2    bathing suit like that.  You know, just those things like that

3    that -- you can't live your authentic self that way.  And

4    it's -- and it's bothersome.  I mean, it is not who I was.  Not

5    what I -- you know, needed to be.

6    Q.   And you said it was also emotional and internal.  Can we

7    break that down.  How was it emotional?

8    A.   Well, just because your -- you know, self-confidence --

9    you know, of not being complete.  You don't -- you don't feel

10   well.  You know, you're still going to bed at night, knowing

11   that you're still somebody that you're, you know, not supposed

12   to be.  You're getting closer, but you're not quite there yet.

13   And that plays a big part on your, you know, mental health,

14   psyche there.  Because you almost feel like a fraud, because

15   you -- you can't get there.  You know.  And it's just not a fun

16   place to be.

17   Q.   And in your understanding, what will surgery do for those

18   feelings?

19   A.   It's going to make it better.  I mean, there's a

20   difference.  We all can look in a mirror and see something that

21   we don't like about us.  Right.  I mean, whether it's "I weigh

22   too much" or "I'm losing my hair" or -- just whatever.  But for

23   me, this is -- it's debilitating for me.  I mean, I'm handling

24   it, but it's rough.

25   Q.   Do you think -- do you expect bottom surgery will be easy?

1    A.    "Be easy"?

2    Q.    "Be easy."

3    A.    No.  No.  It's -- no.  Not at all.

4    Q.    Why do that difficult thing, then?

5    A.    I have to.

6    Q.    And it sounds like, then, after a few visits with

7    Dr. Soety, y'all settled on surgery?

8    A.    We did.

9    Q.    And how did you feel once you had settled on surgery?

10   A.    I felt good.  I mean, at least I'd -- you know, it's so

11   hard, as I'd said earlier, just to even admit to yourself that

12   you're transgender.  But then to come out, you know, telling a

13   room full of cops you felt like you should have been born a

14   woman all these years is not an easy thing to do.  But I did

15   it.  You know, I've come a long way.

16         And so I was happy because I felt like I was finally going

17   to have some closure for this.  You know.  I wouldn't have to

18   feel -- I didn't have to hate myself anymore.

19   Q.    So, once you had settled on surgery, what did you do to

20   try and get it?

21   A.    Um, well, I called my insurance company, just to verify if

22   I was covered, and I was told that I was.  But, knowing that

23   mistakes can be made, I asked my -- the surgeon in New York to

24   call just to verify coverage, and they were told that I was

25   covered for this surgery.

```
 1          Because if I had been told I didn't have coverage, I
 2     wouldn't have bought a plane ticket to New York.  So, I booked
 3     a plane ticket and off I went.
 4     Q.   And why -- why New York?
 5     A.   Because that's where my surgeon is.
 6     Q.   And why did you pick a surgeon there?
 7     A.   Because we don't have any here.  And she was very well
 8     respected.  She's, you know, very well respected in her field.
 9     She's one of the top surgeons.
10     Q.   And what's her name?
11     A.   Dr. Rachel Bluebond-Langner.
12     Q.   And you said you had to go to New York.  Was that for the
13     surgery?
14     A.   Well, it was for a consult.
15     Q.   Like a pre-surgical consult?
16     A.   Yes.  Just to see if physically I was the candidate and
17     matched all the criteria that she required.
18     Q.   Okay.  And when was that?
19     A.   That was in November of '18.
20     Q.   All right.  So, let's walk through the visit, then.  Who
21     did you meet with?
22     A.   I met with, of course, Dr. Bluebond-Langner and the
23     urologist, Dr. Zhao.
24     Q.   And were those the two doctors that were going to be
25     involved in your surgery?
```

1    A.    That's correct.

2    Q.    And what did you talk about with Dr. Bluebond-Langner?

3    A.    She briefed me on, you know, what the surgery was, and,

4    um, kind of what happens during the procedure.  She explained

5    the risks and complications that could be associated with it.

6    We also discussed the after-care.  Pretty much anything that

7    dealt with the surgery itself, you know, we had discussed it.

8    Q.    Did you discuss anything that wasn't about the surgery

9    itself?

10   A.    No.

11   Q.    And then you said that the urologist's name was?

12   A.    Dr. Zhao, I think.

13   Q.    Did you talk about anything else with him?

14   A.    No.

15   Q.    So everything you talked about with Dr. Zhao is also

16   related to the surgery?

17   A.    That's correct.  They came in together, so I don't think

18   Dr. Zhao really said a whole lot.

19   Q.    Okay.  Did you get a -- a date for your surgery set?

20   A.    I did.

21   Q.    And what was that date?

22   A.    It was in January, I think, 19th.

23   Q.    Did you get your surgery?

24   A.    I did not.

25   Q.    Why not?

1    A.   I was denied.  I received a letter from the insurance

2    company.

3              MR. BROWN:  Your Honor, I would like to approach the

4    witness to give her an exhibit.

5              THE COURT:  You may.

6              MR. BROWN:  Thank you, Your Honor.

7    BY MR. BROWN:

8    Q.   Without reading from the letter, Sergeant Lange, do you

9    recognize this letter?

10   A.   I do.

11   Q.   What is this letter?

12   A.   It's the denial letter I received from the insurance

13   company.  Letting me know my pre-authorization for surgery had

14   been denied.

15   Q.   The letter that you just referred to a moment ago?

16   A.   Yes.

17             MR. BROWN:  Your Honor, Plaintiffs seek to move

18   Exhibit P-3 into evidence.

19             THE COURT:  Any objection?

20             MR. LAIL:  No, Your Honor.

21             THE COURT:  It is admitted without objection.

22        (Plaintiff's Exhibit 3 admitted into evidence at

23        1:59 p.m.)

24             MR. BROWN:  And, Your Honor, I would like to publish

25   Exhibit P-3 to the jury.

```
 1              THE COURT:  You may.
 2              MR. BROWN:  And it's including the demonstratives
 3   containing highlights from that exhibit.
 4              Ms. Fata will bring it up momentarily.
 5   BY MR. BROWN:
 6   Q.   Can you see it, Sergeant Lange?
 7   A.   Well, I have a computer screen up here, so I can see it,
 8   yes.
 9   Q.   Can you see it in front of you?
10   A.   Yes.
11   Q.   Great.  And the jury has their screens, so they can see
12   it.
13   A.   Oh, nice.
14   Q.   So, this is the letter that you received?
15   A.   It is.
16   Q.   At the end of November, 2018, Sergeant Lange?
17   A.   That's correct.
18   Q.   The one denying your coverage?  What's the date on this
19   letter?
20   A.   11-26 of '18.
21   Q.   And by the way, did you get this on your birthday?
22   A.   I did.
23   Q.   When's your birthday?
24   A.   November 30th.
25   Q.   And we've blown up some relative parts of the letter so
```

1    Ms. Fata can you just zoom in on the left-hand side there.

2    Thank you.

3        Sergeant Lange, can you please read the top highlighted

4    sentence.

5    A.   Sure.

6            "Recently, you or your provider asked us to

7            review a request for the service listed in

8            the table -- and the request has not been

9            approved.  We'd like to explain why.  This

10           service is excluded or not covered under your

11           plan benefits."

12   Q.   Thank you.  And then can you read that second highlighted

13   passage.

14   A.   Sure.

15           "The requested service is listed as a benefit

16           exclusion in the member's Certificate of

17           Coverage manual, page 60.  Deny Sex

18           Reassignment Surgery as non-covered under the

19           member's healthcare plan."

20   Q.   You said, "Deny Sex Reassignment Surgery as

21   non-covered..."  Is that correct?

22   A.   That's correct.

23           MR. BROWN:  Ms. Fata, you can take this down.

24   BY MR. BROWN:

25   Q.   So, how did getting this letter and reading the passages

1    that you just read make you feel?

2    A.    It was devastating.  I mean, it -- you know, as I'd talked

3    about earlier, you know, finally, after all the years of having

4    this internal struggle about who -- or not letting, you know,

5    who I was to show, to finally coming out, and then, you know,

6    knowing that I was going to be able to get surgery, and finally

7    knowing that this is all going to be over, to suddenly getting

8    denied was just -- it was probably one of the roughest days I

9    had.  I cried for about three days on that.  I mean, it was

10   just -- I was inconsolable.  It was just the anguish of knowing

11   that I was going to have to go -- didn't know how long I was

12   going to have to go, still living my life in limbo kind of

13   thing.

14   Q.    So after your coverage was denied, did you do anything to

15   try to get that decision reversed and get your surgery covered?

16   A.    I did.  I appealed the insurance company's, you know,

17   letter.  I appealed.

18   Q.    And what was the result of that appeal?

19   A.    They denied it.  They denied my appeal.

20   Q.    And did you do anything after they denied your appeal?

21   A.    Well, I tried to appeal it again.

22   Q.    And what was the result of your efforts to appeal it

23   again?

24   A.    They denied that.

25   Q.    Okay.  And then after they denied that, did you try

```
 1   anything else to get your surgery covered?
 2   A.    Yeah.  So, it's different in New York.  The hospital has
 3   an LGBTQ coordinator that's not attached to
 4   Dr. Bluebond-Langner.  And so I had sent him a copy of my
 5   letter, my appeal letter, my first one, to him.  And, um, he
 6   read that letter and asked if he could share it with somebody
 7   that he thought could help in my situation.
 8         And so he introduced me to Noah Lewis, who is with the
 9   group then called Transcend Legal, and then so we began
10   talking.
11   Q.    And is Mr. Lewis a lawyer?
12   A.    He is.
13   Q.    Okay.  And did he agree to help you?
14   A.    He did.
15   Q.    So without getting into the details of any of the
16   conversations that the two of you may have had with each other,
17   what did you two do together to try to get your surgery covered
18   after that?
19   A.    Well, we tried to appeal again, but then --
20   Q.    And what was the result of trying to appeal again?
21   A.    Yeah, it was denied.  I don't even know if we heard back
22   at that point.  But it was denied.
23   Q.    Okay.  And so then after that, did you try anything else?
24   A.    Yeah, we reached out to County officials and just asked --
25             MR. LAIL:  Objection.  Relevance.
```

1              MR. BROWN:  Your Honor, this is -- the County's

2     response or lack of response is a source of her damages in

3     part.

4              THE COURT:  You can cover that briefly.  That was the

5     next step in the appeal process, I think you had established.

6     Is that correct?

7              MR. BROWN:  Yes, Your Honor.

8     BY MR. BROWN:

9     Q.   So, you appealed to the County officials how?

10    A.   We requested just to meet with them to discuss, you know,

11    that this was a medical procedure and that, you know,

12    withholding it had been found to be discriminatory.

13    Q.   And how did they respond to your request for the meeting?

14    A.   They didn't.  They ignored us.

15    Q.   And then after that, did you try anything else to get your

16    surgery covered?

17    A.   We sent another request to just sit down and talk with

18    them.  And that request went ignored, as well.

19    Q.   And after that, did you try anything else to get the

20    surgery covered?

21    A.   Yeah, we tried to reach out to them -- I'm sorry, on the

22    second time, we tried to reach out, and we said:  But if you

23    don't respond to us, then we -- I'll have to -- I will be

24    forced to go to the County Commissioners meeting, which is a

25    public forum, and request publicly that the exclusion get

```
 1    removed.

 2    Q.   And did you, in fact, do that?

 3    A.   We did.

 4    Q.   Did you speak at the meeting?

 5    A.   I did.

 6    Q.   And how did that go?

 7              MR. LAIL:  Objection.  Relevance.

 8    A.   Not --

 9              THE COURT:  Just the result.  Did they grant or deny

10    the request?

11              THE WITNESS:  They denied the request.

12    BY MR. BROWN:

13    Q.   How did the denial make you feel?

14    A.   I felt ignored, you know, and certainly felt that before I

15    could even get up and speak, they had made an announcement that

16    they weren't making any changes.  So, I mean, that right there

17    tells you they didn't care what I had to say, that they weren't

18    going to change it.

19    Q.   And you said this was a public meeting?

20    A.   It was.

21    Q.   Members of the public were there?  It was open to all?

22    A.   They were.

23    Q.   After the meeting, did you get any responses from the

24    public about your request?

25              THE COURT:  Whoa.  Whoa, whoa.  Let's -- where are we
```

1   going with that?

2          MR. BROWN:  Again, Your Honor, it is a source of

3   injury.

4          THE COURT:  Responses from members of the public?

5          MR. BROWN:  Correct, Your Honor.  The -- her

6   experiences, her feelings as a result of being approached by

7   the public as a result of needing to attend this meeting are a

8   source of damages.

9          MR. LAIL:  And I would object that that's very

10  irrelevant.

11         THE COURT:  Pardon?

12         MR. LAIL:  I would object that that's very

13  irrelevant.

14         THE COURT:  The scope of damages, as we've discussed,

15  are the mental anguish and emotional injuries allegedly

16  resulting from the denial of coverage and the fact that

17  Sergeant Lange was not able to get the surgery that had been

18  prescribed for her.  So, I am not seeing how public response

19  factors into that.

20         MR. BROWN:  Your Honor, the -- the shame and

21  humiliation of being discriminated against is also a source of

22  damages.  So, there are two sources of damages in this case,

23  and under Title VII that's well established:  Her mental and

24  emotional anguish not only from having untreated gender

25  dysphoria, but also being discriminated against by her

1    employer.

2              MR. LAIL:  That strays well beyond what the scope of

3    the trial is, Your Honor.

4              THE COURT:  We certainly didn't discuss that.  I will

5    sustain the objection.  Move on.

6              MR. LAIL:  Thank you, Your Honor.

7    BY MR. BROWN:

8    Q.   After the meeting, did you do anything else to have your

9    surgery covered?

10   A.   Um, yeah.  We wrote a letter to -- or filed a -- I don't

11   even know what you call it -- with the EEOC, requesting a right

12   to sue.  Because they continued to ignore us.

13        And then once we got that right-to-sue letter, then we

14   reached out to them a final time and said, you know, this --

15   we've got this right-to-sue letter, we don't want to -- I mean,

16   we've reached out to you many, many times, just -- we didn't

17   want litigation, we wanted to discuss it, work it out,

18   either -- you know, to come to some sort of agreement.  But

19   they had no interest in even discussing it with us, so we had

20   no choice but to seek legal action.

21   Q.   And so you filed a lawsuit at that point?

22   A.   Yes.

23   Q.   And when was the lawsuit filed?

24   A.   It was filed in late 2019.

25   Q.   Does September ring a bell?

1    A.    Yes.

2    Q.    Did you ever consider just paying for the surgery

3    yourself, like with your top surgery?

4    A.    I couldn't afford it.  You know, it's kind of scary

5    because, you know, a lot of people -- well, it is just -- I

6    couldn't afford it without health insurance.  And then there's,

7    you know -- obviously, I'm scared that if there was a

8    complication, that they would deny that, too.  I think most of

9    us know that if you don't have health insurance and have a

10   major claim, that's, like, bankrupt, you know, unless you're

11   wealthy.

12   Q.    So it was almost after a year of your -- sorry, almost a

13   year after your surgery was denied until you filed this

14   lawsuit?

15   A.    Yes.

16   Q.    And since then, it's about three years exactly; is that

17   right?

18   A.    For the lawsuit, yes.

19   Q.    Yeah.  So almost four years?

20   A.    In total.

21   Q.    "In total"?

22   A.    Since I was denied.

23   Q.    And how does it feel going without your surgery this whole

24   time?

25   A.    It's living life in limbo.  I don't know if -- it's hard

1    to explain what it's like to have -- just gender dysphoria to

2    somebody that doesn't have it.  But it's every day.  365 days a

3    year.  Some days are better than others, but it's always there.

4         And to be -- knowing that a lot of the distress, most of

5    the distress, I would say 99.9 percent of the distress I have

6    could go away had it not been for the exclusion.  It's -- to

7    me, it's a couple people making the decision from -- for what's

8    best for me.  Just because they don't agree with me, they are

9    going to deny my health insurance.  That's not fair.

10             MR. LAIL:  I will object to this as well.  It goes

11   beyond the scope of what the Court has decided is the scope of

12   this trial.

13             THE COURT:  Well, I'll overrule that specific

14   objection.  But let's do move on.

15   BY MR. BROWN:

16   Q.   How has it felt -- well, you heard Ms. Morgan this

17   morning, she said you do a very good job at your work.  Do you

18   agree?

19   A.   I try to.

20   Q.   And how does it feel for you to go in to work every day,

21   trying to do a very good job, for four years, and not be

22   treated equally?

23   A.   It's -- I mean, it's tough.

24             MR. LAIL:  Objection.  Your Honor.  Again, scope.

25             THE COURT:  Mr. Brown, we do stray from what was

```
1    defined as the scope of damages, so I am going to sustain that
2    objection.
3              MR. BROWN:  Your Honor, I just have three more
4    questions, and then I think I'll wrap up.
5    BY MR. BROWN:
6    Q.   How does it -- how does going without your surgery for
7    four years affect you emotionally?
8    A.   I still have, you know, low self-esteem.  Some days --
9    it's gotten better.  You know, it's different.  I've come so
10   far, but still have a long way to go.  I still have sleepless
11   nights, still feel uncomfortable around friends to a point that
12   I still don't get close.  I have, you know, mainly one good
13   friend, and then just a couple of acquaintances, like
14   teammates.  But I don't -- I don't have any close, close bonds
15   with a lot of people.
16        Still have trouble sleeping.  You know, still get anxious.
17   You know, I've been kind of scared to vocalize that at work
18   because I don't want -- in law enforcement if, like, your
19   co-workers feel you are any -- you know, weak in any way, that
20   that would break their confidence in you.
21        And so -- and also I felt like if I gave them a reason to
22   show that my performance wasn't that great, then it would be
23   very easy to be let go.
24   Q.   You said you have good days and bad days.
25   A.   Um-hum.
```

1    Q.   What does a good day and a bad day look like for you?

2    A.   A good day is -- obviously I know that, you know, I have

3    gender dysphoria, but I am able to manage it.  It is not --

4    whether it's just a mood or a peace of mind, that I'm able to

5    handle the stress and anxiety a whole lot better than on a bad

6    day.  On a bad day, I am super-emotional.  And it's just tough

7    to get through the day.  Yeah.

8    Q.   So, what do you want from this lawsuit?

9    A.   Well, first and foremost, I just wanted health care.

10   That's how -- why all this started.  I mean, if I just had

11   health care, you never would have heard of me.  But through

12   this process, I know they've treated me like I was worthless.

13   And I know I'm not worthless.  I deserve something.  They've

14   put me through this, I believe, intentionally because they

15   don't agree with what a transgender person is.  And I can't --

16           MR. LAIL:  I will object again.  It goes beyond the

17   scope of what this trial's about.

18           THE COURT:  Sustained.

19   BY MR. BROWN:

20   Q.   Without saying what you think they believe --

21   A.   Okay.

22   Q.   -- can you finish your answer to the question?

23   A.   Repeat the question again for me.

24   Q.   The question is what do you want to get from this lawsuit.

25   A.   So, I can't put a price on what I want.  But I know I, you

1    know, deserve something.

2    Q.   Thank you very much, Sergeant Lange.

3             MR. BROWN:  Your Honor, no further questions at this

4    time.

5             THE COURT:  You may cross-examine.

6             MR. LAIL:  Thank you, Your Honor.

7                         CROSS EXAMINATION

8    BY MR. LAIL:

9    Q.   Good afternoon, Sergeant Lange.

10   A.   Hello.

11   Q.   You covered a lot of ground with Mr. Brown, and I am going

12   to break that down categorically and go into a little more

13   depth with respect to some of those areas.

14   A.   Okay.

15   Q.   So, first, we're going to start with your work.  You work

16   in the Criminal Investigations Division of the Sheriff's

17   Office; is that right?

18   A.   That's correct.

19   Q.   And the Criminal Investigation Division of the Sheriff's

20   Office is sometimes abbreviated CID; right?

21   A.   That's correct.

22   Q.   You've been in CID since 2012; is that right?

23   A.   Yes.

24   Q.   And when you entered CID, that's when you got your

25   promotion to corporal; correct?

1    A.    Correct.

2    Q.    And after two years, you got another promotion to

3    sergeant, and that's your current rank; correct?

4    A.    That's correct.

5    Q.    And that's a pretty standard progression, to go from

6    corporal to sergeant in a 2-year period; is that right?

7    A.    That's correct.

8    Q.    As you addressed a little bit in your direct with

9    Mr. Brown, your investigation work can range from petty theft

10   to homicide; is that right?

11   A.    Yes.

12   Q.    And you had a particular focus on elder abuse cases, which

13   you addressed before, dealing with both physical abuse but also

14   financial issues; is that correct?

15   A.    Correct.

16   Q.    And as a sheriff's deputy, you have state-wide arrest

17   powers; don't you?

18   A.    I do.

19   Q.    And you sometimes even coordinate multi-jurisdictional

20   investigations; don't you?

21   A.    I have before.

22   Q.    And in the past few years, you've been the lead

23   investigator on a few homicides; haven't you?

24   A.    That's correct.

25   Q.    You also handle sexual assault cases; don't you?

1    A.    I do.

2    Q.    And each investigation is important to the victim and the

3    victim's family; is that correct?

4    A.    I would believe so, yes.

5    Q.    And you have to gather evidence in a way that would stand

6    up in court; don't you?

7    A.    Yes.

8    Q.    You also testify in court as part of your job; don't you?

9    A.    I do.

10   Q.    You have to be somewhat methodical and careful in how you

11   carry out your investigation; right?

12   A.    I do.

13   Q.    And you've been able to do those duties since coming to

14   CID in 2012; haven't you?

15   A.    I have.

16   Q.    And that includes since November of 2018 when the surgery

17   was denied; correct?

18   A.    That's correct.

19   Q.    In fact, you've closed almost all the cases that you've

20   handled in the past few years; haven't you?

21   A.    I wouldn't say that.  I mean, you know, sometimes we can't

22   solve them.  Can't solve them all.

23   Q.    Okay.  But you've had a pretty good record; haven't you?

24   A.    I mean, I do okay.

25   Q.    In the time that -- since August -- I'm sorry, yeah,

```
1    November of 2018, when the surgery was denied, you haven't had

2    any unpaid time off; is that correct?

3    A.   I have not.

4    Q.   You have not?

5    A.   No, I don't believe so.

6    Q.   You have taken time off that's vacation or sick leave or

7    something like that, but you haven't lost any pay; correct?

8    A.   No.

9    Q.   You've continued to make your full pay of roughly 46,000 a

10   year; is that correct?

11   A.   That's correct.

12   Q.   Overall, your work group in CID has been generally

13   supportive of you since you came out at work; is that correct?

14   A.   Hum, yeah.  I mean, there's a few folks --

15             MR. BROWN:  Objection.  Relevance.

16             MR. LAIL:  Your Honor, we'll link this up later, but

17   these are some issues dealing with the fact that there's not

18   emotional distress resulting from the work relationships.

19             MR. BROWN:  The supportiveness has nothing to do with

20   that.  It's going to mislead the jury into thinking somehow

21   there's not liability here.

22             THE COURT:  Well, it kind of touches on what we were

23   talking about earlier.  I don't think there's been any

24   contention that there's been any damages or injury from

25   anything that occurred at work.  It's all about the denial of
```

1    insurance coverage.  Or the payment for this particular

2    surgery.  So, if that's the point of the question, I do not see

3    any relevance.

4              MR. LAIL:  Your Honor, there's an Eleventh Circuit

5    case, *Akouri*, that deals with factors to be considered in

6    emotional distress cases, one of which is the esteem of one's

7    work peers, and that's the purpose of asking these questions.

8              THE COURT:  Well, very well.  I will open the door

9    back up on redirect to the -- what I closed it on earlier.  It

10   sounds like.  Go ahead.

11   BY MR. LAIL:

12   Q.   The head of CID is a captain position; is that correct?

13   A.   That's correct.

14   Q.   And Jon Holland was the captain of CID until a couple of

15   months ago when he retired; is that right?

16   A.   He was.

17   Q.   And he's someone that you got along well with; isn't he?

18   A.   I did.  We had a rocky start when I first transitioned,

19   but we got through it.  He's a nice guy.

20   Q.   In fact, he was one of the first people who came to see

21   you in the hospital after your bike accident that you mentioned

22   in your direct testimony; is that right?

23   A.   He was.

24             MR. BROWN:  Objection.  Relevance.  We are now very

25   far away from anything having to do with the denial of health

1    care coverage in November of 2018.

2            THE COURT:  Well, we are, but -- and as I said, I

3    limited your examination, but now apparently the defense

4    concedes that the point is a matter for inquiry, so, I will

5    allow it.  You can come back on redirect.

6    BY MR. LAIL:

7    Q.   Sergeant Lange, in addition to work, you engage in several

8    hobbies; don't you?

