[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13626

_____

ANNA LANGE,

                                                         Plaintiff-Appellee,

*versus*

HOUSTON COUNTY, GEORGIA,
HOUSTON COUNTY SHERIFF CULLEN TALTON,
in his official capacity,

                                                         Defendants-Appellants,

HOUSTON COUNTY BOARD OF
COMMISSIONERS, et al.,

                                                         Defendant.

_____

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 5:19-cv-00392-MTT

_____

Before WILSON, JILL PRYOR, and BRASHER, Circuit Judges.

WILSON, Circuit Judge:

This appeal requires us to determine whether a health insurance provider can be held liable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, for denying coverage for gender-affirming care to a transgender employee *because* the employee is transgender. We hold that it can. The district court did not err in finding that Defendants-Appellants Houston County, Georgia (Houston County) and the Houston County Sheriff (collectively, Defendants) violated Title VII in discriminating against Plaintiff-Appellee Anna Lange, nor did it abuse its discretion in granting a permanent injunction. Thus, we affirm the district court.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Houston County provides a health insurance plan to its own employees, as well as employees of the Houston County Sheriff's Office via a decades-long intergovernmental arrangement between

both entities (hereby, the Health Plan).[1]  The largest share of employees covered by the Health Plan are enrolled via this partnership with the Sheriff's Office.  The Health Plan covers "medically necessary" services, including office visits, doctor services, prescription drugs, surgical supplies, inpatient hospital care, and inpatient professional services, such as surgery and general anesthesia.  A surgery is considered medically necessary if there is a "significant functional impairment and the procedure can be reasonably expected to improve the functional impairment."  Houston County sets the benefit terms, decides what changes are to be made to the Health Plan, determines member deductibles and premiums, and provides services to all enrollees.  Houston County also advises the Sheriff's Office regarding the costs of the Health Plan and issues arising from employee plan participation.

Anna Lange is a transgender woman.  She was assigned a male sex at birth, but her internal knowledge of herself has always been that she is female.  In 2006, she began working for the Sheriff's Office with Cullen Talton serving as the Sheriff.  Throughout most of her life, including her time employed with the Sheriff's Office, she experienced symptoms of gender dysphoria.  Gender dysphoria is a condition that causes feelings of discomfort and distress because of the incongruence between one's gender identity and their

---

[1] The Health Plan is a self-funded or an Administrative Services Only plan administered by Anthem Blue Cross Blue Shield.  Anthem Blue Cross Blue Shield serves as Houston County's third-party administrator and administers claims using funds provided by Houston County and employee contributions.

sex assigned at birth. As the district court notes, if left untreated, people with gender dysphoria are more vulnerable to developing other health concerns including, but not limited to, anxiety, depression, and suicidality.

Lange was formally diagnosed with gender dysphoria by a healthcare provider in 2017. The next year, Lange informed the Sheriff's Office that she was transgender and would be living as a woman. Following her formal diagnosis, Lange's healthcare providers started her on a treatment plan to align her physical characteristics with her gender identity. The plan comprised of hormone therapy and gender-affirming surgery, both of which are shown to alleviate symptoms of gender dysphoria. In 2018, her healthcare providers determined that a vaginoplasty—a surgical procedure to feminize her genitals—was medically necessary.

Lange turned to her health insurance to cover her medically necessary surgery. However, Lange's request for coverage was denied based on the Health Plan's exclusion of "[d]rugs for sex change surgery" and "[s]ervices and supplies for a sex change and/or the reversal of a sex change" (together, the Exclusion).

Lange filed an appeal with Anthem. She also sent a letter to Houston County requesting to resolve the dispute via a negotiations process—which went unanswered. Shortly after the letter was sent, Anthem denied her appeal. Lange then attended a public meeting with the Houston County Board of Commissioners requesting that the Exclusion be removed, to no avail.

