No. 22-13626

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

◆

ANNA LANGE,
*Plaintiff-Appellee*,

v.

HOUSTON COUNTY, GEORGIA, and
HOUSTON COUNTY SHERIFF CULLEN TALTON, in his official capacity,
*Defendants-Appellants*.

◆

On Appeal from the United States District Court
for the Middle District of Georgia
Case No. 5:19-cv-00392-MTT

## BRIEF OF ALABAMA, FLORIDA, GEORGIA, AND 20 OTHER STATES AS *AMICI CURIAE* IN SUPPORT OF APPELLANTS' PETITION FOR REHEARING EN BANC

Steve Marshall
*Attorney General*
Edmund G. LaCour Jr.
*Solicitor General*
A. Barrett Bowdre
*Principal Deputy*
*Solicitor General*
OFFICE OF THE ALABAMA
ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@
  AlabamaAG.gov

Ashley Moody
*Attorney General*
Henry C. Whitaker
*Solicitor General*
OFFICE OF THE FLORIDA
ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, FL 32399
(850) 414-3300
henry.whitaker@
  myfloridalegal.com

Christopher M. Carr
*Attorney General*
Stephen J. Petrany
*Solicitor General*
OFFICE OF THE GEORGIA
ATTORNEY GENERAL
40 Capitol Square, SW
Atlanta, GA 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for* Amicus Curiae
*State of Alabama*

*Counsel for* Amicus Curiae
*State of Florida*

*Counsel for* Amicus Curiae
*State of Georgia*

(*Additional Counsel Listed on Signature Page*)

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1(a)(3) and 26.1-2(b), the undersigned counsel certifies that the following listed persons and parties may have an interest in the outcome of this case:

