No. 22-13626-DD

# In the United States Court of Appeals for the Eleventh Circuit

————

HOUSTON COUNTY, GEORGIA, AND
HOUSTON COUNTY SHERIFF CULLEN TALTON,
IN HIS OFFICIAL CAPACITY,

*Defendants-Appellants*,

v.

ANNA LANGE,

*Plaintiff-Appellee.*

————

Appeal from the United States District Court
for the Middle District of Georgia
Dist.Ct. Docket No. 5:19-cv-00392-MTT

————

**BRIEF OF THE AMERICAN CIVIL RIGHTS PROJECT AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS-APPELLANTS' PETITION FOR REHEARING EN BANC**

————

Daniel I. Morenoff
   Counsel of Record
The American Civil Rights Project
P.O. Box 12207
Dallas, Texas 75225
(214) 504-1835
dan@americancivilrightsproject.org

Exhibit "A"

Houston County, Ga. v. Lange,  C-1-of-1
Case No. 22-13626-DD

# RULE 29(A)(4)(A) CORPORATE DISCLOSURE STATEMENT AND CERTIFICATE OF INTERESTED PERSONS

The American Civil Rights Project (the "ACR Project") is a non-profit corporation organized under the laws of Texas. The ACR Project issues no stock, and is neither owned by or the owner of any corporate entity in whole or in part.

The following interested persons are known to *amicus curiae* and do not appear in the previously-filed CIPs:

1) Bingham, Joseph A. (Counsel for Amicus Curiae The Equal Voting Rights Institute d/b/a The American Civil Rights Project)

2) The Equal Voting Rights Institute d/b/a The American Civil Rights Project (Amicus Curiae for Appellants)

3) Morenoff, Daniel I. (Counsel for Amicus Curiae The Equal Voting Rights Institute d/b/a The American Civil Rights Project)

                                                Respectfully submitted,

                                               */s/ Daniel I. Morenoff*
                                               Daniel I. Morenoff
                                               Counsel of Record

Dated: June 10, 2024

Exhibit "A"

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND RULE 29(A)(4)(A)
CORPORATE DISCLOSURE STATEMENT ........................................... C-1-of-1

TABLE OF CONTENTS ................................................................................... i

TABLE OF AUTHORITIES ............................................................................. ii

INTEREST OF AMICUS CURIAE ................................................................. iv

SUMMARY OF THE ARGUMENT ................................................................ 1

ARGUMENT .................................................................................................... 2

   I. *BOSTOCK*'S HOLDING DOES NOT APPLY ....................................... 2

   II. *BOSTOCK*'S *REASONING* DOES APPLY AND REQUIRES REVERSAL .................................................................................... 6

   III. THE PANEL'S ERROR COMMITS THIS COURT TO ANALAGOUS ERRORS ACROSS A VAST SWATH OF LAW .................... 8

   IV. THE PANEL DECISION PUTS THIS CIRCUIT ON *BOTH* SIDES OF CIRCUIT SPLIT OVER *BOSTOCK*'S MEANING ................................................................................................ 9

   CONCLUSION ........................................................................................ 10

CERTIFICATE OF COMPLIANCE ............................................................. 11

CERTIFICATE OF SERVICE ....................................................................... 12

# TABLE OF AUTHORITIES

### CASES

*Adams v. Sch. Bd. of St. Johns Cnty*,
  57 F.4th 791 (11th Cir. 2022) ...................................................... 6, 9

*Bostock v. Clayton Co.*,
  140 S. Ct. 1731 (2020) ...................................... 1, 2, 3, 4, 5, 6, 7, 8, 9

*Grimm v. Gloucester Co. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020) ............................................................ 9

*Lange v. Houston Cnty.*,
  101 F.4th 793 (11th Cir. 2024) .................................................. 2, 3, 9

*Lange v. Houston Cnty.*,
  608 F.Supp.3d 1340 (M.D. Ga. 2022) ....................................... 2, 3, 4

*Metropolitan Sch. Dist. of Martinsville v. A.C.*, 75 F.4th 760, 770 (7th
  Cir. 2023) ....................................................................................... 9

### STATUTES

Title IX of the Education Amendments of 1972 ........................... 1, 8, 9

Title VII of the Civil Rights Act of 1964 ................... 1, 2, 3, 5, 6, 7, 8, 9

### OTHER AUTHORITIES

District Court Dkt. 155-1 ................................................................... 5

Exhibit "A"

Dep't of Justice Br. in *Tenn. v. U.S. Dep't. of Educ.*,
   6th Cir. Case No.: 22-5807, Dkt. 27, pp. 6-8 (Dec. 15, 2022)........ 1, 8

## **RULES**

34 CFR 106, 88 Fed. Reg. 22860 (Apr. 13, 2023)............................. 1, 8

34 CFR 106, 89 Fed. Reg. 33474 (Apr. 29, 2024)............................. 1, 8

Exhibit "A"

iv

# INTEREST OF AMICUS CURIAE[1]

The ACR Project is a public-interest law firm, dedicated to protecting and where necessary restoring the equality of all Americans before the law. The ACR Project believes its expertise will benefit the Court in its consideration of this case.

