No. 22-13626

# United States Court of Appeals for the Eleventh Circuit

———————

HOUSTON COUNTY, GEORGIA, AND
HOUSTON COUNTY SHERIFF CULLEN TALTON, IN HIS OFFICIAL CAPACITY,
DEFENDANTS-APPELLANTS,

*v.*

ANNA LANGE,
PLAINTIFF-APPELLEE,

———————

*APPEAL FROM THE U.S. DISTRICT COURT FOR THE MIDDLE DISTRICT OF GEORGIA,
NO. 5:19-cv-392, HON. MARC T. TREADWELL, PRESIDING*

———————

**BRIEF OF CHRISTIAN EMPLOYERS ALLIANCE AS *AMICUS CURIAE*
SUPPORTING PETITION FOR REHEARING EN BANC**

———————

CHRISTOPHER MILLS
*Spero Law LLC*
*557 East Bay Street #22251*
*Charleston, SC 29413*
*(843) 606-0640*
*cmills@spero.law*

Counsel for *Amicus Curiae*

JUNE 10, 2024

# CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT

*Lange v. Houston County, Ga.*, No. 22-13626:

The undersigned counsel of record certifies that the following listed persons and entities, in addition to those listed in prior filings, have an interest in the outcome of this case. These representations are made so that the judges of this court may evaluate possible disqualification or recusal.

1. Christian Employers Alliance (*amicus*) does not have a parent corporation, and no corporation owns 10% or more of its stock.

2. Mills, Christopher (counsel for *amicus*) of Spero Law LLC.

*/s Christopher Mills*
Christopher Mills

Counsel for *Amicus Curiae*

June 10, 2024

# EN BANC STATEMENT

I express a belief, based on a reasoned and studied professional judgment, that the panel decision is contrary to the following decisions of the Supreme Court of the United States or the precedents of this circuit and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this court: *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022); *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020); *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125 (1976); *Eknes-Tucker v. Gov. of Ala.*, 80 F.4th 1205 (11th Cir. 2023); *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022).

I express a belief, based on a reasoned and studied professional judgment, that this appeal involves one or more questions of exceptional importance: Whether excluding sex-change operations from a health plan facially discriminates based on sex in violation of Title VII.

*/s Christopher Mills*
Christopher Mills

Counsel for *Amicus Curiae*

## TABLE OF CONTENTS

**Page**

Certificate of Interested Parties and Corporate Disclosure Statement ........................i

En Banc Statement ................................................................................................................i

Table of Citations ............................................................................................................... iii

Statement of the Issue ........................................................................................................1

Interest of *Amicus Curiae* ...................................................................................................1

Summary of the Argument................................................................................................2

Argument.............................................................................................................................5

    I.    The panel's logic contradicts precedent and is self-defeating. ..............5

    II.    The consequences of the panel's decision would be severe. .................8

Conclusion .........................................................................................................................11

## TABLE OF CITATIONS

Page(s)

**CASES**

*Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022) ............... i, 4, 5

*Autocam Corp. v. Burwell*, 573 U.S. 956 (2014) ..................................................... 11

*Bear Creek Bible Church v. EEOC*, No. 18-cv-00824, 2021 WL 5052661 (N.D. Tex. Oct. 31, 2021) ........................................................................................ 11

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) ........................................... i, 3, 8, 10

*Braidwood Mgmt. v. EEOC*, 70 F.4th 914 (5th Cir. 2023) ...................................... 11

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) ........................... 4

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ................................... 11

*Christian Employers Alliance v. EEOC*, No. 1:21-cv-195, 2024 WL 935591 (D.N.D. Mar. 4, 2024) ................................................................................. 1, 10

*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) ........................... i, 2

*Eden Foods, Inc. v. Burwell*, 573 U.S. 946 (2014) ................................................. 11

*Eknes-Tucker v. Gov. of Ala.*, 80 F.4th 1205 (11th Cir. 2023) ......................... i, 2, 7

*Geduldig v. Aiello*, 417 U.S. 484 (1974) ................................................................... 4

*Gen. Elec. Co. v. Gilbert*, 429 U.S. 125 (1976) ..................................................... i, 4

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995) ... 7

*Lange v. Houston Cnty.*, 608 F. Supp. 3d 1340 (M.D. Ga. 2022) ........................... 8

*Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669 (1983) ......... 4

*NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979) ................................... 11

*Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113 (D.N.D. 2021) ............. 10

