No. 22-13626

# In the United States Court of Appeals for the Eleventh Circuit

◆

ANNA LANGE,

*Plaintiff-Appellee,*

v.

HOUSTON COUNTY, GEORGIA, et al.,

*Defendants-Appellants.*

◆

On Appeal from the U.S. District Court for
the Middle District of Georgia
No. 5:19-cv-00392-MTT

## *AMICUS CURIAE* BRIEF OF BILLY BURLEIGH, KATHYGRACE DUNCAN, AND JANE SMITH IN SUPPORT OF DEFENDANTS-APPELLANTS' PETITION FOR REHEARING *EN BANC*

JOSHUA K. PAYNE
  *Counsel of Record*
JORDAN CAMPBELL
RONALD MILLER
DANIEL SEPULVEDA
CAMPBELL MILLER PAYNE, PLLC
5955 Alpha Rd #1491
Dallas, Texas 75240
(214) 316-7156
josh@cmppllc.com

June 10, 2024

Counsel for *Amici Curiae*

Lange v. Houston County, Georgia, et al.
No. 22-13626

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to 11th Cir. R. 26.1-2, *Amici* Billy Burleigh, KathyGrace Duncan, and Jane Smith identify the following trial judges, attorneys, persons, associations, firms, partnerships, or corporations that have an interest in the outcome of the particular case or appeal:

1. Allen & Overy LLP (Counsel for Amicus Curiae Lawyers' Committee for Civil Rights Under Law);

2. Anti-Defamation League (Amicus Curiae for Appellee);

3. Arkles, Z. Gabriel (Counsel for Appellee);

4. Barry, Kevin M. (Counsel for Appellee);

5. Barton, III, Kenneth E. (Counsel for Appellee);

6. Bone, Michelle (Counsel for Amicus Curiae Lawyers' Committee for Civil Rights Under Law);

7. Brown, David (Counsel for Appellee);

8. Burleigh, Billy (Amicus Curiae for Appellants);

9. Calderon, Tovah R. (Counsel for Amicus Curiae Department of Justice);

Lange v. Houston County, Georgia, et al.

No. 22-13626

10.    Campbell, Jordan (Counsel for Amici Curiae Billy Burleigh, KathyGrace Duncan, and Jane Smith);

11.    Campbell Miller Payne, PLLC (Counsel for Amici Curiae Billy Burleigh, KathyGrace Duncan, and Jane Smith);

12.    Clarke, Kristen (Counsel for Amicus Curiae Department of Justice);

13.    Cooper, Barton & Cooper (Counsel for Appellee);

14.    Cooper, M. Devlin (Counsel for Appellee);

15.    Deveney, William D. (Counsel for Appellants);

16.    Duncan, KathyGrace (Amicus Curiae for Appellants);

17.    Elarbee, Thompson, Sapp & Wilson, LLP (Counsel for Appellants);

18.    Equal Rights Advocates (Amicus Curiae for Appellee);

19.    Fata, Catherine Elizabeth (Counsel for Appellee);

20.    Gignilliat, R. Read (Counsel for Appellants);

21.    Grant, Jill K. (Counsel for Appellee);

22.    Greenbaum, Jon (Counsel for Amicus Curiae Lawyers' Committee for Civil Rights Under Law);

Lange v. Houston County, Georgia, et al.
No. 22-13626

23. Houston County, Georgia (Defendant-Appellant);

24. Kieckhafer, Katherine (Counsel for Amicus Curiae Lawyers' Committee for Civil Rights Under Law);

25. Lail, Patrick L. (Counsel for Appellants);

26. Lee, Jason (Counsel for Amicus Curiae Department of Justice);

27. Lange, Anna (Plaintiff-Appellee);

28. Latino Justice PRLDEF (Amicus Curiae for Appellee);

29. Lawyers' Committee for Civil Rights Under Law (Amicus Curiae for Appellee);

30. Miller, Ronald (Counsel for Amici Curiae Billy Burleigh, KathyGrace Duncan, and Jane Smith);

31. Mitrokostas, Nicholas K. (Counsel for Amicus Curiae Lawyers' Committee for Civil Rights Under Law);

32. Morgan, Sharon P. (Counsel for Appellants);

33. National Employment Law Project (Amicus Curiae for Appellee);

34. National Health Law Program (Amicus Curiae for Appellee);

Lange v. Houston County, Georgia, et al.

