No. 22-13626

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

HOUSTON COUNTY, GEORGIA, AND HOUSTON COUNTY SHERIFF
CULLEN TALTON, IN HIS OFFICIAL CAPACITY,

DEFENDANTS-APPELLANTS,

V.

ANNA LANGE,

PLAINTIFF-APPELLEE.

On Appeal from the United States District Court for the
Middle District of Georgia, Macon Division

Case No. 4:21-CV-415

## BRIEF OF *AMICI CURIAE*
## ETHICS AND PUBLIC POLICY CENTER
## IN SUPPORT OF DEFENDANTS-APPELLANTS'
## PETITION FOR REHEARING EN BANC

ERIC N. KNIFFIN
MARY RICE HASSON
ETHICS & PUBLIC POLICY CENTER
1730 M Street, N.W.
 Suite 910
Washington, DC 20036
(202) 682-1200
ekniffin@eppc.org

*Counsel for* Amicus Curiae

June 10, 2024

**22-13626 – Houston County, Georgia, et al., v. Anna Lange**

### CORPORATE DISCLOSURE STATEMENT
### AND CERTIFICATE OF INTERESTED PERSONS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and 11th Cir. R. 26.1, 26.2-1, 26.1-3 and 28-1(b), the undersigned counsel of record for *amicus curiae* certifies that the following listed persons and parties not already listed in the CIP contained in the Defendants-Appellants' petition for rehearing *en banc* have an interest in the outcome of this case:

1.    Ethics and Public Policy Center, *amicus curiae*;

2.    Hasson, Mary Rice, counsel for *amicus curiae*; and

3.    Kniffin, Eric Nieuwenhuis, counsel for *amicus curiae*.

*Amicus curiae* Ethics and Public Policy Center is a non-profit 501(c)(3) organization with no corporate parent and is not owned in whole or in part by any publicly held corporation.

Dated: June 10, 2024

s/ Eric N. Kniffin
Eric N. Kniffin
*Counsel for* Amicus Curiae

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF AUTHORITIES ...................................................................iii

INTEREST OF *AMICUS CURIAE* ....................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................... 2

ARGUMENT ......................................................................................... 4

    I.  The panel's definition of "facial discrimination" precludes employers and courts from considering important, ongoing debates about how to treat gender dysphoria ............................... 4

    II.  There is not, and has never been, an authoritative standard of care for gender dysphoria. ........................................................... 5

        A.  WPATH and Endocrine Society guidelines are not the standard of care. ....................................................................... 6

        B.  This Court and other circuits have noted this lack of medical consensus. .................................................................... 9

    III. The WPATH Files and Cass Review underscore the fundamental deficiencies with and uncertainties regarding gender transition medicine. ....................................................... 10

        A.  WPATH Files ........................................................................ 10

        B.  Cass Review ........................................................................ 12

CONCLUSION ................................................................................... 14

CERTIFICATE OF COMPLIANCE .................................................... 15

CERTIFICATE OF SERVICE ............................................................ 16

# TABLE OF AUTHORITIES

## Cases

*Doe v. Snyder*,
28 F.4th 103 (9th Cir. 2022) ................................................................. 10

*Gibson v. Collier*,
920 F.3d 212 (5th Cir. 2019).............................................................. 10

*Keohane v. Fla. Dep't of Corr. Sec'y*,
952 F.3d 1257 (11th Cir. 2020)............................................................. 9

*Kosilek v. Spencer*,
774 F.3d 63 (1st Cir. 2014) (en banc) .................................................... 9

*Lange v. Houston County, Georgia*,
101 F.4th 793 (11th Cir. 2024) ..................................................... 3, 4, 5

*Lange v. Houston County, Georgia*,
608 F.Supp.3d 1340 (M.D. Ga. 2022) .................................................... 4

## Other Authorities

CMS, *Decision Memo for Gender Dysphoria and Gender
Reassignment Surgery*, CAG–00446N, Aug. 30, 2016 .......................... 7

David Brooks, *The Courage to Follow the Evidence on Transgender
Care*, NY Times, April 18, 2024........................................................... 13

