No. 22-13626

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

◆

ANNA LANGE,
*Plaintiff-Appellee*,

v.

HOUSTON COUNTY, GEORGIA, and
HOUSTON COUNTY SHERIFF CULLEN TALTON, in his official capacity,
*Defendants-Appellants*.

◆

On Appeal from the United States District Court
for the Middle District of Georgia
Case No. 5:19-cv-00392-MTT

## EN BANC BRIEF OF ALABAMA, FLORIDA, AND GEORGIA AS *AMICI CURIAE* IN SUPPORT OF APPELLANTS AND REVERSAL

Steve Marshall
 *Attorney General*
Edmund G. LaCour Jr.
 *Solicitor General*
A. Barrett Bowdre
 *Principal Deputy*
 *Solicitor General*
OFFICE OF THE ALABAMA
ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@
 AlabamaAG.gov

*Counsel for* Amicus Curiae
*State of Alabama*

Ashley Moody
 *Attorney General*
Henry C. Whitaker
 *Solicitor General*
OFFICE OF THE FLORIDA
ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, FL 32399
(850) 414-3300
Henry.Whitaker@
 myfloridalegal.com

*Counsel for* Amicus Curiae
*State of Florida*

Christopher M. Carr
 *Attorney General*
Stephen J. Petrany
 *Solicitor General*
OFFICE OF THE GEORGIA
ATTORNEY GENERAL
40 Capitol Square, SW
Atlanta, GA 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for* Amicus Curiae
*State of Georgia*

*Lange v. Houston County, Ga.*, No. 22-13626

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1(a)(3) and 26.1-2(b), the undersigned counsel certifies that the following listed persons and parties may have an interest in the outcome of this case:

