No. 22-13626

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

ANNA LANGE,

*Plaintiff-Appellee*,

v.

HOUSTON COUNTY, GEORGIA, *et al*.,

*Defendants-Appellants*.

Appeal from the United States District Court for the Middle District of Georgia,
D.C. Docket No. 5:19-cv-00392-MTT

---

## AMICUS BRIEF OF MISSOURI AND 19 OTHER STATES
## IN SUPPORT OF DEFENDANTS-APPELLANTS

---

**ANDREW T. BAILEY**
*Attorney General of Missouri*

Joshua M. Divine
*Solicitor General*
Dominic Barceleau
*Assistant Attorney General*
207 W. High St.
Jefferson City, Missouri 65101
Phone: 573-751-8870
Josh.Divine@ago.mo.gov

*Counsel for Amicus Curiae States*

**CERTIFICATE OF INTERESTED PERSONS**

Under Eleventh Circuit Rule 26.1-1, I hereby certify that the following listed persons and entities have an interest in the outcome of this case and were omitted from the Certificates of Interested Persons previously filed in this case:

1.  Attorney General of Alaska, Treg Taylor

2.  Attorney General of Arkansas, Tim Griffin

3.  Attorney General of Idaho, Raul Labrador

4.  Attorney General of Indiana, Theodore E. Rokita

5.  Attorney General of Iowa, Brenna Bird

6.  Attorney General of Kansas, Kris Kobach

7.  Attorney General of Louisiana, Liz Murrill

8.  Attorney General of Mississippi, Lynn Fitch

9.  Attorney General of Missouri, Andrew Bailey

10. Attorney General of Montana, Austin Knudsen

11. Attorney General of Nebraska, Michael T. Hilgers

12. Attorney General of Ohio, Dave Yost

13. Attorney General of Oklahoma, Gentner Drummond

14. Attorney General of South Carolina, Alan Wilson

15. Attorney General of South Dakota, Marty Jackley

16. Attorney General of Texas, Ken Paxton

17.  Attorney General of Utah, Sean D. Reyes

18.  Attorney General of Virginia, Jason Miyares

19.  Attorney General of West Virginia, Patrick Morrisey

20.  Attorney General of Wyoming, Bridget Hill

21.  Barceleau, Dominic (counsel for State of Missouri)

22.  Divine, Joshua M. (counsel for State of Missouri)

*/s/ Joshua M. Divine*
Joshua M. Divine

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...................................................C-1

TABLE OF AUTHORITIES ..................................................................... ii

STATEMENT OF INTEREST AND SUMMARY OF ARGUMENT ...................1

STATEMENT OF THE ISSUE...................................................................4

ARGUMENT .........................................................................................4

    I.   Medical authorities across the globe have recently concluded that gender-transition interventions lack evidence of safety and efficacy. ............4

        A.  The international medical community has increasingly concluded that these interventions lack scientific support. .......................................5

        B.  Domestic authorities likewise agree that the science is unsettled.............9

   II.  States need flexibility to make the calls about coverage—especially in contexts involving medical uncertainty..........................................................14

CONCLUSION.....................................................................................18

CERTIFICATE OF COMPLIANCE......................................................20

CERTIFICATE OF SERVICE .............................................................20

i

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Boe v. Marshall*, 2:22-cv-184-LCB (M.D. Ala. May 27, 2024)..............................14

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2268 (2022) .......... 1, 18

*Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1225 (11th Cir. 2023)...............4

*Gonzales v. Carhart*, 550 U.S. 124, 163 (2007) ......................................................1

*L. W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 491 (6th Cir. 2023) ......................4

*Lange v. Houston Cnty.*, 101 F.4th 793 (11th Cir. 2024) ................................... 2, 18

*Marshall v. United States*, 414 U.S. 417, 427 (1974)................................... 1, 17, 18

*Voe v. Mansfield*, No. 1:23-cv-864, at *9–12 (M.D.N.C. May 13, 2024)...............12

*Wisc. Dep't of Health and Fam. Servs. v. Blumer*, 534 U.S. 473, 495 (2002)........15

## <u>Rules</u>

Fed. R. App. P. 29 ...................................................................................................20

