CASE NO. 22-13626-U

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

## HOUSTON COUNTY, GEORGIA, AND HOUSTON COUNTY
## SHERIFF CULLEN TALTON, IN HIS OFFICIAL CAPACITY,
Defendants-Appellants,

v.

## ANNA LANGE,
Plaintiff-Appellee.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA, MACON DIVISION
## CIVIL ACTION NO. 5:19-CV-00392-MTT

## EN BANC BRIEF
## OF DEFENDANTS-APPELLANTS

**Sharon P. Morgan, Georgia Bar No. 522955**
**R. Read Gignilliat, Georgia Bar No. 293390**
**William D. Deveney, Georgia Bar No. 219744**
**Patrick L. Lail, Georgia Bar No. 431101**

**ELARBEE, THOMPSON, SAPP & WILSON LLP**
**229 Peachtree Street, NE – Suite 800**
**Atlanta, Georgia 30303**
**(404) 659-6700**

**Attorneys for Defendants-Appellants**

Appeal No. 22-13626-U
**Houston County, Georgia, et al. v. Lange**

## DEFENDANTS-APPELLANTS' CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and 11th Cir. R. 26.1, 26.2-1, 26.1-3 and 28-1(b), the undersigned counsel of record for Defendants-Appellants hereby identifies the following interested persons:

1)  Alabama, State of (Amicus Curiae for Defendants-Appellants);

2)  Alaska, State of (Amicus Curiae for Defendants-Appellants);

3)  Allen & Overy LLP (Counsel for Amicus Curiae Lawyers' Committee for Civil Rights Under Law);

4)  Anti-Defamation League (Amicus Curiae for Plaintiff-Appellee);

5)  Arkansas, State of (Amicus Curiae for Defendants-Appellants);

6)  Arkles, Z. Gabriel (Counsel for Plaintiff-Appellee);

7)  Association of American Physicians and Surgeons (Amicus Curiae for Defendants-Appellants);

8)  Bailey, Andrew (Counsel for Amicus Curiae State of Missouri);

9)  Barry, Kevin M. (Counsel for Plaintiff-Appellee);

10) Barton, III, Kenneth E. (Counsel for Plaintiff-Appellee);

11) Bingham, Joseph A. (Counsel for Amicus Curiae The Equal Voting Rights Institute d/b/a The American Civil Rights Project);

C-1

## Appeal No. 22-13626-U
## Houston County, Georgia, et al. v. Lange

12) Bird, Brenna (Counsel for Amicus Curiae State of Iowa);

13) Bone, Michelle (Counsel for Amicus Curiae Lawyers' Committee for Civil Rights Under Law);

14) Bowdre, Alexander Barrett (Counsel for Amicus Curiae State of Alabama);

15) Brown, David (Counsel for Plaintiff-Appellee);

16) Burleigh, Billy (Amicus Curiae for Defendants-Appellants);

17) Calderon, Tvah R. (Counsel for Amicus Curiae United States Department of Justice);

18) Campbell, Jordan (Counsel for Amici Curiae Billy Burleigh, KathyGrace Duncan, and Jane Smith);

19) Campbell Miller Payne, PLLC (Counsel for Amici Curiae Billy Burleigh, KathyGrace Duncan, and Jane Smith);

20) Carr, Christopher M. (Counsel for Amicus Curiae State of Georgia);

21) Christian Employers Alliance (Amicus Curiae for Defendants-Appellants);

22) Clarke, Kristen (Counsel for Amicus Curiae United States Department of Justice);

23) Cooper, Barton & Cooper (Counsel for Plaintiff-Appellee);

24) Cooper, M. Devlin (Counsel for Plaintiff-Appellee);

25) Deveney, William D. (Counsel for Defendants-Appellants);

**Appeal No. 22-13626-U**
**Houston County, Georgia, et al. v. Lange**

26) Duncan, KathyGrace (Amicus Curiae for Defendants-Appellants);

27) Elarbee, Thompson, Sapp & Wilson, LLP (Counsel for Defendants-Appellants);

28) Equal Rights Advocates (Amicus Curiae for Plaintiff-Appellee);

29) Ethics and Public Policy Center (Amicus Curiae for Defendants-Appellants);

30) Fata, Catherine Elizabeth (Counsel for Plaintiff-Appellee);

31) Fitch, Lynn (Counsel for Amicus Curiae State of Mississippi);

32) Florida, State of (Amicus Curiae for Defendants-Appellants);

33) Georgia, State of (Amicus Curiae for Defendants-Appellants);

34) Gignilliat, R. Read (Counsel for Defendants-Appellants);

35) Grant, Jill K. (Counsel for Plaintiff-Appellee);

36) Greenbaum, Jon (Counsel for Amicus Curiae Lawyers' Committee for Civil Rights Under Law);

37) Griffin, Tim (Counsel for Amicus Curiae State of Arkansas);

38) Hasson, Mary Rice (Counsel for Amicus Curiae Ethics and Public Policy Center);

39) Hilgers, Michael T. (Counsel for Amicus Curiae State of Nebraska);

40) Houston County, Georgia (Defendant-Appellant);

41) Idaho, State of (Amicus Curiae for Defendants-Appellants);

**Appeal No. 22-13626-U**
**Houston County, Georgia, et al. v. Lange**

42) Indiana, State of (Amicus Curiae for Defendants-Appellants);

43) Iowa, State of (Amicus Curiae for Defendants-Appellants);

44) Jackley, Marty (Counsel for Amicus Curiae State of South Dakota);

45) Kansas, State of (Amicus Curiae for Defendants-Appellants);

46) Kieckhafer, Katherine (Counsel for Amicus Curiae Lawyers' Committee for Civil Rights Under Law);

47) Kniffen, Eric Nieuwenhuis (Counsel for Amicus Curiae Ethics and Public Policy Center);

48) Knudsen, Austin (Counsel for Amicus Curiae State of Montana);

49) Kobach, Kris W. (Counsel for Amicus Curiae State of Kansas);

50) Labrador, Raúl (Counsel for Amicus Curiae State of Idaho);

51) LaCour, Edmund G. Jr. (Counsel for Amicus Curiae State of Alabama);

52) Lail, Patrick L. (Counsel for Defendants-Appellants);

53) Lange, Anna (Plaintiff-Appellee);

54) Latino Justice PRLDEF (Amicus Curiae for Plaintiff-Appellee);

55) Lawyers' Committee for Civil Rights Under Law (Amicus Curiae for Plaintiff-Appellee);

56) Lee, Jason (Counsel for Amicus Curiae United States Department of Justice);

**Appeal No. 22-13626-U**
**Houston County, Georgia, et al. v. Lange**

57) Louisiana, State of (Amicus Curiae for Defendants-Appellants);

58) Marshall, Steve (Counsel for Amicus Curiae State of Alabama);

59) Miller, Ronald (Counsel for Amici Curiae Billy Burleigh, KathyGrace Duncan, and Jane Smith);

60) Mills, Christopher (Counsel for Amicus Curiae Christian Employers Alliance);

61) Mississippi, State of (Amicus Curiae for Defendants-Appellants);

62) Missouri, State of (Amicus Curiae for Defendants-Appellants);

63) Mitrokostas, Nicholas K. (Counsel for Amicus Curiae Lawyers' Committee for Civil Rights Under Law);

64) Miyares, Jason S. (Counsel for Amicus Curiae Commonwealth of Virginia);

65) Montana, State of (Amicus Curiae for Defendants-Appellants);

66) Moody, Ashley (Counsel for Amicus Curiae State of Florida);

67) Morenoff, Daniel I. (Counsel for Amicus Curiae The Equal Voting Rights Institute d/b/a The American Civil Rights Project);

68) Morgan, Sharon P. (Counsel for Defendants-Appellants);

69) Morrisey, Patrick (Counsel for Amicus Curiae State of West Virginia);

70) Murrill, Liz (Counsel for Amicus Curiae State of Louisiana);

**Appeal No. 22-13626-U**
**Houston County, Georgia, et al. v. Lange**

71) National Employment Law Project (Amicus Curiae for Plaintiff-Appellee);

72) National Health Law Program (Amicus Curiae for Plaintiff-Appellee);

73) National Women's Law Center (Amicus Curiae for Plaintiff-Appellee);

74) Nebraska, State of (Amicus Curiae for Defendants-Appellants);

75) North Dakota, State of (Amicus Curiae for Defendants-Appellants);

76) Ohio, State of (Amicus Curiae for Defendants-Appellants);

77) Paxton, Ken (Counsel for Amicus Curiae State of Texas);

78) Payne, Amanda M. (Counsel for Plaintiff-Appellee);

79) Payne, Joshua K. (Counsel for Amici Curiae Billy Burleigh, KathyGrace Duncan, and Jane Smith);

80) Petrany, Stephen J. (Counsel for Amicus Curiae State of Georgia);

81) Powell, Wesley (Counsel for Plaintiff-Appellee);

82) Quinnipiae Univ. School of Law Legal Clinic (Counsel for Plaintiff-Appellee);

83) Reyes, Sean D. (Counsel for Amicus Curiae State of Utah);

84) Rokita, Theodore E. (Counsel for Amicus Curiae State of Indiana);

85) Schlafly, Andrew L. (Counsel for Amicus Curiae Association of American Physicians and Surgeons);

**Appeal No. 22-13626-U**
**Houston County, Georgia, et al. v. Lange**

86)    Sepulveda, Daniel (Counsel for Amici Curiae Billy Burleigh, KathyGrace Duncan, and Jane Smith);

87)    Skrmetti, Jonathan (Counsel for Amicus Curiae State of Tennessee);

88)    Smith, Jane (Amicus Curiae for Defendants-Appellants);

89)    Spero Law LLC (Counsel for Amicus Curiae Christian Employers Alliance);

90)    South Carolina, State of (Amicus Curiae for Defendants-Appellants);

91)    South Dakota, State of (Amicus Curiae for Defendants-Appellants);

92)    Talton, Cullen in his official capacity as Sheriff (Defendant-Appellant);

93)    Taylor, Treg (Counsel for Amicus Curiae State of Alaska);

94)    Tennessee, State of (Amicus Curiae for Defendants-Appellants);

95)    Texas, State of (Amicus Curiae for Defendants-Appellants);

96)    Transgender Legal Defense Education Fund, Inc. (Counsel for Plaintiff-Appellee);

97)    Treadwell, Hon. Marc T. (United States District Court Judge);

98)    United States Department of Justice (Amicus Curiae for Plaintiff-Appellee);

99)    Utah, State of (Amicus Curiae for Defendants-Appellants);

**Appeal No. 22-13626-U**
**Houston County, Georgia, et al. v. Lange**

100) Virginia, Commonwealth of (Amicus Curiae for Defendants-Appellants);

101) West Virginia, State of (Amicus Curiae for Defendants-Appellants);

102) Whitaker, Henry C. (Counsel for Amicus Curiae State of Florida);

103) Wilkie Farr & Gallagher LLP (Counsel for Plaintiff-Appellee);

104) Wilson, Alan (Counsel for Amicus Curiae State of South Carolina);

105) Wrigley, Drew H. (Counsel for Amicus Curiae State of North Dakota);

106) Youker, Kathryn J. (Counsel for Amicus Curiae Lawyers' Committee for Civil Rights Under Law);

107) Yost, Dave (Counsel for Amicus Curiae State of Ohio);

108) The American Civil Rights Project (Amicus Curiae for Defendants-Appellants); and

109) The Equal Voting Rights Institute d/b/a The American Civil Rights Project (Amicus Curiae for Defendants-Appellants).

s/ Sharon P. Morgan
Ga. Bar No. 522955
morgan@elarbeethompson.com
R. Read Gignilliat
Ga. Bar No. 293390
gignilliat@elarbeethompson.com
William D. Deveney
Ga. Bar No. 219744

deveney@elarbeethompson.com
Patrick L. Lail
Ga. Bar No. 431101
lail@elarbeethompson.com


**ELARBEE, THOMPSON, SAPP & WILSON, LLP**
229 Peachtree Street, N.E. – Suite 800
Atlanta, Georgia 30303
(404) 659-6700
(404) 222-9718 (facsimile)

Attorneys for Defendants-Appellants

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to this Court's August 29, 2024, notice [App. Doc. 112], this Court, sitting en banc, will hear oral argument by the parties during the week of February 3, 2025.

