No. 22-13626

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

ANNA LANGE,
*Plaintiff-Appellee*

v.

HOUSTON COUNTY, GEORGIA AND
HOUSTON COUNTY SHERIFF CULLEN TALTON,
*Defendants-Appellants*

On Appeal from the United States District Court
for the Middle District of Georgia
No. 5:19-cv-00392-MTT

## EN BANC BRIEF OF PLAINTIFF-APPELLEE

Kenneth E. Barton III
Ga. State Bar No. 301171
M. Devlin Cooper
Ga. State Bar No. 142447
COOPER, BARTON & COOPER, LLP
170 College Street
Macon, GA 31201
(478) 841-9007 tel.
(478) 841-9002 fax
keb@cooperbarton.com
mdc@cooperbarton.com

Wesley R. Powell
Jill K. Grant*
Catherine Fata*
Amanda M. Payne*
WILLKIE FARR & GALLAGHER, LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8000 tel.
(212) 728-8111 fax
wpowell@willkie.com
jgrant@willkie.com
cfata@willkie.com
apayne@willkie.com

Z Gabriel Arkles
Shayna Medley
Ezra Cukor
Seran Gee
ADVOCATES FOR TRANS EQUALITY EDUCATION FUND
520 8th Ave. Suite 2204
New York, NY 10018
(646) 862-9396 tel.
(646) 993-1686 fax
garkles@transequality.org
smedley@transequality.org
ecukor@transequality.org
sgee@transequality.org

*Counsel for Plaintiff-Appellee*
*admitted pro hac vice*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 28(a)(1) of the Federal Rules of Appellate Procedure and Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, the Appellee, Sgt. Anna Lange submits this list, which includes the district court trial judge, and all attorneys, persons, associations of persons, firms, or partnerships that have an interest in the outcome of this review:

1.   Arkles, Gabriel, Esq., *Attorney for Plaintiff-Appellee, Sgt. Anna Lange*

2.   Barton, Kenneth E., Esq., *Attorney for Plaintiff-Appellee, Sgt. Anna Lange*

3.   Cooper, Barton & Cooper, LLP, *Attorneys for Plaintiff-Appellee, Sgt. Anna Lange*

4.   Cooper, M. Devlin, Esq., *Attorney for Plaintiff-Appellee, Sgt. Anna Lange*

5.   Cukor, Ezra U., Esq. *Attorney for Plaintiff-Appellee, Sgt. Anna Lange*

6.   Deveney, William D., Esq., *Attorney for Defendants-Appellants, Houston County, Georgia and Houston County Sheriff, Cullen Talton*

7.   Elarbee, Thompson, Sapp & Wilson, LLP, *Attorneys for Defendants-Appellants, Houston County, Georgia and Houston County Sheriff, Cullen Talton*

C-1

8.    Fata, Catherine E., Esq., *Attorney for Plaintiff-Appellee, Sgt. Anna Lange*

9.    Gee, Seran, Esq. *Attorney for Plaintiff-Appellee, Sgt. Anna Lange*

10.    Gignilliat, R. Read, Esq., *Attorney for Defendants-Appellants, Houston County, Georgia and Houston County Sheriff, Cullen Talton*

11.    Grant, Jill K., Esq., *Attorney for Plaintiff-Appellee, Sgt. Anna Lange*

12.    Houston County, Georgia, *Defendant-Appellant*

13.    Houston County Sheriff, Cullen Talton, *Defendant-Appellant* (deceased)[1]

14.    Lail, Patrick L., Esq., *Attorney for Defendant-Appellants, Houston County, Georgia and Houston County Sheriff, Cullen Talton*

15.    Lange, Anna, *Plaintiff-Appellee*

16.    Medley, Shayna, Esq. *Attorney for Plaintiff-Appellee, Sgt. Anna Lange*

17.    Morgan, Sharon P., Esq., *Attorney for Defendants-Appellants, Houston County, Georgia and Houston County Sheriff, Cullen Talton*

18.    Payne, Amanda M., Esq., *Attorney for Plaintiff-Appellee, Sgt. Anna Lange*

19.    Powell, Wesley R., Esq., *Attorney for Plaintiff-Appellee, Sgt. Anna Lange*

---

[1] Sheriff Cullen Talton passed away during the course of these proceedings.

20.    Advocates for Trans Equality Education Fund (formerly Transgender Legal Defense and Education Fund, Inc.), *Attorneys for Plaintiff-Appellee, Sgt. Anna Lange*

21.    Treadwell, Hon. Marc T., *U.S. District Judge, Middle District of Georgia*

22.    Willkie, Farr & Gallagher, LLP, *Attorneys for Plaintiff-Appellee, Sgt. Anna Lange*

Pursuant to Eleventh Circuit Rule 26.1-3(b), Plaintiff-Appellee, Sgt. Anna Lange, certifies that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

/s/ *Wesley R. Powell*

*Counsel for Plaintiff-Appellee*

## PLAINTIFF-APPELLEE'S
## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

This Court has ruled that oral argument will be conducted the week of February 3, 2025, in Atlanta, Georgia.

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT ................................C-1

PLAINTIFF-APPELLEE'S STATEMENT REGARDING
ORAL ARGUMENT ........................................................................i

TABLE OF AUTHORITIES ........................................................................v

INTRODUCTION ........................................................................1

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUE........................................................2

STATEMENT OF THE CASE........................................................2

    I.     FACTS........................................................................2

          A.    The Parties........................................................2

          B.    Gender Dysphoria ........................................4

          C.    The Health Plan........................................6

          D.    The Exclusion ........................................6

          E.    Sgt. Lange's Transition and Denial of Coverage........................8

          F.    EEOC Proceedings........................................10

          G.    The Lawsuit........................................11

    II.    COURSE OF PROCEEDINGS ........................................11

STANDARD OF REVIEW ........................................................14

SUMMARY OF THE ARGUMENT ................................................15

ARGUMENT ........................................................................19

    I.    THE DISTRICT COURT CORRECTLY HELD
THAT THE EXCLUSION VIOLATES TITLE VII ........................19

          A.    The Exclusion Facially Discriminates on the Basis
of Sex ........................................................19

1.   The Exclusion Cannot Be Applied Without
      Considering the Employee's Sex.....................................24

2.   The Exclusion Discriminates on the Basis of Sex
      Stereotypes........................................................24

3.   The Exclusion Penalizes a Person for the Sheer
      Fact of Transitioning .........................................25

4.   Appellants and Their Amici's Arguments
      Otherwise Are Mistaken................................................26

      a.   An Exclusion Based on Gender Dysphoria
            Would Still Be Based on Sex ...............................26

      b.   Title VII Proscribes Discrimination
            Against Individuals, Not Discrimination
            at the Group Level ................................................27

5.   Numerous Courts Agree ...................................................30

B.   Appellants' Purported Factual Disputes Are Immaterial
      to Whether The Exclusion Is Facially Discriminatory .............31

      1.   Whether Some of Sgt. Lange's Care Was
            Covered Is Immaterial to the Issue of Whether
            the Exclusion Discriminates Based on Sex ....................32

      2.   The Existence of Other Exclusions Does Not
            Render the Exclusion Non-Discriminatory ....................35

      3.   Purported Differences in Surgical Procedures
            Are Immaterial to the Question of Whether the
            Exclusion Discriminates Based on Sex and Are
            Unsupported by the Record ...........................................36

C.   The Outcome of Appellee's Equal Protection Claim
      Does Not Dictate the Fate of Her Title VII Claim....................40

II.   BECAUSE THE EXCLUSION IS FACIALLY
      DISCRIMINATORY, THE DISTRICT COURT
      CORRECTLY HELD THAT NO FURTHER PROOF OF
      INTENTIONAL DISCRIMINATION IS NECESSARY .................42

A.      It Does Not Matter If the Motivation for Appellants' Facial Discrimination Was Benevolent, Malicious, or Unknown, Just That the Action Was Based on Sex .................42

B.      A Desire to Control Costs Does Not Change that the Exclusion Violates Title VII ....................................46

III.    THE DISTRICT COURT'S INJUNCTION PROVIDES FOR SIMPLE EQUALITY ........................................................48

IV.    CONCLUSION ...................................................................49

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases:**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................... 31, 32

*Arizona Governing Comm. for Tax Deferred Annuity &*
  *Deferred Comp. Plans v. Norris*,
  463 U.S. 1073 ........................................................................... 22, 33

*Armstrong v. Flowers Hosp., Inc.*,
  33 F.3d 1308 (11th Cir. 1994) ........................................................... 21

*Avirgan v. Hull*,
  932 F.2d 1572 (11th Cir. 1991) ......................................................... 15

*Bostock v. Clayton Cnty., Ga.*,
  590 U.S. 644 (2020) ........ 16, 20, 21, 22, 24, 25, 27, 28, 29, 33, 34, 40, 42, 43, 49

*Boyden v. Conlin*,
  341 F. Supp. 3d 979 (W.D. Wis. 2018) ............................................... 30

*Burlington N. & S.F.R.*,
  548 U.S. 53 (2006) ....................................................................... 22

*C.P. ex rel. Pritchard v. Blue Cross Blue Shield of Ill.*,
  3:20-cv-06145, 2022WL 17788148 (W.D. Wash. Dec. 19, 2022) ...................... 30

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ..................................................................... 15

*City of Los Angeles, Dep't of Water & Power v. Manhart*,
  435 U.S. 702 (1978) .......................................... 20, 21, 28, 29, 34, 47

*Claire v. Fla. Dep't of Mgmt. Servs.*,
  No. 4:20CV20-MW/MAF, 2024 WL 3955566
  (N.D. Fla. Aug. 1, 2024) ................................................................ 30

*Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*,
  421 F.3d 170 (3d Cir. 2005) ............................................................ 43

*Copeland v. Georgia Dep't of Corr.*,
  97 F.4th 766 (11th Cir. 2024) .......................................................... 20

*Dekker v. Weida*,
    679 F. Supp. 3d 1271 (N.D. Fla. 2023), *on appeal Dekker v. Fla. Agency for Health Care Admin.*, No. 23-12155 (11th Cir. 2023) ..........................................30

*E.E.O.C. v. Atlanta Gas Light Co.*,
    751 F.2d 1188 (11th Cir. 1985) ..........................................................41

*E.E.O.C. v. Catastrophe Mgmt.*,
    *Sols.*, 852 F.3d 1018 (11th Cir. 2016).................................................45

*E.E.O.C. v. Joe's Stone Crab, Inc.*,
    220 F.3d 1263 (11th Cir. 2000) ..................................................... 20, 43

*E.E.O.C. v. R.G. &. G.R. Harris Funeral Homes, Inc.*,
    884 F.3d 560 (6th Cir. 2018),
    *aff'd sub nom. Bostock v. Clayton Cnty., Ga.*,
    590 U.S. 644 (2020)..........................................................................26

