No. 22-13626-U

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

————————————

ANNA LANGE,

Plaintiff-Appellee

v.

HOUSTON COUNTY, GEORGIA, *et al.*,

Defendants-Appellants

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA

————————————

EN BANC BRIEF FOR THE UNITED STATES AS AMICUS CURIAE SUPPORTING
PLAINTIFF-APPELLEE AND URGING AFFIRMANCE ON THE ISSUE
ADDRESSED HEREIN

————————————

KARLA GILBRIDE
  General Counsel

JENNIFER S. GOLDSTEIN
  Associate General Counsel

DARA S. SMITH
  Assistant General Counsel

JEREMY D. HOROWITZ
  Attorney

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
  Office of General Counsel
  131 M St. NE, Fifth Floor
  Washington, D.C.  20507

KRISTEN CLARKE
  Assistant Attorney General

TOVAH R. CALDERON
ELIZABETH P. HECKER
ANNA M. BALDWIN
JASON LEE
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 305-1915

*Anna Lange v. Houston County, Georgia*, No. 22-13626-U

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

In accordance with Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, the United States as amicus curiae certifies that, in addition to those identified in the briefs filed by defendants-appellants, plaintiff-appellee, and their respective amici, the following persons may have an interest in the outcome of this case:

1. Baldwin, Anna M., U.S. Department of Justice, Civil Rights Division, counsel for the United States;

2. Calderon, Tovah R., U.S. Department of Justice, Civil Rights Division, counsel for the United States;

3. Clarke, Kristen, U.S. Department of Justice, Civil Rights Division, counsel for the United States;

4. Gilbride, Karla, Equal Employment Opportunity Commission, Office of General Counsel, counsel for the United States;

5. Goldstein, Jennifer S., Equal Employment Opportunity Commission, Office of General Counsel, counsel for the United States;

6. Hecker, Elizabeth P., U.S. Department of Justice, Civil Rights Division, counsel for the United States;

*Anna Lange v. Houston County, Georgia*, No. 22-13626-U

7. Horowitz, Jeremy D., Equal Employment Opportunity Commission, Office of General Counsel, counsel for the United States;

8. Lee, Jason, U.S. Department of Justice, Civil Rights Division, counsel for the United States;

9. Smith, Dara S., U.S. Department of Justice, Civil Rights Division, counsel for the United States.

The United States certifies that no publicly traded company or corporation has an interest in the outcome of this appeal.

s/ Jason Lee
JASON LEE
 Attorney

Date:  October 30, 2024

# TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ...................................... C-1

INTEREST OF THE UNITED STATES ................................................. 1

STATEMENT OF THE ISSUE ................................................................ 1

STATEMENT OF THE CASE ................................................................ 2

    A.    Statutory Background............................................................ 2

    B.    Factual Background ............................................................... 3

    C.    Procedural History ............................................................... 5

SUMMARY OF ARGUMENT .............................................................. 8

ARGUMENT

    The County's health plan violates Title VII because it
    excludes coverage for medically necessary treatments
    only when they are provided as part of an employee's
    gender-affirming care.................................................................. 11

    A.    The health plan's exclusions facially discriminate
        based on sex by denying coverage only if the medical
        care sought by the employee seeks to align their sex
        characteristics with their gender identity............................ 11

    B.    None of defendants' arguments undermines the
        district court's well-reasoned analysis................................. 17

**TABLE OF CONTENTS (continued):**                    **PAGE**

CONCLUSION ...........................................................................34

CERTIFICATE OF COMPLIANCE

# TABLE OF CITATIONS

**CASES:**                                                                                                 **PAGE**

*Armstrong v. Flowers Hosp., Inc.*,
    33 F.3d 1308 (11th Cir. 1994) ....................................................... 33

*\*Bostock v. Clayton Cnty.*,
    590 U.S. 644 (2020) ........................... 2, 7-9, 11-14, 21, 23-25, 27, 32

*Boyden v. Conlin*, 341 F. Supp. 3d 979 (W.D. Wis. 2018)................ 15, 26

*Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022) ................................... 18

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) ..... 22-23

*C.P. v. Blue Cross Blue Shield of Ill.*, No. 3:20-cv-6145,
    2022 WL 17788148 (W.D. Wash. Dec. 19, 2022) ........................... 16

*EEOC v. Joe's Stone Crab*, 220 F.3d 1263 (11th Cir. 2000) .................. 32

*Flack v. Wisconsin Dep't of Health Servs.*,
    328 F. Supp. 3d 931 (W.D. Wis. 2018) ........................................... 16

*Fletcher v. Alaska*, 443 F. Supp. 3d 1024 (D. Alaska 2020) ............. 15, 26

*Flowers v. Mississippi*, 588 U.S. 284 (2019) ........................................... 22

*General Electric Co. v. Gilbert*, 429 U.S. 125 (1976),
    *superseded by statute as stated in*
    *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983) ......................... 29

*Hammons v. University of Md. Med. Sys. Corp.*,
    649 F. Supp. 3d 104 (D. Md. 2023),
    *appeal pending*, No. 23-1452 (4th Cir.)......................................... 16

*Hishon v. King & Spalding*, 467 U.S. 69 (1984).................................... 28

**CASES:**                                                                                    **PAGE**

\**Kadel v. Folwell*, 100 F.4th 122 (4th Cir.) (en banc),
  *petitions for cert. pending*,
  Nos. 24-90 (filed July 25, 2024),
  24-99 (filed July 26, 2024) .................................. 14-16, 21-23, 26, 30

