IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 22-13626

_____

ANNA LANGE,

Plaintiff-Appellee,

versus

HOUSTON COUNTY, GEORGIA, *et al.*,

Defendants-Appellants.


_____

**[PROPOSED] BRIEF OF LOCAL GOVERNMENTS AS *AMICI CURIAE*
IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE**

Joshua A. Rosenthal
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609

*Counsel for Amici Curiae*

October 30, 2024

## <u>CERTIFICATE OF INTERESTED PARTIES AND<br>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and 11th Cir. R. 26.1, 26.2-1, 26.1-3 and 28-1(b), the undersigned counsel of record for *Amici Curiae* hereby identifies the following interested persons:

1) Alabama, State of (Amicus Curiae for Defendants-Appellants);

2) Alaska, State of (Amicus Curiae for Defendants-Appellants);

3) Allen & Overy LLP (Counsel for Amicus Curiae Lawyers' Committee for Civil Rights Under Law);

4) Anti-Defamation League (Amicus Curiae for Plaintiff-Appellee);

5) Arkansas, State of (Amicus Curiae for Defendants-Appellants);

6) Arkles, Z. Gabriel (Counsel for Plaintiff-Appellee);

7) Association of American Physicians and Surgeons (Amicus Curiae for Defendants-Appellants);

8) Bailey, Andrew (Counsel for Amicus Curiae State of Missouri);

9) Barry, Kevin M. (Counsel for Plaintiff-Appellee);

10) Barton, III, Kenneth E. (Counsel for Plaintiff-Appellee);

11) Bingham, Joseph A. (Counsel for Amicus Curiae The Equal Voting Rights Institute d/b/a The American Civil Rights Project);

12) Bird, Brenna (Counsel for Amicus Curiae State of Iowa);

13) Bone, Michelle (Counsel for Amicus Curiae Lawyers' Committee for Civil Rights Under Law);

14) Bowdre, Alexander Barrett (Counsel for Amicus Curiae State of Alabama);

15) Brown, David (Counsel for Plaintiff-Appellee);

16) Burleigh, Billy (Amicus Curiae for Defendants-Appellants);

17) Calderon, Tvah R. (Counsel for Amicus Curiae United States Department of Justice);

18) Campbell, Jordan (Counsel for Amici Curiae Billy Burleigh, KathyGrace Duncan, and Jane Smith);

19) Campbell Miller Payne, PLLC (Counsel for Amici Curiae Billy Burleigh, KathyGrace Duncan, and Jane Smith);

20) Carr, Christopher M. (Counsel for Amicus Curiae State of Georgia);

21) Christian Employers Alliance (Amicus Curiae for Defendants Appellants);

22) Cincinnati, City of (Amicus Curiae for Plaintiff-Appellee);

23) Clarke, Kristen (Counsel for Amicus Curiae United States Department of Justice);

24) Cleveland, City of (Amicus Curiae for Plaintiff-Appellee);

25) Coglianese, Rich (Counsel for Amicus Curiae City of Columbus, Ohio);

26) Columbus, City of (Amicus Curiae for Plaintiff-Appellee);

27) Cooper, Barton & Cooper (Counsel for Plaintiff-Appellee);

28) Cooper, M. Devlin (Counsel for Plaintiff-Appellee);

29) Cuyahoga, County of (Amicus Curiae for Plaintiff-Appellee);

30) Deveney, William D. (Counsel for Defendants-Appellants);

31) Duncan, KathyGrace (Amicus Curiae for Defendants-Appellants);

32) Elarbee, Thompson, Sapp & Wilson, LLP (Counsel for Defendants Appellants);

33) Emch, Dale R. (Counsel for Amicus Curiae City of Toledo, Ohio);

34) Equal Rights Advocates (Amicus Curiae for Plaintiff-Appellee);

35) Ethics and Public Policy Center (Amicus Curiae for Defendants Appellants);

36) Fata, Catherine Elizabeth (Counsel for Plaintiff-Appellee);

37) Fitch, Lynn (Counsel for Amicus Curiae State of Mississippi);

38) Florida, State of (Amicus Curiae for Defendants-Appellants);

39) Georgia, State of (Amicus Curiae for Defendants-Appellants);

40) Gignilliat, R. Read (Counsel for Defendants-Appellants);

41) Goers, Eric (Counsel for Amicus Curiae Iowa City, Iowa);

42) Grant, Jill K. (Counsel for Plaintiff-Appellee);

43) Greenbaum, Jon (Counsel for Amicus Curiae Lawyers' Committee for Civil Rights Under Law);

44) Griffin, Mark (Counsel for Amicus Curiae City of Cleveland, Ohio);

45) Griffin, Tim (Counsel for Amicus Curiae State of Arkansas);

