Case No. 22-13626-U

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

## HOUSTON COUNTY, GEORGIA, AND HOUSTON COUNTY SHERIFF CULLEN TALTON, IN HIS OFFICIAL CAPACITY
Defendants-Appellants,

**v.**

## ANNA LANGE
Plaintiff-Appellee.

---

## ON APPEAL FROM
## THE UNITED STATES DISTRICT COURT FOR THE MIDDLE
## DISTRICT OF GEORGIA, MACON DIVISION
## CASE NO.:  5:19-CV-00392-MTT

---

## EN BANC REPLY BRIEF OF DEFENDANTS-APPELLANTS

---

**Sharon P. Morgan, Georgia Bar No. 522955**
**R. Read Gignilliat, Georgia Bar No. 293390**
**William D. Deveney, Georgia Bar No. 219744**
**Patrick L. Lail, Georgia Bar No. 431101**
**ELARBEE, THOMPSON, SAPP & WILSON LLP**
**800 International Tower**
**229 Peachtree Street, NE**
**Atlanta, Georgia 30303**
**(404) 659-6700**

**Attorneys for Defendants-Appellants**

Case No. 22-13626-U

Houston County, Georgia, et al. v. Lange

## **DEFENDANTS-APPELLANTS' CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, Appellants hereby certify that the following is a full and complete list of all interested persons as defined under the above-referenced rules that may have an interest in the outcome of this case:

1) ACLU Foundation of Florida (Amicus Curiae for Plaintiff-Appellee);

2) Alabama, State of (Amicus Curiae for Defendants-Appellants);

3) Alaska, State of (Amicus Curiae for Defendants-Appellants);

4) Allen & Overy LLP (Counsel for Amicus Curiae Lawyers' Committee for Civil Rights Under Law);

5) American Civil Liberties Union Foundation (Amicus Curiae for Plaintiff-Appellee);

6) Anti-Defamation League (Amicus Curiae for Plaintiff-Appellee);

7) Arkansas, State of (Amicus Curiae for Defendants-Appellants);

8) Arkles, Z. Gabriel (Counsel for Plaintiff-Appellee);

9) Association of American Physicians and Surgeons (Amicus Curiae for Defendants-Appellants);

10) Bailey, Andrew (Counsel for Amicus Curiae State of Missouri);

C-1

Case No. 22-13626-U
Houston County, Georgia, et al. v. Lange

11)   Barceleau, Dominic (Counsel for Amicus Curiae State of Missouri);

12)   Barry, Kevin M. (Counsel for Plaintiff-Appellee);

13)   Barton, III, Kenneth E. (Counsel for Plaintiff-Appellee);

14)   Bingham, Joseph A. (Counsel for Amicus Curiae The Equal Voting Rights Institute d/b/a The American Civil Rights Project);

15)   Bird, Brenna (Counsel for Amicus Curiae State of Iowa);

16)   Block, Joshua A. (Counsel for Amicus Curiae American Civil Liberties Union Foundation);

17)   Bone, Michelle (Counsel for Amicus Curiae Lawyers' Committee for Civil Rights Under Law);

18)   Bowdre, Alexander Barrett (Counsel for Amicus Curiae State of Alabama);

19)   Brown, David (Counsel for Plaintiff-Appellee);

20)   Burleigh, Billy (Amicus Curiae for Defendants-Appellants);

21)   Burroughs, Gaylynn (Counsel for Amicus Curiae National Women's Law Center ("NWLC")

22)   Calderon, Tvah R. (Counsel for Amicus Curiae United States Department of Justice);

23)   Campbell, Jordan (Counsel for Amici Curiae Billy Burleigh, KathyGrace Duncan, and Jane Smith);

24)   Campbell Miller Payne, PLLC (Counsel for Amici Curiae Billy Burleigh, KathyGrace Duncan, and Jane Smith);

Case No. 22-13626-U
Houston County, Georgia, et al. v. Lange

25) Carr, Christopher M. (Counsel for Amicus Curiae State of Georgia);

26) Christian Employers Alliance (Amicus Curiae for Defendants-Appellants);

27) Cincinnati, City of (Amicus Curiae for Plaintiff-Appellee);

28) Clarke, Kristen (Counsel for Amicus Curiae United States Department of Justice);

29) Cleveland, City of (Amicus Curiae for Plaintiff-Appellee);

30) Coglianese, Rich (Counsel for Amicus Curiae City of Columbus, Ohio);

31) Columbus, City of (Amicus Curiae for Plaintiff-Appellee);

32) Cooper, Barton & Cooper (Counsel for Plaintiff-Appellee);

33) Cooper, M. Devlin (Counsel for Plaintiff-Appellee);

34) Cuyahoga, County of (Amicus Curiae for Plaintiff-Appellee);

35) Deveney, William D. (Counsel for Defendants-Appellants);

36) Divine, Joshua M. (Counsel for Amicus Curiae State of Missouri);

37) Duncan, KathyGrace (Amicus Curiae for Defendants-Appellants);

38) Elarbee, Thompson, Sapp & Wilson, LLP (Counsel for Defendants-Appellants);

39) Emch, Dale R. (Counsel for Amicus Curiae City of Toledo, Ohio);

40) Equal Rights Advocates (Amicus Curiae for Plaintiff-Appellee);

C-3

Case No. 22-13626-U
Houston County, Georgia, et al. v. Lange

41)   Ethics and Public Policy Center (Amicus Curiae for Defendants-Appellants);

42)   Fata, Catherine Elizabeth (Counsel for Plaintiff-Appellee);

43)   Fitch, Lynn (Counsel for Amicus Curiae State of Mississippi);

44)   Florida, State of (Amicus Curiae for Defendants-Appellants);

45)   Georgia, State of (Amicus Curiae for Defendants-Appellants);

46)   Gignilliat, R. Read (Counsel for Defendants-Appellants);

47)   Goers, Eric (Counsel for Amicus Curiae Iowa City, Iowa);

48)   Grant, Jill K. (Counsel for Plaintiff-Appellee);

49)   Greenbaum, Jon (Counsel for Amicus Curiae Lawyers' Committee for Civil Rights Under Law);

50)   Griffin, Mark (Counsel for Amicus Curiae City of Cleveland, Ohio);

51)   Griffin, Tim (Counsel for Amicus Curiae State of Arkansas);

52)   Hasson, Mary Rice (Counsel for Amicus Curiae Ethics and Public Policy Center);

53)   Hilgers, Michael T. (Counsel for Amicus Curiae State of Nebraska);

54)   Houston County, Georgia (Defendant-Appellant);

55)   Idaho, State of (Amicus Curiae for Defendants-Appellants);