9    A.   I -- yeah, I used to.

10   Q.   Or outside activities, I guess.

11   A.   Right.

12   Q.   Among them are in the past refereeing soccer for kids'

13   leagues; is that correct?

14   A.   That's correct.  High school level and younger kids.

15   Q.   Okay.  And you were also a beekeeper and gave away honey

16   to friends; is that right?

17   A.   I was.

18   Q.   Until the stings apparently got too bad and your allergy

19   to the stings got too bad?

20   A.   They don't make good pets, so I had to get rid of them.

21   Q.   More recently you have taken up tennis; is that correct?

22   A.   Yes.

23   Q.   And three of your teams went to the state championship

24   level last year; is that right?

25   A.   That's correct.

1    Q.   And you mentioned in your direct examination that that's

2    been a source of friendships for you since you've taken up that

3    hobby; right?

4    A.   It has.

5    Q.   Next Sergeant Lange, I am going to put some things in time

6    context, just to kind of help put the pieces together.  So, in

7    April of 2017, that's when you came out or revealed that you're

8    transgender with your work; is that correct?

9    A.   That's correct.

10   Q.   And that's also about that time frame when you started

11   taking hormones; is that right?

12   A.   I believe so, yes.

13   Q.   And you testified on direct that you obtained a legal name

14   change.  I believe that was in December of 2017.  Does that

15   sound right to you?

16   A.   That sounds about right.

17   Q.   Okay.  And you changed it from your previous male name to

18   and Anna Hayes Lange; correct?

19   A.   Correct.

20   Q.   And then, as you described a little bit before, in April

21   of 2018, you had breast augmentation surgery; correct?

22   A.   Correct.

23   Q.   And you felt like that would let you pass more easily as

24   female; is that correct?

25   A.   Yeah, it's part of it.

1   Q.   And you declared in this case before that getting the

2   breast augmentation surgery and taking hormones has helped you

3   feel and function better; correct?

4   A.   Correct.

5   Q.   And you acknowledged in your direct testimony that did

6   alleviate some of your emotional distress with respect to

7   gender dysphoria; is that right?

8   A.   That's correct.

9   Q.   Okay.  Mr. Brown mentioned that you paid for that breast

10   augmentation surgery yourself; is that correct?

11   A.   That is.

12   Q.   And you paid a little under 7,000 for that; is that right?

13   A.   That's right.

14   Q.   Now I want to ask a little bit about your health insurance

15   through work.  As a sheriff's deputy, you participated -- you

16   were able to participate in the County's health insurance plan;

17   is that correct?

18   A.   That's correct.

19   Q.   And you've done that pretty much throughout your

20   employment since 2006; is that right?

21   A.   Yes.

22   Q.   You mentioned in your direct testimony that health

23   insurance had been withheld from you.  I want to ask a few

24   questions about that.  You participated in the County's POS

25   plan; is that right?

1   A.   That's correct.

2   Q.   Okay.  And the POS plan that you participated in was the

3   same POS plan that other participants in that plan got; is that

4   right?

5   A.   Yes.

6         THE COURT:  Mr. Lail, where are we going here?

7         MR. LAIL:  Just clarifying the notion of withholding

8   that was raised in her direct examination.  And I think we just

9   did.

10         THE COURT:  The withholding?  You mean the coverage

11   for the surgery that Dr. Bluebond-Langner recommended?

12         MR. LAIL:  Just to --

13         THE COURT:  That's the only testimony I heard about

14   withholding health coverage.  Certainly that's the only

15   relevant testimony.

16         MR. LAIL:  All right.  I'll move on.  Thank you, Your

17   Honor.

18   BY MR. LAIL:

19   Q.   When you came out as transgender to your work group in

20   2017, you were aware at that time of a plan exclusion for sex

21   change surgery; is that right?

22   A.   Yes.

23   Q.   You had discussed the exclusion with the County's health

24   insurance broker before coming out; is that right?

25         MR. BROWN:  Objection to relevance.  This is not

1    relevant to damages.

2              MR. LAIL:  Your Honor, I am just attempting to show

3    that she was aware of these issues at the time she came out

4    with the Sheriff's Office.

5              MR. BROWN:  Whether she was aware or not, it has no

6    relevance to her emotional suffering and mental anguish as a

7    result of being denied coverage.

8              THE COURT:  Well, as I said, both of you seem to be

9    taking a more expansive view of the scope than we have

10   discussed, but if the point is that she was aware of the

11   exclusion, that's been established, and I think you can move

12   on.

13             MR. LAIL:  All right.  Thank you, Your Honor.

14   BY MR. LAIL:

15   Q.   You had mentioned in your direct testimony that before

16   going up to see Dr. Bluebond-Langner, you had a call with the

17   health insurance company about coverage; is that correct?

18   A.   It was.

19   Q.   You don't claim the County or the Sheriff's Office

20   impacted what the health insurance company shared with you on

21   that occasion; is that correct?

22   A.   No.

23   Q.   It's not correct?  Or it is correct?

24   A.   I said, yeah -- no, I don't blame the County.

25   Q.   I want to ask now a little bit about some other medical

1    conditions that you experience.  You deal with ADHD; is that

2    correct?

3    A.    I do.

4    Q.    And ADHD stands for "attention deficit hyperactivity

5    disorder"?

6    A.    That's correct.

7    Q.    Okay.  You take a medication, even now, to help address

8    the symptoms of ADHD; is that right?

9    A.    I do.

10   Q.    That condition sometimes makes it a little hard to focus;

11   is that correct?

12   A.    It does.  Especially in our office.  It's open, it's loud.

13   Q.    Right.  It's kind of an open setting with desks?

14   A.    Yeah.

15   Q.    That's right.  And you mentioned before in your direct

16   testimony that you deal with sleepless nights sometimes; is

17   that correct?

18   A.    Yeah, I have trouble falling to sleep.

19   Q.    And that's -- you know, sleep difficulties is something

20   that you experienced even before the denial of surgery; is that

21   correct?

22   A.    I did.

23   Q.    And, in fact, you take a different medication to help with

24   that condition; is that right?

25   A.    I do.

1    Q.   And that was -- that was also before the denial of

2    surgery; is that correct?

3    A.   Uh-huh.

4    Q.   Is that a yes?

5    A.   Yes.  Sorry.

6    Q.   No problem.  With respect to the surgery, you described a

7    little bit about what you hoped the surgery would accomplish

8    for you in your direct testimony.  The surgery would not end

9    your taking hormones; is that correct?

10   A.   No.  It could eliminate one medication that has some side

11   effects.

12   Q.   That's right.  But you still have to take some other

13   hormones, even beyond that, and going forward for the rest of

14   your life; is that right?

15   A.   Yeah.  Just the normal, you know, HRT program that any

16   female would have to take.

17   Q.   Okay.  All right.  I want to get back into another area,

18   your psychologists, the ones that you've worked with.  The only

19   two psychologists you've seen since 2016 are Lynn Ervin and

20   Elizabeth Soety; is that right?

21   A.   That's correct.

22   Q.   Lynn Ervin is a licensed professional counselor; is that

23   right?

24   A.   Yes.

25   Q.   You saw her for a few sessions and then she unfortunately

```
1   had a pretty serious stroke; is that right?
2   A.    That's correct.
3   Q.    So after that, you began seeing Elizabeth Soety, who is a
4   Ph.D. psychologist; is that right?
5   A.    Correct.
6   Q.    And you had a good rapport with Dr. Soety; is that right?
7   A.    I did.
8   Q.    You believed she would hear you out on whatever issues you
9   were dealing with; right?
10  A.    Yes.
11  Q.    You haven't seen Dr. Soety for therapy since December of
12  2019; have you?
13  A.    No.
14  Q.    And you haven't asked to see her since December of 2019;
15  is that also correct?
16  A.    Yeah, that's correct.  She told me I didn't need to come
17  back unless I had a -- you know, a major issue.
18  Q.    Thank you.
19            THE COURT:  Redirect?
20                        REDIRECT EXAMINATION
21  BY MR. BROWN:
22  Q.    Sergeant Lange, you were asked a moment ago by Mr. Lail a
23  number of questions about your work and your office
24  relationships.  Do you remember that?
25  A.    I do.
```

1    Q.    And you were asked if you were -- if your office was

2    supportive of you, I believe.  Do you recall being asked that?

3    A.    Yes.

4    Q.    Are they always supportive?

5    A.    No.

6    Q.    Can you give some examples.

7    A.    Um, you know, numerous jokes, walking into the office and

8    playing, "Dude (Looks Like a Lady)."  You know, putting, like,

9    a dress on, like, I have an Auburn gnome in there, just --

10   they've done that.  You know, supervisors -- not anybody that's

11   there now -- but, you know, was pretty rough on me with

12   comments and would exclude me from a lot of the things with

13   regular co-workers.  And to the point where I was told that

14   when I come in to work in female attire, it makes them feel

15   uncomfortable.

16         And -- and so, yeah.  I mean, you know, there's -- you've

17   got the ground troops, which I kind of consider myself to be,

18   and some of those have been supportive.  But, you know, the

19   folks that are supervising have not been.

20         THE COURT:  All right.  I will allow that as a

21   response to the question brought up on direct.  In addition --

22   pardon me, on cross -- I stopped you from asking a question

23   about what I gather was an effort to prove -- or elicit

24   testimony on something that might be a consequence of the

25   denial of coverage for the surgery.

```
1              If you have a question along those lines, I will
2    allow it, even if I told you earlier or my ruling seemed to
3    preclude that.  But I think that's acceptable, particularly in
4    light of the cross examination.
5              MR. BROWN:  Thank you, Your Honor.
6    BY MR. BROWN:
7    Q.   Are you the kind of person who likes to talk about your
8    feelings?
9    A.   No, not at all.
10   Q.   And you work in a sheriff's office?
11   A.   I do.
12   Q.   Are you -- are y'all in the habit of talking about your
13   feelings in there --
14   A.   No.
15   Q.   -- with the other sheriff's deputies?
16   A.   No.
17   Q.   And you were asked some questions about your hobbies; is
18   that right?
19   A.   Yes.
20   Q.   Do you recall that?  And do you also recall being asked
21   some questions about your -- doing a good job at work, like
22   Ms. Morgan said this morning?  Do you recall those?
23   A.   Yes.
24   Q.   Does having hobbies or doing a good job at work mean you
25   don't suffer from gender dysphoria?
```

1    A.    No.

2    Q.    Are you able to put those things aside and do a good job?

3    A.    You have to.

4    Q.    I want to return to a topic I was asking you about earlier

5    regarding your attendance at a public meeting of the County and

6    county commissioners.  And I just believe I had asked you how

7    the presentation went.  And I guess my only remaining question

8    about that is how did the County treat you at that

9    presentation?

10   A.    They -- I mean, they ignored me basically.  I mean, they

11   gave me three minutes to speak, but they had already made their

12   decision of what they planned to do before I even got up to

13   speak.  They already announced that no changes would be made.

14   And then when a reason was asked why the exclusion was in place

15   and they kept it in place, they said because of pending

16   litigation.

17   Q.    Was there pending litigation at the time?

18   A.    No.

19   Q.    And how did -- how did that response from the County make

20   you feel?

21   A.    I mean, how can you reason or talk or work through any

22   issues if they just refuse to talk to you.  I mean, it's not

23   even -- you know, am I even worth their time?  Apparently not.

24            MR. BROWN:  No further questions, I think.

25            Thank you, Your Honor.

1          Thank you, Sergeant Lange.

2          THE COURT:  Thank you.

3          Any recross on the narrow points covered on redirect?

4          MR. LAIL:  Thank you, Your Honor.  Three short areas.

5                    RECROSS EXAMINATION

6  BY MR. LAIL:

7  Q.   Sergeant Lange, the CID Group is kind of a teasing work

8  group environment; is that right?

9  A.   Yeah.

10  Q.   And you've engaged in teasing among your peers; is that

11  right?

12  A.   We do.  It just depends on the topic.  I think.  There are

13  some limits.

14  Q.   And you've teased before the surgery was denied; is that

15  right?

16  A.   Oh, yeah.

17  Q.   And you've teased after the surgery has been denied; is

18  that right?

19  A.   Sure.

20  Q.   You mentioned a pretty rough supervisor.  That supervisor

21  left the Sheriff's Office in May of 2020; didn't he?

22  A.   If we're talking about the same supervisor.

23  Q.   I think we are.

24  A.   Yeah.

25  Q.   Okay.  And at the meeting, the commissioner's meeting, you

```
 1   mentioned the 3-minute rule.  That rule was applied to every
 2   speaker; wasn't it?
 3   A.    That particular night, yes.  Not at other meetings.
 4   Q.    Okay.
 5              MR. LAIL:  Thank you.
 6              THE COURT:  Sergeant Lange, you may step down.
 7              THE WITNESS:  Thank you, Your Honor.
 8         (Witness stepped down at 2:40 p.m.)
 9              THE COURT:  So, to your next witness?
10              MS. GRANT:  Your Honor, our next witness is
11   Dr. Elizabeth Soety, and she has not been in the courtroom, so
12   we just need to find her.  She's in the building somewhere.
13              COURTROOM DEPUTY:  She's in Judge Lawson's courtroom.
14              THE COURT:  We'll go ahead and take our afternoon
15   break.  Ten minutes, let's say.  And we'll have the next
16   witness ready to proceed when you come back.  We will remain
17   seated while you go to the jury room.
18         (Jury excused for afternoon break at 2:41 p.m.)
19              THE COURT:  We will recess for ten minutes.
20              COURT OFFICER:  All rise.  Court is in recess.
21         (Court in recess from 2:42 p.m. to 2:58 p.m.)
22              COURT OFFICER:  All rise.  This Honorable Court is
23   back in session.  Be seated and come to order.
24              THE COURT:  Dr. Soety?  Is she here?  You may come on
25   up, if you would, Doctor.
```

```
1                    And Kim may get the jury.

2              COURTROOM DEPUTY:  Okay.

3              THE COURT:  Somebody.

4         (Jury returned to courtroom at 3:00 p.m.)

5              THE COURT:  Welcome back.  The plaintiff's next

6    witness, Dr. Soety, is on the stand.

7                    If you would stand, please, Doctor.

8              COURTROOM DEPUTY:  Do you solemnly swear that your

9    testimony in this case shall be the truth, the whole truth, and

10   nothing but the truth, so help you, God?

11             THE WITNESS:  I do.

12             COURTROOM DEPUTY:  Thank you.  You can be seated.

13   And can you please state your name for the record and spell

14   your last name.

15             THE WITNESS:  Elizabeth Marie Soety.  S-o-e-t-y.

16             COURTROOM DEPUTY:  Thank you.

17             THE WITNESS:  You're welcome.

18             THE COURT:  You may proceed.

19                    ELIZABETH M. SOETY, PH.D.

20   called by Plaintiff at 3:02 p.m., having first been duly sworn,

21   testified as follows:

22                        DIRECT EXAMINATION

23   BY MS. GRANT:

24   Q.   Good afternoon, Dr. Soety.

25   A.   Good afternoon.
```

1    Q.   I am Jill Grant, I am one of the attorneys for Anna Lange.

2    Thank you for your time and participation today.

3    A.   You're welcome.

4    Q.   Dr. Soety, can you please introduce yourself to the jury.

5    A.   My name is Elizabeth Marie Soety.  I am a clinical

6    psychologist.  I have been in private practice for about twenty

7    years.

8    Q.   What does a clinical psychologist do?

9    A.   I diagnose and treat people with mental health conditions.

10   Q.   Do you know the plaintiff here, Sergeant Lange?

11   A.   Yes, I do.

12   Q.   And how did you come to meet her?

13   A.   We had a working relationship.  She was a client that

14   sought care from me.

15   Q.   And around when did you first meet Sergeant Lange?

16   A.   It was June of 2018.

17   Q.   And what is your understanding of the reason that Sergeant

18   Lange came to see you?

19   A.   She had, um, been aware of her gender dysphoria for many

20   years and had been seeking care, which included hormone

21   therapy, and was pursuing surgical intervention for the gender

22   dysphoria.

23   Q.   So, was she seeking a consultation in furtherance of the

24   surgery?

25   A.   Yes.  That's part of the standard of care that's

1    recommended.  That anyone that undergoes medical treatment for

2    gender dysphoria, that they have a mental health practitioner

3    involved.

4    Q.    When you say, "medical treatment for gender dysphoria,"

5    what are you specifically referring to there?

6    A.    Hormone surgery.

7    Q.    Hormones and surgery?

8    A.    "...and surgery," correct.

9    Q.    And did you write a letter for Sergeant Lange in support

10   of her receiving the medical treatment?

11   A.    Yes, I did.

12   Q.    And why did you write that letter?

13   A.    I had met with Sergeant Lange for a couple of sessions and

14   was very comfortable in the diagnosis of gender dysphoria.  I

15   also was not concerned about other areas of life that would

16   potentially interfere with her positive surgical outcome.

17   Q.    So, before we dive into some more details about your

18   treatment of Sergeant Lange, I would like to get a little more

19   detail about your background for the jury.  Did you go to

20   college?

21   A.    Yes, I did.

22   Q.    And where did you go?

23   A.    My undergraduate was at the University of Florida.

24   Please, no comments.  Then I did a terminal master's at the

25   University of Texas at Tyler, with a specialty in

1    neuropsychology.  And then I did my doctoral degree at

2    University of South Florida in clinical psychology with the

3    emphasis in neuropsychology.

4    Q.   And when did you obtain your doctoral degree?

5    A.   In 2002.

6    Q.   And when did you start working as a clinical psychologist?

7    A.   I was technically a post-doc after graduation, so 2002.

8    Q.   What's a post-doc?

9    A.   Oh, sorry, post-doctoral fellowship is after your degree

10   is awarded, you continue to work for another psychologist for a

11   period of time.

12   Q.   Understood.  And then you started in private practice

13   after you finished your post-doc?

14   A.   That's correct, in 2004.

15   Q.   And in your practice as a clinical psychologist, do you

16   have a specialty?

17   A.   My specialty is neuropsychology.

18   Q.   And how much of your practice is dedicated to

19   neuropsychology?

20   A.   At this point in time, I'd probably say a third.

21   Q.   And how do you spend the rest of your time in your

22   practice?

23   A.   I work with people with other mental health conditions,

24   mainly depression and/or anxiety.

25   Q.   So individual treatment?

1   A.   Correct.  Correct.

2   Q.   And in your practice as a clinical psychologist, have you

3   treated individuals with gender dysphoria?

4   A.   Yes, I have.

5   Q.   And other than Sergeant Lange, about how many?

6   A.   I would say anywhere between eight and fifteen at this

7   point.  More than eight, less than fifteen.

8   Q.   Do you have any special training or experience in treating

9   individuals with gender dysphoria?

10  A.   I've done a great deal of research on my own over the

11  years -- reading books, academic material, journal articles.  I

12  also went to a workshop that was specifically devoted to gender

13  dysphoria in -- a couple years ago.  I could look it up if

14  you'd like.

15  Q.   You went to an academic workshop?

16  A.   Correct.  Yes.

17  Q.   And that was to help you understand best practices for

18  treating patients with gender dysphoria?

19  A.   That is correct.

20  Q.   Okay.  And how would you describe your role as a clinical

21  psychologist in treating gender dysphoria?

22  A.   There would -- I could say that there would be two main

23  goals with clients with gender dysphoria.  One is to explore

24  the diagnosis; in other words, background, current issues

25  related to gender, when the gender dysphoria developed, how it

1    developed, so on and so forth.

2        And then the second main goal would be assessing different

3    areas of quality of life.  Making sure that -- whether it's

4    social relationships, work relationships, family

5    relationships -- that those potential stressors are addressed.

6    Q.   And why do you focus on addressing those other potential

7    stressors in other areas of quality of -- of transgender

8    patients' quality of life?

9    A.   Well, I wouldn't say that would be specifically related to

10   transgender patients, but that would be -- it's one of the main

11   goals of counseling, is to work with people and make sure that

12   they're functioning at the best level that they possibly can

13   be.

14   Q.   Understood.

15   A.   I don't think that's unique to people with gender

16   dysphoria.

17   Q.   That is true.  So, turning back to your treatment of

18   Sergeant Lange, after your -- well, did you have an initial

19   meeting with her?

20   A.   Correct.  We have an -- I did an intake session with her.

21   Q.   And what's an intake session?

22   A.   An intake session is where you spend the time getting

23   background information from relationships with family members,

24   educational background, vocational background, hobbies, medical

25   history, trying to cover just the different areas of life.

```
1    Q.   And after that initial intake session, did you have
2    further sessions with Sergeant Lange?
3    A.   Yes, I did.
4    Q.   And about when was that initial intake session, if you can
5    remember the month and the year?
6    A.   Again, I am pretty sure it was June, but --
7    Q.   What year?
8    A.   2018.
9    Q.   And after that initial intake in June, 2018, did you have
10   further sessions with Sergeant Lange?
11   A.   Yes, we did.  We met for a few more sessions in 2018 to --
12   yes.  So, that was the question.
13   Q.   Were there any in 2019?
14   A.   January, 2019, if I remember correctly.  And December of
15   2019, if I remember correctly.
16              THE COURT:  Doctor, do you have your chart?
17              THE WITNESS:  I do.
18              THE COURT:  You can refer to it.
19              THE WITNESS:  Okay.
20   BY MS. GRANT:
21   Q.   You don't have to right now.  I think we're good on this.
22   But you can take it out if you want to be ready to look at it
23   again.  It's up to you.  What do you prefer?
24   A.   I'd rather look.
25   Q.   Okay.
```

1    A.   My memory for four years ago is -- I would rather be

2    correct than --

3    Q.   Okay, yep.

4    A.   Okay.  So, you asked for how many sessions in 2019?

5    Q.   Just whether you did see her in 2019.

6    A.   Whether I did?  Yes.

7    Q.   Yes.  And how many sessions in 2019?

8    A.   Two.

9    Q.   Okay.  Great.  And at the point when you met Sergeant

10   Lange and started treating her, she had already been living as

11   a woman for over a year; correct?

12   A.   That is correct.

13   Q.   And what specific symptoms did you observe in Sergeant

14   Lange during your sessions with her?

15   A.   I think what you mean by "symptoms" is what her presenting

16   prob -- I think I know where you're --

17   Q.   If you don't understand, that's --

18   A.   I'll just answer it the way that I think I understand it.

19   Q.   Okay.

20   A.   Her main concern was the gender dysphoria.  So, as far as

21   symptoms go, I would say dissatisfaction between her identified

22   gender and physical appearance.

23   Q.   Okay.  And did you reach your own independent diagnosis

24   for Sergeant Lange of gender dysphoria?

25   A.   Yes.

1   Q.   Was that the only diagnosis that you reached based on your

2   treatment of Sergeant Lange?

3   A.   To be clear, the initial diagnosis was "major depressive

4   disorder."  And as the sessions progressed and more information

5   was obtained, then I felt that "gender dysphoria" would be a

6   more accurate diagnosis.

7   Q.   Okay.  Why did you initially diagnose Sergeant Lange with

8   major depressive disorder?

9   A.   I personally don't feel comfortable diagnosing gender

10  dysphoria during the first session.  She presented with some

11  concerns, stress in life, and was also taking an

12  anti-depressant at the time, which would fit with a major

13  depressive diagnosis.

14  Q.   So, you did your own assessment, based on your treatment

15  of Sergeant Lange, to include that she had gender dysphoria?

16  A.   That's correct.

17  Q.   Okay.  And other than the gender dysphoria, did you

18  identify any other areas of distress that Sergeant Lange was

19  experiencing during your treatment of her in 2018 and 2019?

20  A.   No.

21  Q.   How were her family relationships functioning?

22  A.   Pretty good.

23  Q.   How about her social relationships?

24  A.   Very good.

25  Q.   Okay.  How about her work relationships?

1    A.    Pretty good.

2    Q.    Did she have hobbies?

3    A.    Yes.

4    Q.    Do you remember what -- or does your chart tell you what

5    they were?

6    A.    Hobbies, um, beekeeping, tennis, I believe there was some

7    volunteer work.

8    Q.    And how was her overall mood?

9    A.    Pretty good, overall.

10   Q.    And all of these things were things that you considered

11   when deciding to write that letter that we talked about;

12   correct?

13   A.    That is correct.

14   Q.    Okay.  And can you describe -- well, do you have the

15   letter in your file?

16   A.    I do.

17   Q.    Okay.  And can you tell us about that letter, meaning what

18   was the process that you undertook in order to obtain the

19   information you needed in order to provide that letter.

20   A.    Okay.  Sergeant Lange provided me with some material,

21   including the areas that needed to be addressed by her

22   insurance company.  We wanted to make sure that those issues

23   were addressed.