Lange subsequently filed claims against Houston County with the Equal Employment Opportunity Commission. She then sued Houston County and the Sheriff of Houston County in the Middle District of Georgia. In addition to seeking relief under Title VII, Lange sought relief under Title I of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq*., and the Equal Protection Clause of the United States Constitution. After discovery, the parties filed cross-motions for summary judgment on all claims.

The district court granted summary judgment to Defendants on Lange's ADA claim; granted summary judgment to Lange on the Title VII claim; and denied summary judgment on the Equal Protection claim with respect to Houston County.[2]

In granting summary judgment to Lange on the Title VII claim, the district court found the Exclusion facially discriminatory as a matter of law. The Title VII claim then proceeded to trial, and a jury awarded Lange $60,000 in damages. After trial, the district court entered an order declaring that the Exclusion violated Title VII and permanently enjoined the Sheriff and Houston County from any further enforcement or application of the Exclusion.

---

[2] The ADA and Equal Protection claims are not before us on appeal. The parties agreed to proceed to trial of Lange's equal protection claim pending resolution of Defendants' present appeal. On September 6, 2022, the district court issued an order declaring the case, as to the equal protection clause claim, set for trial in February 2023. The parties subsequently agreed to a continuance of that trial.

6                    Opinion of the Court                    22-13626

Once the injunction was entered, Defendants timely appealed and moved for a stay pending appeal in the district court.

After considering Defendants' motion, Lange's response, and supplemental briefings, the district court denied Defendants' motion for a stay pending appeal.[3]

## II.    STANDARD OF REVIEW

This court reviews a district court's grant of summary judgment de novo, "viewing all evidence and drawing all reasonable inferences in favor of the non-moving party." *State Farm Mut. Auto. Ins. Co. v. Spangler*, 64 F.4th 1173, 1178 (11th Cir. 2023). "Summary judgment is appropriate only 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). The decision whether to grant or deny permanent injunctive relief is reviewed by this court for an abuse of discretion. *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1221 (11th Cir. 2017). The relevant underlying legal determinations are reviewed de novo. *Id.*

---

[3] While this litigation was pending in the district court, this court issued its en banc decision in *Adams v. School Board of St. Johns County*, 57 F.4th 791 (11th Cir. 2022). The district court subsequently directed the parties to "supplement their briefs to address what effect, if any, *Adams* ha[d] on Defendants' motion to stay injunctive relief." Defendants argued that although *Adams* involved neither similar facts nor the same statutory claims, it may be read as persuasive authority. Plaintiff argued that *Adams* neither altered the merits analysis nor the balance of the equities.

### III.  Discussion

Defendants argue that the district court erred in holding that: (1) the Exclusion violates Title VII; and (2) Houston County is liable under Title VII as an agent of the Sheriff's Office.  Defendants also assert that the district court abused its discretion in granting a permanent injunction.  We will address each argument in turn.

### a.  Title VII Facial Discrimination

To determine whether the district court erred in finding the Exclusion facially discriminatory, we begin with an analysis of Title VII discrimination before turning to the statute's offered protections.

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Generally, discrimination in the Title VII context occurs when an employer intentionally treats an employee worse than other similarly situated employees.  *Bostock v. Clayton Cnty.*, 590 U.S. 644, 657–58 (2020).  Where an employer's policy or practice discriminates against a protected characteristic, no further proof of disparate intent is needed.  *See id.* at 667; *see also Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991) (holding that "[w]hether an employment practice involves disparate treatment through explicit

facial discrimination does not depend on why the employer dis-
criminates but rather on the explicit terms of the discrimination").