1.      Alabama, State of – Amicus Curiae;

2.      Alaska, State of – Amicus Curiae;

3.      Allen & Overy LLP – Counsel for Amicus Curiae;

4.      Anti-Defamation League – Amicus Curiae;

5.      Arkansas – Amicus Curiae;

6.      Arkles, Z. Gabriel – Counsel for Appellee;

7.      Bailey, Andrew – Counsel for Amicus Curiae;

8.      Barry, Kevin M. – Counsel for Appellee;

9.      Barton, Kenneth E. III – Counsel for Appellee;

10.     Bird, Brenna – Counsel for Amicus Curiae;

11.     Bone, Michelle – Counsel for Amicus Curiae;

12.     Bowdre, Alexander Barrett – Counsel for Amicus Curiae;

13.     Brown, David – Counsel for Appellee;

14.     Calderon, Tovah R. – Counsel for Amicus Curiae;

15.     Carr, Christopher M. – Counsel for Amicus Curiae;

16.     Clarke, Kristen  – Counsel for Amicus Curiae;

17.     Cooper, Barton & Cooper – Counsel for Appellee;

18.    Cooper, M. Devlin – Counsel for Appellee;

19.    Deveney, William D. – Counsel for Appellants;

20.    Elarbee, Thompson, Sapp & Wilson LLP – Counsel for Appellants;

21.    Equal Rights Advocates – Amicus Curiae;

22.    Fata, Catherine Elizabeth – Counsel for Appellee;

23.    Fitch, Lynn – Counsel for Amicus Curiae;

24.    Florida, State of – Amicus Curiae;

25.    Georgia, State of – Amicus Curiae;

26.    Gignilliat, R. Read – Counsel for Appellants;

27.    Grant, Jill K. – Counsel for Appellee;

28.    Greenbaum, Jon  – Counsel for Amicus Curiae;

29.    Griffin, Tim – Counsel for Amicus Curiae;

30.    Hilgers, Michael T. – Counsel for Amicus Curiae;

31.    Houston County, Georgia – Defendant-Appellant;

32.    Idaho, State of – Amicus Curiae;

33.    Indiana, State of – Amicus Curiae;

34.    Iowa, State of – Amicus Curiae;

35.    Jackley, Marty – Counsel for Amicus Curiae;

36.    Kansas, State of – Amicus Curiae;

37.    Kieckhafer, Katherine – Counsel for Amicus Curiae;

38.    Knudsen, Austin – Counsel for Amicus Curiae;

39.     Kobach, Kris W. – Counsel for Amicus Curiae;

40.     Labrador, Raúl – Counsel for Amicus Curiae;

41.     LaCour, Edmund G. Jr. – Counsel for Amicus Curiae;

42.     Lail, Patrick L. – Counsel for Appellants;

43.     Lee, Jason – Counsel for Amicus Curiae;

44.     Lange, Anna – Plaintiff-Appellee;

45.     Latino Justice PRLDEF – Amicus Curiae;

46.     Lawyers' Committee for Civil Rights Under Law – Amicus Curiae;

47.     Louisiana, State of – Amicus Curiae;

48.     Marshall, Steve – Counsel for Amicus Curiae;

49.     Mississippi, State of – Amicus Curiae;

50.     Missouri, State of – Amicus Curiae;

51.     Mitrokostas, Nicholas K. – Counsel for Amicus Curiae;

52.     Miyares, Jason S. – Counsel for Amicus Curiae;

53.     Montana, State of – Amicus Curiae;

54.     Moody, Ashley – Counsel for Amicus Curiae;

55.     Morgan, Sharon P. – Counsel for Appellants;

56.     Morrisey, Patrick – Counsel for Amicus Curiae;

57.     Murrill, Liz – Counsel for Amicus Curiae;

58.     National Employment Law Project – Amicus Curiae;

59.     National Health Law Program – Amicus Curiae;

60.     National Women's Law Center – Amicus Curiae;

61.     Nebraska, State of – Amicus Curiae;

62.     North Dakota – Amicus Curiae;

63.     Ohio, State of – Amicus Curiae;

64.     Paxton, Ken – Counsel for Amicus Curiae;

65.     Payne, Amanda M. – Counsel for Appellee;

66.     Petrany, Stephen J. – Counsel for Amicus Curiae;

67.     Powell, Wesley – Counsel for Appellee;

68.     Quinnipiac Univ. School of Law Legal Clinic – Counsel for Appellee;

69.     Reyes, Sean D. – Counsel for Amicus Curiae;

70.     Rokita, Theodore E. – Counsel for Amicus Curiae;

71.     Skrmetti, Jonathan – Counsel for Amicus Curiae;

72.     South Carolina, State of – Amicus Curiae;

73.     South Dakota, State of – Amicus Curiae;

74.     Talton, Cullen in his official capacity as Sheriff – Defendant-Appellant;

75.     Taylor, Treg – Counsel for Amicus Curiae;

76.     Tennessee, State of – Amicus Curiae;

77.     Texas, State of – Amicus Curiae;

78.     Transgender Legal Defense Education Fund – Counsel for Appellee;

79.     Treadwell, Hon. Marc T. – District Court Judge;

80.  U.S. Department of Justice – Counsel for Amicus Curiae;

81.  Utah, State of – Amicus Curiae;

82.  Virginia, Commonwealth of – Amicus Curiae;

83.  West Virginia, State of – Amicus Curiae;

84.  Wilkie Farr & Gallagher LLP – Counsel for Appellee;

85.  Whitaker, Henry C. – Counsel for Amicus Curiae;

86.  Wilson, Alan – Counsel for Amicus Curiae;

87.  Wrigley, Drew H. – Counsel for Amicus Curiae;

88.  Yost, Dave – Counsel for Amicus Curiae;

89.  Youker, Kathryn J. – Counsel for Amicus Curiae;


Respectfully submitted this 10th day of June, 2024.


s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for* Amicus Curiae *State of Alabama*

# RULE 35-5 STATEMENT

I express a belief, based on a reasoned and studied professional judgment, that the panel decision is contrary to the following decisions of the Supreme Court of the United States and that consideration by the full Court is necessary to secure and maintain uniformity of decisions in this Court: *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022); *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993); and *Geduldig v. Aiello*, 417 U.S. 484 (1974). In addition, this appeal involves one or more questions of exceptional importance: whether an employer "discriminate[s] against" an employee "on the basis of sex" under Title VII by offering a healthcare plan that covers some operations, but not sex-change surgeries to construct a "neopenis" or "neovagina."