This case interests the ACR Project because it involves the appropriate application of one of America's foundational non-discrimination laws as interpreted by the Supreme Court. The ACR Project has invested substantial time and resources investigating the meaning of this enactment, as interpreted by the Supreme Court, and believes its analysis will benefit the Court's consideration of this matter.

---

[1] No counsel for a party authored any part of this brief. And no one other than the ACR Project financed the preparation or submission or this brief.

Exhibit "A"

## SUMMARY OF THE ARGUMENT

Since the Supreme Court announced *Bostock v. Clayton Co.*, 140 S. Ct. 1731 (2020), many—like the Plaintiff and the panel-majority in this case—have contended that its interpretation of Title VII of the Civil Rights Act of 1964 ("Title VII") decided, for all American employers, a whole host of contentious issues that were not before the Court. Others—including the U.S. Departments of Justice and Education—have contended that a straight-line extension of *Bostock* to the nondiscrimination requirements of the Title IX of the Education Amendments of 1972 ("Title IX") simultaneously resolved all purportedly related issues for all federal funding recipients.[2]

The Court should rehear this case *en banc* for four interrelated reasons. First, the panel-majority's conclusion that *Bostock* straightforwardly decides this case is wrong—its holding is inapplicable and the Court should use its *en banc* power to prevent a deeply flawed panel opinion from binding the Circuit. Second, to underscore the importance of that error-correction, *Bostock*'s *reasoning*

---

[2] *E.g.*, 34 CFR 106, 89 Fed. Reg. 33474 (Apr. 29, 2024); 34 CFR 106, 88 Fed. Reg. 22860 (Apr. 13, 2023); and Dep't of Justice Br. in *Tenn. v. U.S. Dep't. of Educ.*, 6th Cir. Case No.: 22-5807, Dkt. 27, pp. 6-8 (Dec. 15, 2022) (DOJ explaining that the Equal Employment Opportunity Commission and Department of Education so reinterpret Title VII and Title IX, respectively, nominally based on *Bostock*).

strongly supports the panel-dissent's conclusion that the Defendants have complied with Title VII. This leaves the *en banc* Court's alternatives: (a) rehearing; or (b) leaving standing a precedent that wrongly finds the Supreme Court to have dictated a result it expressly did not, which is completely incompatible with its actual opinion. Third, the Court should take this case *en banc* because its threatened ramifications extend beyond the economy-wide sweep of employer-employee relations—given the wide-berth the Administration and some advocates have taken with a misinterpretation of *Bostock*, if undisturbed, the panel-majority's error will echo across other areas of law. Finally, the Court should rehear this case because the panel-majority's embrace of a radical extension of *Bostock*'s purported, gnostic meaning deepens an existing circuit split on the wider reading of *Bostock* and conflicts with the recent *en banc* opinion of this Court.

## ARGUMENT

### I.  *BOSTOCK*'S HOLDING DOES NOT APPLY

The District Court and the panel-majority contend that *Bostock* requires that all employers maintain health insurance that covers sex-change surgery to comply with Title VII.[3]  The District

---

[3]  *Lange v. Houston Cnty.*, 101 F.4th 793, *8-*12 (11th Cir. 2024); *Lange v. Houston Cnty.*, 608 F.Supp.3d 1340, 1356-59 (M.D. Ga. 2022).

Exhibit "A"

Court maintained this was "clear" because the relevant insurance policy covers mastectomies when required to fight cancer, but not when sought by a biological woman as part of a sex change.[4] According to the District Court, because the same procedure was either insured or not based on the sex of an employee, "*Bostock* covers" this fact pattern, declaring any "discrimination on the basis of transgender status" to be "discrimination on the basis of sex" in "violation of Title VII."[5] The panel-majority briskly agreed.[6]

There is surely much more to be said on why this misreads *Bostock*'s holding than an amicus supporting *en banc* review can address. For now, the ACR Project highlights both what Justice Gorsuch wrote for the Supreme Court in *Bostock* and a material factual distinction that eluded the panel majority.