*Religious Sisters of Mercy v. Becerra*, 55 F.4th 583 (8th Cir. 2022) ..................... 10

*Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248 (1981) ................................... 7

**STATUTES**

42 U.S.C. § 18116 ....................................................................................................... 6

42 U.S.C. § 2000e ............................................................................................... 4

42 U.S.C. § 2000e-2 ............................................................................................ 2

**OTHER AUTHORITIES**

*2023 Employer Health Benefits Survey*, KFF (Oct. 18, 2023),
https://www.kff.org/report-section/ehbs-2023-summary-of-findings/ .................. 8

Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*
(5th ed. 2013) .................................................................................. 3, 4, 6

Brief for the United States as *Amicus Curiae* Supporting Plaintiff-Appellee, *Lange*,
2023 WL 2648303 ............................................................................... 4, 8

Deposition of Daniel Shumer, *Boe v. Marshall*, No. 22-cv-184, Doc. 557-39 (M.D.
Ala. May 27, 2024) .............................................................................. 5, 6

E. Coleman et al., *Standards of Care for the Health of Transgender and Gender
Diverse People, Version 8*, 23 Int'l J. Transgender Health (2022) ............... 3, 5, 9

*Gender Reassignment Services for Gender Dysphoria*, https://perma.cc/8FB5-
9VUS (revised Nov. 9, 2023) ....................................................................... 9

J. Hodax & S. DiVall, *Gender-Affirming Endocrine Care for Youth with a
Nonbinary Gender Identity*, 14 Therapeutic Advances in Endocrinology &
Metabolism (2023), https://doi.org/10.1177/20420188231160405 ..................... 3

TRICARE Policy Manual 6010.60-M (revised Dec. 6, 2022) .................................. 9

W. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-
Incongruent Persons*, 102 J. Clinical Endocrinology & Metabolism 3869 (2017)
............................................................................................................. 4, 5

## STATEMENT OF THE ISSUE

1. Whether excluding sex-change operations from a health plan facially discriminates based on sex in violation of Title VII.

## INTEREST OF *AMICUS CURIAE*

Christian Employers Alliance is an alliance of Christian-owned businesses in the United States. CEA's mission as a ministry is to unite, equip, and represent Christian-owned businesses to protect religious freedom and provide the opportunity for employees, businesses, and communities to flourish. CEA members share a commitment to living out their Christian faith in everyday life. CEA provides advocacy on legal policy issues on behalf of its members. One of these issues is that male and female are immutable realities defined by biological sex. CEA recently obtained a permanent injunction against the EEOC from "interpreting or enforcing Title VII . . . or any implementing regulations thereto against CEA or its present or future members . . . in a manner that would require them to provide insurance coverage for gender-transition procedures in" their health plans. *Christian Employers Alliance v. EEOC*, No. 1:21-cv-195, 2024 WL 935591, at *11 (D.N.D. Mar. 4, 2024). Because the panel's logic mirrors the EEOC's, the CEA has a significant interest in this case.[1]

---

[1] No party's counsel authored, and no party, party's counsel, or other person—other than *amicus curiae*, its members, or its counsel—contributed money for this brief.

## SUMMARY OF THE ARGUMENT

Anna Lange is a biological male who sought a vaginoplasty as a treatment for gender dysphoria. Houston County's health insurance plan does not cover this or other sex-change procedures. The question is whether that non-coverage facially discriminates against Lange "because of . . . sex" under Title VII. 42 U.S.C. § 2000e-2(a)(1).

It does not. No matter one's sex—or gender identity—one cannot have a sex-change operation funded by the insurer. With almost no reasoning, the panel offered three drive-by theories for its holding to the contrary: that the exclusion discriminates based on sex, gender identity, and gender nonconformity. All fail under binding precedent.

**1. The exclusion does not discriminate based on sex.** Its rule "applies equally to both sexes": neither gets sex-change operations covered. *Eknes-Tucker v. Gov. of Ala.*, 80 F.4th 1205, 1228 (11th Cir. 2023). The panel proclaimed that "Lange's sex is inextricably tied to the denial of coverage," Op. 10, but how? If Lange were a female, the insurer still would not cover sex-change surgery. Even narrowing the discrimination claim to the specific procedure—Lange's vaginoplasty—no female could obtain the inversion and removal of male genitalia involved in Lange's desired operation. It is impossible. It is, in the Supreme Court's terms, an operation that "only one sex can undergo." *Dobbs v. Jackson Women's*

2

*Health Org.*, 597 U.S. 215, 236 (2022) (holding that regulation of such procedures does not facially discriminate).