No. 22-13626

35.    National Women's Law Center (Amicus Curiae for Appellee);

36.    Payne, Amanda M. (Counsel for Appellee);

37.    Payne, Joshua K. (Counsel for Amici Curiae Billy Burleigh, KathyGrace Duncan, and Jane Smith);

38.    Powell, Wesley (Counsel for Appellee);

39.    Quinnipiac Univ. School of Law Legal Clinic (Counsel for Appellee);

40.    Sepulveda, Daniel (Counsel for Amici Curiae Billy Burleigh, KathyGrace Duncan, and Jane Smith);

41.    Smith, Jane (Amicus Curiae for Appellants) (pseudonym);

42.    Talton, Cullen in his official capacity as Sheriff (Defendant-Appellant)

43.    Transgender Legal Defense Education Fund (Counsel for Appellee);

44.    Treadwell, Hon. Marc T. (District Court Judge);

45.    U.S. Department of Justice (Amicus Curiae for Appellee);

46.    Wilkie Farr & Gallagher LLP (Counsel for Appellee); and

47.    Youker, Kathryn J. (Counsel for Amicus Curiae Lawyers'

Lange v. Houston County, Georgia, et al.
No. 22-13626

Committee for Civil Rights Under Law).

Respectfully submitted, this 10th day of June, 2024.

/s/ Joshua K. Payne
Joshua K. Payne

Counsel for *Amici Curiae*

## STATEMENT REGARDING *EN BANC* CONSIDERATION

I express a belief, based on a reasoned and studied professional judgment, that this appeal involves one or more questions of exceptional importance, including whether a health plan may lawfully exclude coverage for so-called sex-modification procedures known to cause serious harm.

Respectfully submitted, this 10th day of June, 2024.

/s/ Joshua K. Payne
Joshua K. Payne

Counsel for *Amici Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..................................... C-1

STATEMENT REGARDING *EN BANC* CONSIDERATION ................... i

TABLE OF CONTENTS .............................................................. ii

TABLE OF AUTHORITIES ...................................................... iii

INTEREST OF *AMICI CURIAE*, ISSUES, & SUMMARY OF
ARGUMENT ............................................................................. v

ARGUMENT ............................................................................ 1

    I.   As *Amici* can attest from their own experiences, so-called sex-modification procedures are known to cause serious harm. .................. 1

    II.  Research likewise shows that so-called sex-modification procedures cause serious harm. ............................................ 9

CONCLUSION ......................................................................... 12

CERTIFICATE OF COMPLIANCE ......................................... 14

CERTIFICATE OF SERVICE.................................................... 15

# TABLE OF AUTHORITIES

## Cases

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791

(11th Cir. 2022) (en banc) ........................................................ 9

*Lange v. Houston Cnty., Georgia*, 101 F.4th 793 (11th Cir. 2024) ......... 12

*Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 135 S. Ct. 1338 (2015)

.................................................................................................. 12

## Other Authorities

Elie Vandenbussche, *Detransition-Related Needs and Support: A Cross-*

*Sectional Online Survey*, 69(9) J. Homosex., 1602-1620 (2022) ............ 9

Isabel Boyd, et al., *Care of Transgender Patients: A General Practice*

*Quality Improvement Approach*, 10(1) Healthcare 121 (2022) ............ 11

J. Straub, et al., *Risk of Suicide and Self-Harm Following Gender-*

*Affirmation Surgery*, 16(4):e57472 Cureus 1-9 (2024) ......................... 11

Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical*

*and/or Surgical Transition Who Subsequently Detransitioned: A*

*Survey of 100 Detransitioners,* 50(8) Arch. Sex. Behav. 3353-3369

(2021) ............................................................................................. 9, 10

Lisa Marchiano, *Gender Detransition: A Case Study*, 66(4) J. of Anal.

Psychol. 813-832 (2021) ...................................................................... 10

R. Hall, et al., *Access to Care and Frequency of Detransition Among a*

    *Cohort Discharged by a UK National Adult Gender Identity Clinic:*

    *Retrospective Case-Note Review*, 7(6):e184 BJPsych Open. 1-8 (2021)

    .................................................................................................10, 11

## INTEREST OF *AMICI CURIAE*, ISSUES, & SUMMARY OF ARGUMENT

*Amici* Billy Burleigh, KathyGrace Duncan, and Jane Smith[1] support a health plan's right to exclude coverage for so-called sex-modification procedures because, as *Amici* can attest from their own experiences, such procedures are known to cause serious harm.

*Amici* experienced gender dysphoria and were led to believe that "affirming" medical interventions for the purpose of "gender transition," including surgical procedures, would resolve their gender dysphoria and permit them to live healthy, well-adjusted lives. Sadly, *Amici* learned through their experiences that such interventions did not resolve their mental health issues or gender dysphoria, but only caused physical harm and increased their distress as they realized their bodies had been irreversibly altered based upon a false promise.