E. Coleman et al., *Standards of Care for the Health of Transgender
and Gender Diverse People, Ver. 8*, 23 Int'l J. Transgender Health
S1 (2022) ........................................................................................ 7

Editorial Board, *Helpful Transgender Lessons from Europe*, WSJ,
April 10, 2024...................................................................................... 14

EPPC, *Amicus Briefs: "Gender Transition" Interventions*, https://eppc.org/amicus-briefs/#16-%E2%80%9Cgender-transition%E2%80%9D-interventions-. ................................................2

Hilary Cass, *The Cass Review: Independent Review of Gender Identity Services for Children and Young People* (April 2024) ..... 12, 13

Karl Gerritse et al., *Decision-making approaches in transgender healthcare: conceptual analysis and ethical implications*, 24 Med Health Care Philo. 687 (2021) ..............................................6

Madeline B. Deutsch et al., *What's in a Guideline? Developing Collaborative and Sound Research Designs that Substantiate Best Practice Recommendations for Transgender Health Care*, 18 AMA J. Ethics 1098 (2016).............................................6, 8

Mary Rice Hasson, *Erasing Females in Language and Law*, 11 J. of Christian Legal Thought 44 (Oct. 2011) ..............................................2

Mia Hughes, *The WPATH Files*, Environmental Progress (March 4, 2024)..............................................10, 12

NHS England, *NHS England responds to the publication of the independent review of gender identity services for children and young people* (April 10, 2024) ..............................................14

Noam Shpancer, *Does Our Approach to Gender Dysphoria Need an Overhaul? A new review concludes that many gender-related treatments lack strong evidence*, Psychology Today, April 15, 2024...13

Sara Dahlen et al., *Int'l Clinical Practice Guidelines for Gender Minority/Trans People: Systematic Review and Quality Assessment*, 11 BMJ Open 1 (2021).......................................8

Theresa Farnan, *Our World Has Lost the Catholic Understanding of Human Anthropology*, Our Sunday Visitor, June 2, 2023...............2

Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society*

*Clinical Practice Guideline*, 102 J. Clinical Endocrinology &
    Metabolism 3869 (2017) ........................................................................9

## Treatises

Andrew T. Walker, GOD AND THE TRANSGENDER DEBATE (Good Book
    2017)..........................................................................................................2

Carl R. Trueman, STRANGE NEW WORLD: HOW THINKERS AND
    ACTIVISTS REDEFINED IDENTITY AND SPARKED THE SEXUAL
    REVOLUTION (Crossway 2022) ...............................................................2

Ryan T. Anderson, WHEN HARRY BECAME SALLY (Encounter Books
    2018)..........................................................................................................2

## INTEREST OF *AMICUS CURIAE*[1]

The Ethics and Public Policy Center ("EPPC") is a nonprofit research institution dedicated to applying the Judeo-Christian moral tradition to critical issues of public policy, law, culture, and politics. EPPC has a strong interest in promoting the Judeo-Christian vision of the human person, protecting religious liberty, and responding to the challenges of gender ideology.

Gender ideology has permeated culture with stunning speed, influencing medicine, business, media, entertainment, government, and education. It has sown confusion and led to unprecedented rates of "transgender" identification and body modification requests. These changes have created an urgent need for clarity, education, and guidance.

To meet this need, EPPC launched the Person & Identity Project, led by Director Mary Rice Hasson.[2] Many EPPC Fellows also write and advocate on issues related to gender ideology.[3]

---

[1] No party's counsel authored this brief, no one other than *amicus* and its counsel contributed money for this brief, and all parties have consented to its filing.

[2] EPPC, Person & Identity Project, https://personandidentity.com/.

[3] Relevant publications from EPPC Fellows include:

- Ryan T. Anderson, *When Harry Became Sally* (2018);

1

## INTRODUCTION AND SUMMARY OF ARGUMENT

*Amicus* EPPC joins Defendants-Appellants Houston County, Georgia, and Sheriff Talton (collectively, "Houston County") in asking this Court to review *en banc* the panel's split holding that declining to cover "sex change"[4] drugs and procedures is by definition facially discriminatory against transgender persons in violation of Title VII:

> Health Plan participants who are transgender are the only participants who would seek gender-affirming surgery. Because transgender persons are the only plan participants who qualify for gender-affirming surgery, the plan denies health care coverage based on transgender status.