1. Alabama, State of – Amicus Curiae;

2. Alaska, State of – Amicus Curiae;

3. Allen & Overy LLP – Counsel for Amicus Curiae;

4. Anti-Defamation League – Amicus Curiae;

5. Arkansas – Amicus Curiae;

6. Arkles, Z. Gabriel – Counsel for Appellee;

7. Bailey, Andrew – Counsel for Amicus Curiae;

8. Barry, Kevin M. – Counsel for Appellee;

9. Barton, Kenneth E. III – Counsel for Appellee;

10. Bird, Brenna – Counsel for Amicus Curiae;

11. Bone, Michelle – Counsel for Amicus Curiae;

12. Bowdre, Alexander Barrett – Counsel for Amicus Curiae;

13. Brown, David – Counsel for Appellee;

14. Calderon, Tovah R. – Counsel for Amicus Curiae;

15. Carr, Christopher M. – Counsel for Amicus Curiae;

16. Clarke, Kristen – Counsel for Amicus Curiae;

17. Cooper, Barton & Cooper – Counsel for Appellee;

*Lange v. Houston County, Ga.*, No. 22-13626

18.   Cooper, M. Devlin – Counsel for Appellee;

19.   Deveney, William D. – Counsel for Appellants;

20.   Elarbee, Thompson, Sapp & Wilson LLP – Counsel for Appellants;

21.   Equal Rights Advocates – Amicus Curiae;

22.   Fata, Catherine Elizabeth – Counsel for Appellee;

23.   Fitch, Lynn – Counsel for Amicus Curiae;

24.   Florida, State of – Amicus Curiae;

25.   Georgia, State of – Amicus Curiae;

26.   Gignilliat, R. Read – Counsel for Appellants;

27.   Grant, Jill K. – Counsel for Appellee;

28.   Greenbaum, Jon – Counsel for Amicus Curiae;

29.   Griffin, Tim – Counsel for Amicus Curiae;

30.   Hilgers, Michael T. – Counsel for Amicus Curiae;

31.   Houston County, Georgia – Defendant-Appellant;

32.   Idaho, State of – Amicus Curiae;

33.   Indiana, State of – Amicus Curiae;

34.   Iowa, State of – Amicus Curiae;

35.   Jackley, Marty – Counsel for Amicus Curiae;

36.   Kansas, State of – Amicus Curiae;

37.   Kieckhafer, Katherine – Counsel for Amicus Curiae;

38.   Knudsen, Austin – Counsel for Amicus Curiae;

*Lange v. Houston County, Ga.*, No. 22-13626

39.    Kobach, Kris W. – Counsel for Amicus Curiae;

40.    Labrador, Raúl – Counsel for Amicus Curiae;

41.    LaCour, Edmund G. Jr. – Counsel for Amicus Curiae;

42.    Lail, Patrick L. – Counsel for Appellants;

43.    Lee, Jason – Counsel for Amicus Curiae;

44.    Lange, Anna – Plaintiff-Appellee;

45.    Latino Justice PRLDEF – Amicus Curiae;

46.    Lawyers' Committee for Civil Rights Under Law – Amicus Curiae;

47.    Louisiana, State of – Amicus Curiae;

48.    Marshall, Steve – Counsel for Amicus Curiae;

49.    Mississippi, State of – Amicus Curiae;

50.    Missouri, State of – Amicus Curiae;

51.    Mitrokostas, Nicholas K. – Counsel for Amicus Curiae;

52.    Miyares, Jason S. – Counsel for Amicus Curiae;

53.    Montana, State of – Amicus Curiae;

54.    Moody, Ashley – Counsel for Amicus Curiae;

55.    Morgan, Sharon P. – Counsel for Appellants;

56.    Morrisey, Patrick – Counsel for Amicus Curiae;

57.    Murrill, Liz – Counsel for Amicus Curiae;

58.    National Employment Law Project – Amicus Curiae;

59.    National Health Law Program – Amicus Curiae;

*Lange v. Houston County, Ga.*, No. 22-13626

60.  National Women's Law Center – Amicus Curiae;

61.  Nebraska, State of – Amicus Curiae;

62.  North Dakota – Amicus Curiae;

63.  Ohio, State of – Amicus Curiae;

64.  Paxton, Ken – Counsel for Amicus Curiae;

65.  Payne, Amanda M. – Counsel for Appellee;

66.  Petrany, Stephen J. – Counsel for Amicus Curiae;

67.  Powell, Wesley – Counsel for Appellee;

68.  Quinnipiac Univ. School of Law Legal Clinic – Counsel for Appellee;

69.  Reyes, Sean D. – Counsel for Amicus Curiae;

70.  Rokita, Theodore E. – Counsel for Amicus Curiae;

71.  Skrmetti, Jonathan – Counsel for Amicus Curiae;

72.  South Carolina, State of – Amicus Curiae;

73.  South Dakota, State of – Amicus Curiae;

74.  Talton, Cullen in his official capacity as Sheriff – Defendant-Appellant;

75.  Taylor, Treg – Counsel for Amicus Curiae;

76.  Tennessee, State of – Amicus Curiae;

77.  Texas, State of – Amicus Curiae;

78.  Transgender Legal Defense Education Fund – Counsel for Appellee;

79.  Treadwell, Hon. Marc T. – District Court Judge;

*Lange v. Houston County, Ga.*, No. 22-13626

80.    U.S. Department of Justice – Counsel for Amicus Curiae;

81.    Utah, State of – Amicus Curiae;

82.    Virginia, Commonwealth of – Amicus Curiae;

83.    West Virginia, State of – Amicus Curiae;

84.    Wilkie Farr & Gallagher LLP – Counsel for Appellee;

85.    Whitaker, Henry C. – Counsel for Amicus Curiae;

86.    Wilson, Alan – Counsel for Amicus Curiae;

87.    Wrigley, Drew H. – Counsel for Amicus Curiae;

88.    Yost, Dave – Counsel for Amicus Curiae;

89.    Youker, Kathryn J. – Counsel for Amicus Curiae;


Respectfully submitted this 30th day of September, 2024.


s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for* Amicus Curiae *State of Alabama*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .................................................. C-1

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES ................................................................... ii

STATEMENT OF THE ISSUE ................................................................. 1

INTEREST OF *AMICI CURIAE* ........................................................... 1

SUMMARY OF ARGUMENT .............................................................. 1

ARGUMENT ..................................................................................... 4

    I.    The Plan's Exclusion Passes *Bostock*'s "Simple Test"
           Because It Classifies Based On Diagnosis And Procedure,
           Not Sex Or Gender ................................................................ 5

    II.   Title VII Does Not Afford "Most Favored Nation" Status
           To Plaintiffs Who Cannot Identify A Similarly Situated
           Comparator .......................................................................... 12

CONCLUSION ................................................................................. 18

CERTIFICATE OF COMPLIANCE ..................................................... 20

CERTIFICATE OF SERVICE ............................................................. 21

## TABLE OF AUTHORITIES

**Cases**

*Bostock v. Clayton County*,
　590 U.S. 644 (2020) ........................................................ 1-7, 12, 14, 18

*Bray v. Alexandria Women's Health Clinic*,
　506 U.S. 263 (1993) .................................................................. 15, 17

*Corbitt v. Sec'y of Ala. Law Enforcement Agency*,
　-- F.4th --, No. 21-10486, 2024 WL 4249209 (11th Cir. Sept. 20, 2024) ........ 5, 8

*Dobbs v. Jackson Women's Health Org.*,
　597 U.S. 215 (2022) ........................................................................ 17

*Eknes-Tucker v. Governor of Ala.*,
　80 F.4th 1205 (11th Cir. 2023) ......................................................... 17