Fed. R. App. P. 32 ...................................................................................................20

## <u>Other Authorities</u>

Aimee Woodmass, *UK High Court Rules Ban on Puberty Blockers Is Lawful*,
JuristNews (July 31, 2024) ................................................................................7

Azeen Ghorayshi, *Biden Officials Pushed to Remove Age Limits for Trans Surgery, Documents Show*, N.Y. Times (June 25, 2024)...................................................13

*Care of Children and Adolescents with Gender Dysphoria*, Socialstyrelsen: The
National Board of Health and Welfare (2022)........................................................8

de Vries, *et al.*, *Puberty Suppression in Adolescents With Gender Identity
Disorder: A Prospective Follow-Up Study*, 8 J. Sex. Med. 2276 (2011) ..............3

Edwards-Leeper & Anderson, *The Mental Health Establishment Is Failing Trans
Kids*, Wash. Post (Nov. 24, 2021).......................................................................13

Hembree, et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons*, 102(11) J. Clinical Endocrinology & Metabolism 3869 (Nov. 2017)..11

Jennifer Block, *Gender Dysphoria in Young People Is Rising—And So Is Professional Disagreement*, BMJ (Feb. 23, 2023) ......................................... 6, 17

Ludvigsson, et al., *A Systematic Review of Hormone Treatment for Children with Gender Dysphoria and Recommendations for Research*, Acta Paediatrica (Apr. 17, 2023) ...............................................................................................................8

*Medicaid Expenditures as a Percent of Total State Expenditures by Fund*, KFF (formerly Kaiser Family Foundation) (last visited Sep. 30, 2024).....................14

Missouri Medicaid Ambulatory Surgical Center Provider Manual (2024).............15

Press Release, Am. Soc'y of Plastic Surgeons, ASPS Statement to Press Regarding Gender Surgery for Adolescents (Aug. 14, 2024) ...............................................10

*Recommendation of the Council for Choices in Health Care in Finland*: *Medical Treatment Methods for Dysphoria Related to Gender Variance in Minors*, PALKO/COHERE Finland (2020) .......................................................................9

*Research into Trans Medicine Has Been Manipulated*, The Economist (June 27, 2024) ...................................................................................................................12

The Cass Review Interim Report (Feb. 2022) ................................................. 15, 16

The Cass Review: Independent Review of Gender Identity Services for Children and Young People (Apr. 10, 2024) ......................................... 2, 7, 8, 16

*The Evidence to Support Medicalised Gender Transitions in Adolescents is Worryingly Weak*, The Economist (Apr. 5, 2023) ......................................... 5, 11

*Topic Brief: Treatments for Gender Dysphoria in Transgender Youth*, AHRQ, Nom. No. 0928 (2021) ........................................................................................10

*Transgender No Longer Recognised as 'Disorder' by WHO*, BBC (May 29, 2019)... ...............................................................................................................5

Wang, et al., *Outcomes Following Gender Affirming Phalloplasty: A Systematic Review and Meta-Analysis*, 10 Sexual Med. Revs. 499 (2022)..........................16

*What America Has Got Wrong About Gender Medicine*, The Economist (Apr. 5, 2023) ......................................................................................... 5, 10

WPATH, *Standard of Care 7* (2012) ................................................. 16, 17

WPATH, *Standard of Care 8* (2022) .......................................................11

## STATEMENT OF INTEREST AND SUMMARY OF ARGUMENT

The States of Missouri, Alaska, Arkansas, Idaho, Indiana, Iowa, Kansas, Louisiana, Mississippi, Montana, Nebraska, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, Virginia, West Virginia, and Wyoming submit this brief to explain their strong interest in preserving the democratic prerogative of States to make decisions "'in areas fraught with medical and scientific uncertainties.'" *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2268 (2022) (quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974)); *see also Gonzales v. Carhart*, 550 U.S. 124, 163 (2007) (States have "wide discretion" to regulate "in areas where there is medical and scientific uncertainty"). Making policy decisions in an area of scientific uncertainty is a core, sovereign, democratic function.