## <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT.......................................... .......C-1

STATEMENT REGARDING ORAL ARGUMENT.............................i

TABLE OF CONTENTS.................................................................ii

TABLE OF CITATIONS..............................................................v

STATEMENT OF JURISDICTION...............................................ix

STATEMENT OF THE ISSUE......................................................1

I. STATEMENT OF THE CASE..................................................2

    A.    Nature of the Case.......................................................2

    B.    Statement of Facts.......................................................5

        1. Introduction.........................................................5

        2. Lange's Hire.......................................................5

        3. Lange's Gender Transition.......................................5

        4. Lange's Requested Insurance Coverage for Bottom Surgery ..................................................................6

        5. Denial of Coverage for Bottom Surgery.........................7

    C.    Course of Proceeding and Dispositions in Court Below......10

        1. The Parties and Lange's Amended Complaint..............10

2. Lange's Motion for Preliminary Injunction, Defendants' Motions to Dismiss, and the U.S. Supreme Court's *Bostock* Opinion.............................................................11

3. The District Court's Hearing and Order on Defendants' Motions to Dismiss.................................................12

4. Lange's Renewal and Subsequent Withdrawal of Her Superseding Motion for Preliminary Injunction.............15

5. The Parties' Cross-Motions for Summary Judgment.......15

6. The District Court's Summary Judgment Order.............17

7. Jury Trial on Damages on Lange's Title VII Claim.........23

8. Permanent Injunction and Appeal...............................23

D. Standard of Review......................................................25

II. SUMMARY OF THE ARGUMENT.........................................25

III. ARGUMENT AND AUTHORITY................…..................…...28

A. *Bostock* held that discrimination merely on the basis of transgender status or sexual orientation constitutes discrimination because of sex under Title VII....................29

1. Bostock does not support the District Court decision......29

2. The "medically necessary" status of sex change surgery for insurance purposes is not determinative.................37

B. Other Supreme Court decisions support Defendants' position ...................................................................40

C. The record does not support summary judgment to Lange ..…..…...…..…..............…......................................46

1. The District Court erred in awarding summary judgment to the party with the burden of proof............46

2. Coverage of Lange's care shows the plan does not discriminate...........................................................53

3. Lange's procedure is not the same as a natal female's vaginoplasty .........................................................57

4. The Injunction should be dissolved...........................59

IV. CONCLUSION.........................................................................60

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF CITATIONS

## Cases

*Adams by and through Kasper v. Sch. Bd. of St. Johns Cty.*,
57 F.4th 791 (11th Cir. 2022)……………………………………………31

*Alabama v. Ctrs. for Medicare & Medicaid Servs.*,
674 F.3d 1241 (11th Cir. 2012) (per curiam) ………………………...……25

*Bostock v. Clayton County*,
590 U.S. 644 (2020)    …………………………………………….........Passim

*Bostock v. Clayton Cty., Ga.*,
723 F. App'x 964 (11th Cir. May 10, 2018) (per curiam)……………12, 32

*Chudasama v. Mazda Motor Corp.*,
123 F.3d 1353 (11th Cir. 1997) …………………………………………….x

*City of Los Angeles v. Manhart*,
435 U.S. 702, 710 (1978) …………………………………...……42, 43, 60

*Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*,
589 U.S. 327 (2020)    ……………………………………………………31

*Department of Community Health v. Freels*,
258 Ga.App. 446 (2002)    ………………………………………..…… 38

*Doe v. Catholic Relief Services*,
618 F.Supp.3d 244, 250 (D. Md. 2022),
*vacated in part on other grounds*, 2023 WL 155243,
CCB-20-1815 (D. Md. Jan. 11, 2023)…………………………….....…..36

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*,
884 F.3d 560 (6th Cir. 2018)……………………………………………34

*Geduldig v. Aiello,*
417 U.S. 484 (1974) ....................................................13-15, 17, 18

*Glenn v. Brumby,*
663 F.3d 1312 (11th Cir. 2011) ...........................................14, 15, 18

*Int'l Union, United Auto, Aerospace & Agr. Implement Workers
of Am., UAW v. Johnson Control, Inc.,* 499 U.S. 187 (1991) .19, 40-42, 60

*McDonnell Douglas v. Green*
411 U.S. 792 (1973) ..................................................... 16

*Jones v. Dillard's Inc.,*
331 F.3d 1259 (11th Cir. 2003) ...................................................25

*Kirby v. Anthem, Inc., Civil Action No. 1:19-CV-000597-ELR,*
2019 WL 2004128 (N.D. Ga. Mar. 21, 2019).....................................49

*Lewis v. City of Union City,*
918 F.3d 1213 (11th Cir. 2019) (en banc) ......................................59

*Liao v. Tennessee Valley Auth.,*
867 F.2d 1366 (11th Cir. 1989)   ................................................44, 52

*Newport News Shipbldg. & Dry Dock Co.,*
462 U.S. 669 (1983) .................................................. 19, 42, 43, 60

*Sanctuary Surgical Centre, Inc. v. Aetna Inc.,*
546 Fed. Appx. 846 (11th Cir. 2013)..........................................38

*Smith v. Lockheed-Martin Corp.,*
644 F.3d 1321 (11th Cir. 2011) ...................................................16

*Tillis on behalf of Wuenschel v. Brown*
12 F.4th 1291 (11th Cir. 2021)..........................................................x

*Underwood v. Perry Cty. Comm.,*
431 F.3d 788, 793 (11th Cir. 2005) ……………………………………………50

*United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in Ala.,*
941 F.2d 1428 (11th Cir. 1991) (en banc) ………………………………… 47, 49

*Whiteside v. Metropolitan Life Ins. Co.,*
798 F. Supp. 1380 (D. Minn. 1992)……………………………………………35

*Young v. United Parcel Service,*
575 U.S. 206 (2015) …………………………………………....... 44, 46, 49, 52

*Zarda v. Altitude Express,*
883 F.3d 100 (2d Cir. 2018) (en banc)………………………………...33, 34, 36

**Statutes**

28 U.S.C. § 1292 ……………………………………………………………..ix

28 U.S.C. § 1331 ……………………………………………………………..ix

29 U.S.C. § 794…………………………………………………………………11

42. U.S.C. § 1983 ………………………………………………………Passim

42 U.S.C. § 2000e ………………………………………………………...Passim

42 U.S.C. §§ 12131-12134 ………………………………………………………11

42 U.S.C. §§ 12101-12117……………………………………………………11

Ga. Const. art. I, § 1, para. 2………………………………………………10, 11

**Other**

11th Cir. R. 26.1 .............................................................C-1

11th Cir. R. 26.2.............................................................C-1

FRAP 3 ..........................................................................ix

Fed. R. Civ. P 12 ......................................................11, 12

## STATEMENT OF SUBJECT-MATTER
## AND APPELLATE JURISDICTION

This Court has subject matter jurisdiction over Plaintiff-Appellee Anna Lange's ("Lange") claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3). [*See* Doc. 1, 56.]

Defendants-Appellants filed their Notice of Appeal on October 21, 2022. [Doc. 262.] This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1) because this is an appeal of an injunction entered under Title VII against Defendants-Appellants, by the District Court on October 3, 2022. [Doc. 258.]

This Court also has jurisdiction to review the District Court's Order entered on June 2, 2022, insofar as that Order granted summary judgment to Lange on her Title VII claim against Defendants-Appellants [Doc. 205] and merged into the injunction entered on October 3, 2022. *See* Fed R. App. P. 3(c)(4) ("The notice of appeal encompasses all orders that, for purposes of appeal, merge into the designated judgment or appealable order. It is not necessary to designate those orders in the notice of appeal.").

Additionally, this Court has jurisdiction to review the U.S. District Court's June 2, 2022, Order under the doctrine of pendent appellate jurisdiction, because the injunction entered on October 3, 2022, was predicated on that earlier ruling—and, so, they are "inextricably intertwined"—such that a review of the former "is necessary to ensure meaningful review of the latter." *Tillis on behalf of Wuenschel v. Brown*, 12 F.4th 1291, 1297 (11th Cir. 2021) ("[U]nder the doctrine of pendent appellate jurisdiction, we may address non-appealable orders if they are inextricably intertwined with an appealable decision or if review of the former decision is necessary to ensure meaningful review of the latter." (internal quotations marks and citation omitted)); *see also Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1365 (11th Cir. 1997) (exercising pendent appellate jurisdiction to review otherwise non-appealable order granting motion to compel where appealed sanctions order was based in part on defendant's alleged violation of sanctions order).

## <u>STATEMENT OF THE ISSUE</u>

In its August 29, 2024, En Banc Briefing Notice [App. Doc. 112], the

Court identified the following issue for the Parties to focus their briefs on

for purposes of the upcoming en banc rehearing:

> Whether the employer-provided health insurance policy at
> issue, which covers medically necessary treatments for
> certain diagnoses but bars coverage for Lange's "sex change"
> surgery, facially violates Title VII of the Civil Rights Act of
> 1964.

# I.    STATEMENT OF THE CASE

## A.    Nature of the Case

This is a case of alleged employment discrimination based on health insurance coverage.  Plaintiff-Appellee Anna Lange ("Lange") asserts that exclusions for sex change surgery (or the reversal of a sex change) and drugs for sex change surgery amount to sex discrimination under Title VII because of her transgender status.  She makes this assertion (a) despite the undisputed fact that almost all her non-surgical gender transition care (endocrinologist visits, hormones, and psychological care) was covered by her health plan; (b) despite the undisputed fact that the challenged exclusions were in the health plan long before her hire and applied to her with equal force when she presented as male as well as when she presented as female; and (c) despite the undisputed fact that she is subject to the same almost 100 total exclusions as all other plan participants – male or female, transgender or not.  And while Lange claims the sex change surgery she desired is "medically necessary," the same can be said for other healthcare subject to exclusions, including sexual dysfunction treatments and drugs, bariatric surgery, and hearing aids.  Thus, the plan's coverage of transgender care is similar to its

coverage of other types of care – initial (generally less-expensive) treatments are covered, while more intensive (expensive) treatment is not covered.  This does not amount to sex discrimination in violation of Title VII.

Lange and Defendants-Appellants Houston County, Georgia ("Houston County" or "the County") and Houston County Sheriff Cullen Talton, in his official capacity ("Sheriff Talton" or "the Sheriff," collectively with the County, the "Defendants"), respectively, moved for summary judgment on Lange's claims of sex discrimination under 42 U.S.C. § 1983 (based on an alleged violation of the Equal Protection Clause of the U.S. Constitution) and Title VII.  Despite typically being analyzed together under the same standard in this Circuit, the District Court's summary judgment order treated these claims quite differently. [Doc. 205.]