*Eknes-Tucker v. Governor of Alabama*,
    80 F.4th 1205 (11th Cir. 2023) ..........................................................42

*Fain v. Crouch*,
    618 F.Supp.3d 313 (S.D. W. Va. Aug. 2, 2022),
    *aff'd Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) ..................... 4, 30

*Farmer v. Brennan*,
    511 U.S. 825 (1994)..........................................................................4

*Feemster v. BSA Ltd. P'ship*,
    548 F.3d 1063 (D.C. Cir. 2008) ..........................................................44

*Flack v. Wis. Dep't of Health Servs.*,
    395 F. Supp. 3d 1001 (W.D. Wis. 2019) .............................................30

*Fletcher v. Alaska*,
    443 F. Supp. 3d 1024 (D. Alaska 2020) .............................................30

*Florida v. HHS*,
    19 F.4th 1271 (11th Cir. 2021) ..........................................................14

*Fontenot v. Upjohn Co.*,
    780 F.2d 1190 (5th Cir. 1986) ..........................................................40

*Frank v. United Airlines, Inc.*,
    216 F.3d 845 (9th Cir. 2000) ..........................................................43

*Geduldig v. Aiello*,
    417 U.S. 484 (1974) ....................................................................... 41, 42

*General Elec. Co. v. Gilbert*,
    429 U.S. 125 (1976) ....................................................................... 41, 42

*Glenn v. Brumby*,
    663 F.3d 1312 (11th Cir. 2011) ............................................. 20, 25, 26

*Gordon v. Bibb Cnty. Sch. Dist.*,
    No. 22-13286, 2023 WL 8253881 (11th Cir. Nov. 29, 2023) ............................38

*Int'l Union, United Auto. Aerospace &*
    *Agric. Implement Workers of Am. v. Johnson Controls, Inc.*,
    499 U.S. 187 (1991) ............................................. 22, 39, 41, 43, 44, 46

*Jankovitz v. Des Moines Indep. Cmty. Sch. Dist.*,
    421 F.3d 649 (8th Cir. 2005) ...............................................................43

*Kadel v. Folwell*,
    100 F.4th 122 (4th Cir. 2024) ................................................. 4, 25, 33

*Kadel v. Folwell*,
    620 F. Supp. 3d 33 (M.D.N.C. 2022),
    *aff'd Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) ........................................30

*Larkin v. Michigan Dep't of Social Servs.*,
    89 F.3d 285 (6th Cir. 1996) ...............................................................43

*Maddox v. Grandview Care Ctr., Inc.*,
    780 F.2d 987 (11th Cir. 1986) .............................................................21

*Monroe v. Fla. Dep't of Corr.*,
    793 F. App'x 924 (11th Cir. 2019) ....................................................45

*Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*,
    462 U.S. 669 (1983) ................................. 16, 20, 28, 33, 34, 35, 41, 42

*Phillips v. Martin Marietta Corp.*,
    400 U.S. 542 (1971) ....................................................................... 29, 34

*Price Waterhouse v. Hopkins*,
    490 U.S. 228 (1989) ..........................................................................25

*Ricci v. DeStefano*,
    557 U.S. 557 (2009) ....................................................................... 20, 43

*Rodriguez v. Procter & Gamble Co.*,
    465 F. Supp. 3d 1301 ............................................................44

*Schroer v. Billington*,
    577 F. Supp. 2d 293 (D.D.C. 2008) .............................. 26, 28

*Showtime/The Movie Channel, Inc. v. Covered Bridge Condo. Ass'n, Inc.*,
    881 F.2d 983 (11th Cir. 1989), *vacated on other grounds*, 895 F.2d 711
    (11th Cir. 1990) ............................................................ 1, 14

*Snider v. Jefferson State Cmty. Coll.*,
    344 F.3d 1325 (11th Cir. 2003) ..........................................40

*Subotic v. Jabil, Inc.*,
    No. 22-13880, 2024 WL 797140 (11th Cir. Feb. 27, 2024) .................38

*Whitaker v. Kenosha Unified Sch. Dist. No.1 Bd. of Educ.*,
    858 F.3d 1034 (7th Cir.  2017) ..........................................24

*Young v. United Parcel Serv., Inc.*,
    575 U.S. 206 (2015) .............................................. 29, 45, 48

## Statutes & Other Authorities:

28 U.S.C. § 1292(a)(1) .............................................. 1, 14

28 U.S.C. § 1292(b) ....................................................12

42 U.S.C. § 2000e .....................................................41

42 U.S.C. § 2000e(k) ..................................................44

42 U.S.C. § 2000e-2(a) ................................................44

42 U.S.C. § 2000e-2(a)(1) ...................................... 20, 34, 47

42 U.S.C. § 2000e-5(g) ................................................13

Fed. R. App. P. 3(c)(4) ................................................1

Fed. R. Civ. P. 56(c) .................................................38

Fed. R. Civ. P. 56(c)(1) .......................................... 37, 38

Fed. R. Civ. P. 56(c)(1)(A) ....................................... 15, 31

Fed. R. Civ. P. 56(e)(2) .......................................... 37, 38

M.D. Ga. Loc. R. 56 ...................................................38

## INTRODUCTION

This case challenges the exclusion of coverage for transgender healthcare in the Houston County, Georgia (the "County") employee health plan (the "Health Plan"), administered by Anthem Blue Cross Blue Shield ("Anthem"). The Health Plan contains a sex-based exclusion for "[d]rugs for sex change surgery," and "[s]ervices and supplies for a sex change," that eliminates coverage even when a provider has determined such care is medically necessary and it is medically necessary within the meaning of the plan (the "Exclusion"). Thus, through the Exclusion, Appellants deny coverage of undisputedly medically necessary healthcare to Health Plan members, such as Sgt. Lange, precisely because they are transgender—even where the very same medically necessary care is covered under the Health Plan for members who are not transgender. As a result, Appellants have discriminated against Sgt. Lange on the basis of sex in violation of Title VII of the Civil Rights Act of 1964.

## JURISDICTIONAL STATEMENT

This is an appeal from a permanent injunction. Doc. 262. This Court has jurisdiction to review the injunction under 28 U.S.C. § 1292(a)(1). This Court may consider the underlying grant of summary judgment by the district court to the extent necessary to review the permanent injunction or as it otherwise deems appropriate. Fed. R. App. P. 3(c)(4); *Showtime/The Movie Channel, Inc. v. Covered Bridge*

*Condo. Ass'n, Inc.*, 881 F.2d 983, 987 (11th Cir. 1989), *vacated on other grounds*, 895 F.2d 711 (11th Cir. 1990).

## STATEMENT OF THE ISSUE

As set forth in the En Banc Briefing Notice (App. Doc. 112), this Court has asked the parties to address the following issue:

> Whether the employer-provided health insurance policy at issue, which covers medically necessary treatments for certain diagnoses but bars coverage for those same treatments when sought by Sgt. Lange for her medically necessary "sex change" surgery, facially violates Title VII of the Civil Rights Act of 1964.

## STATEMENT OF THE CASE

### I.    FACTS.

### A.    The Parties.

Plaintiff-Appellee Sgt. Lange has been a deputy with the Sheriff's Office since 2006.   *See* Defendants-Appellants' Response to Plaintiff's Statement of Undisputed Material Facts, Doc. 179-3, ¶ 28.  She is an exceptional employee who "has performed her duties as an investigator very well."   *Id.*.  She is also a transgender woman, which means that, although she was assigned a male sex at birth, her internal knowledge of herself has always been that she is female.  *Id.* at ¶ 29.  In 2017, she was formally diagnosed with gender dysphoria, which is the clinical name for the distress caused by the incongruence between one's gender identity and

2

sex assigned at birth. District Court Order on Summary Judgment, Doc. 205, p. 2. As part of her treatment, she now lives fully and openly as a woman and has taken steps to align her body with her gender identity. *Id.*; Doc. 179-3, ¶¶ 33–35. However, the Exclusion prevented her from receiving certain care to treat her gender dysphoria, including her prescribed vaginoplasty (or "bottom surgery"), rendering her gender dysphoria only partially treated and leading to significant suffering and distress. Doc. 205, pp. 2–3.

For years, Sgt. Lange was barred from obtaining needed surgery because Appellants have maintained the Exclusion in the Health Plan against Anthem's recommendation, even though they admit the care they exclude is medically necessary and cost was not a factor in their decision. Doc. 179-3, ¶¶ 37–38, 134–135, 141, 174, 194.

Defendant-Appellant Houston County is a political subdivision of Georgia governed by the Houston County Board of Commissioners (the "Commissioners"). Doc. 179-3, ¶ 43. The Commissioners are responsible for the Health Plan, which is provided to employees of the County, the Sheriff, and other public agencies. *Id.* at ¶ 44. At the time of the Complaint, Defendant-Appellant Cullen Talton had been the Sheriff of Houston County, Georgia since 1973, (together with the County "Appellants"). *Id.* at ¶ 39. He chose to have the County provide the Health Plan to his employees on his behalf. *Id.* at ¶ 60.

**B.** **Gender Dysphoria.**

Transgender is a term used to describe a person whose gender identity—*i.e.*, their internal sense of the sex they know themselves to be—differs from the sex that they were assigned at birth. *Id.* at ¶ 1. This dissonance can cause clinically significant distress or impairment in a person's life. Doc. 179-3, ¶ 2. The medical diagnosis for this distress is gender dysphoria, which can cause debilitating anxiety and depression, self-harm, and suicide if left untreated. *Id.* at ¶ 3. But it is treatable via social transition, hormone therapy, and various surgical procedures to align a person's sex characteristics with the person's gender identity. Docs. 179-3, ¶¶ 7, 10–14; 195, ¶¶ 7, 10–14. Today, when used for transgender people, these treatments tend to be referred to as gender transition, gender-affirming, gender confirmation, transgender healthcare, or treatment for gender dysphoria; in the past, they were more often referred to as sex change, sex reassignment, or treatment for transsexualism. *See* Expert Report of Dr. Schechter, Doc. 148-2 at 2, n.1; *compare Farmer v. Brennan*, 511 U.S. 825, 829 (1994) with *Kadel v. Folwell*, 100 F.4th 122, 143 (4th Cir. 2024). Gender dysphoria is a condition that, by definition, only transgender people can have. *See* Doc. 179-3, ¶¶ 1, 3.

Since 1979, the World Professional Association for Transgender Health, a non-profit professional organization devoted to transgender health, has promulgated Standards of Care (the "SOC") for the clinical management of gender dysphoria that

reflect the best available scientific evidence and expert consensus for care, including gender-confirming surgery. Plaintiff's Amended Statement of Undisputed Material Facts, Doc. 195, ¶ 8. Medical consensus is that surgery is medically necessary for many people with gender dysphoria. Docs. 179-3. ¶ 14; 205, p. 3. Major health professional associations—including the American Medical Association, the Endocrine Society, the American Psychiatric Association, the American Psychological Association, the American College of Physicians, the American Osteopathic Association, and the American College of Obstetrics and Gynecology—endorse insurance coverage for this healthcare, in line with the SOC. Doc. 195, ¶ 9.