*Lange v. Houston Cnty.*, 101 F.4th 793 (11th Cir.),
  *reh'g en banc granted, opinion vacated*,
  110 F.4th 1254 (11th Cir. 2024) ................................. 32-33

*Lawrence v. OPM*, No. 0120162065,
  2024 WL 3040129 (EEOC May 30, 2024) ...................................... 16

*Lewis v. City of Union City*, 934 F.3d 1169 (11th Cir. 2019) ................. 21

*Newport News Shipbuilding & Dry Dock Co. v. EEOC*,
  462 U.S. 669 (1983) ...................................................... 3, 8, 12, 29-31

*Obergefell v. Hodges*, 576 U.S. 644 (2015) ............................................... 23

*Powers v. Ohio*, 499 U.S. 400 (1991) ....................................................... 22

*United Auto. Workers v. Johnson Controls, Inc.*,
  499 U.S. 187 (1991) ......................................................... 20, 32-33

*Young v. United Parcel Serv., Inc.*, 575 U.S. 206 (2015) .................... 27-28

**STATUTES:**

Civil Rights Act of 1964 (Title VII)
  42 U.S.C. 2000e-2(a)...................................................................... 1
  42 U.S.C. 2000e-2(a)(1) ................................................. 2, 11-12, 25
  42 U.S.C. 2000e-5(a)...................................................................... 1
  42 U.S.C. 2000e-5(f)(1) ................................................................. 1
  42 U.S.C. 2000e(k)......................................................................... 29

**STATUTES (continued):**                                **PAGE**

Patient Protection and Affordable Care Act
     42 U.S.C. 18116(a)........................................................................ 4, 16
     Pub. L. No. 111-148, 124 Stat. 119 (2010) ...................................... 3

**RULE:**

11th Cir. R. 35-8 .......................................................................... 1

## INTEREST OF THE UNITED STATES

The United States has a substantial interest in this appeal, which concerns the proper application of the prohibition against sex discrimination in Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-2(a), to a health insurance plan that excludes coverage of certain medically necessary gender-affirming care for transgender employees. The Attorney General and the Equal Employment Opportunity Commission (EEOC) share enforcement authority under Title VII.  *See* 42 U.S.C. 2000e-5(a) and (f)(1).

The United States files this brief under 11th Circuit Rule 35-8.

## STATEMENT OF THE ISSUE

Plaintiff-appellee Anna Lange, a transgender woman and former deputy in the Houston County Sheriff's Office, was denied insurance coverage for a medically necessary procedure to treat her gender dysphoria, based on an exclusion in her health insurance plan for "[s]ervices and supplies for a sex change."  Doc. 155-1, at 71.[1]  The plan

---

[1] "Doc. __, at __" refers to the docket entry and page number of documents filed on the district court's docket at No. 5:19-cv-392 (M.D. Ga.).  "Br. __" refers to appellants' en banc brief and page number.

would have covered the procedure if it had been provided for some other medically necessary purpose.

The United States addresses the following question posed by the Court in its briefing notice:

> Whether the employer-provided health insurance policy at issue, which covers medically necessary treatments for certain diagnoses but bars coverage for Lange's "sex change" surgery, facially violates Title VII of the Civil Rights Act of 1964.

En Banc Briefing Notice 1 (Aug. 29, 2024).

## STATEMENT OF THE CASE

### A.    Statutory Background

Title VII makes it unlawful for a covered employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. 2000e-2(a)(1). The Supreme Court has held that discrimination based on transgender status violates Title VII's prohibition against sex discrimination. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 660-661 (2020); *see also id.* at 660 ("[I]t is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex."). The Supreme Court has also made clear that Title VII applies to employer-sponsored

health insurance plans because such benefits are a part of an employee's "compensation, terms, conditions, or privileges of employment." *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682 (1983) ("*Newport News*").

### B.    Factual Background

a.  The Houston County Sheriff's Office offers its employees healthcare benefits by permitting them to enroll in Houston County's health insurance plan.  Doc. 205, at 3.  The plan is "self-funded" (Doc. 205, at 3), meaning that the County's third-party administrator of the plan, Anthem Blue Cross Blue Shield, pays employees' and dependents' medical claims using funds provided by the County and obtained through employee contributions (Doc. 150-1, at 8-9, 16).  The plan contains a number of exclusions, including, as relevant here, two that deny coverage for "[s]ervices and supplies for a sex change and/or the reversal of a sex change" and "[d]rugs for sex change surgery."  Doc. 155-1, at 71, 73.

In 2010, Congress enacted the Patient Protection and Affordable Care Act (ACA), Pub. L. No. 111-148, 124 Stat. 119, which, among other things, bars sex discrimination in health programs and activities

receiving federal financial assistance.  *See* 42 U.S.C. 18116(a).
Following enactment of the ACA, Anthem recommended that the
County eliminate the two exclusions mentioned above.  *See* Doc. 205, at
3-4.  The County rejected Anthem's recommendation and chose to retain
the exclusions.  Doc. 205, at 4.

b.  Lange began working for the Houston County Sheriff's Office in
2006 and was promoted to Sergeant in 2014.  Doc. 147, at 2.  At that
time, Lange presented as male.  Doc. 147, at 3.  A few years later,
Lange was diagnosed with gender dysphoria and, in 2017, she began
identifying and presenting as female and changed her legal name to
align with her gender identity.  Doc. 147, at 3-4.