C-3

46) Hasson, Mary Rice (Counsel for Amicus Curiae Ethics and Public Policy Center);

47) Hilgers, Michael T. (Counsel for Amicus Curiae State of Nebraska);

48) Houston County, Georgia (Defendant-Appellant);

49) Idaho, State of (Amicus Curiae for Defendants-Appellants);

50) Indiana, State of (Amicus Curiae for Defendants-Appellants);

51) Iowa, State of (Amicus Curiae for Defendants-Appellants);

52) Iowa City (Amicus Curiae for Plaintiff-Appellee);

53) Jackley, Marty (Counsel for Amicus Curiae State of South Dakota);

54) Kansas, State of (Amicus Curiae for Defendants-Appellants);

55) Kieckhafer, Katherine (Counsel for Amicus Curiae Lawyers' Committee for Civil Rights Under Law);

56) Kniffen, Eric Nieuwenhuis (Counsel for Amicus Curiae Ethics and Public Policy Center);

57) Knudsen, Austin (Counsel for Amicus Curiae State of Montana);

58) Kobach, Kris W. (Counsel for Amicus Curiae State of Kansas);

59) Labrador, Raúl (Counsel for Amicus Curiae State of Idaho);

60) LaCour, Edmund G. Jr. (Counsel for Amicus Curiae State of Alabama);

61) Lail, Patrick L. (Counsel for Defendants-Appellants);

62) Lange, Anna (Plaintiff-Appellee);

63) Latino Justice PRLDEF (Amicus Curiae for Plaintiff-Appellee);

64) Lawyers' Committee for Civil Rights Under Law (Amicus Curiae for Plaintiff-Appellee);

65) Lee, Jason (Counsel for Amicus Curiae United States Department of Justice);

66) Louisiana, State of (Amicus Curiae for Defendants-Appellants);

67) Manoloff, Richard (Counsel for Amicus Curiae Cuyahoga County, Ohio)

68) Marshall, Steve (Counsel for Amicus Curiae State of Alabama);

69) Miller, Ronald (Counsel for Amici Curiae Billy Burleigh, KathyGrace Duncan, and Jane Smith);

70) Mills, Christopher (Counsel for Amicus Curiae Christian Employers Alliance);

71) Mississippi, State of (Amicus Curiae for Defendants-Appellants);

72) Missouri, State of (Amicus Curiae for Defendants-Appellants);

73) Mitrokostas, Nicholas K. (Counsel for Amicus Curiae Lawyers' Committee for Civil Rights Under Law);

74)  Miyares, Jason S. (Counsel for Amicus Curiae Commonwealth of Virginia);

75) Montana, State of (Amicus Curiae for Defendants-Appellants);

76) Moody, Ashley (Counsel for Amicus Curiae State of Florida);

77) Morenoff, Daniel I. (Counsel for Amicus Curiae The Equal Voting Rights Institute d/b/a The American Civil Rights Project);

78) Morgan, Sharon P. (Counsel for Defendants-Appellants);

79) Morrisey, Patrick (Counsel for Amicus Curiae State of West Virginia);

80) Murrill, Liz (Counsel for Amicus Curiae State of Louisiana);

81) National Employment Law Project (Amicus Curiae for Plaintiff Appellee);

82) National Health Law Program (Amicus Curiae for Plaintiff Appellee);

83) National Women's Law Center (Amicus Curiae for Plaintiff Appellee);

84) Nebraska, State of (Amicus Curiae for Defendants-Appellants);

85) North Dakota, State of (Amicus Curiae for Defendants Appellants);

86) Ohio, State of (Amicus Curiae for Defendants-Appellants);

87) Paxton, Ken (Counsel for Amicus Curiae State of Texas);

88) Payne, Amanda M. (Counsel for Plaintiff-Appellee);

89) Payne, Joshua K. (Counsel for Amici Curiae Billy Burleigh, KathyGrace Duncan, and Jane Smith);

90) Petrany, Stephen J. (Counsel for Amicus Curiae State of Georgia);

91) Powell, Wesley (Counsel for Plaintiff-Appellee);

92) Quinnipiac Univ. School of Law Legal Clinic (Counsel for Plaintiff-Appellee);

93) Reyes, Sean D. (Counsel for Amicus Curiae State of Utah);

94) Rosenthal, Joshua A. (Counsel for Amici Curiae Local Governments);

95) Rokita, Theodore E. (Counsel for Amicus Curiae State of Indiana);

96) Schlafly, Andrew L. (Counsel for Amicus Curiae Association of American Physicians and Surgeons);

97) Sepulveda, Daniel (Counsel for Amici Curiae Billy Burleigh, Kathy Grace Duncan, and Jane Smith);