56)   Indiana, State of (Amicus Curiae for Defendants-Appellants);

Case No. 22-13626-U
Houston County, Georgia, et al. v. Lange

57)   Iowa City (Amicus Curiae for Plaintiff-Appellee);

58)   Iowa, State of (Amicus Curiae for Defendants-Appellants);

59)   Jackley, Marty (Counsel for Amicus Curiae State of South Dakota);

60)   Kansas, State of (Amicus Curiae for Defendants-Appellants);

61)   Kieckhafer, Katherine (Counsel for Amicus Curiae Lawyers' Committee for Civil Rights Under Law);

62)   Kniffen, Eric Nieuwenhuis (Counsel for Amicus Curiae Ethics and Public Policy Center);

63)   Knudsen, Austin (Counsel for Amicus Curiae State of Montana);

64)   Kobach, Kris W. (Counsel for Amicus Curiae State of Kansas);

65)   Labrador, Raúl (Counsel for Amicus Curiae State of Idaho);

66)   LaCour, Edmund G. Jr. (Counsel for Amicus Curiae State of Alabama);

67)   Lail, Patrick L. (Counsel for Defendants-Appellants);

68)   Lange, Anna (Plaintiff-Appellee);

69)   Latino Justice PRLDEF (Amicus Curiae for Plaintiff-Appellee);

70)   Lawyers' Committee for Civil Rights Under Law (Amicus Curiae for Plaintiff-Appellee);

71)   Lee, Jason (Counsel for Amicus Curiae United States Department of Justice);

C-5

Case No. 22-13626-U
Houston County, Georgia, et al. v. Lange

72) Louisiana, State of (Amicus Curiae for Defendants-Appellants)

73) Manoloff, Richard (Counsel for Amicus Curiae Cuyahoga County, Ohio);

74) Marino, Anya (Counsel for Amicus Curiae NWLC);

75) Marshall, Steve (Counsel for Amicus Curiae State of Alabama);

76) McNamara, Caroline A. (Counsel for Amicus Curiae ACLU Foundation of Florida);

77) Miller, Ronald (Counsel for Amici Curiae Billy Burleigh, KathyGrace Duncan, and Jane Smith);

78) Mills, Christopher (Counsel for Amicus Curiae Christian Employers Alliance);

79) Mississippi, State of (Amicus Curiae for Defendants-Appellants);

80) Missouri, State of (Amicus Curiae for Defendants-Appellants);

81) Mitrokostas, Nicholas K. (Counsel for Amicus Curiae Lawyers' Committee for Civil Rights Under Law);

82) Miyares, Jason S. (Counsel for Amicus Curiae Commonwealth of Virginia);

83) Montana, State of (Amicus Curiae for Defendants-Appellants);

84) Moody, Ashley (Counsel for Amicus Curiae State of Florida);

85) Morenoff, Daniel I. (Counsel for Amicus Curiae The Equal Voting Rights Institute d/b/a The American Civil Rights Project);

86) Morgan, Sharon P. (Counsel for Defendants-Appellants);

Case No. 22-13626-U
Houston County, Georgia, et al. v. Lange

87)    Morrisey, Patrick (Counsel for Amicus Curiae State of West Virginia);

88)    Murrill, Liz (Counsel for Amicus Curiae State of Louisiana);

89)    National Employment Law Project (Amicus Curiae for Plaintiff-Appellee);

90)    National Health Law Program (Amicus Curiae for Plaintiff-Appellee);

91)    National Women's Law Center (Amicus Curiae for Plaintiff-Appellee);

92)    Nebraska, State of (Amicus Curiae for Defendants-Appellants);

93)    North Dakota, State of (Amicus Curiae for Defendants-Appellants);

94)    Ohio, State of (Amicus Curiae for Defendants-Appellants);

95)    Paxton, Ken (Counsel for Amicus Curiae State of Texas);

96)    Payne, Amanda M. (Counsel for Plaintiff-Appellee);

97)    Payne, Joshua K. (Counsel for Amici Curiae Billy Burleigh, KathyGrace Duncan, and Jane Smith);

98)    Petrany, Stephen J. (Counsel for Amicus Curiae State of Georgia);

99)    Powell, Wesley (Counsel for Plaintiff-Appellee);

100)  Pride At Work, AFL-CIO (Amicus Curiae for Plaintiff-Appellee);

101)  Public Rights Project (Amicus Curiae for Plaintiff-Appellee);

Case No. 22-13626-U
Houston County, Georgia, et al. v. Lange

102)  Quinnipiac Univ. School of Law Legal Clinic (Counsel for Plaintiff-Appellee);

103)  Reyes, Sean D. (Counsel for Amicus Curiae State of Utah);

104)  Rodriguez, Dariely (Counsel for Amicus Curiae Lawyers' Committee for Civil Rights Under Law);

105)  Rokita, Theodore E. (Counsel for Amicus Curiae State of Indiana);

106)  Rosenthal, Joshua A. (Counsel for Amicus Curiae Public Rights Project);

107)  Schlafly, Andrew L. (Counsel for Amicus Curiae Association of American Physicians and Surgeons);

108)  Sepulveda, Daniel (Counsel for Amici Curiae Billy Burleigh, KathyGrace Duncan, and Jane Smith);

109)  Skrmetti, Jonathan (Counsel for Amicus Curiae State of Tennessee);

110)  Smart Woerner, Emily (Counsel for Amicus Curiae State of Tennessee);

111)  Smith, Jane (Amicus Curiae for Defendants-Appellants);

112)  Smith, Rachel (Counsel for Amicus Curiae NWLC);

113)  Spero Law LLC (Counsel for Amicus Curiae Christian Employers Alliance);

114)  South Carolina, State of (Amicus Curiae for Defendants-Appellants);

C-8

Case No. 22-13626-U
Houston County, Georgia, et al. v. Lange

115) South Dakota, State of (Amicus Curiae for Defendants-Appellants);

116) Talton, Cullen (deceased) in his official capacity as Sheriff (Defendant-Appellant);

117) Taylor, Treg (Counsel for Amicus Curiae State of Alaska);

118) Tennessee, State of (Amicus Curiae for Defendants-Appellants);

119) Texas, State of (Amicus Curiae for Defendants-Appellants);

120) The American Civil Rights Project (Amicus Curiae for Defendants-Appellants);

121) The Equal Voting Rights Institute d/b/a The American Civil Rights Project (Amicus Curiae for Defendants-Appellants

122) Theran, Elizabeth E. (Counsel for Amicus Curiae NWLC);

123) Tilley, Daniel B. (Counsel for Amicus Curiae ACLU Foundation of Florida);

124) Toledo, City of (Amicus Curiae for Plaintiff-Appellee);