24        I also reviewed the WPATH Standards of Care and the items

25   that are -- they recommend addressing in the letter to the

1    surgeon.

2    Q.    And so what did you say in the letter?

3    A.    Oh.

4    Q.    On the high level.  You don't have to read the letter.

5    A.    How long are we here for?  The first paragraph is

6    basically the background of the gender dysphoria as far as, um,

7    when she first noticed it, the care that she had received by

8    two other clinicians, and the other medical interventions as

9    far as the gender dysphoria.  So that's the first paragraph.

10        Um, the second paragraph addresses the criteria for gender

11   dysphoria.  The fact that despite the medical care to the point

12   to date that there still is the present gender dysphoria.  And

13   that the surgery would address some of these issues.

14        Next paragraph is about any kind of medical issues that

15   could potentially interfere, and there were none.

16        Then, the next issue is the social paragraph as far as

17   what family support, social support, hobbies, work history,

18   just basically covering the different areas of life that the --

19   we know would be -- could have an impact after surgery.

20        The next paragraph addresses the plans as far as

21   postoperative care.

22        Next paragraph is specifically about the WPATH criteria as

23   far as we've discussed risks and benefits of surgery, um, and

24   Ms. Lange is capable of making informed consent as far as the

25   surgery goes.

```
 1        And then the final paragraph is about my background and
 2   the number of people that I have seen, transgender clients,
 3   over the years and my background.
 4   Q.   So, this is a letter that you wrote in support of Sergeant
 5   Lange obtaining gender affirming surgery; right?
 6   A.   That's correct.
 7   Q.   And you wrote this letter based on your evaluation of her.
 8   And as an -- in a way that you felt that she met the clinical
 9   guidelines to qualify for the surgery; right?
10   A.   That's correct.
11   Q.   And you wrote that letter in your own words; correct?
12   A.   Oh, that's correct.
13   Q.   And based on your own assessment through your treatment of
14   her?
15   A.   Yes.  That's correct.
16   Q.   And after you provided Sergeant Lange with that letter in
17   support of her surgery, around -- what's the date of that
18   letter, actually?
19   A.   October 11th, 2018.
20   Q.   Okay.  And after you provided that letter, did you see
21   Sergeant Lange again?
22   A.   Yes.  So, the letter was written on the 11th of October,
23   and the next session after that would have been October 31st,
24   2018.
25   Q.   And what did you discuss in that October 31st session?
```

1    A.    There was discussion about family relationships, and there

2    was also discussion of social relationships.

3    Q.    Okay.  And at that point, did she believe she was going to

4    get the surgery?

5    A.    That's my understanding.  I don't have a specific note

6    that says that specifically.

7    Q.    Okay.  And what -- when did you see Sergeant Lange after

8    October 31st?

9    A.    November 27th.

10   Q.    And when was the next appointment?

11   A.    After November 27th was January 29th, 2019.

12   Q.    Okay.  And do you have notes from the January 29th -- do

13   you have your notes from the January 29th session?

14   A.    I do.

15   Q.    And can you tell me what you discussed in that session.

16   A.    That was the session where she informed me that she was

17   not able to have the surgery because of insurance issues, and

18   she was dealing with the distress related to that decision.

19   Q.    Can you provide any more detail about the distress that

20   Sergeant Lange was experiencing at that point?

21   A.    I described in my notes she's dealing with grief regarding

22   the cancellation of the surgery.  It was a loss.  I note she

23   was in distress at the time, um, and we spent the majority of

24   the session talking about coping mechanisms, what she needed to

25   do to take care of herself, to stay as functional as she can

1  with the distress.

2  Q.   And as Sergeant Lange's treating psychologist, did you

3  recommend to her in 2019 that she continue with therapy?

4  A.   I gave that -- I put the responsibility on the client, and

5  I did specific -- I did particularly with her also.  I had

6  faith in her ability to determine what she needed.  And if she

7  needed more support from me, she knew I was available.  But she

8  expressed to me that she had good coping mechanisms.  She knew

9  what she needed to do to take care of herself.  So, that's the

10  way we left it.

11  Q.   And at that point, did you believe that talk therapy would

12  help alleviate her gender dysphoria?

13  A.   No.  Not at all.

14  Q.   And why not?

15  A.   The gender dysphoria isn't treated with counseling.  The

16  issues that someone may experience related to the gender

17  dysphoria conflict with friends, family, that can be addressed

18  in therapy, but not the gender dysphoria itself.

19  Q.   What's the treatment for gender dysphoria?

20  A.   Medical intervention.

21  Q.   Which is the hormones and the surgery that we've

22  addressed?

23  A.   The hormones and the surgery, yes.

24  Q.   Thank you.

25           MS. GRANT:  Nothing further at this point.

```
 1                THE COURT:  You may cross-examine.

 2                         CROSS EXAMINATION

 3   BY MR. LAIL:

 4   Q.    Dr. Soety, you are a Ph.D. psychologist; is that right?

 5   A.    That's correct.

 6   Q.    And as you addressed before, you work with patients in

 7   private -- in a private practice setting; right?

 8   A.    That's correct.

 9   Q.    You began seeing Sergeant Lange in June of 2018, after her

10   previous therapist had had a stroke; is that correct?

11   A.    That's my understanding, yes.

12   Q.    And your office provided a treatment summary as part of

13   this case; is that correct?

14   A.    That is correct.

15   Q.    You have a white binder up there that has some exhibits.

16   I would like to ask you about an exhibit, and then we'll go a

17   little further.

18   A.    Okay.

19   Q.    You'll see there are tabs for Plaintiff's Exhibits and

20   then Defendants' Exhibits.

21   A.    Okay.

22   Q.    So in the Defendant one, if you will look at D-4.

23   A.    Repeat again.

24   Q.    D-4, or Number 4 in the Defendants Section.

25   A.    Oh, okay.
```

```
1    Q.    Can you identify what this document is.

2    A.    This is the treatment summary that I wrote that's dated

3    July 27th, 2021.

4    Q.    Okay.  And you prepared this summary yourself?

5    A.    That's correct.

6    Q.    Okay.  And you keep this kind of summary in the normal

7    course of your practice's regularly conducted business

8    activities?

9    A.    Yes, I do.

10   Q.    And you prepared it based on your own session notes with

11   Sergeant Lange; is that correct?

12   A.    That's correct.

13   Q.    And those session notes were taken at the time of your

14   individual therapy sessions with Sergeant Lange; is that right?

15   A.    That's correct.

16   Q.    And you've obviously brought those therapy notes with you

17   today because you've referred to them already; is that right?

18   A.    That is correct.

19           MR. LAIL:  Your Honor, I offer D-4 into evidence.

20           THE COURT:  Why?  She can testify about it.

21           MR. LAIL:  It's simply a reference with the dates as

22   opposed to relying on the memory of the jurors.

23           THE COURT:  Well, I mean, you can -- the date's in

24   the record.  Typically the medical record itself is not

25   admissible when the doctor is here to testify about it.
```

1          MR. LAIL:  Right.  And this is a summary of the

2     session dates.  It is not the session notes themselves.

3          THE COURT:  Where is a copy of the exhibits?

4          MR. LAIL:  I can bring you one here.  Sorry, I

5     thought you had a notebook.

6          THE COURT:  This looks like it's the medical record.

7          MR. LAIL:  Your Honor, my understanding is it was

8     prepared in lieu of providing the actual session notes.

9          THE COURT:  Okay.  But -- again, she's here to

10    testify about her treatment.  And that's the evidence of the

11    treatment.  And this is -- by the way, is -- you're talking

12    about July 27th, 2021?

13         MR. LAIL:  That's right.

14         THE COURT:  I mean, you're free to ask her about it,

15    but that's how this evidence gets in when the doctor is here;

16    not by tendering the medical record itself.

17         MR. LAIL:  Okay.

18         THE COURT:  If you find it necessary to impeach her

19    with it, then maybe that's another question.  But the medical

20    records --

21         MR. LAIL:  I don't think we'll have to go there.

22         THE COURT:  All right.

23    BY MR. LAIL:

24    Q.   Well, let me ask you about some of the dates that are

25    referenced here.  And you've already testified about some of

1    these sessions that I was going to ask you about.

2        I do want to ask a few more questions about the intake

3    summary.  Sorry, the intake session, the first session that you

4    had with her.

5    A.    Okay.

6    Q.    About how long did that session last?

7    A.    55 minutes.

8    Q.    Okay.  And in that session, you addressed the reason

9    Sergeant Lange came in to see you and several areas of

10   background information; is that right?

11   A.    That's correct.

12   Q.    And she wanted continued support as she pursued gender

13   reassignment therapy; is that right?

14   A.    That's correct.

15   Q.    And as you referenced in direct testimony, Sergeant Lange

16   mentioned having several hobbies she engaged in like fishing,

17   golf, beekeeping, that sort of thing; is that right?

18   A.    Yes.  Yes.

19   Q.    Now I'd like to ask you to look at Exhibit D-5, please.

20   A.    Okay.

21          MR. LAIL:  We're bringing you one.

22        (Document provided to the Court at 3:27 p.m.)

23   BY MR. LAIL:

24   Q.    All right.  Dr. Soety, can you identify this document,

25   please.

```
 1   A.    Of course.  This is the letter dated October 11th, 2018,
 2   that I wrote to the surgeon.
 3   Q.    Okay.  And you prepared this letter; correct?
 4   A.    Yes, that's correct.
 5   Q.    And you prepared it based on your knowledge -- the
 6   knowledge you had at the time of the letter regarding Sergeant
 7   Lange's gender dysphoria; is that correct?
 8   A.    That's correct.
 9   Q.    And you keep this kind of letter in the normal course of
10   your practice's regularly conducted business activities?
11   A.    Yes.
12           MR. LAIL:  I'll offer D-5 into evidence.
13           THE COURT:  Any objection to D-5?
14           MS. GRANT:  No objection.
15           THE COURT:  It is admitted without objection.
16       (Defense Exhibit 5 admitted into evidence at 3:27 p.m.)
17   BY MR. LAIL:
18   Q.    I think you see D-5 in front of you.  I would like to
19   refer you to the second paragraph.  And within this
20   paragraph -- and let me just draw that (marking on monitor).  I
21   think everybody can see that.  So, on that line, there is a
22   sentence that begins, "Ms. Lange..."  And you describe
23   Ms. Lange in that sentence as a well adjusted individual; is
24   that right?
25   A.    Yes.
```

1    Q.   And what was that assessment based on?

2    A.   Her level of functioning in the different cognitive -- the

3    different areas of life.

4    Q.   Now, going to the fourth paragraph, if we can page down a

5    little bit.  So, this is the bottom paragraph of the first

6    page.  You note that Sergeant Lange has "good social and family

7    support."  Why did you include that information in this letter

8    to Dr. Lange's surgeon?

9    A.   Because it follows the WPATH Guidelines.

10   Q.   And that support network can help her with any physical or

11   emotional challenges associated with having major surgery; is

12   that correct?

13   A.   Would you repeat the question, please.

14   Q.   Sure.  That support network can help her with any physical

15   or emotional challenges associated with having surgery; is that

16   right?

17   A.   That's correct.

18   Q.   And in the same paragraph, you note her hobbies of

19   fishing, golfing, and beekeeping.  Why did you include those

20   activities in this letter to her surgeon?

21   A.   Because, again, it's following the WPATH Guidelines of

22   what the person's quality of life is.  That there's -- that

23   their level of functioning is good in different quality --

24   different areas of quality of life.

25   Q.   Okay.  And so also in that paragraph you note that

1    Sergeant Lange denies problems in the workplace.  Why was that

2    important to include?

3    A.   Again, it's an area of functioning, her workplace

4    stressors.  If there is significant stress in the workplace,

5    that that could interfere with positive outcome post-surgery.

6    Q.   Okay.  And by this point, you had had multiple sessions

7    with Sergeant Lange before writing this letter; is that

8    correct?

9    A.   "Multiple," meaning more than one?  Yes.

10   Q.   Again, I think based on your treatment summary you had met

11   with her in July, September, and October.  So at least three;

12   is that right?

13   A.   That sounds accurate, yes.

14   Q.   You had a colleague, Krystal Jackson, also write a letter

15   of support for Sergeant Lange; is that correct?

16   A.   That's correct.

17   Q.   And that's also part of the WPATH Standard for having

18   transgender surgery?

19   A.   Yes, it is.

20   Q.   And Dr. Jackson sat in with you on one session for about

21   30 minutes; is that right?

22   A.   That is correct.

23   Q.   You had a good rapport with Sergeant Lange; didn't you?

24   A.   Yes, I did.

25   Q.   And you heard her out on the issues she was dealing with;

1    is that correct?

2    A.    That is correct.

3    Q.    There was not a time that she asked to meet with you and

4    you were not able to meet; is that correct?

5    A.    Not to my knowledge.

6    Q.    In your December 16 of 2019 session -- I believe you

7    touched on this earlier, and it's fine to look at the session

8    notes -- she discussed some insurance issues associated with

9    her legal case; is that correct?

10   A.    That's correct.

11   Q.    But your treatment notes do not include specific details

12   about what she raised; is that correct?

13   A.    That is correct.

14   Q.    And in that December, 2019, visit, Sergeant Lange also

15   addressed certain social events and groups, including her new

16   hobby of tennis; is that right?

17   A.    That's correct.

18   Q.    Why was that notable, that she mentioned this new activity

19   in her life?

20   A.    I specifically asked her about her quality of life and how

21   she was spending her free time.  My main concern was how the

22   depression could have been exacerbated by the inability to have

23   surgery, as she had been looking forward to for an extended

24   period of time.  So, I was mainly looking for her level of

25   functioning and making sure that the depression was not worse.

1    Q.   So, as her treating psychologist, you were making sure

2    that any depression she may have had based on the surgery

3    wasn't seeping over into other areas of her life?

4    A.   That's fair.

5    Q.   Okay.  And since this December, 2019, visit you have not

6    seen Sergeant Lange for therapy; is that correct?

7    A.   That's correct.

8    Q.   And since that December, 2019, visit she has not asked to

9    see you for therapy; is that correct?

10   A.   That's correct.

11   Q.   Thank you, Dr. Soety.

12   A.   Okay.  You're welcome.

13            THE COURT:  Okay.  Any redirect?

14            MS. GRANT:  Just a couple questions.

15                    REDIRECT EXAMINATION

16   BY MS. GRANT:

17   Q.   I probably should have asked you this before, once you

18   took out your notes, so I just want to -- can you explain to

19   the jury what -- in your practice as a clinical psychologist,

20   you know, how you keep your notes.  What you were looking at

21   earlier to answer the questions.

22   A.   Oh, of course.  Of course.  My therapy notes that I write

23   after the session, I make sure to cover the length of the

24   session, whether it was an in-person, any noteworthy behaviors,

25   any noteworthy symptoms.  For example, if somebody expressed

1    suicidality, I will note that.  The main purpose of the therapy

2    session -- or of the therapy notes is to document where we

3    were, what the current problem focus is, and what our plan for

4    the immediate future is.

5    Q.   Okay.  And so you don't write -- when you're taking your

6    notes, they are handwritten notes; right?

7    A.   When I do an intake session, those are handwritten notes

8    as I'm speaking with the individual.

9    Q.   And you don't write down everything that is said.

10   A.   No, I don't.

11   Q.   And you followed this normal practice with Sergeant Lange?

12   A.   Correct.

13   Q.   Your note-taking, right.  And one other thing you

14   mentioned was WPATH.

15   A.   Yes.

16   Q.   But we didn't define what that is.  Can you explain.

17   A.   Oh, okay.  WPATH stands for World Professional Association

18   for Transgender Health.  And this is the organization that has

19   been established to facilitate standard of care regardless of

20   where you are in the world.  It was previously Harry Benjamin,

21   and then it became the World.

22   Q.   And WPATH establishes the standard of care for treatment

23   of individuals with gender dysphoria; right?

24   A.   That is correct.

25   Q.   And that is the standard of care you followed when you

1   determined that Sergeant Lange was an appropriate candidate for

2   the surgery?

3   A.   That's correct.

4   Q.   And can you take a look at D-5, the document that you were

5   just looking at.

6   A.   Oh, okay.

7   Q.   So, when Mr. Lail was up here, he read a sentence that

8   started, "Ms. Lange is an intelligent, well adjusted

9   individual..."  Could you read that entire sentence, please.

10  A.   Oh, sure.

11          "Ms. Lange is an intelligent, well-adjusted

12          individual and her gender dysphoria is the

13          only issue causing her problems in her day to

14          day life."

15  Q.   Okay.  And was this true, that her gender dysphoria was

16  the only issue causing her problems in her day-to-day life

17  throughout your treatment of Sergeant Lange?

18  A.   To the best of my knowledge, yes.

19  Q.   And this is what made Sergeant Lange a good candidate for

20  the surgery; correct?

21  A.   Most definitely, yes.

22  Q.   And is playing tennis an indication that Sergeant Lange

23  did not have gender dysphoria?

24  A.   No, it is not.

25  Q.   Is being good at her job an indication that Sergeant Lange

1    did not have gender dysphoria?

2    A.    No.

3    Q.    Is not going to regular therapy an indication that

4    Sergeant Lange did not have gender dysphoria?

5    A.    No.

6    Q.    Does the distress of having gender dysphoria decrease over

7    time?

8    A.    Not to my knowledge.

9    Q.    Based on your treatment of Sergeant Lange, what could have

10   alleviated the distress that she experiences from having gender

11   dysphoria?

12   A.    Surgery.

13              MS. GRANT:  No further questions.

14              THE COURT:  Anything further for Dr. Soety?

15              MR. LAIL:  No.  Thank you, Your Honor.

16              THE COURT:  I want to be clear, Mr. Lail.  It is true

17   that generally the treatment notes do not go into evidence when

18   the doctor testifies about the treatment.  But based upon the

19   question early in redirect, was there some other reason for

20   offering D-4 that I missed somehow?

21              MR. LAIL:  It's just a -- a record so that it's clear

22   when these sessions took place.  Since the session notes

23   themselves are not admitted.

24              THE COURT:  All right.  It is a summary, including

25   that.  Is there any objection to the admission of Defendant's

1   Exhibit 4?

2          MS. GRANT:  We do object to the admission of this

3   document.  I didn't ask about this one in particular, but I

4   don't believe this is part of the medical record.  I believe it

5   was prepared at the time the medical records were requested in

6   connection with this litigation.  And all of that

7   information -- the dates that they want in the record are

8   already in the record, so it's duplicative.

9          THE COURT:  Well, it is being offered to establish

10  the dates of individual therapy sessions.  And this

11  indicates -- and tell me if this is correct, Dr. Soety -- that

12  the dates of your individual therapy sessions were July 19,

13  2018; September 21, 2018; October 4, 2018; October 31st, 2018;

14  November 27, 2018; January 29, 2019; and December 16, 2019?

15         THE WITNESS:  That is correct.

16         THE COURT:  Okay.  So, I think that establishes the

17  purpose for which -- for which the exhibit was offered.

18         Thank you, Dr. Soety.  You may step down.

19         May she be excused?

20         MR. LAIL:  Yes, Your Honor.

21         MS. GRANT:  Yes, Your Honor.

22      (Witness was excused at 3:40 p.m.)

23         THE COURT:  And is our next witness

24  Dr. Bluebond-Langner?

25         MR. POWELL:  It is, Your Honor.  We call by video

1    Dr. Bluebond-Langner.

2         Your Honor, earlier this morning you asked us how

3    long it is, and we gave you an inaccurate number.  It's about

4    an hour and change.  I think we told you it was under 40

5    minutes.  In case that affects your thinking about the balance

6    of the day, I wanted you to know that.

7         THE COURT:  Just that it's 25 minutes longer than I

8    thought.  But nothing other than that.

9         As I mentioned, ladies and gentlemen, taking a

10   videotaped deposition is a proper way to preserve testimony, as

11   we lawyers call it.  The normal way to say it is using

12   testimony.  But to facilitate the doctor's schedule, anybody's

13   schedule, this is allowed.  The witness will be testifying just

14   as if she were on the witness stand.

15        So, with that, you may proceed.

16             RACHEL BLUEBOND-LANGNER, M.D.

17   presented by video deposition at 3:41 p.m., having first been

18   duly sworn, testified as follows:

19        (Video of Dr. Bluebond-Langner began playing at 3:42 p.m.)

20        "*VIDEOGRAPHER:  ...12:59 p.m. eastern daylight time on*

21        *Friday, September 23rd, 2022.*

22         "*This is media unit one of the video-recorded*

23        *deposition of Rachel Bluebond-Langner, M.D. in the matter*

24        *of Anna Lange versus Houston County, Georgia, et al., filed*

25        *in the United States District Court, Middle District of*

1      *Georgia.*

2           *"This deposition is being held at NYU Langone located*

3      *at 424 East 34th Street in New York, New York.*

4           *"My name is Paul Baker, and I am the videographer.  The*

5      *court reporter is Todd DeSimone, and we are both from*

6      *Veritext.*

7           *"May I please have an introduction from counsel*

8      *beginning with the noticing attorney.*

9                *MR. POWELL:  "Wes Powell of Willkie, Farr &*

10     *Gallagher, on behalf of the plaintiff.*

11               *MR. LAIL:  "And Patrick Lail on behalf of*

12     *defendants.*

13          *"Will the court reporter swear in the witness.*

14               *COURT REPORTER:  "Would you raise your right*

15     *hand.  Do you solemnly swear that the testimony you are*

16     *about to give will be the truth, the whole truth, and*

17     *nothing but the truth, so help you, God?*

18               *THE WITNESS:  "I do.*

19                    *EXAMINATION BY MR. POWELL:*

20     *"Q.   Good afternoon, Dr. Bluebond-Langner.  I'm Wes*

21     *Powell.  We have met before, but I'm one of the lawyers*

22     *for the plaintiff in this case, Sergeant Anna Lange, and*

23     *I'm going to be asking you some questions on her behalf*

24     *today, and so we thank you in advance both for hosting us*

25     *here at NYU Langone and also for your time and*

1      *participation.*

2          *"Some of my questions and your answers will be played*

3      *for a jury in the trial in this case that takes place next*

4      *week in Macon, Georgia.  Do you understand that?*

5      *"A.  Yes.*

6      *"Q.  And counsel for the defendants also has a right to*

7      *ask you questions when I finish.  And you understand that*

8      *as well?*

9      *"A.  Yes.*

10     *"Q.  If I don't ask -- if you don't understand a question*

11     *that I ask today, just please let me -- ask me to try*

12     *again and I will do my best.*

13         *"Where do you currently work?*

14     *"A.  I work at NYU Langone Health.*

15     *"Q.  And what is NYU Langone Health?*

16     *"A.  It is an academic medical center in New York City.*

17     *"Q.  And what is your job here at NYU Langone?*

18     *"A.  I'm an associate professor of plastic and*

19     *reconstructive surgery, and I am the co-director of*

20     *transgender surgery services.*

21     *"Q.  And are you also a -- as part of that, are you a*

22     *practicing surgeon?*

23     *"A.  Yes.*

24     *"Q.  Who generally are the patients that you treat?*

25     *"A.  I treat transgender patients.  My practice is*

1        dedicated to gender affirming surgery.

2        "Q.  I will come back for a bit more information on your

3        background.

4           "Do you know the plaintiff here, Sergeant Anna Lange?

5        "A.  Yes, I saw her in consultation for surgery in 2018.

6        "Q.  And that's how you met her?

7        "A.  Yes.

8        "Q.  And I take it that's the only relationship that you

9        have with her?

10       "A.  Correct.

11       "Q.  And did you say that occurred back in November, 2018?

12       "A.  Correct.

13       "Q.  Did you understand that Sergeant Lange was seeking

14       your medical advice when she visited you?

15       "A.  Yes.

16       "Q.  And did you provide medical advice to her?

17       "A.  Yes.

18       "Q.  And what was the nature of the medical advice you

19       provided Sergeant Lange?

20       "A.  She presented to me with gender dysphoria, and one of

21       the treatments for gender dysphoria is gender affirming

22       surgery.  In her case it would be vaginoplasty, and we

23       recommended vaginoplasty for her.

24       "Q.  And you mentioned gender dysphoria.  For the benefit

25       of the jury, can you just give us your working definition

1    of that.

2    "A.   Sure.  When somebody's internal sense of gender

3    identity does not align with the sex that they were

4    assigned at birth.  So, in Sergeant Lange's case she was

5    assigned male at birth and identifies and lives her life

6    as a female.

7    "Q.   And are there symptoms of gender dysphoria?

8    "A.   Yes.  There are accepted definitions, and Sergeant

9    Lange meets those definitions.  She, again, has the

10   significant distress from an incongruence in her gender

11   identity and her anatomy.