The Supreme Court clarified in *Bostock* that "discrimination
based on . . . transgender status necessarily entails discrimination
based on sex" as prohibited under Title VII.[4]  590 U.S. at 669.  This
is because an employer who discriminates based on transgender
status is intentionally treating that employee differently *because of
their sex." Id.* at 660–61 (emphasis added) ("[H]omosexuality and
transgender status are inextricably bound up with sex. . . . [T]o

---

[4] On April 29, 2024, the U.S. Equal Employment Opportunity Commission
issued updated enforcement guidelines on workplace harassment, including
sex-based discrimination under Title VII.  The guidelines were published to
"provide clarity to the public regarding existing requirements under the law
or agency policies" and describe sex-based harassment as follow:

> [S]ex-based harassment includes harassment based on sexual
> orientation or gender identity, including how that identity is
> expressed.  Harassing conduct based on sexual orientation or
> gender identity includes epithets regarding sexual orientation
> or gender identity; physical assault due to sexual orientation or
> gender identity; outing (disclosure of an individual's sexual ori-
> entation or gender identity without permission); harassing
> conduct because an individual does not present in a manner
> that would stereotypically be associated with that person's sex;
> repeated and intentional use of a name or pronoun incon-
> sistent with the individual's known gender identity (misgen-
> dering); or the denial of access to a bathroom or other sex-seg-
> regated facility consistent with the individual's gender identity.

U.S. Equal Emp. Opportunity Comm'n, EEOC-CVG-2024-1, Enforcement
Guidance on Harassment in the Workplace (2024).

discriminate on these grounds requires an employer to intention-
ally treat individual employees differently because of their sex.").

Applying *Bostock*'s reasoning to the facts in this case, we con-
clude that the district court was correct in finding that the Exclu-
sion violated Title VII.  There is no genuine dispute of fact or law
as to whether the Exclusion unlawfully discriminates against Lange
and other transgender persons.  The Exclusion is a blanket denial
of coverage for gender-affirming surgery.  Health Plan participants
who are transgender are the only participants who would seek gen-
der-affirming surgery.  Because transgender persons are the only
plan participants who qualify for gender-affirming surgery, the plan
denies health care coverage based on transgender status.[5]  This find-
ing is further supported by our court's decision in *Glenn v. Brumby*,
where we held that an individual may not "be punished because of
his or her perceived gender-nonconformity."  663 F.3d 1312, 1319
(11th Cir. 2011).  In denying coverage for the vaginoplasty, Houston
County   deprived   Lange   of   a   benefit   or   privilege   of   her

---

[5] *See also Kadel v. Folwell*, -- F.4th --, 2024 WL 1846802, at *14 (4th Cir. Apr. 29,
2024), recognizing that:

> Just as cisgender people would not seek any treatment for gen-
> der dysphoria, they would not seek certain surgeries for gen-
> der-affirming purposes.  For instance, a cisgender woman
> would never seek a hysterectomy, oophorectomy, or vaginec-
> tomy for gender-affirming reasons because, for her, those sur-
> geries are not gender-affirming.  Nor would a cisgender man
> ever seek an orchiectomy or penectomy for gender-affirming
> reasons because, for him, those surgeries are not gender-af-
> firming.

employment by reason of her nonconforming traits, thereby unlawfully punishing her for her gender nonconformity. *See id.* at 1317.

The dissent suggests that the plan is not discriminatory because "it does not draw a line between procedures transgender people need and procedures that other people need." Brasher Dissent at 8. According to the dissent, "the plan draws a line between sexchange operations and other operations." *Id.* But this kind of line drawing is precisely what makes the plan discriminatory. By drawing a line between gender-affirming surgery and other operations, the plan intentionally carves out an exclusion based on one's transgender status. Lange's sex is inextricably tied to the denial of coverage for gender-affirming surgery.

Defendants maintain that Lange's discrimination claim should be defeated because she was able to secure other transition-related care under the Health Plan. This argument reflects a misunderstanding of existing law and precedent. The language of Title VII is clear: the statute prohibits discrimination with respect to one's compensation. 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has explicitly held that insurance is a benefit within Title VII's "compensation, terms, conditions, or privileges of employment." *Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 682 (1983). Insurance coverage conditioned upon one's protected status therefore violates Title VII. An employer is not shielded from liability when it engages in discriminatory practices concerning some treatment and not others. Each instance of

discrimination presents an independent violation. *Bostock*, 590 U.S. at 662. If we were to find otherwise, Title VII would be rendered obsolete.