Respectfully submitted this 10th day of June, 2024.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for* Amicus Curiae *State of Alabama*

s/ Henry C. Whitaker
Henry C. Whitaker
*Counsel for* Amicus Curiae *State of Florida*

s/ Stephen J. Petrany
Stephen J. Petrany
*Counsel for* Amicus Curiae *State of Georgia*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................................... C-1

RULE 35-5 STATEMENT ...................................................................... i

TABLE OF CONTENTS .......................................................................... ii

TABLE OF AUTHORITIES ................................................................... iii

ISSUE MERITING EN BANC CONSIDERATION ............................................. 1

INTEREST OF *AMICI CURIAE* AND  SUMMARY OF ARGUMENT ............... 1

ARGUMENT ...................................................................................... 4

    I.    The Plan's Exclusion Passes *Bostock*'s "Simple Test." ...................... 4

    II.    The Panel's Test Radically Expands Title VII .................................. 8

CONCLUSION ................................................................................... 12

ADDITIONAL COUNSEL ..................................................................... 14

CERTIFICATE OF COMPLIANCE ....................................................... 15

CERTIFICATE OF SERVICE ............................................................... 16

# TABLE OF AUTHORITIES

**Cases**

*Bostock v. Clayton Cnty.*,
　　590 U.S. 644 (2020)..............................................................i, 2-4, 8, 11

*Bray v. Alexandria Women's Health Clinic*,
　　506 U.S. 263 (1993)................................................................ i, 10, 11

*Dobbs v. Jackson Women's Health Org.*,
　　597 U.S. 215 (2022)................................................................ i, 3, 11

*Eknes-Tucker v. Governor of Ala.*,
　　80 F.4th 1205 (11th Cir. 2023) ..........................................................11

*Geduldig v. Aiello*,
　　417 U.S. 484 (1974)................................................................ i, 10, 11

*Kadel v. Folwell*,
　　100 F.4th 122 (4th Cir. 2024) ...........................................................12

**Statutes**

42 U.S.C. §2000e(a).........................................................................1

42 U.S.C. §2000e(b) ........................................................................1

42 U.S.C. §2000e(k) ......................................................................11

**Acts**

Title VII, Civil Rights Act of 1964.............................................i, 1-4, 8-12

**Other Authorities**

American Society of Plastic Surgeons, *Aesthetic Genital Plastic Surgery Surgical Options: What Is A Vaginoplasty?*,
https://perma.cc/5WFH-57QP ............................................................5

Cleveland Clinic, *Metoidioplasty*,
https://my.clevelandclinic.org/health/treatments/21668-metoidioplasty
(accessed June 7, 2024) ...............................................................6

Cleveland Clinic, *Orchiectomy*,
https://my.clevelandclinic.org/health/procedures/orchiectomy
(accessed June 7, 2024) ...............................................................6

Cleveland Clinic, *Perineoplasty*,
https://my.clevelandclinic.org/health/treatments/23183-perineoplasty
(accessed June 7, 2024) ...............................................................6

Cleveland Clinic, *Phalloplasty*,
https://my.clevelandclinic.org/health/treatments/21585-phalloplasty
(accessed Feb. 16, 2024) ............................................................6, 7

Cleveland Clinic, *Vaginectomy*,
https://my.clevelandclinic.org/health/treatments/22862-vaginectomy
(accessed June 7, 2024) ...............................................................7

E. Coleman et al., *WPATH Standards of Care for the Health of Transgender & Gender Diverse People, Version 8*,
23 INT'L J. OF TRANSGENDER HEALTH S18
(Sept. 15, 2022), https://perma.cc/Y9G6-TP3M ................................6

Sarah O'Neill et al., *The role of penectomy in penile cancer—evolving paradigms*,
TRANSLATIONAL ANDROLOGY & UROLOGY 3191 (2020),
http://dx.doi.org/10.21037/tau.2019.08.14 ........................................6

## ISSUE MERITING EN BANC CONSIDERATION

Does an employer "discriminate against" an employee "on the basis of sex" under Title VII by offering a healthcare plan that covers some operations, but not sex-change surgeries to construct a "neopenis" or "neovagina"?

## INTEREST OF *AMICI CURIAE* AND
## SUMMARY OF ARGUMENT

The States of Alabama, Florida, Georgia, Alaska, Arkansas, Idaho, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, and West Virginia respectfully submit this brief as *amici curiae* in support of Appellants' petition for rehearing en banc.