On the first, Justice Gorsuch was well aware that some might construe *Bostock* more broadly than the Court did. He expressly wrote that:

> we have not had the benefit of adversarial testing of [the lawfulness of other policies] and we do not prejudge any such question today. Under Title VII, too, we do not purport

---

[4] *Id.* at 1357.
[5] *Id.* at 1359.
[6] *Lange*, 101 F. 4th at *10-*12.

3

> to address bathrooms, locker rooms, or anything else of the kind. The only question before us is whether an employer who fires someone simply for being … transgender has … discriminated against that individual "because of such individual's sex."[7]

The Supreme Court left all other questions for another day. The District Court and the panel-majority's insistence that *Bostock* shuts down all counters cannot survive this fact.

On the second, the hypo relied upon simply differs from this case's facts. The Plaintiff is a biological man who identifies as—and seeks surgery to present like—a woman.[8] Accepting *arguendo* the psychological needs of the dysphoric, the difference from a cancer patient remains plain. The Plaintiff faces no life-threatening disease and presents no melting-ice-cream scenario. Instead, the Plaintiff wants—by all accounts for very real psychological reasons—to undergo body-modification surgery.

The proper parallel, then, is not a cancerous woman. It is a dysmorphic man *who is not transgender*. Such a man might well have a very real psychological drive to rid himself of a leg or (like the Plaintiff) to change the appearance of his sex organs, just as a

---

[7] *Bostock*, 140 S.Ct. at 1753.
[8] *Lange*, 608 F.Supp.3d at 1346.

4

dysmorphic woman *who is not transgender* may have very real psychological reasons to seek breast augmentation. The plan exclusion at issue, here, prevents insurance coverage of the surgery the Plaintiff seeks; the same policy's parallel provisions prevent these dysmorphics from obtaining their equally psychologically driven surgeries on the employer's dime.⁹ Apparently, for clarity, the policy includes the former exclusion, even though the latter exclusion equally prohibits coverage of the same surgery less directly.

Neither Title VII, nor *Bostock*, says anything about whether an employer must ensure coverage of any of these treatments or whether an employer whose policies cover *none* of them—like the Defendants—has done anything wrong. In no sense is *sex* a but-for cause of the denial of treatment for any of these earnestly sought, but elective and cosmetic, surgeries. Without that peg to the statute, the policy at issue does not implicate and cannot violate Title VII.

---

⁹ The relevant exclusion for "services … meant to … change, or improve[,] how you look or … given for social reasons" including "treatments to … change the size, shape or look of … body features" is Exclusion 14, found in the record at Dist. Ct. Dkt. 155-1, p. 68.

## II. *BOSTOCK*'S *REASONING* DOES APPLY AND REQUIRES REVERSAL

On the other hand, the *reasoning* of *Bostock* does apply to these facts, and it points unambiguously toward reversal.

*Bostock* did not hold that when Title VII says "sex," it really means "sex or sexual orientation or gender identity." This *en banc* Court has already recognized that "*Bostock* actually 'proceed[ed] on the assumption' that the term 'sex,' as used in Title VII, 'refer[red] only to *biological* distinctions between male and female.'"[10] To paraphrase, how *Bostock* reads Title VII's ban on sex discrimination to reach the firing of a transgender employee: if Stephens is an anatomical, chromosomal man who prefers to be treated as a female and to adopt the clothing and mannerisms generally associated with being female, and Employer fires Stevens, while Employer would not have fired an actual female who preferred to be treated as a female and adopted the clothing and mannerisms generally associated with being female, that's sex discrimination!

Yes, it is. And it violated Title VII.

But the Court did not hold that Stephens *was* a woman. If it had so held, it would have spoiled Stephens' argument. Title VII doesn't forbid discrimination between different categories of women (transgender vs. cisgender) or men (transgender vs. cisgender).

---

[10] *Adams v. Sch. Bd. of St. Johns Cnty*, 57 F.4th 791, 813 (11th Cir. 2022).

Exhibit "A"

Stephens won precisely because Stephens remained a man and not a woman.

That reasoning simply dictates a different result in the situation before the Court than it did in *Bostock*. A transgender individual invoking *Bostock*, alone, yields no talismanic conferment of legitimacy to a Title VII claim.

Why? Because under the Defendants' policy, insurance would cover *no* parallel procedure to that sought by the Plaintiff if the Plaintiff were a biological woman rather than a biological man. As discussed above, just as the Defendants' policy denies surgical coverage to the Plaintiff, it denies coverage of a "top" surgery for a biologically female employee. More directly on point, the same insurance covers no biological woman's proposed, elective "bottom" surgeries (whether labiaplasties, clitoral hood reductions, labia majora augmentations, or other so-called "vaginal rejuvenations"), no matter how earnestly sought or psychologically driven.