No wonder, then, that the panel relied on generalities from *Bostock* rather than apply its "straightforward rule": "chang[e] the employee's sex" and see if it "yield[s] a different choice by the employer." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 659–60 (2020). Here, neither males nor females get coverage for a transitioning vaginoplasty or any other sex-change operation, so there is no sex discrimination.

**2. The exclusion does not discriminate based on gender identity.** One can be cisgender, agender, transgender, non-binary, or anything else—and sex-change operations are excluded. Without citation, the panel asserted that "transgender persons are the only plan participants who qualify for gender-affirming surgery." Op. 9. That's incorrect: individuals wishing to detransition could desire sex-change operations;[2] some individuals who do not identify as transgender seek the operations;[3] and many individuals that seek sex-change operations (and identify as transgender now) will not ultimately identify as transgender.[4]

---

[2] E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health, S42 (2022) (hereinafter "SOC-8").

[3] J. Hodax & S. DiVall, *Gender-Affirming Endocrine Care for Youth with a Nonbinary Gender Identity*, 14 Therapeutic Advances in Endocrinology & Metabolism (2023), https://doi.org/10.1177/20420188231160405.

[4] Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 455–56 (5th ed. 2013) (hereinafter "DSM-5").

Even if the panel were right, it would make no difference. "Because the [insurance] policy divides [employees] into two groups"—those who want sex-change operations and those who do not—and both groups include transgender employees,[5] "there is a 'lack of identity' between the policy and transgender status." *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 809 (11th Cir. 2022) (quoting *Geduldig v. Aiello*, 417 U.S. 484, 496–97 & n.20 (1974)); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271 (1993). The same rule applies under Title VII (other than to pregnancy-related issues). *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 133–36 (1976).[6] That means no facial discrimination here based on gender identity.

**3. The exclusion does not discriminate based on gender nonconformity.** Regardless of whether one conforms to sex (or gender) stereotypes, sex-change operations are excluded. As just explained, some gender *conforming* individuals may

---

[5] "[N]ot all" transgender people suffer from gender dysphoria, and only some with gender dysphoria "seek[] medical treatment to alter body characteristics." DSM-5, *supra* note 4, at 451–54; W. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons*, 102 J. Clinical Endocrinology & Metabolism 3869, 3875 (2017) (similar).

[6] Congress amended Title VII to prescribe a different result *only* for discrimination "on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). The United States' effort to read this limited amendment as entirely abrogating *Geduldig* and *Gilbert* and covering *every* medical condition is as atextual as it is unsupported by precedent. Brief for the United States as *Amicus Curiae* Supporting Plaintiff-Appellee 16, 19, *Lange*, 2023 WL 2648303 (hereinafter "U.S. Brief"); see *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 684 (1983) (holding only that the amended statute "makes clear that it is discriminatory to treat pregnancy-related conditions less favorably than other medical conditions").

4

desire those operations, and some gender nonconforming individuals will *not* desire them, so there is no discrimination. *See Adams*, 57 F.4th at 809.

If the panel were nonetheless correct that the exclusion constitutes Title VII facial discrimination, the consequences would be far-reaching. The panel's logic would force health plans to cover all procedures used in one sex, regardless of their use. That result conflicts with binding precedents of the Supreme Court and this Court. Further, the panel's opinion would result in an inundation of Title VII litigation involving employers—especially religious employers—who object on religious (and often scientific) grounds to covering experimental, sterilizing sex-change procedures. The Court should grant rehearing en banc.

## ARGUMENT

**I.    The panel's logic contradicts precedent and is self-defeating.**

As gender-transition specialist (and expert witness for the United States) Dr. Daniel Shumer recently testified elsewhere, doctors choose many gender transition procedures based on sex. *Boe v. Marshall*, No. 22-cv-184, Doc. 557-39, at 90:1–2, 94:9–95:23 (M.D. Ala. May 27, 2024) (hereinafter "Shumer") ("I would need to know their anatomical hormonal sex."). Doctors would not perform Lange's penile inversion on a female. They would not give a male testosterone to transition, or a female estrogen. *Id.* at 90:15–18; Hembree et al., *supra* note 5, at 3886–87; SOC-8, *supra* note 2, at S128–30 (separating surgical options by persons "assigned male at

birth (AMAB) and assigned female at birth (AFAB)"). Doctors similarly make these decisions based on gender identity, refusing transitioning procedures to those whose gender identity aligns with their sex (or are non-binary or other). Shumer 98:14–99:10. And they consider gender nonconformity, making decisions based on a diagnosis founded in stereotypes like whether a person prefers "typical masculine clothing," "games[] or activities stereotypically used or engaged in by the other gender," and "playmates of the other gender." DSM-5, *supra* note 4, at 452.