*Amici* offer the Court an understanding of their experiences as detransitioners and evidence showing that those procedures are harmful.

---

[1] A pseudonym is being used to protect the identity of *Amicus* Jane Smith and her family members. *Amici* have filed a motion for leave to submit this brief pursuant to 11th Cir. R. 29-3. No counsel for a party authored this brief in whole or in part, and no person other than *Amici* or their counsel made a monetary contribution intended to fund the preparation or submission of the brief.

# ARGUMENT

## I. As *Amici* can attest from their own experiences, so-called sex-modification procedures are known to cause serious harm.

### Billy Burleigh

Billy Burleigh grew up in a good family with supportive parents. But in the first grade he began experiencing intrusive thoughts that "God made a mistake. I'm a girl." Through elementary school he had learning and emotional difficulties. He was in emotional pain, and he withdrew from others, trying to cope. He was sexually abused in sixth grade by a male diving coach.

Looking for answers to his distress, the prevailing information he received was that the only way to overcome the disconnect was to change his body to conform to what his mind was telling him. Driven by depression and thoughts of suicide, Billy was willing to try anything to relieve his suffering. He told his therapist he wanted to transition, and she provided him a letter to begin cross-sex hormones. Billy was prescribed spironolactone, to block testosterone, and estrogen. He underwent multiple surgeries. Starting at age 34, he underwent

vaginoplasty, labioplasty, an Adam's apple shave, facial plastic surgery, and voice feminization surgery.

However, no matter how many surgeries he had, every time Billy looked in the mirror he saw a man staring back at him. Despite a successful professional career and passing well as a woman he still had all the same problems and mental distress he had before transitioning. After seven years, he began to detransition. What helped Billy come to terms with his male body was finding peace with God and a wonderful faith community. With the help of healthy relationships with other men and a community that loved and supported him, he was able to make the journey back to embracing his male self. Billy got married in 2011 and is currently living happily as a male, a husband, and father, although he still must live with the consequences of a scarred body and the inability to engage sexually with his wife.

Based on his experience, Billy believes strongly that the medical and surgical interventions aimed at "affirming" a discordant gender identity are harmful. They are putting a band-aid on the underlying issues that the individual is having. People are looking for acceptance, significance, and security. "Gender-affirming" treatments are offered to

satisfy those needs, but from his own painful experience Billy warns they cannot do that long term. Billy has spoken with many detransitioned young people. Many of them have experienced trauma and/or sexual abuse. Billy has realized that these individuals need therapy and a safe environment to work through and address the severe mental health issues they are experiencing. Individuals facing the struggles Billy faced need help with their thoughts, not a body "fix" with hormones and surgery.

### KathyGrace Duncan

From a very young age, KathyGrace was gender nonconforming; she preferred male attire, thought she was a "boy," and wanted to live as one. However, it was not until after she had medically transitioned and lived for many years as a man that she was able to reflect on the complex true origins and causes of her self-perception and gender dysphoria. Growing up in a dysfunctional family in which her mother was often the victim of her father's emotional and verbal abuse, KathyGrace intuited the message that "my dad would love me if I were a boy." Sexual abuse by a family member between the ages of 10 and 12 further convinced her that being a girl meant being unsafe and unlovable.

3

In sixth grade, she learned about female to male transsexuals, leading her to conclude that her distress was caused by not having the "right" body and the only way to live a normal life was to medically transition and become a heterosexual male. At age 19, she began living as a man named Keith and went to a therapist who formally diagnosed her with gender dysphoria. She began testosterone and a year later had a mastectomy. At the time, she believed changing her body was necessary so that what she saw in the mirror matched what she felt on the inside. She never viewed her condition as touching on mental health issues, and neither did the therapist who diagnosed her. Whether her self-perception and desire to transition was related to her mental health issues was never explored.

After 11 years passing as a man and living a relatively "happy" and stable life (which included having a number of girlfriends), KathyGrace realized that she was living a lie built upon years of repressed pain and abuse. Hormones and surgery had not helped her resolve underlying issues of rejection, abuse, and sexual assault. Her desire to live as a man was a symptom of deeper, unmet needs.

With the help of life coaches and a supportive community, KathyGrace returned to her female identity and began addressing the underlying issues that had been hidden in her attempt to live as a man. She experienced depression that she had repressed for years and grieved over the irreversible changes to her body. KathyGrace believes that if someone had walked with her through her feelings instead of affirming her desire to transition, she would have been able to address her mental health issues more effectively and not spent so many years making and recovering from a grave mistake.