---

- Andrew T. Walker, *God and the Transgender Debate* (2017);
- Carl R. Trueman, *Strange New World: How Thinkers and Activists Redefined Identity and Sparked the Sexual Revolution* (2022);
- Mary Rice Hasson, *Erasing Females in Language and Law*, 11 J. of Christian Legal Thought 44, 46 (Oct. 2011), available at https://eppc.org/publication/erasing-females-in-language-and-law/.
- Theresa Farnan, *Our World Has Lost the Catholic Understanding of Human Anthropology*, Our Sunday Visitor (June 2, 2023), https://www.oursundayvisitor.com/our-world-has-lost-the-catholic-understanding-of-human-anthropology;
- Amicus briefs on gender identity authored by EPPC fellows are available at EPPC, *Amicus Briefs: "Gender Transition" Interventions*, https://eppc.org/amicus-briefs/#16-%E2%80%9Cgender-transition%E2%80%9D-interventions-.

[4] *Amicus* uses the common terms "sex change" and "gender transition" to denote efforts to change a person's appearance or body so that it more closely resembles the person's expressed gender identity. A person cannot change his or her sex.

*Lange v. Houston County, Georgia*, 101 F.4th 793, 799 (11th Cir. 2024).

As Houston County notes in its petition, this facial discrimination analysis conflicts with the Supreme Court and Eleventh Circuit precedent.[5] *Amicus* offers this brief to note that the panel decision would also harm the public good by prejudging important, ongoing debates within the medical community and around the world about how best to understand and treat gender dysphoria.

As Judge Brasher points out in his dissent, when a court finds that a health plan exclusion facially violates Title VII, that is the end of the story. The panel, in essence, held that it is *per se* discriminatory to reject surgeries that purportedly treat gender dysphoria by amputating the patient's reproductive organs and ensure that he or she will remain a life-long medical patient.

This conclusion, however, is false. As demonstrated below, there is no medical consensus about how to treat gender dysphoria. Even if there is no dispute *in this case* that Plaintiff Lange's "sex change" surgery was

---

[5] Petition at 8-18.

3

"medically necessary,"[6] there are profound ongoing debates in the medical community about the best ways to treat gender dysphoria and the efficacy of "gender transition" procedures. *Amicus* asks the Court to rehear this case to ensure that employers, courts, and other decisionmakers remain free to take the best evidence about gender dysphoria into account.

## ARGUMENT

## I. The panel's definition of "facial discrimination" precludes employers and courts from considering important, ongoing debates about how to treat gender dysphoria.

The panel held that excluding coverage for "sex change" procedures facially discriminates against transgender persons in violation of Title VII. *Lange*, 101 F.4th at 799. This is a profoundly consequential holding, for where a court finds "explicit facial discrimination," "no other proof of disparate intent is needed"—it does not matter "why the employer discriminates." *Id*. at 798.

---

[6] *Lange*, 101 F.4th at 796 ("In 2018, [Lange's] healthcare providers determined that a vaginoplasty . . . was medically necessary."); *Lange v. Houston County, Georgia*, 608 F.Supp.3d 1340, 1347 (M.D. Ga. 2022) ("No evidence disputes Lange's evidence that the prescribed vaginoplasty is medically necessary.").

As Judge Brasher warns in his dissent, this holding renders all such considerations legally irrelevant. It "did not matter" that Houston County claims it had good faith, non-discriminatory reasons for excluding "sex change" coverage. *Id*. at 803 (Basher, J., dissenting). The panel in essence has declared that the matter is closed: "sex changes" work and are "medically necessary"; any voices to the contrary are legally irrelevant.

This would be a terrible precedent because, as demonstrated below, there is not now and has never been a medical consensus on how to treat gender dysphoria.