*Eknes-Tucker v. Governor of Alabama*,
　-- F.4th --, No. 22-11707, 2024 WL 3964753 (11th Cir. Aug. 28, 2024) .......... 13

*Geduldig v. Aiello*,
　417 U.S. 484 (1974) ................................................................. 3, 14-17

*Kadel v. Folwell*,
　100 F.4th 122 (4th Cir. 2024) ........................................................ 7, 14

*Newport News Shipbuilding & Dry Dock Co. v. EEOC*,
　462 U.S. 669 (1983) .................................................................. 16, 17

**Statutes**

42 U.S.C. § 2000e(a) ........................................................................... 1

42 U.S.C. § 2000e(b) ........................................................................... 1

42 U.S.C. § 2000e(k) ...................................................................... 16, 17

42 U.S.C. § 2000e-2(a)(1) ..................................................................... 4

ii

**Acts**

Title VII of the Civil Rights Act of 1964.........................................1-5, 9, 12, 14-18

**Other Authorities**

Aaron L. Heston et al., *Phalloplasty: techniques and outcomes*,
    TRANSLATIONAL ANDROLOGY & UROLOGY (June 2019),
    https://doi.org/10.21037%2Ftau.2019.05.05 ......................................................10

American Society of Plastic Surgeons,
    *Aesthetic Genital Plastic Surgery Surgical Options: What Is A Vaginoplasty?*,
    https://perma.cc/5WFH-57QP ...........................................................................7

Cleveland Clinic, *Metoidioplasty*,
    https://my.clevelandclinic.org/health/treatments/21668-metoidioplasty
    (accessed Sept. 20, 2024)....................................................................................9

Cleveland Clinic, *Orchiectomy*,
    https://my.clevelandclinic.org/health/procedures/orchiectomy
    (accessed Sept. 20, 2024).................................................................................. 9

Cleveland Clinic, *Perineoplasty*, https://my.clevelandclinic.org/health/treat
    ments/23183-perineoplasty (accessed Sept. 20, 2024)......................................10

Cleveland Clinic, *Phalloplasty*,
    https://my.clevelandclinic.org/health/treatments/21585-phalloplasty
    (accessed Sept. 20, 2024)..................................................................................10

Cleveland Clinic, *Vaginectomy*,
    https://my.clevelandclinic.org/health/treatments/22862-vaginectomy
    (accessed Sept. 20, 2024)..................................................................................10

E. Coleman et al., *WPATH Standards of Care for the Health of Transgender
    & Gender Diverse People, Version 8*, 23 INT'L J. OF TRANSGENDER HEALTH
    (Sept. 15, 2022), https://perma.cc/Y9G6-TP3M .................................................8

Robin Respaut et al., *Why Detransitioners are Crucial to the Science of Gender
    Care*, REUTERS (Dec. 22, 2022), https://www.reuters.com/investigates/special-
    report/usa-transyouth-outcomes/ ......................................................................13

Sarah O'Neill et al., *The role of penectomy in penile cancer—*
*evolving paradigms*, TRANSLATIONAL ANDROLOGY & UROLOGY (2020),
http://dx.doi.org/10.21037/tau.2019.08.14 ..........................................................9

## STATEMENT OF THE ISSUE

Whether the employer-provided health insurance policy at issue, which covers medically necessary treatments for some diagnoses but does not cover Anna Lange's "sex change" surgery, facially violates Title VII of the Civil Rights Act of 1964.

## INTEREST OF *AMICI CURIAE*

*Amici Curiae* are the States of the Eleventh Circuit: Alabama, Florida, and Georgia. As employers, *amici* are subject to Title VII, as are countless businesses within each State. *See* 42 U.S.C. § 2000e(a), (b). The State of Florida's State Group Insurance plan also has active litigation in the Northern District of Florida regarding a plan exclusion for sex-reassignment services that has existed since the 1970s. *Amici* thus respectfully submit this brief in support of Appellants and reversal. They ask the Court to clarify that Congress did not mandate that all employer health plans cover sex-change surgeries when it enacted Title VII of the Civil Rights Act sixty years ago.

## SUMMARY OF ARGUMENT

Relying primarily on the Supreme Court's decision in *Bostock v. Clayton County*, 590 U.S. 644 (2020), Lange contends that Houston County violated Title VII's prohibition on sex-based discrimination when it excluded "sex change" surgeries from its health insurance plan. Lange is wrong.

1

*First*, by its own terms, *Bostock* simply applied the "traditional standard for but-for causation" to determine whether an employment action occurs "because of" sex: "change one thing at a time"—the employee's sex—"and see if the outcome changes." 590 U.S. at 1739 (citation omitted). Applying the test here, nothing changes: Whether the employee is male or female, the county's insurance plan excludes coverage for sex-change surgeries.