The district court's decision threatens this democratic prerogative—and not just with respect to adults, but also with respect to state policies concerning children. Throughout its opinion, the court errs—badly—in a way that taints the rest of its analysis. Today, gender transition interventions include puberty blockers, cross-sex hormones, and surgeries. The district court's decision assumes that these interventions (in particular, surgeries) are "medically necessary," but an emerging international consensus establishes the opposite. Just a few weeks before this Court's panel issued its opinion, a four-year, four-hundred-page, comprehensive review conducted by the United Kingdom's National Health Service concluded that

1

the evidence for gender transition interventions is "remarkably weak," with "no good evidence on the long-term outcomes of interventions." The Cass Review: Independent Review of Gender Identity Services for Children and Young People 13 (Apr. 10, 2024) [hereinafter Cass Review].[1] In line with these findings, the United Kingdom has restricted the use of transition interventions for minors, joining other countries—like Finland, Norway, and Sweden—that have recently declared these interventions to be "experimental," "lacking" in evidentiary support, and entailing "risks [that] … are likely to outweigh the expected benefits." *Infra* Part I.A.

Organizations on this side of the pond have likewise expressed concern about gender transition interventions. The U.S. Department of Health and Human Services did so three years ago. And even the organizations proffered by the plaintiff—such as WPATH and the Endocrine Society—muster only half-hearted recommendations, not the full-throated endorsement the plaintiff's brief to the panel suggested. *See* Brief of Plaintiff-Appellee at 6, *Lange v. Houston Cnty.*, 101 F.4th 793 (11th Cir. 2024), 2023 WL 2586024, at *6. Last month, the American Society of Plastic Surgeons declined to endorse WPATH's standards of care because "there is considerable uncertainty as to the long-term efficacy for the use of chest and genital surgical interventions" and "the existing evidence base is viewed as low quality/low

---

[1] https://cass.independent-review.uk/wp-content/uploads/2024/04/CassReview_Final.pdf

certainty."[2]    The Endocrine Society also acknowledges that its relevant recommendations are "weak recommendations" because the quality of evidence is "low" or "very low," and WPATH admits that the model it advocates is unproven and that it merely "is *hoped* that future research will explore the effectiveness of this model."  *Infra* Part I.B.  To be sure, the district court's decision concerned adults, but advocates have pushed for pediatric interventions precisely because the outcomes of these interventions in adults have often proven unsatisfactory.  *E.g.*, de Vries, *et al.*, *Puberty Suppression in Adolescents With Gender Identity Disorder: A Prospective Follow-Up Study*, 8 J. Sex. Med. 2276, 2279 (2011) ("In adult transsexuals, postoperative psychopathology is associated with difficulties in passing in their new gender.").

    In light of the medical uncertainty acknowledged in the international medical community, *Amici* States have taken a variety of approaches to the issue.  Some decline to pay for these chemical and surgical interventions through state-funded healthcare programs.  As of last month, 25 States—having compared the known, irreversible side-effects to the unknown, speculative benefits—have gone further and passed laws prohibiting these interventions in certain circumstances.  And some States, like Missouri, have passed laws barring interventions in certain

---

[2] https://www.plasticsurgery.org/for-medical-professionals/publications/psn-extra/news/asps-statement-to-press-regarding-gender-surgery-for-adolescents

circumstances only temporarily (Missouri's moratorium on hormonal interventions sunsets in three years)—until policymakers obtain the benefit of more scientific studies. Still other States have allowed these interventions—but only after individuals have first been provided adequate counseling care and psychological support.

Because of the Supreme Court's precedent recognizing that States have wide authority in areas of medical uncertainty, this Court should permit the States and local governments like Houston County appropriate latitude to respond to these scientifically unsettled issues.

## STATEMENT OF THE ISSUE

Whether state or local governments must fund gender transition interventions.

## ARGUMENT

### I.    Medical authorities across the globe have recently concluded that gender-transition interventions lack evidence of safety and efficacy.