The District Court denied all parties' motions for summary judgment on the Section 1983/Equal Protection claim, finding genuine issues of material fact as to whether the County's adoption and maintenance of the exclusions were done with the requisite discriminatory intent. [Doc. 205, pp. 16-21.] However, the District Court

granted summary judgment *to Lange* – who bears the burden of proof – on her disparate treatment claim under Title VII, concluding that the U.S. Supreme Court's holding in *Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020), compelled the conclusion that the exclusions were "facially discriminatory" as a matter of law and further concluding that the question of Defendants' alleged discriminatory intent (or lack thereof) was therefore "immaterial." [Doc. 205, pp. 21-28.]

Following a jury trial on the issue of damages only on Lange's Title VII claim, the District Court—relying on its summary judgment ruling— entered an "Order for Permanent Injunctive and Declaratory Relief" ("Injunction") on October 3, 2022. [Doc. 258.]    The Injunction permanently enjoins Defendants from further enforcement or application of the exclusions and directed Defendants to process Lange's claim for "bottom surgery" (a suite of procedures including vaginoplasty). [*Id.*] Defendants appealed the Injunction, predicated on the summary judgment ruling that, irrespective of discriminatory intent (or the lack thereof), the health plan facially violates Title VII.

### B.    Statement of Facts

#### 1.    Introduction

Since at least 1973, Houston County has made its Health Plan available to employees of the Sheriff's Office through an intergovernmental arrangement between the two entities. [Doc. 137-5, ¶ 6.] The Health Plan is a self-funded plan, under which a third-party administrator ("TPA") administers claims using funds provided by the County and employee contributions. [Doc. 137-4, ¶ 3; 137-5, ¶ 11.] Anthem BlueCross BlueShield ("Anthem") has provided TPA services to the Health Plan at all times relevant hereto. [See Doc. 137-4, ¶¶ 2-3.]

#### 2.    Lange's Hire

In September 2006, Sheriff Talton, who has been Sheriff since 1973, hired Lange, who then presented as male, as a Deputy Sheriff. [Doc. 150-8, p. 6.] Lange has participated in the Health Plan at all times since. [Doc. 150-8, p. 13.]

#### 3.    Lange's Gender Transition

In early 2017, Lange was diagnosed with gender dysphoria. [Doc. 150-8, p. 16.] Lange thereafter began a regimen of hormone replacement therapy overseen by her endocrinologist and counseling sessions with her

psychotherapist. [Doc. 150-18, p. 16.] All of these non-surgical services were covered under the Health Plan. [Doc. 150-18, pp. 11-12 (Pl. Dep., Ex. 36, pp. 120:14-124:17; Doc. 141 (Soety Dep., Ex. 3, pp. 38:23-41:12) (filed under seal)).]

Shortly thereafter, in April 2017, Lange informed Sheriff Talton that she wanted to present as female going forward and requested permission to follow the Sheriff's Office's female dress policy, which the Sheriff granted that same day. [Doc. 150-8, p. 18.] Approximately a year later, in April 2018, Lange underwent surgery to feminize her chest (also referred to as "top surgery") but did not seek reimbursement for the procedure under the Health Plan. [Doc. 147, ¶ 14; Doc. 150-18, pp. 20-21.]

### 4. Lange Requested Insurance Coverage for Bottom Surgery

Lange subsequently determined that genitourinary surgery (also referred to as "bottom surgery") was the next step in the treatment of her gender dysphoria. [Docs. 147, ¶¶ 14; Doc. 150-18, pp. 20-21.] Accordingly, on November 13, 2018, Lange met with a surgeon in New York, a medical consultation that also was covered under the Health Plan. [Doc. 144-1, p. 8, ¶ 23; Doc. 253-2, p. 1; *see also* Doc. 259 (Trial Transcript), pp. 172-73.]

**5.    Denial of Coverage for Bottom Surgery**

The Health Plan contains a number of exclusions from coverage.

[Doc. 137-5, ¶ 13.] Among the 68 "medical" exclusions are the following:

...

36.    **Hearing Aids** Hearing aids or exams to prescribe or fit hearing aids for members over 18 years of age, unless listed as covered in this Benefit Booklet. This Exclusion does not apply to cochlear implants. This Exclusion does not apply to hearing aids to correct degenerative hearing loss.

....

39.    **Infertility Treatment** Testing or treatment related to infertility treatment except for diagnostic services and procedures to correct an underlying medical condition. Infertility procedures not specified in this Benefit Booklet.

....

57.    **Sex Change** *Services and supplies for a sex change and/or the reversal of a sex change.*

58.    **Sexual Dysfunction** *Services or supplies for male or female sexual problems.*

....

68.    **Weight Loss Surgery** Bariatric surgery. This includes but is not limited to Roux-en-Y (RNY), laparoscopic gastric bypass surgery or other gastric bypass surgery (surgeries to lower stomach capacity and divert partially digested food from the duodenum to the jejunum, the

section of the small intestine extending from the duodenum, or gastroplasty, (surgeries that reduce stomach size), or gastric banding procedures.

[*See* Doc. 155-1, pp. 70-72 (boldface in original; italics added).]

In addition, the Health Plan has 29 "pharmacy" exclusions, including the following:

....

15.    **Infertility Drugs** Drugs used in assisted reproductive technology procedures to achieve conception (e.g., IVF, ZIFT, GIFT)

....

26.    **Sex Change Drugs** *Drugs for sex change surgery*.

27.    **Sexual Dysfunction Drugs** *Drugs to treat sexual or erectile problems*.

....

29.    **Weight Loss Drugs** Any drug mainly used for weight loss.

[*See* Doc. 155-1, p. 74 (boldface in original; italics added).

The Health Plan has, using the same or similar language, maintained "the Exclusion"[1] (*i.e.*, medical exclusion number 57 and

---

[1] Throughout the proceedings, those two exclusions—medical exclusion no. 57 and pharmacy exclusion no. 26, respectively—have been

pharmacy exclusion number 26) since at least 1998—approximately eight years before Lange was hired as a Sheriff's Deputy and became a plan participant. [Doc. 150-13, p. 12; Doc. 159, p. 45.] Lange is the only openly transgender person employed by the Sheriff's Office or the County government, and, thus, the only known transgender member of the Health Plan. [Doc. 150-19, p. 19.] For this reason, Defendants do not dispute that the only Health Plan participants impacted by the Exclusion are those transgender persons seeking to undergo "sex change" surgery. [Doc. 151, ¶ 15; Doc. 115-20, p. 3.]

Anthem informed Lange that coverage for bottom surgery under the Health Plan would be denied pursuant to the Exclusion. [Doc. 147, ¶ 27.] In February, 2019, Lange requested that the County's Board of Commissioners remove the Exclusion or, in the alternative, grant her an exemption that would allow coverage for bottom surgery; because the plan terms for the year had already been set at that time, the Board denied her request. [Doc. 179-3, ¶¶ 173, 174.]

---

referred to collectively as the "Exclusion," and, thus, except where otherwise necessary, Defendants do the same here.

Lange then commenced this action asserting, *inter alia*, a disparate treatment claim of sex discrimination based on her transgender status in the provision of employee health benefits under Title VII.

## C.    The Course of Proceedings and Dispositions in the Court Below

### 1.    The Parties and Lange's Amended Complaint

Lange filed this action on October 2, 2019, against Houston County, its Board of Commissioners (the "Board"), and multiple County officials in their official and individual capacities. [Doc. 1.] Pursuant to an Amended Complaint filed on April 10, 2020, Lange added her employer—Sheriff Talton—as a Defendant in his individual and official capacities but did not drop the County or any of its officials as Defendants. [Doc. 56.]

Lange challenged two coverage exclusions in the County's Health Plan: "**Sex Change** Services and supplies for a sex change and/or the reversal of a sex change"; and "**Sex Change Drugs** for sex change surgery." [Doc. 1; Doc. 56; Doc. 155-1, pp. 72, 74.] Specifically, Lange's Amended Complaint asserted claims of (1) discrimination based on her sex and transgender status under 42 U.S.C. § 1983 and the federal Equal Protection Clause; (2) a similar claim under the Georgia Constitution,

Ga. Const. art. I, § 1, para. 2; (3) intentional discrimination based on her sex under Title VII; (4) intentional discrimination—including an alleged failure to accommodate—based on a diagnosis of gender dysphoria under Title I of the Americans With Disabilities Act, 42 U.S.C. §§ 12101-12117 ("ADA"); (5) intentional discrimination under Title II of the ADA, 42 U.S.C. §§ 12131-12134; and (6) intentional discrimination under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(A). [Doc. 56.]

### 2. Lange's Motion for Preliminary Injunction, Defendants' Motions to Dismiss, and the U.S. Supreme Court's *Bostock* Opinion

Lange filed a Motion for Preliminary Injunction on November 22, 2019—and a Superseding Motion for a Preliminary Injunction on April 10, 2020—requesting an order enjoining enforcement of the Exclusion as to her and directing Anthem to provide coverage for her bottom surgery for which she had been denied coverage under the Health Plan pursuant to the Exclusion. [Doc. 28, p. 1; Doc. 28-1, p. 11; Doc. 57, p. 1; Doc. 57-1, p. 8.]

On May 11, 2020, Sheriff Talton filed a Motion to Dismiss for Lack of Jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, and the remaining Defendants filed a Motion to Dismiss

pursuant to Rule 12(b)(6). [Docs. 61, 62.] And on May 15, 2020, Defendants filed a joint response in opposition to Lange's Superseding Motion for a Preliminary Injunction. [Doc. 63.]

On June 15, 2020, the U.S. Supreme Court issued its opinion in *Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020), holding that – contrary to binding Eleventh Circuit precedent followed by the appellate panel in that same case, *see Bostock v. Clayton Cty., Ga.*, 723 F. App'x 964 (11th Cir. May 10, 2018) (*per curiam*) – a claim of sex discrimination under Title VII *could* be predicated on a plaintiff's transgender or homosexual status. *See Bostock*, 590 U.S. at 683 ("An employer who fires an individual merely for being gay or transgender defies [Title VII].").

### 3.  The District Court's Hearing and Order on Defendants' Motions to Dismiss

On August 19, 2020, the District Court conducted a hearing on the Motions to Dismiss. [*See* Doc. 87.]   On October 30, 2020, the District Court entered an Order dismissing Lange's claims and each Defendant except as follows: (1) her Section 1983/Equal Protection claim; (2) her Title VII claim; and (3) her ADA Title I claim, each against the County and the Sheriff in his official capacity. [Doc. 89, p. 36.]

As to the Title VII sex discrimination claim, the District Court held that "Lange [had] alleged sufficient facts to support a plausible inference of individual discrimination." [Doc. 89, pp. 21-22.]

As to the Section 1983/Equal Protection claim, the District Court held that Lange's "argument that the Exclusion is facially discriminatory [was] suspect" based on the Supreme Court's opinion in *Geduldig v. Aiello*, 417 U.S. 484 (1974). [Doc. 89, pp. 23-25.] In *Geduldig*, the Court heard an Equal Protection challenge to a California "disability insurance system that pa[id] benefits to persons in private employment who [were] temporarily unable to work because of disability not covered by workmen's compensation" but "exclude[d] from coverage certain disabilities resulting from pregnancy." *See id.* at 486. The issue presented was whether that program "invidiously discriminate[d] against [the one remaining plaintiff] and others similarly situated by not paying insurance benefits for disability that accompanie[d] normal pregnancy and childbirth." *Id.* at 492.