Surgical reconstruction of sex characteristics is not unique to transgender healthcare; rather it treats multiple conditions, including gender dysphoria. Doc. 195, ¶ 17. For example, surgeons perform vaginoplasties, a form of genital reconstruction surgery, following oncologic resection, injury, infection, or to address congenital conditions. *Id.* In non-transgender individuals, genital reconstruction may be used to treat conditions such as epispadias (a condition where the urethra is not properly developed), hypospadias (a condition where the urinary opening is not in the typical location), illness, traumatic injury, or the congenital absence of a vagina. Doc. 148-2, ¶¶ 39–40. When used in accordance with the WPATH SOC to treat gender dysphoria, gender confirming surgeries such as vaginoplasties are safe and it is undisputed that they are effective. Docs. 179-3 ¶ 10; 148-2 , ¶ 4. The only

evidence on the subject in the record indicates that surgeons use the same billing codes for vaginoplasties whether they are for transgender or cisgender people, and these surgeries are likely to be reimbursed at the same or similar rates. Doc. 148-2, ¶ 4.

### C.    The Health Plan.

Since at least 1973, the Sheriff and the County have participated in a voluntary intergovernmental agreement, under which the County provides a range of personnel services for the Sheriff, including the Health Plan. Doc. 205, p. 3; 179-3, ¶¶ 60–62. The plan is self-funded, and it is administered by Anthem (commonly referred to as an "Administrative Services Only" or "ASO" plan). Docs. 205, p. 3; 179-3, ¶ 69.

The Health Plan covers "medically necessary" services including "office visits and doctor services," "prescription drugs," "diagnostic laboratory" services, "surgical supplies," "inpatient hospital care," and "inpatient professional services," including "surgery" and "general anesthesia." Doc. 179-3, ¶ 72, Doc. 155-1. There are approximately 1,500 Health Plan members. *Id.* at ¶ 67; Doc. 205, p. 3. The County sets benefit terms. Docs. 179-3, ¶ 62; 195, ¶¶ 62, 64.

### D.    The Exclusion.

The Health Plan has contained the Exclusion since at least 1998. Docs. 205, p. 3. It excludes coverage for "[d]rugs for sex change surgery," and "[s]ervices and supplies for a sex change and/or the reversal of a sex change." *Id.* at 3–4; Doc. 179-

3 ¶¶ 75–76.  The Exclusion denies coverage of otherwise covered treatments only for transgender people who need them to change their sex characteristics.  *Id.* at ¶¶ 77–78.  According to the County, the Exclusion withdraws coverage for at least "procedures . . . surgically to . . . help someone transition," "hormones or therapy or whatever may be required after the surgery," and "mental health counseling . . . specific to transitioning."  Doc. 159, p. 27:5–20.  The Health Plan does not otherwise exclude coverage for medically necessary genital reconstruction surgery.  Doc. 155-1, p. 53.

In September 2016, Anthem notified the County that "the exclusion for gender identity disorders and sex change surgery will be removed from [Anthem's 2017] plans . . ." (the "Nondiscrimination Mandate").  Docs. 179-3, ¶¶ 81–86; 205, p. 4.  However, Anthem permitted ASO plans to choose to "opt out" of the Nondiscrimination Mandate.  Docs. 205, p. 4; 179-3 ¶¶ 83–85, 91.  Although "the County generally follows the recommendation of its third-party administrator as to exclusions," the County chose the opt-out.  Doc. 205, p. 4; 179-3, ¶¶ 87–90.  Appellants admit that decision was not based on any consideration of medical or cost information related to the Exclusion.  Docs. 205, p. 6; 179-3, ¶¶ 134–35; 150-15, pp. 100:8–19, 105:12–24, 101:6–21, 115:3–16; 150-6, pp. 75:4–76:14.

### E.     <u>Sgt. Lange's Transition and Denial of Coverage.</u>

On April 18, 2018, Sgt. Lange informed Kenneth Carter, Houston County's Director of Personnel, that she is transgender, and they discussed whether the Health Plan would cover surgery. Docs. 205, p. 5; 179-3, ¶¶ 93–94. Citing the Exclusion, Mr. Carter explained that it would not. Docs. 205, p. 5; 179-3, ¶ 94. Later that day, Sgt. Lange met with the Sheriff and Mr. Carter, which is when she told the Sheriff that she is transgender and planned to transition from male to female. Docs. 205, p. 5; 179-3, ¶¶ 98–99. The Sheriff asked Mr. Carter, "What the hell is he talking about?" and commented, "I don't believe in sex changes." Docs. 205, p. 5; 179-3, ¶ 100. That same day, Mr. Carter emailed Donna Clark, the County's insurance broker, informing her that they "just had the meeting with the sheriff and it went well. I am good with nothing being covered and I think he is also . . ." Doc. 179-3, ¶ 110.

That same month, Sgt. Lange had surgery to feminize her chest, paying cash. 179-3 ¶ 35; 150-18, pp. 154:9–19, 155:1–11. Upon the recommendation of her healthcare provider, she determined that a vaginoplasty would be the next step in her treatment. Doc. 205, p. 3; Doc. 179-3, ¶ 37. On September 12, 2018, she contacted Anthem about coverage. Doc. 179-3, ¶ 114. Anthem informed Sgt. Lange that the surgery would be covered, provided that it was medically necessary under Anthem's clinical guidelines. *Id.* at ¶ 115; Doc. 205, p. 6. As no surgeon was available locally, Sgt. Lange found Dr. Rachel Bluebond-Langner, an Anthem in-network provider in

New York.  Doc. 179-3, ¶ 117.  On November 13, 2018, Sgt. Lange had a consultation with Dr. Bluebond-Langner and her colleague, Dr. Lee Zhao.  *Id.* at ¶ 120.  They determined that a vaginoplasty was medically necessary for Sgt. Lange's gender dysphoria under WPATH SOC, consistent with Anthem's clinical guidelines.  *Id.* at ¶ 121; Doc. 224-3 ¶¶ 27, 31.  They scheduled her surgery for January 31, 2019, and submitted a pre-authorization request to Anthem, following conversations in which Anthem informed Dr. Bluebond-Langner's office that the surgery was eligible for coverage with pre-authorization.  Doc. 179-3, ¶¶ 122–24.

Upon learning of Sgt. Lange's impending surgery, Mr. Carter and Ms. Clark confirmed the County's opt-out with Anthem, thus maintaining the Exclusion in the Health Plan and frustrating Sgt. Lange's surgery.[2]  Doc. 205, p. 6.  On November 30, 2018, Anthem informed Sgt. Lange that, due to the Exclusion, her surgery would not be covered.  *Id.*; Doc. 179-3, ¶ 129.

When the County subsequently filled out paperwork confirming its opt-out from the Nondiscrimination Mandate, Anthem required the County to indemnify it and to discuss the opt-out with counsel.  Docs. 205, p. 6; 195, ¶¶ 130–33; 179-3, ¶¶ 151–55.

---

[2] The County asserts it had rejected the Nondiscrimination Mandate prior to that date; at minimum, it appears Anthem had no record of that.  Doc. 205, p. 6.

9

In addition to the denial of her bottom surgery, Sgt. Lange had other routine healthcare coverage denied by Anthem pursuant to the Exclusion. Docs. 195, ¶ 263; 140-4 ¶ 36. For example, on June 12, 2019, she was denied coverage for a routine blood test for monitoring her hormone and medication levels; on October 18, 2021, she was denied coverage for her annual endocrinologist visit. Doc. 195, ¶¶ 265–266; 179-3, ¶ 266. Sgt. Lange received coverage for some other healthcare, such as her hormone prescriptions. Doc. 137-3, pp. 48–50; Doc. 150-18, pp. 120:18–124:17. The County did not intend for hormones to be covered.[3]

## F.    **EEOC Proceedings.**

Sgt. Lange made numerous attempts to resolve this matter without litigation, but the County refused to negotiate. Doc. 179-3, ¶¶ 138–140, 165–173; Doc. 205, pp. 6–7. As a result, Sgt. Lange filed a charge against the County with the U.S.

---

[3] Around the time he learned that Sgt. Lange was transgender, the County's Director of Personnel Kenneth Clark wrote to the County's insurance broker saying, "I know that the insurance does not pay for gender reassignment surgery or any medication that comes with it," but inquired about coverage for counseling; the broker responded that if the "codes were used" counseling would also not be covered because the "'overall diagnosis' is not covered." Doc. 155-6. Mr. Carter responded he was "good" with nothing being covered to avoid "loopholes." Doc. 155-7. In his deposition in 2021, Mr. Carter responded "As I understand it, yes," to the question: "[W]ould exclusion 26 prevent hormone replacement therapy if used to treat gender dysphoria?" Doc. 155, 37:13–16. And in a 30(b)(6) deposition, the County explained that the Exclusion withdrew coverage for at least "procedures . . . surgically to . . . help someone transition," "hormones or therapy or whatever may be required after the surgery," and "mental health counseling . . . specific to transitioning." Doc. 159, 27:5–20.

Equal Employment Opportunity Commission ("EEOC") and was issued a right-to-sue letter on July 8, 2019. Doc. 205, p. 7. On September 20, 2019, Sgt. Lange's counsel made one final request to remove the Exclusion or grant an exception, in advance of the impending deadline to file suit. Doc. 179-3, ¶¶ 181–82. The County declined but, for the first time, and only in response to the threat of litigation, requested information from Anthem about the cost of Sgt. Lange's surgery. *Id.* at ¶ 188; Doc. 205, p. 7. Anthem provided an estimate of $25,600. Docs. 205, p. 7; 179-3, ¶¶ 189–194.

### G. <u>The Lawsuit.</u>

Sgt. Lange filed suit on October 2, 2019. Doc. 1.

At a November 19, 2019, meeting, the Commissioners voted to maintain the provisions of the Health Plan—including the Exclusion—leaving the plan unchanged for 2020. Docs. 205, p. 7; 179-3, ¶¶ 202–212.

## II. <u>COURSE OF PROCEEDINGS.</u>

On October 2, 2019, Sgt. Lange filed suit against Houston County, Georgia and others, seeking relief under Title VII; the Equal Protection Clauses of the United States and Georgia Constitutions; Section 504 of the Rehabilitation Act; and Titles I and II of the Americans with Disabilities Act ("ADA"). Docs. 1; 56. On April 10, 2020, Sgt. Lange filed an Amended Complaint adding the Sheriff as a defendant. Doc. 56. On May 11, 2020, the Appellants filed Motions to Dismiss. Docs. 61; 62.