As part of her transition, Lange took steps to make her
"appearance more female over time."  Doc. 147, at 3-4.  This included
hormone replacement therapy under the care of an endocrinologist.
Doc. 147, at 3.  Lange's treatment also included undergoing surgery "to
feminize her chest."  Doc. 205, at 2.  Lange personally paid for the costs
of that surgery because she "knew that the County's Health Plan would
not cover it."  Doc. 147, at 5.

To treat her gender dysphoria—and consistent with the recommendation of her endocrinologist, two psychologists, and a surgeon—Lange also sought a vaginoplasty. Doc. 147, at 5-6. The procedure qualified as "medically necessary" under Anthem's guidelines, and thus, Anthem initially told Lange that it would be covered. Doc. 205, at 6 (citation omitted). But the County official responsible for administration of the plan later consulted with the County's insurance broker and "worked with Anthem to ensure" that the plan's exclusion of coverage for gender-affirming care would apply instead. Doc. 205, at 4, 6. Consequently, Lange's preauthorization request was denied based on the "benefit exclusion" for "[s]ex [r]eassignment [s]urgery." Doc. 150-5, at 85.

## C.    Procedural History

Lange sued Houston County, alleging, as relevant here, that the exclusions from coverage in the County's health insurance plan for gender-affirming surgery and related medications violate Title VII "by intentionally providing lesser terms of compensation to employees . . . who are seeking a gender transition." Doc. 56, at 28.

The district court agreed, entering summary judgment in Lange's favor and holding that the challenged exclusions "facially discriminat[e]" based on sex.  Doc. 205, at 22.  The court pointed out that, for example, "the plan pays for mastectomies when medically necessary for cancer treatment," but it denies coverage "when mastectomies are medically necessary for [gender-affirming] surgery." Doc. 205, at 23.  The court further noted that, based on defendants' own admissions, it was undisputed that "the Exclusion[s] appl[y] only to transgender [health plan] members," and that they "appl[y] to Lange because she is transgender."  Doc. 205, at 23.  Accordingly, the court found the challenged exclusions facially discriminatory because, under *Bostock*, "discrimination on the basis of transgender status is discrimination on the basis of sex and is a violation of Title VII."  Doc. 205, at 25.

The district court rejected defendants' arguments to the contrary. Doc. 205, at 24-28.  With respect to defendants' contention that its plan discriminates based on procedure (gender-transition surgery) rather than transgender status, the court held that the argument simply confirms that "[t]ransgender employees cannot get medically necessary

- 6 -

treatment" they need "because they are transgender."  Doc. 205, at 24.
The court also found unpersuasive defendants' argument that a plan
only facially discriminates "if it completely excludes coverage for
transgender care," holding that "Title VII does not exempt 'partial'
violations."  Doc. 205, at 26, 28 (emphasis and citation omitted).

A divided panel of this Court affirmed.  The panel majority first
observed that "[w]here an employer's policy or practice discriminates
against a protected characteristic, no further proof of disparate intent is
needed."  Opinion (Op.) 7.  And it explained that in *Bostock*, the
Supreme Court held that "'discrimination based on . . . transgender
status necessarily entails discrimination based on sex' as prohibited
under Title VII."  Op. 8 (alteration in original) (quoting *Bostock*, 590
U.S. at 669).

Turning to Lange's claim, the panel majority explained that the
County's health insurance plan imposes "a blanket denial of coverage
for gender-affirming surgery," a procedure that "only" transgender
participants "would seek" or "qualify for."  Op. 9.  Thus, applying
*Bostock*, the panel majority held that the plan violates Title VII because
it facially discriminates "based on transgender status."  Op. 9, 11.

- 7 -

Judge Brasher filed a dissenting opinion (Dissent). He asserted that the plan "doesn't treat anyone differently based on sex, gender nonconformity, or transgender status," but rather, distinguishes based on the nature of the procedure provided. Dissent 4-6.

This Court granted rehearing en banc (Order 2 (Aug. 15, 2024)) and requested supplemental briefing on the following question: "Whether the employer-provided health insurance policy at issue, which covers medically necessary treatments for certain diagnoses but bars coverage for Lange's 'sex change' surgery, facially violates Title VII of the Civil Rights Act of 1964" (En Banc Briefing Notice 1 (Aug. 29, 2024)).

## SUMMARY OF ARGUMENT

The Supreme Court has squarely held that Title VII's prohibition against sex discrimination encompasses discrimination on the basis of transgender status, *see Bostock v. Clayton Cnty.*, 590 U.S. 644, 660-661 (2020), and also that Title VII protects employees from discrimination in employer-sponsored health benefits, *see Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682 (1983).

Consistent with these precedents, this Court should hold that an employer violates Title VII if it provides a health insurance plan that denies transgender employees coverage for medically necessary gender-affirming care, when the care (such as the medically necessary vaginoplasty Lange sought here) would be covered if provided for some other medically necessary reason. Such an exclusion facially discriminates based on sex because it denies medical care *only* when the care is provided for gender transition purposes. Indeed, defendants do not dispute that the County's plan would cover the vaginoplasty Lange seeks if it were provided for some reason *other than* to treat gender dysphoria. There is thus "no way" to determine coverage under the County's health insurance plan, in light of the challenged exceptions, "without considering [an employee's] sex" assigned at birth. *Bostock*, 590 U.S. at 668.

Defendants' arguments to the contrary misunderstand the required analysis under Title VII and should be rejected. Defendants try to reframe the exclusions as merely distinguishing between different types of medical procedures, but they cannot avoid the fact that when the exclusions operate to deny coverage for a transgender employee's

- 9 -

medically necessary gender-affirming care, that employee's sex is a but-for cause of the denial.  Defendants also argue that the county's plan is not facially discriminatory because it provided Lange the same coverage afforded to other employees, which included coverage of some of her gender-affirming care.  But neither uniform application of discriminatory exclusions, nor nondiscriminatory coverage of *other* medical care, forecloses a finding that a plan facially violates Title VII.