98) Skrmetti, Jonathan (Counsel for Amicus Curiae State of Tennessee);

99) Smart Woerner, Emily (Counsel for Amicus Curiae City of Cincinnati, Ohio);

100) Smith, Jane (Amicus Curiae for Defendants-Appellants);

101) Spero Law LLC (Counsel for Amicus Curiae Christian Employers Alliance);

102) South Carolina, State of (Amicus Curiae for Defendants Appellants);

103) South Dakota, State of (Amicus Curiae for Defendants Appellants);

104) Talton, Cullen in his official capacity as Sheriff (Defendant Appellant);

105) Taylor, Treg (Counsel for Amicus Curiae State of Alaska);

106) Tennessee, State of (Amicus Curiae for Defendants-Appellants);

107) Texas, State of (Amicus Curiae for Defendants-Appellants);

108) Toledo, City of (Amicus Curiae for Plaintiff-Appellee);

109) Transgender Legal Defense Education Fund, Inc. (Counsel for Plaintiff-Appellee);

110) Treadwell, Hon. Marc T. (United States District Court Judge);

111) United States Department of Justice (Amicus Curiae for Plaintiff Appellee);

112) Utah, State of (Amicus Curiae for Defendants-Appellants);

113) Virginia, Commonwealth of (Amicus Curiae for Defendants Appellants);

114) West Virginia, State of (Amicus Curiae for Defendants Appellants);

115) Whitaker, Henry C. (Counsel for Amicus Curiae State of Florida);

116) Wilkie Farr & Gallagher LLP (Counsel for Plaintiff-Appellee);

117) Wilson, Alan (Counsel for Amicus Curiae State of South Carolina);

118) Wrigley, Drew H. (Counsel for Amicus Curiae State of North Dakota);

119) Youker, Kathryn J. (Counsel for Amicus Curiae Lawyers' Committee for Civil Rights Under Law);

120) Yost, Dave (Counsel for Amicus Curiae State of Ohio);

121) The American Civil Rights Project (Amicus Curiae for Defendants Appellants); and

122) The Equal Voting Rights Institute d/b/a The American Civil Rights Project (Amicus Curiae for Defendants-Appellants).

*Amici Curiae* are government entities that do not issue stock. Neither *Amici* nor their counsel are aware of any publicly traded corporation with an interest in this action.

This the 30th day of October, 2024

/s/ Joshua A. Rosenthal
Joshua A. Rosenthal

<u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PARTIES AND

    CORPORATE DISCLOSURE STATEMENT ................................................. C-1

TABLE OF CONTENTS ..........................................................................................i

TABLE OF AUTHORITIES .................................................................................. ii

INTEREST OF AMICUS CURIAE ........................................................................1

STATEMENT OF THE ISSUE ..............................................................................2

SUMMARY OF ARGUMENT ..............................................................................2

ARGUMENT ..........................................................................................................3

    I.  LOCAL GOVERNMENTS OF VARYING SIZES ACROSS THE
       UNITED STATES ALREADY COVER GENDER-AFFIRMING
       CARE. .......................................................................................................4

    II. COVERAGE OF GENDER-AFFIRMING CARE IS NOT COST
       PROHIBITIVE FOR LOCAL GOVERNMENTS. .......................................6

       A.  Providing Insurance Coverage of Gender-Affirming Healthcare is Not
          Expensive. ..............................................................................................6

       B.  Local Governments' Benefits from Covering Gender-Affirming Care
          Outweigh the Costs. ...............................................................................9

    III.LOCAL GOVERNMENTS REMAIN COMPETITIVE EMPLOYERS
       BY PROVIDING COVERAGE FOR GENDER-AFFIRMING CARE. .....11

CONCLUSION .....................................................................................................12

CERTIFICATE OF COMPLIANCE ....................................................................16

CERTIFICATE OF SERVICE .............................................................................17

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bostock v. Clayton County., Georgia*, 590 U.S. 644 (2020) ................................3

*City of Los Angeles, Dep't of Water & Power v. Manhart*,
  435 U.S. 702 (1978)............................................................................6

*Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*,
  462 U.S. 669 (1983)............................................................................3

**Regulations**

29 C.F.R. § 1604.9(e) ............................................................................6

**Other Authorities**

Am. Med. Ass'n, *Health insurance coverage for gender-affirming care of
  transgender patients* (2019), https://perma.cc/X94B-4KJP..............................10

Ann Huffman et al., *Workplace support and affirming behaviors: Moving
  toward a transgender, gender diverse, and non-binary friendly workplace*,
  22 Int. J. of Transgender Health 225 (2020)......................................................12

Beth Umland & Eliza Hilfer, *Health benefits that matter to the LGBTQ+
  community: By the numbers*, Mercer (last visited Oct. 9, 2024),
  https://perma.cc/XKH7-XR37 ..........................................................................4