125) Transgender Legal Defense Education Fund, Inc. (Counsel for Plaintiff-Appellee);

126) Treadwell, Hon. Marc T. (United States District Court Judge);

127) United States Department of Justice (Amicus Curiae for Plaintiff-Appellee);

128) Utah, State of (Amicus Curiae for Defendants-Appellants);

Case No. 22-13626-U
Houston County, Georgia, et al. v. Lange

129) Virginia, Commonwealth of (Amicus Curiae for Defendants-Appellants);

130) West Virginia, State of (Amicus Curiae for Defendants-Appellants);

131) Whitaker, Henry C. (Counsel for Amicus Curiae State of Florida);

132) Wilkie Farr & Gallagher LLP (Counsel for Plaintiff-Appellee);

133) Wilson, Alan (Counsel for Amicus Curiae State of South Carolina);

134) Wrigley, Drew H. (Counsel for Amicus Curiae State of North Dakota);

135) Youker, Kathryn J. (Counsel for Amicus Curiae Lawyers' Committee for Civil Rights Under Law); and

136) Yost, Dave (Counsel for Amicus Curiae State of Ohio).

<u>s/ Sharon P. Morgan</u>
Ga. Bar No. 522955
morgan@elarbeethompson.com
R. Read Gignilliat
Ga. Bar No. 293390
gignilliat@elarbeethompson.com
William D. Deveney
Ga. Bar No. 219744
deveney@elarbeethompson.com
Patrick L. Lail
Ga. Bar No. 431101
lail@elarbeethompson.com

C-10

## TABLE OF CONTENTS

APPELLANTS' CERTIFICATE OF INTERESTED PERSONS AND

CORPORATE DISCLOSURE STATEMENT ........................................ C-1

TABLE OF CONTENTS ................................................................ i

TABLE OF CITATIONS ............................................................... iv

ARGUMENT AND CITATION OF AUTHORITY .................................... 1

    I.   The Parties' Positions Reflect Different Views of

        Discrimination, the Impact of *Bostock*, and

        Summary Judgment ..................................................... 2

        A. *Bostock* ............................................................ 2

        B. *Manhart* ........................................................... 8

        C. *Newport News* .................................................... 9

        D. *Young* ............................................................. 11

        E. Differences/Similarities in surgical procedures .............. 12

        F. Summary judgment standard ................................... 15

    II.  Plaintiff's Position is not Consistent with the Law ................ 19

    III.  Summary Judgment for Plaintiff Should Be Reversed

        and the Injunction Should Be Dissolved .................................. 22

CONCLUSION ........................................................................ 27

# TABLE OF CITATIONS

**Federal Cases**                                          **Page(s)**

*Adams v. Sch. Bd. of St. Johns County,*
   57 F.4th 791 (11th Cir. 2022) (en banc) ................................ 5

*Anderson v. Liberty Lobby,*
   477 U.S. 242 (1986) ................................................................ 16

*Avirgan v. Hull,*
   932 F.2d 1572 (11th Cir. 1991) .......................................... 16

*Bostock v. Clayton County,*
   590 U.S. 644 (2020) ................................................... *passim*

*Boyden v. Conlin,*
   341 F. Supp. 3d 979 (W.D. Wis. 2018) ................................ 11

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ................................................................ 16

*City of Los Angeles v. Manhart,*
   435 U.S. 702 (1978) ............................................... passim

*Copeland v. Georgia Department of Corrections,*
   97 F.4th 766 (11th Cir. 2024) ............................................ 3

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.,*
   884 F.3d 560 (6th Cir. 2018) ............................................... 6

*Fletcher v. Alaska,*
   443 F. Supp. 3d 1024 (D. Alaska 2020) .............................. 11

*Fontenot v. Upjohn Co.,*
   780 F.2d 1190 (5th Cir. 1986) ............................................ 16

*Glenn v. Brumby,*
   663 F. 3d 1312 (11th Cir. 2011) .......................................... 6

*Grimm v. Gloucester County Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020) ............................................................. 4

*Harris v. Forklift Sys.*,
  510 U.S. 17 (1993) ........................................................................... 21

*Kadel v. Folwell*,
  100 F.4th 122 (4th Cir.) (en banc) ................................................ 4, 11

*Kirby v. Anthem*,
  2019 WL 2004128 (N.D. Ga. Mar. 21, 2019) .................................... 18

*Kirkland v. City of Tallahassee*,
  856 F. App'x 219 (11th Cir. 2021) ..................................................... 25

*Lewis v. City of Union City*,
  918 F.3d 1213 (11th Cir. 2019) (en banc) ...................................... 5, 12

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*
  475 U.S. 574 (1986) ......................................................................... 16

*Mitchell v. City of Lafayette*,
  504 F. App'x 867 (11th Cir. 2013) ..................................................... 25

*Newport News Shipbuilding and Dry Dock Co. v. E.E.O.C.*,
  462 U.S. 669, 683 (1983) ................................................................ 9, 10

*Perimeter Mall, Inc v. Retail Sense, Inc.*,
  162 Ga. App. 465 (1982) .................................................................. 18

*Phillips v. Legacy Cabinets*,
  87 F.4th 1313 (11th Cir. 2023) ......................................................... 26

*Ricci v. DeStefano*,
  557 U.S. 557 (2009) ......................................................................... 19

*Showtime/The Movie Channel, Inc. v. Covered Bridge
Condo. Ass'n, Inc.*,
  881 F.2d (11th Cir. 1989), vacated, 895 F.2d 711 (11th Cir. 1990) .... 15

*Smith v. Lockheed-Martin Corp.,*
 644 F.3d 1321 (11th Cir. 2011) ........................................................... 26

*Tillis on behalf of Weschler v. Brown,*
 12 F. 4th 1291 (11th Cir. 2021) ........................................................... 15

*United States v. Four Parcels of Real Prop. in Greene &*
*Tuscaloosa Ctys. in Ala.,*
 941 F.2d 1428 (11th Cir. 1991) (en banc) ..................................... 16, 18

*Young v. United Parcel Service,*
 575 U.S. 206 (2015) ............................................................. 11, 19, 21

## Statutes

ACA Section 1557 ....................................................................... 7

## Rules

Eleventh Circuit Rules 26.1-1, 26.1-2, 26.1-3 ..................................... C-1

FRAP 3 .................................................................................. 15

FRAP 26.1 ................................................................................ 1

FRCP 56 ................................................................................. 15

## Other

 worldpopulationreview.com/us-city-rankings/how-many-cities-are-in-
the-us .................................................................................. 2

## ARGUMENT AND CITATION OF AUTHORITES

This en banc appeal presents this Court with competing views of the application of *Bostock v. Clayton County*, 590 U.S. 644 (2020), and other Supreme Court precedent to the issue in this case – whether a plan that covered most of Lange's transition care, but not sex change surgery, could permissibly draw a line similar to those drawn in several of the almost 100 plan exclusions. Defendants submit that acceptance of Lange's view would compel the conclusion that no plan could ever deny *any* treatment associated with a gender transition. Conversely, acceptance of Defendants' view would mean finding – at the very least – that a plan covering most transition related care is not *facially* discriminatory on the basis of transgender status. That is all this appeal requires.