12   "Q.   How common is gender dysphoria, based on your

13   experience as a surgeon?

14   "A.   It's estimated to be anywhere from .5 to 1 percent of

15   the population.

16   "Q.   And I think you made a reference to this, but are

17   there guidelines that you follow as a surgeon in assessing

18   and treating a patient with gender dysphoria?

19   "A.   Yes.  There are ICD-10 codes or definitions.  There

20   are as well the WPATH, or the World Professional

21   Association of Transgender Health, Guidelines.

22   "Q.   Is that -- are those guidelines sometimes referred to

23   as standard of care?

24   "A.   Correct.

25   "Q.   What's the purpose of a standard of care or the

1    *guidelines that you referenced?*

2    *"A.  They help professionals who treat gender dysphoria*

3    *provide the optimal care for the transgender patient.*

4    *"Q.  And you mentioned the WPATH organization.  Can you*

5    *tell us what that is.*

6    *"A.  It is a multidisciplinary group of professionals that*

7    *treat all aspects of not only gender dysphoria but the*

8    *transgender patient.  So, mental health professionals,*

9    *endocrinologists, primary care physicians, surgeons,*

10    *social workers, even physical therapists are members of*

11    *the WPATH.*

12    *"Q.  And am I correct that within all of those roles that*

13    *you just described, that WPATH provides a standard of care*

14    *that you follow at least in part as a surgeon?*

15    *"A.  Yes.*

16    *"Q.  And is it in your view a generally accepted standard*

17    *of care?*

18    *"A.  Yes, it is the standard of care that surgeons follow,*

19    *that insurances also follow.*

20    *"Q.  Why is this the generally accepted standard of care,*

21    *the WPATH standard?*

22    *"A.  It is written by people who have significant*

23    *experience treating gender dysphoria and transgender*

24    *individuals, and it is evidence-based as well.*

25    *"Q.  Does the standard of care provide guidance on how to*

1       diagnose gender dysphoria?

2       "A.   They provide some guidance.   They refer back, though,

3       to the ICD-10 and DSM-V and other governing bodies.   So,

4       because it's a world professional association, there may

5       be some differences.

6       "Q.   What are the -- you've referred to two other sort of

7       sources of standards.   Can you just tell us what those

8       are.

9       "A.   Sure.   One is the International Coding and

10      Diagnostics, which is ICD-10.   And that is what we use --

11      we -- in medicine we offer a diagnosis and then a

12      treatment.   And the DSM is a psychiatric diagnosis, which

13      gender dysphoria is -- may be removed from.

14      "Q.   I understand.   And do the various guidance sources

15      that you follow, do they provide guidance on what health

16      care is medically necessary to treat gender dysphoria?

17      "A.   They do.   They set forth guidelines, not only for the

18      diagnosis but also the treatment.

19      "Q.   And did you follow that guidance when treating

20      Sergeant Lange?

21      "A.   Yes.   She met the criteria.

22      "Q.   So how did you apply it in her case?   And I should

23      say, I understand you have in front of you what file you

24      have maintained from Sergeant Lange's visit to you.   To

25      the extent that you need to review it to refresh your

1    *recollection in response to questions, please do that.*

2    *"A.   So, when she came to us in 2018, she had a very*

3    *typical presentation.  She had gender dysphoria, and she*

4    *had sought treatment for her gender dysphoria.  She had*

5    *been living as a woman for over a year, and the minimum is*

6    *a year.*

7    *"She had been taking estrogen to treat her gender*

8    *dysphoria, which provided some alleviation but not*

9    *complete resolution of her gender dysphoria.  It was clear*

10    *that she had no other mental health conditions.  She was*

11    *of capacity to make informed decisions about her care.*

12    *She understood the implications of surgery, the*

13    *irreversible nature and the impact it would have on*

14    *fertility.*

15    *"And she also had supporting letters from mental health*

16    *professionals who had explored her history of gender*

17    *dysphoria, which dates back to actually her early*

18    *childhood -- she was ten or eleven -- as well as the*

19    *therapy that they had done to explore the appropriate*

20    *treatment path for her.*

21    *"Q.   So, you referenced other professionals that she had*

22    *consulted before coming to you.  And, again, you can --*

23    *you can refer to your file as necessary.  But was one of*

24    *those a psychologist named Elizabeth Soety?*

25    *"A.   Yes.*

```
 1        "Q.  And what information did you receive from Dr. Soety?
 2        "A.  So, she provided a letter which, again, was a
 3        detailed history of her gender history and gender
 4        identity.  And also attested to the fact that there were
 5        no other confounding mental health conditions.  And also
 6        discussed the significant distress that the gender
 7        dysphoria and gender incongruence caused.  So, the lack of
 8        alignment of her anatomy with who she is and how she
 9        identifies, causing significant depression and anxiety and
10        compromising overall wellbeing.
11        "Q.  Anything else that you recall from the information
12        that Dr. Soety provided you?
13        "A.  She also agreed that not only was Anna capable of
14        making a decision to proceed with surgery, but she also
15        supported this as a next step in the treatment of gender
16        dysphoria.
17        "Q.  Did you also receive a letter or a document from a
18        Krystal Jackson?
19        "A.  Yes.
20        "Q.  And am I correct that Dr. Jackson was another mental
21        health professional who evaluated her?
22        "A.  Yes.
23        "Q.  And what did you learn from the material that
24        Dr. Jackson supplied you?
25        "A.  She again reinforced the diagnosis of gender
```

1       dysphoria and the significant distress that it caused Anna

2       in the form of depression and anxiety.  And that Anna had

3       had other treatments which helped but did not completely

4       treat the gender dysphoria.  And, again, supported surgery

5       as the next step in the treatment.

6       "Q.  Anything else that -- other than what you've just

7       testified to that you learned from, I believe it was

8       Dr. Jackson?

9       "A.  (Shaking head in the negative.)

10      "Q.  Okay.  Sorry, you have to say it out loud.

11      "A.  No.

12      "Q.  And next did you -- did you receive correspondence

13      from a Dr. Barry Johns?

14      "A.  Yes.

15      "Q.  And who is Dr. Johns?

16      "A.  He is the endocrinologist who provides hormones or

17      estrogen for Anna.

18      "Q.  And what information did you review that Dr. Johns

19      had submitted to you?

20      "A.  Um, so, she is -- Dr. Johns provides not only

21      estrogen but also androgen blockade.  And he also

22      discusses the diagnosis of gender dysphoria, that she has

23      it, she has gender dysphoria.  He treats her for her

24      gender dysphoria with hormones, but this again is not in

25      and of itself adequate treatment, and that surgery is the

         1          next step.  And she would be -- should she have surgery,

         2          she would be able to come off of her androgen blocker,

         3          which has other side effects that are not necessarily

         4          benign.  And that she would be able to reduce her estrogen

         5          level and, of course, improved mental health.

         6          "Q.  And did you rely, at least in part, on the

         7          information that you received from Drs. Soety, Jackson,

         8          and Johns in making your recommendations of the care that

         9          Sergeant Lange needed?

        10          "A.  Yes, we approached this as a multidisciplinary team.

        11          "Q.  Did you also base your assessment of her care needs

        12          on your own consultation with her in November of 2018?

        13          "A.  Yes.

        14          "Q.  How many times did you meet with her?

        15          "A.  Once.

        16          "Q.  Is it typical for you to evaluate a patient who is

        17          seeking -- potentially seeking surgery for gender

        18          dysphoria based on a single consultation?

        19          "A.  It can be.

        20          "Q.  Why does it not require more consultations than that?

        21          "A.  Again, the -- when somebody presents with very clear

        22          symptoms and has seen other professionals, such as two

        23          mental health professionals and an endocrinologist or

        24          somebody providing hormones, it is not uncommon for us to

        25          confirm the diagnosis during the consultation and explore

1          options.

2          "Q.  And you testified earlier that the treatment that you

3          recommended for her was vaginoplasty; is that correct?

4          "A.  Correct.

5          "Q.  Just very briefly, what is vaginoplasty?

6          "A.  Vaginoplasty turns male genitalia -- so, penis and

7          scrotum -- into a vulva and vagina.  So, female genitalia.

8          "Q.  And is -- is vaginoplasty sometimes referred to as

9          'bottom surgery'?

10         "A.  Yes.

11         "Q.  If I refer to 'bottom surgery' for the balance of

12         this, you'll understand what I mean.

13         "A.  Yes."

14         "A.  As we pointed out, she had a clear diagnosis of

15         gender dysphoria.  She had taken hormones and still had

16         symptoms of gender dysphoria, significant distress.  And

17         we know that individuals with gender dysphoria who have

18         ongoing distress will benefit from surgery -- so, bottom

19         surgery -- as the next step in their treatment.

20         "Q.  And I think you were referring to this, but how did

21         you expect that bottom surgery would impact her gender

22         dysphoria?

23         "A.  We expect complete or near-complete resolution of the

24         gender dysphoria and the related symptoms -- depression,

25         anxiety, difficulty navigating the world.

1      "Q.  And what was -- your expectation about that benefit

2      of having surgery for Sergeant Lange, what was that based

3      on?

4      "A.  My own experience as well as data in the literature

5      to support that.

6      "Q.  Is the surgery that you recommended to Sergeant Lange

7      cosmetic surgery?

8      "A.  No.

9      "Q.  Why is it not cosmetic surgery?

10      "A.  It is reconstructive surgery where she has anatomy

11      that is incongruent with her identity, and it is medically

12      necessary.  There is a medical diagnosis, and this is the

13      known treatment for it.

14      "Q.  At the time that you saw her, in addition to surgery

15      which you recommended, did you recommend any other

16      treatment for her gender dysphoria?

17      "A.  No.

18      "Q.  For example, did you recommend talk therapy by a

19      psychiatrist or a psychologist?

20      "A.  No, she was in therapy at the time.

21      "Q.  Did -- why did you not suggest any other forms of

22      care apart from surgery?

23      "A.  She had explored the other forms of care and still

24      had persistent gender dysphoria.

25      "Q.  So, when did you recommend that she have surgery?

1          *What I mean is, soon?  Sooner rather than later?  What was*

2          *your view of how quickly she should have the surgery at*

3          *the time?*

4          *"A.  We booked her within six months of seeing her.*

5          *"Q.  Did you -- were you of the view that she needed to*

6          *have the surgery imminently?*

7          *"A.  I don't think she needed to have the surgery the next*

8          *day.  I do think she needed to have it within a year of*

9          *the diagnosis.*

10         *"Q.  Did you think that delaying the surgery further would*

11         *impact her health?*

12         *"A.  It causes ongoing psychological distress.  It causes*

13         *ongoing depression and anxiety.  And we know that those*

14         *have physiologic implications for somebody's health and*

15         *wellbeing.  And that chronic depression and anxiety*

16         *shortens lives.*

17         *"Q.  And just to close this out, at the time that you*

18         *recommended surgery to her, to Sergeant Lange, did you*

19         *think there was any other way to alleviate her gender*

20         *dysphoria then?*

21         *"A.  No.*

22         *"Q.  And when did you schedule the surgery for her?  The*

23         *date of the surgery.*

24         *"A.  January of 2019.*

25         *"Q.  And were you prepared and available to perform it*

1          then?

2          "A.   Yes.   She was posted in the operating room.

3          "Q.   And did the surgery happen then?

4          "A.   No.

5          "Q.   Why not?

6          "A.   The insurance authorization was denied.   The

7          predetermination.

8          "Q.   Do you have an understanding as to why it was denied?

9          "A.   She -- we were told that she had gender affirming

10         surgery benefits.   When we went to authorize it, we were

11         told that this was a plan exclusion, that her employer had

12         excluded it from the plan.

13         "Q.   Dr. Bluebond-Langner, would you agree with me that

14         we're about -- just short of about four years since you

15         recommended surgery for Sergeant Lange?

16         "A.   Yes.

17         "Q.   And to be clear, you haven't performed that surgery

18         on her as of today?

19         "A.   No.

20         "Q.   And do you remain willing and able to do it?

21         "A.   Yes.

22         "Q.   Okay.   I'm now going to get into some more mundane

23         topics, walk you through the history of your life.   No.

24         At least your education.   Did you go to college?

25         "A.   Yes.

1          "Q.   And where did you go?

2          "A.   I went to Rutgers University.

3          "Q.   In New Jersey?

4          "A.   Yes.

5          "Q.   Go, New Jersey!  Did you go to medical school?

6          "A.   Yes, I went to Johns Hopkins in Baltimore.

7          "Q.   And you -- did you receive that degree in 2003?

8          "A.   Yes.

9          "Q.   And did you receive more medical training after

10         medical school?

11         "A.   Yes.  I went to the Johns Hopkins/University of

12         Maryland combined plastic surgery residency program in

13         Baltimore.

14         "Q.   And how long did that residency last?

15         "A.   Eight years.

16         "Q.   Have you done fellowships since then?

17         "A.   Yes.  I did a fellowship in craniofacial and

18         microsurgery in Mexico City from 2011 to 2012.

19         "Q.   Do you have any board certifications?

20         "A.   Yes.  I am board certified by the American Board of

21         Plastic Surgery and received that certification in 2013.

22         "Q.   Have you published articles on the surgical treatment

23         of gender dysphoria?

24         "A.   Yes.

25         "Q.   Ballpark, how many?

1       "A.   On gender affirming surgery specifically, I don't

2    have specific count.   Generally in academia, over 90

3    publications in peer-reviewed journals.

4    "Q.   So that's all told of your writings?

5    "A.   Yes.

6    "Q.   Some of which were about gender affirming care --

7    "A.   Many.

8    "Q.   -- but you don't have a specific recollection of

9    that?

10    "A.   Correct.   Many of which.

11    "Q.   What are some of the topics that you've written

12    about?

13    "A.   Patient reported outcomes.   Surgical techniques and

14    innovations.   Surgical complications.

15    "Q.   And all of that -- is all of that with respect to

16    forms of gender confirming care?

17    "A.   Yes.

18    "Q.   Do any -- did any of those articles concern

19    vaginoplasty?

20    "A.   Yes.

21    "Q.   Ballpark, how often have you written in peer-reviewed

22    journals on the subject of vaginoplasty?

23    "A.   I am not sure how often.   We have an active, ongoing

24    research team.   We have three people, and we're constantly

25    publishing.   This year alone there will be over seven

1    articles on vaginoplasty specifically and many more on

2    gender affirming surgery.

3    "Q.  And is all of the writing on surgery that you're

4    currently doing or have done at least in the recent past,

5    is all of that -- does all of that concern surgery for

6    transgender individuals?

7    "A.  Yes.

8    "Q.  What are -- just give me a sense of what are some of

9    the peer-reviewed journals that you've published in.

10   "A.  _Plastic and Reconstructive Surgery_, which is the main

11   plastic surgery journal.  _Journal of Urology_, which is the

12   main urologic journal.  _International Journal of_

13   _Transgender Health_.  Those are the three main journals.

14   And then there are others like _Annals of Plastic Surgery_.

15   I've lost track.  I would have to look at my CV, but those

16   are the big journals and ones that accept our material.

17   "Q.  Is it fair to say that these are leading journals --

18   "A.  Yes.

19   "Q.  -- in the area that you practice?

20   "A.  Yes.

21   "Q.  And are these widely consulted by practitioners in

22   your field?

23   "A.  Yes.  These are the most referenced journals with the

24   highest index.

25   "Q.  And do you consult them yourself in your practice?

1          "A.   Yes.  We read them every month.

2          "Q.   Do you give speeches, presentations on the treatment

3          of gender dysphoria?

4          "A.   Yes.  Not the treatment of gender dysphoria as a

5          whole, but specifically surgery as one of the treatments

6          for gender dysphoria.

7          "Q.   And if you could, just give me a sense of the topics

8          that you've spoken on in that regard.

9          "A.   Vaginoplasty, phalloplasty, and chest

10         masculinization -- or what's called gender affirming

11         mastectomy -- and then breast augmentation.

12         "Q.   In what forums have you given these speeches?

13         "A.   The annual -- all of the annual meetings for plastic

14         and reconstructive surgery, the urology meetings as well,

15         and then the WPATH or the World Professional Association

16         of Transgender Health meetings, as well as other, um,

17         continuing medical education courses.

18         "Q.   And are these forums in the United States?

19         "A.   Um, for the most part, yes.  Occasionally abroad.

20         "Q.   Where abroad have you spoken?

21         "A.   Ghent, the University of Ghent.  And when the meeting

22         occurred -- when the World Professional Association of

23         Transgender Health Meeting occurred in Montreal and Buenos

24         Aires, there.

25         "Q.   Do you teach courses in medical school?

1          "A.   Not from -- we will give lectures in the medical

2     school, and we teach residents.   So, I always operate with

3     at least one if not multiple residents.   And that is how

4     residents learn.

5          "Q.   So it's an educational function?

6          "A.   Right.

7          "Q.   And what are -- you've mentioned that you lecture at

8     medical -- at the medical school.   Is that at NYU's

9     medical school?

10          "A.   Yes.

11          "Q.   What are the subjects you lecture on?

12          "A.   Gender affirming surgery, but I will also be visiting

13     professor in other departments of plastic surgery that

14     have residents and medical students.

15          "Q.   Do you, yourself, participate in continuing education

16     programs on the issue of gender dysphoria -- or surgery

17     for gender dysphoria, I should say?

18          "A.   Yes.

19          "Q.   And what are some of the courses that you take?

20          "A.   Um, so, there's the Fenway Institute course.   There

21     will be panels at different meetings.   The American

22     Association of Plastic Surgery will have a panel.   The

23     American Society for Reconstructive Microsurgery will have

24     a panel.   The American Society of Plastic Surgery will

25     have a panel.   The World Professional Association of

1           *Transgender Health has a 2-day surgeons course.  And I*

2           *attend all of those.*

3           *"Q.  When did you begin actually practicing as a surgeon*

4           *specializing in gender confirming surgeries?*

5           *"A.  I began practicing as a plastic surgeon in July of*

6           *2012.  My first gender affirming surgery that I performed*

7           *was in 2013.  My practice slowly grew to be 50 percent*

8           *gender affirming surgery, and when I moved to New York in*

9           *2017, it was nearly 90 percent of my practice.  I was*

10          *recruited to NYU to start the gender affirming surgery*

11          *program here, and now it is 100 percent of my practice.*

12          *"Q.  And just so that we have the timeline, when you began*

13          *as a surgeon in 2012, was that at the University of*

14          *Maryland?*

15          *"A.  Yes.*

16          *"Q.  And when did you move here to NYU Langone?*

17          *"A.  January of 2017.*

18          *"Q.  So all together you've been performing gender*

19          *confirming surgeries since 2012?*

20          *"A.  '13.*

21          *"Q.  '13.  And as it stands now, I think you mentioned*

22          *this, but what percentage of your surgical work is for*

23          *gender affirming care?*

24          *"A.  100.*

25          *"Q.  How many gender affirming surgeries have you*

1          performed in your career, which I guess is since 2013?

2          "A.  Over 2,000.

3          "Q.  And ballpark, how many of those specifically were

4          vaginoplasty and related care?

5          "A.  Over 500.

6          "Q.  And got it.  So all together about 2,000 surgeries

7          that are treatment for gender dysphoria?

8          "A.  Correct.

9               MR. POWELL:  "Why don't we take a break.  I may

10     be done.  But we'll -- we'll just take a couple minutes to

11     caucus with my colleagues and -- and then it may be -- you

12     may be out.  "VIDEO TECH:  Please stand by.  The time is

13     1:29 p.m.  We are off the record.

14        "The time is 1:37 p.m.  We are back on the record.  You

15     may proceed.

16          MR. POWELL:  "Oh, we're all done with questions.

17   Thank you.  Thank you for your time.  I reserve the right to

18   redirect.

19               EXAMINATION BY MR. LAIL:

20     "Q.  Good afternoon, Dr. Bluebond-Langner.

21     "A.  Hi.

22     "Q.  I am going to ask about several categories of

23     information that you covered with Mr. Powell, and I will

24     just get into a little more detail about some of those

25     things.  So, first, in terms of your background, you are a

```
 1          surgeon; correct?
 2          "A.   Yes.
 3          "Q.   And you testified that you had had some residency and
 4          fellowship time, eight plus years of training in plastic
 5          surgery specifically; correct?
 6          "A.   Correct.
 7          "Q.   And you have not engaged in similar training in
 8          psychology; is that correct?
 9          "A.   Correct.
10          "Q.   And you have not engaged in similar training in
11          psychiatry; is that correct?
12          "A.   Correct.
13          "Q.   In fact, the articles and speeches that you
14          identified in response to Mr. Powell's questions have to
15          do with surgery; correct?
16          "A.   Correct.
17          "Q.   And you don't hold yourself out as a psychologist or
18          a psychiatrist; is that correct?
19          "A.   Correct.
20          "Q.   Mr. Powell covered some statistics with you in terms
21          of the number of procedures you've done in your career.
22          And my understanding from other documents in the case is
23          that you perform about 300 sex change procedures per year;
24          is that right?
25          "A.   More than that now.
```

1          "Q.   Oh, how many is it now?

2          "A.   Probably closer -- 350 to 400.

3          "Q.   Okay.  So, your focus, then, as a surgeon is on the

4          patient's surgical procedure; is that right?

5          "A.   Uh-huh.

6          "Q.   Is that a yes?

7          "A.   Yes.

8          "Q.   If you would, just answer verbally.  Thank you.

9          "A.   Yes.

10         "Q.   You see the patient for one or more pre-surgical

11         consults; right?

12         "A.   Correct.

13         "Q.   And then you perform the surgery; is that right?

14         "A.   Correct.

15         "Q.   And then after the surgery, you may have several

16         post-surgical check-ins to see how things are going; is

17         that right?

18         "A.   Correct.

19         "Q.   In your experience, is sex change surgery -- does

20         that lead to a good outcome for most patients?

21         "A.   Yes.

22         "Q.   But there are some for whom surgery does not

23         alleviate their symptoms; is that correct?

24         "A.   We have not -- what symptoms are you asking about?

25         "Q.   Symptoms of gender dysphoria, the anxiety,

1     depression, that sort of thing.

2     "A.   I would say that for relieving the symptoms of gender

3     dysphoria, in our experience -- and we follow our patients

4     for many years, we see them every week, and then at six

5     months, one year, and then we see them back every year --

6     resolution of the gender dysphoria is greater than

7     95 percent.

8     "Q.   Okay.  In your testimony in response to Mr. Powell's

9     questions, you identified several other treatments for

10    gender dysphoria, such as living in the gender role in

11    which the person identifies; is that correct?

12    "A.   Correct.

13    "Q.   It also includes psychotherapy; is that right?

14    "A.   Correct.

15    "Q.   And it also includes taking hormones; is that right?

16    "A.   Correct.

17    "Q.   You saw Sergeant Lange for treatment on one occasion

18    in November of 2018; is that right?

19    "A.   Correct.

20    "Q.   And your colleague, Dr. Lee Zhao, saw Sergeant Lange

21    on that same date, November 13 of 2018; is that correct?

22    "A.   Correct.

23    "Q.   Dr. Zhao is a urologist; is that right?

24    "A.   Correct.

25    "Q.   And he would have helped you with the surgery on

1      Sergeant Lange if the surgery had proceeded; is that

2      right?

3      "A.  Correct.

4      "Q.  He ended up seeing Sergeant Lange before you did on

5      November 13 of 2018; is that right?

6      "A.  We generally see -- I am not sure.  Temporally it was

7      very close.  We see each other -- she was seen in the

8      morning, Tuesday morning.

9      "Q.  And did you have the benefit of seeing Dr. Zhao's

10     notes before you saw Sergeant Lange?

11     "A.  No.

12     "Q.  I am going to hand you what is marked for

13     identification as Defendants' Exhibit 8.  This is

14     premarked and the black-out stuff has to do with details

15     about Sergeant Lange that the parties agreed to redact.

16     That's why there's some blacking-out compared to what you

17     may remember from what your notes look like.

18         "Can you identify what I've handed you and what has

19     been marked for identification as Defendants' Exhibit 8.

20     "A.  Sure, this was my note after seeing her in November

21     of 2018.

22     "Q.  And notes like this are kept in the normal course of

23     NYU's regularly conducted business activity; is that

24     right?

25     "A.  Correct.

1          "Q.   And these notes were made at the time the services

2     were rendered or shortly thereafter; is that right?

3          "A.   Correct.

4          "Q.   And those notes were made by you based on your

5     knowledge of the consultation you had with Sergeant Lange;

6     is that right?

7          "A.   Correct.

8               MR. LAIL:  "I offer Defendants' Exhibit 8 into

9     evidence.

10              MR. POWELL:  "I have no objection.

11         "BY MR. LAIL:

12         "Q.   Dr. Bluebond-Langner, if you will notice in the

13    bottom right corner there are some numbers.  If you would

14    look at the Page Number 2418.