The Exclusion is a facially discriminatory policy, and its harmful effects are not mitigated by the existence of other nondiscriminatory policies. We therefore affirm the district court's finding that the Exclusion is facially discriminatory in violation of Title VII.

### b. Title VII Liability

We now consider whether Houston County is liable as an employer under Title VII. Houston County requests that we deploy a narrow reading of the statute, and that even if there is a finding of discrimination, it should not be held liable because it is not an employer as defined by Title VII. In light of circuit precedent, we decline to cabin our interpretation of the statute in this way.

Title VII's definition of employer includes any government, governmental agency, partnership or association, or any agent of such an entity. 42 U.S.C. § 2000e(a)–(b). This definition is liberally construed, and courts may consider the "totality of the employment relationship" in determining whether an entity is an employer. *Peppers v. Cobb Cnty.*, 835 F.3d 1289, 1297 (11th Cir. 2016). "Where the employer has delegated control of some of the employer's traditional rights, such as hiring or firing, to a third party, the third party has been found to be an 'employer' by virtue of the agency relationship." *Williams v. City of Montgomery*, 742 F.2d 586, 589 (11th Cir. 1984) (per curiam) (quotations omitted).

Here, the delegation at issue concerns the provision of health insurance. The Supreme Court has made clear that "there is no reason to believe that Congress intended a special definition of discrimination in the context of employee group insurance coverage." *City of L.A., Dep't of Water & Power v. Manhart*, 435 U.S. 702, 710 (1978). Health insurance is squarely a benefit within Title VII's "compensation, terms, conditions, or privileges of employment." *Newport News Shipbuilding*, 462 U.S. at 682. Further, the Supreme Court has held that providers must consider discriminatory impacts when designing plan coverage. *See Shapiro v. Thompson*, 394 U.S. 618, 633 (1969) (holding that "[t]he saving of welfare costs cannot justify an otherwise invidious classification"), *overruled on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974).

The dissent describes Houston County's health insurance plan as "just a cheap plan." Brasher Dissent at 8. But costs savings do not excuse discrimination, nor may they be used to circumvent liability under Title VII. *See Newport News Shipbuilding*, 462 U.S. at 685 n.26. Regardless, the district court found that Houston County had not considered "any cost information prior to deciding not to consider Lange's request to remove the Exclusion." *Lange v. Hous. Cnty.*, 608 F. Supp. 3d 1340, 1348, 1355 (M.D. Ga. 2022).

The district court consequently did not err in holding Houston County liable under Title VII. The administration and provision of health insurance was delegated from the Sheriff's Office to Houston County. A delegation of this kind is directly in line with our decision in *Williams*. 742 F.2d at 589. In accepting such a

delegation, Houston County qualified themselves as an agent and employer under Title VII, and therefore assumed liability stemming from this delegated role.

Houston County argues that we should not read too much into this delegation, contending that the Sheriff's Office is simply "taking advantage" of an existing health insurance plan. While this may be the reason underlying the partnership, it does nothing to absolve Houston County of agency liability. Thus, we affirm the district court's determination finding Houston County liable under Title VII.

### c.  Permanent Injunction

Finally, we review the district court's order permanently enjoining Houston County and the Sheriff from further enforcement or application of the Exclusion for an abuse of discretion. *See Barrett*, 872 F.3d at 1221. In granting a permanent injunction, the district court may grant relief if the plaintiff has shown that:

> (1) [the plaintiff] has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction.

*AcryliCon USA, LLC v. Silikal GMBH & Co.,* 46 F.4th 1317, 1327 (11th Cir. 2022) (quoting *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008)) (alteration in original).

After reviewing the briefs, and having the benefit of oral argument, we find that Defendants have failed to show that the district court abused its discretion in entering a permanent injunction. The record supports finding that Lange met most, if not all, of the criteria outlined above. We address each factor in turn.