As employers, state governments are subject to Title VII. *See* 42 U.S.C. §2000e(a), (b). So are countless businesses within each State. *Amici* thus have a strong interest in ensuring that Title VII is interpreted correctly. The panel's decision fails to do this and would, if not corrected, drastically expand Title VII liability far beyond what the statute allows and create chaos for employers throughout the Circuit. The decision calls out for en banc review.

To be sure, the panel opinion got one thing right: It rejected, or at least did not embrace, Plaintiffs' and the United States' argument that the sex-change surgery Sergeant Lange desired was the "same treatment" Houston County's insurance plan covered for other employees. *See* Lange Br. 6 ("same procedures"); United States'

1

Br. 18 ("same care"). That argument was necessary for Lange because, if correct, it could help establish employment discrimination—that Lange was treated "worse than others who are similarly situated." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 657 (2020). But the argument failed on the facts. Lange sought a penile inversion vaginoplasty, a surgery that uses penile and scrotal skin to construct a "neovagina" as part of a sex-change operation. This is—quite obviously—not the "same procedure" that a female could or would undergo (for any reason); and the procedure is performed on males for just one purpose (the one excluded by the plan). Because the plan's classification turns on diagnosis, not gender identity or sex, it is hard to say who the County's insurance plan treated Lange "worse than." That should have been the end of Lange's Title VII claim.

Instead, the panel majority purported to change the legal test. Begin with *Bostock*'s "simple test": "if changing the employee's sex would have yielded a different choice by the employer," then the employer has engaged in sex-based discrimination. 590 U.S. at 659-60. The County's plan passes that test. Change the employee's sex or gender classification however you like and the plan still does not cover sex-change operations. As a result, the panel majority was forced to craft a new test for Lange's claim to succeed: "Because transgender persons are the only plan participants who qualify for gender-affirming surgery, the plan denies health coverage based on transgender status." Op.9. Under the majority's view, it seems that no

comparison is needed because no comparator exists. The upshot is that an employer "discriminates" on the basis of sex, and thus faces Title VII liability, if its insurance plan does not cover any medical intervention that only one sex or gender identity can or would choose to undergo.

That is wrong. The majority's comparator-free approach to "discrimination" fails because "'discriminate against' … mean[s] treating that individual worse than others who are *similarly situated*." *Bostock*, 590 U.S. at 657 (emphasis added). By the same token, it is not discrimination to treat differently situated people or medical treatments differently. That explains why Title VII does not require employers to cover abortions, for instance, even though "[women] [would be] the only plan participants who qualify for [abortion]." Nor does it command that employers cover erectile dysfunction drugs, even though only men would qualify. Likewise, Congress did not (sixty years ago) mandate that all employer health plans cover penile inversion surgeries. "The regulation of a medical procedure that only one sex can undergo does not trigger heightened constitution scrutiny," *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 236-37 (2022), and it does not constitute facial sex-based discrimination under Title VII either. *Amici* thus strongly urge the Court to grant rehearing en banc and swiftly correct the panel's wayward decision before it imposes severe consequences on *Amici* and their citizens.

# ARGUMENT

## I.     The Plan's Exclusion Passes *Bostock*'s "Simple Test."

In *Bostock*, the Supreme Court declared that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." 590 U.S. at 660. In so reasoning, the Court applied standard rules of but-for causation: "change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Id.* at 656. The resulting difference in treatment from "chang[ing] one thing at a time" was key to the Court's conclusion. As the Court explained, "an employer who intentionally treats a person worse because of sex—such as by firing the person for actions or attributes it would tolerate in an individual of another sex—discriminates against that person in violation of Title VII." *Id.* at 658.

Lange, joined by the United States, tried to show that the County's plan fails this test by arguing that the plan covers the "same procedures" for men and women who identify as cisgender that it excludes for men and women who identify as transgender. Lange Br. 6; *see* United States' Br. 18. Lange thus asserted: "If [Lange] were identified as female, her vaginoplasty would be covered under the Health Plan; however, because she was not, it is not. Sex is the but-for cause of the differential treatment under the Exclusion." Lange Br. 22-23.