*Bostock*'s reasoning makes such cross-sex differentials in treatment the signature predicate for Title VII to apply. The Defendants treat *precisely no one* differently because of their sex. Lacking that "but-for" element, this case deserves the reversal only *en banc* review can yield.

### III. THE PANEL'S ERROR COMMITS THIS COURT TO ANALAGOUS ERRORS ACROSS A VAST SWATH OF LAW

Above and beyond the inherent importance of this case to the parties and to the development of the Circuit's Title VII jurisprudence, the nationwide effort of some to apply the panel-majority's broad-reading of *Bostock* beyond Title VII raises the stakes for the Court's decision further. As long as the panel-majority's opinion stands, parties will cite it for the propriety of reading *Bostock* more broadly than the Supreme Court wrote it to answer Title VII questions the Supreme Court expressly did not address. But the panel-majority's baleful impact would go further.

Across agencies, the current Administration maintains that, post-*Bostock*, statutes prohibiting sex discrimination must be read to cover gender-identity.[11] As a result, as long as the panel-majority's opinion stands, the Court should expect to see parties cite it, in at least Title IX cases, as proof of the propriety of a far-broader reading of *Bostock*.

What happens in Vegas will not stay in Vegas. This Court will hear all about it in other cases where parties will try to extend *Bostock* to compel answers to questions unanswered by Congress in Title VII.

---

[11] *See* n. 2, *supra*.

8

## IV. THE PANEL DECISION PUTS THIS CIRCUIT ON *BOTH* SIDES OF CIRCUIT SPLIT OVER *BOSTOCK*'S MEANING

Most pertinently, those parties will argue that the panel-majority's opinion effectively overrules this Court's careful *en banc* work in *Adams*,[12] moving the Circuit to the opposite side of the worsening circuit split over how *Bostock* should be understood and applied.[13]

In *Adams*, the *en banc* Court faced and rejected the argument that "*Bostock* equated 'sex' to 'transgender status[.]"[14] Yet, here, the panel-majority has nonetheless held that "[t]he Supreme Court clarified in *Bostock* that [all] 'discrimination based on … transgender status necessarily entails discrimination based on sex' as prohibited under Title VII."[15]

Those conclusions directly conflict. The panel-majority has taken the side of the Fourth and Seventh Circuits against the *en banc* Court.

The Court cannot allow a precedent of one of its panels to so confuse the Circuit's precedents. The Court should rehear this

---

[12] *See generally Adams*, 57 F.4th 791.

[13] For that circuit split on the application of *Bostock* to Title IX, see: *Metropolitan Sch. Dist. of Martinsville v. A.C.*, 75 F.4th 760, 770 (7th Cir. 2023); *Grimm v. Gloucester Co. Sch. Bd.*, 972 F.3d 586, 618 (4th Cir. 2020); and *Adams*, generally, 57 F.4th 791.

[14] *Adams*, 57 F.4th at 813.

[15] *Lange*, 101 F. 4th at *8.

matter *en banc* to either correct the panel-majority's rogue action or to adopt it as the jurisprudence of the Circuit.

## CONCLUSION

The Court should undertake *en banc* review to assure this matter receives the full consideration it deserves.

Respectfully submitted,

/s/ *Daniel I. Morenoff*
Daniel I. Morenoff
  Counsel of Record
The American Civil Rights Project
P.O. Box 12207
Dallas, Texas 75225
(214) 504-1835
dan@americancivilrightsproject.org

*Counsel for* Amicus Curiae

Dated: June 10, 2024

Exhibit "A"

# CERTIFICATE OF COMPLIANCE

With Type-Volume Limitation, Typeface Requirements,
and Type Style Requirements

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   [X]   this brief contains 2,013 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

   [ ]   this brief uses a monospaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

   [X]   this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Mac, version 16.85.2 in Century Schoolbook, 14-point type face, or

   [ ]   this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

                                                   /s/ Daniel I. Morenoff
                                                  Daniel I. Morenoff
                                                  *Counsel for* the ACR Project

Dated: June 10, 2024

## CERTIFICATE OF SERVICE

    I certify that this document has been filed with the clerk of the court and served by ECF upon all counsel of record.

*/s/ Daniel I. Morenoff*
Daniel I. Morenoff
*Counsel for* the ACR Project

Dated: June 10, 2024

Exhibit "A"