Asked if his transitioning treatments discriminate based on sex, Dr. Shumer insisted that these choices simply reflect "appropriate medical management." Shumer 99:18–100:2. But on the panel's theory, these choices constitute facial sex discrimination that (for providers accepting federal funds) violates federal law: a person's "sex is inextricably tied to" what treatments they are offered. Op. 10; *see* 42 U.S.C. § 18116(a). So too would many other common medical procedures used only in one sex. Fertility clinics, for instance, would be liable for deciding to implant fertilized eggs only in females.

What's more, if sex discrimination *does* extend to operations only one sex can undergo, the County plan's refusal to fund sex-change operations mirrors federal non-discrimination law by prohibiting *providers* from discriminating based on sex using the County's money. Prohibiting sex discrimination could not be discrimination because of sex—making the panel's logic self-defeating. *Cf. Hurley v. Irish-*

6

*Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 572 (1995) ("Provisions like these are well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination, and they do not, as a general matter, violate the" Fourteenth Amendment.).

Continuing the descent into madness, if the panel were right that the County's exclusion is sex discrimination, then a plan would also discriminate by covering transitioning hormones—say, testosterone for females to look more "masculine"— and refusing to cover testosterone for males who want to look more "masculine." Same goes for any number of other implants, augmentations, enhancements, and drugs. *And* it would violate Title VII to fail to cover "sex change *reversals*." Op. 21 (Brasher, J., dissenting). In essence, the panel's logic means that any procedure related to gender transition gets special (and universal) coverage, regardless of why or how the procedure is used. *See id.* at 24; *see also Amicus* Brief of Alabama 8–12 (showing that the same logic would apply to *all* treatments tied to sex); *contra Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 259 (1981) (explaining that Title VII "does not demand that an employer give preferential treatment").

All this is nonsense. That sex-change operations "are themselves sex-based" does not make every regulation pertaining to them discriminatory. *Eknes-Tucker*, 80 F.4th at 1228 ("treatments for gender dysphoria are different for males and for females because of biological differences between" them). Slicing off a male's genitals

7

is not the same procedure as correcting a female's congenital absence of a vagina. Giving a female testosterone to transition is not the same procedure as giving testosterone to a male to treat hypogonadism (or to win the Tour de France). Contra the district court, a mastectomy "for cancer treatment" is not the same procedure as removing a woman's healthy breasts "for sex change." *Lange v. Houston Cnty.*, 608 F. Supp. 3d 1340, 1358 (M.D. Ga. 2022).

These realities are presumably why the panel (and the United States) made no effort to identify an analogous "other operation[]" (or "same treatment") covered by the County's plan. Op. 10; U.S. Brief, *supra* note 6, at 10–11. That flaw is of a piece with the rest of the panel opinion, which substitutes inapplicable generalities from *Bostock* for *Bostock*'s test, Supreme Court and circuit precedent, and logic.

## II. The consequences of the panel's decision would be severe.

Redefining Title VII's prohibition against sex-based discrimination to forbid employers from choosing to cover "some treatment and not others," Op. 10, would have devastating consequences for employers. Employers already pay huge sums for healthcare coverage, and those costs are rising. *2023 Employer Health Benefits Survey*, KFF (Oct. 18, 2023), https://www.kff.org/report-section/ehbs-2023-summary-of-findings/ (employers paid $17,393 on average for each family premium and $7,034 for each single premium in 2023, up 7% from 2022). Traditionally, employers have had flexibility in structuring benefits packages, offering more coverage as

an incentive for prospective employees or choosing a cheaper plan to cut costs. The panel's decision leaves employers with no options, requiring them to cover *any* treatment labeled "gender-affirming care." In addition to hormone therapy and genital surgery, this could include prosthetics, voice therapy and surgery, facial surgery and body contouring, and hair removal. *See* SOC-8, *supra* note 2, at S18 (designating each "[m]edically necessary"). As noted, the panel's reasoning could further require employers to cover *any* procedure connected to "sex"—from fertility treatments or care for sexual dysfunction to cosmetic procedures and abortions.