**Jane Smith**

Jane grew up in a deeply traumatic family setting. Her parents were hoarders, so she grew up surrounded by filth. Horrifically, she was sexually abused by her father, an alcoholic, for years growing up. Undoubtedly related to her traumatic upbringing, Jane suffered from post-traumatic stress disorder, night terrors, severe depression and anxiety, and she developed an eating disorder. Jane even became suicidal and at one point was hospitalized when she became delirious and threatened to kill herself.

Since the age of 16, Jane had gone to therapy to try to help treat her mental health issues. Around this time, Jane also began to be heavily influenced online by sites and groups on Tumblr and other social media platforms that promoted transgenderism as a panacea for people struggling with mental health issues, like depression and anxiety. During her treatment with her first therapist, as this online influence started to sink in, Jane asked the therapist whether he thought she might be transgender. Despite admitting that he did not have much familiarity with the subject matter, the therapist said that he thought she might be since she was "so logical and analytical" (evidently, the therapist thought of logic and analysis as male-typical traits), but he did not account for the trauma Jane faced every day. Since the therapist did not know much about transgender issues, he referred Jane to a second therapist, who passed her along to the purported experts at one of the most prominent gender clinics in the Midwest.

Jane decided to go to the gender clinic. She was entirely open about and shared her highly troubled past and her existing, profound mental health struggles. She relayed that she was not sure she was transgender. Despite all of this, *on her first visit*, the staff at the clinic began referring

6

to her with male pronouns and offered to prescribe her cross-sex hormones. Jane declined the initial invitation since, again, she was not even sure she felt she was transgender. However, she continued to return to the clinic. After a number of additional visits—at each one she again was offered cross-sex hormone prescriptions—she decided that she wanted to try to become a boy. The clinic underplayed the known side-effects, simply reading a list of outcomes and describing them as some minor things that "might" happen. Instead, Jane was told that she would finally get to "experience male puberty."

She did not experience male puberty. She stayed on testosterone and other "gender-affirming" medications for almost six years. And it wrecked her body. Within the past two years, Jane decided to detransition and identify as her natural female self. She realized she could never become a man; instead, she can now appreciate that she was just young, confused, vulnerable, and bisexual and had been seduced and deceived to buy into an idea she could never actually attain.

Life has become exceedingly difficult given the permanent effects of the cross-sex hormones. Her voice has permanently changed—she was a soprano but is now a baritone—and she feels that she does not recognize

7

the voice coming out of her own body, a deeply disturbing reality for her. Others are also taken aback when they see her returning feminine appearance but then "hear a man's voice" when she talks; she suspects she has lost out on three job opportunities because of it. She grew facial hair and has to shave to try to stave off the male appearance it brings. She struggles with eating disorders. She has joint issues, general fatigue, and increased vascularity. She randomly gets extremely nauseous. Jane has vaginal atrophy and other adverse effects in her genitals. And she feels that her brain has been severely compromised.

Once a very successful student who graduated high school early with multiple scholarship offers, Jane now struggles to hold a job. And she is angry. Angry at the doctors who did this to her. Angry that someone with her extreme mental health comorbidities could have been offered life-altering cross-sex hormones after a single visit by the purported experts at a prestigious gender clinic. And she is angry that due to a harsh statute of limitations in her home state of Ohio, she has no recourse in the courts, as she did not realize the harm and abuse that was inflicted upon her until it was too late under existing Ohio law.

## II.   Research likewise shows that so-called sex-modification procedures cause serious harm.

*Amici* are not alone in their experiences of being misled into life-altering medical interventions to change their bodies to look like the opposite sex. A growing body of research indicates that an increasing number of individuals are detransitioning. This shows that interventions to alter a person's physical appearance, including the removal of healthy body parts, is harmful *per se*.[2]

For example, a survey of 237 detransitioners showed 70% reported that they detransitioned after realizing their gender dysphoria was related to other issues. Elie Vandenbussche, *Detransition-Related Needs and Support: A Cross-Sectional Online Survey*, 69(9) J. Homosex., 1602-1620, 1606 (2022). And a survey of 100 detransitioners showed 60% reported their decision to detransition was motivated by the fact that they "became comfortable identifying with their natal sex." Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical*

---

[2] That sex-modification procedures cause harm is also demonstrated by the concept of "gender fluidity—i.e., the practice . . . in which some individuals claim to change gender identities associated with the male and female sexes and thereby treat sex as a mutable characteristic." *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 803 n.6 (11th Cir. 2022) (en banc).

*Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners,* 50(8) Arch. Sex. Behav. 3353-3369, 3361 (2021).

Dr. Littman found that, as is true of *Amici*, a majority of the study subjects felt that they had been rushed into medical "gender-affirmative" interventions with irreversible effects without the benefit of adequate psychologic evaluation. *Id.* at 3364-3366. She also found that several of the participants in her study felt pressured to transition from their doctors or therapists. *Id.* at 3366. Thirty-eight percent of participants in Dr. Littman's study said that their gender dysphoria was caused by trauma or mental health issues, and more than half said that transitioning delayed or prevented them from getting treatment for their trauma or mental health issues. *Id.* at 3361-3362.

Dr. Littman observed that her research into detransitioners "adds to the existing evidence that gender dysphoria can be temporary." *Id.* at 3365; *see also* Lisa Marchiano, *Gender Detransition: A Case Study*, 66(4) J. of Anal. Psychol. 813-832, 814 (2021) ("[T]he number of young people detransitioning (reaffirming their natal sex) … appears to be increasing. Detransitioners are now sharing their stories online and entering therapy."); R. Hall, et al., *Access to Care and Frequency of Detransition*

*Among a Cohort Discharged by a UK National Adult Gender Identity Clinic: Retrospective Case-Note Review*, 7(6):e184 BJPsych Open. 1-8, 1 (2021) ("Detransitioning might be more frequent than previously reported."); Isabel Boyd, et al., *Care of Transgender Patients: A General Practice Quality Improvement Approach*, 10(1) Healthcare 121 (2022) ("[T]he detransition rate found in this population is novel and questions may be raised about the phenomenon of overdiagnosis, overtreatment, or iatrogenic harm as found in other medical fields.").[3]

In addition to the detransition phenomenon, a recent study found that patients who had undergone sex-modification surgery had "a 12.12 times greater risk of suicide attempts" than patients who had not undergone such surgery. J. Straub, et al., *Risk of Suicide and Self-Harm Following Gender-Affirmation Surgery*, 16(4):e57472 Cureus 1-9, 3 (2024). Patients who had undergone surgery also had "a 7.76 times higher risk of PTSD." *Id.*

---

[3] Reddit's "detrans" forum (http://www.reddit.com/r/detrans/) has more than doubled, from over 23,000 members in November 2021 to 54,000 members today. Notably, March 12, 2021, was the first International Detransition Awareness Day. *See* Detrans Awareness Day, https://www.detransawareness.org/; Our Duty, Detransition Awareness Day, https://ourduty.group/2021/03/12/detransition-awareness-day/.

Because sex-modification surgery has been shown to make functional impairment worse, it cannot be "'reasonably expected to improve'" functional impairment. *Lange v. Houston Cnty., Georgia*, 101 F.4th 793, 796 (11th Cir. 2024) (quoting health plan). Nor can surgery be said to reliably treat "anxiety, depression, and suicidality." *Id.*

## CONCLUSION

The experiences of *Amici* and other detransitioners, as well as research showing that so-called sex-modification surgery increases rather than reduces mental anguish, demonstrates that the County has "'a legitimate, nondiscriminatory, nonpretextual reason'" for its policy excluding such surgeries. *Lange v. Houston Cnty., Georgia*, 101 F.4th 793, 806 (11th Cir. 2024) (Brasher, J., dissenting) (quoting *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 222, 135 S. Ct. 1338, 1350 (2015)).

*Amici* respectfully submit that this Court should grant Defendants-Appellants' Petition for Rehearing *En Banc*.

Dated: June 10, 2024        Respectfully submitted,

/s/ Joshua K. Payne
JOSHUA K. PAYNE
  *Counsel of Record*
JORDAN CAMPBELL
RONALD MILLER
DANIEL SEPULVEDA
CAMPBELL MILLER PAYNE, PLLC
5955 Alpha Rd #1491
Dallas, Texas 75240
(214) 316-7156
josh@cmppllc.com

Counsel for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 29(b)(4) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 29-3, this document contains 2,549 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Respectfully submitted, this 10th day of June, 2024.

/s/ Joshua K. Payne
Joshua K. Payne

Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

The foregoing *Amicus Curiae* Brief was electronically filed with the U.S. Court of Appeals for the Eleventh Circuit on June 10, 2024. The Court's electronic filing system will provide notification to counsel of record.

Respectfully submitted, this 10th day of June, 2024.

<u>/s/ Joshua K. Payne</u>
Joshua K. Payne

Counsel for *Amici Curiae*