## II.    There is not, and has never been, an authoritative standard of care for gender dysphoria.

Though the panel summarily declared "vaginoplasty" a "medically necessary surgery" for males with gender dysphoria, *Lange*, 101 F.4th at 796, gender specialists exhibit no such confidence. Experts recognize that "[t]ransgender medicine presents a particular challenge for the development of evidence-based guidelines" because of "limited" data, "lower-quality evidence," retrospective study design, "lack of uniform

data collection," and limited research funding.[7] Experts admit the "field of gender-affirming medicine is characterized by a . . . slim (biomedical) evidence base."[8] Though advocates, government officials, and even judges have sometimes said otherwise, there is not now and has never been a medical consensus on how to treat what is now known as gender dysphoria.

### A.  WPATH and Endocrine Society guidelines are not the standard of care.

Thought transgender advocates tout the World Professional Association of Transgender Healthcare's (WPATH) Standards of Care and the Endocrine Society's guidelines as "generally accepted treatment standards," there is no plausible case that they meet this standard.

Aside from its title "standards of care" (currently, Standards of Care 8 or "SOC 8"), the WPATH SOC never claims to represent a legal, ethical,

---

[7] Madeline B. Deutsch et al., *What's in a Guideline? Developing Collaborative and Sound Research Designs that Substantiate Best Practice Recommendations for Transgender Health Care*, 18 AMA J. Ethics 1098, 1099 (2016), https://journalofethics.ama-assn.org/article/whats-guideline-developing-collaborative-and-sound-research-designs-substantiate-best-practice/2016-11.

[8] Karl Gerritse et al., *Decision-making approaches in transgender healthcare: conceptual analysis and ethical implications*, 24 Med. Health Care Phil. 687 (2021), https://doi.org/10.1007/s11019-021-10023-6.

or professional standard of care. Instead, the guidelines repeatedly emphasize their "flexible" and "adaptable" nature.[9] Indeed, the Centers for Medicare & Medicaid Services (CMS) cited the "flexibility" of WPATH's previous version (SOC 7) as a reason why it refused to endorse WPATH guidelines for Medicare coverage determinations.[10] Further, WPATH merely states that its recommendations are based on "data derived" from systematic evidence reviews "*where available*" (emphasis added); it fills the remaining gaps with selected "background reviews and expert opinions."[11]

Unlike true evidence-based standards, SOC 8 does not auger the strength of its recommendations based on the quality of the evidence cited in support. Nor does SOC 8 evaluate the available evidence according to "risk of bias, imprecision, inconsistency, indirectness . . . or

---

[9] E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1, S3 (2022), https://doi.org/10.1080/26895269.2022.2100644.

[10] Decision Memo, CMS, *Gender Dysphoria and Gender Reassignment Surgery*, CAG–00446N, Aug. 30, 2016 [hereinafter "CMS Decision Memo"], https://www.cms.gov/medicare-coverage-database/view/ncacal-decision-memo.aspx?proposed=N&NCAId=282.

[11] E. Coleman et al., *supra* n.9 at S3.

publication bias," as do reliable substantive evidence reviews that use GRADE methodology.[12]

According to a 2021 first-of-its-kind systematic analysis[13] of international clinical practice guidelines (CPGs) for "gender minority/trans health" published in the British Medical Journal (BMJ), "WPATH SOCv7 *cannot* be considered 'gold standard'" (emphasis added).[14] Though the BMJ review found that none of the twelve international gender medicine guidelines assessed met the rigorous standard for clinical practice guidelines (or standards of care), the WPATH guidelines were singled out for their "incoherence" and subjected to particularly strong criticism.[15]

---

[12] Deutsch et al., *supra* n.7, at 1099. ("[WPATH's SOC] remains largely based on lower-quality evidence (i.e., observational studies) and expert opinion . . . SOC v7 lacks any rating of the quality of the available evidence or strength of the recommendations or description of how expert contributors are selected to participate in the process of developing the guidelines.").

[13] Sara Dahlen et al., *International clinical practice guidelines for gender minority/trans people: systematic review and quality Assessment*, 11 BMJ Open 1 (2021), https://doi.org/10.1136/bmjopen-2021-048943 ("This is the first systematic review using a validated quality appraisal instrument of international CPGs addressing gender minority/trans health.").

[14] *Id*. at 8.