In an attempt to get around *Bostock*'s reasoning, Lange and the United States argued to the panel that Lange sought the same treatment the plan covered for other employees. *See* Lange Panel Br. 6 ("same procedures"); United States' Panel Br. 18 ("same care"). But this is not true. While there is another surgical procedure called a "vaginoplasty," it is used to repair a natal woman's vagina following trauma like childbirth. That is not the surgery Lange sought. Lange sought a transitioning penile-inversion vaginoplasty that uses penile and scrotal skin to construct a "neovagina" as part of a sex-change operation. This is—quite obviously—not the "same procedure" that a female could or would undergo (for any reason); and the procedure is performed on males for just one purpose (the one excluded by the plan). Because the plan's classification thus turns on diagnosis or treatment, not gender identity or sex, it does not unlawfully discriminate under Title VII.

*Second*, the Supreme Court in *Bostock* also affirmed the traditional understanding of discrimination. According to the Court, "[t]o 'discriminate against' a

2

person" under Title VII "mean[s] treating that individual worse than others who are similarly situated." 590 U.S. at 657. Because Lange has yet to identify any "similarly situated" employee whom Lange is treated "worse than," the county's plan does not "discriminate against" Lange.

To try to get around *this* holding of *Bostock*, Lange urged both the district court and the panel to find discrimination on the basis that—as the vacated panel opinion put it—"transgender persons are the only plan participants who qualify for gender-affirming surgery." Panel Op. 9; *see* Doc. 205 ("D. Ct. Op.") at 23 ("The undisputed, ultimate point is that the Exclusion applies only to transgender members."). Thus, according to Lange, no comparison is needed because no comparator exists. Under Lange's theory, an employer "discriminates" "because of" sex if it does not cover any medical intervention that only one sex or gender identity could undergo.

The district court rightly rejected this very argument in ruling on Lange's claim under the Equal Protection Clause. There, the district court recognized that it is not discrimination—no employee is treated "worse than" another—if the coverage decision governs a "medical procedure that only one sex can undergo," such as Lange's transitioning vaginoplasty. *See* D. Ct. Op. at 18 & n.9 (citing *Geduldig v. Aiello*, 417 U.S. 484 (1974)). The district court discarded this logic when it turned to Lange's Title VII claim, but it applies there, too. Were it otherwise, employers

3

providing health insurance for other procedures would need to pay for abortions (since women would be the only plan participants who could qualify) and erectile dysfunction drugs (since men would be the only plan participants who could qualify). But nothing in Title VII suggests that it grants "most favored nation" status to employees without similarly situated comparators. And certainly nothing suggests that Congress mandated, sixty years ago, that all employer health plans cover penile inversion surgeries. It is not discrimination under Title VII to treat differently situated people or medical treatments differently.

## ARGUMENT

Title VII of the Civil Rights Act of 1964 makes it "unlawful … for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employments, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). While both Lange and the district court read the Supreme Court's decision in *Bostock* to mean that Title VII requires the county's health insurance plan to cover Lange's sex-change surgery to treat gender dysphoria if it provides coverage for other treatments for other health conditions, *Bostock* did not rewrite Title VII in such a manner. Under *Bostock*, a health plan that classifies based on procedure or diagnosis rather than sex or gender does not facially discriminate under Title VII. And nothing in *Bostock* suggests that plaintiffs who

4

cannot identify a similarly situated comparator can bring a successful claim for discriminatory treatment under Title VII.

## I.     The Plan's Exclusion Passes *Bostock*'s "Simple Test" Because It Classifies Based On Diagnosis And Procedure, Not Sex Or Gender.

In *Bostock*, the Supreme Court declared that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." 590 U.S. at 660. In so reasoning, the Court applied standard rules of but-for causation: "change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Id.* at 656. The resulting difference in treatment from "chang[ing] one thing at a time" was key to the Court's conclusion. As the Court explained, "an employer who intentionally treats a person worse because of sex—such as by firing the person for actions or attributes it would tolerate in an individual of another sex—discriminates against that person in violation of Title VII." *Id.* at 658.

Here, the county's policy does not discriminate under *Bostock*'s "simple test." To start, the plan denies coverage for a male employee seeking sex-change surgery. Now imagine the employee's sex was instead female and "see if the outcome changes." *Id.* at 656. It does not: The plan also denies coverage for a female employee seeking sex-change surgery. The policy "language is neutral in the sense that it is not gender-based—*i.e.*, the [p]olicy does not impose a sex-based classification." *Corbitt v. Sec'y of Ala. Law Enforcement Agency*, -- F.4th --, No. 21-10486, 2024

WL 4249209, at *6 (11th Cir. Sept. 20, 2024) (quotation marks omitted) (rejecting under rational-basis review equal protection challenge to Alabama's policy requiring an individual seeking to change sex designation on driver's license to provide either an amended birth certificate or a letter from a physician who performed the reassignment procedure). "It does not distinguish between males and females in any respect." *Id.* "Rather, it applies to *all* [employees] wishing to have the[ir] sex changed," whether they seek to have a "male to female" operation or a "female to male" operation; "all are covered by the [p]olicy and subject to the same requirements." *Id.* (second alteration in original).