The science surrounding gender transition interventions is new and unsettled. This Court recently acknowledged the "recent surges" in treatments for gender dysphoria despite "uncertainty regarding benefits" and "irreversible effects." *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1225 (11th Cir. 2023); *see also L. W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 491 (6th Cir. 2023), *cert. granted sub nom.*, *United States v. Skrmetti*, 144 S. Ct. 2679 (2024) ("This is a relatively new diagnosis with ever-shifting approaches to care over the last decade or two."). The World

Health Organization classified transgender identity as a mental health disorder until just five years ago. *Transgender No Longer Recognised as 'Disorder' by WHO*, BBC (May 29, 2019).[3]  These recent, enormous changes make the district court's core assumption—that gender transition surgery is medically necessary—as perplexing as it is demonstrably erroneous.

### A. The international medical community has increasingly concluded that these interventions lack scientific support.

There is a growing, robust, international consensus that when it comes to these interventions, "the evidence is lacking." *What America Has Got Wrong About Gender Medicine*, The Economist (Apr. 5, 2023).[4]  Countries across Europe—the United Kingdom, France, Finland, Norway, and Sweden, among others—"have raised the alarm," expressing concern that the harms "outweigh the benefits." *Id.* Finland recently described these interventions in minors as "experimental" and said "treatment should seldom proceed beyond talking therapy"—*i.e.*, counseling. *The Evidence to Support Medicalised Gender Transitions in Adolescents is Worryingly Weak*, The Economist (Apr. 5, 2023).[5]  As the publication recently known as the British Medical Journal summarized it, "European countries have issued guidance

---

[3] https://www.bbc.com/news/health-48448804
[4] https://www.economist.com/leaders/2023/04/05/what-america-has-got-wrong-about-gender-medicine
[5] https://www.economist.com/briefing/2023/04/05/the-evidence-to-support-medicalised-gender-transitions-in-adolescents-is-worryingly-weak

to limit medical intervention in minors" and are instead "prioritising psychological care" such as counseling.  Jennifer Block, *Gender Dysphoria in Young People Is Rising—And So Is Professional Disagreement*, BMJ, 1 (Feb. 23, 2023).[6]

**United Kingdom.**  The United Kingdom's recently released, four-year, four-hundred-page, comprehensive overview of the science best illustrates this trend. Unlike the authors of WPATH's standards of care—who have financial and reputational interests in pushing a certain viewpoint—the head of the United Kingdom's Cass Review was chosen because she had "no prior involvement or fixed views in this area" and thus was unlikely to be swayed by financial or reputational interest.[7]

The Cass Review was led by Dr. Hilary Cass, former President of the Royal College of Paediatrics and Child Health.  The review commissioned at least nine studies—"systematic reviews," the gold standard study in evidence-based medicine.[8]  These reviews focused on the interventions that precede surgery—puberty blockers and cross-sex hormones.  After four years of study, and on the basis of these reviews, Dr. Cass's team concluded that the evidence for gender transition interventions is "remarkably weak," that there is "no good evidence on the long-term

---

[6] https://www.bmj.com/content/bmj/380/bmj.p382.full.pdf
[7] https://cass.independent-review.uk/nice-evidence-reviews/
[8] Available at https://cass.independent-review.uk/nice-evidence-reviews and https://adc.bmj.com/pages/gender-identity-service-series.

outcomes of interventions," that doctors ordinarily are supposed to be "cautious" but that "[q]uite the reverse happened" here, that the evidence "had already been shown to be weak" in 2020, and that in 2024 "there continues to be a lack of high-quality evidence in this area." Cass Review at 13, 20.

For example, with respect to puberty blockers, the Cass Review found "no evidence that puberty blockers improve body image or dysphoria, and very limited evidence for positive mental health outcomes, which without a control group could be due to placebo effect or concomitant psychological support." *Id.* at 179. On cross-sex hormones, the Cass Review determined that the existing studies were so weak that "[n]o conclusions can be drawn about the effect on gender dysphoria, body satisfaction, psychosocial health, cognitive development, or fertility." *Id.* at 184.

The Cass Review thus recommended restricting medicalized interventions— for example, by focusing on "provid[ing] assessment and psychological support" rather than rushing to chemical and surgical intervention. *Id.* at 36.