Resolving that issue against the plaintiff, the Court found it "[could not] agree that the exclusion of [that] disability from coverage

-13-

amount[ed] to invidious discrimination under the Equal Protection Clause." *Id.* at 494. More specifically, the Supreme Court found that

> [t]he lack of identity between [pregnancy] and gender as such under th[e] insurance program [at issue] [became] clear upon the most cursory analysis. The program divide[d] potential recipients into two groups—pregnant women and nonpregnant persons. While the first group is exclusively female, the second includes members of both sexes. The fiscal and actuarial benefits of the program thus accrue[d] to members of both sexes.

*Id.* at 496 n.20. Accordingly, the *Geduldig* Court held that the plaintiff's contention that "she ha[d] suffered discrimination because she encountered a risk that was outside the program's protection [was] not a valid one under the Equal Protection Clause." *Id.* at 497.

Applying *Geduldig* to the issues raised by Defendants' Motions to Dismiss, the District Court held that the Exclusion was *not* facially discriminatory under the Equal Protection Clause because "Lange has the same health coverage as other employees." [Doc. 89, p. 21.] In so holding, the District Court expressly rejected Lange's contention that *Geduldig* "ha[d] been undermined by intervening precedent"—including *Bostock* and this Circuit's opinion in *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011)—finding that "*those cases have no bearing on whether a health exclusion is facially discriminatory.*" [*See* Doc. 89, p. 24 (emphasis

added); *see also id.* ("the issue addressed by *Geduldig* is different; whether an insurance exclusion based on a health condition is facially discriminatory. *Neither Bostock nor Glenn had any bearing on that issue.*" (emphasis added).]

### 4. Lange's Renewal and Subsequent Withdrawal of Her Superseding Motion for Preliminary Injunction

On October 30, 2020, Lange renewed her request that the District Court schedule oral argument on her pending Superseding Motion for Preliminary Injunction as to her Title VII and Section 1983/Equal Protection claims [Doc. 91, pp. 1-2], but Lange withdrew her motion on May 19, 2021. [Doc. 111, p. 1.]

### 5. The Parties' Cross-Motions for Summary Judgment

On November 3, 2021, Lange and Defendants each moved for summary judgment on all remaining claims. [Docs. 136, 137, 140.] The parties filed their respective responses in opposition on December 22, 2021 [*see* Docs. 177, 178, 179], and their respective briefs in reply on January 26, 2022 [*see* Docs. 186, 187, 188].

In moving for summary judgment on her Title VII claim, Lange contended there was "direct evidence" of sex discrimination. [Doc. 140-1, pp. 21-30.] Accordingly, Lange argued, it was "unnecessary" to proceed

under either the burden-shifting, circumstantial-evidence framework adopted by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 802-804 (1973), or the "convincing mosaic" standard recognized by this Circuit in *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). [Doc. 140-1, p. 15 n.7.] In their response in opposition, Defendants expressly contested, *inter alia*, Lange's arguments that she had presented direct evidence of sex discrimination. [Doc. 179, pp. 10-11.]

The District Court conducted a hearing on the parties' motions on February 24, 2022. [Docs. 196, 197.] On March 29, 2022, the District Court requested additional briefing from the parties on the following issue: "[w]hether an exclusion in the employee health care benefit plan that excludes medically necessary coverage because of transgender status necessarily is a violation of Title VII." [Doc. 200.] On April 8, 2022, the parties submitted their additional briefing: Lange arguing that the Exclusion violated Title VII; Defendants arguing that it did not. [Docs. 201, 202.[2]]

---

[2]    The term "medically necessary" as used in this case is from Anthem's guidelines. [*See* Doc. 205, p. 4.] Pursuant to those guidelines, Anthem considers surgery to be medically necessary if there is a "significant functional impairment AND the procedure can be reasonably expected to improve the functional impairment." [*See* Doc. 150-25, p. 2.]

### 6.    The District Court's Summary Judgment Order

On June 2, 2022, the District Court entered an Order on the parties' summary judgment motions, ruling as follows:

The District Court granted summary judgment to Defendants on Lange's ADA claim because she "submitted no evidence that her gender dysphoria results from a physical impairment." [Doc. 205, p. 33; *see also id.*, pp. 28-33.]

Regarding Lange's Section 1983/Equal Protection claim, the District Court denied both parties' motions, holding that *Geduldig* "foreclosed" any argument that the Exclusion was "facially discriminatory" based on sex under the Equal Protection Clause and, furthermore, that "a genuine dispute of material fact [existed] as to whether the adoption and maintenance of the Exclusion was done with discriminatory intent." [*Id.*, p. 21 n. 11; *see also id.*, pp. 16-21.] In particular, following "the logic of *Geduldig*," the District Court held that "Lange has *the same coverage* as other employees because *the Exclusion applies equally to a male seeking to become a woman or a woman seeking to become a man.*" [*Id.* at 17 (emphasis added).] The District Court held

-17-

that the Exclusion therefore "creates two groups—those that want a 'sex change' and those that do not"—and since both groups contain transgender members, "a 'lack of identity' exists between the policy and transgender status." [*Id.*, p. 18.[3]] Accordingly, the District Court held that "in the context of the Equal Protection Clause, the Exclusion does not facially discriminate on the basis of sex." [*Id.*[4]]

But on her Title VII discrimination claim, the District Court came to the opposite legal conclusion in *granting* Lange's—and denying Defendants'—summary judgment motions. [Doc. 205, pp. 21-28.] The District Court acknowledged that "[a]t first look, it may seem odd that the question of whether the Exclusion violated the Equal Protection Clause is one of fact while the question of whether the Exclusion violates Title VII can be decided as a matter of law." [*Id.* at p. 21.] But the District

---

[3]    It is undisputed that transgender persons may be either biologically male or biologically female and, furthermore, that some transgender persons do *not* want a "sex change." [Doc. 179-3, ¶ 14.]

[4]    As in its Order on Defendants' Motion to Dismiss [Doc. 89, p. 24], the District Court found that this Circuit's opinion in *Glenn*, *supra*, "ha[d] no bearing on the issue of whether an insurance exclusion based on a medical procedure that only one sex can undergo is facially discriminatory under the Equal Protection Clause because *Geduldig* already provides the answer." [Doc. 205, p. 18, n.9, citing 417 U.S. at 496 n.20; *see also* Doc. 89, p. 24.]

Court held that "[w]hether odd or not, the reason is clear—*Bostock* …."
[*Id.*]

In arriving at the latter ruling, the District Court correctly held
that "healthcare coverage" falls within Title VII's ban on sex
discrimination in "compensation, terms, conditions, or privileges of
employment." [*Id.* (citing *Newport News Shipbldg. & Dry Dock Co.*, 462
U.S. 669, 682 (1983) (quoting 42 U.S.C. § 2000e-2(a)(1))).]  The District
Court likewise correctly held that, under *Bostock*, when an employer
discriminates against an individual because of his or her transgender
status, the employer discriminates against that individual because of his
or her sex in violation of Title VII. [Doc. 205, p. 21 (*citing Bostock*, 140 S.
Ct. at 1741, [590 U.S. at 660]).] But the District Court erred in holding—
both as a matter of fact and law—that, based on *Bostock*, "it is undisputed
that the Exclusion is facially discriminatory" under Title VII and [that],
as such, Defendants' "intent [was] immaterial." [*Id.*, p. 22 (citing *Int'l
Union, United Auto, Aerospace & Agr. Implement Workers of Am., UAW
v. Johnson Control, Inc.*, 499 U.S. 187, 199 (1991) ("*Johnson Controls*")).]

The District Court appeared to base its factual findings on two
purportedly undisputed facts contained in Paragraphs 77 and 78 of

Lange's Statement of Material Facts in support of her summary judgment motion:[5/] (i) that "[t]he Exclusion denies coverage for procedures and treatments that would otherwise be covered if provided in connection with a different diagnosis" [Doc. 205, pp. 22-23 (quoting Doc. 179-3, ¶ 77); *see also* Doc. 195, ¶ 77]; and (ii) that "Defendants admit 'that the only Health Plan participants impacted by the Exclusion are transgender people seeking a 'sex change'" [Doc 205, pp. 22-23 (quoting Doc. 179-3, ¶ 78); *see also* Doc. 195, ¶ 78].

More specifically, as to Lange's Paragraph 77, the District Court accepted her assertion that "the [Health Plan] pays for hormone replacement therapy medically necessary for the treatment of menopause, but not hormone replacement therapy medically necessary for 'sex change.'" [Doc. 205, p. 23.] But, as discussed further below, that finding is not only unsupported by the record, but it directly contradicts Lange's own deposition testimony that her hormones and hormone therapy *were covered* by the Health Plan and is belied more generally by Lange's other deposition testimony and exhibits. [Doc. 150-18, pp. 11-12

---

[5/]     *See* Local Rule 56, M.D.Ga. (requiring that both summary judgment movants and respondents file "separate and concise statement[s] of material facts" along with their initial briefs).

(Pl. Dep. II, pp. 120:14-124:17, Ex. 36.[6/]]  And even if the District Court's finding were correct, it would not show unlawful discrimination because hormone therapy to treat menopause is logically not the same "procedure" or "treatment" as using oppose sex hormones as part of a sex-change.

Moreover, because it is *Lange* who bears the burden of proof on causation under Title VII, all material facts and reasonable inferences therefrom were required to be drawn in *Defendants'* favor on *her* summary judgment motion. [Doc. 205, pp. 8-9.] Therefore, as also discussed further below, the District Court erred—as a matter of law—in crediting Lange's factual assertion that the Exclusion barred her *non-*surgical treatment for gender dysphoria as either undisputed or otherwise supporting summary judgment in her favor.[7/]

---

[6/]Although Lange made the conclusory assertion at the summary judgment hearing that some of her healthcare was covered only because her providers had used special coding to disguise that the care was for gender transition [*see* Doc. 197, pp. 56-57,] Defendants showed that was not the case through actual evidence in the record; namely, the coding used by her endocrinologist in his own records [Doc. 201, p. 3].

[7/] Indeed, as discussed further below, the District Court expressly acknowledged in its Order that Defendants' "qualifications on their [purported] admission to Plaintiff's Statement of Fact 77 [was] well taken" – that although the Exclusion "excludes coverage for sex change

As to Paragraph 78 of Lange's Statement of Material Facts, Defendants did acknowledge that the Exclusion—again, comprised of one of 68 medical exclusions and one of 29 pharmacy exclusions contained in the Health Plan—logically impacted only transgender participants who might seek a sex change. But the District Court inexplicably treated that common sense acknowledgment as a concession of *but-for causation* and, ultimately, liability under Title VII, concluding that under the Exclusion, "[t]ransgender employees cannot get medically necessary treatment for 'sex change' medical care because they are transgender." [Doc. 205, p. 24 (emphasis added).] "On these [purportedly] undisputed facts, [the District Court held that] the implication of *Bostock* is clear." [*Id.*] Accordingly, the District Court entered summary judgment for Lange on her Title VII claim. [*Id.* at p. 28.]