On October 30, 2020, the Court denied the dismissal of the Title VII, federal equal protection, and ADA Title I claims against Houston County, Georgia and the Sheriff in his official capacity, but dismissed all other claims and defendants. Doc. 89, p. 36. The County then filed a motion for reconsideration, which was denied. Docs. 94; 102.

The parties cross-moved for summary judgment on all claims on November 3, 2021. Docs. 136–137; 140. The district court subsequently requested supplemental briefing on "[w]hether the exclusion in the employee Health care benefit plan that excludes necessary coverage because of transgender status necessarily is a violation of Title VII." Docs. 196–197; 200.

On June 2, 2022, the district court held that the Exclusion was facially discriminatory, in violation of Title VII, and that the County is an "agent" of the Sheriff for purposes of providing the Health Plan. Doc. 205, pp. 12, 28. The district court granted summary judgment for Appellants on Sgt. Lange's remaining ADA claim and denied both motions for summary judgment as to her equal protection claim. Doc. 205, pp. 21, 33. The Appellants moved to certify the district court's opinion for interlocutory review pursuant to 28 U.S.C. § 1292(b). Doc. 206. That motion was denied, Doc. 220, and the matter proceeded to a damages trial on Sgt. Lange's Title VII claim.

On September 27, 2022, after the jury returned a verdict, Sgt. Lange was awarded compensatory damages under Title VII for her emotional distress caused by the Appellants' refusal to cover her vaginoplasty.  Doc. 256.  The parties then conferred on the terms of an injunction, which was jointly submitted to the district court and entered into on October 3, 2022 (the "Injunction") pursuant to 42 U.S.C. § 2000e-5(g).  Doc. 258.  The Injunction declared that the Exclusion violated Title VII and "permanently enjoin[ed] [Appellants] from any further enforcement or application of the Exclusion" requiring that "[w]ithin 14 days of this Order, [Appellants] shall: Notify [Anthem] . . . of this order and take all necessary steps to ensure Anthem ceases to enforce or apply the Exclusion" as well as to further "direct Anthem to process any claim for Sgt. Lange's vaginoplasty, including all associated charges for services, supplies, and facilities" for her medically necessary treatment. *Id.*

On October 17, 2022, Appellants moved to stay the Injunction pending appeal and on October 21, 2022, filed notice of interlocutory appeal on the district court's finding that the Exclusion was facially discriminatory under Title VII.  Docs. 262; 260-1.  The Injunction was temporarily stayed, but following full briefing, on March 1, 2023, the district court denied Appellants' motion to stay the Injunction pending appeal.  Docs. 265; 289.

13

The parties briefed the appeal and oral argument was ordered for November 14, 2023, before a panel of this Court. App. Doc. 61. Following oral argument, on May 13, 2024, this Court issued an opinion ("Panel Opinion") affirming the district court's ruling. App. Doc. 79-1. The following day, on May 14, 2024, the issuance of the mandate was withheld. App. Doc. 82. On June 3, 2024, the Appellants petitioned for a rehearing en banc, which was granted on August 15, 2024, thereby vacating the Panel Opinion. App. Docs. 84; 111. On September 30, 2024, the Appellants filed their en banc brief. App. Doc. 118 (hereinafter, "Brief").

## STANDARD OF REVIEW

An appellate court reviews a district court's grant of a permanent injunction for abuse of discretion. *See Florida v. HHS*, 19 F.4th 1271, 1279 (11th Cir. 2021). The underlying findings of fact are reviewed for clear error and the conclusions of law *de novo*. *Id.*

This Court may, in its discretion, consider aspects of the underlying summary judgment order. *See Showtime/The Movie Channel, Inc. v. Covered Bridge Condo. Ass'n, Inc.*, 881 F.2d, 983, 987 (11th Cir. 1989) ("Although '[a]ppellate review under § 1292(a)(1) is ordinarily confined to the injunctive aspects of the district court's order . . . such confinement is a rule of judicial administration, not of jurisdiction. An appellate court has power to review the case to the extent it chooses to exercise it.'") (citation omitted).

14

Summary judgment is proper when "there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asserting that a material issue of fact is genuinely disputed "must support the assertion by [ ] citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). A party may not "simply rely [ ] on legal conclusions or evidence which would be inadmissible at trial. The evidence presented cannot consist of conclusory allegations or legal conclusions." *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991) (citations omitted).

## SUMMARY OF THE ARGUMENT

This is a simple sex discrimination case based on Title VII's simple test. An employer that withholds an employment benefit based on sex has discriminated based on sex. That is exactly what Appellants have done by eliminating coverage for otherwise covered health care if they see it as related to "sex change."

It is undisputed that the Health Plan's Exclusion for "sex change" procedures is the reason that Appellants denied coverage for Sgt. Lange's vaginoplasty. It is also undisputed that the Exclusion applies only to transgender members of the Plan and applies to Sgt. Lange because she is transgender. But for Sgt. Lange's assigned sex and transgender status, the Health Plan would have covered her medically necessary vaginoplasty. It is settled law that discrimination based on transgender

status is unlawful sex discrimination.  Thus, the district court correctly found that this Exclusion, in this Health Plan, which applies only to transgender plan members and withdraws healthcare that would otherwise be covered, is facially discriminatory in violation of Title VII.[4]  No further proof of discriminatory intent is required. Accordingly, granting Sgt. Lange's motion for summary judgment was proper, and the district court soundly exercised its discretion in enjoining the enforcement of the Exclusion.[5]

Appellants and their amici make several incorrect arguments otherwise.  They contend that *Bostock* and other Supreme Court precedent should not apply to healthcare benefits.  But the fact that health coverage is subject to Title VII has been settled law for at least half a century.  *Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 682 (1983).  Appellants argue that the Exclusion depends on diagnosis and procedure.  But the Exclusion doesn't reference any diagnosis or procedure.  Instead, it bars coverage for *any* procedure when it is classified as a "sex change," which Appellants concede only applies to transgender people.  And even if the Exclusion were based on diagnosis, an exclusion based on a diagnosis of

---

[4] Appellants state that the "issue presented in this en banc proceeding is whether the health plan—with its coverages and exclusions—is facially discriminatory under Title VII."  Brief at 40.  But the district court holding was limited to the Exclusion.

[5] The district court also correctly held that Houston County acted as an agent of the Sheriff's Office.  This Court has not requested briefing on this issue.

gender dysphoria is sex based, so sex would still be a but for cause of the denial of coverage for Sgt. Lange's surgery.

Amici also argue that because the Exclusion applies to "sex changes" and to "reversal," of a "sex change" it must not discriminate against anyone based on sex. Not so. The Exclusion's reach to "reversal" simply means that it penalizes both those who seek to change their sex characteristics in a way not associated with the sex they were assigned at birth and those who have done so in the past, which exacerbates rather than mitigates liability.

Appellants also attempt to manufacture factual disputes. They claim that there is a dispute about whether some of Appellee's healthcare was covered. There is not. The parties agree that some (though not all) of her care was covered. It is also immaterial. Every instance of discriminatory treatment is a Title VII violation. They also point to the existence of other exclusions in the plan, which have no bearing on this case. Sgt. Lange has never contended that the plan does not contain other exclusions, nor has she challenged the validity of the plan as a whole. Rather, she challenges the Exclusion, which was the only issue decided by the district court.

Sgt. Lange proved through undisputed evidence that, because of the Exclusion, Appellants have withdrawn coverage for surgery that she needs and that otherwise would have been covered, because she is transgender. As a result, the district court enjoined enforcement of the Exclusion. What matters here is what

Appellants do not dispute: the Exclusion withdraws coverage only for transgender members and the Exclusion applies to Sgt. Lange because she is transgender.

In their attempt to create fact disputes, Appellants also introduce issues that lack any support in the record. For example, they claim that surgeries required by transgender individuals must employ different techniques than those used for cisgender people. Even if this claim were true, it is immaterial to the finding of facial discrimination because it does not change the fact that the Exclusion removes healthcare coverage from Sgt. Lange based on sex, not surgical technique. And the differences about which Appellants speculate are, themselves, based on sex.

Appellants further argue that the district court erred because it applied Title VII case law to Sgt. Lange's Title VII claim to discern facial sex discrimination, instead of imposing inapplicable Equal Protection law. This argument disregards the differences in these laws as well as controlling Supreme Court precedent. Appellants claim that Sgt. Lange has not established discriminatory intent, but it is well-settled that that a facially discriminatory policy—like the one at issue here— satisfies Title VII's intent requirement. They further claim that Sgt. Lange seeks to make transgender people a "most favored nation" when all she has requested is that the healthcare that she needs (and that would otherwise be covered) not be withdrawn on account of her sex. Requiring Appellants to do so, and provide Sgt.

Lange the same coverage on the same terms that they offer her cisgender peers, is no more than the law requires.

Because the District Court properly granted summary judgment to Sgt. Lange on her Title VII claim, the Injunction should be upheld.

## **ARGUMENT**

## I. **THE DISTRICT COURT CORRECTLY HELD THAT THE EXCLUSION VIOLATES TITLE VII.**

The district court correctly determined based on the undisputed facts that the Exclusion facially discriminates based on sex by denying coverage for procedures that would otherwise be covered because the employee is transgender.   As set forth below, additional reasoning supports the District Court's conclusion that the Exclusion facially discriminates based on sex: (1) the Exclusion cannot be applied without considering the employee's sex; (2) the Exclusion discriminates on the basis of stereotypes about people's physical appearance based on their birth-assigned sex; and (3) the Exclusion penalizes a person for changing their sex.   Appellants' and their amici's arguments otherwise are mistaken.   Other district courts uniformly agree that equivalent health plan exclusions violate federal statutory protections against sex discrimination.

### A.    **The Exclusion Facially Discriminates on the Basis of Sex.**

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of

employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). It is well settled that employee benefits including health insurance constitute "compensation, terms, conditions, or privileges of employment." *Newport News*, 462 U.S. at 682; *see also City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 710 (1978) ("[T]here is no reason to believe that Congress intended a special definition of discrimination in the context of employee group insurance coverage."). It is equally well settled that discrimination based on sex in violation of Title VII includes discrimination based on transgender status.[6] *See Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 661 (2020)*; Glenn v. Brumby*, 663 F.3d 1312, 1320–21 (11th Cir. 2011); *see also Copeland v. Georgia Dep't of Corr.*, 97 F.4th 766, 775 (11th Cir. 2024) (stating "discrimination against transgender individuals like [plaintiff] is discrimination 'because of sex'" (quoting *Bostock*, 590 U.S. at 662)).