Defendants' remaining arguments are similarly meritless.  The district court's ruling does not afford Lange "more favorabl[e]" treatment under the County's plan (Br. 45); rather, it holds, consistent with Title VII, that an employer may not use sex as a basis to deny coverage for medically necessary care—like the vaginoplasty Lange seeks here—that would otherwise qualify for coverage under the employer's health insurance plan if it were sought for another medically necessary purpose.  This conclusion does not change simply because not all transgender employees will choose to undergo gender-affirming surgery—Congress rejected such logic decades ago when it amended Title VII.  Finally, nothing in this analysis conflates disparate treatment with mere disparate impact.

- 10 -

This Court should affirm.

## ARGUMENT

**The County's health plan violates Title VII because it excludes coverage for medically necessary treatments only when they are provided as part of an employee's gender-affirming care.**

### A.    The health plan's exclusions facially discriminate based on sex by denying coverage only if the medical care sought by the employee seeks to align their sex characteristics with their gender identity.

The district court correctly held that by denying coverage for medically necessary treatment for gender dysphoria that aligns an employee's sex characteristics with their gender identity—even though the procedure would be covered if provided for a different medically necessary purpose—the County's health plan facially discriminates on the basis of sex and transgender status in violation of Title VII.

1. Title VII bars an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. 2000e-2(a)(1). The term "discriminate" refers to a "difference in treatment or favor" for an employee. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 657 (2020) (citation omitted). And this prohibition on discrimination extends to employer-sponsored health insurance plans.

*See Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682 (1983) ("Health insurance and other fringe benefits are 'compensation, terms, conditions, or privileges of employment'" under Title VII.).

In *Bostock*, the Supreme Court squarely held that Title VII's prohibition against sex discrimination encompasses discrimination based on transgender status. As the Court explained, the statute's bar on discrimination "because of" sex, *see* 42 U.S.C. 2000e-2(a)(1), "incorporates the 'simple' and 'traditional' standard of but-for causation," *Bostock*, 590 U.S. at 656 (citation omitted). The Court further explained that "sex is necessarily a but-for cause" of discrimination on the basis of transgender status because such conduct "penalizes a person identified as [one sex] at birth for traits or actions that [the employer] tolerates in an employee identified as [a different sex] at birth." *Id.* at 660-661 (emphasis omitted). In that way, "the individual employee's sex plays an unmistakable and impermissible role" when an employer discriminates based on transgender status. *Ibid.*; *see also ibid.* (explaining that "it is impossible to discriminate against a person for being . . . transgender without discriminating

against that individual based on sex"). This is true even if one assumes that the term "sex" in Title VII "refer[s] only to biological distinctions between male and female." *Id.* at 655.

2. Applying these principles here, because the challenged exclusions in the County's health plan bar coverage for certain medically necessary procedures *only* when they are provided for the purpose of aligning a person's sex characteristics with their gender identity, the plan facially discriminates based on sex and violates Title VII. By barring coverage for "[s]ervices and supplies for a sex change" (Doc. 155-1, at 71), the plan denies benefits when a procedure or drug is provided to alter an individual's sex characteristics to match their gender identity and not their sex assigned at birth. In doing so, the plan "unavoidably discriminates against persons with one sex identified at birth and another today." *Bostock*, 590 U.S. at 669. And by barring coverage for services and supplies for the "reversal of a sex change" (Doc. 155-1, at 71), the plan similarly denies benefits when a procedure or drug seeks to bring an individual's sex characteristics into alignment with their gender identity and sex assigned at birth, and such alignment does not already exist. Both situations entail facial sex

discrimination because "[t]here is no way" to determine whether coverage will be provided "without considering [an employee's] sex" assigned at birth. *Bostock*, 590 U.S. at 668.

The en banc Fourth Circuit recently explained why the denial of health insurance coverage for medically necessary gender-affirming care that would otherwise qualify for coverage—like the vaginoplasty Lange seeks here—represents "textbook sex discrimination." *Kadel v. Folwell*, 100 F.4th 122, 153 (4th Cir. 2024) (en banc), *petitions for cert. pending*, Nos. 24-90 (filed July 25, 2024), 24-99 (filed July 26, 2024). *Kadel* considered challenges to state health insurance plans that denied coverage for gender-affirming surgery. *Id.* at 133-134. As described by the Fourth Circuit, when the purpose of "surgery [was] to align a patient's gender presentation with their sex assigned at birth, the surgery [was] covered" under the States' plans, but "[w]hen the purpose [was] to align a patient's gender presentation with a gender identity that d[id] not match their sex assigned at birth, the surgery [was] not covered." *Id.* at 153. This meant that individuals assigned female at birth could obtain coverage for a vaginoplasty provided "for gender-

affirming purposes"—for example, to treat the "congenital absence of a vagina"—"but those assigned male at birth [could not]." *Ibid.*