Brief for Am. Med. Ass'n et al. as Amici Curiae Supporting Plaintiff-
  Appellees, *Kadel v. Folwell*, 100 F. 4th 122 (4th Cir. 2024) (No. 22-1721)....10

*Cleveland Population Demographics*, City of Cleveland (last visited Oct. 11, 2024), https://perma.cc/W62A-NW94 .............................................................5

E. Coleman, *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int. J. of Transgender Health S1 (2022).............9

Em Buyea, *The Impact of Banning Gender-Affirming Care in America: A Step Backward for Equality*, Tufts Ctr. for Health Sys. and Pol'y (June 26, 2023), https://perma.cc/4M3H-YA6B...............................................10

*Health Care for Transgender and Gender Diverse Individuals,* AGOC Committee Opinion No. 823 (2021), https://perma.cc/EPP9-K86M.................9

*HIV Treatment Adherence*, HIVinfo.NIH.gov (Aug. 12, 2021), https://perma.cc/PL6V-YT77...............................................................11

Human Rights Campaign Found., *Municipal Equality Index 2023* (Nov. 2023), https://perma.cc/TYJ5-FT2K ........................................4, 5, 11, 12

Human Rights Campaign Found., *San Francisco Transgender Benefit* (March 10, 2020), https://perma.cc/KC8F-W48W .............................................7

Human Rights Campaign Found., *Transgender-Inclusive Benefits: Medical Treatment Cost and Utilization* (last visited, Oct. 11, 2024), https://perma.cc/67AS-527Q ..........................................................7, 8

Jack L. Turban, et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation*, Pediatrics, (Feb. 2020).............................................10

Jody L. Herman, *Costs and Benefits of Providing Transition-Related Health Care Coverage in Employee Health Benefits Plans* (Sept. 2013), https://perma.cc/8EJG-2SBG......................................................7, 8, 10, 11, 12

Kassra Garoosi, *Association between genital gender-affirming surgery and psychiatric comorbidities in individuals with gender incongruence*, 21 J. of Sexual Med. 729 (2024) ...................................................................10

Kellan Baker & Arjee Restar, *Utilization and Costs of Gender-Affirming Care in a Commercially Insured Transgender Population*, 50 J. L. Med. Ethics 456 (2022) ..........................................................................8

Ledibabari Ngaage et al., *A Review of Insurance Coverage of Gender-Affirming Genital Surgery*, 145 J. Am. Soc. of Plastic Surgeons 803 (March 2020) ........................................................................................5

*Major Employers*, City of Cleveland, https://perma.cc/K3BW-WEWP ..............5

Pheadra Corso et al., *Medical costs and productivity losses due to interpersonal and self-directed violence in the United States*, 33 Am. J. of Preventative Med. 265 (2007) ..........................................................11

Rachelle Cutler et al., *Economic impact of medication nonadherence by disease groups: a systematic review*, 8 BMJ Open 10 (2018) .........................11

William V. Padula et al., *Societal Implications of Health Insurance Coverage for Medically Necessary Services in the U.S. Transgender Population: A Cost-Effectiveness Analysis*, 31 J. of Internal Med. 394 (2016) .............................................................................................................8

World Population Review, *Allentown, Pennsylvania Population 2024*, https://perma.cc/H6KN-TTXS. .........................................................................5

World Population Review, *Atlanta, Georgia Population 2024*, https://perma.cc/9QUY-URVB ................................................................................

## INTEREST OF AMICUS CURIAE[1]

*Amici* are localities across the country, representing communities of varying sizes with diverse populations, economic circumstances, and local interests. *Amici* all already offer health insurance to their employees, which covers gender-affirming care. We file this brief in strong support of Appellee and as a demonstration of our belief that providing coverage of transgender-inclusive healthcare is not only required under Title VII, but also deeply beneficial for local governments themselves.

As employers, we recognize the need to provide equal healthcare coverage in order to maintain a competitive and inclusive workplace. We are acutely aware that gender-affirmation treatment, including surgery, is medically necessary for some current and potential employees, and aim to provide insurance benefits that sufficiently support those who need it. *Amici* also view providing transition-related healthcare benefits as both cost-effective and consistent with our values. For *amici*, regardless of size or location, offering coverage of gender-affirming care has not proven expensive or burdensome. We share a common commitment to providing

---

[1] A list of all *amici* is available at Appendix A. No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund its preparation or submission. No person other than *amici* or *amici*'s counsel made a monetary contribution to the preparation or submission of this brief.

equal healthcare coverage for all of our employees, regardless of transgender status, and urge affirmance of the district court's injunction.