This Reply Brief summarizes and examines the respective positions of Lange and Defendants, addresses the ramifications of applying their respective views, and demonstrates that case law and policy considerations weigh in favor of (1) reversing both the District Court's finding of facial discrimination and its grant of summary judgment to Lange and (2) dissolving the Injunction.

## I.    The parties' positions reflect different views of discrimination, the impact of *Bostock*, and summary judgment.

### A.    *Bostock*.

**Lange.**    Lange contends *Bostock* clearly and independently answers the issue in this case, arguing that because (1) discrimination on transgender status is discrimination because of sex and (2) the Exclusion[1] impacts Lange (who is transgender), there is *facial* discrimination obviating any need to prove discriminatory intent.  [App. Doc. 128 at 32-38.]  If that were *Bostock*'s true import, all health plans would now be required to cover all transgender procedures.  But they are not.[2]

---

[1] As has been the parties' practice, Defendants refer to both the medical exclusion for sex change surgery and/or the reversal of a sex change and the pharmacy exclusion for drugs for sex change surgery as "the Exclusion."

[2] Statistics submitted by one of Lange's amici indicate *Bostock*'s holding was not as clear on health plan coverage as Lange now suggests. According to a survey by the Human Rights Campaign, the number of cities offering health plan coverage for sex change surgery increased from 188 in 2022 to 215 in 2023.  [App. Doc. 145 at 18.]  Since there are over 19,000 incorporated cities in America and 310 with populations of over 100,000, these numbers hardly signal conclusive impact of *Bostock* on health plans.  https://worldpopulationreview.com/us-city-rankings/how-many-cities-are-in-the-us (last visited Nov. 9, 2024).  Citing another

The principal problem with Lange's view is that it makes *Bostock* do more than it can. To illustrate that *Bostock* is not determinative of all transgender cases, one need look no further than *Copeland v. Georgia Department of Corrections*, 97 F.4th 766 (11th Cir. 2024). In that case, the same panel that heard this case reversed summary judgment to the employer as to harassment based on transgender status. However, *Bostock* was not determinative – it only went as far as validating that harassment based on transgender status is actionable under Title VII. 97 F.4th at 775. The panel still had to evaluate the record evidence under harassment case law to determine if it was sufficiently severe or pervasive. 97 F.4th at 775-76. *Bostock* serves the same threshold purpose here as well. Discrimination in the provision of benefits based on transgender status would violate Title VII. But that does not mean a plan that covered most of Lange's transition care and excluded only transition surgery is facially discriminatory.

A secondary weakness with Lange's application of *Bostock* is that it relies on consideration of the Exclusion in isolation from how the Plan as

---

study by the consultancy Mercer, half of large employers cover sex change surgery – meaning half do not. [App. Doc. 145 at 18.]

a whole works – or how health plans work in general.  To accept Lange's view would mean no aspect of transition care could ever be excluded – even if a plan were otherwise generous in its coverage of transition treatments.  As shown below, this is not the law and it goes far beyond the limited holding of *Bostock*.

**Defendants.**  Based on the majority's disavowal of having decided any of "these consequences" pointed out in Justice Alito's dissent, 590 U.S. at 681, Defendants contend *Bostock* did not answer the question presented in this case.  This case is unique in that an exclusion of one type of surgery (among many other plan exclusions), equally applicable to all plan participants, presents a different context than an ordinary employment claim based on "ultimate employment actions" (such as failure to hire, failure to promote, demotion, or discharge due to qualifications, performance, or conduct).  *Bostock* left for another day the specific issue of what constitutes discrimination in employment benefits based on transgender status.[3]

---

[3] Lange's reliance on the Fourth Circuit's decision in *Kadel v. Folwell,* 100 F.4th 122 (4th Cir. 2024) (en banc) is misplaced.  Title VII was not at issue on appeal, and the Equal Protection finding was based on *Grimm v. Gloucester County Sch. Bd.,* 972 F.3d 586 (4th Cir. 2020), which this Circuit declined to follow in its Equal Protection analysis in

Most examples of discrimination discussed in *Bostock* involved sexual orientation scenarios, but one offered this scenario based on transgender status:

> Or take an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an *otherwise identical employee* who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth. Again, the individual employee's sex plays an unmistakable and impermissible role in the discharge decision.

590 U.S. at 660 (emphasis added). In a health insurance context, who is that "otherwise identical employee"? With or without surgery, Lange is not "otherwise identical" to a natal female in need of a vaginoplasty – the anatomical differences make the procedures materially different (as addressed further below).[4]

---

*Adams v. Sch. Bd. of St. Johns County, Florida*, 57 F.4th 791, 812 (11th Cir. 2022) (en banc).

[4] Lange's amici point out that identifying a comparator is but one way to demonstrate discrimination. [App. Doc. 132 at 28-29.] While true, Lange has not identified factors supporting a "mosaic" of discrimination or direct evidence or (as argued throughout this case) facial discrimination. *See, e.g., Lewis v. City of Union City*, 918 F.3d 1213, 1220 n. 6 (11th Cir. 2019) (en banc).

The exclusion challenged here pre-dated, by at least 8 years, Lange's application for employment, and pre-dated, by more than 20 years, Lange's first informing Defendants that she wished to identify as female moving forward and requested that she be permitted to dress in accordance with the Sheriff's Office's female dress policy. [Doc. 179-3, ¶ 99.] That request was granted the same day. [Doc. 179-3, ¶ 106.] Also in 2018, Lange took leave to undergo "top surgery." [Doc. 179-3, ¶ 35.] Lange, the only known transgender participant in the Health Plan, remains employed in the Sheriff's Office to this day.