15         "A.   Um-hum.

16         "Q.   And about three-fourths of the way down the page

17    there is a list of medications.

18         "A.   Um-hum.

19         "Q.   This is the list of medications that Sergeant Lange

20    told you she was taking at the time of your consult with

21    her; is that correct?

22         "A.   Uh-huh, yes.

23         "Q.   The first one listed is Estradiol.  That is a female

24    hormone; is that correct?

25         "A.   Correct.

1       "Q.   And one side effect of Estradiol is increased anxiety

2       or depression; is that right?

3       "A.   Not that I'm aware of.

4       "Q.   Okay.   The next one listed is Lunesta.   That one is a

5       sleep aid; is that correct?

6       "A.   Correct.

7       "Q.   So, she was taking that at the time she came to see

8       you in November of 2018; right?

9       "A.   Correct.

10      "Q.   Spironolactone, the next one, is something that

11      lowers testosterone; right?

12      "A.   Blocks it, yes.

13      "Q.   Blocks testosterone.   You testified about that in

14      response to questions from Mr. Powell.

15      "A.   Correct.

16      "Q.   And then the last one, Vyvanse, is a medication for

17      ADHD; is that right?

18      "A.   Correct.

19      "Q.   And ADHD is attention deficit hyperactivity disorder;

20      correct?

21      "A.   Correct.

22      "Q.   If you will, look to the next page, 2419.   After the

23      vital signs that are at the top of the page, the next

24      section is a Review of Systems; is that correct?

25      "A.   Correct.

1         "Q.  And most of these are physical, such as respiratory

2         or musculoskeletal.  Would you agree with that?

3         "A.  Correct.

4         "Q.  There is one entry for psych.  What does the

5         abbreviation "PSYCH" stand for?

6         "A.  Psych.  Psychiatric.

7         "Q.  And what's noted there is "alert and oriented times

8         three, conversant."

9            ""Oriented times three" means she was oriented to

10        person, time and place; is that correct?

11        "A.  Correct.

12        "Q.  So, she had told you she was Anna Lange, she knew the

13        time of day, and she knew where she was; is that correct?

14        "A.  Correct.

15        "Q.  Also on Page 2419, the same page you're on, there is

16        a narrative at the bottom that reviews the risks and

17        benefits of surgery.  And it says they were reviewed at

18        great length; is that right?

19        "A.  Correct.

20        "Q.  And if you want, I will give you a second to review

21        that.  I will ask you some questions about that.

22        "A.  Okay.  I --

23        "Q.  You're familiar with it?

24        "A.  Very familiar, thank you."

25        "Q.  If you will turn now to 2420 at the top, you reviewed

1      *what you called the probability of success for the*

2      *surgery; is that right?*

3      "A.   *Correct.*

4      "Q.   *What amounts to success?*

5      "A.   *There are many ways to define success.  From a --*

6      *from a strictly surgical standpoint, success is the*

7      *completion of the operation, and the patient is alive at*

8      *the end of the surgery.  We go beyond that and we say that*

9      *there are no complications in the postoperative period,*

10     *and that there is patient satisfaction, and that there is*

11     *resolution of the diagnosis that we sought to treat.*

12     "Q.   *Okay.  So, what is the definition of success that you*

13     *had in mind as you discussed with Sergeant Lange the*

14     *probability of success for the planned surgery?*

15     "A.   *Repeat the question, what --*

16     "Q.   *Sure.  I think you defined success could be just the*

17     *surgery happens and the patient is still alive.  But*

18     *you've also added some other things.  What definition of*

19     *success did you have in mind when you discussed this with*

20     *Sergeant Lange?*

21     "A.   *So, we anticipate that she goes through surgery, that*

22     *she does not have postoperative complications, and that*

23     *she has resolution of her gender dysphoria, and she's*

24     *pleased with the outcome.*

25     "Q.   *When it says 'probability of success,' did you give a*

1    *percentage to Sergeant Lange?*

2    *"A.  I don't recall.*

3    *"Q.  Do you generally give a percentage of success to a --*

4    *a percentage in the probability of success part of your*

5    *discussion with patients?*

6    *"A.  Not unless specifically asked for numbers, we don't.*

7    *We discuss the purpose of the operation, the potential*

8    *complications, the expected postoperative course and*

9    *outcome.*

10   *"Q.  Okay.  Would you agree that medical records are*

11   *intended to be accurate -- an accurate record of the*

12   *encounter with the patient?*

13   *"A.  Yes.*

14   *"Q.  And a nurse once told me if it's not documented, it*

15   *didn't happen.  Is that an aphorism in the medical*

16   *community?*

17   MR. POWELL:  *"Objection.*

18   *"A.  Not that I am aware of.*

19   *"Q.  Would you agree that it's important for insurance*

20   *purposes and for professional malpractice issues of, you*

21   *know, patients being upset and perhaps suing the surgeon,*

22   *that it's -- it's important to have an accurate record of*

23   *the encounter with the patient?*

24   *"A.  Sure.*

25   MR. POWELL:  *"Objection.*

1    "BY MR. LAIL:

2    "Q.   Reviewing Exhibit D-8, would you agree that these

3    notes do not reflect discussion of Sergeant Lange's

4    emotional state at the time she saw you in November of

5    2018?

6    "A.   I guess I'm unclear on that question.   What you mean

7    by 'emotional state.'

8    "Q.   Well, you've described that gender dysphoria is

9    associated with a sense of anxiety, depression, you know,

10   other emotional issues related to one's sense of

11   self-being not aligned with one's physical anatomy.   And

12   so my question is, is there anywhere in these notes you

13   can point to me where that was discussed between you and

14   Sergeant Lange?

15   "A.   So, when people come to the doctor's office for any

16   surgery, any medical issue -- cancer, let's say --

17   distress is common.   Anxiety, depression, they accompany

18   the diagnosis, be it cancer or, in this case, gender

19   dysphoria.

20      "I am not treating the -- I don't -- I never claim to

21   treat the depression or the anxiety.   I treat the

22   diagnosis, which is gender dysphoria.   It's a medical

23   condition.   It's been removed, actually, from the _DSM_,

24   which is the psychiatric literature, and now called

25   'gender incongruence.'   So I treat that.

1        "*In the conversation, it comes up that she -- why she*
2   *needs this surgery and what her dysphoria is, yes.  Do we*
3   *document word for word what she said?  No.  Did I have a*
4   *clear understanding of her dysphoria and what its*
5   *implications were?  100 percent yes.*
6   "*Q.   Okay.  Thank you.  Looking back to Page 2417, in the*
7   *H and P section, toward the top of the page you note that*
8   *Dr. Lange's (sic) therapist is Elizabeth Soety; is that*
9   *right?*
10  "*A.   Correct.*
11  "*Q.   She is the psychologist that you mentioned in*
12  *response to questions from Mr. Powell, who--Dr. Soety--*
13  *wrote a letter to you in support of Sergeant Lange's*
14  *candidacy for surgery; is that right?*
15  "*A.   Correct.*
16  "*Q.   At the conclusion of the November, 2018,*
17  *consultation, Sergeant Lange was scheduled for surgery in*
18  *January of 2019 based on a cancellation you had had; is*
19  *that correct?*
20  "*A.   I don't recall the details of when her date*
21  *specifically was moved into.*"
22  "*Q.   After your consult, coverage of the surgery was*
23  *denied; right?*
24  "*A.   Yes.*
25  "*Q.   I'm showing you what's been marked for identification*

1    *as Exhibit P-2.  This is a longer document, I'll let you*
2    *take a look through it, and I will ask you some questions*
3    *about it.*
4    *"A.  Sure.  You can proceed.*
5    *"Q.  This is a fax from your office to David Brown from*
6    *July 26th of 2021, conveying--according to the cover*
7    *sheet, which is marked 2409--additional records for*
8    *review.  Do you see that?*
9    *"A.  Yes.*
10   *"Q.  Looking through this, would you agree that these are*
11   *records that came from your office?*
12   *"A.  Yes.*
13   *"Q.  Would you agree that keeping a fax like this,*
14   *transmitting medical information, is a record that's kept*
15   *in the normal course of NYU's regularly conducted business*
16   *activities?*
17   *"A.  I don't understand the question.*
18   *"Q.  Sure.  All I'm asking is, would it be standard, once*
19   *you've sent information like what's contained in P-2, to*
20   *retain a copy of what was sent for your business records?*
21   *"A.  I don't know.*
22   *"Q.  Do these records contain information or records that*
23   *were made at the time the services were rendered?*
24   *"A.  Yes.*
25   *"Q.  And were these notes by you and by Dr. Zhao and other*

1     *documents within this compilation, were they made by*

2     *individuals who had knowledge of what's described in these*

3     *documents?*

4     *"A.   Was -- repeat the question.   Was the fax made by*

5     *someone that knew what was in the document?*

6     *"Q.   Were the records within the fax made by people who*

7     *had knowledge of what is in the various provisions of this*

8     *fax?*

9     *"A.   (No response.)*

10    *"Q.   So, in other words, let's look at -- look at Bates*

11    *Number Page 2422.*

12    *"A.   Yes.*

13    *"Q.   Can you identify what 2422 through 2427 are.*

14    *"A.   Yes.   That is my partner, Lee Zhao's note from*

15    *clinic.*

16    *"Q.   Were those notes made by him at the time of his*

17    *consult with Sergeant Lange?*

18    *"A.   I don't know when he wrote the note.   I don't know.*

19    *They are in reference to -- they are documentation of his*

20    *consultation with her, but I don't know when he wrote the*

21    *note.*

22    *"Q.   Is it your standard practice and your colleague's*

23    *standard practice to make these notes contemporaneous with*

24    *or shortly after the consult with a patient?*

25    *"A.   Yes.*

1          "Q.  And is keeping the records that are contained in 2422

2     through 2427 something that is kept in the normal course

3     of NYU's regularly conducted business activities?

4     "A.  Do you mean are they -- they are kept in Epic.  Is

5     that what you're asking?

6     "Q.  Epic is your medical records system?

7     "A.  Yes.  They are entered into the medical record

8     system, and that's where they live.

9     "Q.  Okay.  All right.

10          MR. LAIL:  "I'll offer P-2 into evidence.

11          MR. POWELL:  "No objection.

12     "BY MR. LAIL:

13     "Q.  So, let's look at --

14          MR. POWELL:  "Other than relevance, I should say.

15     We object to the relevance at least of some part of the

16     information that's in here.

17          MR. LAIL:  "I tell you what.  Let's do this.

18     "BY MR. LAIL:

19     "Q.  Let me give you this, which is identified as a

20     Defendants' Exhibit 9 for identification.  If you will,

21     look at the bottom page numbers, this is 2422 through

22     2427, the same pages I just asked you questions about.

23       "So, again, are these -- notes like this -- kept in the

24     normal course of NYU's regularly conducted business

25     activities?

1      "A.   Yes.

2      "Q.   And were these notes made at the time the services

3      were rendered?

4      "A.   I don't know when the note was written.   It is a

5      reflection of the services rendered on 11-18 -- or

6      11-2018.

7      "Q.   And it is your practice's standard practice to make

8      those notes contemporaneous or shortly after a visit with

9      a patient?

10     "A.   Yes.

11     "Q.   And these notes were made by Dr. Zhao, who had

12     knowledge of his treatment of Sergeant Lange on

13     November 13, 2018?

14     "A.   Yes.

15            MR. LAIL:   "Then I offer D-9 into evidence.

16            MR. POWELL:   "No objection.

17     "BY MR. LAIL:

18     "Q.   If you would, look at Bates-numbered Page 2423 in

19     Exhibit D-9.   Are you there?

20     "A.   '2423'?

21     "Q.   Yes.

22     "A.   Yes, I'm here.

23     "Q.   And about three-fourths of the way down the page

24     there's a Review of Symptoms.   Do you see that?

25     "A.   Yes.

1    "Q.  I'm sorry, Review of Systems.  Those reflect a review

2    of physical aspects of Sergeant Lange's health; is that

3    correct?

4    "A.  Correct.

5    "Q.  And it does not include Sergeant Lange's emotional

6    status; is that correct?

7    "A.  Correct.

8    "Q.  Okay.  If you will, turn with me now to

9    Bates-numbered Page 2425.  Starting about halfway down

10   there's a title part that says, 'Answers for HPI/ROS

11   Submitted by the Patient on 11-9-2018.'.

12      "'HPI' stands for history of present illness; is that

13   right?

14   "A.  Uh-huh.

15   "Q.  Is that a yes?

16   "A.  Yes.

17   "Q.  And 'ROS' refers to report of symptoms?

18   "A.  Correct.

19   "Q.  How is this information -- it says it was submitted

20   by the patient on 11-9-2018.  How was that presented to

21   your practice?

22   "A.  There used to be a paper form that the patient filled

23   out and gave to the medical assistant.

24   "Q.  Was that the practice in 2018?

25   "A.  Yes.

1          "Q.   In connection with today's deposition, you were

2     provided with a subpoena asking you to bring your

3     practice's complete medical record in connection with

4     Sergeant Lange's treatment.   Does that complete medical

5     record include her responses to the HPI/ROS?

6          "A.   That was not filed in the -- I am not able to

7     identify that and find that in media section, which is

8     where it would have been scanned in.

9          "Q.   Looking at what is presented in Dr. Zhao's notes

10    below that heading, which continues from 2425 to 2426,

11    does this look to be a complete listing of the categories

12    of information that's gathered in the HPI/ROS form?

13         "A.   Yes.

14         "Q.   And if you'll look at the last part of that list on

15    2426 -- and let me just preface, these are all answers

16    provided by the patient; right?

17         "A.   I would assume, but they are not entered by the

18    patient.

19         "Q.   Who are they entered by?

20         "A.   The medical assistant.

21         "Q.   Okay.   And based on what the medical records show, in

22    the last four categories Sergeant Lange reports no

23    decreased concentration, no dysphoric or down mood, no

24    nervousness or anxiety, and no sleep disturbances; is that

25    correct?

1          "A.   That is what is recorded here in the record.   It is

2     not my record.   It is not my note.   And as I said, it

3     wasn't necessarily entered directly by the patient.   It

4     was entered by a medical assistant.

5          "Q.   And, again, this is what your practice's medical

6     record shows, though?

7          "A.   This is what Dr. Lee Zhao record shows.

8          "Q.   Okay.

9          "A.   Not mine.

10              MR. POWELL:   "I just object to the questions to

11     the extent that they are asking her about a record that is

12     not hers and she is not competent to testify to.

13          "BY MR. LAIL:

14          "Q.   Getting back to the denial of the surgery.   The

15     denial of the surgery was communicated to your office; is

16     that correct?

17          "A.   Yes.

18          "Q.   And it was communicated to your office about two

19     weeks after your November, 2018, consult.   Do you remember

20     that being the rough time frame?

21          "A.   I do not remember.   I have no recollection of the

22     time frame of submission to denial.   I just know that it

23     was denied.

24          "Q.   And it was denied before the anticipated surgery in

25     January of 2019; is that right?

```
 1        "A.   Yes.

 2        "Q.   So you knew that meant her surgery would be delayed;

 3        is that right?

 4        "A.   Correct.

 5        "Q.   After receiving the denial letter, did you reach out

 6        to Sergeant Lange's treating psychologist, Dr. Soety,

 7        about treatment options for the delay?

 8              MR. POWELL:   "Objection.

 9        "A.  I personally did not.

10        "BY MR. LAIL:

11        "Q.   Do you know if anyone from your office did?

12        "A.   I do not.

13        "Q.   After receiving the denial letter, did you reach out

14        to Dr. Soety's colleague, Krystal Jackson, about treatment

15        options during the delay?

16        "A.  I personally did not.

17        "Q.   After receiving the denial letter, did you reach out

18        to Sergeant Lange's endocrinologist, Dr. Barry Johns,

19        about treatment options during the delay?

20        "A.   I personally did not.

21        "Q.   After receiving the denial letter, did you reach out

22        to Sergeant Lange directly about treatment options during

23        the delay?

24        "A.   I personally did not.

25        "Q.   You mentioned in response to questions from
```

1          *Mr. Powell the ICD-10 coding provision.*

2          *"A.   Correct.*

3          *"Q.   Under the ICD-10 standards, you coded Sergeant*

4          *Lange's visit as an F64.0; is that right?*

5          *"A.   Correct.*

6          *"Q.   What does that stand for in the ICD-10 coding*

7          *mechanism?*

8                  *MR. POWELL:   "Objection.   Relevance.*

9          *"A.   Gender dysphoria.*

10         *"BY MR. LAIL:*

11         *"Q.   And in response to the subpoena provided to you for*

12         *this deposition, asking you to bring your complete medical*

13         *records, you did bring some additional documents.   Would*

14         *you pull those up for me again.*

15         *"A.   (Providing documents.)*

16         *"Q.   And I will just state for the record that they*

17         *include a letter from Dr. Johns, which you referred to in*

18         *your testimony with Mr. Powell.   They include a 2-page*

19         *letter from Mr. Soety, which you mentioned in your*

20         *testimony with Mr. Powell.   They include an unredacted*

21         *version of your, um, consult record with Sergeant Lange.*

22         *And they include a billing record showing a service date*

23         *of November 13, 2018, for an office/out-patient visit with*

24         *patient Anna Lange for which she paid $25 and for which*

25         *insurance paid $222.60.   And there was an insurance*

1      adjustment of 127.40.

2          "Again, let me hand these documents back to you.  Have

3      I accurately summarized what you brought with you in

4      response to the subpoena?

5      "A.  Yes.

6              MR. LAIL:  "Why don't we go off the record again

7      and I'll consult with my folks.  We may be done.

8              MR. POWELL:  "Sure, we can step out so you can

9      have a --

10             VIDEO TECH:  "The time is 2:10 p.m.  We are off

11     the record.

12         "The time is 2:23 p.m.  We are back on the record.

13     "BY MR. LAIL:

14     "Q.  Dr. Bluebond-Langner, if you would, pull up

15     Defendants' Exhibit 8, please.

16     "A.  Uh-huh.

17     "Q.  And look at Bates-numbered Page 2419.

18     "A.  Uh-huh.

19     "Q.  And right in the middle of the page, below the big

20     redaction, there's the word 'Plan.'  In that paragraph, it

21     says:

22             'If approved for surgery will need to return

23             for additional consultation prior to surgery

24             to evaluate further readiness for surgery and

25             expectations.'

1          "Based on that sentence, was it your understanding at

2     the time of seeing Sergeant Lange that she would need to

3     come back for additional pre-surgical consultation?

4     "Q.  It is our --

5              MR. POWELL:  "Objection to relevance.  But go

6     ahead.  Go ahead, you can answer.  Sorry.

7     "A.  So, it is our standard practice to bring patients

8      back for what we call an education visit and then a

9      preoperative visit.  And it is at that point that we go

10     over further details about after-care that's expected,

11     support that will be needed, supplies that will be needed,

12     signing of the consent, review of the procedure, and the

13     hospital stay.  So, standard.

14     "Q.  Okay.  If you would, look at 2420 of that same

15     exhibit, D-8.  At the bottom of the page, there's a

16     heading of 'Media.'  And the last indication there is a

17     scan on September 21 of 2018 of a BE, with your initials,

18     Dr. RBL.

19     "A.  Uh-huh.

20     "Q.  Do you know what the BE form is?

21     "A.  I don't know what -- it's benefits and explanation, I

22     think.  It's where we verify the benefits.

23     "Q.  Okay.  Was that when your staff member, Cheryl

24     Morris, called Blue Cross/Blue Shield to check on

25     something?

1   "A.   Yeah.   She would have verified on -- I believe that

2   she verified on 9-21 that, um, that the patient, Anna

3   Lange, had gender affirming surgery benefits.

4   "Q.   That was a call to, according to this, Blue

5   Cross/Blue Shield?

6   "A.   Correct.

7   "Q.   If Sergeant Lange is able to have surgery, would you

8   conduct the surgery?

9   "A.   If she selected me as a surgeon."

10   "Q.   What is the wait time that Sergeant Lange would have

11   to get surgery with you?

12   "A.   I don't know.   You would have to talk to the

13   scheduler.

14   "Q.   Do you have a general sense?

15   "A.   She's a patient that's known to us, so the

16   circumstances would be different."

17   "Q.   After November 13 of 2018 you did not treat Sergeant

18   Lange again; is that right?

19   "A.   Correct.

20   "Q.   And your colleague, Dr. Zhao, also did not treat

21   Sergeant Lange after November 13 of 2018; is that right?

22   "A.   Correct.

23       MR. LAIL:   "No further questions.

24       MR. POWELL:   "I have just a couple of follow-up

25   questions.

1              RE-EXAMINATION BY MR. POWELL:

2      "Q.  *Dr. Bluebond-Langner, you may recall Mr. Lail asked*

3      *you a series of questions about whether you had -- after*

4      *learning of the denial of coverage, you had reached out to*

5      *Dr. Soety and Sergeant Lange's other professionals about*

6      *what treatment options might be available in light of the*

7      *delay.  Do you remember those questions?*

8      "A.  *Yes.*

9      "Q.  *Why didn't you reach out to Dr. Soety to discuss*

10     *additional treatment options that she might offer for*

11     *Sergeant Lange's gender dysphoria?*

12     "A.  *It's my opinion that at this point the -- the*

13     *definitive treatment is surgery.  And that was not on the*

14     *table because insurance denied it.  So there was no*

15     *further treatment that I felt was necessary.  I feel that*

16     *the next step in the definitive treatment for gender*

17     *dysphoria, which is a medical condition, is vaginoplasty*

18     *or bottom surgery.*

19     "Q.  *So, is it fair to say that you didn't think that*

20     *psychotherapy was a meaningful treatment at that point for*

21     *her gender dysphoria?*

22     "A.  *Correct.*

23     "Q.  *Mr. Lail also asked you questions about -- what --*

24     *whether your record reflected any commentary on Sergeant*

25     *Lange's mental and emotional state when you consulted with*

1      *her.  Do you remember those questions?*

2      *"A.   Correct.*

3      *"Q.   Is it part of your practice as a gender affirming*

4      *surgeon to discuss the mental and emotional state of a*

5      *patient when she arrives?  He or she arrives?*

6      *"A.   In a very limited fashion.  As his questioning*

7      *pointed out, I am a surgeon.  I am not a psychologist or a*

8      *psychiatrist.  But I am also not treating a psychiatric*

9      *condition.  I am treating a medical condition, and that's*

10     *gender dysphoria.  And just as you would with any other*

11     *condition, such as let's take cancer, you explore the*

12     *other symptoms that may result as a -- as a result of the*

13     *diagnosis.*

14         *"So, we may discuss and understand the anxiety and the*

15     *depression and figure out ways to support her, but that's*

16     *not a diagnosis that I make.  And I also do not*

17     *specifically treat that.  I treat gender dysphoria with*

18     *surgery.*

19     *"Q.   Understood.*

20             *MR. POWELL:  "I think that's it.*

21             *MR. LAIL:  "I have no further questions.*

22             *THE WITNESS:  "Thank you.*

23             *VIDEO TECH:  "The time is 2:30 p.m.  We are off*

24     *the record."*

25       *(Video ended at 4:48 p.m.)*

```
 1              THE COURT:  Does that conclude the plaintiff's
 2    evidence?
 3              MR. POWELL:  It does, Your Honor.
 4              THE COURT:  Do you have any exhibits to tender?
 5              MR. POWELL:  I think -- no, we don't.
 6              THE COURT:  Pardon?
 7              MR. POWELL:  We do not, no.
 8              THE COURT:  Very well.  The plaintiff rests then?
 9              MR. POWELL:  Yes, Your Honor, we do.
10                        PLAINTIFF RESTS
11              THE COURT:  Ladies and gentlemen, as you've just
12    heard, the plaintiff has rested her case.  I thought we would
13    finish with the evidence today, but we will not.  I've got some
14    things to discuss with the lawyers.  I do anticipate our one
15    witness tomorrow -- well, we only have one witness tomorrow,
16    subject to any rebuttal, but no new witnesses tomorrow.
17              So, we'll be getting the case to you at some point
18    mid-morning, I'm confident.
19              Remember, you have not heard all the evidence yet.
20    You can't make any judgments or decisions yet because you
21    haven't heard all the evidence.  And remember particularly my
22    instructions to you this morning overnight; and primarily, the
23    instruction that you not allow yourselves to be exposed to any
24    information about the case.
25              With that, I am going to let you go back to the jury
```

1    room.  Kim will check with you, just to make sure you've got

2    what you need.  Be back in the morning by 10 minutes of 9:00.

3    That way, we will be able to get started promptly at 9:00.  We

4    will remain seated while you go to the jury room.