First, given our finding that the district court did not err in concluding that the Exclusion violates Title VII, an irreparable injury is found in the Exclusion's plain discrimination against Lange because she is transgender. Second, Lange's Title VII claim demonstrates that monetary damages would not cure the live discrimination and injury presented by the Exclusion. The district court has equitable discretion to choose an appropriate remedy, and appropriately enjoined the enforcement or application of a policy found to be unlawful under statute. Third, the district court's well-reasoned order demonstrates that it did not abuse its discretion in assessing the balance of hardships. For example, Houston County alleged that the costs of gender-affirming surgeries would be burdensome. However, because Lange established an injury resulting from a facially discriminatory policy, the district court aptly determined that cost savings cannot justify such a policy. We therefore find that the district court sufficiently considered the balance of hardships and was well-reasoned in finding that Lange had established that they weighed in her favor. Fourth and finally, there is no

evidence in the record to support the contention that the public interest would be disserved by this injunction.

The district court did not abuse its discretion in granting a permanent injunction.

## IV.    CONCLUSION

For these reasons, we affirm the district's well-reasoned opinion finding Houston County and the Sheriff of Houston County liable under Title VII, and we affirm the district court's subsequent order enjoining further enforcement or application of the Exclusion.

**AFFIRMED.**

BRASHER, Circuit Judge, dissenting:

The majority opinion says the question here is whether an employer-provided health insurance policy may deny coverage "to a transgender employee *because* the employee is transgender." The answer to that question, the majority opinion concludes, is "no."

I agree with that proposition as far as it goes. But it doesn't go very far in this case. The reason is that the employer-provided health insurance plan here does not deny coverage to anyone *because* he or she is transgender. The alleged problem with this plan is that it excludes coverage for sex change surgeries, not that it denies coverage to transgender people. On the face of this policy, it doesn't treat anyone differently based on sex, gender nonconformity, or transgender status. Because this policy does not facially discriminate, I respectfully dissent.

## I.

Sergeant Anna Lange was born a male but, after being diagnosed with gender dysphoria in 2017, began to identify as a woman. According to one of Lange's expert witnesses, gender dysphoria is a "serious medical condition" that creates "an intense and persistent discomfort" with one's biological anatomy. Most transgender individuals seek some level of medical services in connection with their diagnoses. Those services range from mental health counseling to hormones, all the way up to a sex change surgery.

As a treatment for gender dysphoria, Lange sought to have male-to-female sex change surgery. Sex change surgeries are a suite of medical procedures that can vary in their purpose, cost, and complexity. They may include "[c]hest reconstruction surgery"; "[g]enital reconstruction surgeries" such as "penectomy (removal of the penis), orchiectomy (removal of the testes), vaginoplasty, clitoroplasty, and/or vulvoplasty"; and other surgeries such as "facial feminization surgery, liposuction, lipofilling, voice surgery, thyroid cartilage reduction, gluteal augmentation . . . , and hair reconstruction, among others."

Some of these procedures can be performed on either biological sex, but some procedures are specific to biology. For example, as explained by Lange's doctor, a natal man's "vaginoplasty" will be very different from a natal woman's. For a natal man to undergo a vaginoplasty, "the testicles will be removed, the urethra will be shortened, and the penile and scrotal skin will be used to line the neovagina, the space between the rectum and the prostate and bladder." Additionally, the patient must undergo an "extensive regimen of post-surgery dilatation to prevent the closure of the neovagina." The same can be said when comparing a natal woman's phalloplasty—the construction of a neopenis—with a phalloplasty a natal man may undergo. A health insurance company's medical guidelines explain that a natal woman's phalloplasty "involves removal of the uterus, ovaries, and vagina, and creation of a neophallus[] and scrotum with scrotal prostheses," which "is a multistage reconstructive procedure."

As a sergeant with the Houston County Sheriff's Office, Sergeant Lange participates in the county's health insurance plan, which contains several coverage exclusions. In total, the plan excludes coverage for 68 medical categories and 29 pharmaceutical categories. Excluded categories include dental and vision care, elective abortions, contraceptives, hearing aids, fertility treatment, and oral surgeries.