That argument is wrong because the biological reality is that a vaginoplasty performed to complete a sex-change operation is not the same treatment as a vaginoplasty performed on a woman. As Judge Brasher pointed out in his dissent, according to Lange's expert, the transitioning vaginoplasty Lange sought "requires that a person's testicles be removed, the urethra be shortened, and the penile and scrotal skin be used to line the neovagina, the space between the rectum and the prostate and bladder." Op.26 (Brasher, J., dissenting) (cleaned up). It follows that a woman undergoing a "vaginoplasty" to "tighten the vagina" by surgically "bring[ing] the separated muscles together," typically following trauma like childbirth,[1] is not receiving the "same procedure" that Lange desires—even if surgeons euphemistically refer to both procedures by the same name. Change the patient's sex and the coverage decision remains the same: The plan does not cover a penis inversion *for anyone*, male or female, trans-identifying or not.

The same is true for other interventions recommended by the World Professional Association for Transgender Health (WPATH)—an activist medical interest group dedicated to promoting coverage for sex-change treatments.[2] *See* Lange Br. 6 (relying on WPATH's say-so to argue that sex-change operations are "medically

---

[1] *See* American Society of Plastic Surgeons, *Aesthetic Genital Plastic Surgery Surgical Options: What Is A Vaginoplasty?*, https://perma.cc/5WFH-57QP.

[2] *See generally* Br. of Alabama as *Amicus Curiae*, *United States v. Skrmetti*, No. 23-477 (filed Feb. 2, 2024).

necessary"); E. Coleman et al., *WPATH Standards of Care for the Health of Transgender & Gender Diverse People, Version 8*, 23 INT'L J. OF TRANSGENDER HEALTH S18 (Sept. 15, 2022), https://perma.cc/Y9G6-TP3M (non-exhaustive listing of "[m]edically necessary gender-affirming interventions"). To take just a few examples, castration and orchiectomy (the surgical removal of a male's testicles) and penectomy (the surgical removal of the penis) are medical procedures that only one sex can undergo for the simple reason that females do not have testicles or a penis to remove.[3] Metoidioplasty is the surgical creation of a "neophallus, literally a 'new penis,'" using tissue from a woman's clitoris.[4] The operation cannot be performed on a man.

More generally, phalloplasty is similar to metoidioplasty in that it also creates a neophallus, but it uses tissue from a patient's arm, thigh, or back to craft the faux-penis.[5] For females, the procedure can include a perineoplasty ("a surgical procedure to repair the perineum and external organs of [the] vagina"[6]); a vaginectomy ("a

---

[3] *See* Cleveland Clinic, *Orchiectomy*, https://my.clevelandclinic.org/health/procedures/orchiectomy (accessed June 7, 2024); Sarah O'Neill et al., *The role of penectomy in penile cancer—evolving paradigms*, TRANSLATIONAL ANDROLOGY & UROLOGY 3191, 3191-94 (2020), http://dx.doi.org/10.21037/tau.2019.08.14.

[4] Cleveland Clinic, *Metoidioplasty*, https://my.clevelandclinic.org/health/treatments/21668-metoidioplasty (accessed June 7, 2024).

[5] Cleveland Clinic, *Phalloplasty*, https://my.clevelandclinic.org/health/treatments/21585-phalloplasty (accessed June 7, 2024).

[6] Cleveland Clinic, *Perineoplasty*, https://my.clevelandclinic.org/health/treatments/23183-perineoplasty (accessed June 7, 2024).

surgical procedure to remove all or part of the vagina"[7]); and a hysterectomy and/or oophorectomy (removal of the uterus and ovaries, respectively).[8] There is a surgery by the same name that males can undergo—reconstructing a penis following trauma or due to a congenital abnormality[9]—though it is safe to say that a "phalloplasty" performed on members of different sexes for different purposes that necessitate different, sex-specific procedures are not the "same procedures."

And this is the larger point. Even if members of both sexes could take the same drug or undergo the same "procedure" at some high level of generality, basing coverage decisions on differing diagnoses and corresponding treatment recommendations is not discriminatory because that decision, by itself, does not mean that anyone is treated worse than someone else because of sex. The "treatments" are simply not the same. Appendectomies, C-sections, and quadruple bypasses all involve a scalpel, but in no meaningful sense are they the "same treatments." Likewise for medications. To the diabetic patient, injecting insulin is lifesaving. To the hypoglycemic patient, it can be life ending. Same drug, different treatments. States routinely authorize or cover drugs for some treatments (morphine to treat a patient's pain), but

[7] Cleveland Clinic, *Vaginectomy*, https://my.clevelandclinic.org/health/treatments/22862-vaginectomy (accessed June 7, 2024).