　　The United States is not blind to the unreasonableness of these obligations—at least when the weight falls on its own shoulders. The military's health insurance program covers mental health treatment and hormone procedures for gender dysphoria but excludes all surgical treatments. TRICARE Policy Manual 6010.60-M, Chapter 7, § 1.3 at 3.1 (revised Dec. 6, 2022). Medicare, meanwhile, does not cover gender transition hormone or surgical procedures for minors. *Gender Reassignment Services for Gender Dysphoria*, https://perma.cc/8FB5-9VUS (revised Nov. 9, 2023).

　　Religious employers face special threats from the panel's logic. Many "employers and healthcare providers have strong religious objections to sex reassignment procedures, and therefore requiring them to pay for . . . these procedures will have a severe impact on their ability to honor their deeply held religious beliefs."

9

*Bostock*, 590 U.S. at 731 (Alito, J., dissenting). For members of the CEA specifically, covering experimental gender-transition procedures offends religious convictions "that male and female are immutable realities defined by biological sex and that gender reassignment is contrary to" their Christian values. *CEA*, 2024 WL 935591, at *8. As a district court recently recognized in granting CEA a permanent injunction against the EEOC's enforcement of this same interpretation of Title VII, that interpretation would force CEA's members to choose between providing this coverage in violation of their beliefs and "fac[ing] harsh consequences like paying fines and facing civil liability." *Id.*

Other religious employers have raised the same concerns. *See, e.g.*, *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1147 (D.N.D. 2021) (finding that a "refusal to perform or cover gender-transition procedures would result in the [religious plaintiffs] losing millions of dollars in federal healthcare funding and incurring civil and criminal liability" while compliance with the mandate "would violate [the plaintiffs'] religious beliefs as they sincerely understand them"), *aff'd Religious Sisters of Mercy v. Becerra*, 55 F.4th 583 (8th Cir. 2022) (affirming permanent injunction for the plaintiffs).

These fears are well-founded. The EEOC "has never disavowed an intent to enforce Title VII's prohibition on gender-transition exclusions in health plans" against religious employers, *Religious Sisters*, 513 F. Supp. 3d at 1142, and it has

10

not provided any "official guidance indicating any exemptions for employers . . . on religious grounds." *Braidwood Mgmt. v. EEOC*, 70 F.4th 914, 921 (5th Cir. 2023). In fact, the EEOC has even resisted pre-enforcement challenges of its interpretation of sex discrimination against a *church*. *Bear Creek Bible Church v. EEOC*, No. 18-cv-00824, 2021 WL 5052661 (N.D. Tex. Oct. 31, 2021). If the EEOC's and panel's interpretation of Title VII takes root, a flood of RFRA challenges will be forthcoming. *Cf., e.g.*, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014); *Autocam Corp. v. Burwell*, 573 U.S. 956 (2014); *Eden Foods, Inc. v. Burwell*, 573 U.S. 946 (2014).

Even if religious employers ultimately prevail, repeated challenges result in investigations and lawsuits that cost considerable time and money—and burden religious freedom. *See NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979) ("[T]he very process of inquiry" "may impinge on rights guaranteed by the Religion Clauses."). While the members of CEA are protected by injunction, other employers face oppressive litigation if they refuse to violate their religious convictions. And entities like the County would have no apparent recourse from being compelled to spend taxpayer monies to fund controversial, experimental procedures based on an unsupported reading of Title VII.

## CONCLUSION

The Court should grant rehearing en banc.

11

Respectfully submitted,

s/ Christopher Mills
CHRISTOPHER MILLS
*Spero Law LLC*
*557 East Bay Street #22251*
*Charleston, SC 29413*
*(843) 606-0640*
*cmills@spero.law*

Counsel for *Amicus Curiae*

JUNE 10, 2024

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 29(b)(4) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 2,600 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

3. This document has been scanned for viruses and is virus-free.

Dated: June 10, 2024

/s Christopher Mills
Christopher Mills

## CERTIFICATE OF SERVICE

I, Christopher Mills, an attorney, certify that on this day the foregoing Brief was served electronically on all parties via CM/ECF.

Dated: June 10, 2024

s/ Christopher Mills<br>
Christopher Mills