[15] *Id*. (referencing the "incoherence" of WPATH SOCv7).

Like the WPATH "standards," the Endocrine Society guidelines rely on "low" and "very low" quality evidence and include a disclaimer stating that its "guidelines cannot guarantee any specific outcome, *nor do they establish a standard of care.*"[16] In sum, no current guidelines for treating gender dysphoria, much less the guidelines by WPATH and the Endocrine Society, qualify as an authoritative CPG or standard of care.

### B. This Court and other circuits have noted this lack of medical consensus.

This Court and three of its sister circuit courts have noted this lack of consensus. In 2020, this Court reprimanded a district court for finding WPATH standards "authoritative for treating gender dysphoria in prison" without considering arguments over the merits of WPATH standards. *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1296 (11th Cir. 2020). The First, Fifth, and Ninth Circuits have likewise recognized that WPATH guidelines do not reflect medical consensus. *See Kosilek v. Spencer*, 774 F.3d 63, 88 (1st Cir. 2014) (en banc) ("[p]rudent medical professionals . . . reasonably differ in their opinions regarding [WPATH's]

---

[16] Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869, 3895 (2017), https://doi.org/10.1210/jc.2017-01658.

requirements"); *Gibson v. Collier*, 920 F.3d 212, 223 (5th Cir. 2019) ("WPATH Standards of Care do not reflect medical consensus"); and *Doe v. Snyder*, 28 F.4th 103, 112 (9th Cir. 2022) ("WPATH's Standards of Care are not universally endorsed").

## III. The WPATH Files and Cass Review underscore the fundamental deficiencies with and uncertainties regarding gender transition medicine.

Two recent developments—the WPATH Files and the Cass Review—reflect the evidence outlined above and underline why it is critical that this Court ensure that lower courts and other decisionmakers remain free to take the best science and medical judgment into account.

### A.    WPATH Files

On March 4, 2024, a U.S. based think tank released the "WPATH Files," a 241-page report that discloses and analyzes leaked internal discussions between doctors, nurses, and other WPATH members.[17] The Executive Summary describes WPATH's "approach to medicine" as

---

[17] Mia Hughes, *The WPATH Files*, Environmental Progress (March 4, 2024), https://environmentalprogress.org/big-news/wpath-files.

"consumer-driven and pseudoscientific" and observes that WPATH "members appear to be engaged in political activism, not science."[18]

The WPATH Files reveal "gender-affirming care" as a series of "unethical medical experiments":

> [T]here have never been any properly controlled trials in the wider field of gender medicine, which also consistently lacks long-term data. Studies that show a positive outcome for sex-trait modification procedures have a very short follow-up period, and those that attempt to monitor how patients fare years after undergoing hormonal and surgical interventions are compromised by a high percentage of study participants lost to follow-up. The few attempts at long-term follow-up for adults who have undergone sex-trait modification interventions do not show positive outcomes, with individuals showing social difficulties and a significantly elevated rate of completed suicides and mental health issues. While each of these studies has its methodological limitations, the findings cast serious doubt on any claims that sex-trait modification interventions result in overwhelmingly positive outcomes for patients.[19]

The WPATH Files concludes with this sobering assessment:

> Currently, lawmakers, judges, insurance companies, and public health providers . . . are not aware that the political activists within WPATH are promoting a reckless, consumer-driven transition-on-demand approach to extreme body modification, even for minors and the severely mentally ill….
>
> Gender dysphoria is a complex psychiatric condition, and there is no easy answer as to the best way to ease the pain of

---

[18] *Id*. at 3.

[19] *Id*. at 17-18 (citations omitted).

those afflicted. It … is possible to state with unequivocal certainty that [WPATH] does not advocate for the best possible care for this vulnerable patient cohort, and the detrimental impact of WPATH's actions over the past two decades has rendered the organization irredeemable. It is now imperative to usher in a new era in gender medicine, one that prioritizes the health and well-being of patients as its foremost objective.[20]

## B.    Cass Review

A month after the WPATH Files, on April 9, 2024, British pediatrician Hilary Cass published the 388-page "Cass Review," the culmination of a four-year study commissioned by the National Health Service in England.[21] Dr. Cass concluded that "gender medicine . . . is built on shaky foundations."[22] The report emphasizes that there are "conflicting views about the clinical approach, with expectations at times being far from usual clinical practice."[23]

---

[20] *Id.* at 71.