Before the panel, Lange attempted to get around this roadblock by arguing that the plan covers the "same procedures" for men and women who identify as cisgender that it excludes for men and women who identify as transgender. *See* Lange Panel Br. 6; United States' Panel Br. 18. Lange thus asserted: "If [Lange] were identified as female, her vaginoplasty would be covered under the Health Plan; however, because she was not, it is not. Sex is the but-for cause of the differential treatment under the Exclusion." Lange Panel Br. 22-23.

This argument is wrong because Lange has changed not one but three things in applying *Bostock*'s "simple test": the employee's sex, the employee's diagnosis, and the employee's sought-after treatment. Start with diagnosis. Lange sought a transitioning vaginoplasty to treat gender dysphoria. *See* D. Ct. Op. at 2-3. Yet Lange

does not argue that vaginoplasty would be a medically necessary surgery for a female suffering from gender dysphoria. Rather, Lange's argument is that the plan sometimes covers non-transitioning vaginoplasty surgeries for women suffering from *other* diagnosed health conditions. But if the diagnoses are different, then under *Bostock*, sex is not the but-for cause of any difference in coverage.

The same is true of the treatment at issue. Lange labels both surgeries "vaginoplasty." But a "vaginoplasty" performed as part of a male-to-female sex-change operation is not the same treatment as a vaginoplasty performed on a natal female. As Judge Brasher pointed out in his dissent from the panel majority's opinion, Lange's doctor explained that the transitioning "vaginoplasty" Lange sought "requires that a person's testicles be removed, the urethra be shortened, and the penile and scrotal skin be used to line the neovagina, the space between the rectum and the prostate and bladder." Panel Op. 26 (Brasher, J., dissenting) (cleaned up). By contrast, the only vaginoplasty procedure a woman could undergo refers to "a procedure designed to tighten the vagina" by surgically "bring[ing] the separated [vaginal] muscles together," typically following trauma like childbirth.[1] "These are not the same!" *Kadel v. Folwell*, 100 F.4th 122, 188 (4th Cir. 2024) (Richardson, J., dissenting). So again, Lange's sleight of hand does not satisfy *Bostock*'s simple test: If the

---

[1] *See* American Society of Plastic Surgeons, *Aesthetic Genital Plastic Surgery Surgical Options: What Is A Vaginoplasty?*, https://perma.cc/5WFH-57QP.

medical treatment is different, then sex is not the but-for cause for any difference in coverage. The plan simply does not cover a penis inversion *for anyone*, male or female, trans-identifying or not.

Zooming out, the same logic holds true for others of the "dozens of possible surgical procedures that transgender people can undergo." *Corbitt*, 2024 WL 4249209, at *15 n.4 (J. Pryor, J., concurring in judgment) (brackets omitted). Although "no single patient undergoes all of the ones possible for their gender," such procedures include "zero-depth vaginoplasty, phalloplasty, metoidioplasty, mastectomy, chest reconstruction, hysterectomy, testosterone subcutaneous implants, and contra laryngoplasty." *Id.* The World Professional Association for Transgender Health (WPATH) recognizes still others: "hysterectomy +/- bilateral salpingo-oophorectomy; bilateral mastectomy, chest reconstruction or feminizing mammoplasty, nipple resizing or placement of breast prostheses; … phalloplasty and metoidioplasty, scrotoplasty, and penile and testicular prostheses, penectomy, orchiectomy, vaginoplasty, and vulvoplasty; hair removal from the face, body, and genital areas for gender affirmation…; gender-affirming facial surgery and body contouring; voice therapy and/or surgery; as well as puberty blocking medication and gender-affirming hormones." E. Coleman et al., *WPATH Standards of Care for the Health of Transgender & Gender Diverse People, Version 8*, 23 INT'L J. OF TRANSGENDER HEALTH S18 (Sept. 15, 2022), https://perma.cc/Y9G6-TP3M.

Under Lange's logic, Title VII requires employers with health insurance plans to pay for *all* these "medically necessary" treatments. But in no instance is the diagnosis and procedure the "same" as what the county's plan normally covers, making it clear that sex is not the but-for cause of any differentiation in treatment options.

To take just a few examples, castration and orchiectomy (the surgical removal of a male's testicles) and penectomy (the surgical removal of the penis) are normally performed only when necessary to treat otherwise-unresponsive cancers or to remove damaged testes following trauma.[2] These are medical procedures that only one sex can undergo for the simple reason that females do not have testicles or a penis to remove.