Consistent with the Cass Review, the United Kingdom has restricted availability of these interventions. Puberty blockers, for example, are permitted only in a formal research protocol—none of which exists yet. Aimee Woodmass, *UK High Court Rules Ban on Puberty Blockers Is Lawful*, JuristNews (July 31, 2024).[9]

---

[9] https://www.jurist.org/news/2024/07/uk-high-court-rules-ban-on-puberty-blockers-is-lawful/

While the Cass Review did not recommend prohibiting cross-sex hormones entirely, it did stress "extreme caution" and said that hormones should be tried only as a "tertiary" intervention if others fail. Cass Review at 35–36. While the district court's conclusion focused in particular on surgeries for an adult plaintiff, these conclusions are relevant because surgeries are preceded by these other interventions, often in adolescence.

**Sweden.** Similarly, Sweden's health authority issued guidelines concluding that, at least for minors, "the risks of puberty blockers and gender-affirming treatment are likely to outweigh the expected benefits." *Care of Children and Adolescents with Gender Dysphoria*, Socialstyrelsen: The National Board of Health and Welfare (2022).[10]

After the Swedish health authority made these determinations in 2022, a major study in Sweden reinforced the conclusions. Ludvigsson, et al., *A Systematic Review of Hormone Treatment for Children with Gender Dysphoria and Recommendations for Research*, Acta Paediatrica (Apr. 17, 2023).[11] That study concluded there was a "current lack of evidence for hormonal therapy improving gender dysphoria" and thus the interventions "should be considered experimental," concluded this "absence of long-term studies is worrying because many individuals start treatment as minors

[10] https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/kunskapsstod/2023-1-8330.pdf
[11] https://doi.org/10.1111/apa.16791

8

and CSHT is lifelong," and concluded that better research is "urgently needed." *Id.* at 2280, 2288, 2290.

**Finland.** Likewise, Finland's health authority recently reviewed the data and concluded that (at least for minors), these interventions are "an experimental practice," that "there are no medical treatment[s] that can be considered evidence-based," that surgical treatments should be taken off the table entirely, and that hormonal intervention should be used (if at all) only as a last resort. *Recommendation of the Council for Choices in Health Care in Finland*: *Medical Treatment Methods for Dysphoria Related to Gender Variance in Minors*, PALKO/COHERE Finland (2020).[12]

## B. Domestic authorities likewise agree that the science is unsettled.

The district court's assumption that transition surgery is medically necessary is especially faulty in light of the domestic organizations—including some favorably cited by the plaintiff—that recognize the limitations.

Start first with the U.S. Department of Health and Human Services. One of its subagencies, the U.S. Agency for Healthcare Research and Quality, recently concluded (with respect to minors), "There is a lack of current evidence-based guidance for the care of children and adolescents who identify as transgender,

---

[12] Certified translation available at https://ago.mo.gov/wp-content/uploads/Finland-Guidelines-for-Minors-certified-translation.pdf.

particularly regarding the benefits and harms of pubertal suppression, medical affirmation with hormone therapy, and surgical affirmation." *Topic Brief: Treatments for Gender Dysphoria in Transgender Youth*, AHRQ, Nom. No. 0928, at 2 (2021).[13]

Particularly relevant in this case about sex-change surgery is the recent development from the American Society of Plastic Surgeons. ASPS concluded that "there is considerable uncertainty as to the long-term efficacy for the use of chest and genital surgical interventions for the treatment of adolescents with gender dysphoria, and the existing evidence base is viewed as low quality/low certainty." Press Release, Am. Soc'y of Plastic Surgeons, ASPS Statement to Press Regarding Gender Surgery for Adolescents (Aug. 14, 2024).[14] ASPS's bottom line is that "[m]ore high-quality research in this rapidly evolving area of healthcare is needed."