---

surgery and drugs related to sex change surgery," it does not exclude non-surgical treatment for gender dysphoria. [Doc. 205, p. 23; *see also id.*, p. 26 (appearing to acknowledge that the Health Plan "covers some treatment relating to Lange's transgender status").] Nevertheless, the District Court held that Defendants' factual qualification was "immaterial to the question of whether the Exclusion is facially discriminatory" under Title VII. [*Id.*, at p. 23.]

### 7.    Jury Trial on Damages on Lange's Title VII Claim

Because its Order granting Lange summary judgment on her Title VII claim was limited to the issue of liability, the District Court set the action for a jury trial on the issue of compensatory damages, which trial was conducted on September 26 and 27, 2022. [Doc. 251.] On September 27, the jury returned a damages verdict in the amount of $60,000. [Doc. 256.[8/]]

### 8.    Permanent Injunction and Appeal

On September 27, 2022, Lange submitted to the District Court a proposed "Order for Permanent Injunctive and Declaratory Relief" pursuant to 42 U.S.C. § 2000e-5(g). [Doc. 258.] The relief sought pursuant to the Injunction was similar to that sought in Lange's previously filed (and withdrawn) Superseding Motion for Preliminary Injunctive Relief but was now predicated on the Order granting summary judgment to Lange on her Title VII claim and, purportedly, "the findings of undisputed fact and conclusions of law" in that Order. [Doc. 258.]

---

[8/]    At trial, Lange did not put forth any evidence in support of her claim for damages based on the lack of any coverage for her "top surgery" or other out-of-pocket expenses and, ultimately, withdrew any claim to recover damages based on the same. [Doc. 259 (Trial Transcript), p. 226.]

On October 3, 2022, the District Court entered the Injunction declaring that the Exclusion "violated Title VII"; "permanently enjoin[ing] Defendants from any further enforcement or application of the Exclusion"; and ordering Defendants (i) to notify Anthem of the Order and "to take all necessary steps to ensure Anthem cease[d] to enforce or apply the Exclusion or to maintain it in the Health Plan," and (ii) to

> direct Anthem to process any claim for Lange's vaginoplasty, including all "Medically Necessary pre-operative care (as that term is used in the Health Plan) as indicated by her treating providers, in accordance with the terms, conditions, and limitations of the Health Plan as they stood in 2019 (except as modified herein).

[Doc. 258, pp. 1-2.]

On October 21, 2022, Defendants filed their Notice of Appeal of the District Court's Injunction. [Doc. 262.] On November 17, 2022, the District Court entered an Order continuing the trial, if any, of Lange's Section 1983/Equal Protection claim pending this appeal. [Doc. 281; *see also* Docs. 272, 272-1, 279, 279-1.]

On May 13, 2024, an Eleventh Circuit panel, in a 2-1 decision, affirmed the District Court's Order finding Defendants liable under Title VII and the subsequent Order enjoining further enforcement or application of the Exclusion. [App. Doc. 79-1.] On August 15, 2024, this

-24-

Court entered an Order vacating the panel decision and directing that this appeal be reheard en banc.  [App. Doc. 111-1.]

**D.    Standard of Review**

This Court reviews a district court's entry of a permanent injunction for an abuse of discretion but reviews the underlying conclusions of law de novo. *Alabama v. Ctrs. for Medicare & Medicaid Servs.*, 674 F.3d 1241, 1244 n. 2 (11th Cir. 2012) (per curiam). Additionally, this Court reviews the grant of summary judgment de novo. *Jones v. Dillard's Inc.*, 331 F.3d 1259, 1262 (11th Cir. 2003).

## II.    SUMMARY OF THE ARGUMENT

The Health Plan does not discriminate—facially or otherwise—against transgender individuals.  Rather, the plan treats transition care just like it treats other healthcare—covering most types of care and excluding the most expensive forms of non-life-threatening care.  This Court should reverse the District Court's judgment for three reasons.

First, *Bostock* does not answer the issue presented in this case.  The *Bostock* majority declined to rule on anything other than the simplified issue in the cases presented—does firing (or not hiring or not promoting, etc.) a person based merely on sexual orientation or transgender status

amount to sex discrimination under Title VII?  Other concerns (including healthcare), it said, were matters for future cases.  If *Bostock* shed light on the issues here, it reveals Lange's failure to show how she was treated worse than any similarly situated employee.  The Health Plan does *not* provide different coverage to Lange because she is transgender—she has the same coverage at the same cost as all other participants.  And the exclusion for sex change surgery would apply regardless of who asked for it—just like the other plan exclusions that happen to be of little or no interest to Lange.  Moreover, the fact that sex change surgery meets the definition of "medically necessary" under Anthem's Guidelines (a functional impairment that is reasonably expected to improve with a procedure) does not distinguish it from other "medically necessary" care excluded from coverage, such as sexual dysfunction treatments and drugs, bariatric surgery, and hearing aids.

Second, other Supreme Court cases do not undermine—and in fact support—Defendants' position. Affirming the District Court's order would grant "most-favored nation" status to all transgender participants in all health plans in this Circuit, as nothing could be excluded from coverage if it affected a gender transition, no matter the similarity with

other health plan exclusions. This special status is inconsistent with other jurisprudence applying Title VII to benefits and would elevate transgender employees over other statutorily protected employees.

Third, while this appeal directly challenges the Injunction, it necessarily contends that summary judgment to Lange – constituting the legal foundation for the Injunction – was error. Accordingly, Defendants address several points in connection with summary judgment:

- The District Court granted summary judgment to the party bearing the burden of proof (Lange) and did so in such a way as to obviate the need for her to present evidence of Defendants' discriminatory intent. It found facial discrimination despite record evidence that— at the very least—raises disputes of material fact on that score when construed in Defendants' favor.

- Based on the uncontroverted record, including Lange's own sworn testimony, the County's Health Plan covered most *non*-surgical care for her transition, even if it indisputably did not cover sex change *surgery*. This presents at least a dispute of fact, and it contradicts the conclusion that the Health Plan was facially discriminatory

because it shows that the Plan differentiated based on treatment, not sex or gender identity.

- Highlighting the error of Lange's argument that the County covers the "same treatments" for other employees, Lange's own experts explained that the suite of surgical procedures a transgender female like Lange would undergo—and which Lange has now undergone pursuant to the Injunction—as part of sex change surgery are unique and distinct from the medical procedures a natal female would undergo as part of her sexual healthcare.

### III.   ARGUMENT AND AUTHORITY

This appeal challenges the District Court's finding that the County's Health Plan, in which Lange participated, was *facially* discriminatory under Title VII. [Doc. 205 at 22.] That ruling was the foundation on which a Permanent Injunction was issued. [Doc. 258.] Defendants show below that *Bostock*—the determinative legal basis for the District Court's ruling—does not control the outcome here; that other Supreme Court precedent supports Defendants' position; and that the District Court erred in entering summary judgment for Lange, who bears the burden of proof, in light of record evidence that *at the very least*

presents multiple disputes of fact. Accordingly, this Court should dissolve the Injunction and reverse the grant of summary judgment to Lange under Title VII.

## A.　***Bostock*** **held that discrimination merely on the basis of transgender status or sexual orientation constitutes discrimination because of sex under Title VII.**

### 1. *Bostock* **does not support the District Court's decision.**

The Supreme Court in *Bostock* addressed and resolved a *threshold* statutory question under Title VII on which the federal circuit courts of appeals were then split: whether homosexual and transgender plaintiffs could avail themselves of the sex-based protections of Title VII or whether, for example, "an employer [could] fire someone *simply* for being homosexual or transgender." *See* 590 U.S. at 651 (emphasis added); *see also id.* at 653 ("Each of the three cases before us started the same way: An employer fired a long-time employee shortly after the employee revealed that he or she is homosexual or transgender—and *allegedly for no reason other* than the employee's homosexuality or transgender status." (emphasis added)); *id.* at 665 ("*For present purposes*, [the employers] *do not dispute* that they fired the plaintiffs for being homosexual or transgender.") (emphasis added).

-29-

Based on those factual assumptions, the *Bostock* Court explained that, under Title VII, "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 660. Accordingly, the Court held that "[a]n employer who fires an individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex" and, thus, "[a]n employer who fires an individual *merely* for being gay or transgender defies" Title VII's prohibition on discrimination because of sex. *Id.* at 651-52, 683 (emphasis added).[9]

In his *Bostock* dissent, Justice Alito "briefly note[d] some of the potential consequences of the Court's decision," among them:

---

[9]    "The only statutorily protected characteristic at issue in [*Bostock*] [was] 'sex,'" and the Court "proceed[ed] on the assumption that 'sex' signified what the employers [there] suggest[ed], referring only to *biological distinctions* between male and female." *See* 590 U.S. at 655 (emphasis added). The plaintiffs in *Bostock* had argued that the term "sex" in Title VII "bore a broader scope, capturing more than anatomy and reaching at least some norms concerning gender identity and sexual orientation." *Id.* at 655. But the majority in *Bostock* observed that "nothing in [its] approach to [*Bostock*] turn[ed] on the outcome of the parties' debate" [on these issues] and that the plaintiffs there had "conceded the [defendants'] point for argument's sake." *Id.* at 655.

> *Healthcare.* Healthcare benefits may emerge as an intense battleground under the Court's holding. *Transgender employees have brought suit under Title VII to challenge employer-provided health insurance plans that do not cover costly sex reassignment surgery.* Similar claims have been brought under the Affordable Care Act (ACA), which broadly prohibits sex discrimination in the provision of healthcare.

*Bostock*, 590 U.S. at 730 (Alito, J., dissenting) (footnotes omitted; emphasis added); *see also id.* at 724-34 (Alito, J., dissenting) (discussing other "potential consequences" of the majority's decision).

In stark contrast to the District Court's interpretation, the *Bostock* majority addressed Justice Alito's dissent by acknowledging the limited reach of the majority opinion as follows:

> What are these consequences anyway? …. *The only question before us is whether an employer who fires someone simply for being homosexual or transgender* has discharged or otherwise discriminated against that individual "because of such individual's sex." …. *Whether other policies and practices might or might not qualify as unlawful discrimination* or find justifications under other provisions of Title VII *are questions for future cases*, not these.

*Id.* at 1753 (emphasis added).[10]

---

[10] *See also Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 589 U.S. 327, 339 n. * (2020) ("[W]e are a court of review, not of first view, and do not normally strain to address issues that are less than fully briefed and that the district and appellate courts have had no opportunity to consider." (internal quotation marks and citations omitted)); *cf. Adams by and through Kasper v. Sch. Bd. of St. Johns Cty.*,

So, the nature of "these" three cases at issue in *Bostock* matters:

***Bostock.*** The plaintiff in *Bostock* had been a decade-long child welfare advocate at Clayton County with an award-winning employment history until it was discovered he played in a gay recreational softball league. 590 U.S. at 653. Shortly after that discovery, he was fired as an "unbecoming" county employee. *Id.* The defendant moved to dismiss on the grounds that under then-binding Eleventh Circuit precedent, Title VII "[did] not prohibit employers from firing employees for being gay and so [the plaintiff's] suit could be dismissed as a matter of law." *See Bostock*, 590 U.S. at 654 (citing *Bostock v. Clayton Cty., Ga.*, 723 F. App'x 964 (11th Cir. 2018) (per curiam)). Following reversal by the Supreme Court and remand to the district court, the parties conducted discovery and filed cross-motions for summary judgment, and a magistrate judge recommended the denial of both motions. *See Bostock v. Clayton Cty., Ga.*, 1:16-CV-01460, ECF No. 166, pp. 62-63 (N.D. Ga. June 2, 2002). The case was thereafter administratively closed pursuant to a settlement (in an unspecified amount) before the district court ruled on the report and

---

57 F.4th 791, 808 (11th Cir. 2022) (observing that the Supreme Court in *Bostock* "expressly declined to address the issue of sex-separated bathrooms and locker rooms").

recommendation. *See id.*, ECF No. 177 (Aug. 8, 2022), ECF No. 179 (Oct. 14, 2022). Thus, the Supreme Court's opinion in *Bostock* did not prove dispositive, even as to the named plaintiff's claim.