Sgt. Lange's Title VII claim is of disparate treatment, which "occur[s] where an employer has treated [a] particular person less favorably than others because of a protected trait." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (internal citations and quotations omitted). One way to show disparate treatment is facial discrimination. *See E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1273 (11th Cir. 2000). Facial discrimination is when, for example, "an employer adopts a policy that explicitly

---

[6] Indeed, Appellants do not dispute this point. *See* Brief at 19.

treats some employees differently from others on the basis of [a protected characteristic]." *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1313 (11th Cir. 1994); *see also Maddox v. Grandview Care Ctr., Inc.*, 780 F.2d 987, 989, 991 (11th Cir. 1986) (affirming district court ruling that defendant's leave of absence policy was discriminatory on its face and constituted direct evidence of discrimination violative of Title VII).

To determine whether an employer facially discriminates because of sex in violation of Title VII, the Supreme Court has repeatedly held that one need only apply the "simple test" of "whether the evidence shows treatment of a person in a manner which but for that person's sex would be different." *Manhart*, 435 U.S. at 711; *see Bostock*, 590 U.S. at 672-73.[7] "Often, events have multiple but-for causes . . . a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision. So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law." *Bostock,* 590 U.S. at 656.[8] *Bostock* applied the simple test from *Manhart*, a benefits case. *Id.* at 663-64, 672–73. *Bostock* clarified that in future cases, inquiry into whether "other policies

---

[7] Title VII may also attach under the even more capacious "motivating factor" causation standard. *Bostock*, 590 U.S. at 657.

[8] Appellants imply that Title VII bars sex discrimination only when it is the sole cause of an adverse action. Brief at 29–30 (citing *Bostock*). Far from it. Hence, *Bostock* clarified that firing women who like the Yankees, but not men who are also fans of the Yankees, is still sex discrimination.

and practices" constitute discrimination against transgender people should be resolved in the same way as in any Title VII case: by determining whether they are "distinctions or differences in treatment that injure protected individuals." *Id*. at 681 (quoting *Burlington N. & S.F.R.*, 548 U.S. 53, 59 (2006)).[9]

Applying the simple test here, as the district court did, leads to an equally simple and straightforward conclusion: the Exclusion facially discriminates based on sex by denying coverage for procedures that would otherwise be covered because of an employee's transgender status. The terms of the plan dictate that, even when medically necessary and otherwise within the plan terms, coverage will be withheld for "[d]rugs for sex change surgery," and "[s]ervices and supplies for a sex change. . . ." Doc. 205 at 3–4. It is undisputed that a vaginoplasty was medically necessary for Sgt. Lange and, but for the Exclusion, it would have been covered under the Health Plan. Doc. 150-1, p. 14; Doc. 179-3 ¶¶ 37, 38, 77. But for Sgt. Lange's assigned sex and transgender status, the plan would have covered her care. Doc. 179-3 ¶ 77.

---

[9] The only defense to facial sex discrimination is a bona fide occupation qualification (BFOQ), but that is irrelevant here. *See Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am. v. Johnson Controls, Inc*., 499 U.S. 187, 192 (1991); *see also Arizona Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris*, 463 U.S. 1073 at 1084 n.13 (BFOQ defense is inapplicable in benefits cases, which "have nothing to do with occupational qualifications."). As the district court correctly noted, Appellants have never argued that a bona fide occupational qualification justifies the Exclusion. *See* Doc. 205 at 22, n.12.

The district court correctly determined that the Exclusion discriminates based on sex. Doc. 205, p. 28. As the district court explained, by its own terms, the Exclusion plainly "excludes coverage for sex change surgery and drugs related to sex change surgery." *Id.* at 23. Thus, even when a procedure would be covered for any other medically-necessary reason, Appellants specifically refuse to cover it when it is needed for a "sex change." *Id.* The district court correctly concluded that "[t]he undisputed, ultimate point is that the Exclusion applies only to transgender members, and it applies to Lange because she is transgender." *Id.* Appellants have conceded this point.[10] Brief at 9, 19–20; Docs. 179-3, ¶¶ 77–78; 289, p. 9 n.3. The district court was thus compelled to hold that the Exclusion facially discriminates based on sex.

As set forth in more detail below, additional reasoning supports the district court's conclusion that the Exclusion facially discriminates based on sex: (1) the Exclusion cannot be applied without considering the employee's sex; (2) the Exclusion discriminates on the basis of stereotypes about people's physical appearance based on their birth-assigned sex; and (3) the Exclusion penalizes a person for changing their sex.

---

[10] Appellants only disputed this point to the extent that Sgt. Lange suggests that *all* treatment for gender dysphoria is excluded. But the issue on appeal relates only to the denial of Sgt. Lange's vaginoplasty, which was undisputedly denied due to the Exclusion. Brief at 9.

1. <u>The Exclusion Cannot Be Applied Without Considering the Employee's Sex.</u>

The Exclusion facially discriminates based on sex because it cannot be applied without considering the employee's sex. A policy that cannot be applied "without considering sex" is based on sex. *Bostock*, 590 U.S. at 668; *see also Whitaker v. Kenosha Unified Sch. Dist. No.1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017) (a "policy [that] cannot be stated without referencing sex" is "inherently based upon a sex-classification"). In deciding whether to apply the Exclusion and withhold care that is otherwise covered, Appellants or their agents must know whether Sgt. Lange was identified as male or female at birth, and therefore, whether the care she needs counts as a "sex change." Doc. 179-3, ¶¶ 75–76. If she were identified as female at birth, a medically necessary vaginoplasty would be covered under the Health Plan; however, because she was not, it is not. *Id.* at ¶¶ 37–38, 77; Doc. 155-1, p. 53. Sex is the but-for cause of the differential treatment. *See Bostock*, 590 U.S. at 656–60.

2. <u>The Exclusion Discriminates on the Basis of Sex Stereotypes.</u>

The Exclusion also facially discriminates on the basis of sex stereotypes. *See Bostock*, 590 U.S. at 660–62. By excluding coverage for care when the reason is "sex change," the Exclusion discriminates on the basis of stereotypes about people's physical traits based on their assigned sex at birth. Indeed, "[a] person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes," "which presume that men and women's appearance and

24

behavior will be determined by their [assigned] sex." *Glenn*, 663 F.3d at 1316, 1320; *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) ("[W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group.").[11]     Because the Exclusion—on its face—distinguishes between those seeking care that changes a person's sex characteristics in a way that does not adhere to stereotypes associated with their birth-assigned sex and those seeking care to align their sex characteristics with their birth-assigned sex, it relies on sex stereotypes. *See Kadel v. Folwell*, 100 F.4th 122, 154 (4th Cir. 2024) ("[A] policy that conditions access to gender-affirming surgery on whether the surgery will better align the patient's gender presentation with their sex assigned at birth is a policy based on gender stereotypes.").

3.     The Exclusion Penalizes a Person for the Sheer Fact of Transitioning.

The Exclusion discriminates on its face because it penalizes a person "based on the sheer fact of the[ir] transition." *Glenn*, 663 F.3d at 1321*; see also Bostock*, 590 U.S. at 660 (an employer violates Title VII when it "intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee

---

[11] Although decided under the Equal Protection Clause, *Glenn* relied on Title VII precedent—most notably, *Price Waterhouse*—and includes a full Title VII analysis. *See Glenn*, 663 F.3d at 1317–18, 1320–21.

identified as female at birth"); *E.E.O.C. v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 574–75 (6th Cir. 2018), *aff'd sub nom. Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644 (2020) ("[D]iscrimination 'because of sex' inherently includes discrimination against employees because of a change in their sex."). The Exclusion therefore impermissibly singles out one of "[t]he very acts that define transgender people," *Glenn*, 663 F.3d at 1316 (citing Ilona M. Turner, *Sex Stereotyping Per Se: Transgender Employees and Title VII*, 95 CAL. L. REV. 561, 563 (2007)), and penalizes them by withholding procedures that would support their transition. One cannot penalize people for seeking to change or having changed their physical sex characteristics from typically male to typically female without relying on sex. *See Schroer v. Billington*, 577 F. Supp. 2d 293, 306–08 (D.D.C. 2008) (explaining that just as discrimination against a person for converting to a different religion is unquestionably "[d]iscrimination 'because of religion'" under Title VII, so discrimination against a person who "has changed her sex" is discrimination "because of sex").

4. <u>Appellants and Their Amici's Arguments Otherwise Are Mistaken.</u>

a. *An Exclusion Based on Gender Dysphoria Would Still Be Based on Sex.*

Amici argue that the Exclusion relies on diagnosis and procedure instead of sex. Br. of Ala. et al. at 15; *see also supra* IB3. But the text of the Exclusion does

26

not refer to diagnosis or procedure, it refers to sex.  Docs. 205, pp. 2–3; 179-3, ¶ 76. And in practice, the Exclusion functions always to withdraw coverage for vaginoplasty from transgender women regardless of diagnosis, while it never withdraws coverage of vaginoplasty for cisgender women regardless of diagnosis. *See* Docs. 155-1, p. 115; 179-3 ¶¶ 72–73.

Appellants and their agents would still rely on sex if they discerned Sgt. Lange's sex through her diagnosis, gender dysphoria—a diagnosis that depends on an incongruence between one's gender identity and assigned sex at birth.  Doc. 179-3, ¶ 2.  There is no way for a provider to diagnose someone with gender dysphoria or an insurer or employer to make a coverage determination based on gender dysphoria without relying on sex.  *See Bostock*, 590 U.S. at 668 (even if an employer only knows that someone is gay or transgender, and not their assigned sex, the employer that bases an employment decision on that knowledge still relies on sex). That gender dysphoria also requires clinically significant distress related to that incongruence makes no difference either.  *See id.* at 656 ("[A] defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision.").

> b.    *Title VII Proscribes Discrimination Against Individuals, Not Discrimination at the Group Level.*

Title VII prohibits discrimination against individuals.  Appellants' arguments that the Exclusion does not discriminate against all—or only—people assigned the

same sex at birth have been expressly rejected by the Supreme Court. First, the fact that the Exclusion forbids coverage based on sex for transgender people labeled male and female at birth does not exculpate Appellants. Multiple types of sex discrimination "double[] rather than eliminate Title VII liability." *Bostock,* 590 U.S. at 662–63, 672.

The Exclusion's reach to "reversal" of a "sex change" also compounds rather than cures the facial discrimination. Doc. 179-3, ¶ 76. It penalizes people because they have already changed or need to change their sex characteristics in a way that does not match the sex they were assigned at birth. In the same way, an employment policy that allows leave for religious observance unless the employee converted religions—whether for the first time or back to their childhood religion after a previous conversion—is facial discrimination of the basis of religion. *Schroer,* 577 F. Supp. 2d 293 at 306. It penalizes employees for changes in religion, initial or subsequent. So too here: the Exclusion penalizes employees classified as changing sex. The fact that it reaches those changing away from or back to the sex they were labeled at birth does no more than show the same outcome can be achieved through the combination of different factors. "In either case, though, sex plays an essential but-for role." *Bostock,* 590 U.S. at 672.