As the Fourth Circuit cogently explained, such an exclusion of coverage facially discriminates based on sex because the provision of benefits turns on "whether the patient was assigned male at birth." *Kadel*, 100 F.4th at 154. If an employee sought coverage for a medically necessary vaginoplasty under the States' plans, one could not know if the procedure would be covered "without knowing whether the vaginoplasty is to treat gender dysphoria—in other words, whether the patient was assigned male at birth." *Id.* at 154; *see also id.* at 147 (explaining that the exclusion makes determining coverage "impossible . . . without inquiring into a patient's sex assigned at birth and comparing it to their gender identity"). The States' health insurance plans thus "facially discriminate[d] on the basis of sex" because "some patients will be eliminated from candidacy for" vaginoplasties and other gender-affirming surgeries "solely from knowing their sex assigned at birth." *Id.* at 134, 153; *see also Fletcher v. Alaska*, 443 F. Supp. 3d 1024, 1030 (D. Alaska 2020) (reaching this conclusion under Title VII); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 995-997 (W.D. Wis. 2018)

- 15 -

(same); *Lawrence v. OPM*, No. 0120162065, 2024 WL 3040129 (EEOC May 30, 2024) (same under Title VII's federal-sector provision).[2] This logic applies with equal force to the County's plan because, given the challenged exclusions, there is no way to determine coverage "without referencing sex" assigned at birth. *Kadel*, 100 F.4th at 153.[3]

_____

[2] Other district courts have reached similar conclusions under Section 1557 of the ACA, which bars sex discrimination in health programs and activities receiving federal financial assistance. 42 U.S.C. 18116(a); *see Hammons v. University of Md. Med. Sys. Corp.*, 649 F. Supp. 3d 104, 117 (D. Md. 2023), *appeal pending*, No. 23-1452 (4th Cir. docketed Apr. 26, 2023); *C.P. v. Blue Cross Blue Shield of Ill.*, No. 3:20-cv-6145, 2022 WL 17788148, at *6 (W.D. Wash. Dec. 19, 2022); *Flack v. Wisconsin Dep't of Health Servs.*, 328 F. Supp. 3d 931, 951 (W.D. Wis. 2018).

[3] Exclusions from health insurance coverage for medically necessary gender-affirming care can also discriminate based on sex under a sex-stereotyping theory of liability. As *Kadel* explains, a plan that "conditions access to gender-affirming surgery on whether the surgery will better align the patient's gender presentation with their sex assigned at birth is a policy based on gender stereotypes"—for example, "the assumption that people who have been assigned female at birth are supposed to have breasts, and that people assigned male at birth are not." 100 F.4th at 154. Coverage exclusions "based on [such] gender stereotypes impermissibly discriminate on the basis of sex." *Ibid.*

**B.    None of defendants' arguments undermines the district court's well-reasoned analysis.**

Defendants propose a number of grounds on which to reverse the district court's finding that the County's plan facially discriminates based on sex, but none withstands scrutiny.

1.  First, defendants attempt to depict the challenged exclusions as simply drawing distinctions in coverage based on particular types of surgical procedures.  The County's plan, they say, "draws [a] line between those who want the treatment of transition surgery . . . and those who do not."  Br. 56 (emphasis omitted).  But reframing the County's plan as denying healthcare benefits for certain medical treatments ignores the sex-based rules inherent in the exclusions' terms and operation.  The exclusions *define* the excluded care based on an employee's sex—specifically, whether the procedure will "change" the employee's physical attributes to or from those associated with the person's "sex" assigned at birth.  Doc. 155-1, at 71.  And in practice, they exclude coverage for otherwise eligible, medically necessary care only when the procedure is provided because a person's gender identity is inconsistent with their sex assigned at birth, or in the case of sex-change "reversal[s]" (Doc. 155-1, at 71), because a person's gender

identity had been inconsistent with their sex assigned at birth. *See* Br. 20 (acknowledging that the exclusions "den[y] coverage for procedures and treatments that would otherwise be covered if provided in connection with a different diagnosis" (citation omitted)). Thus, "[b]ecause the [person's] sex at birth determines whether or not the [person] can receive" coverage for the procedure, the plan necessarily "discriminates on the basis of sex." *Brandt v. Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022).

2. Relatedly, defendants describe medically necessary gender-affirming surgery as not involving "the same" procedure as that which would be performed on a cisgender person. Br. 58. For example, they reference different "steps" for performing a vaginoplasty on a transgender woman, as compared to those taken when performing a vaginoplasty on a cisgender woman. Br. 58. But health insurance providers generally do not distinguish between procedures "performed on a transgender patient or a non-transgender patient" when processing claims involving the same care—rather, "[t]he same" billing code is used for a vaginoplasty "performed for a non-transgender woman as treatment for congenital absence of the vagina [and] for a transgender

woman with gender dysphoria." Doc. 148-1, at 13-14. More importantly, the insurance exclusions rely on sex-based lines to deny health insurance benefits when medical treatments like vaginoplasties are provided to "change" an individual's sex characteristics to those that differ from their sex assigned at birth—or, in the case of a "reversal of a sex change," those that align with their sex assigned at birth where such alignment does not already exist (Doc. 155-1, at 71)—even though the same treatments are covered when provided for other medically necessary reasons (Doc. 155-1, at 71).[4]

The record below bears out this straightforward conclusion. The County admitted that, under the challenged exclusions, the denial of coverage for such surgical procedures turns *not* on any differences between the procedures when performed on transgender individuals as compared to cisgender individuals, but rather, based on whether the

---

[4] The plan's exclusion of coverage for "[d]rugs for sex change surgery" (Doc. 155-1, at 71, 73) makes this point abundantly clear. Under this exclusion, if Lange were to undergo a vaginoplasty, the plan would cover neither any anesthesia drugs used prior to the procedure, nor any antibiotics or painkillers used after the procedure—even though *the same drugs* would be covered for a vaginoplasty provided to treat a different diagnosis—all because the procedure itself seeks to alter Lange's sex characteristics to match her gender identity.