## STATEMENT OF THE ISSUE

Whether the employer-provided health insurance policy at issue, which covers medically necessary treatments for certain diagnoses but bars coverage for Lange's "sex change" surgery, facially violates Title VII of the Civil Rights Act of 1964.

## SUMMARY OF ARGUMENT

By mandating equal treatment of transgender-specific care, the district court and panel reached a determination that is not only legally correct but also aligns with sound public-sector employment practices. Affirming the decision below would not create additional burdens for local governments. On the contrary, local governments that cover transgender-inclusive healthcare find that it is cost effective and beneficial to their communities.

Local government offices are often major employers. They recruit, train, and support public servants across the country. Health insurance benefits are a central part of their compensation packages. And many local governments already offer healthcare plans that cover gender-affirming care for their transgender employees.

Providing equal healthcare coverage is advantageous for local governments. Insurance plans that cover gender-affirming care are widely offered by public and private employers alike. This coverage is not expensive for employers, as few

employees need to use it. By increasing access to medically necessary healthcare, government entities can also conserve resources in the long run by avoiding expensive adverse outcomes associated with a lack of treatment for those who do. Additionally, equal, inclusive coverage helps local governments remain competitive as employers, maintain an inclusive workplace, and increase job satisfaction.

## **ARGUMENT**

This Court's panel correctly read *Bostock v. Clayton County* to prohibit coverage exclusions that target gender-affirming surgeries for transgender employees.[2] Title VII bars discrimination on the basis of sex in "compensation, terms, conditions, or privileges of employment"—which includes health insurance benefits.[3] And as the Supreme Court makes clear in *Bostock*, discrimination "based on . . . transgender status necessarily entails discrimination based on sex."[4] Houston County's health insurance plan excludes "coverage for sex change surgery and drugs related to sex change surgery."[5] Since only transgender people would require surgery or medication for the purposes of a "sex change," the exclusion applies only to transgender employees, and discriminates unlawfully on that status.[6]

---

[2] Panel Op., App. Doc. 111-1.

[3] *Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 682 (1983).

[4] *Bostock v. Clayton County., Georgia*, 590 U.S. 644, 669 (2020).

[5] Dist. Ct. Op., Doc. 205, p. 23.

[6] Dist. Ct. Op., Doc. 205, p. 23–24.

Local governments are well-equipped to provide nondiscriminatory health insurance plans. By removing its "sex-change" exclusion, Houston County would conform to an employment practice already widely and successfully adopted by local government employers across the country.

## I.    LOCAL GOVERNMENTS OF VARYING SIZES ACROSS THE UNITED STATES ALREADY COVER GENDER-AFFIRMING CARE.

Many cities and counties offer insurance coverage for gender-affirming care, consistent with Title VII. As of November 2023, 215 cities offered benefits packages with transgender-inclusive healthcare, up from 188 cities in 2022.[7] And insurance plans that cover gender-affirming care are common even outside of local government. In 2022, half of all large private employers, as well as three quarters of employers with over 20,000 employees, covered gender-affirmation surgery.[8]

The localities that offer this coverage vary widely in size. For example, the city of Cleveland, Ohio offers its employees a choice between two health insurance plans, both of which include coverage for gender-affirming care. Cleveland city

---

[7] Human Rights Campaign Found., *Municipal Equality Index 2023* (Nov. 2023), https://perma.cc/TYJ5-FT2K.

[8] Beth Umland & Eliza Hilfer, *Health benefits that matter to the LGBTQ+ community: By the numbers*, Mercer (last visited Oct. 9, 2024), https://perma.cc/XKH7-XR37.

government has 6,561 employees,[9] serving over 361,000 constituents.[10] The City of Atlanta, Georgia, with a population of more than 500,000,[11] also offers insurance coverage of gender-affirming care for its employees.[12] And many smaller localities, such as Allentown, Pennsylvania with its population of less than 125,000 people,[13] cover gender-affirmation treatment for their employees.[14]

Local governments' budgets and operations can accommodate nondiscriminatory health plans. Over ninety percent of insurance companies have a policy that covers gender-affirming care.[15] In fact, Houston County's insurance provider had removed exclusions for "sex change surgery" from its default plans in 2016.[16] Generally, Houston County, like other government employers, follows the suggestion of its insurance providers regarding what exclusions are reasonable to maintain.[17] Here, however, the County explicitly chose to keep an exclusion for "sex

[9] *Major Employers*, City of Cleveland (last visited Oct. 9, 2024), https://perma.cc/K3BW-WEWP.

[10] *Cleveland Population Demographics*, City of Cleveland (last visited Oct. 11, 2024), https://perma.cc/W62A-NW94.

[11] World Population Review, *Atlanta, Georgia Population 2024*, (last visited Oct. 29, 2024), https://perma.cc/9QUY-URVB.