As such, the facts in this case are wholly distinguishable from those in either *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F. 3d 560 (6th Cir. 2018) ("*Harris*") aff'd sub nom., *Bostock*, 590 U.S. at 644, and *Glenn v. Brumby*, 663 F. 3d 1312 (11th Cir. 2011), both cited by Lange. [App. Doc. 128 at 38.] Summary judgment was granted to the plaintiffs in both *Harris* and *Glenn* – the latter of which was *not* a Title VII case – based on the respective defendants' *admitted* discriminatory motives. *See Harris*, 884 F. 3d at 569 (noting funeral home fired Stephens because "he was no longer going to represent himself as a man. He wanted to dress as a woman"); *Glenn*, 663 F. 3d at 1320 (Brumby fired Glenn

because he was "a man dressed as a woman and made up as a woman;" it was "the sheer fact of the transition."). Lange, who remains employed, cannot point to any such evidence here.

Moreover, there is no evidence that the exclusion was put into (or maintained in) the Plan because of Lange's – or anyone else's – transgender status or due to any other manifestation of transgender animus. Rather, the County was motivated by a desire to constrain the cost of the Plan as a whole. While Lange repeats that the County did not consider cost at various points during Lange's challenges in this case [App. Doc. 128 at 15, 19, 58-59], she ignores that the decisions in question were never about cost. First, when Lange requested a plan change at a County Board of Commissioners meeting in February 2019, the terms of the Plan had already been set for the year, so her request was denied at that time. [Doc. 179-3, ¶ 174.] Second, when prompted by third party administrator Anthem about the nondiscrimination mandate in Section 1557 of the Affordable Care Act, the County's Personnel Director correctly determined that the County's self-funded plan was not subject to Section 1557. [Doc. 179-3, ¶ 91.] Neither instance supports an inference that cost was not a factor when the Board of Commissioners

considered removing the Exclusion in November 2019 before deciding to retain all 68 medical exclusions and all 29 pharmacy exclusions to control the overall cost of the Plan.  [Doc. 137-7 at ¶ 4; Doc. 137-9 at ¶ 4; Doc. 137-8 at ¶ 4.]

Accordingly, *Bostock* does not support a finding of facial discrimination here.  Rather, *Bostock*'s test of changing one thing at a time, 590 U.S. at 656, shows the Plan is not discriminatory because changing the sex of the person requesting transition surgery would make no difference – whether a natal male, natal female, cisgender male, cisgender female, transgender male, or transgender female desired sex change surgery, the Exclusion would apply equally to all to deny it.

### B. *Manhart.*

**Lange.**  Lange claims the "simple test" in *City of Los Angeles v. Manhart* is "whether the evidence shows treatment of a person in a manner which but for that person's sex would be different."  [App. Doc. 128 at 33, quoting *Manhart*, 435 U.S. 702, 711 (1978).]  Lange claims this test shows discrimination because *the Exclusion* (not the entire plan) "withholds" (at other places "withdraws") coverage for vaginoplasty.  [*Id.*

at 34.]⁵  But the Exclusion applies to all plan participants, regardless of sex in general or transgender status in particular.

**Defendants.**  Defendants argue that *Manhart* stands for the simple proposition that charging (14.84%) more to female pension plan participants violated Title VII – but that's not this case.  Here, Lange had the same coverage at the same cost as all other plan participants, and the Exclusion applies to all plan participants – male or female, transgender or not.  Thus, while the Exclusion *impacts* only transgender people seeking a sex change [Doc. 179-3, ¶ 78], the Exclusion *applies* to all plan participants.  Thus, *Manhart* is not determinative.

## C. *Newport News*

**Lange.**  Citing *Newport News Shipbldg. & Dry Dock Co. v. EEOC,* Lange contends that facial discrimination may be found "even if the magnitude of the discrimination is smaller."  [App. Doc. 128 at 46, quoting 462 U.S. 669, 683 (1983).]  This quote from *Newport News* appears in the opinion after the Court's discussion of *Manhart.*  462 U.S.

---

⁵ Lange's language (withdraw/withhold) suggests the Plan is animate and pulls existing coverage away if a person is transgender.  But this Exclusion has been in the Plan since at least 1998, as Lange knew when she first approached Defendants about transitioning.  [Doc. 179-3, ¶ 94.]

at 682-83.  However, even if the magnitude of the discrimination at issue in *Newport News* (omitting coverage of pregnancy for the wives of male employees) was more subtle than the discrimination in *Manhart* (requiring female participants to make higher retirement plan contributions for the same benefit), that does not mean a plan that applies one of almost 100 exclusions to *all* plan participants is discriminatory.

**Defendants.**  Defendants cite *Newport News* for the proposition that a different coverage package, based on sex, violates Title VII.  [App. Doc. 118 at 62-63.]  Again, that's not this case.  Lange had the same coverage as all other plan participants.  That coverage may have impacted her differently than others – like the exclusion for sexual dysfunction impacts cisgender plan participants differently than it impacts Lange – but she had the same coverage available to her (which was lacking in *Newport News*).  And as Judge Brasher observed in dissent from the panel opinion, viewing this issue differently blurs the line between disparate *treatment* claims and disparate *impact* claims.  [App.

Doc. 79-1 at 24-25.]    Here, Lange is pursuing a discrimination claim

based on disparate treatment, which requires proof of intent.[6]

**D. *Young*.**

**Lange.**    Lange posits that *Young v. United Parcel Service* is

irrelevant to this appeal because it merely interpreted and applied the

Pregnancy Discrimination Act [App. Doc. 128 at 56-57], even though that

analysis occurred only *after* the Court rejected Young's initial theory that

---

[6] Lange also persists in claiming that partial coverage amounts to a partial violation of Title VII, which is still a violation. [App. Doc. 128 at 46.]  This misses the point of this appeal.  The District Court found a *facial* violation, which is untenable when most of Lange's care was, in fact, covered.  The DOJ's amicus brief cites three extra-circuit cases for the supposed proposition that partial coverage was found to violate Title VII.  [App. Doc. 132 at 33-34.]  But *Kadel v. Folwell,* 100 F.4th 122, 134 (4th Cir.) (en banc), involved only Equal Protection (and the Medicaid Act and Affordable Care Act) on appeal – not Title VII.  *Fletcher v. Alaska,* 443 F. Supp. 3d 1024, 1027 (D. Alaska 2020), appears to have adjudicated the 2017 plan, which excluded *all* transgender coverage and led the plaintiff to obtain surgery in Thailand (before the 2018 plan opened up coverage to certain non-surgical treatments).  Finally, *Boyden v. Conlin,* 341 F. Supp. 3d 979, 988 (W.D. Wis. 2018), involved coverage of mental health treatment for gender dysphoria and hormones (unless the hormones were a build up to surgery), but not surgery.  The *Boyden* court concluded that arrangement violated Title VII.  *Id.* at 995.  None of these outcomes is controlling on this Court, none is the product of a plausible extension of *Bostock*, and none reflects an analysis dictated by Eleventh Circuit precedent.

purported to grant "most favored nation" status to pregnant employees. 575 U.S. 206, 220-23 (2015).