5           (Jury dismissed for the day at 4:50 p.m.)

6           THE COURT:  For future reference, it's common with

7    videotaped depositions to edit out all extraneous content --

8    objections, anything.  You would be surprised how much time

9    that can save when you add it all up.

10          Our witness tomorrow, Mr. Lail, how long do you

11   anticipate his direct?

12          MR. LAIL:  Your Honor, we had listed him as a "may

13   call" just in the event that we needed to based on Sergeant

14   Lange's testimony, but we don't anticipate needing to call him.

15          THE COURT:  Very well.  Do you have any exhibits that

16   you need to tender?

17          MR. LAIL:  Well, I guess only the exhibits that were

18   mentioned in the deposition.  I am not sure if the Court has

19   made a ruling specifically on those or not.

20          THE COURT:  I haven't seen any.

21          MR. LAIL:  Oh, I see.

22          THE COURT:  You know, let's -- I mean, how do you

23   propose to handle that?

24          MR. LAIL:  I believe you were handed a notebook that

25   has the defendants' and the plaintiff's exhibits.  So, the ones

1    at issue are P-2, D-8 and D-9.

2            THE COURT:  What is it in D-2 that you want to

3    tender?  Certainly everything in here is not admissible.

4            MR. LAIL:  Your Honor, that is what purports to be

5    the complete file as requested during discovery.  As we were

6    negotiating this during discovery, we wanted to subpoena

7    records directly, and the plaintiffs asked that the records

8    come through them.  So, this is the process to get her file, so

9    to speak.  And this is -- this is what was produced.

10           THE COURT:  Well, I don't doubt that this is what was

11   produced.  But a lot of things get produced that aren't

12   admissible in court.  We need to know what in here, if

13   anything, is admissible.  I mean --

14           MR. LAIL:  Your Honor, I think beginning with 2417,

15   through 2421, is actually encompassed within one of the

16   D-exhibits.  And also 2422 through 2427 is encompassed in the

17   other D-exhibit.  I don't remember which is which.

18           So, really, the pages 2428 through the end of the

19   exhibit are the remainder of records that Dr. Bluebond-Langner

20   had at her disposal.  All but the last few pages are the things

21   that she had at her disposal at the time of her visit with

22   Sergeant Lange.  And the last several pages, 2432 to -- the end

23   is the denial letter that her office received that I asked the

24   question about during the deposition.

25           THE COURT:  Okay.  So, tell me what you're tendering.

```
 1              MR. LAIL:  Your Honor, it would be 2428 through

 2     actually just 2431, because the denial letter was entered

 3     separately as part of Sergeant Lange's testimony.

 4              THE COURT:  So you're tendering from Defendants'

 5     Exhibit 2 --

 6              MR. LAIL:  Plaintiff's 2.

 7              THE COURT:  Pardon?

 8              MR. LAIL:  "Plaintiff's 2."

 9              THE COURT:  Well, the plaintiff isn't tendering it.

10     They're already rested, we know.

11              MR. LAIL:  Well, it's identified as Plaintiff's 2,

12     yes.

13              THE COURT:  It is not unusual for documents to be

14     marked as potential exhibits.  But you want to tender from

15     Plaintiff's Exhibit 2, Pages 2428 through 2432?  Well, pardon

16     me, 2431.

17              MR. LAIL:  -31, right.

18              THE COURT:  Is that correct?

19              MR. LAIL:  That's right.

20              THE COURT:  Is there any objection to that?

21              MR. POWELL:  Your Honor, this -- the witnesses were

22     not asked about any of these letters, for starters.  And they

23     are in the nature of medical records.  There was testimony

24     taken from the treating professionals, and that's in the

25     record.  We don't really understand the relevance of admitting
```

1   this.

2          As you obviously said earlier, these are medical

3   records, and we have already taken testimony from the witnesses

4   with knowledge of them.

5          THE COURT:  Well, Dr. Soety's record or letter, her

6   October 11, 2018, has already been admitted without objection.

7   Am I correct?

8          MR. POWELL:  Correct.  I stand corrected.  She was

9   examined on that.

10          THE COURT:  I didn't understand why it was necessary

11   given our stipulation, but nobody objected, so I admitted it.

12          But the plaintiff objects, then, to the admission of

13   2428, which is a letter dated September 28, 2018.  And

14   Exhibit-- or pardon me, Page Number 2431, which is a letter

15   dated October 11, 2018.  Is that correct, Mr. Powell?

16          MR. POWELL:  That's correct, Your Honor.

17          THE COURT:  And you say they are not relevant.  So,

18   Mr. Lail, what do you say to that?

19          MR. LAIL:  Well, these are the documents that form

20   the basis for Dr. Bluebond-Langner's opinion that surgery was

21   appropriate in the first place.

22          THE COURT:  But all that's been stipulated to.

23          MR. LAIL:  Well, that's true.

24          THE COURT:  Yeah.  There's some basis for letting

25   Dr. Soety's in, other than the fact that nobody objected.  I

1    mean, she was here, she testified to it.  These other exhibits

2    are from physicians or providers who did not testify and,

3    again, the point that they go to has already been stipulated.

4            If they don't go to that point -- that is, there is

5    some information in here that doesn't go to the issue of -- or

6    point that we've stipulated to -- then it's evidence from

7    somebody who didn't testify.  So, think about it overnight, but

8    right now, I don't -- and by the way, whatever exhibits you

9    need to tender, we will do in the presence of the jury

10   tomorrow.  I'd rather go ahead, though, and streamline the

11   process by discussing it tonight.

12           So, as things stand right now, I do not see a basis

13   for admitting from Plaintiff's Exhibit 2, Pages 2428 and 2431.

14   The purpose for which they are being offered is the subject --

15   goes to a subject that has already been stipulated to, and so

16   it's redundant of that.

17           And, again, Mr. Lail, you will have a chance to

18   tender whatever you want tomorrow.  But any other exhibits that

19   we can discuss this afternoon to resolve any issues there may

20   be?  Do you have any?

21           MR. LAIL:  No, thank you.

22           THE COURT:  Okay.  So, when we return in the morning,

23   we will -- do you have any exhibits at all to tender in the

24   morning?  Mr. Lail?

25           MR. LAIL:  Well, yes.  From Dr. Soety's testimony,

1   and then also I believe the D-8 and D-9 from

2   Dr. Bluebond-Langner's testimony.

3            THE COURT:  Well, let's look D-8.  D-8 is -- appears

4   to be the note of the office visit that Dr. Bluebond-Langner

5   testified about.  Is there any objection to that?

6            MR. POWELL:  Your Honor, no.  We waived the

7   objections during the deposition of that one.

8            THE COURT:  D-8 will be admitted when you tender

9   tomorrow, without objection.

10            And what was the other one?

11            MR. LAIL:  D-9.  Those are the medical notes of her

12   colleague, Dr. Zhao.

13            THE COURT:  I overrule the objection to Dr. Zhao.

14   That's Z-h-a-o, by the way.  I overrule the objection to

15   questioning Dr. Bluebond-Langner about it because I thought the

16   record established that this was a note from her practice, and

17   I thought it was fair game for cross examination.  But is there

18   any objection to its dmission?

19            MR. POWELL:  No, Your Honor.  We already had waived

20   our objection.

21            THE COURT:  All right.  So that will be admitted

22   without objection tomorrow.  So, tendering exhibits should take

23   a couple minutes in the morning.

24            As we discussed, in the morning -- this morning, we

25   don't have any issues with regard to the instructions.  So, in

1    the morning, after the announcement from the defendant that

2    they rest, after tendering -- defendants rest after tendering

3    their exhibits, we will proceed with closing arguments.

4              Anything further from the plaintiff to discuss?

5              MR. POWELL:  Nothing from the plaintiff, Your Honor.

6              THE COURT:  From the defendants?

7              MR. DEVENEY:  Your Honor, with regard to the Rule 50

8    motions, we did want to preserve our ability to appeal the

9    Court's summary judgment order against the defendants, of

10   course.

11             THE COURT:  Well, I -- I think that's preserved.  I

12   mean, did you want to make a motion at the close of the

13   plaintiff's case?  And at the --

14             MR. DEVENEY:  We want to make sure we don't not do

15   it.  Mostly, Your Honor.  But with respect to --

16             THE COURT:  They may can think of a reason why you

17   couldn't appeal that.  I can't think of any.  But in terms of

18   the trial, I mean, do you have a motion -- that is, the issues

19   that we're resolving with this trial, specifically the damages

20   that are discussed, I mean, do the defendants have any motion

21   in that regard to make?

22             MR. DEVENEY:  Well, I must admit, Your Honor, I am

23   not entirely clear with respect to the pecuniary damages.

24   There's been no evidence put on by the plaintiff's counsel with

25   respect to any pecuniary losses.

1           THE COURT:  Well, and that's of course not an issue

2      that was to be resolved in this proceeding.  Your recent

3      briefing addresses that.  What I thought we would do is, after

4      I instruct the jury, we can talk about where you are.

5           I've got your subsequent briefs from both of you on

6      those various issues.  But, you know, the -- the procedure for

7      resolving the issues with regard to those pecuniary expenses

8      was not this trial.  This trial was solely on the evidence --

9      as the pretrial order makes clear and as our discussions have

10     made clear, was solely to address the non-pecuniary damages.

11     You know, I have my questions about the pecuniary damages, but

12     we'll discuss those further tomorrow.  So.

13          MR. DEVENEY:  And I guess I would like to talk to my

14     colleagues and evaluate whether there's a Rule 50 motion that

15     we should file with respect to the non-pecuniary losses, Your

16     Honor.

17          THE COURT:  Well, that's fine.  You know, that --

18     that's a -- an issue that turns on the sufficiency of the

19     evidence.  And on this particular issue, I don't know what a

20     motion could be.  But nonetheless, after -- if you have

21     anything further to say on it, I'll hear from you in the

22     morning.

23          MR. DEVENEY:  Thank you, Your Honor.

24          THE COURT:  All right.  Thank you, all.  And, yes, if

25     you could be here, just to be safe, about 8:30 in the morning,

```
1    and we'll get all set up.  And by the time the jury is brought
2    in, we will get started.  Have a good evening.
3              COURT OFFICER:  All rise.  Court is adjourned for the
4    day.
5         (Proceedings were adjourned at 5:06 p.m.)
6                              *   *   *
7         (Proceedings resumed at 8:35 a.m. on Tuesday, September
8         27, 2022.)
9                       P R O C E E D I N G S
10             COURT OFFICER:  All rise.  United States District
11   Court for the Middle District of Georgia is now in session.  Be
12   seated and come to order.
13             THE COURT:  Good morning.
14             COUNSEL COLLECTIVELY:  Good morning.
15             THE COURT:  Who is lead counsel for the plaintiffs?
16             MR. POWELL:  I am, Your Honor.
17             THE COURT:  Thank you, Mr. Powell.  Who is lead
18   counsel for the defendants?
19             MS. MORGAN:  I believe I'm listed as lead counsel for
20   the defendants, Your Honor.
21             THE COURT:  Thank you, Ms. Morgan.
22             Mr. Powell, how many lawyers does the plaintiff have
23   attending this trial?
24             MR. POWELL:  This is the trial team.
25             THE COURT:  I see Mr. Barton, I have seen other
```

```
1    lawyers.  How many lawyers do you have here for this trial?
2              MR. POWELL:  We have -- I think we have a total of
3    seven.
4              MS. GRANT:  Yeah.
5              THE COURT:  Sounds about right.
6              Ms. Morgan, what about the defendants?
7              MS. MORGAN:  A total of four.
8              THE COURT:  And Mr. Hall?
9              MS. MORGAN:  Yes, sir.
10             THE COURT:  All right.  You may be seated.
11             After closing arguments, we're going to have
12   something we have not had before, and that's a coherent
13   discussion about pecuniary losses.  I can tell you remand --
14   although the defendants might make this argument, remand is not
15   on the table.  That is a do-over.  It was your obligation to
16   get your case ready for trial.
17             Nowhere in your summary judgment motion did you raise
18   any arguments about these expenses to establish -- or make any
19   effort to establish any undisputed facts with regard to these
20   particular expenses.  I am not about to remand so you can get a
21   do-over for something that you should have done just -- you did
22   a better job, at least you mentioned injunctive relief,
23   although you never articulated the injunctive relief you were
24   looking for.
25             So, both sides need to give some thought to that.
```

1    And Defendants haven't been particularly helpful on that issue,

2    either.  I've gotten boilerplate 6- or 7-page trial briefs that

3    come nowhere close to addressing the issue.  In part, that's

4    because the issue didn't come up until late in the game.

5            Be thinking about this, particularly with regard to

6    the top surgery, whether or not the plaintiff exhausted any

7    claim for the top surgery.  This is, by the way, a Title VII

8    action that we're trying, so we're not leaving here until

9    there's some resolution to that issue.

10           All right.  Is it still the defendant's intention to

11   rest?  Other than tendering?

12           MS. MORGAN:  Yes, Your Honor.

13           THE COURT:  Thank you, Ms. Morgan.

14           All right.  What's our jury count, Kim?

15           COURTROOM DEPUTY:  I'm sorry, I need to go take a

16   look.

17           THE COURT:  I know we're early, we still have some

18   things we need to discuss.

19           So when the jury is ready, and after I have checked

20   with them to be sure that there's been no violation of my

21   instructions, I will allow the defendant to tender the exhibits

22   that we discussed yesterday.  They are all being admitted

23   without objection.

24           I'll allow the defendants to rest in the presence of

25   the jury because there -- well, I guess because evidence is

1   being admitted, there technically could be rebuttal to whatever

2   those exhibits may show.

3           Will there be any rebuttal?

4           MR. POWELL:  Your Honor, we don't anticipate that.

5           THE COURT:  Very well.  Then I will explain to the

6   jury briefly about what closing arguments are and then I will

7   turn it over to the plaintiffs.

8           Plaintiff, of course, has the right to open and

9   close.  Mr. Powell, how long do you anticipate the plaintiff's

10  closing will be?

11          MR. POWELL:  Your Honor, about ten minutes.

12          THE COURT:  Okay.  Ms. Morgan, the defendants'?

13          MS. MORGAN:  I anticipate about ten, fifteen minutes.

14          THE COURT:  Very well.  As we mentioned a couple of

15  times yesterday, there are no exceptions to the final

16  instructions.  I will then instruct the jury and they will

17  retire to deliberate.

18          Mr. Powell, anything further from the plaintiff's

19  standpoint to discuss now?

20          MR. POWELL:  Your Honor, I don't think that we've

21  seen the form -- the verdict form.

22          THE COURT:  You have submitted the form.

23          MR. POWELL:  If that's the form that we're using,

24  then that's --

25          THE COURT:  Yeah.  And that's the one you submitted

```
 1   by agreement.  You know, there again, a matter that I'm not

 2   sure got much thought, now that you're no longer in

 3   agreement -- or not in agreement with regard to the limitations

 4   on the verdict, we'll see if that comes into play.

 5            But nevertheless, the jointly agreed verdict form

 6   provides for a single finding for or against the defendants

 7   jointly.  So, I don't know that any thought was given to the

 8   potential issues that may raise with regard to the numerosity

 9   limitation, but, nonetheless, that's your verdict form.  It's

10   acceptable to me, and that's the verdict form the jury will

11   have.

12            Anything else, Mr. Powell?

13            MR. POWELL:  No, Your Honor.

14            THE COURT:  Anything further from the defendants?

15            MS. MORGAN:  No, Your Honor.

16            THE COURT:  All right.  I will give you a few minutes

17   to get organized.  We'll begin as soon as we have all our

18   jurors.

19            COURT OFFICER:  All rise.  Court is in recess.

20         (Court in recess from 8:43 a.m. to 9:03 a.m.)

21         (Jury returned to the courtroom at 9:03 a.m.)

22            COURT OFFICER:  All rise.  This Honorable Court is

23   back in session.  Be seated and come to order.

24            THE COURT:  Good morning, ladies and gentlemen.  And

25   welcome back.
```

```
 1              JURY COLLECTIVELY:  Good morning.

 2              THE COURT:  I have my question for you, of course.

 3    Overnight, did anybody have any difficulty with my

 4    instructions, particularly with regard to not being exposed to

 5    any information about the case?

 6         (Jurors shaking heads in the negative.)

 7              THE COURT:  Very well.  Thank you.  As you heard

 8    yesterday, the plaintiff, Sergeant Lange, rested her case.

 9              Ms. Morgan, what is the defendants' announcement?

10              MS. MORGAN:  Your Honor, the defendants rest at this

11    time.

12              THE COURT:  And I understand you do have some

13    exhibits to tender.

14              MS. MORGAN:  I'm sorry, we do have a couple of

15    exhibits to tender as well.

16              THE COURT:  Very well.

17              MR. LAIL:  We would like to tender Defendants'

18    Exhibit D-5, Defendants' Exhibit 8, and Defendants' Exhibit 9.

19              THE COURT:  They are admitted without objection.

20    Thank you.

21         (Defendants' Exhibits 5, 8, and 9 admitted into evidence

22         at 9:05 a.m.)

23                        DEFENDANT RESTS

24              THE COURT:  Is there any rebuttal, Mr. Powell?

25              MR. POWELL:  No, Your Honor, there isn't.
```

1              THE COURT:  Ladies and gentlemen, that means that the

2    evidence has closed.  And that further means we can move

3    directly into the closing arguments of the lawyers.

4              As I explained at the outset of the trial yesterday,

5    in their closing arguments the lawyers have a little more

6    leeway about what they can argue.  They can now argue, based

7    upon the evidence you have heard and their interpretation of

8    that evidence what they think your verdict should be.  Remember

9    that although what the lawyers say is important, it is not

10   evidence.  The evidence is what you heard from the witnesses

11   and what you will see from the exhibits, which will be with you

12   in the jury room.

13             The procedure for closing arguments is this.  The

14   plaintiff -- a lawyer for the plaintiff will give an opening

15   closing argument.  A lawyer for the defendant will then have a

16   closing argument for the defendants.  And then the plaintiff

17   can rebut whatever argument was made by the defendants.

18             After that, I will instruct you on the law, and then

19   you will go back to the jury room to begin your deliberations.

20             Mr. Powell, the plaintiff may present her closing

21   argument.

22             MR. POWELL:  Thank you, Your Honor.  Mr. Brown is

23   going to be delivering that.

24             THE COURT:  Very well.  Mr. Brown?

25             MR. BROWN:  Thank you, Your Honor.  May I reserve a

1    moment for rebuttal afterwards?

2              THE COURT:  Yes.

3              MR. BROWN:  Thank you.

4              There is no microphone here?

5              THE COURT:  There is an area mic right there in front

6    of you.

7              MR. BROWN:  Great, thank you.

8              Good morning, ladies and gentlemen.

9              JURY COLLECTIVELY:  Good morning.

10             MR. BROWN:  I am David Brown.  I am representing

11   Sergeant Lange.  And I am going to talk to you about four

12   years.  Sergeant Anna Lange has suffered most of her life with

13   gender dysphoria every day.  But four years ago, Sergeant Lange

14   finally found the one medical treatment that would take that

15   suffering away, and she couldn't get it.  She couldn't get it

16   because she's transgender.

17             And the judge has told you that the defendants are

18   responsible for that.  Defendants' exclusion is the only reason

19   the surgery was denied.  So, for the past four years, Sergeant

20   Lange has suffered needlessly.

21             Now, you listened to Sergeant Lange, and you heard

22   her say she doesn't want to be here.  She tried really hard not

23   to bring a lawsuit.  She just wanted health care.  She did

24   everything she could to get coverage.  But the defendants

25   stone-walled her every step of the way.  And now here we are,

1    four years later.

2            Four years of unnecessary suffering.  And there's

3    only one thing that can be done here today to make any of that

4    right, and that's to award damages.  That's the law.  Now,

5    nobody likes asking for money, and that's not what this lawsuit

6    is about.  You heard Sergeant Lange say that that's not what

7    this lawsuit is about.

8            This lawsuit is about health care, it's about

9    fairness, it is about treating Sergeant Lange with dignity and

10   with respect, and it's about showing her that she is worth

11   something, that her four years of suffering is worth something.

12           And only you can decide what four years of suffering

13   is worth.  I can't.  The judge can't.  And you heard even

14   Sergeant Lange said she can't.

15           But what I do know is that for the past four years,

16   no one would listen to Sergeant Lange.  And then yesterday I

17   saw you listening.  And you will remember what she said.

18   Sergeant Lange told you what living with gender dysphoria is

19   like.  How she lives every day with this indescribable feeling

20   that her body must be female, but it isn't fully, and something

21   is terribly wrong.

22           She said even on her best days, she knows she has

23   gender dysphoria, but she's able to manage it.  And what is she

24   managing?  Hating herself.  Constant anxiety, depression, and

25   sadness.  Feeling like her life is in limbo.  Sleepless nights.

1    And on those worst nights, sometimes wishing that in the

2    morning she just wouldn't wake up.  And from a person who

3    doesn't like to talk about her feelings.

4            You also heard how much it took her to get to the

5    point where she was ready to face all of that.  Ready to come

6    out to her fellow officers as transgender, ready to seek the

7    help of medical professionals, and ready to begin to

8    transition.

9            And then she told you about how hopeful she felt,

10   knowing that there was a surgery that she could get that would

11   finally put an end to her struggle with gender dysphoria.  She

12   said she felt like she was finally going to have some closure

13   and that she wouldn't have to hate herself anymore.

14           And then she told you about the letter that she got.

15   And you saw it:  "Deny Sex Reassignment Surgery as

16   non-covered."  And you heard Sergeant Lange say that getting

17   that letter was one of the roughest days she'd ever had.  She

18   cried for three days.  She was inconsolable.  And you heard her

19   tell you that all she wanted was that surgery -- the very same

20   surgery that would have been covered if she weren't

21   transgender, the surgery that would have put an end to her

22   suffering.

23           But the defendants stood in her way.  And you heard

24   her tell you how the defendants stone-walled her over and over

25   again as she tried to get the coverage she needed.  And she

1    talked about how that made her feel:  Ignored.  Humiliated.

2    Like they didn't even think that she was worth their time.

3            This is the emotional pain and the mental anguish

4    that Sergeant Lange suffered because of the defendants.  This

5    is the suffering that she seeks fair compensation for.

6            You also heard from some other witnesses in addition

7    to Sergeant Lange.  You heard from Dr. Soety, her psychologist.

8    She told you that she diagnosed Sergeant Lange with gender

9    dysphoria and that, other than gender dysphoria, Sergeant Lange

10   had no other issues.  She had a good family and social and work

11   relationships.  She had hobbies and volunteered.  She was doing

12   well, except for her gender dysphoria.  And her gender

13   dysphoria was the only issue causing her problems.

14           And her gender dysphoria could not be treated by

15   therapy, which is why Dr. Soety wrote a letter to

16   Dr. Bluebond-Langner, recommending surgery for Sergeant Lange.

17           And then you heard from Dr. Bluebond-Langner.  And

18   she's a surgeon who specializes in the treatment of gender

19   dysphoria.  She saw Sergeant Lange in 2018.  She testified that

20   Sergeant Lange needed surgical treatment, that it was the only

21   effective treatment, that there weren't any others.

22           That vaginoplasty is more than 95-percent effective

23   in the treatment of gender dysphoria.  That she expected that

24   with vaginoplasty, Sergeant Lange would have a complete or

25   near-complete resolution of her gender dysphoria and the

related symptoms, like anxiety and like depression.  And that
without the surgery, Sergeant Lange's gender dysphoria would
not improve.

And what do the defendants -- the County and the
Sheriff's Office -- what do they have to say in response?
Nothing.  They didn't call a single witness.  No one testified.
No one contradicted anything Sergeant Lange said.  Instead,
they are just hoping that you won't listen to her.  That you
will ignore everything that she said.

After she shared the most intimate details of her
life with you in an open courtroom, that you'll ignore that all
of her suffering is the defendants' fault.  That they broke the
law.  In fact, they are counting on that.  They are counting on
you to ignore her just like they did.

They want you to believe that because she has hobbies
or friends and family, that she's really good at her job, that
she can't possibly be suffering on the inside.  They want you
to believe that everything that Sergeant Lange said to you
yesterday about her suffering just isn't true.  That's wrong.

You listened to Sergeant Lange, so you know that's
wrong.  Sergeant Lange has struggled with her gender dysphoria
for most of her life, and she's gotten good at keeping that
struggle hidden.  She kept her guard up and never let people
get close, but she told you about the distress and the anxiety
and the constant struggle she has experienced because of her

gender dysphoria.

And all of that would have ended four years ago but for the defendants' exclusion. And you're not here today to compensate her for that lifetime of struggle. As the judge instructed, you're here today to decide on a fair sum of money for the past four years -- four years she spent suffering needlessly, knowing the treatment was within arm's reach, but not for her.