Since at least 1998, the plan has excluded "drugs," "[s]ervices[,] and supplies for a sex change and/or the reversal of a sex change." The plan also contains other provisions that would likely prohibit a patient from receiving certain sex-change-type surgeries. For example, the plan does not cover cosmetic surgeries or medically necessary surgeries to treat sexual dysfunction.

The plan's sex change exclusion is consistent with the pattern in the rest of the insurance plan: it covers medically necessary treatments but excludes particularly expensive, top-of-the-line procedures. For example, although it covers various treatments for obesity, the plan excludes coverage for bariatric surgery. Similarly, for a gender dysphoria diagnosis, the plan covers basic treatments like hormone replacements from an endocrinologist and sessions with a psychotherapist, but it does not cover surgery.

When the insurer that administers the County's plan denied coverage for a sex change operation, Lange sued the County under Title VII for discrimination "because of sex." The district court held that there was a genuine dispute of fact about why the County's plan excluded sex changes from its coverage. But the court held

that this factual dispute did not matter because it believed the County's insurance plan violated Title VII on its face. Accordingly, the district court granted summary judgment for Lange and permanently enjoined the exclusion for sex change surgeries from the County's insurance plan. The County appealed.

## II.

Lange has sued the County for disparate treatment under Title VII, which makes it unlawful for an employer to deny fringe benefits because of an employee's sex. *See Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682 (1983). To succeed on this Title VII cause of action, Lange must prove that the County had a "discriminatory intent or motive" for its actions. *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). One way to prove discriminatory intent is the existence of a "formal, facially discriminatory policy requiring adverse treatment of employees with [] [a protected] trait." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993). In other words, a facially discriminatory policy is almost always enough by itself to demonstrate discriminatory intent. *See Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am. v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991).

Lange argues, and the majority holds, that excluding sex change operations on the face of this policy necessarily means that the County is intentionally discriminating against transgender people because of sex. I disagree. Although the policy does not cover sex change surgeries, it doesn't treat anyone differently based on sex, gender nonconformity, or transgender status. Lange may be

able to prove a Title VII claim with more evidence or on a different theory of liability, but Lange's intentional discrimination claim cannot succeed on the face of this policy alone.

*A.*

I'll start in the same place the majority opinion does—with *Bostock v. Clayton County*, 590 U.S. 644 (2020). In *Bostock*, the Court held that Title VII prohibits firing an employee "simply for being" transgender. *Id.* at 681. The Court explained that "[i]f [an] [] employer intentionally relies in part on an individual employee's sex when deciding to discharge the employee—put differently, if changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred." *Id.* at 659–60. In light of this understanding of sex discrimination, the Court reasoned that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 660.

Turning to the County's insurance plan, the challenged exclusion doesn't fit *Bostock*'s rubric because nothing about the exclusion turns on Lange's sex. Unlike the employees in *Bostock* who were fired because they identified with a gender different from their natal sex, this health insurance plan does not deny medical coverage to participants "simply for being . . . transgender." *Id.* at 681. To be akin to *Bostock*, the policy would have to deny some or all coverage to transgender people. But it doesn't. The County's insurance plan covers transgender people and provides treatments for gender dysphoria. Lange's sex is not relevant to the County's

insurer at all. All that matters is whether Lange is asking the insurer to pay for the constellation of medical procedures known as a "sex change."

There is also no serious argument that the plan—on its face—relies on gender stereotypes. As the Supreme Court explained in *Price Waterhouse v. Hopkins*, 490 U.S. 288 (1989), discrimination based on gender stereotypes is unlawful sex-based discrimination. *See id.* at 251–52. We, likewise, have held that the law prohibits "not just discrimination because of biological sex, but also gender stereotyping—failing to act and appear according to expectations defined by gender." *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011). But this insurance plan has nothing to do with stereotypes. The exclusion for sex change surgery is consistent with other exclusions for treatments for sexual dysfunction, cosmetic surgery, bariatric surgery, and the like. And the exclusion applies equally to sex change *reversals*. If the plan discriminated against participants because of gender stereotypes, it would cover procedures to *align* a participant's physical characteristics with those of his or her natal sex. Instead, the plan refuses to pay for a suite of medical procedures whether the goal is to align with natal sex or differ from natal sex.