[8] Heston, *supra* note 10, at 255.

[9] Cleveland Clinic, *Phalloplasty*, https://my.clevelandclinic.org/health/treatments/21585-phalloplasty (accessed June 7, 2024).

not others (morphine to assist a patient's suicide). And there is a world of difference between removing a man's testicles to save his life from cancer and castrating him because his gender identity is "eunuch," as WPATH recommends.[10] These are not the "same treatments."

To return to the vaginoplasty Lange sought, as Judge Brasher explained, "even if a natal woman could undergo these same procedures, other exclusions in the plan would deny coverage to the extent those procedures were prescribed to improve her appearance or treat sexual dysfunction," Op.26 (dissenting)—or, for that matter, to treat gender dysphoria. These are classifications based on diagnosis, not sex or transgender status. Lange's claim thus should have failed. A male seeking a penile inversion vaginoplasty is not "similarly situated" to a female seeking a procedure she biologically cannot obtain. *Bostock*, 590 U.S. at 657. Declining to pay for that surgery does not "treat[] a person worse because of sex." *Id.*

## II.     The Panel's Test Radically Expands Title VII.

Perhaps realizing that Lange's "same treatments" argument is a factual dead end, the panel majority blazed a different pathway. Rather than "changing one thing at a time and see[ing] if the outcomes changes," *id.* at 660, the majority determined

---

[10] *See* WPATH SOC8 at S88-89 (explaining that "castration" may be "medically necessary gender-affirming care" for individuals who identify as "eunuchs"—i.e., individuals "assigned male at birth" who "wish to eliminate masculine physical features, masculine genitals, or genital functioning").

that this traditional but-for causation test could not detect the discrimination at play here "[b]ecause transgender persons are the only plan participants who qualify for gender-affirming surgery," Op.9. Of course, this statement is wrong factually—the majority's insistence erases the existence of individuals who once identified as transgender, no longer do, and seek to reverse sex-change treatment (whose surgeries the County's plan *also* excludes, *see* Op.18 (Brasher, J., dissenting)—but put that aside for now. According to the majority, that "fact" by itself is enough to show that "the plan denies health care coverage based on transgender status." Op.9. And that was true, the majority held, even if—indeed, perhaps *because*—changing the patient's sex or transgender identification would change nothing at all about the coverage determination.

Thus, in a few sentences, the majority fundamentally transforms Title VII. Under the majority's approach, employer insurance plans would seemingly need to cover *every* possible treatment that only one sex or gender identity could or would undergo or else face liability for discriminating based on sex. Just plug in a few different scenarios into the panel's holding:

- "Because [men] are the only plan participants who qualify for [erectile dysfunction medication or surgery], the plan denies health care coverage based on [male] status."

- "Because [women] are the only plan participants who qualify for [treatments to harvest and freeze their eggs], the plan denies health care coverage based on [female] status."

- "Because [eunuchs] are the only plan participants who qualify for [eunuch-affirming castration surgery], the plan denies health care coverage based on [eunuch] status."

This reasoning cannot be squared with Title VII. In enacting the Civil Rights Act of 1964, Congress did not mandate coverage for Viagra or abortion. Indeed, the Supreme Court has expressly rejected the majority's line of reasoning in equal protection cases. In *Geduldig v. Aiello*, 417 U.S. 484 (1974), the Court "rejected the claim that a state disability insurance system that denied coverage to certain disabilities resulting from pregnancy discriminated on the basis of sex in violation of the Equal Protection Clause of the Fourteenth Amendment." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271 (1993). The Court acknowledged that "only women can become pregnant," but explained that "it does not follow that every legislative classification concerning pregnancy is a sex-based classification." *Geduldig*, 417 U.S. at 406 n.20. Thus, "[a]bsent a showing that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other," the Court concluded, "lawmakers are constitutionally free to include or exclude pregnancy from the coverage of

legislation such as this on any reasonable basis, just as with respect to any other physical condition." *Id.*

Congress later amended Title VII to encompass discrimination "on the basis of pregnancy, childbirth, or related medical conditions," 42 U.S.C. §2000e(k), recognizing that more was needed than Title VII's ban on sex discrimination to extend those protections. And the Court's reasoning in *Geduldig* has been reaffirmed since then. *See Dobbs*, 597 U.S. at 236; *Bray*, 506 U.S. at 271-72. This Court has even applied *Geduldig*, *Bray*, and *Dobbs* to reject the majority's reasoning in an equal protection challenge to Alabama's law prohibiting the administration of sex-change treatments to minors. *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1229-30 (11th Cir. 2023) (holding that "the regulation of a course of treatment that only gender nonconforming individuals can undergo would not trigger heightened scrutiny unless the regulation were a pretext for invidious discrimination"). The panel's decision here cannot be squared with those decisions.