[21] Hilary Cass, *The Cass Review: Independent review of gender identity services for children and young people* (April 2024), https://cass.independent-review.uk/home/publications/final-report/.

[22] Hilary Cass, *Gender medicine for children and young people is built on shaky foundations. Here is how we strengthen services*, BMJ (April 9, 2024), https://www.bmj.com/content/385/bmj.q814.

[23] Cass Review at 20.

Four years ago, when the study began, "the evidence base . . . had already been shown to be weak."[24] The final report concluding that WPATH's "Standards of Care" and the Endocrine Society's guidelines "lack developmental rigour" and "transparency."[25] But Cass's broader conclusion took aim at the medical profession as a whole:

> This is an area of remarkably weak evidence, and yet results of studies are exaggerated or misrepresented by people on all sides of the debate to support their viewpoint. The reality is that we have no good evidence on the long-term outcomes of interventions to manage gender-related distress.[26]

Within a few days, the Cass Review was widely hailed as a breakthrough. An article in Psychology Today called the review "eye-opening."[27] A New York Times columnist called Dr. Cass a "hero"[28] and the Wall Street Journal's Editorial Board called the Cass Review "a rebuke to the gender-industrial complex" and praised it for showing

---

[24] *Id.*

[25] *Id.* at 6.

[26] *Id* at 13.

[27] Noam Shpancer, *Does Our Approach to Gender Dysphoria Need an Overhaul?*, Psychology Today (April 15, 2024), https://www.psychologytoday.com/us/blog/insight-therapy/202404/does-our-approach-to-gender-dysphoria-need-an-overhaul.

[28] David Brooks, *The Courage to Follow the Evidence on Transgender Care*, NY Times (April 18, 2024), https://www.nytimes.com/2024/04/18/opinion/transgender-care-cass-report.html.

"wisdom and humility," "in contrast to the ideological conformity in U.S. medical associations."[29] NHS England, for its part, expressed its gratitude to "Dr. Cass and her team for their comprehensive work" and pledged to "set out a full implementation plan" in response.[30]

## CONCLUSION

For the foregoing reasons, and those stated by Houston County, *amicus* urges the Court to grant the petition and rehear this case *en banc*.

Respectfully submitted,

s/ Eric N. Kniffin
ERIC N. KNIFFIN
MARY RICE HASSON
ETHICS & PUBLIC POLICY CENTER
1730 M Street, N.W.
Suite 910
Washington, DC 20036
(202) 682-1200
ekniffin@eppc.org

*Counsel for* Amicus Curiae

JUNE 10, 2024

---

[29] Editorial Board, *Helpful Transgender Lessons from Europe*, WSJ (April 10, 2024), https://www.wsj.com/articles/hilary-cass-review-transgender-medicine-national-health-service-u-k-3d0b6e88.

[30] NHS England, *NHS England responds to the publication of the independent review of gender identity services for children and young people* (April 10, 2024), https://www.england.nhs.uk/2024/04/nhs-england-responds-to-the-publication-of-the-independent-review-of-gender-identity-services-for-children-and-young-people/.

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 29(a)(5) because this brief contains 2,551 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Microsoft Word Version 2404 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: June 10, 2024

s/ Eric N. Kniffin
Eric N. Kniffin
*Counsel for* Amicus Curiae

**CERTIFICATE OF SERVICE**

I hereby certify that I have, on this date, filed electronically the foregoing amicus brief with the Clerk of this Court, and have served it upon counsel by filing it with the court's electronic-filing system. In compliance with the Federal Rules of Appellate Procedure, I have also delivered four copies of this brief to Clerk of Court, U.S. Court of Appeals for the Eleventh Circuit, 56 Forsyth St. N.W., Atlanta, Georgia 30303.

Dated: June 10, 2024

s/ Eric N. Kniffin
Eric N. Kniffin
*Counsel for* Amicus Curiae