Metoidioplasty is the surgical creation of a "neophallus, literally a 'new penis,'" using tissue from a woman's clitoris.[3] The operation cannot be performed on a man, and it apparently has no application outside the context of sex-change surgeries.

---

[2] *See* Cleveland Clinic, *Orchiectomy*, https://my.clevelandclinic.org/health/procedures/orchiectomy (accessed Sept. 20, 2024); Sarah O'Neill et al., *The role of penectomy in penile cancer—evolving paradigms*, Translational Andrology & Urology 3191, 3191-94 (2020), http://dx.doi.org/10.21037/tau.2019.08.14.

[3] Cleveland Clinic, *Metoidioplasty*, https://my.clevelandclinic.org/health/treatments/21668-metoidioplasty (accessed Sept. 20, 2024).

Phalloplasty is similar to metoidioplasty in that it also creates a neophallus; the difference is that it uses tissue from a patient's arm, thigh, or back to craft the faux-penis.[4] Other than that general definition, "[p]halloplasty is not a homogenous procedure" but "a patient and surgeon-specific combination of many "sub procedures that are used to meet the patient's goals."[5] For transitioning females, the procedure can include a perineoplasty ("a surgical procedure to repair the perineum and external organs of [the] vagina"[6]); a vaginectomy ("a surgical procedure to remove all or part of the vagina"[7]); and a hysterectomy and/or oophorectomy (removal of the uterus and ovaries, respectively).[8] There is a surgery by the same name that males can undergo—reconstructing a penis following trauma or due to a congenital abnormality[9]—though it is safe to say that a "phalloplasty" performed on members of different sexes for different purposes that necessitate different, sex-specific procedures are not the "same procedures."

---

[4]    Cleveland Clinic, *Phalloplasty*, https://my.clevelandclinic.org/health/treatments/21585-phalloplasty (accessed Sept. 20, 2024).

[5] Aaron L. Heston et al., *Phalloplasty: techniques and outcomes*, TRANSLATIONAL ANDROLOGY & UROLOGY 254-65 (June 2019), https://doi.org/10.21037%2Ftau.2019.05.05.

[6]    Cleveland Clinic, *Perineoplasty*, https://my.clevelandclinic.org/health/treatments/23183-perineoplasty (accessed Sept. 20, 2024).

[7]    Cleveland Clinic, *Vaginectomy*, https://my.clevelandclinic.org/health/treatments/22862-vaginectomy (accessed Sept. 20, 2024).

[8] Heston, *supra* note 5, at 255.

[9]    Cleveland Clinic, *Phalloplasty*, https://my.clevelandclinic.org/health/treatments/21585-phalloplasty (accessed Sept. 20, 2024).

And this is the larger point. Even if members of both sexes could take the same drug or undergo the same "procedure" at some high level of generality, basing coverage decisions on differing diagnoses and corresponding treatment recommendations is not discriminatory because that decision, by itself, does not mean that anyone is treated "worse than" someone else because of sex. The "treatments" are simply not the same. Appendectomies, C-sections, and quadruple bypasses all involve a scalpel, but in no meaningful sense are they the "same treatments." Likewise for medications. States routinely authorize or cover drugs for some treatments (morphine to treat a patient's pain), but not others (morphine to assist a patient's suicide). And there is a world of difference between removing a man's testicles to save his life from cancer and castrating him because his gender identity is "eunuch," as WPATH recommends.[10] These are not the "same treatments."

To return to the vaginoplasty Lange sought, "even if a natal woman could undergo these same procedures, other exclusions in the plan would deny coverage to the extent those procedures were prescribed to improve her appearance or treat sexual dysfunction." Panel Op. 26 (Brasher, J., dissenting). These are classifications based on diagnosis and treatment, not sex. That is not intentional discrimination

---

[10] *See* WPATH SOC8 at S88-89 (explaining that "castration" may be "medically necessary gender-affirming care" for individuals who identify as "eunuchs"—i.e., individuals "assigned male at birth" who "wish to eliminate masculine physical features, masculine genitals, or genital functioning").

under Title VII. A male seeking a penile inversion vaginoplasty is not "similarly situated" to a female seeking a procedure she biologically cannot obtain. *Bostock*, 590 U.S. at 657. And declining to pay for that surgery does not "treat[] a person worse because of sex." *Id.* The district court erred by holding otherwise.

## II.    Title VII Does Not Afford "Most Favored Nation" Status To Plaintiffs Who Cannot Identify A Similarly Situated Comparator.