Then there are the organizations touted by the plaintiff: the self-described advocacy organization WPATH and the Endocrine Society. But even these organizations have conceded that there are major gaps in the science: "America's professional bodies acknowledge the science is low quality." *What America Has Got Wrong About Gender Medicine*, The Economist.[15]

---

[13] https://effectivehealthcare.ahrq.gov/system/files/docs/topic-brief-gender-dysphoria.pdf

[14] https://www.plasticsurgery.org/for-medical-professionals/publications/psn-extra/news/asps-statement-to-press-regarding-gender-surgery-for-adolescents

[15] https://www.economist.com/leaders/2023/04/05/what-america-has-got-wrong-

For example, the Endocrine Society has recommended using puberty blockers and cross-sex hormones for minors, but the relevant recommendations are highly limited and filled with qualifications: the organization offers only "weak recommendations" because the quality of the evidence is "low" or "very low." Hembree, et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons*, 102(11) J. Clinical Endocrinology & Metabolism 3869, at 3871–72 (Nov. 2017).[16] Similarly, WPATH advocates what it calls a "gender-affirming care" model, and found only "scant, low-quality evidence" to support its recommendations. *The Evidence to Support Medicalised Gender Transitions in Adolescents Is Worryingly Weak*, The Economist.[17]  In its most recent guidelines, WPATH even admits that its model is unproven, and that "it is *hoped* that future research will explore the effectiveness of this model."  WPATH, *Standard of Care 8*, at S33 (2022) (emphasis added).[18]

In hindsight, reliance on WPATH is especially silly for reasons that go beyond WPATH's own statements.  Recent documents produced in discovery reveal that WPATH has long been suppressing scientific research that undercuts WPATH's preferred conclusions.

---

about-gender-medicine

[16] https://academic.oup.com/jcem/article/102/11/3869/4157558

[17] https://www.economist.com/briefing/2023/04/05/the-evidence-to-support-medicalised-gender-transitions-in-adolescents-is-worryingly-weak

[18] https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644

WPATH hired a team from Johns Hopkins University to conduct "dozens" of systematic evidence reviews for WPATH to use in crafting its new guidelines. *See* U.S. Dep't of Health and Human Services' Response to Motions to Seal, *Voe v. Mansfield*, No. 1:23-cv-864, at *9–12 (M.D.N.C. May 13, 2024), ECF No. 100.[19] But then WPATH interfered with publication of the science when the results came back negative. As the Johns Hopkins team lead privately reported to HHS—in documents that have since been made public—WPATH began "trying to restrict our ability to publish" after "we found little to no evidence" supporting these interventions. *Id.* Summarizing these documents, *The Economist* reported that WPATH "expressed a desire to control the results" and said Johns Hopkins could not release results "without WPATH approval," which would only be given if WPATH believed the results did not "negatively affect" WPATH's advocacy. *Research into Trans Medicine Has Been Manipulated*, The Economist (June 27, 2024).[20]

Those suppression attempts have become so bad that prominent practitioners in the field are starting to speak out. Dr. Erica Anderson, who identifies as transgender and is a prominent clinical psychologist in San Francisco, has expressed concern that activists regularly hamper medical development by silencing critics. As Anderson said, "The pressure by activist medical and mental health providers, along

---

[19] https://ago.mo.gov/wp-content/uploads/Voe-v-Mansfield-USDC-MDNC.pdf
[20] https://www.economist.com/united-states/2024/06/27/research-into-trans-medicine-has-been-manipulated

with some national LGBT organizations to silence the voices of detransitioners and sabotage the discussion around what is occurring in the field is unconscionable." Edwards-Leeper & Anderson, *The Mental Health Establishment Is Failing Trans Kids*, Wash. Post (Nov. 24, 2021).[21]

A New York Times report also reveals that WPATH bowed to political pressure to change its guidelines—pressure from the Biden administration. Azeen Ghorayshi, *Biden Officials Pushed to Remove Age Limits for Trans Surgery, Documents Show*, N.Y. Times (June 25, 2024).[22] "U.S. health officials lobbied to remove age minimums for surgery in minors because of concerns over political fallout." *Id.* WPATH complied—over the dissent of members who said "we should be basing this on science and expert consensus," not political pressure. *Id.*

Even more shocking, acting on the advice of "social justice lawyers," some WPATH authors intentionally chose *not* to seek evidence reviews so they would not have to report the results, which were expected to be negative. As one author explained: "Our concerns, echoed by the social justice lawyers we spoke with, is that evidence-based review reveals little or no evidence and puts us in an untenable position in terms of affecting policy or winning lawsuits." Defendants' motion for

---

[21] https://www.washingtonpost.com/outlook/2021/11/24/trans-kids-therapy-psychologist/