*Zarda.* The plaintiff in *Zarda* was a skydiving instructor who sometimes did "tandem" jumps where he was "strapped hip-to-hip and shoulder-to-shoulder" to another jumper/client. *Zarda v. Altitude Express*, 883 F.3d 100, 108 (2d Cir. 2018) (en banc). A female client claimed he touched her inappropriately and Zarda then offered that he was gay to excuse his behavior. *Id.* The client complained and Zarda was fired. *Id.* He then sued for "sex stereotyping" under Title VII, and "sexual orientation" discrimination, as recognized under New York statutory law. *See* 883 F.3d at 109. His Title VII claim was dismissed because the Second Circuit had "previously held that sexual orientation discrimination claims … [were] not cognizable under Title VII." *Id.* at 107 (citing cases), 109.[11/] The Second Circuit later granted en banc review of the dismissal of plaintiff's Title VII claim, overturned its prior precedents, and held that "sexual orientation is a form of sex

_____

[11/] His state law claim went to trial and Zarda lost. *Zarda*, 883 F.3d at 109; *see also Zarda*, 855 F.3d at 81-82 (panel opinion affirming jury verdict for the defendant on the plaintiff's New York law claim).

discrimination" barred by the federal statute. *See Zarda*, 883 F.3d at 131-32. Notably, *Bostock's* holding also did not result in victory for Zarda—at least not as to liability. Following remand to the district court, and additional proceedings, the parties settled the action for $6,224.30. *See Zarda v. Altitude Express, Inc.*, Case # 2:10-cv-04334-EK-AYS, ECF 309, Stipulation (E.D.N.Y. Mar. 11, 2022).

**Harris Funeral Homes.** In *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560 (6th Cir. 2018), the Sixth Circuit affirmed the district court's grant of summary judgment under Title VII for the plaintiff, a transgender female, based upon the owner's deposition testimony that he fired the plaintiff shortly after being informed of her intention to dress as a woman (and, ultimately, undergo sex reassignment surgery) because the plaintiff "was no longer going to represent himself as a man. He wanted to dress as a woman." *Id.* at 567-68; *see also id.* at 566-67, 571, 581. Therefore, the grant of summary judgment to the plaintiff in *Harris Funeral Homes* was based on the admitted subjective discriminatory motivation of the defendant.

In summary, the facts underlying *Bostock*, *Zarda*, and *Harris Funeral Homes* raised the straightforward application of Title VII's

prohibition on discrimination to traditional employment decisions (in each case, termination).  With such decisions, one is either hired or not, promoted or not, fired or not. Health insurance is different.  With respect to a medical condition (gender transition, sexual dysfunction, obesity, hearing), some care (usually initial interventions) is reimbursable while other care (often more expensive surgeries) is excluded.  Due to cost constraints, line-drawing is a necessary evil in benefit plans.  *Whiteside v. Metropolitan Life Ins. Co.*, 798 F. Supp. 1380, 1390 (D. Minn. 1992) ("Any time that the coverage of an employee benefit plan is not universal, line-drawing becomes a necessary evil.")

But none of the *Bostock* cases dealt with health insurance.  And the facts of this case in no way mirror *Bostock*.  "To be akin to *Bostock*, the policy would have to deny some or all coverage to transgender people. But it doesn't."  [App. Doc. 79-1 at 20 (vacated) (Brasher, J., dissenting).] In other words, for *Bostock* to dictate the outcome of Plaintiff's Title VII claim as determined by the District Court, the County would have had to deny Lange the right to participate in the Plan due to her transgender

status.[12] That never happened. To the contrary, Lange has—and has had—the same coverage, at the same cost, with the same exclusions, as all other plan participants.  [*See* Doc. 89, p. 24; *see also* Doc. 205, p. 17.[13]] And the fact that Lange had the same health benefits (including an exclusion for sex change surgery) while female-identifying as when male-identifying shows her transgender status had no impact.

Also, the direct link between disclosure of sexual orientation or transgender status in *Bostock, Zarda*, and *Harris Funeral Homes* is completely lacking here.  When Lange first informed Defendants in 2017 that she was transgender, wished to present as female, and requested permission to follow the Sheriff's Office's female dress policy, she was not

---

[12] Envision an open enrollment meeting after which Lange is dropped from the Healthcare Plan because she discloses that she is transgender (like the plaintiff in *Harris Funeral Homes*—"Oh, you're transgender? Then, you can't participate in the plan anymore."). This happened in *Doe v. Catholic Relief Services*, 618 F.Supp.3d 244, 250 (D. Md. 2022), *vacated in part on other grounds*, 2023 WL 155243, CCB-20-1815 (D. Md. Jan. 11, 2023), where there was "no genuine dispute over the fact that CRS revoked Doe's dependent health insurance because of his sex—in particular, that he was a man married to another man …." *Id.* at 252 (citing *Bostock*, 590 U.S. at 656). *Bostock*'s holding is properly applied to such cases; this, however, is not such a case.

[13] The Exclusion itself also "applies equally to a male seeking to become a woman or a woman seeking to become a man."  [Doc. 205 at p. 17.]

fired; instead, her request was granted the very same day. [Doc. 150-8, p. 18.] Neither was Lange fired a year later after undergoing top surgery—another outward expression of her transgender status—nor at any time thereafter. [Doc. 147, ¶ 14; Doc. 150-18, pp. 20-21.]  Lange, who has now undergone sex change surgery pursuant to the Injunction, remains employed by the Sheriff's Office. These facts materially distinguish Lange's situation from the facts underlying *Bostock*, *Zarda*, and *Harris Funeral Homes*.

### 2. The "medically necessary" status of sex change surgery for insurance purposes is not determinative.

In framing the issue to be briefed on rehearing, this Court referred to the concept of "medically necessary" treatments.  [App. Doc. 112.] Importantly, for purposes of this case, the term "medical necessity" is defined in an Anthem Clinical Utilization Management Guideline that establishes various contractual standards for administration of the Health Plan. [*See* Doc. 179-3 ¶ 16; Doc. 150-25, p. 2.] Under the Guideline, surgery is medically necessary if there is "significant functional impairment AND the procedure can be reasonably expected to improve the functional impairment." [Doc. 179-3 ¶ 16.] That is a low

bar.[14] Medical necessity should not be conflated with concepts such as a hospital's "code blue," indicating a life-threatening cardiac or respiratory emergency requiring resuscitation.

Moreover, many of the treatments excluded under the plan—sexual dysfunction drugs, bariatric surgery, hearing aids—meet the definition of medical necessity in that they indicate significant functional impairment, and the treatment can be reasonably expected to improve the functional impairment. Thus, the fact that transition surgery is "medically necessary" does not make its exclusion unique among other

---

[14] Other plans impose significantly more criteria. *See, e.g., Sanctuary Surgical Centre, Inc. v. Aetna Inc.*, 546 F. App'x. 846, 853 (11th Cir. 2013) ("care or treatment as likely to produce a significant positive outcome as, and no more likely to produce a negative outcome than, any alternative service or supply, both as to the disease or injury involved and the Member's overall health condition," and be no more costly than other available alternatives); *Dep't of Community Health v. Freels*, 258 Ga. App. 446, 449-50 (2002) ("Medically necessary services are those services which are reasonable and necessary in establishing a diagnosis and providing palliative, curative or restorative treatment for physical and/or mental health conditions. … The services provided, as well as the type of provider and setting, must be appropriate to the specific medical needs of the recipient; and there must be no other equally effective, more conservative or substantially less costly course of treatment available."). In the present case, the Health Plan's general description of "Medically Necessary" also sets a comparatively low bar, requiring that care be "appropriate" for the diagnosis, "compatible" with medical practice, provided in a "safe and appropriate" setting, and "cost effective" compared to alternatives.  [Doc. 155-1 at 116.]

plan exclusions and is not dispositive of whether there has been a Title VII violation. Otherwise put, although the Health Plan covers only "medically necessary" forms of healthcare, not *all* "medically necessary" forms of healthcare are covered.

Among those "medically necessary" forms of treatment specifically excluded under the Health Plan are:

- "**Sexual Dysfunction Services** and supplies" to treat "male or female sexual problems" [Doc. 155-1, p. 72, no. 58 (emphasis in original)];

- "**Sexual Dysfunction Drugs**" "to treat sexual or erectile problems," the last of which impacts male plan participants only [*id.*, p. 74, no. 27];

- **"Weight Loss Surgery"** "Bariatric surgery" [*id.*, p. 72, no. 68]; and

- **"Hearing Aids"** "Hearing aids or exams to prescribe or fit hearing aids" [Doc. 155-1, p. 70, no. 36.]

The Health Plan also specifically limits (when not excluding entirely) certain forms of "medically necessary" treatment for infertility, including "[d]rugs used in assisted reproductive technology procedures to achieve conception." [Doc. 155-1, p. 70, no. 39; *id.*, p. 74, no. 15.]

Importantly, these other examples demonstrate that a procedure's status as "medically necessary" is not dispositive of whether it is excluded from coverage.

The issue presented in this en banc proceeding is whether the health plan—with its coverages and exclusions—is facially discriminatory under Title VII. As noted above, *Bostock* alone supplied the District Court's rationale for answering that issue in the affirmative. [Doc. 205 at 21.] Yet *Bostock* expressly left such questions "for future cases." 590 U.S. at 1753. And *Bostock* must be read in light of other Supreme Court precedent interpreting Title VII in the healthcare context.

## B.  **Other Supreme Court decisions support Defendants' position.**

Other Supreme Court decisions potentially bear on the issue presented here.

The District Court held that "if an adverse action is facially discriminatory, the employer's intent is immaterial—'the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect.'" [*Id.* at 22 (quoting *Johnson Controls*, 499 U.S. at 199.] While this general statement is true as far as

it goes, *Johnson Controls* is not factually analogous here and neither mandates nor supports the District Court's legal conclusion that the Exclusion is facially discriminatory.

The employer in *Johnson Controls* implemented a "fetal-protection policy" which excluded women of childbearing age from certain jobs – effectively giving "[f]ertile men, but not fertile women, [] a choice as to whether they wish[ed] to risk their reproductive health for a particular job." *Id.* at 197. The Supreme Court found the employer's bias to be "obvious" because its fetal-protection policy necessarily "classifie[d] on the basis of gender and childbearing capacity, rather than fertility alone." *Id.* at 198.

But Lange is not limited in her ability to pursue or remain in any particular position of employment with Defendants; rather, she challenges two of almost 100 medical and pharmacy exclusions that limit various forms of treatment under the Health Plan—just as the Sheriff himself was limited in addressing his hearing loss by the exclusion for hearing aids and still other exclusions limit the ability of other plan participants to treat various medical conditions, such as obesity. [Doc.

155-1, p. 72 no. 68, p. 74 no. 29.]  Thus, the health insurance context makes *Johnson Controls* a poor fit for determining Lange's claim.