To the extent Appellants argue that *Manhart* and *Newport News* require a showing that women as a class were treated differently from men as class, they are

mistaken for the same reason. *See Bostock,* 590 U.S. at 662–63 (citing *Manhart,* 435 U.S. at 707, 711). That argument was expressly rejected in *Manhart,* where the employer argued that it charged women as a class more to achieve parity at the group level because otherwise their greater longevity as a class meant they would "be subsidized, to some extent, by the class of male employees." 435 U.S. 702, 708–09. The Supreme Court has made plain "a rule that appears evenhanded at the group level can prove discriminatory at the level of individuals." *Bostock,* 590 U.S. at 663. Title VII's "focus on the individual is unambiguous," and so "an employer violate[s] Title VII because, when its policy work[s] exactly as planned, it could not 'pass the simple test' asking whether an *individual* . . . employee would have been treated the same regardless of her sex." *Id.* at 663 at 1743 (citing *Manhart,* 435 U.S. at 711) (emphasis added).

Appellants' similar argument that, because some transgender people do not need surgery, the Exclusion is not facially discriminatory suffers the same fatal flaws. Brief at 44–45 (citing *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 222 (2015)). Again, under Title VII, it is well settled that a policy need not discriminate against all members of a particular group to be facially discriminatory. *See Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971) (*per curiam*). It is thus irrelevant to a determination of facial discrimination whether every transgender person—or even most—in Sgt. Lange's position would seek the care she sought. It is enough that

Sgt. Lange was prescribed a vaginoplasty as medically necessary to treat her gender dysphoria and that coverage for that treatment was barred by the Exclusion because of Sgt. Lange's sex assigned at birth and transgender status.

### 5.    Numerous Courts Agree.

Finally, if there were any doubt about the correctness of the district court's decision, federal courts—with *Lange*, nine in total—have been unanimous in striking down equivalent transgender health coverage exclusions in cases reaching the final merits under Title VII or other federal sex discrimination statutes. *Claire v. Fla. Dep't of Mgmt. Servs.*, No. 4:20CV20-MW/MAF, 2024 WL 3955566, at *6 (N.D. Fla. Aug. 1, 2024) *decision stayed* (Dkt. 187); *Dekker v. Weida*, 679 F. Supp. 3d 1271, 1290 (N.D. Fla. 2023), *on appeal Dekker v. Fla. Agency for Health Care Admin.*, No. 23-12155 (11th Cir. 2023); *C.P. ex rel. Pritchard v. Blue Cross Blue Shield of Ill.*, 3:20-cv-06145, 2022 WL 17788148, at *6 (W.D. Wash. Dec. 19, 2022); *Fain v. Crouch*, 618 F.Supp.3d 313, 326–28 (S.D. W. Va. Aug. 2, 2022), *aff'd Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024); *Kadel v. Folwell*, 620 F. Supp. 3d 33 at 386-87 (M.D.N.C. 2022), *aff'd Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024); *Fletcher v. Alaska*, 443 F. Supp. 3d 1024, 1030 (D. Alaska 2020); *Flack v. Wis. Dep't of Health Servs.*, 395 F. Supp. 3d 1001, 1015, 1020–22 (W.D. Wis. 2019); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 995 (W.D. Wis. 2018).

**B.    Appellants' Purported Factual Disputes Are Immaterial to Whether The Exclusion Is Facially Discriminatory.**

The District Court correctly found the exclusion to be facially discriminatory.

The facts relevant to its ruling are undisputed and clear:

- Appellants control the terms of the Health Plan, Docs. 150-2, p. 14; 179-3, ¶ 62;

- The Health Plan contains the Exclusion, Docs. 205, pp. 3–4; 179-3, ¶¶ 74–76; 195, ¶¶ 74–76; 155-1, pp. 66, 71.

- The Exclusion denies coverage for care in connection with a "sex change," Docs. 205, pp. 3–4; 155-1, pp. 66, 71;

- The only participants impacted by the Exclusion are transgender people, Docs. 205, p. 19; 179-3, ¶ 78; and

- The Exclusion applies to Sgt. Lange because she is transgender. Docs. 205, pp. 19, 23; 179-3, ¶¶ 30, 78.

Appellants' assertions otherwise cannot change that Sgt. Lange has met her burden for summary judgment. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (original emphasis). To assert that there is a genuine dispute of material facts, a party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, . . . or other materials. . . ." Fed. R. Civ. P. 56(c)(1)(A). A dispute about material facts is genuine "if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party." *Anderson*, 106 S. Ct. 2505, 2510 (1986). "[T]he substantive law will identify which facts are material . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id*. Here, the purported factual disputes for the most part do not actually exist and, more importantly, do not matter to the outcome of the case.

> 1.    <u>Whether Some of Sgt. Lange's Care Was Covered Is Immaterial to the Issue of Whether the Exclusion Discriminates Based on Sex.</u>

Appellants argue that the Exclusion is not facially discriminatory because it is not a categorical exclusion of *all* medically necessary care for a gender transition. Brief at 54–56. They also argue that, to discriminate, the Health Plan would have to "deny Lange the right to participate in the Plan due to her transgender status." Brief at 35. Both arguments are unavailing. Because the Exclusion barred coverage of Sgt. Lange's vaginoplasty, that Appellants sometimes covered her hormones and allowed her to enroll in the plan is immaterial

Appellants attempt to manufacture a dispute of facts where there is none. Specifically, they contend that summary judgment was inappropriate because there was a factual dispute about whether some non-surgical transition-related care was covered. Brief at 48–49. No such dispute as to material facts exists; all parties agree that some (but not all) of Sgt. Lange's non-surgical care was covered and that surgery was not. Docs. 179-3, ¶¶ 129, 266; 195, ¶¶ 263, 265–66; 140-4 ¶ 36; 137-3, pp. 48–

50; 150-18, pp. 120:18–124:17.  It is also immaterial.  There is, at most, a dispute of fact regarding whether the Health Plan was *intended* to cover any transition-related care.  Doc. 197, pp. 56–58.  But this fact is also immaterial to the issue of facial discrimination under Title VII and thus does not foreclose summary judgment for Sgt. Lange.

Each instance of discrimination is an "independent violation" of Title VII. *Bostock*, 590 U.S. at 662; *see also Arizona Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris*, 463 U.S. 1073, 1081 n. 102 (1983) (finding it was "irrelevant" that the employer offered several benefits options that did not discriminate based on sex because "[a]n employer that offers one fringe benefit on a discriminatory basis cannot escape liability because he also offers other benefits on a nondiscriminatory basis."); *see also Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 683 (1983) (providing some, but less extensive, coverage of pregnancy services to spouses of male employees violated Title VII); *Kadel,* 100 F.4th at 139, 164 (finding that West Virginia policy precluding Medicaid coverage for surgery, but not hormones, discriminated against transgender Medicaid recipients).  It is undisputed that Sgt. Lange's vaginoplasty was denied pursuant to the Exclusion.  Doc. 179-3, ¶ 129.  That alone violates Title VII, even if Appellants did not discriminate against her on some other occasions.

As the district court explained, an employer cannot lawfully withhold benefits because of sex for some procedures even if it covers others.  Doc. 205, p. 28.  "Title VII does not exempt 'partial' violations." *Id*. (citing 42 U.S.C. § 2000e-2(a)(1)); *see also Phillips*, 400 U.S. at 543-44 (rejecting that an employer had a defense under Title VII where on the whole it hired more women than men); *Newport News*, 462 U.S. at 683 ("[A] plan that provided complete hospitalization coverage for the spouses of female employees but did not cover spouses of male employees when they had broken bones would violate Title VII by discriminating against male employees."). The panel similarly rejected Appellants' argument noting that it "reflects a misunderstanding of existing law and precedent" because "[a]n employer is not shielded from liability when it engages in discriminatory practices concerning some treatment and not others." Panel Opinion at 10–11 (citing *Bostock*, 590 U.S. at 662).

The argument that, to violate Title VII, Appellants would have had to deprive Sgt. Lange of enrollment in the plan or insurance coverage altogether presents an even more extreme form of the same flawed argument.  It is also directly at odds with binding Supreme Court precedent.  *See Newport News*, 462 U.S. at 683; *Manhart*, 435 U.S. at 711.  The conclusion that a policy is facially discriminatory may "be reached even if the magnitude of the discrimination [is] smaller" than a blanket denial of benefits.  *Newport News,* 462 U.S. at 683.  As the district court

correctly stated, Appellants' argument that enrolling participants in the same plan proves they have not discriminated "lacks any merit." Doc. 205, p. 26. Such a rule would allow any discriminatory policy to be written into a coverage plan, as was the case in *Newport News*. 462 U.S. at 676.

### 2. The Existence of Other Exclusions Does Not Render the Exclusion Non-Discriminatory.

Appellants point out that the plan does not cover all medically necessary care and contains additional exclusions. Brief at 37–40, 52–53.[12] That is true. It does not create a dispute of material fact. Doc. 179-3, ¶ 74. Appellants concede that the Exclusion alone prevented coverage for Sgt. Lange's vaginoplasty. *Id.* at ¶ 129. The other exclusions played no role and have no bearing on this case. *Id.* If the other plan exclusions do not rely on sex or another protected characteristic, they are not facially discriminatory under Title VII. If they do, they are also illegal. As discussed in I.B.1, *supra,* whether or not a defendant discriminates in some other context is irrelevant to a Title VII claim. Regardless of the presence or absence of other exclusions, Sgt. Lange was denied care by *this* Exclusion because of her sex and

---

[12] To the extent Appellants are arguing, as below, that properly applying Title VII here to forbid the Exclusion would also compel removal of their other, non-discriminatory exclusions, that is simply not plausible, and even Appellants' own actuarial expert didn't believe it. Doc. 137-12, p. 95 ("That would sound like a stretch to me, that they would all be removed."). But even if it were, that is a policy argument best directed to Congress, which enacted Title VII without "slippery slope" defenses.

transgender status, which is an independent violation of Title VII. *See supra* Section I.B.1.[13]

        3.    <u>Purported Differences in Surgical Procedures Are Immaterial to the Question of Whether the Exclusion Discriminates Based on Sex and Are Unsupported by the Record.</u>

Appellants claim that there can be differences in how certain procedures are performed on transgender and cisgender patients, depending on their respective sex characteristics. *See* Brief at 77–78. But Appellants can point to no evidence whatsoever in support of their point, and whether such differences exist is immaterial to the question of whether the Exclusion facially discriminates based on sex. This argument is just another distraction from the actual issue on appeal. It is also, ultimately, circular.