diagnosis is gender dysphoria or something else. Specifically, the County did not dispute the fact that "[t]he [e]xclusion denies coverage for procedures and treatments," such as vaginoplasties, "that would otherwise be covered if provided in connection with *a different diagnosis*." Doc. 179-3, at 30-31 (emphasis added).[5]

For these and other reasons, defendants' amici err in suggesting that Lange's claim fails for lack of a "similarly situated" comparator because the type of vaginoplasties that cisgender women receive are not identical to those that transgender women receive. Ala., Fla., & Ga. En Banc Amicus Br. 7-12 (citation omitted); *see also* Br. 59. This Court has specifically advised that, under Title VII, "[a] plaintiff's failure to produce a comparator does not necessarily doom" a claim of sex

---

[5] The County suggests that its plan excludes coverage for gender-affirming surgery based on the "[e]xpense" of the procedure. Br. 49; *see also id.* at 2-3, 25, 35. But as the district court explained below, it is "undisputed that cost was not a factor in the County's decision" to retain the exclusions. Doc. 205, at 6. In any case, the County's motive for adopting the exclusions is irrelevant to the question of whether they facially discriminate. When an "employment practice involves disparate treatment through explicit facial discrimination," the unlawfulness of that discrimination "does not depend on *why* the employer discriminates but rather on the explicit terms of the facial discrimination." *United Auto. Workers v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991) (emphasis added); *see also* pp. 32-33, *infra*.

discrimination. *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (citation omitted). This makes perfect sense: a comparator simply provides one way of showing that, but for the employee's sex or some other protected attribute, the employer's discriminatory action would not have occurred. But it is not the only way to prove causation. *See ibid.* (discussing other ways to establish discrimination). Here, but-for causation already is evident from the face of the challenged exclusions and the County's admission that Lange's vaginoplasty would have been covered if provided for some medically necessary reason other than aligning her genitalia with her gender identity. *See* pp. 19-20, *supra*.[6]

---

[6] The Court may also affirm the district court's finding of facial sex discrimination on the basis that the County's plan "bar[s] treatments on the basis of transgender identity by proxy." *Kadel*, 100 F.4th at 149. "[D]efendants admit[ted] 'that the only [h]ealth [p]lan participants impacted by the [e]xclusion are transgender people seeking a 'sex change.'" Doc. 205, at 19 (citation omitted). This was the case in *Kadel. See* 100 F.4th at 148 (explaining that "the gender-affirming surgeries that are not covered for anyone are surgeries that only transgender people would get"). Such exclusions "use gender dysphoria as a proxy for transgender identity." *Id.* at 150. And as *Bostock* emphasized, "discrimination based on . . . transgender status necessarily entails discrimination based on sex." 590 U.S. at 669.

3.  Next, defendants argue that the County's plan does not facially discriminate based on sex because it provides Lange "the same coverage, at the same cost, with the same exclusions" as it does to "all other plan participants."  Br. 36.  "Th[is] argument is . . . tautological, akin to saying that the law 'applies equally to all to whom it applies.'"  *Kadel*, 100 F.4th at 147 (citation omitted).  It is also meritless.

The Supreme Court has flatly rejected the argument that laws that differentiate based on a protected characteristic like race or sex are not discriminatory simply because they apply to members of all races or sexes.  "It is axiomatic," for example, "that racial classifications do not become legitimate on the assumption that all persons suffer them in equal degree."  *Powers v. Ohio*, 499 U.S. 400, 410 (1991); *cf. Flowers v. Mississippi*, 588 U.S. 284, 299 (2019) (explaining in the context of jury selection that "[d]iscrimination against one defendant or juror on account of race is not remedied or cured by discrimination against other defendants or jurors on account of race").

Thus, a policy that uniformly forbids the wearing of yarmulkes would not be purged of its discriminatory character simply because it applies to Jews and non-Jews alike.  *See Bray v. Alexandria Women's*

*Health Clinic*, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews.").  State bans on same-sex marriage also discriminate against gays, lesbians, and bisexual individuals, even though they equally "apply to straight" persons.  *Kadel*, 100 F.4th at 148 (emphasis omitted); *see also Obergefell v. Hodges*, 576 U.S. 644, 672-675 (2015).  So too here.  Even if the challenged exclusions of coverage for gender-affirming care technically "apply to everyone," they are, in practice, "only relevant to transgender individuals."  *Kadel*, 100 F.4th at 146 (emphasis omitted).  Indeed, defendants concede as much.  *See* Br. 22 (admitting that the exclusions "logically impact[] only transgender participants who might seek a sex change").

Defendants and their amici also find no purchase in citing *Bostock*'s statement that but-for causation is analyzed by "chang[ing] one thing at a time and see[ing] if the outcome changes."  590 U.S. at 656.  They argue that but-for causation is lacking here because the plan's denial of coverage for gender-affirming care applies to both male and female "employee[s] seeking sex-change surgery."  Ala., Fla., & Ga. En Banc Amicus Br. 5-6; *see also* Br. 57.  They are wrong.  For transgender individuals assigned male at birth *and* those assigned

female at birth, sex operates as a but-for cause under the challenged

exclusions because coverage would be provided if their sex assigned at

birth were different.  For example, the exclusions would not bar Lange

from obtaining a medically necessary vaginoplasty if she were a

cisgender female, because the sex-change exclusion would not apply.