[12] *Municipal Equality Index 2023*, *supra* n.7.

[13] World Population Review, *Allentown, Pennsylvania Population 2024*, (last visited Oct. 29, 2024), https://perma.cc/H6KN-TTXS.

[14] *Municipal Equality Index 2023*, *supra* n.7.

[15] Ledibabari Ngaage et al., *A Review of Insurance Coverage of Gender-Affirming Genital Surgery*, 145 J. Am. Soc. of Plastic Surgeons 803, 805 (March 2020).

[16] Dist. Ct. Op., Doc. 205, p. 4.

[17] Dist. Ct. Op., Doc. 205, p. 4; Def.'s Statement of Material Facts Resp., Doc. 179-3, ¶¶ 87–90.

change surgery" despite its provider's recommendation and nondiscrimination policies.[18]

## II. COVERAGE OF GENDER-AFFIRMING CARE IS NOT COST PROHIBITIVE FOR LOCAL GOVERNMENTS.

In this case, Houston County "did not consider any cost information prior to deciding not to grant Lange's request to remove the Exclusion."[19] Furthermore, cost justification is not a viable defense to a Title VII claim.[20] However, even if considerations of cost were relevant, they would weigh against the denial of equal coverage for gender-affirming care for two reasons.[21] First, the coverage itself is not expensive. And second, providing coverage allows local governments to avoid the negative financial consequences of limiting access to care.

### A. Providing Insurance Coverage of Gender-Affirming Healthcare is Not Expensive.

Cities and counties can offer an insurance plan that covers gender-affirming surgery and healthcare without experiencing financial strain. Almost twenty-five

---

[18] Dist. Ct. Op., Doc. 205, p. 4.

[19] Dist. Ct. Op., Doc. 205, p. 7.

[20] *City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 717 (1978); *see also* 29 C.F.R. § 1604.9(e) ("It shall not be a defense under Title VII to a charge of sex discrimination in benefits that the cost of such benefits is greater with respect to one sex than the other.").

[21] For these reasons, the concerns articulated by *amici* Missouri and other states are unfounded. *See* Brief for Missouri et al. as Amici Curiae Supporting Defendants-Appellants App. Doc 117, p. 14.

years ago, the city of San Francisco removed exclusions for transgender healthcare from its insurance plans for employees and their dependents.[22] Since then, the city has seen "no increase in overall premiums or plan costs attributable to the transgender benefit."[23] Instead, both the cost of the benefit and its utilization have been low.[24] More recently, *amicus* City of Cleveland conducted a review of claims submitted under one of its insurance plans that covers gender-affirming care. The City found that between January 2022 and September 2024, it had not received any claims for gender-affirmation surgery, and that claims related to other treatments for gender identity disorder cost just over $5,600. Annually, all claims filed under this plan total roughly thirty million dollars. Thus, in the past two- and one-half years, claims for gender-affirming care made up less than 0.00007 of costs under the plan.

Similarly, private employers who cover gender-affirmation treatment have not noticed any increases in costs that could be attributed to coverage.[25] In a survey of private and public employers who offer transgender-inclusive benefits, eighty-five

---

[22] Human Rights Campaign Found., *San Francisco Transgender Benefit* (March 10, 2020), https://perma.cc/KC8F-W48W

[23] *Id*; *see also* Jody L. Herman, *Costs and Benefits of Providing Transition-Related Health Care Coverage in Employee Health Benefits Plans* 3 (Sept. 2013), https://perma.cc/8EJG-2SBG ("[P]roviding broader coverage did not result in higher costs for surveyed employers.").

[24] *San Francisco Transgender Benefit*, *supra* n.22

[25] Human Rights Campaign Found., *Transgender-Inclusive Benefits: Medical Treatment Cost and Utilization* (last visited, Oct. 11, 2024), https://perma.cc/67AS-527Q.

percent of respondents reported *no costs* associated with adding transition-related coverage to their existing healthcare plans.[26]

Insurance coverage of gender-affirming healthcare is likely inexpensive because few employees submit claims for utilization of transgender-inclusive benefits.[27] By some estimates, "an employer with 20,000 employees would see, on average, one claimant utilizing the transition-related healthcare benefit every 14 months."[28] According to a study conducted in 2019, the average cost per person of a vaginoplasty and phalloplasty was $53,645 and $133,911, respectively.[29] Yet, given the low utilization rate for transition-related services, the budget impact on insurance claims was only seventy-two cents per year, or six cents per month, per member.[30] An earlier study analyzing the cost-effectiveness of insurance coverage for gender-affirming care found that the five-year budget impact of providing such coverage would be even less: only 1.6 cents per member per month.[31]

---

[26] Herman, *supra* n.23, at 2.