**Defendants.**  Defendants highlight the *Young* Court's treatment of the "most favored nation" status argument and how Lange's position in this case would amount to the same thing for transgender individuals. [App. Doc. 118 at 64.]  Lange suggests eliminating the Exclusion would not result in preferential treatment but "simple equality."  [App. Doc. 128 at 60.]  But her concept of "simple equality" overlooks the differential it would create with other plan participants whose exclusions remain in place.

### E.    Differences/Similarities in surgical procedures.

**Lange.**  As the party bearing the burden of proof, it is Lange's burden to show a similarly situated comparator who was treated better. *Lewis v. City of Union City*, 918 F.3d 1213, 1221 (11th Cir. 2019).  In this health insurance context, that burden requires Lange to show a similarly situated comparator who desires the same surgery.  She has not done so.

Lange initially contends that an ordinary vaginoplasty performed on a natal female is the "very same" procedure as used in a so-called "transgender vaginoplasty."  [App. Doc. 128 at 13.]  But later, Lange

concedes that surgical differences exist, only to characterize such distinctions as "immaterial." [App. Doc. 128 at 51.] Lange also points out that, despite surgical differences, the procedures are billed using the same Current Procedural Terminology (CPT) codes. [App. Doc. 128 at 49; App. Doc. 132 at 26-27.] However, the issue for en banc review involves whether the Plan facially discriminates, not how the procedure is coded for reimbursement.

Delving further, Lange also contends that the presence of penile or scrotal tissue does not warrant distinguishing a transition vaginoplasty from a reparative one. [App. Doc. 128 at 52.] That misses the point. The very presence of penile or scrotal tissue demonstrates the distinction – a natal male has such tissue (indeed, it is used to form the neovagina) while a natal female does not.[7]

Along the way, Lange contends it is undisputed that her "vaginoplasty" would have been covered under the Plan but for the Exclusion. [App. Doc. 128 at 34, citing 179-3, ¶ 77.] The specific question at deposition was whether, without an exclusion, sex change surgery

---

[7] Tellingly, Lange is distancing herself from her own experts' testimony. [Doc. 148-2 at ¶ 25; Doc. 144-1 at ¶ 25.]

would be covered under an Anthem health plan if it was medically necessary. [Doc. 179-3, ¶ 77.] That comparison is between one health plan and another; not one procedure and another.[8]

**Defendants.** In addition to the anatomical differences pointed out in Defendants' principal brief (the necessary removal of the penis and testicles and the inversion of penal skin to *create* a vagina) [App. Doc. 118 at 77-79], and contrary to what Lange contends is the routine nature of vaginoplasties under the same CPT code, Lange had to seek out Dr. Rachel Bluebond-Langner, a New York surgeon, as an expert in "performing gender-affirming surgeries" because no one in Lange's community performs bottom surgery. [Doc. 144-1, ¶¶ 1, 23.] Indeed, "approximately 95%" of Dr. Bluebond-Langner's patients "are transgender individuals seeking gender-affirmation surgeries." [*Id.*, ¶ 8.] This statement demonstrates that vaginoplasty *for transgender patients* is such a unique – and therefore *non*-routine – procedure that a surgeon specializes in doing almost nothing but that procedure.

---

[8] The rest of the statement of material fact specifically asks about mastectomies and mental health – not vaginoplasty. [Doc. 179-3, ¶ 77.]

The difference in surgical procedures between sex *change* surgery (the creation or construction of a vagina) and organ *repair* surgery (the repair or reconstruction of an existing vagina) defeats the argument that the Plan covers *the same* procedure for natal females but not transgender females. The additional – and unavoidable – steps of removing the penis and testicles are significant in this distinction.

### F.     Summary judgment standard.[9]

**Lange.** As an initial matter, Lange's arguments on appeal fail to take into account the unique procedural posture of this case at summary judgment, as she clearly fell short of meeting the applicable standard under Rule 56 as the moving party bearing the burden of proof on her Title VII claim. In this regard, "[a]n understanding of proof … is essential to the proper application of the summary judgment standard." *United*

---

[9] To the extent Lange's reliance on *Showtime/The Movie Channel, Inc. v. Covered Bridge Condo. Ass'n, Inc.*, 881 F.2d, 983, 987 (11th Cir. 1989), vacated, 895 F.2d 711 (11th Cir. 1990), reflects a subtle effort to call into question this Court's jurisdiction over the District Court's summary judgment order, Defendants note that *Showtime* was decided prior to the 2021 amendment to FRAP 3(c)(4) and that it fails to apply the "inextricably intertwined/necessary to ensure meaningful review" standard applicable to the pendent jurisdiction analysis. *See, e.g., Tillis on behalf of Weschler v. Brown*, 12 F. 4th 1291, 1297 (11th Cir. 2021).

*States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in Ala.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) ("*Four Parcels*").

Because Lange bears the burden of proof on her Title VII claim— and as the movant on summary judgment—she is required to "show affirmatively the absence of a genuine issue of material fact: [she] [was required to] support [her] motion with credible evidence … that would entitle [her] to a directed verdict if not controverted at trial." *Id.* at 1438 (emphasis in original) (internal quotation marks and citation omitted). The case authority upon which Lange relies, however, addresses a legal standard that is inapplicable here inasmuch as the movant in each of those cases did *not* bear the burden of proof at trial.[10]

Further with regard to summary judgment, Lange now concedes there is no dispute that the Plan covered some of her transition related care.  [App. Doc. 128 at 44-45.]  But Lange goes on to claim that this fact

---

[10] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 245-47, 256-57 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 324 (1986); *Avirgan v. Hull*, 932 F.2d 1572, 1579 (11th Cir. 1991).  [App. Doc. 128 at 27, 43.] The non-binding holding in *Fontenot v. Upjohn Co.*, 780 F.2d 1190 (5th Cir. 1986) [*Id.* at 52]—which also predates the Supreme Court's summary judgment trilogy of *Anderson, Celotex*, and *Matsushita Elec. Ind. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)—is similarly distinguishable.

is somehow immaterial. [*Id.* at 45.] It was material in the District Court's view. To the contrary, the summary judgment order made much of Plaintiff's Statement of Undisputed *Material* Facts No. 77 and 78. [Doc. 205 at 22-23.][11] The District Court even went too far in extrapolating with Fact 77, stating incorrectly that hormones for menopause were covered, but hormones for a gender transition were not. [Doc. 205 at 23.] Lange cannot revise the summary judgment record (or Order), which belies disputes of fact on what is covered and what is not.