Now, ladies and gentlemen, the judge told you that Sergeant Lange bears the burden of proof. She's met that burden. The evidence shows that. The evidence shows that it's more likely than not that she has suffered these past four years only because of Defendants' exclusion.

And as you heard, it's been a long road for her to get to this point. Sergeant Lange has had to turn to the legal system to get the care that she really needs. To get her surgery. To end her gender dysphoria and stop her suffering. To be treated like a person who is worth something.

And that brings me back to where I started. The only thing that you can do in this courtroom, ladies and gentlemen, is set the wrongs of these last four years right. Now is the time for you, the jury, to hold the defendants responsible for their discrimination. It's time for you to show Sergeant Lange that she's worth something. That her suffering is worth something.

1          Now, of course, it can be hard to put a dollar value

2     on someone else's suffering, but here's how I want you to think

3     of it.  I want you to envision a scale, an old fashioned

4     balancing scale.  And the left side of that scale is weighed

5     down by four years' worth of hating herself and constant

6     anxiety and depression and sadness and feeling like her life is

7     in limbo and sleepless nights and sometimes wishing that she

8     just wouldn't get up in the morning -- all because of

9     Defendants' exclusion.

10          And your job is to figure out what must be placed on

11    the right side of the scale to balance that.  What is her four

12    years of pain and suffering worth?  Only you can decide that.

13          But let me offer two suggestions.  First, let me

14    suggest that a fair amount is in the hundreds of thousands.

15    Some of you may think that seems quite high.  Some of you may

16    think that seems low, because four years is an awfully long

17    time.

18          Second, juries across America return sizeable

19    verdicts in discrimination cases.  An amount in the hundreds of

20    thousands is only fair.  But ultimately that is not my

21    decision, it is your decision.  And with fair compensation,

22    these scales will be rebalanced, and Sergeant Anna Lange can

23    move on, once again, with her surgery and with her life.

24          Thank you very much.

25          THE COURT:  Ms. Morgan?

1              MS. MORGAN:  Good morning.  I was introduced to you

2     yesterday and I am Sharon Morgan.  Thank you for your time.

3     This is a little bit of an unusual trial and perhaps this will

4     be a little bit of an unusual closing argument.

5              You did hear before the trial started that the Court

6     had decided that the County's plan -- health plan contained

7     this exclusion for sex reassignment surgery that we've heard a

8     lot about over the last 24 hours and that that exclusion

9     violates federal law.

10             So, the County -- I represent the County and the

11    Sheriff's Office -- their liability is established.  So you

12    don't have to decide that part of the case, of course.

13             Rather, your job is limited to deciding -- think

14    about it this way -- two questions.  Your first question is

15    this.  Whether Sergeant Lange is entitled to compensatory

16    damages.  And as you've heard, that is seeking an award of

17    money damages for any emotional distress or mental anguish that

18    the exclusion caused her.  And that's the first question.

19             The second question is, if you decide yes to that,

20    then the question and the answer will be how much.  What is

21    that amount, if you make a decision on the first question.

22             Let me say to the first question, Sergeant Lange's

23    entitlement to an award of damages is not automatic, although

24    you would think so from what you've just heard earlier.  Nor

25    can it be assumed.  You've heard that she has to prove her

```
1    entitlement to damages by evidence, by a preponderance of the

2    evidence.

3            And I want to stop there and say, there was much made

4    about the fact that maybe defendant didn't take the case

5    seriously, Defendant didn't bring witnesses.  It is not

6    Defendants' burden.  The plaintiff has the burden here.

7            And you, yourself, sat here yesterday and you heard

8    that defendants did indeed ask questions of witnesses, the same

9    witnesses who would have the information, and I am going to

10   share some of that evidence with you in just a few minutes.

11           As to the second question, any amount that you award

12   Sergeant Lange also has to be supported by the evidence.

13           So, let's actually evaluate the evidence you heard.

14   But before I go too much further, I do want to address an issue

15   that came up yesterday in some questions that you heard from

16   Sergeant Lange's counsel.  That dealt with questions like this:

17   whether her participation in certain activities or the fact

18   that she could do a good job somehow meant she does not have

19   gender dysphoria.  I want to clarify that her gender dysphoria

20   is not in dispute, as you know.  Defendants have never denied

21   that she has gender dysphoria.  And the parties have actually

22   stipulated to that fact for this trial.

23           And by definition, the gender dysphoria definition,

24   there is emotional distress associated with having gender

25   dysphoria, although it varies.
```

1              But as I'd like to explain in a few minutes and

2        you're going to hear some evidence to this, we believe what the

3        activities do show is that Lange has not experienced emotional

4        distress to such a level that she is entitled to monetary

5        damages as a result of the exclusion.  So, again, the question

6        before you is what additional damages of emotional anguish did

7        the exclusion cause her.

8              Now, you did hear a lot of testimony from Sergeant

9        Lange yesterday about her childhood, about her feelings from a

10       very early age that she should be female, and certainly the

11       difficulties and challenges associated with that.  She

12       described feelings of confusion, anxiety, sleepless nights,

13       self-loathing.  You heard that evidence yesterday.

14             She also discussed the bike accident in 2012, which

15       ultimately led to her decision later, in 2017, to begin

16       transitioning to live fully and openly as a female.  You heard

17       her say that at the time of that accident, she was distressed,

18       if you will, to wake up and realize she was still here.  She

19       hated herself at that point in time.

20             But I believe that's the only evidence you would have

21       heard about hating herself.  You didn't hear that she's hated

22       herself for the past four years.  That was not in evidence in

23       this case.

24             She also discussed that she was diagnosed with gender

25       dysphoria, again, describing feelings that we've talked about:

1    depression, anxiety, sleeplessness, low self-esteem.  You heard

2    how she took steps to alleviate gender dysphoria.  She sought

3    counseling with a therapist.  She went to an endocrinologist.

4    She started hormone therapy.  Those kind of things help

5    alleviate the symptoms.  She had a name change.  She had breast

6    augmentation.  These are all steps toward alleviating gender

7    dysphoria.

8              And, of course, she testified that while those

9    symptoms improved, the different treatments did not eliminate

10   or alleviate her gender dysphoria.

11             She testified she continued to be unhappy.  And for

12   this reason, obviously, she sought sex reassignment surgery.

13   Now, all these facts we just talked about are important for one

14   thing.  They give you context for understanding Sergeant

15   Lange's transition process.  They help you understand that.

16   They help you to understand her experience of being

17   transgender.  But they are not facts that you rely on in

18   determining whether Sergeant Lange is entitled to emotional

19   distress damages in this case.

20             Defendants are not responsible for Sergeant Lange's

21   gender dysphoria or the symptoms that actually result from

22   gender dysphoria.  Defendants are responsible only in this

23   trial for any emotional distress damages that resulted from the

24   application of that exclusion and the denial of the surgery.

25   So, in other words, again, what additional distress or mental

1    anguish did the exclusion cause her?

2              You did hear from three witnesses yesterday.  Three

3    important witnesses.  The first, of course, being Sergeant

4    Lange.  She had received the letter from the insurance company,

5    Blue Cross/Blue Shield, in November, denying sex reassignment

6    based on the exclusion.  Understandably upset.  Very

7    disappointed of course.  You heard she cried for three days.

8    And this is something she wanted and desired, and no one is

9    saying that is not the case.

10             She went to see her psychologist, Dr. Soety, in

11   January, 2019, shortly thereafter.  But because Lange had good

12   coping mechanisms, she herself stated she decided not to seek

13   additional therapies.

14             She talked about sleepless nights, but she suffered

15   sleepless nights before the denial of the surgery, and she was

16   taking medications for sleeplessness before the denial of the

17   surgery, and that continued.  There is no indication that that

18   worsened after the surgery.

19             She herself testified she continued to have -- and

20   you heard a few minutes ago from Mr. Brown -- good work and

21   family relationships, good social relationships.  She has a

22   very important job.  She is a sworn law enforcement officer.

23   She is a valued member of the Sheriff's Office.

24             She has been able to work in her job through whatever

25   emotional distress she has been experiencing.  There is no

1    evidence that her ability to do her job has been diminished in

2    any way or that her performance has suffered as a result of

3    that.  She continues to work extra jobs for money when needed.

4    She has not had to take unpaid leave or time away from work.

5         And then she, herself, testified I think one of the

6    most recent things she's enjoyed is tennis, and she enjoys

7    competing on several teams, and she has friendships from that

8    team, and enjoys that in her spare time.

9         As I mentioned earlier, her ability to successfully

10   engage in work and these other areas of her life doesn't mean

11   she doesn't have gender dysphoria.  Rather, as Dr. Soety

12   testified, we submit that these factors show that someone whose

13   symptoms of gender dysphoria -- that shows someone whose

14   symptoms of gender dysphoria have not crossed into other facets

15   or other areas of her life.  And we think that shows that she's

16   not experienced the amount of mental anguish or emotional

17   distress that would entitle her to damages in this case, in

18   this situation.

19        Let me share a few more points about what Dr. Soety

20   said.  She had knowledge -- let me back up and say think about

21   Dr. Soety.  She is someone who had knowledge of Sergeant

22   Lange's experience, being transgender, both before and after

23   denial of the surgery.  So she can speak to before and after.

24   She treated her for several months before surgery was denied

25   due to the exclusion, and she treated her afterwards.  She has

1    a perspective of Sergeant Lange's emotional status and

2    wellbeing both before and after, which I think is important.

3           She described Sergeant Lange as well adjusted, based

4    on her relationships, as we just said.  Dr. Soety herself said

5    on the stand here that's based on, quote, good family

6    relationships, very good social relationships, good work

7    relationships.  She is an emotionally pretty good overall

8    individual.

9           She saw Sergeant Lange for a therapy session in

10   January of 2019, following Sergeant Lange's receipt of the

11   letter.  Now, Dr. Soety shared that cancellation of the surgery

12   was a loss to Sergeant Lange.  You heard that testimony

13   yesterday.  That Lange was distressed by this.  That they spent

14   a majority of the time in that session talking about Lange's

15   coping mechanisms.  She talked about that a little bit.

16          And then Soety said -- I think the question was asked

17   if she continued to see Lange after then, and she said, "I put

18   the responsibility on my patients for further therapy; in other

19   words, I am looking to them, for them to tell me what they

20   need."  And she said that she did that very specifically also

21   with respect to Sergeant Lange.

22          She said she had faith in Sergeant Lange's ability to

23   determine what she needed.  And as of January, 2019, Dr. Soety

24   testified that Lange expressed to her that she had good coping

25   skills.  Lange knew what she needed to do to take care of

1    herself, to manage, and that is where they left it.

2              She said she was available if Sergeant Lange needed

3    her for any reason, but she did not see Lange again until

4    almost a year later.  In December of 2019.

5              We submit that the fact that Lange waited another

6    year before seeing Dr. Soety for the last time would indicate

7    that her issues after the denial of surgery were manageable.

8              Then there was the final Dr. Soety visit in December

9    of 2019.  And again, as I said, Dr. Soety had seen her in

10   January, 2019, and then she sees her again in December of 2019.

11   Dr. Soety again testified that at that time she was looking at

12   Sergeant Lange's level of functioning.  Sergeant Lange is her

13   client.  She wanted to make sure that Sergeant Lange was doing

14   well, that her depression wasn't exacerbated by not being able

15   to have the surgery.

16             And Lange, herself, testified that Soety told her --

17   Dr. Soety told her that she, Dr. Soety, did not need Sergeant

18   Lange to come back unless she had a major issue.  And Sergeant

19   Lange testified that she's not been back to see Dr. Soety

20   since.

21             And certainly last but not least, the witness you

22   heard from, Dr. Rachel Bluebond-Langner, by the video

23   deposition yesterday -- or video testimony yesterday.  Just a

24   remainder that Dr. Bluebond-Langner saw Lange on only one

25   occasion.  Now, again, this was before surgery was denied.  And

1   her visit was focused solely on the surgery, as you would

2   expect it to be.  She's a surgeon.

3          So, they discussed the actual sex reassignment

4   procedure, certain risks involved, the benefits of the

5   procedure, the surgery.  Much like any of us would if we went

6   to a doctor and were having a surgical procedure.  They would

7   go through those types of things to make sure you were very

8   informed and understood what was taking place.  That's what

9   Dr. Bluebond-Langner did for Sergeant Lange when she visited.

10         She also testified or said that she understood that

11  Sergeant Lange had gender dysphoria, and of course she

12  understands the symptoms of gender dysphoria, and she testified

13  what that means generally.  But she did not assess Sergeant

14  Lange's emotional state or status, and she did not really

15  testify as to what that meant for Sergeant Lange specifically.

16  Again, it's not a negative for Dr. Bluebond-Langner.  It is

17  simply a statement of fact that she's a surgeon, she had never

18  met Sergeant Lange before, and she sees her for this one

19  pre-surgery consult.  It stands to reason that she would not do

20  a psychological or could do a psychological or emotional

21  assessment.

22         And, indeed, you heard her, herself, at the close of

23  her testimony.  She says as a surgeon she addresses the medical

24  issue, not the emotional distress that may be associated with

25  it.  She understands that there are symptoms associated with

1    it.  You do not tell -- hear her expound or discuss any of

2    those symptoms, or particularly what those symptoms were in

3    relation to Sergeant Lange.

4          And then Dr. Zhao's notes, which indicate that at the

5    time of the consult Lange had reported that she was not

6    experiencing -- no decreased concentration, no dysphoric mood,

7    no nervousness, anxiousness, or sleep disturbance at that time.

8          That was Dr. Bluebond-Langner's visit.

9          Two weeks after that consult with

10   Dr. Bluebond-Langner is when the authorization for surgery was

11   denied.  And Dr. Bluebond-Langner said herself that after her

12   consult she had no further communication with Sergeant Lange.

13         It stands to reason, or obvious, that

14   Dr. Bluebond-Langner would have no knowledge of any specific

15   stress Sergeant Lange suffered as a result of the exclusion.

16   She simply did not see her or have any communication with her

17   after the fact.

18         One thing Dr. Bluebond-Langner did opine on.  She

19   predicted that delaying the surgery -- I believe she testified

20   more than a year -- the testimony was really more of a

21   recommendation that somebody who is diagnosed with gender

22   dysphoria should probably have the surgery -- I believe she

23   stated within a year, and that waiting beyond that or delaying

24   beyond that could have an adverse effect on the individual.

25   Again, I will submit to you that's a prediction.  It is a

1    professional one, admittedly, but it is not based on any sort

2    of psychological assessment of Sergeant Lange herself.

3              It is really your job to decide what, if any, effect

4    the delay in surgery or denial of surgery had on Sergeant

5    Lange's emotional distress, whether it was sufficiently severe

6    to be addressed through monetary award.

7              Before I turn this back over to Mr. Brown, who has

8    the closing words, I am going to reiterate a couple of points,

9    and then I have another suggestion for you.  As I said at the

10   very beginning, two questions.  The first -- and I will return

11   to that -- is you have to decide whether Sergeant Lange has

12   proven by a preponderance of the evidence that she's suffered

13   additional emotional distress or mental anguish because of the

14   plan exclusion.  Not because she has suffered from gender

15   dysphoria or because of any symptoms she may have had prior to

16   that time.  Because of the denial of the exclusion.

17             I submit to you that Sergeant Lange has offered

18   evidence relating to the difficulty she's had, and that's been

19   throughout much of her life.  And I don't say that in any way

20   to diminish that, so please don't misunderstand me.  Those are

21   symptoms and things and challenges that Sergeant Lange has been

22   dealing with since she was a young child, by her own testimony.

23             But your focus is much more specific than that.  You

24   have to look at what evidence has she put forth to prove

25   damages caused by the application of the exclusion.  And,

second, if you decide that she's proved by a preponderance of
the evidence that she's entitled to recover damages for
emotional distress because of the exclusion, then you have to
decide what an appropriate amount of damages is.

Here again, the amount has to be based on what has
been proved that was caused by the exclusion.  With respect to
our closing argument, we submit to you that you can answer
Question Number One:  No.

But if you choose to answer it yes, there are some
markers for things that you can look to.  Now, Mr. Brown
suggested to you that you have to make this decision yourself,
and he would recommend something in the hundreds of thousands
of dollars, but that's up to you.  And he wanted to share the
comment that there were juries across America who offer large
verdicts in cases, and that's true.

But that's not this verdict.  And that's not this
jury.  This case.  This time.  These facts.  This evidence.
You have what's in front of you to make a decision in this
case.  And we would submit that that number, if you decide to
award something, could be something that's appropriate for
Sergeant Lange.  You've heard what her salary is.  You can look
at her salary of 46,000.  You could consider some multiple,
some three months, six months of that as well.  That's also
appropriate for you to consider.  Again, that's up to you as
you go back and you hear all the evidence.

1          And last but certainly not least, on behalf of

2     Houston County and the Houston County Sheriff's Office, which

3     we represent, I would really like to express our sincere

4     appreciation for your valuable time and commitment to this

5     process.  Thank you so very much.

6          THE COURT:  Mr. Brown?

7          MR. BROWN:  Thank you, Your Honor.

8          Ladies and gentlemen, Ms. Morgan's argument misses

9     the point in a very key way.  She came up here and she said the

10    defendants are not responsible for Sergeant Lange's gender

11    dysphoria.  And that's right.  But what they are responsible

12    for is the four years of her distress from her gender dysphoria

13    that was untreated as a result of their denial.  That's when

14    their liability starts.

15         That's when Sergeant Lange had a path, she was on a

16    path, she was this close (indicating) to having an end to all

17    that suffering, and she couldn't get it because Defendants took

18    it away from her because of their discrimination.  That's the

19    point of this case.  That is what Sergeant Lange is asking you

20    for fair compensation for today.

21         You also heard Ms. Morgan mention a couple of things

22    about Dr. Soety.  And once again, she misses the point.

23    Dr. Soety said that Sergeant Lange was coping except for her

24    gender dysphoria.  And you heard Sergeant Lange say that she

25    was raised to handle her own problems, and so she was doing

1    that.  Except for her gender dysphoria.  Because there was no

2    way that she could.  That's what you heard Dr. Soety say and

3    that's what you heard Sergeant Lange say.  There's no way to

4    fix this except by the surgery that the defendants took away

5    from her.

6            Finally, when she was closing, Ms. Morgan said we

7    encourage you to think about three months, six months, and

8    again, that misses the point.  That is the wrong number.  We

9    are here talking about four years.  Four years of suffering

10   because of what Defendants did.  Because of their exclusion.

11   Because Sergeant Lange is transgender.

12           And I request that when you return to your

13   deliberations, you keep that number in mind.  Four years.

14           Thank you very much, ladies and gentlemen.

15           THE COURT:  Ladies and gentlemen, you have heard the

16   closing arguments of the lawyers.  It is now my duty to

17   instruct you on the rule of law -- the rules of law that you

18   must apply as you consider the evidence.

19           But you will have available to you in the jury room a

20   copy of these instructions.  Feel free to take notes, too, but

21   just understand you will have that with you in the jury room.

22           After I instruct you, of course you will retire to

23   the jury room and deliberate and reach a verdict.  Your

24   decision must be based only on the evidence presented during

25   this trial.  That evidence includes the stipulations of fact,

1   the undisputed facts that I read to you at the beginning of the

2   trial.

3           You must not be influenced in any way by either

4   sympathy for or prejudice against any party or anyone.

5           You must follow the law as I explain it -- even if

6   you do not agree with the law -- and you must follow all of my

7   instructions as a whole.  You must not single out or disregard

8   any one instruction.

9           The fact that a governmental entity or agency is

10  involved as a party must not affect your decision in any way.

11  A government agency and all persons stand equal before the law

12  and must be dealt with as equals in a court of justice.

13          When a governmental agency is involved, of course, it

14  may act only through people, its employees.  And in general a

15  governmental agency is responsible under the law for the acts

16  and statements of its employees that are made within the scope

17  of their duties as employees of the governmental agency.

18          Now, as I said, you must consider only the evidence

19  that I have admitted in the case, and that includes the

20  testimony of the witnesses and the exhibits I have admitted.

21  Again, the exhibits will be with you in the jury room.  But

22  anything the lawyers say is not evidence, and that is not

23  binding on you.

24          You should not assume from anything that I have said

25  that I have any opinion about any factual issue in the case.

1   Except for my instructions to you on the law, you should

2   disregard anything I may have said during the trial in arriving

3   at your decision based upon the evidence.

4          It is your own recollection and interpretation of the

5   evidence that matters.

6          In considering the evidence, you may use reasoning

7   and common sense to make deductions and reach conclusions.  And

8   you should not be concerned whether evidence is direct or

9   circumstantial.

10          As I said at the beginning of the trial, "direct

11   evidence" is the testimony of a person who asserts that he or

12   she has actual knowledge of a fact, such as an eyewitness.

13          "Circumstantial evidence" is proof of a chain of

14   facts and circumstances that tend to prove or disprove a fact.

15   There is no legal difference in the weight you may give to

16   either direct or circumstantial evidence.

17          Now, when I say you must consider all of the

18   evidence, I do not mean that you must accept all of the

19   evidence as true or accurate.  You should decide whether you

20   believe what each witness had to say and how important that

21   witness' testimony was.

22          In making that decision, you may believe or

23   disbelieve any witness, in whole or in part.  And the number of

24   witnesses concerning a particular point -- testifying

25   concerning a particular point does not necessarily matter.

1              To decide whether you believe a witness, I remind you

2    of some questions that you can ask as you consider the

3    evidence:

4              Did the witness impress you as one who was telling

5    the truth?

6              Did the witness have any particular reason not to

7    tell the truth?

8              Did the witness have a personal interest in the

9    outcome of the case?

10             Did the witness seem to have a good memory?

11             Did the witness have the opportunity and ability to

12   accurately observe the things he or she testified about?

13             Did the witness appear to understand the questions

14   clearly and answer them directly?

15             Did the witness' testimony differ from other

16   testimony or other evidence?

17             You should also ask yourself whether the -- there was

18   evidence that a witness testified falsely about an important

19   fact and ask whether there was evidence that at some other time

20   a witness said or did something or didn't say or do something

21   that was different from the testimony the witness gave during

22   the trial.

23             But keep in mind that a simple mistake does not

24   necessarily mean a witness was not necessarily telling the

25   truth as he or she remembers it.  People naturally tend to

1   forget some things or remember them inaccurately.  So, if a

2   witness misstated something, you must decide whether it was

3   because of an innocent lapse of memory or an intentional

4   deception.  The significance of your decision may depend on

5   whether the statement was about an important fact or about an

6   unimportant detail.

7        Now, in this case, as you've heard, I've already

8   found that the Exclusions violate federal civil rights law

9   prohibiting employers from discriminating against employees in

10  the terms and conditions of their employment because of sex;

11  therefore, you must consider Sergeant Lange's claim for what

12  the law calls "compensatory damages."

13       When considering the issue of her claim for

14  compensatory damages, you should determine what amount, if any,

15  has been proven by Sergeant Lange, by a preponderance of the

16  evidence, as full, just, and reasonable compensation for all of

17  Sergeant Lange's damages as a result of the denial of health

18  insurance coverage for "drugs for sex change surgery" and

19  "services and supplies for a sex change," no more and no less.

20  Again, those are the two exclusions that were at issue.

21       Compensatory damages are not allowed as punishment

22  and must not be imposed or increased to penalize Houston County

23  or the Houston County Sheriff's Office.

24       Also, compensatory damages must not be based on

25  speculation or guesswork, but you should consider any emotional

1    pain, suffering, inconvenience, mental anguish, and loss of

2    enjoyment of life resulting from the denial of health insurance

3    coverage for Sergeant Lange's surgery to the extent you find

4    that Sergeant Lange has proved them by a preponderance of the

5    evidence, and no others.

6           To determine whether and how much Sergeant Lange

7    should recover, you may consider both the mental and physical

8    aspects of injury -- tangible and intangible.  Sergeant Lange

9    does not have to introduce evidence of a monetary value for

10   intangible things like emotional pain and mental anguish.

11   There is no exact standard that you must apply.  But the award,

12   if any, should be fair in light of the evidence that you have

13   heard.

14          Now, the fact that I have given you instructions

15   concerning the issue of Sergeant Lange's damages should not be

16   interpreted in any way as an indication that I have determined

17   that Sergeant Lange is entitled to damages.  That's your

18   decision -- you decide whether she is entitled to the damages

19   that she claims.

20          Your verdict must be unanimous.  That means you all

21   have to agree.  And your deliberations are secret.  You will

22   never have to explain your deliberations with anyone if you

23   don't care to.