Although *Bostock* was a monumental decision in antidiscrimination law, it doesn't dictate a ruling in favor of every transgender plaintiff who sues over any employment policy. The employer here isn't doing anything remotely like the employer in *Bostock*. Neither the reasoning nor the result in *Bostock* supports Lange.

### B.

Given that coverage under the plan doesn't turn on any individual's sex, transgender status, or gender stereotype, how can Lange claim that it does? Lange makes two arguments to transform an exclusion that, on its face, does not turn on an individual's sex into one that facially discriminates against transgender people. Neither argument works.

### 1.

Lange's primary argument is that the policy facially discriminates against transgender people because transgender people are the only people who would want a sex change operation and because it denies coverage for those operations. The majority likewise says that the policy facially discriminates against transgender people because "Health Plan participants who are transgender are the only participants who would seek" sex change surgery. The syllogism goes like this: some transgender people want a sex change operation as a treatment for gender dysphoria; those are the only people who would want a sex change operation; the policy doesn't cover sex change operations; therefore, the policy facially discriminates based on transgender status.

Assuming Lange is factually correct that only transgender people would want sex change surgery, that doesn't mean the plan discriminates because of sex. An employer discriminates under Title VII when it treats an employee differently than it would without the employee's protected trait. So the Supreme Court has held that

an employer cannot give its female employees a benefit package better than the package it offers to its male employees. *See Newport News Shipbuilding & Dry Dock Co.*, 462 U.S. at 676. It's the comparison—e.g., what is provided to males versus what is provided to females—that tells us whether a health insurance policy is facially discriminatory.

Under that understanding of discrimination, this plan doesn't discriminate. Title VII doesn't guarantee employees coverage for any particular medical procedure, and this plan is not especially generous in its coverage. The plan covers transgender people and gender dysphoria. Although it excludes one treatment for gender dysphoria, it also excludes coverage for all sorts of similar things such as expensive surgeries, cosmetic procedures, and all treatments for sexual dysfunction. The upshot is that the plan doesn't seem to provide the equivalent of a sex change surgery to anyone. It's not discriminatory; it's just a cheap plan.

The majority opinion says that it doesn't matter that the insurance plan covers transgender people and gender dysphoria because an employer "is not shielded from liability when it engages in discriminatory practices concerning some treatment and not others." But the majority is missing the point. The point is that, on the face of the plan, it does not draw a line between procedures transgender people need and procedures that other people need. Instead, the plan draws a line between sex-change operations and other operations. That the plan covers transgender people and gender dysphoria raises a reasonable inference that there is a "but for"

cause *other than transgender status* for the plan to decline coverage for sex change operations. But, more to the point here, it unequivocally establishes the absence of *facial* discrimination against transgender people or transgender-related treatments.

There are three additional problems with conflating this policy—an insurance policy that denies coverage for a single treatment for gender dysphoria—with a policy that facially discriminates against transgender people because of sex.

First, this view of the law doesn't equalize fringe benefits—it treats certain people more favorably than others. Under the majority's view, an insurance policy can exclude coverage for obesity. It can decline to cover cosmetic procedures to hide scars and repair mastectomies. It can even decline to cover expensive, life-saving cancer treatment. But an employer-provided insurance plan must always cover every treatment for gender dysphoria. There is no basis in the text of Title VII for that result.