Nor can it be squared with the text of Title VII, for one can't even begin to assess whether denying coverage for a surgery is discriminatory without identifying the "similarly situated" comparator. *Bostock*, 590 U.S. at 657. And here, when it came to comparing a "vaginoplasty" for men versus a vaginoplasty for women, the panel did not contest what Judge Richardson recently concluded: "These are not the

same!" *Kadel v. Folwell*, 100 F.4th 122, 188 (4th Cir. 2024) (dissenting). When the majority nonetheless found discrimination, it plainly erred.

The majority's rewrite of Title VII will produce wide-ranging consequences for employers throughout the Circuit who now face both greater liability and diminished clarity over how far the law extends. *Amici* thus respectfully request that the Court quickly vacate the panel's opinion and consider this issue en banc. *Amici* intend to seek argument time if the Court grants further review.

## CONCLUSION

The Court should grant the petition.

Dated: June 10, 2024

Respectfully submitted,

Steve Marshall
 *Attorney General*

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
 *Solicitor General*
A. Barrett Bowdre
 *Principal Deputy Solicitor General*
OFFICE OF THE ALABAMA
ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov

*Counsel for* Amicus Curiae
*State of Alabama*

Ashley Moody
 *Attorney General*

s/ Henry C. Whitaker
Henry C. Whitaker
 *Solicitor General*
OFFICE OF THE FLORIDA
ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, FL 32399
(850) 414-3300
henry.whitaker@myfloridalegal.com

*Counsel for* Amicus Curiae
*State of Florida*

Christopher M. Carr
 *Attorney General*

s/ Stephen J. Petrany
Stephen J. Petrany
 *Solicitor General*
OFFICE OF THE GEORGIA
ATTORNEY GENERAL
40 Capitol Square, SW
Atlanta, GA 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for* Amicus Curiae
*State of Georgia*

*(Additional Counsel Listed on Next Page)*

## ADDITIONAL COUNSEL

TREG TAYLOR
Attorney General
State of Alaska

TIM GRIFFIN
Attorney General
State of Arkansas

RAÚL R. LABRADOR
Attorney General
State of Idaho

THEODORE E. ROKITA
Attorney General
State of Indiana

BRENNA BIRD
Attorney General
State of Iowa

KRIS W. KOBACH
Attorney General
State of Kansas

LIZ MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

ANDREW BAILEY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

DREW H. WRIGLEY
Attorney General
State of North Dakota

DAVE YOST
Attorney General
State of Ohio

ALAN WILSON
Attorney General
State of South Carolina

MARTY JACKLEY
Attorney General
State of South Dakota

JONATHAN SKRMETTI
Attorney General & Reporter
State of Tennessee

KEN PAXTON
Attorney General
State of Texas

SEAN D. REYES
Attorney General
State of Utah

JASON MIYARES
Attorney General
Commonwealth of Virginia

PATRICK MORRISEY
Attorney General
State of West Virginia

# CERTIFICATE OF COMPLIANCE

1.     I certify that this brief complies with the type-volume limitations set forth in Federal Rule of Appellate Procedure 29(b)(4). This brief contains 2,600 words, including all headings, footnotes, and quotations, and excluding the parts of the brief exempted under Federal Rule of Appellate Procedure 32(f).

2.     In addition, this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for* Amicus Curiae
*State of Alabama*

**CERTIFICATE OF SERVICE**

I certify that on June 10, 2024, I electronically filed this document using the

Court's CM/ECF system, which will serve counsel of record.


<u>s/ Edmund G. LaCour Jr.</u>
Edmund G. LaCour Jr.
*Counsel for* Amicus Curiae
*State of Alabama*