The district court rightly recognized that Lange's "same treatments" argument could not show discrimination under the Equal Protection Clause. As the district court explained, "Lange has the same coverage as other employees because the Exclusion applies equally to a male seeking to become a woman or a woman seeking to become a man," and, in any event, Lange sought a "medical procedure that only one sex can undergo." D. Ct. Op. 17-18 & n.9.

Curiously, the district court discarded this logic when it came to Lange's Title VII claim. Rather than "changing one thing at a time and see[ing] if the outcomes change[d]," *Bostock*, 590 U.S. at 660, the district court constructed a false syllogism: (1) *Bostock* teaches that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex," (2) "the Exclusion applies only to transgender members," therefore (3) the plan discriminates on the basis of sex under Title VII. D. Ct. Op. 22-23 (quotation marks and citation omitted). The panel majority did the same: (1) "The Supreme Court clarified in *Bostock* that 'discrimination based on … transgender status necessarily

12

entails discrimination based on sex,'" (2) "Health Plan participants who are transgender are the only participants who would seek gender-affirming surgery," therefore (3) "the plan denied health care coverage based on transgender status" and thus discriminated based on sex. Panel Op. 8-9 (quotation marks and citation omitted).

There are at least two problems with the syllogism. First, the minor premise is not true. Only by erasing the existence of individuals who once identified as transgender, no longer do, and now seek sex-change treatment to go *back* to appearing as their natal sex can the district court and panel majority assume that "transgender persons are the only plan participants" to whom the exclusion applies. Yet such detransitioners exist,[11] and their reverse sex-change procedures are not covered by the plan, either. *See* Panel Op. 18 (Brasher, J., dissenting). So it is not only "transgender persons" who are affected by the exclusion.

Second, and more significantly, the conclusion does not follow even if the premises were true. The panel majority reasoned that "*[b]ecause* transgender persons are the only plan participants who qualify for gender-affirming surgery, the plan denies health care coverage *based on* transgender status." Panel Op. 9

---

[11] *See, e.g.*, *Eknes-Tucker v. Governor of Alabama*, -- F.4th --, No. 22-11707, 2024 WL 3964753, at *19, 23-27 (11th Cir. Aug. 28, 2024) (Lagoa, J., concurring) (noting and reproducing "testimony from detransitioners"); Robin Respaut et al., *Why Detransitioners are Crucial to the Science of Gender Care*, REUTERS (Dec. 22, 2022), https://www.reuters.com/investigates/special-report/usa-transyouth-outcomes/.

(emphases added). But while that assertion might be relevant for a disparate *impact* claim, it cannot show facially disparate *treatment* under *Bostock*, which is what Lange alleged. As Judge Richardson recently explained regarding a challenge to a State's Medicaid plan that excluded coverage for gender dysphoria treatments, even if "only transgender individuals experience gender dysphoria," that would "not mean the exclusion[] discriminate[s] based on transgender status, any more than the fact that 'only women can become pregnant' made the exclusion in *Geduldig* facially discriminatory." *Kadel*, 100 F.4th at 174 (Richardson, J., dissenting). "Rather, the dispositive question is whether the plan[] provide[s] equal risk coverage for all persons." *Id.* "And that is the case here—there is 'no risk from which [non-transgender persons] are protected and [transgender persons] are not. Likewise, there is no risk from which [transgender persons] are protected and [non-transgender persons] are not.'" *Id.* (alterations in original) (quoting *Geduldig*, 417 U.S. at 496-97).

Indeed, applying Lange's faulty logic consistently would effect a major reworking in Title VII liability. No longer would *Bostock*'s "but-for" causation test be needed, because changing the patient's sex or transgender identification would change nothing at all about the plan's coverage determination. And no longer would plaintiffs need to show that they were treated "worse than" a similarly situated comparator, because they could simply assert that there *is* no comparator. The upshot would be that employer insurance plans would need to cover *every* possible

14

treatment that only one sex or gender identity could or would undergo. Just plug in a few different scenarios into the panel majority's statement:

- "Because [men] are the only plan participants who qualify for [erectile dysfunction medication or surgery], the plan denies health care coverage based on [male] status."

- "Because [women] are the only plan participants who qualify for [treatments to harvest and freeze their eggs], the plan denies health care coverage based on [female] status."

- "Because [eunuchs] are the only plan participants who qualify for [eunuch-affirming castration surgery], the plan denies health care coverage based on [eunuch] status."