[22] https://www.nytimes.com/2024/06/25/health/transgender-minors-surgeries.html

Summary Judgment and Brief in Support, *Boe v. Marshall*, 2:22-cv-184-LCB (M.D. Ala. May 27, 2024), ECF No. 619 (quoting Ex. 174, ECF Nos. 560-24 at 2).[23]

## II. States need flexibility to make the calls about coverage—especially in contexts involving medical uncertainty.

States have limited resources and must allocate them accordingly. Missouri, for example, spends 24% of its general funds just on Medicaid. *Medicaid Expenditures as a Percent of Total State Expenditures by Fund*, KFF (formerly Kaiser Family Foundation) (last visited Sep. 30, 2024).[24] That number does not include administrative costs for Medicaid, *id.*, nor non-Medicaid healthcare funding (such as insurance coverage for state employees). And it of course does not cover the thousands of other things States must fund, such as road services and education.

Limited resources necessarily means that States must make tough calls about what to cover. If, for example, a State has enough funds to cover only one of two different procedures, the State must triage and decide which procedure will lead to the best health outcomes overall. It may choose, for example, to focus resources on procedures that increase life longevity by years rather than expensive procedures that modestly decrease pain for a short time—even though both procedures are independently worthwhile.

---

[23] https://www.courtlistener.com/docket/63252064/619/boe-v-marshall/
[24] https://www.kff.org/medicaid/state-indicator/medicaid-expenditures-as-a-percent-of-total-state-expenditures-by-fund/

Absent federal preemption, these are policy decisions that the States are entitled to make. "Medicaid … is designed to advance cooperative federalism." *Wisc. Dep't of Health and Fam. Servs. v. Blumer*, 534 U.S. 473, 495 (2002). Apart from federally established floors, the program generally "leave[s] to States the decision" about what to cover. *See id.* at 497.

States regularly exercise this discretion. For example, Missouri Medicaid covers pacemakers, but not ones with plutonium batteries because of the attendant risks of those pacemakers. Missouri Medicaid Ambulatory Surgical Center Provider Manual at 13 (2024).[25] Similarly, Missouri does not cover vein punctures for blood draws, "routine foot care," orthotic splints, testing for specific antibodies, or transportation to a medical facility—even though physicians might determine that all those services are medically necessary. *Id.*

The ability of States to make these judgment calls is always necessary, but it is especially necessary in the context of gender transition interventions given the emerging international consensus that these interventions lack scientific support. While the intended benefits of these interventions remain speculative, the risks are severe and typically "well understood." The Cass Review Interim Report 35 (Feb. 2022).[26] "These include increased cardiovascular risk, osteoporosis, and hormone-

---

[25] https://mydss.mo.gov/media/pdf/ambulatory-surgical-center-provider-manual
[26] https://cass.independent-review.uk/wp-content/uploads/2022/03/Cass-Review-

dependent cancers." *Id.* at 36. Fertility is also hampered. *Id.* Some interventions impede fertility; others—like surgery—render a person completely and irrevocably infertile.

Other risks are less well understood because of lack of testing but are still extraordinary. These can include the concern that interventions in fact "alter[ ]" a person's gender identity, "permanently disrupt[ ]" "brain maturation," and decrease bone density (leading to increased risk of fractures). Cass Review at 178. Surgeries in particular are known to have especially high complication rates and low evidence of efficacy. *See, e.g.,* Wang, et al., *Outcomes Following Gender Affirming Phalloplasty: A Systematic Review and Meta-Analysis*, 10 Sexual Med. Revs. 499 (2022) (reporting complication rates of 76.5% and noting that "current evidence" of surgical "outcomes is weak").

In contrast, counseling care is recognized to be effective and is free from any of these side effects. Counseling care (sometimes called "talk therapy" or "psychotherapy") has been "highly recommended" by WPATH and other groups. *E.g.*, WPATH, *Standard of Care 7*, at 28 (2012).[27] That is because it can "greatly facilitate the resolution of gender dysphoria"; indeed, through this care, many "individuals integrate their trans- or cross-gender feelings into the gender role they

---

Interim-Report-Final-Web-Accessible.pdf
[27] https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_English.pdf

were assigned at birth and do not feel the need to feminize or masculinize their body." *Id.* at 8, 25.