Unlike *Johnson Controls*, the Supreme Court's opinions in *City of Los Angeles v. Manhart*, 435 U.S. 702, 710 (1978) ("*Manhart*") and *Newport News* addressed questions regarding fringe benefits. But neither case supports summary judgment in Lange's favor under Title VII because both cases are factually distinguishable.

*Manhart* presented a disparate treatment claim based on a fringe benefit offered to male and female employees that was identical *in kind* but not in *cost*.  The employer "required its [2,000] female employees to make larger contributions to its pension fund than its [10,000] male employees" based on the employer's belief that, "[a]s a class, women live longer than men." *Manhart*, 435 U.S. at 704-705 (noting that the defendant "required female employees to make monthly contributions to the [pension] fund which were 14.84% higher than the contributions required of comparable male employees.").  Not surprisingly, this overt distinction in pricing was found to violate Title VII.

In *Newport News*, the employer's plan differentiated, for coverage of pregnancy, between female *employees* who were provided coverage and

female *spouses* of male employees who were not. *Id.* at 672. But the Supreme Court, applying *Manhart*, held that the pregnancy limitation on the non-employee wives of male employees violated Title VII: "the husbands of female employees receive[d] a specified level of hospitalization coverage for *all* conditions; the wives of male employees receive[d] such coverage *except for* pregnancy-related conditions." *Id.* at 682-85 (emphasis added).[15/]

Neither *Manhart* nor *Newport News* mandates—or supports—summary judgment in Lange's favor. In each of those cases, an employment benefit was provided to male and female employees in a discriminatory manner based on their sex: pension benefits at a higher cost to female employees than male employees in *Manhart*; different dependent coverage for female employees and male employees in *Newport News*. In contrast, under the Health Plan here, it is undisputed that "Lange has the same health coverage as other employees"—and at the same cost. [*See* Doc. 89, p. 24; *see also* Doc. 205, p. 17.]

---

[15/] The Court in *Newport News* assumed all dependent spouses of male employees were female. *Id.* at 684.

The District Court's summary judgment order would essentially grant transgender individuals "most-favored nation" status under Title VII, which would run afoul of the Supreme Court's holding in *Young v. United Parcel Service*, 575 U.S. 206 (2015). Lange contended that the Exclusion violates Title VII because it "impacts only [her], as she is the only openly transgender health plan member" [Doc. 140-1, p. 27], which is similar to *Young* where a pregnant plaintiff claimed, "evidence that pregnant and nonpregnant workers were not treated the same" meant "she must win." 575 U.S. at 221. *Cf. Liao v. Tennessee Valley Auth.*, 867 F.2d 1366, 1369 (11th Cir. 1989) (noting, in context of affirmative action, that Title VII does not require any employer to grant preferential treatment to any employee on the basis of his or her membership in an underrepresented protected classification).

But the Supreme Court said, "disparate-treatment law normally permits an employer to implement policies that are not intended to harm members of a protected class, even if their implementation sometimes harms those members, as long as the employer has [] legitimate, non-discriminatory, non-pretextual reasons for doing so." *Young*, 575 U.S. at 222. Health insurance benefits serve as a prime example: some

participants may make no use of those benefits for years while other participants may do so constantly—even though all participants pay the same premium.[16]

The fact that transgender individuals fall into both groups (i.e., those plan participants who want sex-change surgery and those who do not) is further evidence that the Exclusion is not *facially* discriminatory. But under the terms of the Injunction, Lange would be treated more favorably than the approximately 1,499 cisgender participants whose desired treatments—including medically necessary treatments—are subject to Health Plan exclusions for "[s]ervices or supplies for male or female sexual problems" generally and "[d]rugs to treat sexual or erectile

---

[16] As Defendants pointed out in the District Court: "This is an insurance case. It is alleged in the form of constitutional and statutory claims, but it boils down to whether a relatively small self-funded health insurance plan can cover less expensive treatments for certain conditions while excluding coverage of more expensive treatments for those same conditions. Conditions administered in this way include hearing, obesity, and transgender care. In distinguishing between different levels of treatment for these conditions, the Health Plan engages in the necessary insurance evil of line-drawing. However, this line-drawing is not discriminatory to [Lange]. The [Health] Plan does not draw a line between transgender and non-transgender participants; it draws a line between transgender participants who want surgery and those who do not. Since there are transgender individuals on both sides of the line, the [E]xclusion is not based on transgender or gender dysphoria status and does not violate the law." [Doc. 189, p. 1.]

problems," as well as medically necessary treatment and drugs for "[i]nfertility." [Doc. 155-1, pp. 70, 72, 74.] Affirming the District Court would mean no aspect of transition care could ever be excluded from *any* plan. That is more than Title VII authorizes and conflicts with the holding in *Young*.

## C.    **The record does not support summary judgment to Lange.**

The District Court erred in awarding summary judgment to Lange for at least the following reasons: (1) summary judgment was awarded to the party with the burden of proof without the requisite showing for such an award; (2) most of Lange's transition care was covered by the plan; (3) surgery for a transgender female is not the same as surgery for a natal female; and, accordingly, (4) the Injunction should be dissolved.

### 1.    **The District Court erred in awarding summary judgment to the party with the burden of proof.**

Part of what makes this appeal unique is not just the finding of facial discrimination, but also the fact that the District Court reached that determination in the process of entering summary judgment for Lange, who bears the burden of proof under Title VII. But where "the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must

support its motion with credible evidence … that would entitle it to a directed verdict if not controverted at trial." *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in Ala.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) ("*Four Parcels*") (internal quotation marks and citation omitted) (emphasis in original).

Therefore, Lange, as the movant, had to "show that, on all the essential elements of [her] case on which [she] bears the burden of proof at trial, no reasonable jury could find for [Defendants]." *Id.* She did not meet this burden, since "all reasonable doubts about the facts" and "all justifiable inferences" are to be drawn in favor of Defendants as the non-moving parties. *Id.* at 1437 (internal quotation marks and citation omitted).

The District Court held that "it is undisputed that the Exclusion is facially discriminatory." [Doc. 205, p. 22.] That finding was premised on two facts proffered by Lange as undisputed: (i) "The Exclusion denies coverage for procedures and treatments that [purportedly] would otherwise be covered if provided in connection with a different diagnosis"; and (ii) "the only Health Plan participants impacted by the Exclusion are

transgender people seeking a 'sex change.'" [Doc. 205, pp. 22-23 *citing* Doc. 179-3, ¶¶ 77, 78.]

Defendants admitted Lange's Statement of Fact 78 that the Exclusion "impact[s]" only those "transgender people seeking a 'sex change,'" but Defendants expressly contested Lange's Statement of Fact 77 "to the extent [Lange] suggest[ed] that all treatment for gender dysphoria is excluded" based on Lange's own deposition testimony that "her endocrinologist visits, psychological visits, and hormones and other medications have been covered by the Health Plan." [Doc. 205, p. 23 (citing Doc. 179-3, ¶¶ 77, 78).][17/]

The District Court conceded as "well taken" Defendants' "qualification of their [purported] admission to Plaintiff's Statement of Fact 77"—principally, that while the Exclusion "excludes coverage for sex change surgery and drugs related to sex change surgery," it does not

---

[17/] This recognition stands in contrast to the District Court's mistaken observation that hormones for menopause would be covered but hormones for a transition would not be. [Doc. 205 at 23.] To be fair, the District Court was relying on testimony in which a County representative answered questions about such coverage with phrases such as, "[a]s I understand it …" [*Id.* at 22.] But the Health Plan identifies Anthem as Claims Administrator [*see* Doc. 155-1, p. 110], and Lange did not depose or otherwise obtain testimony from Anthem.

exclude other, *non*-surgical treatment for gender dysphoria. [*Id.* at 23.] And still later in the Order, the District Court again appeared to acknowledge that the Health Plan "covers some treatment relating to Lange's transgender status." [*Id.* at 26.]   Given these qualifications, Lange has not "affirmatively" demonstrated facial discrimination or her entitlement to summary judgment. *Four Parcels*, 941 F.2d at 1438.

In addition, the District Court failed to construe the Health Plan "as a whole," as is typically done under contract law, *see Kirby v. Anthem, Inc.*, Civil Action No. 1:19-CV-000597-ELR, 2019 WL 2004128, at *5-7 (N.D. Ga. Mar. 21, 2019), and failed to recognize that federal "disparate-treatment law normally permits an employer to implement policies that are not intended to harm members of a protected class, even if their implementation sometimes harms those members, as long as the employer has [] legitimate, nondiscriminatory, nonpretextual reasons for doing so," *Young*, 575 U.S. at 222.   Expense is such a reason, as the entirety of the Health Plan–as well as the sworn statements of Commissioners [Doc.137-7, ¶ 4, Doc. 137-8, ¶ 4, Doc. 137-9, ¶ 4]–shows. Comparing the treatment of claims usually considered together,

*Underwood v. Perry Cty. Comm.*, 431 F.3d 788, 793 (11ᵗʰ Cir. 2005), reveals the District Court's error.

The District Court determined that neither party was entitled to summary judgment on the Equal Protection claim, as the facts–including with respect to discriminatory intent–were "hotly disputed." [Doc. 205 at 20.] It said:

- the Exclusion was *not* facially discriminatory. [Doc. 205 at 16.]

- a showing of intent *was* required. [Doc. 205 at 17.]

- the plan (as a whole) drew a line between plan members who want sex change surgery and those who don't, with transgender members on each side. [Doc. 205 at 18.]

Yet on the Title VII claim the District Court said:

- the Exclusion *is* facially discriminatory. [Doc. 205 at 22.]

- evidence of intent is "immaterial." [Doc. 205 at 22.]

- even though the same line-drawing applies: "The undisputed, ultimate point is that *the Exclusion* applies only to transgender members, and it applies to Lange because she is transgender." [Doc. 205 at 23 (emphasis added).]

Thus, the District Court improperly limited its consideration under Title VII to the Exclusion alone. In so doing, it ignored relevant context from the proper analysis of Lange's health insurance plan claim. In the health insurance context, as Judge Brasher observed in his panel dissent, "[i]t's the comparison—e.g., what is provided to males versus what is provided to females—that tells us whether a health insurance policy is facially discriminatory." App. Doc. 79-1 at 23.

Without that context, a court would be deprived of relevant comparisons to how the plan works. In this regard, the Exclusion is comprised of one medical exclusion and a related pharmacy exclusion:

57. **Sex Change** Services and supplies for a sex change and/or the reversal of a sex change.

26. **Sex Change Drugs** Drugs for sex change surgery.

[Doc. 155-1 at 72, 74 (boldface in original).]

For purposes of comparison and to supply critical context, there are also medical and pharmacy exclusions that expressly address sexual healthcare:

58. **Sexual Dysfunction** Services or supplies for male or female sexual problems.

27. **Sexual Dysfunction Drugs** Drugs to treat sexual or erectile problems.

-51-

[Doc. 155-1 at 72, 74 (boldface in original).]