Below, Appellants cited an extra-record document to support consideration of this new issue. Doc. 179 at 18 n.14. Now, Appellants cite the report put forth by Dr. Loren Schechter, arguing that a vaginoplasty performed on a transgender woman

---

[13] To the extent Appellants imply equivalent care for cisgender members might not be covered because of the "sexual dysfunction" exclusion, their argument is devoid of support. They point to nothing in the record about how the sexual dysfunction exclusion operates, let alone that it could stop coverage for a vaginoplasty. It is undisputed that the plan covers reconstructive surgery for illness, injury, and congenital "abnormalities . . . in order to create a more normal appearance," which includes vaginoplasty. Doc. 179-3 ¶72; Doc. 155-1, pp. 52–53. And according to the uncontradicted evidence in the record, vaginoplasty is not used to treat "sexual dysfunction" in cisgender women, but to form a vagina that was, for example, missing at birth or affected by infection or traumatic injury. Doc. 148-2, ¶¶ 39–40.

must be different than a vaginoplasty performed on a cisgender woman. Brief at 58. But Dr. Schechter's statements do not support any such inference.

In the cited portion of his declaration, Dr. Schechter merely lists several different possible surgeries that may be necessary for transgender women, one of which is vaginoplasty. Doc. 148-2, ¶ 25 (naming chest reconstruction surgery, various genital reconstruction surgeries, and various surgical procedures on other body sites as non-exhaustive list of "surgical treatment options that are generally accepted in the medical community and are consistent with the SOC"). He does not discuss surgical techniques employed for the surgery at issue here or any other surgery for anyone, transgender or cisgender. *Id.* He goes on to explain the necessity of these surgeries for transgender people, the situations in which cisgender people obtain the same surgeries, the reality that these surgeries "do not become more expensive simply because they are being performed" on transgender people and "are likely to be reimbursed at the same or similar rates" using the same Current Procedural Terminology ("CPT") codes as used for cisgender people,[14] and the cost

---

[14] Appellants attempted to "dispute" the statement concerning CPT codes, stating that Dr. Schechter, a practicing physician with expertise in genital surgery, was not an expert on billing practices. However, they did not retain their own expert nor did they put forth any evidence even suggesting that a vaginoplasty for a cisgender woman would be coded or billed differently than it would be for a transgender woman. *See* Fed. R. Civ. P. 56(c)(1). However, in the absence of specific citations to controverting facts, a movant's facts are generally deemed to be admitted for summary judgment purposes. *See* Rule 56(e)(2) ("If a party fails to properly support

efficiency of treating gender dysphoria when considered in light of how much it reduces negative health outcomes for transgender people, such as depression, suicide attempts, and infectious disease. *Id.* at ¶¶ 4, 27–42.

Dr. Bluebond-Langer's declaration does not help Appellants either—she simply describes obtaining informed consent from Sgt. Lange related to the techniques she planned to use for Sgt. Lange's surgery. Doc. 144-1, ¶ 25. She offered no testimony whatsoever about how the surgical techniques she planned to use for Sgt. Lange might compare to techniques used for others, cisgender or transgender. *Id.*

Despite ample opportunity to do so, Appellants did not adduce *any* evidence on this issue. In the absence of evidence, they invite this Court to speculate that

---

an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion"); M.D. Ga. Loc. R. 56 ("All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate."); *Subotic v. Jabil, Inc.,* No. 22-13880, 2024 WL 797140, at *5 (11th Cir. Feb. 27, 2024) (holding that even improperly citing evidence in the record can result in a party's failure to meet the requirements of Rule 56(c)(1)); *Gordon v. Bibb Cnty. Sch. Dist.*, No. 22-13286, 2023 WL 8253881, at *2 (11th Cir. Nov. 29, 2023) (citing Fed. R. Civ. P. 56(e)(2)) (stating that "legal conclusions and facts not supported by specific citations will not be considered by the court when deciding a motion for summary judgment" and further explaining that court may deem a party's facts as undisputed if a respondent fails to properly address a movant's assertion of fact.). But even if this fact were not admitted, the outcome would remain the same. The Exclusion does not discriminate based on cost or surgical procedure used—it denies coverage based on sex.

surgical techniques must differ in a way that matters.[15]  But ultimately, purported differences in surgical techniques are immaterial.  The Exclusion differentiates based on sex, not surgical technique; if a vaginoplasty is for a transgender person, it will be classified as "sex change" surgery and the Exclusion will withdraw coverage, no matter what technique is used.  If a vaginoplasty is for a cisgender person, it will not be classified as "sex change" surgery and coverage will not be withdrawn, again, regardless of technique used or body type of the patient.  The Exclusion rests on the sex of the patient, never the surgical technique.

Further, the speculation on this point only underlines that the distinction Appellants seek to draw is based on sex.  Ultimately, they ask this Court to say that those assigned a male sex at birth simply cannot be compared with those assigned a female sex at birth, because the genitals they were born with vary.  By the same reasoning, an employer could offer a plan that covers surgery to treat all cancer, including testicular cancer, but explicitly excludes ovarian cancer, because testes and ovaries are not identical so surgical techniques could vary.  These are precisely the sort of distinctions Title VII prohibits employers from drawing.  *See Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am. v. Johnson Controls,*

---

[15] If one chooses to speculate, it seems at least as safe to assume that a vaginoplasty performed on a cisgender woman who was born without a vagina would likely differ significantly from a vaginoplasty performed on a cisgender woman who had cancer or had suffered injury to the vagina.

*Inc.*, 499 U.S. 187, 204 (1991) (discrimination based on childbearing capacity is sex discrimination). Thus, to the extent Appellants object to the presence of penile or scrotal tissue during a vaginoplasty procedure (Brief at 58), that is not a permissible basis on which to determine whether to offer an employment benefit such as insurance coverage, because it is based on sex. *Bostock,* 590 U.S. at 655 (sex, at minimum, refers to "reproductive biology" or the "biological distinctions between male and female.").

### C. The Outcome of Appellee's Equal Protection Claim Does Not Dictate the Fate of Her Title VII Claim.

Appellants argue that the district court could not have found that the Exclusion was facially discriminatory in the context of Title VII without also finding that it was discriminatory under the Equal Protection Clause. *See* Brief at 17–19, 59. While the Equal Protection Clause and Title VII can overlap, they also differ in ways that may lead to different results—as they did here. *Snider v. Jefferson State Cmty. Coll.*, 344 F.3d 1325, 1328 (11th Cir. 2003) (explaining that Title VII and the "Constitution are not always concurrent").

While Appellants frame this issue as a factual dispute, in reality they simply disagree with the district court's conclusion that the Exclusion constitutes facial discrimination under Title VII but not the Equal Protection Clause. *See* Brief at 17–19, 59. Disagreement about a legal conclusion cannot defeat summary judgment. *See Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986) ("The party

opposing a motion supported by affidavits cannot discharge his burden by alleging legal conclusions."). Here, the Plan terms are not in dispute, and it is the terms of the policy that are dispositive. *See Johnson Controls,* 499 U.S. at 199; Doc. 179-3, ¶¶ 76–77.

Further conflating Equal Protection and Title VII, amici suggest that *Geduldig v. Aiello*, 417 U.S. 484 (1974) can override clear and binding precedent on Title VII. Br. of Ala. et al. at 27. But whatever the salience of *Geduldig* in the equal protection context, it has none in Title VII. Congress clearly abrogated *General Elec. Co. v. Gilbert*, 429 U.S. 125 (1976), the Title VII analogue to *Geduldig*, when it passed the Pregnancy Discrimination Act, 42 U.S.C. §§ 2000e. *See Newport News*, 462 U.S. at 678 (Congress "unambiguously expressed its disapproval of both the holding and the reasoning of the Court in the *Gilbert* decision"); *see also E.E.O.C. v. Atlanta Gas Light Co*., 751 F.2d 1188, 1190 (11th Cir. 1985) (finding *Newport News* should have retroactive effect, because it should have been clear upon passage of the Pregnancy Nondiscrimination Act that "Congress has unequivocally rejected that reasoning").

The Court in *Newport News* expressly rejected amici's argument that the Pregnancy Discrimination Act was limited to addressing the facts of *Gilbert.* Br. of Ala. et al. at 26. *Newport News*, 462 US. at 679–82. The Court pointed to the legislative history indicating the House and Senate reports agreed with the dissenting Justices' interpretation of Title VII and passed the Act with the intention of

repudiating *Gilbert* and *Geduldig*'s reasoning as to all Title VII sex discrimination claims. *Id.* The Court unambiguously concluded Congress rejected *Gilbert* not only to pregnant employees, but to all "*all* individuals [subject to] sex discrimination in employment," including the male plaintiffs in the case. *Id.* *Bostock* makes the wholesale rejection of *Gilbert*'s reasoning all the more clear; after all, in *Gilbert,* the Court reasoned in part that because not all women were pregnant, discrimination based on pregnancy could not be based on sex. *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 135 (1976). But in *Bostock,* the Court emphasized that it did not matter that discrimination based on transgender status or sexual orientation could affect people of more than one sex and would not affect everyone with the same sex; it was still a sex-based rule. *Bostock,* 590 U.S. at 645–48, 667.[16]

## II. BECAUSE THE EXCLUSION IS FACIALLY DISCRIMINATORY, THE DISTRICT COURT CORRECTLY HELD THAT NO FURTHER PROOF OF INTENTIONAL DISCRIMINATION IS NECESSARY.

### A. It Does Not Matter If the Motivation for Appellants' Facial Discrimination Was Benevolent, Malicious, or Unknown, Just That the Action Was Based on Sex.

Appellants argue that Sgt. Lange has not put forth adequate evidence of discriminatory intent. They are incorrect. The Exclusion is a facially discriminatory

---

[16] Amici's reliance on *Eknes-Tucker v. Governor of Alabama,* 80 F.4th 1205 (11th Cir. 2023) is incorrect for the same reason. As amici note, *Eknes-Tucker* was predicated on *Geduldig*, and turned on the appropriate level of scrutiny for anti-trans discrimination the equal protection context. Br. of Ala. et al. at 27.

policy that, itself, proves discriminatory intent. Disparate treatment simply requires intent to act based on a protected characteristic. *Ricci,* 557 U.S. at 579 (2009) ("[E]xpress, race-based decision making violates Title VII's command" regardless of motivation); *Joe's Stone Crab, Inc.,* 220 F.3d at 1283 ("[W]e emphasize that a finding of disparate treatment requires no more than a finding that women were intentionally treated differently . . . because of or on account of their gender.").