*See* pp. 19-20, *supra*.  Thus, just as an employer that "is equally happy

to fire male *and* female [transgender] employees" violates Title VII

because "the employer must, along the way, intentionally treat [the]

employee[s] worse based in part on . . . sex," *Bostock*, 590 U.S. at 662, so

too do the challenged exclusions facially discriminate based on sex by

denying coverage for men and women alike.

4.  Defendants additionally contend that the County's plan does

not facially discriminate based on sex because it "covered most non-

surgical care for [Lange's] transition, even if it indisputably did not

cover sex change surgery."  Br. 27 (emphasis omitted); *see also id.* at 49.

But the mere fact that *some* benefits may have been provided in a

nondiscriminatory manner neither changes the facially discriminatory

nature of the challenged exclusions, nor demonstrates that

discrimination with regard to *other* "compensation, terms, conditions, or privileges of employment" has not occurred. 42 U.S.C. 2000e-2(a)(1).

Defendants similarly suggest that *Bostock* would only "dictate the outcome of" Lange's Title VII claim if the County had "den[ied] Lange the right to *participate* in the [p]lan due to her transgender status." Br. 35 (emphasis added). But Title VII's prohibition against "discriminat[ion]," 42 U.S.C. 2000e-2(a)(1), is not limited to wholesale denials of an employee's ability to enroll in a health insurance plan. Rather, *Bostock*'s analysis logically applies to *any* "difference[s] in treatment or favor" based on membership in a protected class that is not otherwise exempted by statute. 590 U.S. at 657 (citation omitted).

Put differently (and correctly) by the district court, "Title VII does not exempt 'partial' violations." Doc. 205, at 28 (citation omitted). Instead, the statute "makes *each instance* of discriminating against an individual employee because of that individual's sex an independent violation of Title VII." *Bostock*, 590 U.S. at 662 (emphasis added). Unsurprisingly, then, many courts have found coverage exclusions for medically necessary gender-affirming surgery to be facially discriminatory even where the health insurance plans at issue covered

some non-surgical treatments of gender dysphoria. *See Kadel*, 100 F.4th at 133, 153; *Fletcher*, 443 F. Supp. 3d at 1027, 1030; *Boyden*, 341 F. Supp. 3d at 988, 997.

5.  Defendants similarly err in suggesting that the district court's ruling affords transgender employees "more favorabl[e]" treatment under the County's plan because some medically necessary gender-affirming surgery would be covered, while coverage for treatments of things like "[s]exual [d]ysfunction" and "[i]nfertility" would remain excluded under other provisions of the plan. Br. 39, 45-46 (last alteration in original; citations omitted).

As an initial matter, unrelated and unchallenged exclusions of coverage do not bear on the question of whether sex is a but-for cause of the denial of coverage under the *challenged* exclusions. But even if the exclusions for the treatment of "sexual dysfunction" and infertility were relevant, they do not discriminate based on sex:  in contrast to the challenged exclusions, they apply evenhandedly to all people, regardless of sex assigned at birth or transgender status. *See* Doc. 155-1, at 69 (denying coverage for "[t]esting or treatment related to infertility except for diagnostic services and procedures to correct an underlying medical

condition"), 71 (same for "[s]ervices or supplies for male or female
sexual problems").  In short, these exclusions do not withdraw coverage
for medically necessary treatment (like the vaginoplasty Lange seeks
here) that would otherwise be eligible under the County's plan if
provided for a purpose other than conforming her physical sex
characteristics to align with her gender identity.

Moreover, holding that the challenged exclusions facially
discriminate based on sex, as the district court did, does not treat
transgender employees more favorably than cisgender employees.  The
upshot of the district court's ruling is *not* that Title VII mandates
employer coverage of all care for gender dysphoria.  Instead, it simply
reflects the fact that when medically necessary care is otherwise
covered, Title VII bars an employer from withdrawing that coverage
only when the care is provided to modify an employee's physical sex
characteristics in accordance with their gender identity.  *Cf. Bostock*,
590 U.S. at 669 (explaining that Title VII prohibits "discriminat[ion]
against persons with one sex identified at birth and another today").

Nor do defendants (Br. 44-45) derive any support for their position
from *Young v. United Parcel Service, Inc.*, 575 U.S. 206 (2015).  *Young*

interpreted the Pregnancy Discrimination Act and rejected what the Court characterized as a "most favored nation" reading of the statute, under which an employer who provides any "worker[] with an accommodation . . . must provide similar accommodations to all pregnant workers" who have "comparable physical limitations." *Id.* at 221 (emphasis omitted). The district court did not adopt such a reading of Title VII. Rather, it simply concluded that, under Title VII, if an employer chooses to provide health insurance coverage for a medically necessary procedure, it may not exclude coverage for that procedure only when it is provided to "change" an employee's physical attributes to or from those associated with the person's "sex" assigned at birth. Doc. 155-1, at 71; *see also Hishon v. King & Spalding,* 467 U.S. 69, 75 (1984) ("A benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion, even if the employer would be free . . . simply not to provide the benefit at all."). In short, the ruling below ensured that Lange would receive nondiscriminatory treatment under the plan, not "more favorabl[e]" treatment. Br. 45.

6. Defendants additionally fault the district court's finding of facial sex discrimination because not all transgender individuals choose

to undergo gender-affirming surgery.  Br. 45, 56-57.  This argument
echoes logic that Congress specifically rejected when amending Title
VII.  In *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976), *superseded
by statute as stated in Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983),
the Court considered a Title VII challenge to an employer compensation
plan that provided disability benefits to employees who could not work
due to nonoccupational sickness or an accident, but denied such benefits
for an employee's inability to work due to pregnancy.  *Id.* at 127-129.
The Court held that the exclusion did not constitute sex discrimination
under Title VII because while "pregnant women" are "exclusively
female," "nonpregnant persons . . . include[] members of both sexes."  *Id.*
at 135-136 (citation omitted).