[27] *Transgender-Inclusive Benefits: Medical Treatment Cost and Utilization*, *supra* n.25.

[28] Herman, *supra* n.23, at 13.

[29] Kellan Baker & Arjee Restar, *Utilization and Costs of Gender-Affirming Care in a Commercially Insured Transgender Population*, 50 J. L. Med. Ethics 456, 463 (2022).

[30] *Id.* at 467.

[31] William v. Padula et al., *Societal Implications of Health Insurance Coverage for Medically Necessary Services in the U.S. Transgender Population: A Cost-Effectiveness Analysis*, 31 J. of Internal Med. 394, 398 (2016).

Defendants admit that Houston County's Health Plan denies coverage for certain surgeries when associated with a diagnosis of gender dysphoria, but covers the relevant procedures and treatments in connection with different diagnoses.[32] Getting rid of the discriminatory exclusion would increase claims only to the extent that *transgender* employees undergo "*sex change surgery*," but not for reconstructive surgeries on sex-associated organs for cisgender employees.[33] Thus, it would not broadly increase the type of treatment a local government entity would have to cover. In short, because these surgeries are not frequently necessary, any costs associated with coverage of gender-affirming care would likely be minimal.

## B. Local Governments' Benefits from Covering Gender-Affirming Care Outweigh the Costs.

For the limited number of employees who do require gender-affirming care, the consequences of living without treatment can be severe.[34] And without insurance coverage, most patients cannot access care.[35] Transgender people for whom gender-affirming care is medically necessary may "experience increased psychological distress, depression, anxiety, and self-harm tendencies" without it.[36]

---

[32] Dist. Ct. Op., Doc. 205, p. 22.

[33] Defs.' Statement of Material Facts Resp., Doc. 179-3, ¶¶ 77–78.

[34] E. Coleman, *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int. J. of Transgender Health S1, S18–19 (2022).

[35] *Health Care for Transgender and Gender Diverse Individuals*, AGOC Committee Opinion No. 823 (2021), https://perma.cc/EPP9-K86M.

[36] Em Buyea, *The Impact of Banning Gender-Affirming Care in America: A Step Backward for Equality*, Tufts Ctr. for Health Sys. and Pol'y (June 26, 2023),

Those who receive care, on the other hand, benefit from its significant positive effects. After undergoing gender-affirming treatment, patients have lower rates of anxiety, suffer from fewer functional impairments, and experience a higher quality of life.[37] Increased access to gender-affirming care also leads to a reduction in suicide and substance use, improvements in mental health, and, for those who need it, higher rates of adherence to HIV care.[38]

Local government employers similarly experience benefits associated with providing treatment, including increased employee productivity and noticeable cost savings.[39] After all, employers benefit as the health of their employees improves. When an employee suffers from poor mental health or suicidal tendencies associated with a lack of gender-affirming care, employers, as insurers, cover the costs of acute

---

https://perma.cc/4M3H-YA6B; *see also* Jack L. Turban, et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation*, Pediatrics, (Feb. 2020) at 1, 2.

[37] Brief for Am. Med. Ass'n et al. as Amici Curiae Supporting Plaintiff-Appellees, *Kadel v. Folwell*, 100 F. 4th 122 (4th Cir. 2024) (No. 22-1721); *see also* Kassra Garoosi, *Association between genital gender-affirming surgery and psychiatric comorbidities in individuals with gender incongruence*, 21 J. of Sexual Med. 729, 733 (2024) (finding "a significant association" gender-affirming surgery and "reduced psychiatric comorbidities" in individuals with gender dysphoria).

[38] Am. Med. Ass'n, *Health insurance coverage for gender-affirming care of transgender patients* (2019), https://perma.cc/X94B-4KJP.

[39] Herman, *supra* n.23, at 7 ("[C]ost savings [] may result by reducing costs associated with not providing medically necessary care for people who experience gender dysphoria.").

care, hospitalization, and long-term mental health treatment.[40] Employers also face additional costs if employees' distress interferes with treatment of other medical conditions, such as HIV. Inclusive coverage helps to reduce costs related to absenteeism or lowered productivity because of illness.[41] By making a minimal financial investment in coverage for gender-affirming care, local governments can avoid the costs associated with a lack of access to transition-related treatment and improve the lives of their transgender employees.[42]

## III.  LOCAL GOVERNMENTS REMAIN COMPETITIVE EMPLOYERS BY PROVIDING COVERAGE FOR GENDER-AFFIRMING CARE.

For local governments, ensuring that their employee insurance policies cover gender-affirming care is an asset, not a burden. Inclusive workplace policies, including benefits packages, have been proven to be effective employee recruitment and retention tools.[43] In a survey of employers that offer transgender-inclusive benefits, over half of the respondents noted that providing this coverage made them more competitive in their fields and "help[ed them] to retain and/or recruit the best

---

[40] *Id.* at 9–10; *see generally* Pheadra Corso et al., *Medical costs and productivity losses due to interpersonal and self-directed violence in the United States*, 33 Am. J. of Preventative Med. 265 (2007).