Lange also concedes the existence of other exclusions but argues that because only one exclusion prevented her from having sex change surgery, these other exclusions are not relevant. [App. Doc. 128 at 47-48.] But Lange omitted any mention of applicable case law that health plans are to be construed as a whole, making the other exclusions relevant to

---

[11] As addressed separately above, Fact 77 states broadly that the Exclusion denies coverage of certain procedures that would otherwise be covered – making specific references to mastectomies and mental health coverage. The County disputed Fact 77 to the extent it suggests that *all* treatment for a gender transition was excluded – citing Lange's testimony that most of her care was covered. [Doc. 179-3, ¶ 77.] Fact 78 states that the only plan participants *impacted* by the Exclusion are transgender, which the County admitted. [Doc. 179-3, ¶ 78.] Nevertheless, like all other exclusions, the Exclusion *applies* to all plan participants.

show consistent application with other health conditions. *See, e.g., Kirby v. Anthem, Inc.,* Civil Action No. 1:19-CV-000597-ELR, 2019 WL 2004128, at *15 (N.D. Ga. Mar. 21, 2019) (noting "a contract should not be torn apart and construed in pieces, but the court should look to the entire instrument ...") (quoting *Perimeter Mall, Inc. v. Retail Sense, Inc.*, 162 Ga. App. 465, 466 (1982)).

Indeed, "[i]t's the comparison … that tells us whether a health insurance policy is facially discriminatory." [App. Doc. 79-1 at 23 (Brasher, J. dissenting), vacated, App. Doc. 111-1 at 2.] The Plan's other exclusions for the sexual and reproductive health of the approximately 1,499 cisgender plan participants constitute valid comparator evidence – particularly with all reasonable inferences drawn in favor of defendants as non-movants on Lange's motion for summary judgment – clearly supporting a reasonable inference that Lange was *not* treated more adversely than cisgender participants in being denied coverage for her "bottom surgery." *Four Parcels,* 941 F.2d at 1437-38.

**Defendants.** Defendants assert that the District Court erroneously treated as *un*disputed certain facts that *are* very much disputed – particularly where Lange has the burden of proof. [App. Doc.

118 at 67-69.]  For example, the existence of other exclusions in the Plan shows that transition care was treated like other medical conditions.

In bringing her discrimination claim as one for alleged disparate treatment under Title VII, Lange "must establish that [Defendants] had a discriminatory intent or motive for taking [this] job-related action." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (citation and internal quotation marks omitted); see also *Bostock*, 590 U.S. at 657-58 ("the difference in treatment based on sex must be intentional"). As the Supreme Court held in , "disparate treatment law normally permits an employer to implement policies that are not intended to harm members of a protected class, even though their implementation sometimes harms those members, as long as the employer has [] legitimate, nondiscriminatory, non-pretextual reasons for doing so."  Therefore, even though the plaintiff in *Young* was the only pregnant employee impacted by the defendant employer's policy, this did not satisfy or otherwise relieve her of her burden of proving discriminatory intent.  *Id*. at 228-32.

## II.    Lange's Position is not Consistent with the Law.

In Lange's view, the mere fact that the Plan's terms impacted her negatively established that the Plan is discriminatory.  The question

arising from this position is: where does it end?  Lange and her amici contend that *Bostock* compels the remedying of "*any* differences in treatment or favor" [App. Doc. 132 at 33] and makes unlawful *any* health plan provision that does not cover a treatment for gender transition. [App. Doc. 128 at 38.] This is an overly broad application of *Bostock*.

In fact, employing this application of *Bostock*, Lange finds "double discrimination" in the Plan's exclusion of both sex change surgery and the reversal of a sex change.  [App. Doc. 128 at 40.]   As Defendants have pointed out, however, the Exclusion's applicability to reversals shows that the Plan does not treat anyone worse *because of* sex (or gender identity) – it turns on the kind of surgery at issue, not the sex or gender identity of the patient.  The fact that Lange sees discrimination in the application of the Exclusion to a patient who has *turned from being transgender* further illustrates the (over)expansiveness of her view of *Bostock*.

Moreover, in response to the argument that the Exclusion focuses on procedure or diagnosis, Lange contends "the text of the Exclusion does not refer to diagnosis or procedure, it refers to sex." [App. Doc. 128 at 38-39.]  This is wrong.  The Exclusion refers to the procedure of sex change

surgery ("26. **Sex Change Drugs** *Drugs for sex change surgery*"). [Doc. 155-1 at 74.]

As argued by Defendants, adopting the position advocated by Lange and embraced by the District Court would establish "most favored nation" status for transgender employees. Such a result is neither required by a proper application of *Bostock* nor consistent with longstanding precedent under Title VII. *See, e.g., Young*, 575 U.S. at 222 ("[D]isparate treatment law normally permits an employer to implement policies that are not intended to harm members of a protected class, even though their implementation sometimes harms those members, as long as the employer has [] legitimate, nondiscriminatory, non-pretextual reasons for doing so."); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (charting "a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury.").[12]

---

[12] Although *Harris* is a harassment case and not a disparate treatment case, Lange's view of *Bostock's* reach would eliminate the balancing of *Harris* for a no-offenses standard as to transgender employees. *Bostock* does not go that far, and only Congress could grant such a right to any group of employees and impose such an obligation on employers.

Instead, the law as applied to the facts of this case requires a fresh look to determine whether a long-standing plan coverage arrangement that does not exclude transgender individuals from participation or charge them more for coverage, that applies equally to male and female participants alike, and that reflects handling of transition care like the treatment of other health conditions under the Plan so overtly smacks of differential treatment that it amounts to *facial* discrimination.

## III.  Summary Judgment for Lange Should Be Reversed and the Injunction Should Be Dissolved.

Ultimately, this appeal is about whether the District Court's finding of facial discrimination based on *Bostock* was a correct application of law.  It was not.  As shown in Defendants' principal brief, *Bostock* did not purport to answer the question of whether a health plan offering coverage for most transition treatments, but not surgery, is facially discriminatory under Title VII. [App. Doc. 118 at 49-57.]  Following this logic makes sense, as it honors the limitation of *Bostock* by *Bostock's* own author. *Id.* at 681 ("the *only* question before us is whether an employer who fires someone for being … transgender has discharged or otherwise

discriminated against that individual 'because of such individual's sex'")
(emphasis added).[13]

"To discriminate against a person…would seem to mean treating
that individual worse than others who are similarly situated." *Bostock*,
509 U.S. at 657 (internal quotation marks and citation omitted); *see also*
*Id.* at 681 ("the term 'discriminated against' refers to 'distinctions or
differences in treatment that injure protected individuals'") ("citation
omitted"). And to discriminate on the grounds of transgender status
"requires an employer to intentionally treat individual employees
differently because of their sex." *Bostock*, 590 U.S. at 661. Rather than
identifying record evidence addressing this standard of discriminatory
*treatment*, Lange focuses instead on the *impact* of the Exclusion on her.
That is not enough.