24          And each of you must decide the case for yourself,

25   but only after considering the evidence with your fellow

1    jurors.  So, you must decide the case with one another and try

2    to reach an agreement.  While you are discussing the case, do

3    not hesitate to reexamine your own opinion and change your mind

4    if you become convinced that you were wrong.  But do not give

5    up your honest beliefs just because others think differently or

6    because you simply want to get the case over with.

7            Remember that now you are in a very real way the

8    judges of the case -- the judges of the facts of the case.

9    Your only interest is to seek the truth from the evidence that

10   you have heard.

11           When you get to the jury room, the first thing you

12   need to do -- one of the first things -- is to select a

13   foreperson, somebody who will speak on your behalf when you

14   return to the courtroom.  The foreperson will direct your

15   deliberations, and, as I said, speak for you in court.

16           You will have a verdict form with you.  It's very

17   simple.  You will simply answer two questions, yes or no.  And

18   they will be self-explanatory.

19           That verdict form is limited to the issues of

20   determining -- you determining whether Sergeant Lange suffered

21   damages and, if so, what is the amount of those damages caused

22   by the defendants' violation of the law.

23           In other words, and as I mentioned earlier, you are

24   not responsible for deciding whether the defendants violated

25   the law, Title VII of the Civil Rights Act of 1964.  That issue

1   has already been decided.

2          So, you will have the verdict form with you in the

3   jury room.  When you have agreed on your verdict, your

4   foreperson must fill in the form and each of you must sign it,

5   and then you will return to the courtroom for the delivery of

6   your verdict.

7          If you need to communicate with me at any time during

8   your deliberations, write a note, give it to the court security

9   officer.  He will deliver it to me.  I will discuss it with the

10  lawyers, and we will give you an appropriate response.

11         In your communications, if there are any, do not tell

12  us where you are in terms of voting on reaching a verdict.  We

13  don't need to know that the vote is so-many to so-many.  Just

14  ask your question and we'll give you the best response we have.

15         That concludes the Charge of the Court.  Ladies and

16  gentlemen, you may return to the jury room.  We will confer and

17  bring to you the exhibits, and then you can begin your

18  deliberations.

19      (Jury excused to deliberate at 9:51 a.m.)

20         THE COURT:  We will take a 15-minute break and then

21  return to discuss the issues that I mentioned earlier and

22  others.  But anything from the plaintiff before we take a

23  break?

24         MR. POWELL:  No, Your Honor.

25         THE COURT:  Anything from the defendant?

1          MS. MORGAN:  No, Your Honor.

2          THE COURT:  All right.  We will be in recess for 15

3    minutes.

4          COURT OFFICER:  All rise.

5       (Court in recess from 9:53 a.m. to 10:19 a.m.)

6          THE COURT:  Be seated.  All right.

7          Let's talk about unresolved issues.  Clearly, I've

8    reached the point that I'm not happy about how the lawyers have

9    handled some of these issues.  I have had them thrown in my lap

10   with apparently no thought given by Plaintiffs or Defendants.

11         I understand they are relatively minor issues, but

12   those are the issues that, believe me, you cannot overlook.  I

13   understand that all of you have limited experience when it

14   comes to this stage of litigation, and perhaps I should have

15   been more forceful a little earlier.  But now I am.

16         I was very surprised when I got the pretrial

17   submissions to see the plaintiff's position on these expenses

18   and the apparent thought that, hey, we're entitled to recover

19   these expenses, although there was nothing much more said than

20   that.

21         Defendants haven't given it much thought, either.

22   Other than boilerplate trial briefs, I haven't seen anything

23   particularly helpful from them on the subject.

24         If we go back -- and I am talking now only about the

25   expenses.  I have already discussed with you the fact that --

```
 1   my concern about the subject of scope of equitable relief.
 2              But if we go back and look -- and I am looking at the
 3   Statement of Undisputed Facts -- you know, the only thing that
 4   was said -- and it was clearly only by way of background, and
 5   it's at Paragraph 35 of Document 179-3, and they mention that,
 6   "Sergeant Lange also obtained top surgery to feminize her
 7   chest."  And the response to that was, "Undisputed.  Plaintiff
 8   acknowledged she paid for this surgery."
 9              Other than that, with regard to expenses, we have to
10   turn to Section 22, which is at Page 101 of that document, and
11   specifically Paragraph 265:
12              "On June 12, 2019, she was denied coverage
13              for routine," Sergeant Lange was, "...for a
14              routine blood test for monitoring her hormone
15              and medication levels, citing the Exclusion."
16   The response to that was:
17              "Disputed, as the cited evidence does not
18              support that Plaintiff was told that she was
19              denied coverage for this blood test due to
20              the Exclusion."
21   That's it.
22              Well, you know, Paragraph 266:
23              "And as recently as October 18, 2021, she was
24              denied coverage for her regular annual visit
25              to the endocrinologist."
```

1    It doesn't say why.  The response to that is:

2              "Undisputed, but Plaintiff testified that her

3              previous endocrinologist visits have been

4              covered under the plan."

5    That meant not much to me, because nothing in the briefs argued

6    the point or suggested that there was any -- that the plaintiff

7    was seeking any determination that the defendant was liable in

8    the Motion for Summary Judgment for any specific expenses.  And,

9    consequently, nothing in my order addressed the issue.  I simply

10   ruled that the exclusion was a violation -- the two exclusions

11   violated Title VII.

12             What was on the table, of course, was the fact that

13   the bottom surgery had been denied.  So, I, again, was

14   surprised when the plaintiffs took the position, initially as a

15   matter of undisputed fact, that they were entitled to recover

16   these.  And these expenses, of course, an issue for the Court,

17   not for the jury.

18             It took me a while at that pretrial conference to

19   explain, but I thought it became eventually clear why there was

20   no determination that there was any liability for those

21   expenses.  There is nothing in the record.  It hasn't been

22   established in the record why any expenses were denied, and, of

23   course, there was no denial of any claim for top surgery

24   because no claim was submitted.  Later, the plaintiffs

25   developed a theory that it was futile to do so.

1              I mentioned exhaustion.  The defendants haven't.

2     That's usually an issue that we fight about a lot in Title VII

3     cases, to the extent -- now, I don't necessarily blame the

4     defendants for that.  At least not initially.  Because there

5     was nothing in the Complaint and nothing in the EEOC claim that

6     I would take as an allegation that there was some adverse

7     employment event with regard to the top surgery.

8              It wasn't alleged in the Complaint.  It was

9     referenced in the EEOC form, again, as it has been throughout,

10    by way of background.  But that top surgery occurred over a

11    year before the EEOC claim was filed.  At some point I would

12    have thought the defendants might have said, well, gosh, there

13    may be an exhaustion issue here.  But, no.  I have raised it.

14             And then the latest effort by the plaintiff to put

15    these expenses on the table is to say, well, Judge, remand it

16    so that the insurance company can consider those expenses.

17    And, as I said, that is a non-starter.  That is, as I said, a

18    do-over.  You had every opportunity to put that claim on the

19    table.

20             You claim, with some certainty, although I don't know

21    that there's any evidence, but you claim with some certainty

22    that expenses were denied because of the surgery.  It's your

23    obligation to put those at play.  And if we were to have a

24    non-jury trial to decide the issue of liability for those

25    expenses, then that's what you needed to be addressing.

1              But you don't.  When you realized that you haven't

2     built the record that you need, you say, "Well, Judge, remand."

3     Again, that's a do-over.

4              So, again, a relatively minor issue, given all the

5     activity in this case by all of the lawyers populating the

6     case.  But here we are over a matter that involves $10,000,

7     which if it involves any further activity, is going to involve

8     a non-jury trial, which I am going to set right away if that's

9     what we're going to have to do.

10             All right.  Mr. Powell, what's the plaintiff's

11    position at this point?

12         (Aside between co-counsel at 10:29 a.m.)

13             MR. POWELL:  Your Honor, we've had a discussion and

14    we're prepared to let the pecuniary claims go at this point.

15             THE COURT:  I think that's a wise decision.

16             I assume that Defendants have no objection to that;

17    is that correct?

18             MS. MORGAN:  That is correct.  Defendants have no

19    objection, Your Honor.

20             THE COURT:  All right.  Then that leaves for

21    resolution -- well, not for resolution, really.  But -- well,

22    let me see, to be sure.  Am I correct in assuming that apart

23    from getting the jury verdict, the only issue -- well, two.

24    One, is of course the scope of any injunctive relief, and I

25    guess your resolution of the expenses probably goes a long way

1    towards resolving that issue as well.  And then there's the

2    issue of attorneys fees.

3            On the scope of the injunction, the defendants, as I

4    recall, took the position that they would respond if and when

5    the plaintiff moved for injunctive relief.  But the plaintiff

6    has moved for injunctive relief, they just never said what they

7    wanted the scope to be, except in their -- well, we now have

8    something on the table, which needs to be modified.

9            So, the question is for the defendants now, what is

10   their position -- what is the defendants' position on the scope

11   of injunctive relief?

12       (Aside between counsel at 10:31 a.m.)

13           THE COURT:  By the way, while you're thinking about

14   that, the reason I came in -- I should have done this a long

15   time ago, too -- is ask who was lead counsel.  One problem in

16   this case is we have lawyering by committee.  And I'm through

17   with that, too.

18           So, what's the defendants' position?

19           MS. MORGAN:  Your Honor, I am not sure the defendants

20   are actually prepared at this point to give the position on

21   this.  If we could have some time.  I think we had made some

22   objection to the language that was in this particular document.

23   It looks like some of that is going to come out.

24           THE COURT:  That's a good point.  As I mentioned.

25   So, I will leave you in a moment to discuss that issue further.

```
 1              Then the other issue -- outstanding issue would be I
 2      saw reference to a request for attorneys fees.  Mr. Powell,
 3      does the defendant -- pardon me, does the plaintiff intend to
 4      request attorneys fees?
 5              MR. POWELL:  We do, Your Honor.
 6              THE COURT:  All right.  We'll talk about that when we
 7      get back together.  Anything else other -- with regard to the
 8      Title VII claim that is left open for resolution at this point?
 9              MR. POWELL:  None that we can think of, Your Honor.
10              THE COURT:  From the defendants?
11              MS. MORGAN:  Nothing for Defendants, Your Honor.
12              THE COURT:  All right.  We will take a recess.  I
13      will allow you to talk.  Let me know when you're ready to get
14      back together; otherwise, we will wait for the jury.  Thank
15      you.
16              COURTROOM DEPUTY:  All rise.
17          (Court in recess from 10:33 to 10:50 a.m.)
18              THE COURT:  Take your seats.
19              We have two questions from the jury, on Post-it
20      notes, so we have affixed them to paper.  Let me address
21      Question 2 first, which is:
22              "Did the insurance cover the medication from
23              the endocrinologist?"
24              I am not sure what prompted that question, based upon
25      the evidence.  Maybe there was something that was in one of
```

1     these exhibits that prompted it.

2           My reaction is to respond to that by saying, "That is

3     not an issue in the case."

4           What do the plaintiffs think?

5           MR. POWELL:  That's our view, Your Honor.

6           THE COURT:  How about the defendants?

7           MS. MORGAN:  I think we would take the same position,

8     Your Honor.

9           THE COURT:  So, I will simply respond, "That is not

10    an issue in the case."

11          Question 1 is:

12          "Was the plaintiff aware of the exclusion

13          contained in the policy prior to applying for

14          approval of surgery?"

15          Interesting question, goes to a point that I raised

16    when we were fighting over -- not "fighting" -- when we were

17    discussing these pecuniary damages and the inconsistency

18    between the position the plaintiff was taking on the top

19    surgery -- that is, it was futile to apply because she knew

20    about the exclusions -- and then we heard substantial evidence

21    that, well, the insurance company or the plan said they were

22    going to pay, only to pull the rug out earlier (sic).  But that

23    is not anything that the jury needs to know.

24          My reaction to that question is something to this

25    effect:

```
 1              "I cannot comment on the evidence you have

 2              nor can I add any further evidence."

 3   Because I think what -- you know, they heard the testimony that

 4   I just referred to about how initially everything was fine, it

 5   was going to be paid.  But certainly I don't recall Sergeant

 6   Lange being asked if she was aware of the exclusion.

 7              MR. LAIL:  Your Honor, we did elicit testimony from

 8   Sergeant Lange that when she came out to the Sheriff's Office,

 9   that she was aware of the exclusion.  So that -- that is in her

10   testimony.

11              THE COURT:  She testified to that?

12              MR. LAIL:  That's right.

13              THE COURT:  Okay.  Well, then -- then I think --

14   then, yes, that confirms to me that the response I just stated

15   is the appropriate response.  Does the defendant agree with

16   that?  Let me say it again:

17              "I cannot comment on the evidence that you

18              have heard nor can I add any further

19              evidence."

20              MR. LAIL:  I'm sorry, is that the complete response

21   or was that a second part to it?

22              THE COURT:  Yeah, I mean, I am not going to tell them

23   that it's in evidence one way or the other.  They've got to

24   remember that.  It would be highly inappropriate for me to say,

25   "Well, no, Sergeant Lange testified to this."  I can't do that.
```

1              MR. LAIL:  Would it be acceptable to say, "I cannot

2      add to the evidence you have"?  I'm sorry, not --

3              MR. GIGNILLIAT:  Sorry, Your Honor, this is the

4      lawyering by committee that you rightfully expressed

5      disapproval of.  But what we would suggest is that the Court

6      respond to that particular question with just the first half of

7      what you indicated, that "I cannot comment on the evidence you

8      have."

9              The concern being that the second part of that, which

10     is "nor can I add to the evidence," "add further evidence," I

11     feel like implicit in that piece of it is that it's not in the

12     record.

13             THE COURT:  That's a good point.  And I think if

14     we're going to leave off the second clause, we need to modify

15     the first clause, and just say, "I cannot comment on the

16     evidence."  Period.  So not suggest anything either way.

17             Do Plaintiffs agree with that?

18             MR. POWELL:  We do, Your Honor.

19             THE COURT:  Okay.  Kim, if you would, let the lawyers

20     take a look at that, and make copies, and send it back to the

21     jury.

22             COURTROOM DEPUTY:  Okay.

23             THE COURT:  Thank you.  We will remain in recess or

24     be in recess till we hear further.

25         (Court in recess from 10:58 a.m. to 1:22 p.m.)

```
 1            COURT OFFICER:  All rise.  This Honorable Court is
 2   back in session.  Be seated.  Come to order.
 3            THE COURT:  Well, we have a very perceptive jury.
 4   What happened -- the question of course is:
 5            "What is the legal definition of
 6            preponderance?"
 7   What happened is that the preliminary instructions you submitted
 8   appropriately had that, and you each had your own version as to
 9   one sentence in that.  But the Charge of the Court did not
10   include the pattern charge on Preponderance.  That's my mistake.
11   I should have caught that because, obviously, you have to charge
12   the jury on the burden of proof.  So, I'm thankful to them for
13   catching that.
14            What I propose to do is to call them back in and,
15   first, caution them that they can't take this instruction and
16   give it any more weight than any other instruction, they have
17   to consider the instructions of the Court as a whole, and then
18   charge them on this.
19            Do you all have the charge on Burden of Proof --
20            MR. POWELL:  We do.
21            THE COURT:  -- that we prepared?  The first two
22   perhaps are exactly what I charged in the preliminary
23   instructions that I took from your proposed instruction.  The
24   final paragraph is the balance of the pattern instruction on
25   Burden of Proof.
```

1          So, I would bring them back in and congratulate them

2     on their sleuthing and give them this charge.  And since they

3     have the other -- the rest of the charge with them, they would

4     also have a copy of this with them in the jury room.

5          From the plaintiff's standpoint, any observations or

6     questions about that?

7          MR. POWELL:  No, Your Honor.  This makes sense.  And

8     the charge looks fine to us.

9          THE COURT:  From the defense?

10         MS. MORGAN:  The same, Your Honor.  It is fine with

11    us.

12         THE COURT:  All right.  We can bring the jury in.

13     (Jury returned to courtroom at 1:26 p.m.)

14         THE COURT:  We brought you back in, ladies and

15    gentlemen, just to be sure the pizza was okay.

16     (Laughter.)

17         THE COURT:  No, seriously, you caught a mistake, as

18    your question tells us, and the question you have asked is:

19         "What is the legal definition of

20         preponderance?"

21         You may recall that in the preliminary instructions I

22    talked about that, but it should have been included in the

23    final instruction as well.  So, you were right to ask that

24    question.

25         So, what I'm going to do is to give you the

1   instruction on Burden of Proof, which defines "preponderance of

2   the evidence."

3          Before I do that, though, I caution you that you

4   should not single out this charge.  You are to consider my

5   instructions, the Charge of the Court, as a whole.  This charge

6   has no more importance than any other.  So, you will have a

7   copy of this with you.  Consider it in conjunction with the

8   other instructions that I gave you and that you have with you

9   in the jury room.

10         But here is the charge in response to the question

11  you have asked:

12             "Sergeant Lange has the burden of proving her

13             damages by what the law calls a

14             'preponderance of the evidence.'  That means

15             Sergeant Lange must prove that, in light of

16             all the evidence, the damages that she claims

17             to have incurred are more likely true than

18             not.

19             "So, if you put the evidence favoring

20             Sergeant Lange and the evidence favoring

21             Houston County and Sheriff Talton on opposite

22             sides of balancing scales, Sergeant Lange

23             needs to make the scales tip to the side.

24  And you may remember at the beginning of the trial I called your

25  attention to an old fashioned set of scales, where you weigh on

1   each side, and that is what the charge is talking about.  The

2   charge continues as follows:

3             "To decide whether any fact has been proved

4             by a preponderance of the evidence, you may

5             consider the testimony of all witnesses,

6             regardless of who called them, and all

7             exhibits that the Court allowed, regardless

8             of who produced them.  After considering all

9             the evidence, if you decide a claim or fact

10            is more likely true than not, then the claim

11            or fact has been proved by a preponderance of

12            the evidence."

13  So, that is the full charge on the plaintiff's burden of proof;

14  and in particular, the definition of "preponderance of

15  evidence."

16            So, you may return to the jury room and continue with

17  your deliberations.  Thank you.

18        (Jury excused to deliberate at 1:29 p.m.)

19            THE COURT:  Anything further at this time from the

20  plaintiff?

21            MR. POWELL:  No, Your Honor.  I can tell you that

22  we're making progress on the form of injunction.  We've got a

23  last issue that we're working through, but we should have it to

24  you in a bit.

25            THE COURT:  Very good.  Thank you.

1             Anything further from the defense at this point?

2             MS. MORGAN:  Nothing further from the defense.  Thank

3    you.

4             THE COURT:  All right.  We will go back to recess.

5             COURT OFFICER:  All rise.  Court is in recess.

6        (Court in recess from 1:30 to 1:47 p.m.)

7             COURT OFFICER:  All rise.  This Honorable Court is

8    back in session.  Be seated and come to order.

9             THE COURT:  I understand we have a verdict.  You may

10   bring the jury in.

11       (Jury returned to the courtroom at 1:53 p.m.)

12            THE COURT:  Ladies and gentlemen, I understand you

13   have a verdict.  Ms. Moore, are you the foreperson?

14            JUROR:  I am.

15            THE COURT:  Would you please hand the verdict to the

16   court security officer.

17            The form of the verdict is in order.

18            Ms. Tavalero, you may publish it.

19            COURTROOM DEPUTY:  Okay.  In the matter of Anna Lange

20   versus Houston County, Georgia, *et al.*, Civil Action Number

21   5:19-CV-392.  The Verdict Form reads as follows:

22            "We, the jury, for our damages verdict, do

23            find as follows:

24            "Question Number 1:  Has Plaintiff Sergeant

25            Anna Lange, proven by a preponderance of the

1              evidence that she suffered emotional pain and

2              mental anguish as a result of the Exclusion?

3              "Answer:  Yes.

4              "Question Number 2:  If your answer is YES,

5              what amount of money do you award for

6              emotional pain and mental anguish to

7              Plaintiff Sergeant Lange?

8              "$60,000.

9              "SO SAY WE ALL, this 27th day of September,

10             2022,"

11    signed by the foreperson and the eleven remaining jurors.

12             THE COURT:  Thank you.

13             Mr. Powell, anything further from the jury before I

14    dismiss them?

15             MR. POWELL:  No, Your Honor.  We thank them for their

16    service.

17             THE COURT:  Ms. Morgan?

18             MS. MORGAN:  No, Your Honor.  Similarly, we thank

19    them for their service, as well.

20             THE COURT:  We all thank you for your service, ladies

21    and gentlemen.  I am going to ask you to return to the jury

22    room one last time.  I want to come back and thank you

23    personally.  I will just take a couple of minutes.  Let me

24    speak to the lawyers and I will be right back.  But we will

25    remain seated while you go to the jury room.

1              (Jury dismissed and exited the courtroom at 1:55 p.m.)

2              THE COURT:  Counsel, give me just a few minutes to

3     speak to the jury, and I will be right back.

4              (Court stepped out to jury room at 1:56 p.m., returning to

5              the courtroom at 1:59 p.m.)

6              THE COURT:  The lawyers may have noted from the

7     questionnaires that Mr. Enderson previously served on a jury

8     here, and so they were particularly interested in knowing

9     whether or not there's a chance they would be called back

10    again.  I said no, that's lightning striking, so you don't have

11    to worry about that.

12             All right.  Any report on you all's discussion?

13             MR. POWELL:  Your Honor, I -- I think we have one

14    last issue that I'm -- actually, we haven't checked with them,

15    where they stand on it.  I think we've agreed on everything.

16             And just so you understand what the issue is, is that

17    we had proposed today to them that at the point at which

18    Sergeant Lange's claim for her surgery goes back to Anthem to

19    be approved, that any out-of-pocket costs that she would incur

20    would be capped essentially at what she would have paid back in

21    2019.  And they are amenable to that, but they were just

22    working on some language on that.  So, that's really the last

23    issue, I think, from our perspective.

24             THE COURT:  So do you think you can get some language

25    put together and get that to me?

1              MR. POWELL:  Are we close?

2              MR. LAIL:  I believe we're reasonably close, Your

3       Honor.  Again, it's because it is Houston County's plan, but

4       the administration is done by a different party, we are trying

5       to get a little more information about exactly how that would

6       work; whether it would be adjudicated under current standards

7       and we would, after the fact, have to modify it based on

8       out-of-pockets or co-pays or whatever from 2019, or if Anthem

9       can kind of roll it all back to 2019 for purposes of this

10      claim.  We just don't have that detail yet, and we may not

11      today.

12             But I think we can come up with language today that

13      will likely address either of those situations.  We may -- I

14      haven't addressed this yet with David or Wes, but in terms of

15      the time period this is going into effect, I think originally

16      it was 7 days.  We might ask for 14, just because it may take a

17      little bit of back-and-forth with Anthem to make sure we have

18      some of that nailed down.

19             THE COURT:  That's fine with me.  So, we will --

20      we'll look forward to getting that.  And thank you for that.

21             I think we need to also set a time for filing your

22      Motion for Attorneys Fees.  What would you suggest, Mr. Powell?

23             MR. POWELL:  Your Honor, I think 30 days would work

24      for us.  Of course, we understand that they may well appeal,

25      and that may have an effect on that.  But we can get it done in

1    30 days.

2           THE COURT:  Very well.  I'll allow 30 days to file

3    that, standard 21 days to respond.  But we can be flexible

4    there as well.

5           Now, we may at some point need to talk about an

6    appeal.  That issue may come up again.  May not, I guess, with

7    the entry of injunctive relief.  But we'll see.  But I guess

8    for today, those are the only issues to address.  Anything

9    further from the plaintiffs?

10          MR. POWELL:  No, Your Honor.

11          THE COURT:  And from the defendants?

12          MS. MORGAN:  No, Your Honor.

13          THE COURT:  All right.  Thank you, all.  And we will

14   move on to the next stage.

15          COURT OFFICER:  All rise.

16      (Proceedings concluded at 2:04 p.m.)

17                            END OF RECORD

18

19

20

21

22

23

24

25

1                        CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5              I, Darlene D. Fuller, Federal Official Realtime Court

6     Reporter, in and for the United States District Court for the

7     Middle District of Georgia, do hereby certify that pursuant to

8     Section 753, Title 28, United States Code, that the foregoing is

9     a true and correct transcript of the stenographically reported

10    proceedings held in the above-entitled matter and that the

11    transcript page format is in conformance with the regulations of

12    the Judicial Conference of the United States.

13

14                              Dated this 8th day of October, 2022

15

16                              _____
                                *Darlene D. Fuller*
17                              Darlene D. Fuller, RPR, CRR, RMR
                                NCRA No. 5803
18                              Federal Official Court Reporter
                                Georgia CCR 5641-3440-5157-6832
                                Michigan Certification CSR-0929
19

20

21

22

23

24

25