Second, the majority's reasoning effectively eliminates "disparate impact" as a separate theory of liability. For various reasons, Lange is proceeding here under a disparate *treatment* theory, which is why the claim requires a showing of discriminatory intent. But we have developed an entire body of law—disparate impact—to address claims about certain facially nondiscriminatory employment policies that harm members of a protected class. *See e.g.*, *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1273–74 (11th Cir. 2000). That body of law requires, among other things, an evaluation of an employer's legitimate business reasons for adopting the

policy. *See id.* at 1275; 42 U.S.C. § 2000e–2(k)(1)(A)(i). But that body of law is unnecessary under the majority's reasoning—if an employer's policy uniquely affects members of a protected class, a court can just declare it facially discriminatory.

Third, the Supreme Court rejected very similar reasoning in *Young v. United Parcel Services*, 575 U.S. 206 (2015), to that employed by the majority here. There, a pregnant UPS driver challenged the company's policy of providing light-duty accommodations to some disabled employees but not to pregnant women. *See id.* at 211–12. After her doctor restricted her from lifting more than twenty pounds, the driver asserted that, because UPS accommodated certain disabled persons with lifting restrictions, the company must also accommodate her. *See id.* at 214–17. The driver's logic was similar to Lange's—because she did not receive a benefit similar to some "workers with nonpregnancy-related disabilities" under the company policy, "that is the end of the matter, she must win." *Id.* at 210, 221. But the Court in *Young* disagreed with that reasoning, explaining that it "doubt[ed] that Congress intended to grant pregnant workers an unconditional most-favored-nation status." *Id.* at 222. Instead of declaring such a policy facially invalid, the Court explained that it had to inquire into whether "the employer has a legitimate, nondiscriminatory, nonpretextual reason" for the policy. *Id.*

For all these reasons, we can't say that an insurance plan facially discriminates because of sex just because it does not cover a single treatment for gender dysphoria.

2.

I'll move now to Lange's second argument, which the majority opinion does not directly address. Title VII's "simple test" asks "whether the evidence shows treatment of a person in a manner which but for that person's sex would be different." *City of L.A., Dep't of Water & Power v. Manhart*, 435 U.S. 702, 711 (1978) (internal quotation marks omitted); *see also Bostock*, 590 U.S. at 659–60 ("[I]f changing the employee's sex would have yielded a different choice[,] . . . a statutory violation has occurred."). Trying to identify that kind of differential treatment on the face of the plan, Lange says that the plan would cover certain procedures that are part of a sex change operation (e.g., a vaginoplasty) if Lange were a natal woman but does not cover those procedures only because Lange is a natal man.

Although this argument may be sound as a matter of law, it fails on the facts. The record reflects that the constellation of procedures that are needed for a male-to-female sex change are unique and not medical procedures that a natal woman could ever undergo. As Lange's expert explained, the male-to-female sex change procedure requires that a person's "testicles [] be removed, the urethra [] be shortened, and the penile and scrotal skin [] be used to line the neovagina, the space between the rectum and the prostate and bladder." Moreover, even if a natal woman could undergo these same procedures, other exclusions in the plan would deny coverage to the extent those procedures were prescribed to improve her appearance or treat sexual dysfunction.

To be clear, I'm not saying that a health insurance plan doesn't discriminate so long as it treats both men and women equally *as groups*. The Supreme Court has rejected that proposition. *See Bostock*, 590 U.S. at 663–65. Instead, the point is that, on the face of this policy, Lange's sex was not the "but for" cause of the insurance company's treatment. The insurer didn't refuse to cover any procedure for Lange as a natal man that it would have covered if Lange were a natal woman. Unlike in *Bostock* in which the employer had to know the employee's sex to know how it would treat the employee, the insurer here doesn't need to know Lange's sex to decide whether the policy provides coverage.

### III.

For this policy to facially discriminate against transgender people, coverage under the policy must turn on sex, a gender stereotype, or transgender status. It doesn't. That doesn't necessarily mean Lange loses this lawsuit; it just means that Lange cannot establish unlawful discrimination on the face of the policy alone. Because the exclusion is not facially discriminatory under Title VII, I would reverse the district court's grant of summary judgment, vacate the permanent injunction, and remand for further proceedings.