This reasoning cannot be squared with Title VII. In enacting the Civil Rights Act of 1964, Congress did not mandate coverage for Viagra or abortion. Indeed, as the district court recognized, the Supreme Court has expressly *rejected* this line of reasoning in equal protection cases. In *Geduldig v. Aiello*, 417 U.S. 484 (1974), the Court "rejected the claim that a state disability insurance system that denied coverage to certain disabilities resulting from pregnancy discriminated on the basis of sex in violation of the Equal Protection Clause of the Fourteenth Amendment." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271 (1993). The Court acknowledged that "only women can become pregnant," but explained that "it does not

follow that every legislative classification concerning pregnancy is a sex-based classification." *Geduldig*, 417 U.S. at 496 n.20. Rather, "[a]bsent a showing that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other, lawmakers are constitutionally free to include or exclude pregnancy from the coverage of legislation such as this on any reasonable basis, just as with respect to any other physical condition." *Id.*

Congress later amended Title VII to encompass discrimination "on the basis of pregnancy, childbirth, or related medical conditions," 42 U.S.C. § 2000e(k), recognizing that more was needed than Title VII's ban on sex discrimination to extend those specific protections. The district court took this amendment to mean that Congress repudiated *Geduldig*'s reasoning entirely "in Title VII analysis," D. Ct. Op. 27 n.14, but nothing in the statutory language or the amendment's text supports that interpretation. Congress did not change any text in Title VII that could alter the causation standard for determining sex-based discrimination, nor did it include other medical interventions—like sex-change surgeries—in the specific list of procedures it added surrounding "pregnancy" and "childbirth."

Nor is the Supreme Court's decision in *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669 (1983), to the contrary, as the district court seemed to think. *See* D. Ct. Op. 27 n.14. In that case, the Supreme Court simply recognized that "it is discriminatory to treat pregnancy-related conditions less favorably than

16

other medication conditions" under the amended provision of Title VII. 462 U.S. at 684. Its holding extended no further, and Lange does not argue that a transitioning vaginoplasty is a "pregnancy-related condition[]."

Notably, the Supreme Court has recently reaffirmed its agreement with *Geduldig*'s logic about how to identify sex-based discrimination under the Equal Protection Clause. *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 236 (2022) (noting that "[t]he regulation of a medical procedure that only one sex can undergo"—there, abortion—"does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other'" (quoting *Geduldig*, 417 U.S. at 496)); *see also Bray*, 506 U.S. at 271-72. And this Court recently applied *Geduldig*, *Bray*, and *Dobbs* to reject the district court's and panel majority's reasoning in an equal protection challenge to Alabama's law prohibiting the administration of sex-change treatments to minors. *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1229-30 (11th Cir. 2023) (holding that "the regulation of a course of treatment that only gender nonconforming individuals can undergo would not trigger heightened scrutiny unless the regulation were a pretext for invidious discrimination"). Though these are equal protection cases, Lange has not explained why their logic does not apply to the mine run of Title VII cases *not* concerning "pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k).

Indeed, as *Bostock* explains, a court cannot even begin to assess whether denying coverage for a surgery is a discriminatory employment action under Title VII without identifying a "similarly situated" comparator. *Bostock*, 590 U.S. at 657. The district court thus should have denied Lange's claim when Lange failed to satisfy that initial obligation. Instead, the district court—and later the panel majority—created a new category of liability under Title VII to allow Lange's claim to proceed even though the penile-inversion "vaginoplasty" Lange sought is in no way similar to the reparative surgery the county's plan covers for women who have suffered vaginal trauma. This was error the Court should correct.

## CONCLUSION

The Court should reverse.

Respectfully submitted,

Steve Marshall
  *Attorney General*

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
  *Solicitor General*
A. Barrett Bowdre
  *Principal Deputy Solicitor General*
OFFICE OF THE ALABAMA
ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov

*Counsel for* Amicus Curiae
*State of Alabama*

 Ashley Moody
  *Attorney General*

s/ Henry C. Whitaker
Henry C. Whitaker
  *Solicitor General*
OFFICE OF THE FLORIDA
ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, FL 32399
(850) 414-3300
henry.whitaker@myfloridalegal.com

*Counsel for* Amicus Curiae
*State of Florida*

Christopher M. Carr
  *Attorney General*

s/ Stephen J. Petrany
Stephen J. Petrany
  *Solicitor General*
OFFICE OF THE GEORGIA
ATTORNEY GENERAL
40 Capitol Square, SW
Atlanta, GA 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for* Amicus Curiae
*State of Georgia*

SEPTEMBER 30, 2024

## CERTIFICATE OF COMPLIANCE

1.    I certify that this brief complies with the type-volume limitations set forth in Federal Rule of Appellate Procedure 29(a)(5) because it contains 4,095 words, including all headings, footnotes, and quotations, and excluding the parts of the brief exempted under Rule 32(f).

2.    In addition, this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for* Amicus Curiae
*State of Alabama*

**CERTIFICATE OF SERVICE**

I certify that on September 30, 2024, I electronically filed this document using the Court's CM/ECF system, which will serve counsel of record.

<div style="margin-left: 40%;">

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for* Amicus Curiae
*State of Alabama*

</div>