In other words, a method of treatment with *no* physical side effects has been recognized—even by prominent proponents of chemical and surgical intervention—as an effective clinical response to gender dysphoria. It is thus no surprise that "European countries have issued guidance to limit medical intervention" in certain cohorts and instead are "prioritising psychological care." Block, *Gender Dysphoria in Young People Is Rising*, at 1.[28]

The States and local governments ought to be able to do the same. Faced with limited resources and a decision about whether to cover a procedure that is widely recognized in the European medical community to be experimental, the States' "options must be especially broad." *Marshall*, 414 U.S. at 427. States should not be forced to pay for hotly disputed interventions just because they are supported by a self-described advocacy group with a troubling record of trying to suppress evidence.

The district court's contrary conclusion that Houston County has *no* discretion to exclude controversial surgeries is not just contrary to law and undermined by science; it threatens the ability of States to make the tough decisions with which they

---

[28] https://www.bmj.com/content/bmj/380/bmj.p382.full.pdf

17

are democratically entrusted.  The district court's decision undermines federalism and should quickly be reversed.

## CONCLUSION

The district court's decision relies on dubious sources to find that "particularly expensive, top-of-the-line procedures" are medically necessary.  *Lange*, 101 F.4th at 802 (Brasher, J., dissenting).  A growing consensus shows that the opposite is true. The States urge this Court to reverse district court's decision and to restore the States' discretion to make decisions "'in areas fraught with medical and scientific uncertainties.'"  *Dobbs*, 142 S. Ct. at 2268 (quoting *Marshall*, 414 U.S. at 427).

September 30, 2024                     Respectfully submitted,

                                      **ANDREW T. BAILEY**,
                                      Attorney General

                                      /s/ *Joshua M. Divine*
                                      Joshua M. Divine, 69875MO
                                        Solicitor General
                                      Dominic Barceleau, 76510MO
                                        Assistant Attorney General
                                      Office of the Attorney General
                                      207 West High St.
                                      Jefferson City, MO 65101
                                      Phone: (573) 751-8870
                                      Josh.Divine@ago.mo.gov

                                      *Counsel for Amicus Curiae*

18

*Counsel for Additional Amici States*

Treg Taylor
Attorney General
State of Alaska

Dave Yost
Attorney General
State of Ohio

Tim Griffin
Attorney General
State of Arkansas

Gentner Drummond
Attorney General
State of Oklahoma

Raúl Labrador
Attorney General
State of Idaho

Alan Wilson
Attorney General
State of South Carolina

Theodore E. Rokita
Attorney General
State of Indiana

Marty Jackley
Attorney General
State of South Dakota

Brenna Bird
Attorney General
State of Iowa

Ken Paxton
Attorney General
State of Texas

Kris Kobach
Attorney General
State of Kansas

Sean D. Reyes
Attorney General
State of Utah

Liz Murrill
Attorney General
State of Louisiana

Jason Miyares
Attorney General
State of Virginia

Lynn Fitch
Attorney General
State of Mississippi

Patrick Morrisey
Attorney General
State of West Virginia

Austin Knudsen
Attorney General
State of Montana

Bridget Hill
Attorney General
State of Wyoming

Michael T. Hilgers
Attorney General
State of Nebraska

## CERTIFICATE OF COMPLIANCE

1. The undersigned hereby certifies that this brief complies with the type-volume limits of Fed. R. App. P. 29 and 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 3530 words as determined by the word-count feature of Microsoft Word.

2. The undersigned also certifies that this brief complies with the typeface and formatting requirements of Fed. R. App. P. 29 and 32(a)(5) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point, Times New Roman font.  The hard copies submitted to the clerk are exact copies of the CM/ECF submission.

*/s/ Joshua M. Divine*
Joshua M. Divine


## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was electronically filed on September 30, 2024, with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit using the CM/ECF system; that all participants are registered CM/ECF users; and that service will be accomplished by the CM/ECF system.

*/s/ Joshua M. Divine*
Joshua M. Divine