Before the District Court, Lange referred to the Exclusion (*i.e.*, medical exclusion 57 and pharmacy exclusion 26) as "based upon a sex-classification" [*see* Doc. 140-1, p. 22 (internal quotation marks and citation omitted)], even though it applies to male and female participants, including transgender males and transgender females. But the coverage limitations imposed by medical exclusion *58* and pharmacy exclusion *27* on the treatment of "sexual dysfunction" also deal with sex, and also apply to male and female participants, including transgender males and transgender females. Lange suggests that the broader, more general exclusions contained in medical exclusion 58 and pharmacy exclusion 27 are simply irrelevant to—and not to be considered in deciding—the disparate treatment question presented here [Doc. 187 at 16-17; App. Doc. 33 at 50-51], but there is no practical difference except that 57 and 26 affect transgender individuals. Thus, implicit in Lange's argument is the false notion that Title VII entitles transgender individuals to preferential treatment. *Young,* 575 U.S. at 207; *see also Liao*, 867 F.2d at 1369.

Therefore, it would be error, especially in a disparate treatment case, for this Court to analyze the Exclusion in isolation from all other exclusions—including, but not limited to, other sex-based exclusions—in the Health Plan.

### 2. Coverage of Lange's care shows the plan does not discriminate.

As Lange herself acknowledged, "*[l]ike all insurance plans*, the Health Plan contains a number of exclusions, i.e., certain types of medical care that are not covered." [Doc. 174, ¶ 74 (emphasis added).]  To be specific, there are 68 medical exclusions and 29 pharmacy exclusions in the Health Plan.  [Doc. 155-1 at 72, 74.]  Lange does not argue–nor could she feasibly–that Title VII prohibits healthcare plans from having *any* exclusions.  As Judge Brasher recognized in his panel dissent, "[t]he plan's sex change exclusion is consistent with the pattern in the rest of the insurance plan: it covers medically necessary treatments but excludes particularly expensive, top-of-the-line procedures."  [App. Doc. 79-1 at 18 (vacated).]  All exclusions apply to all plan participants–Lange is subject to the exclusions for sexual dysfunction drugs, bariatric surgery, and hearing aids, none of which she is known to need or desire; and cisgender participants are subject to the exclusion for sex change

surgery or the reversal of a sex change, even though they are not likely to need or desire such procedures.

Moreover, the Exclusion (in the same or similar language) has been part of the Health Plan since at least 1998 – eight years before Lange was hired by the Sheriff's Office in 2006. [Doc. 150-13, p. 12; Doc. 159, p. 45.] It was not a response to Lange's informing the Sheriff of her desire to present as female after 11 years on the job.

Under the plan, Lange had the following care covered:

- Lange saw an endocrinologist to manage her hormones as part of her transition. The endocrinologist determined how much of various hormones to take, prescribed the hormones, discussed certain side effects and concerns with Lange, and tracked that Lange's hormone levels and other general health were in line with what they should be. [Doc. 150-18 p. 7, 103:11-25; *id.* pp. 10-11 116:8-117:7.] These visits–coded for Z87.890 (personal history of sex reassignment) or F64.1 (Gender identity disorder in adolescence and adulthood)–were covered by the Health Plan and Lange generally paid a flat co-pay. [*Id.* Ex. 36.]

- Lange took hormones, such as estrogen (a female hormone) and spironolactone (which suppresses male hormones) to facilitate her transition.  [*Id.* at 148:13-149:1.]  Her prescription records show that she only paid a flat co-pay amount for these hormones, showing they too were covered by the Health Plan.  [*Id.* Ex. 44; 147:20-148:12.]

- Lange also saw a psychologist, who gauged Lange's commitment to transition and counseled her through that process.  The psychologist's support was necessary to support Lange's candidacy for transition surgery.  [*Id.* 127:12-130:2.]  Because her psychologist initially entered a diagnosis code for depression (F33.0) and never changed it [Soety Dep. 41:13-21], the fact these bills were covered under the Health Plan is not directly indicative they would have been covered if the coding reflected a transgender diagnosis code; however, in light of the coverage of other matters with a transgender code, it cannot be inferred that they *would not* have been covered with a gender transition code.

- Finally, Lange identified Dr. Bluebond-Langner in New York as the surgeon she wanted to perform her surgery.  When Lange visited

New York and was evaluated by Dr. Bluebond-Langner and a surgical colleague (Dr. Zhao), that evaluation–clearly coded as an evaluation for transition surgery (F64.0)–was covered by the Health Plan.  [Doc. 259 at 171:25-173:5.]

- But after Dr. Bluebond-Langner's office called for pre-authorization of the surgery itself, Anthem issued a denial letter that the surgery would *not* be covered because of the Exclusion.[18] [Doc. 179-3 ¶ 129.]

This litany of covered treatment and one excluded surgery–most of which was clearly coded as related to gender transition–defies the District Court's conclusion that the Health Plan is *facially* discriminatory on transgender status.  [Doc. 205 at 26-28.]  Instead of drawing a line between transgender plan participants and all others, it draws the line between those who want the treatment of transition *surgery* (or the reversal of such a procedure) and those who do not.  Since there are

---

[18] This should not have been surprising, as Lange's first comment about her transition at work was to the County's Personnel Director who told her in that conversation the County's plan excludes coverage for sex change surgery.  [Doc. 179-3 ¶¶ 93-94.]  Lange said she had already checked that out and even suggested she might get a part-time job at Starbuck's, whose plan she understood covered such surgery.  [Doc. 137-3 at 57(56:22-25).]

transgender individuals on both sides of the line,[19] transgender status cannot be the but-for cause of the distinction.  In keeping with *Bostock*'s instruction to change one thing at a time until you find what makes a difference (making it the but-for cause), 590 U.S. at 656, transgender status is not the difference maker for the Health Plan.  "That the plan covers transgender people and gender dysphoria raises a reasonable inference that there is a 'but for' cause *other than transgender status* for the plan to decline coverage for sex change operations. But, more to the point here, it unequivocally establishes the absence of *facial* discrimination against transgender people or transgender-related treatments."  [App. Doc. 79-1 at 23-24 (vacated) (Brasher, J., dissenting) (emphasis in original).]

### 3. Lange's procedure is not the same as a natal female's vaginoplasty.

The District Court suggested that the same procedure Lange sought–a vaginoplasty–would have been covered for a natal female.[20]

---

[19] Lange's expert has acknowledged that not all transgender individuals desire to go through surgery.  [Doc. 148-2 ¶¶ 22, 20.]

[20] A *natal* female is a person born with female anatomy.   A *cisgender* female is a natal female who identifies as female. A *transgender*

[Doc. 205 at 23.][21] But Lange's surgeon, Dr. Bluebond-Langner, showed that a natal male's procedure (like Lange's) is different from a natal female's – "the testicles will be removed, the urethra will be shortened, and the penile and scrotal skin will be used to line the neovagina, the space between the rectum and the prostate and bladder." [Doc. 144-1 at ¶ 25.] These steps would all be unnecessary–and impossible–for a natal female, showing that the suite of surgical procedures referred to by the District Court as "vaginoplasty" are not the same for natal males and natal females.

Lange's other surgical expert, Dr. Schechter, also broke down the steps by procedure for transgender females like Lange: "Genital reconstruction surgeries: penectomy (removal of the penis), orchiectomy (removal of the testes), vaginoplasty, clitoroplasty, and/or vulvoplasty

_____

female—like Lange—is born a natal male (with male anatomy) but identifies as female.

[21] The District Court actually dealt with other examples: "The fact of the matter is, for example, that the plan pays for mastectomies when medically necessary for cancer treatment but not when mastectomies are medically necessary for sex change surgery. And the plan pays for hormone replacement therapy medically necessary for the treatment of menopause, but not hormone replacement therapy medically necessary for "sex change." [Doc. 205 at 23.] As pointed out above, the latter comparison is factually wrong.

(creation of female genitalia including the labia minora and majora)."
[Doc. 148-2 at ¶ 25.]    Without question, the penectomy and the
orchiectomy would not be necessary or possible for a natal female.
Accordingly, no inference that a similar procedure would be covered for
natal female plan participants could reasonably be drawn from the
record, as it is belied by contextual evidence of the material differences
in the procedures.

### 4.    The Injunction should be dissolved.

In summary, because the District Court relied on medical
procedures or forms of treatment unrelated to gender dysphoria, they
constitute, at most, *circumstantial evidence* of discrimination regarding
which there are–at the very least–genuine issues of material fact that a
reasonable jury could resolve in Defendants' favor.  *Lewis v. City of Union
City*, 918 F.3d 1213, 1220, n. 6, 1231 (11th Cir. 2019) (en banc).

As with Lange's all-but identical sex discrimination claim under the
Equal Protection Clause, the District Court found "a genuine dispute of
material fact as to whether the adoption and maintenance of the
Exclusion was done with discriminatory intent." [Doc. 205, p. 21; *see also
id.*, p. 33 ("Lange's equal protection claim will proceed to trial because

there are numerous disputes of fact as to whether the Exclusion was adopted and maintained with a discriminatory intent.").] The Supreme Court's opinions in *Johnson Controls*, *Manhart*, *Newport News*, and *Bostock* do not render the question of intent "immaterial" as to her disparate treatment claim under Title VII. [*Id.*, p. 22.]  *See Bostock*, 590 at 659 ("An employer violates Title VII when it *intentionally* fires an individual employee based in part on sex.) (emphasis added).  The District Court erred in granting summary judgment to Lange on that claim and in issuing the Injunction based on that erroneous determination.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, Defendants respectfully request that this Court reverse the District Court's Order granting summary judgment to Lange on her Title VII claim and dissolve the Injunction based on that Order.

Respectfully submitted this 30th day of September, 2024.

<u>s/ Sharon P. Morgan</u>
Sharon P. Morgan
Georgia Bar No. 522955
R. Read Gignilliat
Georgia Bar No. 293390

William D. Deveney
Georgia Bar No. 219744
Patrick L. Lail
Georgia Bar No. 431101


ELARBEE, THOMPSON, SAPP & WILSON, LLP
229 Peachtree Street, N.E. – Suite 800
Atlanta, Georgia 30303
(404) 659-6700 (telephone)
(404) 222-9718 (facsimile)
morgan@elarbeethompson.com
gignilliat@elarbeethompson.com
deveney@elarbeethompson.com
lail@elarbeethompson.com

*Attorneys for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

Counsel for the Appellants hereby certifies that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B). This brief contains 11,898 words.

*s/ Sharon P. Morgan*
Georgia Bar No. 522955


ELARBEE, THOMPSON, SAPP & WILSON, LLP
229 Peachtree Street, N.E. – Suite 800
Atlanta, Georgia 30303
(404) 659-6700 (telephone)
(404) 222-9718 (facsimile)
morgan@elarbeethompson.com
gignilliat@elarbeethompson.com
deveney@elarbeethompson.com
lail@elarbeethompson.com

*Attorneys for Defendants-Appellants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have, this date, filed electronically the foregoing **En Banc Brief of Defendants-Appellants** with the Clerk of this Court, and have served it upon counsel by filing it with the court's electronic-filing system. In compliance with the Federal Rules of Appellate Procedure, I have also delivered ten copies of this brief to Clerk of Court, U.S. Court of Appeals for the Eleventh Circuit, 56 Forsyth St. N.W., Atlanta, Georgia 30303.

This the 30th day of September, 2024.

*s/Sharon P. Morgan*
Sharon P. Morgan
Georgia Bar No. 522955

ELARBEE, THOMPSON, SAPP & WILSON, LLP
229 Peachtree Street, N.E. – Suite 800
Atlanta, Georgia 30303
(404) 659-6700 (telephone)
(404) 222-9718 (facsimile)
morgan@elarbeethompson.com

*Attorneys for Defendants-Appellants*