Where a facially discriminatory policy is identified, discriminatory intent is established and no further proof of intent is needed. *See Bostock,* 590 U.S. at 667 ("[N]othing in Title VII turns on the employer's labels or any further intentions (or motivations) for its conduct beyond sex discrimination."); *Johnson Controls,* 499 U.S. at 199 ("[T]he absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect."); *see also Joe's Stone Crab,* 220 F.3d at 1283–84 ("[A] plaintiff need not prove that a defendant harbored some special "animus" or "malice" towards the protected group to which she belongs."); *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.,* 421 F.3d 170, 177 (3d Cir. 2005)[17]; *Larkin v. Michigan Dep't of Social Servs.,* 89 F.3d 285, 290 (6th Cir. 1996); *Jankovitz v. Des Moines Indep. Cmty. Sch. Dist.,* 421 F.3d 649, 652 (8th Cir. 2005); *Frank v. United Airlines, Inc.,* 216 F.3d 845, 854 (9th Cir. 2000);

---

[17] This case involves violation of Title VIII of the Civil Rights Act, the Fair Housing Act, which uses "Title VII as a starting point" for analysis. *Cmty. Servs.,* 421 F.3d at 176 n.5.

*Feemster v. BSA Ltd. P'ship*, 548 F.3d 1063, 1070 (D.C. Cir. 2008); *Rodriguez v. Procter & Gamble Co.*, 465 F. Supp. 3d 1301, 13241 (S.D. Fla. 2020). The "explicit terms of the discrimination" suffice. *Johnson Controls*, 499 U.S. at 199.

Appellants say *Johnson Controls* is a "poor fit" because they did not keep Sgt. Lange from a "position of employment." Brief at 41. Not so. These factual differences are immaterial. Nothing in *Johnson Controls* hints limiting at what constitutes facial discrimination or that it proves discriminatory intent in this way— nor could it have, given the plain text of the statute. 42 U.S.C. § 2000e-2(a). In *Johnson Controls,* "the bias . . . [was] obvious." 499 U.S. at 197. The challenged policy explicitly classified employees based on sex, specifically childbearing capacity, eliminating certain positions for some, but not all, women. *Johnson Controls,* 499 U.S. at 192, 197. Here, the discrimination is no less explicit: the Exclusion classifies employees based on sex, specifically transgender status and the sex they were labeled at birth, eliminating coverage for vaginoplasties, among other care, for some but not all women.

Appellants also contend that the district court's decision contravenes *Young* by ignoring potential additional motivations for the Exclusion. Brief at 49. Their argument fails. *Young* is completely inapposite.

As a threshold matter, *Young*'s holdings pertain to interpretation of the phrase "similar in their ability or inability to work" in 42 U.S.C. § 2000e(k), which is

specific to pregnancy and not at issue here. *Young,* 575 U.S. at 226–227, 230 (explaining that its holding is "limited to the Pregnancy Discrimination Act context."); *E.E.O.C. v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1025 (11th Cir. 2016) ("The rationale and holding in *Young* are based on, and therefore limited to, the language in a specific provision of the [pregnancy discrimination act]."); *see also Monroe v. Fla. Dep't of Corr.*, 793 F. App'x 924, 928 (11th Cir. 2019).

*Young* does not change the standard for facial discrimination. In *Young*, the policy at issue required all drivers to lift seventy pounds, with limited exceptions, such as for those injured on the job. *Young* 575 U.S. at 211. The Court characterized this policy not as facial discrimination based on pregnancy but instead as distinguishing "in light of characteristics unrelated to pregnancy" and, thus, facially neutral. *Young*, 575 U.S. at 219–220. The Court observed that the plaintiff had produced evidence that could permit an inference of intentional discrimination and held that she could take advantage of the *McDonnell-Douglas* burden shifting framework on remand. The Court also reaffirmed that additional evidence of intent and the burden shifting framework is not needed when a "workplace policy, practice, or decision relies expressly on a protected characteristic." *Young*, 575 U.S. at 212–213. Unlike in *Young*, the Exclusion at issue here is facially discriminatory, relying expressly on sex—it bars coverage for "sex change." Doc. 179-3, ¶¶ 76–77. The

*McDonnell-Douglas* burden shifting framework does not apply and any further proof of intent is unnecessary.

The district court was correct—by its "explicit terms," the Exclusion discriminates on the basis of sex in violation of Title VII. *See* Doc. 205, pp. 21–22 (quoting *Johnson Controls*, 499 U.S. at 199, 206). Because the Exclusion is facially discriminatory, *see* I.A*, supra*, the district court properly held that no further proof of discriminatory intent is necessary—the policy itself was sufficient to prove a Title VII violation. *Id*.

### B.    A Desire to Control Costs Does Not Change that the Exclusion Violates Title VII.

Appellants argument that they don't discriminate because of sex but instead limit coverage for expensive non-lifesaving care fails. Brief at 25. Appellants cite no record support for their argument. The record shows the opposite to be true.

Rationing coverage in this way is, manifestly, not what this Exclusion does; the sole criterion for the Exclusion is whether care is for "sex change," not its cost or whether denial would result in the plan member's death. Appellants arguments otherwise do not change that they facially discriminate based on sex. *See,* I.A.

Indeed, Appellants concede that cost was not a factor in their decision to maintain the exclusion. Doc. 205, p. 6 ("[I]t is undisputed that cost was not a factor in the County's decision to opt out of the nondiscrimination mandate," which would have required removal of the Exclusion.); Doc. 179-3 ¶¶ 134–135, 174, 228, Doc.

150-15, p. 105. In any event, the estimated cost of the vaginoplasty Sgt. Lange sought amounted to approximately one quarter of one percent (0.25%) of the Health Plan's approximately $10 million average annual expenditure. Docs. 179-3 ¶¶ 70, 189–92, 224–26; 137-11, p. 62:13–20. Appellants have never disputed that this care is medically necessary—even, for some, life-saving. Doc. 179-3 ¶¶ 6, 14–16, 37–38, 121.

Even if cost did motivate Appellants, a cost defense is unavailable under Title VII, for the same reasons described in II.A—additional motivations are irrelevant where discrimination based on a protected characteristic has been established. *See Manhart*, 435 U.S. at 717 ("[N]either Congress nor the courts have recognized [a cost justification] defense under Title VII."). For good reason: discrimination through reducing compensation to disfavored employees saves employers money by definition—allowing such a defense would make the term "compensation" in the text of Title VII meaningless. 42 U.S.C. 2000e-2(a)(1). Employers have free rein to save money in myriad ways, many of which the County has employed here and may continue to employ. Doc. 161, p. 51 (describing various cost control measures). Title VII simply proscribes doing so through discrimination based on sex, race, color, religion, or national origin.

## III.   THE DISTRICT COURT'S INJUNCTION PROVIDES FOR SIMPLE EQUALITY.

Appellants contend that the district court's decision grants Sgt. Lange preferential treatment.  They are incorrect.  The district court's injunction leads not to favoritism, but to simple equality.

In support of their point, Appellants cite *Young,* which has no bearing here. *Supra* II.A.  Moreover, in *Young*, the Court expressed concern over a rule that could require employers to grant all pregnant employees their requested accommodations if any worker received an accommodation under any circumstance, even if the criteria for deciding on accommodations were neutral as to pregnancy (such as the employee's seniority or the hazardousness of their duties).  *Young*, 575 U.S. at 219. Sgt. Lange has never advocated for such a rule.  Appellants do not dispute that she meets neutral requirements for coverage, such as the Health Plan's medical necessity criteria.  *See, e.g.*, Doc. 179-3 ¶¶ 14–16, 115, 121.  The injunction merely requires the Appellants, when neutral criteria are met, to offer the same coverage for the same medically necessary procedures that would otherwise be covered under the Plan, but for the Exclusion.  This is a right that anyone—cisgender or transgender—may vindicate under Title VII.  If Appellants' policy were reversed and permitted coverage of surgeries like vaginoplasty or mastectomy when medically necessary for "sex changes," but not otherwise, then a cisgender employee could bring her own

claim.  The injunction corrects inequality to afford Sgt. Lange the same coverage as her colleagues.

* * *

The Court in *Bostock* could not have spoken more clearly on the breadth of the statute's "simple and momentous" message: "An individual's . . . transgender status is not relevant to employment decisions."  *Bostock*, 590 U.S. at 660.  In banning coverage for care for "sex change," Appellants defied that message and discriminated against Sgt. Lange based on her transgender status.

## IV.    <u>CONCLUSION.</u>

Because the district court properly granted summary judgment to Sgt. Lange on her Title VII claim and did not abuse its discretion in enjoining enforcement of the Exclusion, this Court should affirm.

Respectfully submitted this 30th day of October, 2024.

*/s/ Wesley R. Powell*

| | |
|---|---|
| Wesley R. Powell | Z Gabriel Arkles |
| Jill K. Grant | Ezra Cukor |
| Catherine E. Fata | Shayna Medley |
| Amanda M. Payne | Seran Gee |
| WILLKIE, FARR & GALLAGHER LLP | ADVOCATES FOR TRANS EQUALITY |
| 787 Seventh Avenue | EDUCATION FUND, INC. |
| New York, NY 10019-6099 | 520 8th Ave. Ste. 2204 |
| (212) 728-8000 tel. | New York, NY 10018 |
| (212) 728-8111 (fax) | (646) 862-9396 tel. |
| wpowell@willkie.com | (646) 993-1686 fax |
| jgrant@willkie.com | garkles@transequality.org |
| cfata@willkie.com | smedley@transequality.org |
| apayne@willkie.com | ecukor@transequality.org |
| | sgee@transequality.org |

Kenneth E. Barton III
Ga. Bar No. 301171
M. Devlin Cooper
Ga. Bar No. 142447
COOPER, BARTON & COOPER
170 College Street
Macon, GA 31201
478-841-9007
478-841-9002 (fax)
keb@cooperbarton.com
mdc@cooperbarton.com

*Counsel for Plaintiff-Appellee*

## <u>CERTIFICATE OF COMPLIANCE</u>

On behalf of Plaintiff-Appellee Sgt. Anna Lange, I hereby certify pursuant to Federal Rule of Appellate Procedure 32(g)(1) that the Brief of Plaintiff-Appellee is proportionally spaced, has a typeface of 14 points or more, and contains 12,116 words.

This 30th day of October, 2024.

/s/ *Wesley R. Powell*
Wesley R. Powell
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
(212) 728-8000 tel.
(212) 728-8111 fax
wpowell@willkie.com

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served the foregoing **BRIEF OF PLAINTIFF-APPELLEE** to the Clerk of Court using the CM/ECF system, which will automatically send electronic mail notification of such filing to the following counsel of record, who are CM/ECF participants:

R. Read Gignilliat, Esq.
Sharon P. Morgan, Esq.
William D. Deveney, Esq.
Patrick L. Lail, Esq.
Elarbee, Thompson, Sapp & Wilson, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia 30303
gignilliat@elarbeethompson.com
morgan@elarbeethompson.com
lail@elarbeethompson.com
*Attorneys for Defendants-Appellants*

This 30th day of October, 2024.

/s/ *Wesley R. Powell*
Wesley R. Powell
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
(212) 728-8000 tel.
(212) 728-8111 fax
wpowell@willkie.com