Two years later, Congress amended the definition of "because of
sex" in Title VII to include pregnancy and related medical conditions.
*See* 42 U.S.C. 2000e(k).  As the Court later explained, this amendment
"not only overturned the specific holding in [*Gilbert*], but also *rejected
the test of discrimination employed by the Court in that case.*"  *Newport
News*, 462 U.S. at 676 (emphasis added); *see also id.* at 678 (recounting
how Congress "unambiguously expressed its disapproval of both the

holding and the reasoning of the Court in the *Gilbert* decision"). Specifically, Congress "unequivocally rejected [*Gilbert*'s] reasoning" that a health insurance plan "that single[s] out pregnancy-related benefits for exclusion [is] nondiscriminatory on its face" even though "only women can become pregnant." *Id.* at 684. Accordingly, when presented in *Newport News* with a health insurance plan that "mirror[ed] . . . the plan at issue in *Gilbert*," the Court held that the plan facially discriminated based on sex. *Id.* at 685; *see also ibid.* (explaining that "Congress' rejection of the premises of [*Gilbert*] forecloses any claim" that the plan is nondiscriminatory).

*Newport News* thus forecloses defendants' argument that facial discrimination cannot be found here because there may be some transgender individuals "who do not" want gender-affirming surgery. Br. 45. Under a straightforward application of the opinion's rationale, denying health insurance coverage to transgender employees for gender-affirming surgery constitutes sex discrimination under Title VII, even though not all transgender individuals will seek out such treatment. *See also Kadel*, 100 F.4th at 145 n.19 (explaining that "a

law need not affect every transgender person to discriminate against transgender people as a class").

Moreover, contrary to the assertions of defendants' amicus (Christian Emps. Amicus Br. 8-10), *Newport News* is not limited to pregnancy discrimination. Rather, the Court described its analysis as having applied "the proper test" for evaluating discrimination under Title VII. *Newport News*, 462 U.S. at 676. But regardless, even if the amicus were correct, defendants' argument still fails for two additional reasons. First, in relying on the fact that some transgender individuals may not pursue gender-affirming surgery, defendants mistake a potential lack of *injury* to some members of the protected class for a lack of facial discrimination under the plan. And second, the argument ignores the fact that where a transgender employee *does* want to undergo such treatment to treat gender dysphoria, the plan impermissibly denies coverage based on the purpose of the procedure and the employee's sex assigned at birth. *See* pp. 13-16, *supra*.[7]

---

[7] Defendants' amicus also suggests that "Congress amended Title VII to prescribe a different result only for discrimination 'on the basis of pregnancy,'" and "left the default rule of . . . *Gilbert* in place as to all other medical conditions." Christian Emps. Amicus Br. 6-7 (emphasis

7.  Finally, the foregoing analysis does not "effectively eliminate[] 'disparate impact' as a separate theory of liability."  *Lange v. Houston Cnty.*, 101 F.4th 793, 805 (11th Cir.) (Brasher, J., dissenting), *reh'g en banc granted, opinion vacated*, 110 F.4th 1254 (11th Cir. 2024). Disparate impact liability may apply where a defendant maintains a facially neutral employment practice that has a disparate impact on a protected group.  *See EEOC v. Joe's Stone Crab*, 220 F.3d 1263, 1274 (11th Cir. 2000).  But as set forth *supra*, the County's health plan is not neutral on its face—rather, the exclusions facially discriminate based on sex by prohibiting medically necessary treatments *only* when they are provided to change a person's sexual characteristics to match their gender identity.

Having demonstrated that the law discriminates on its face, Lange was not required to provide further evidence of discriminatory intent.  *See* Doc. 205, at 22, 28; *see also United Auto. Workers v.*

---

and citation omitted).  But the Supreme Court already has rejected the proposition that Title VII incorporates different causation standards for different types of sex discrimination.  *See Bostock*, 590 U.S. at 673 (finding no basis in "Title VII's text" for applying different standards to discrimination based on transgender status and discrimination based on "sex" or "sex[] stereotypes").

*Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991) ("Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination."); *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1313 (11th Cir. 1994) (explaining that a plaintiff establishes "disparate treatment" by showing that a policy "explicitly treats some employees differently from others on the basis of" a protected characteristic).  Nothing in this analysis conflates disparate treatment with disparate impact or rests on a mere finding that the challenged exclusions "uniquely affect[] members of a protected class."  *Lange*, 101 F.4th at 805 (Brasher, J., dissenting).

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's ruling and hold that the County's health insurance plan facially discriminates based on sex.

Respectfully submitted,

KARLA GILBRIDE
  General Counsel

JENNIFER S. GOLDSTEIN
  Associate General Counsel

DARA S. SMITH
  Assistant General Counsel

JEREMY D. HOROWITZ
  Attorney

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
  Office of General Counsel
  131 M St. NE, Fifth Floor
  Washington, D.C.  20507

KRISTEN CLARKE
  Assistant Attorney General

s/ Jason Lee
TOVAH R. CALDERON
ELIZABETH P. HECKER
ANNA M. BALDWIN
JASON LEE
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 305-1915

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of 11th Circuit Rule 35-7 and Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because it contains 6424 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365.

s/ Jason Lee
JASON LEE
  Attorney

Date: October 30, 2024