[41] Rachelle Cutler et al., *Economic impact of medication nonadherence by disease groups: a systematic review*, BMJ Open 10 (2018); *see also HIV Treatment Adherence*, HIVinfo.NIH.gov (Aug. 12, 2021), https://perma.cc/PL6V-YT77 ("Skipping HIV medicine . . . increases the risk of drug resistance and . . . allows HIV to destroy the immune system.").

[42] Herman, *supra* n.23, at 7.

[43] *Municipal Equality Index 2023*, *supra* n.7.

available talent in the industry."[44] These benefits also enhance an employer's reputation and increase job satisfaction among employees.[45] Healthcare and other benefits, rather than salary alone, are a large part of what draws people to public employment. People employed by cities and counties work to serve their communities and expect their employers to provide them with the necessary support to remain healthy and productive. More broadly, offering insurance packages that cover gender-affirming care allows local-government employers to reflect their values of equality and fairness in their human resources policies.[46] By providing these benefits to their employees, local governments can foster inclusive workplaces for public servants across the country.

## CONCLUSION

*Amici* and other local governments around the country have found that they benefit from providing equal healthcare coverage, for very limited additional cost. Accordingly, and for all of the reasons stated by Appellees, the order of the district court should be affirmed.

Respectfully submitted,

---

[44] Herman, *supra* n.23, at 15.

[45] *Municipal Equality Index 2023*, *supra* n.7; *see also* Ann Huffman et al., *Workplace support and affirming behaviors: Moving toward a transgender, gender diverse, and non-binary friendly workplace*, 22 Int. J. of Transgender Health 225 (2020) (discussing the importance of workplace support for job satisfaction among non-binary and transgender employees).

[46] Herman, *supra* n.23, at 15.

/s/ Joshua A. Rosenthal
Joshua A. Rosenthal
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
T: 330-607-0730
josh@publicrightsproject.org
*Counsel for Amici Curiae*

## **ADDITIONAL COUNSEL**

RICH COGLIANESE
City Attorney
77 North Front Street, 4th Floor
Columbus, OH 43215
*Counsel for the City of Columbus, Ohio*

DALE R. EMCH
Law Director
One Government Center, Ste. 2250
Toledo, OH 43604
*Counsel for City of Toledo, Ohio*

ERIC GOERS
City Attorney
410 E. Washington St
Iowa City, IA 52240
*Counsel for Iowa City, Iowa*

MARK D. GRIFFIN
Chief Legal Officer and Law Director
601 Lakeside Ave., Room 106
Cleveland, OH 44114
*Counsel for the City of Cleveland, Ohio*

RICHARD D. MANOLOFF
Director of Law
Cuyahoga County Department of Law
2079 East 9th Street, 7th Floor
Cleveland, OH 44115
*Counsel for Cuyahoga County, Ohio*

EMILY SMART WOERNER
City Solicitor
801 Plum Street, Room 214
Cincinnati, OH 45202
*Counsel for City of Cincinnati, Ohio*

## <u>APPENDIX A – LIST OF *AMICI CURIAE*</u>

City of Columbus, Ohio
City of Cincinnati, Ohio
City of Cleveland, Ohio
Cuyahoga County, Ohio
Iowa City, Iowa
City of Toledo, Ohio

## **CERTIFICATE OF COMPLIANCE**

Counsel for *Amici Curiae* hereby certifies that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B). This brief contains 2,722 words.

This the 30th day of October, 2024

*/s/ Joshua A. Rosenthal*
Joshua A. Rosenthal
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
(330) 607-0730
josh@publicrightsproject.org

*Counsel for Amici Curiae*

16

## **CERTIFICATE OF SERVICE**

I hereby certify that I have, this date, filed electronically the foregoing [Proposed] Brief of Local Governments as Amici Curiae in Support of Plaintiff-Appellee and Affirmance with the Clerk of this Court, and have served it upon counsel by filing it with the court's electronic-filing system. I have also delivered ten copies of this brief to Clerk of Court, U.S. Court of Appeals for the Eleventh Circuit, 56 Forsythe St. N.W., Atlanta, Georgia 30303.

This the 30th day of October, 2024

*/s/ Joshua A. Rosenthal*
Joshua A. Rosenthal
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
(330) 607-0730
josh@publicrightsproject.org

*Counsel for Amici Curiae*

17