---

[13] This Court's statement of the issue makes reference to the
concept of "medically necessary" care. Lange acknowledged:
"[Defendants] point out that the Plan does not cover all *medically*
*necessary* care and contains additional exclusions. Brief at 37–40, 52–53.
That is true." [App. Doc. 128 at 47 (emphasis added).] Thus, even Lange
does not assert that the medical necessity of a transgender vaginoplasty
is determinative of this case. Lange also took no issue with Defendants'
statement of the medical necessity standard in Anthem's document, the
low burden it represents, and its distinction from a "code blue" emergency
situation. [App. Doc. 118 at 57-58.]

Lange contends, and the District Court agreed, that *Bostock* requires a finding that the Exclusion violates Title VII on its face because only transgender participants would wish to undergo sex change surgery. But this is not a disparate impact case. Thus, it is not enough to simply say that Title VII prohibits sex discrimination in health benefits and that, per *Bostock*, sex discrimination includes discrimination based on transgender status. [App. Doc. 128 at 27-28.] Neither *Bostock* nor any of the other Supreme Court precedents upon which Lange relies speak to whether Title VII prohibits an employer from providing less than complete health insurance coverage for a particular medical condition or diagnosis, even if that condition or diagnosis may be applicable to a singular trait; in this case, transgenderism.

Indeed, in explaining its holding in *Manhart*, the Supreme Court expressly stated: "we do not suggest that [Title VII] was intended to revolutionize the insurance and pension industries. All that [was] at issue [in *Manhart* was] a requirement that men and women make unequal contributions to an employer-operated pension fund." *See Manhart*, 435 U.S. at 716-17. Likewise, in *Bostock*, the Supreme Court left for another day the issue of whether Title VII prohibits "employer-

provided health insurance plans that do not cover costly sex reassignment surgery," *see Bostock*, 590 U.S. at 730 (Alito J., dissenting), stating that "[w]hether other policies and practices might or might not qualify as unlawful discrimination or find justifications under other provisions of Title VII are questions for future cases, not these," *see* id. at 681.[14] Accordingly, *Bostock* must be read as addressing only the threshold Title VII statutory construction question presented in that case, and *not* the unrelated issue of whether a health plan that covered most of Lange's care is facially discriminatory.

Context matters in employment cases and the context of a health insurance plan cannot be ignored here. In typical employment cases, a model employee may be subject to a lawful discharge when an employer conducts a workforce reduction for financial reasons. *Kirkland v. City of Tallahassee*, 856 F. App'x 219, 224 (11th Cir. 2021); *Mitchell v. City of Lafayette*, 504 F. App'x 867, 870-71 (11th Cir. 2013). Conversely, an employee who indisputably violated an employer's work rule may

---

[14] If the Supreme Court precedents upon which Lange relies here – either individually or collectively – answered the question raised by Justice Alito in dissent, the Supreme Court could have said so, as almost all of those cases were the subject of discussion in the majority opinion.

nonetheless be able to show discrimination by proffering evidence that similarly situated employees violated the same rule but were disciplined less harshly. *Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1322-23 (11th Cir. 2023); *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1342-43 (11th Cir. 2011). This is the context in which *Bostock* was decided.

But in a health insurance case, an employee's qualifications, performance, or conduct (or misconduct) are utterly irrelevant – benefits under a health plan are equally available to all eligible employees, good or bad. What is relevant – and, furthermore, undisputed in the context of this case – is that "*[l]ike all insurance plans*, [Defendants'] health plan contains a number of exclusions, i.e., certain types of medical care that are not covered." [Doc. 179-3, ¶ 74 (emphasis added).] Indeed, there are a total of 68 specifically-enumerated exclusions for services, supplies, and equipment, as well as 29 specifically-enumerated exclusions for prescription drugs, in the County's Health Plan. [See Doc. 155-1, pp. 67-72.] Neither the mere incorporation of such exclusions nor their number violates Title VII. And the fact that transgender care is handled like other medical situations under the Plan – where most treatment is

covered, but certain expensive treatments are not – means the Plan cannot be facially discriminatory.

## CONCLUSION

For each of the reasons set forth above, Defendants respectfully request that this Court reverse the District Court's Order granting summary judgment to Lange on her Title VII claim and dissolve the Injunction entered pursuant to said Order.

Respectfully submitted, this 20th day of November 2024.

*s/ Sharon P. Morgan*
Sharon P. Morgan
Georgia Bar No. 522955
R. Read Gignilliat
Georgia Bar No. 293390
William D. Deveney
Georgia Bar No. 219744
Patrick L. Lail
Georgia Bar No. 431101

ELARBEE, THOMPSON, SAPP & WILSON, LLP
229 Peachtree Street, N.E., Suite 800
Atlanta, Georgia 30303
(404) 659-6700 (telephone)
(404) 222-9718 (facsimile)
morgan@elarbeethompson.com
gignilliat@elarbeethompson.com
deveney@elarbeethompson.com
lail@elarbeethompson.com

*Attorneys for Defendants-Appellants*

# CERTIFICATE OF COMPLIANCE

Counsel for the Appellants hereby certifies that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B). This brief contains 5,551 words.

*s/ Sharon P. Morgan*
Georgia Bar No. 522955

ELARBEE, THOMPSON, SAPP & WILSON, LLP
229 Peachtree Street, N.E., Suite 800
Atlanta, Georgia 30303
(404) 659-6700 (telephone)
(404) 222-9718 (facsimile)
morgan@elarbeethompson.com

*Attorneys for Defendants-Appellants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify pursuant to Rule 25(d)(2) of the Federal Rules of Appellate Procedure that a true and correct copy of this **EN BANC REPLY BRIEF OF DEFENDANTS-APPELLANTS** has been filed via the Court's ECF filing system, which will automatically serve Plaintiff-Appellee's attorneys as follows:

Kenneth E. Barton, III
M. Devlin Cooper
Wesley R. Powell
Jill K. Grant
Catherine E. Fata
Amanda M. Payne
David Brown
Gabriel Arkles
Kevin M. Barry

This the 20th day of November 2024.

*s/ Sharon P. Morgan*
Georgia Bar No. 522955

ELARBEE, THOMPSON, SAPP & WILSON, LLP
229 Peachtree Street, N.E., Suite 800
Atlanta, Georgia 30303
(404) 659-6700 (telephone)
(404) 222-9718 (facsimile)
morgan@elarbeethompson.com

*Attorneys for Defendants-Appellants*